# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| SPECIALTY PRODUCTS HOLDING CORP., | : | Case No. 10-_____ (___) |
| et al.,[1] | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |

## DECLARATION OF STEPHEN J. KNOOP
## IN SUPPORT OF FIRST DAY PLEADINGS

1.      I am the Chairman and Chief Executive Officer of both Specialty Products Holding Corp. ("SPHC") and Bondex International, Inc. ("Bondex"), which are the debtors in the above-captioned chapter 11 cases (collectively, the "Debtors"). I have held these positions with SPHC since April 1, 2010, and with Bondex since May 26, 2010.

2.      I am also the Senior Vice President of Corporate Development for RPM International Inc. ("International") and have served in that capacity since October 2006. I have held other positions with International since 1996.

3.      SPHC is a wholly owned subsidiary of non-debtor International. SPHC is the direct parent of Bondex, and the direct or indirect parent of certain additional domestic and foreign non-debtor subsidiaries. Neither SPHC nor Bondex has any business operations.

4.      Prior to my employment with International, I was employed as an associate specializing in corporate and securities law for the Cleveland law firm of Calfee, Halter & Griswold. I am a graduate of Michigan State University's James Madison College and the University of Michigan Law School.

---

[1]      The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Specialty Products Holding Corp. (0857); and Bondex International, Inc. (4125). The Debtors' address is 4515 St. Clair Avenue, Cleveland, Ohio 44103.

5.     As described below, SPHC, through its non-debtor, domestic subsidiaries (collectively, the "Operating Subsidiaries" and, together with the Debtors, the "SPHC Companies"),[2] is a leading manufacturer, distributor and seller of various specialty chemical product lines.  The asbestos liabilities of the Debtors have precipitated these chapter 11 cases.

6.     On the date hereof (the "Petition Date"), each of the Debtors commenced a reorganization case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (the "First Day Pleadings").

7.     I submit this Declaration in support of the First Day Pleadings.  I have reviewed each of the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtors and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

8.     In my capacity as Chairman and Chief Executive Officer, I am familiar with the Debtors' and the Operating Subsidiaries' day-to-day operations, assets, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon:  (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (d) my opinion based upon my experience and knowledge of the Debtors' and the Operating Subsidiaries' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]     The Operating Subsidiaries are the following entities:  Chemical Specialties Manufacturing Corporation; Day-Glo Color Corp.; Dryvit Systems, Inc.; Dryvit Holdings, Inc.; Guardian Protection Products, Inc.; Kop-Coat, Inc.; RPM Wood Finishes Group, Inc.; and TCI, Inc.

9.     Part I of this Declaration provides a description of the Debtors' corporate and capital structures and an overview of the Debtors' businesses. Part II of this Declaration describes the circumstances that precipitated the commencement of these chapter 11 cases, as well as the Debtors' plans for these cases. Those circumstances are also described in more detail in the Debtors' Informational Brief filed with the Court concurrently with this Declaration. Part III of this Declaration sets forth the relevant facts in support of each of the First Day Pleadings.

## Part I

## The Debtors' Corporate and Capital Structure and Businesses

10.     SPHC was initially incorporated under the name Republic Powdered Metals, Inc. and later changed its name to RPM, Inc. Until 2002, SPHC was the parent holding company for the RPM businesses that then existed. In 2002, SPHC engaged in a corporate reorganization, which resulted in International, an entity formed at that time, becoming the parent holding company in place of SPHC, and SPHC and other companies becoming intermediate holding companies. In May 2010, SPHC changed its name from RPM, Inc. to Specialty Products Holding Corp.

11.     As stated above, Debtor SPHC is the parent of Debtor Bondex, as well as the direct parent of the eight domestic Operating Companies and the indirect parent of certain other domestic and foreign non-debtor subsidiaries. As an intermediate holding company, SPHC itself has no operations and its assets consist primarily of its direct and indirect ownership interests in its subsidiaries. Bondex has no operations or material assets. Non-debtor International owns, directly or indirectly, each of the Debtors and the Operating Companies.

12.     Neither the Debtors nor the Operating Subsidiaries have any funded indebtedness.

13.     The SPHC Companies are leading manufacturers, distributors and sellers of various specialty chemical product lines, including exterior insulating finishing systems, powder coatings, fluorescent colorants and pigments, cleaning and protection products, fuel additives, wood treatments and coatings and sealants, in both the industrial and consumer markets. Their family of products include those marketed under brand names such as CCI, Chemspec, Day-Glo, Dryvit, Guardian, Mohawk, Kop-Coat, TCI and Valvtect.

14.     During fiscal year 2009, the SPHC Companies generated consolidated revenues of approximately $329 million and pre-tax income of approximately $19 million.[3] As of April 30, 2010, the SPHC Companies had 960 full- and part-time employees.

15.     International is a multinational holding company with subsidiaries that manufacture and market high-performance coatings, sealants and specialty chemicals, primarily for maintenance and improvement. Its products are sold in approximately 150 countries and territories. International's stock is publicly traded on the New York Stock Exchange under the trading symbol "RPM," and is owned by approximately 300 institutional investors and approximately 85,000 individuals.

16.     International, through its subsidiaries, employs approximately 9,700 people worldwide and operates approximately 90 manufacturing facilities in more than 20 countries. For the fiscal year ended May 31, 2009, International's net sales were approximately $3.4 billion, with approximately 67 percent of the sales to industry worldwide and the remaining approximately 33 percent to consumers mainly in North America. SPHC and its subsidiaries represent less than 9 percent of International's consolidated revenues and less than 11 percent of International's consolidated pre-tax income for fiscal year ended May 31, 2009.

---

[3]     The Debtors' fiscal year runs from June 1 to May 31.

## Part II

### Events Leading to the Commencement of
### These Cases and the Debtors' Plans for These Cases

17.     The SPHC Companies' businesses and operations are healthy and

profitable, and generate cash. As of the Petition Date, the SPHC Companies had no funded

indebtedness, and their anticipated collections and access to financing were more than sufficient

to meet the SPHC Companies' operating needs. As described more fully in the Debtors'

Informational Brief filed with the Court concurrently with this Declaration, these cases have

been precipitated by the continuing demands of asbestos plaintiffs in the more than 10,000

asbestos-related bodily injury lawsuits pending against the Debtors.

18.     The Debtors' purported asbestos-related liabilities derive principally if not

exclusively from the acquisition of the Reardon Company in 1966. The Reardon Company

manufactured and sold certain joint compound and related home patch and repair products

containing asbestos, and the Debtors continued to sell such products following the acquisition.

The Debtors ceased selling asbestos-containing joint compound products in 1977 and halted

sales of other asbestos-containing products in the early 1980s. In addition to the Reardon

Company products, SPHC sold certain asbestos-containing roofing products and sealants

until 1972.

19.     The Debtors have faced thousands of asbestos-related lawsuits since as

early as 1980, primarily precipitated by the acquisition of the Reardon Company and production

and sale of its line of products. Since 1980, Bondex has received more than 20,000 such

lawsuits, and, beginning in 1992, SPHC has been named in more than 8,000 such lawsuits.

Based on current filing rates, the Debtors had expected to face many more lawsuits in the near

future. As of April 30, 2010, the Debtors were defendants in more than 10,000 pending

asbestos-related bodily injury lawsuits filed in various state courts, with the vast majority of current claims pending in six states — Texas, Florida, Mississippi, Maryland, Illinois and Ohio.

20. International never produced, marketed, distributed or sold any of the Debtors' or any other products. Nonetheless, scores of pending lawsuits against one or both of the Debtors have also named International and/or one or more of non-debtor affiliates of International as defendants, seeking to hold them derivatively liable for asbestos-containing products manufactured, sold or distributed by the Debtors. These lawsuits assert successor liability and other derivative theories in an effort to impose liability on International or International's non-debtors affiliates for such products. To date, no court has issued a ruling or made a finding that International or any its non-debtor affiliates is responsible for any asbestos-containing products manufactured, sold, or distributed by the Debtors or that International or any its non-debtor affiliates should be treated as a successor-in-interest to one or both of the Debtors.

21. Until 2003, the Debtors' asbestos liability was covered in part by insurance. In 2003, however, certain of the Debtors' third-party insurers claimed exhaustion of coverage, and ceased making any payments. On July 3, 2003, the Debtors and non-debtor Republic Powdered Metals, Inc. ("Republic") filed the case of <u>Bondex International, Inc. et al. v. Hartford Accident and Indemnity Company et al.</u>, Case No. 1:03-cv-1322, in the United States District Court for the Northern District of Ohio, for declaratory judgment, breach of contract and bad faith against these third-party insurers, challenging their assertion that their policies covering asbestos-related claims had been exhausted. In December 2008, the Ohio District Court granted summary judgment in favor of the insurers. Thereafter, the Debtors appealed to the United States Court of Appeals for the Sixth Circuit, which appeal remains pending.

22.     For years, the asbestos litigation did not have a material impact on the Debtors. Until 2003, insurance had been funding approximately 90 percent of the Debtors' asbestos costs. After a wave of bankruptcy filing by co-defendants in 2000 and 2001, the number of asbestos claims against the Debtors began to skyrocket. Although the number of claims has since declined to some degree, primarily due to the drop off in unimpaired claims, settlement demands have escalated and the Debtors incurred asbestos costs in the range of approximately $60 million to $82 million per year from fiscal years 2005 through 2009.

23.     The increasing cost of managing and resolving the Debtors' asbestos-related litigation has led the Debtors to conclude that commencement of these chapter 11 cases is necessary. The Debtors' goal is to negotiate, obtain approval of, and consummate a plan of reorganization that establishes an appropriately funded trust pursuant to section 524(g) of the Bankruptcy Code. The Debtors' intent is that the trust would provide for the fair and efficient payment of legitimate present and future asbestos claims, and that the Court would enter a channeling injunction permanently protecting the Debtors and their affiliates from any further asbestos claims arising from products manufactured and sold by the Debtors.

## Part III

### Facts in Support of the First Day Pleadings

24.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings requesting various forms of relief. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' chapter 11 cases (the "First Day Hearing") at which the Court will hear certain of the First Day Pleadings. The Debtors also anticipate that the Court will consider the remainder of the First Day Pleadings at a later time. The First Day Pleadings that the Debtors anticipate will be heard at the First Day Hearing are

described in Sections III.A through III.C below. The remaining First Day Pleadings are described in Section III.D below.

25.    Generally, the purpose of the First Day Pleadings is to (a) obtain authorization for necessary postpetition financing and the continuation of a cash management system integral to such financing and (b) establish procedures for the smooth and efficient administration of these chapter 11 cases. I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.

A.    **The Case Administration Motions**

*Joint Administration*

26.    The Debtors will present a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of the Debtors' chapter 11 cases. Such an order is a necessary administrative convenience for the Court, the Office of the Clerk of the Court (the "Clerk's Office") and all parties in interest.

*Appointment of Claims and Noticing Clerk*

27.    The large number of creditors and other parties in interest involved in the Debtors' chapter 11 cases may impose heavy administrative and other burdens upon the Court and the Clerk's Office. To relieve the Court and the Clerk's Office of these burdens, the Debtors will seek the entry of an order appointing Logan & Company, Inc. as the Debtors' claims and noticing clerk in these chapter 11 cases.

***Request to (I) File Consolidated List of Creditors, (II) File a Consolidated List
of the Thirty Asbestos Plaintiffs Firms with the Largest Scope or Number of
Asbestos Cases and (III) Establish Certain Notice Procedures for Asbestos
Claimants***

28.     The Debtors will seek authority to file the lists identifying their respective

creditors on a consolidated basis in the format or formats currently maintained in the ordinary

course of the Debtors' businesses. In addition, the Debtors will seek Court approval to file a

consolidated list of the thirty asbestos plaintiff firms with the largest scope or number of asbestos

cases against the Debtors in lieu of listing the individual asbestos claimants with the largest

unsecured claims against the Debtors. The Debtors believe that providing the U.S. Trustee with

the list of asbestos plaintiff firms will assist the U.S. Trustee in forming an asbestos creditors'

committee. Finally, the Debtors will seek approval to serve all notices, mailings and other

communications related to these chapter 11 cases on asbestos-related personal injury claimants

care of their counsel of record at such counsel's address. In order to implement these notice

procedures, the Debtors will list the names and addresses of the asbestos plaintiffs firms in the

Debtors' creditor list in lieu of listing the individual asbestos creditors' addresses.

**B.      The Cash Management Motion**

29.     Prior to the Petition Date, in the ordinary course of business, the Debtors

and their non-debtor subsidiaries maintained approximately 40 bank accounts (collectively,

the "Bank Accounts") including a concentration account, collection accounts, disbursement

accounts and other special purpose accounts. The Debtors maintain each Bank Account at a

financial institution insured by the Federal Deposit Insurance Corporation (the "FDIC"). To

manage the flow of cash through the Bank Accounts, the Debtors utilize an integrated cash

management system that provides for the collection and disbursement of funds used to conduct

the business of the Operating Subsidiaries.

30. Prior to the Petition Date, all funds in SPHC's concentration account at PNC Bank, N.A. (the "Concentration Account") were swept daily into a concentration account at PNC maintained by International (the "International Concentration Account"). In the ordinary course of business, the International Concentration Account would fund SPHC's Concentration Account to permit SPHC's Concentration Account to fund the Disbursement Accounts. Prior to the Petition Date, in anticipation of the commencement of these chapter 11 cases, the Debtors modified their cash management system so that funds in the Concentration Account are no longer swept to the International Concentration Account, and the International Concentration Account no longer funds SPHC's Concentration Account. Other than this modification, the cash management system utilized by the Debtors and International prior to the Petition Date is the same as the Debtors' current cash management system (the "Cash Management System").

31. The Cash Management System, as modified in connection with these chapter 11 filings, is similar to cash management systems commonly employed by corporate enterprises of comparable size and complexity. It provides clear benefits to the Debtors, such as enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. These benefits and controls are especially important here given the significant volume of cash transactions, aggregating approximately $300 million annually, managed through the Cash Management System.

32. In addition, given the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, it would be difficult and unduly burdensome for the Debtors to establish an entirely new system of accounts and a new cash management and disbursement system for each separate legal entity. Thus, under the

circumstances, the maintenance of the Cash Management System, as such system may be modified pursuant to the requirements of the $40 million in debtor in possession financing (the "DIP Facility") with Wachovia Capital Finance Corporation (New England), as agent (the "DIP Agent"), not only is essential, but also is in the best interests of the Debtors' respective estates and creditors.

33.     If the Debtors are not permitted to continue to utilize the Cash Management System, as modified in accordance with the DIP Facility, the operations of the Operating Subsidiaries would be severely disrupted, impeding their ability to operate profitably. Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

34.     Under the Cash Management System, funds generated by the business operations of each of the Operating Subsidiaries generally flow into SPHC's centrally maintained Concentration Account. As individual Operating Subsidiaries require funds to meet current obligations, cash is automatically transferred from the Concentration Account into the appropriate Disbursement Accounts to fund necessary disbursements.

35.     Accordingly, during these chapter 11 cases, at any given time, there may be balances due or owing from SPHC to another Operating Subsidiary. These balances will represent extensions of intercompany credit. To ensure that the funds transferred by the Operating Subsidiaries into the Concentration Account will remain available to the appropriate Operating Subsidiaries, the Debtors will request that, pursuant to section 364(c)(1) of the Bankruptcy Code, all intercompany claims of an Operating Subsidiary against SPHC resulting from transfers of cash through the Cash Management System be accorded superpriority status, with priority over any and all administrative expenses of the kind specified in sections 503(b)

and 507(b) of the Bankruptcy Code, subject and subordinate only to the superpriority administrative claims granted to the DIP Agent under orders of the Court approving the DIP Facility. The requested relief will maximize the protection afforded by the Cash Management System to the Debtors and the Operating Subsidiaries by ensuring that each individual Debtor and Operating Subsidiary utilizing funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility.

36.     The Debtors will also seek authority to (a) implement ordinary course changes to their Cash Management Systems, as the Debtors may determine that other changes in the Cash Management System are beneficial to them, and (b) open and close bank accounts as they deem necessary (consistent with the terms of the DIP Facility). The Debtors will further request that their banks and financial institutions be authorized to honor the Debtors' requests to open or close any bank accounts, provided, however, that any new domestic account is established at a bank that is insured with the FDIC or the Federal Savings & Loan Insurance Corporation and is organized under the laws of the United States or any State therein, or, in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, on the list of authorized bank depositories for the District of Delaware.

C.      **The DIP Financing Motion**

37.     The Debtors require postpetition financing primarily to assure that they have sufficient funds to finance these chapter 11 cases. Accordingly, the financing provided under the DIP Facility is necessary to ensure that the Debtors have the ability to proceed with these chapter 11 cases and maximize the value of their estates for the benefit of all stakeholders.

38.     To achieve the Debtors' reorganization goals, the Debtors must ensure they have access to adequate amounts of capital needed to fund all fees and expenses related to these chapter 11 cases. Without access to postpetition financing, the ability of the Debtors to

reorganize under the Bankruptcy Code may be jeopardized. Approval of the DIP Facility is, therefore, necessary to maximize the value of the Debtors' estates.

39.     To obtain postpetiton financing, beginning in May 2010, Blackstone contacted approximately seven financing sources, including banks and hedge funds, to gauge their interest in providing financing in connection with the Debtors' anticipated commencement of these chapter 11 cases. Five of the parties executed non-disclosure agreements and, in accordance with such agreements, were provided access to a dataroom established by the Debtors in connection with the contemplated postpetition financing. The remaining two parties were existing lenders of International and were provided access to the dataroom, subject to previously existing non-disclosure agreements. Ultimately, the Debtors received five proposals for postpetition financing.

40.     The Debtors, with the assistance of Blackstone and their other professionals, reviewed each of the five proposals. Following further discussions with certain of the prospective lenders, the Debtors determined that the proposal submitted by the DIP Agent was the best available alternative. Among other reasons, the Debtors and their advisors selected the DIP Agent because of the favorable pricing and 36-month maturity offered in its proposal. None of the entities approached by the Debtors was willing to make a postpetition loan on an unsecured basis for a facility of this type and magnitude and on terms as favorable as the DIP Facility.

41.     The Debtors have an urgent and immediate need to borrow $5,000,000 under the DIP Facility. Although the Debtors do not anticipate that, over the long-term, the Operating Subsidiaries will use the credit facility for their ongoing working capital, capital expenditure and general corporate needs, an initial borrowing is critical for a number of reasons.

First, the initial borrowing is necessary to provide sufficient liquidity in the event the Operating Subsidiaries experience any contraction in trade credit as a result of the filing of these chapter 11 cases. Second, the Operating Subsidiaries are entering a period in their business cycles where they build their working capital and the funding is needed to ensure sufficient liquidity for the working capital build. Third, the interim borrowing is important because it will enable the Operating Subsidiaries to clearly demonstrate to their vendors, suppliers and customers that the Operating Subsidiaries have sufficient liquidity, despite any perceived uncertainty created by these chapter 11 cases, to fund their ongoing operations. Absent authorization to obtain credit on an interim basis pending a final hearing, the Debtors may suffer immediate and irreparable harm because the Operating Subsidiaries, which are direct or indirect subsidiaries of SPHC, may temporarily have insufficient liquidity to meet their ongoing obligations. The interim relief requested herein is vital because it will prevent any disruption in the operations of the Operating Subsidiaries and make certain that the Debtors have a meaningful opportunity for a successful reorganization.

**D.** **Anticipated First Day Pleadings Not to Be Heard at the First Day Hearing**
*Extension of Time to File Schedules and Statements*

42. The Debtors believe they will need additional time beyond the time period allotted under the Bankruptcy Code and the Local Rules to assemble all of the information necessary for each of the Debtors to complete and file the required schedule of assets and liabilities, schedule of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs (collectively, the "Schedules and Statements"). The Debtors will need the additional time because of (a) the size, scope and complexity of these chapter 11 cases, (b) the urgency of the filing and (c) the volume of material that must be compiled and reviewed by the Debtors' limited staff to complete the Schedules and

Statements during the hectic early days of these cases. The Debtors, moreover, have thousands of creditors and other parties in interest, and for each of those parties, the Debtors must ascertain the pertinent information, including addresses and claim amounts, to complete the Schedules and Statements. Accordingly, the Debtors will seek the entry of an order extending the time within which the Debtors must file their Schedules and Statements to 45 days from the Petition Date, without prejudice to the Debtors' right to seek a further extension for cause.

### *Professional Retention Applications*

43.     The retention of certain chapter 11 professionals is essential to the Debtors' reorganization efforts. Accordingly, the Debtors will seek to retain various professionals to represent and assist them in connection with these chapter 11 cases. These professionals include: (a) Jones Day as counsel; (b) Richards, Layton & Finger as local counsel; (c) Evert Weathersby Houff as special asbestos litigation counsel; (d) Calfee, Halter & Griswold LLP as special corporate counsel; (e) Blackstone Advisory Partners L.P. as financial advisors; (f) Ernst & Young as accountants; and (g) Bates White, LLC as asbestos consultants.

### *Interim Compensation*

44.     Given the size and complexity of the Debtors' chapter 11 cases and the amounts of fees and expenses that will be incurred by the Debtors' professionals, the Debtors also will seek the entry of an administrative order establishing certain procedures that will permit the Debtors to pay the professionals retained by them and other constituencies in these cases on a monthly basis. Such professionals' fees and expenses will be subject to interim and final allowance in accordance with the procedures established by the Court.

### *Ordinary Course Professionals*

45.     The Debtors' officers and management call upon certain professionals, including attorneys, consultants and other professionals employed by the Debtors in the ordinary

course of business (collectively, the "Ordinary Course Professionals"), to assist the Debtors in carrying out their assigned duties and responsibilities. The Ordinary Course Professionals principally consist of various law firms (the "Defense Firms") who, prior to the Petition Date, were defending the Debtors in approximately 10,000 asbestos personal injury lawsuits. The Debtors will likely require assistance from the Defense Firms in the early stages of these chapter 11 cases to inform the courts and parties involved in those asbestos cases that the cases have been stayed pursuant to section 362 of the Bankruptcy Code. Included among the Ordinary Course Professionals utilized by the Debtors are certain Defense Firms (collectively, the "Primary Defense Firms"), that will have primary responsibility for overseeing the process of informing the courts and parties in interests in the Debtors' asbestos litigation cases that those cases are stayed.

46.     It is essential that the employment of the Ordinary Course Professionals, many of whom are already familiar with the Debtors, be continued in order to avoid disruption to the Debtors. The Debtors submit that the proposed employment of the Ordinary Course Professionals, and the payment of monthly compensation (subject to certain limits), are in the best interests of the Debtors' estates and creditors. The authorization to retain, employ and pay the Ordinary Course Professionals will save the Debtors' estates the substantial expense associated with applying separately for the retention of each professional, as well as avoid the incurrence of additional fees related to the preparation and prosecution of interim fee applications. Likewise, the procedures for which the Debtors seek approval will relieve the Court, the Office of the United States Trustee for the District of Delaware and any official committee of creditors of the burden of reviewing numerous fee applications involving relatively small amounts of fees and expenses.

47.     Accordingly, the Debtors will seek the entry of an order authorizing them to retain, employ and pay the Ordinary Course Professionals in the ordinary course of their businesses. Specifically, the Debtors will seek authority to pay the fees of each of the Ordinary Course Professionals, subject to the following limits (the "OCP Fee Limit"): (a) for each month, (i) $15,000 for each Ordinary Course Professional that is not a Primary Defense Firm or (ii) $50,000 for each Primary Defense Firm; and (b) for the pendency of these cases, (i) $100,000 for each Ordinary Course Professional that is not a Primary Defense Firm or (ii) $400,000 for each Primary Defense Firm. If the fees of any Ordinary Course Professional exceed the OCP Fee Limit, the payment of the excess fees shall be subject to review and an opportunity to object by certain specified parties. If no timely objection is received, the Debtors will be authorized to pay the applicable Ordinary Course Professionals' additional fees; if a timely objection is received, however, the applicable Ordinary Course Professional will be required to either submit a formal application to the Court for the additional compensation or waive the right to any fees over the OCP Fee Limit.

### *Administrative Services Agreement and Employment Arrangement*

48.     Prior to the Petition Date, International provided certain centralized corporate and administrative services (the "Administrative Services") to all of its subsidiaries, including the SPHC Companies. Specifically, prior to the Petition Date, International provided, among others, the following Administrative Services to its subsidiaries: information technology services; business development services; tax preparation and advice; travel agency services; credit card processing; environmental; health and safety services; property management; human resources services; lobbying services; finance, accounting and legal services; purchasing services; and capital expenditure consulting.

DLI-6307951v3
RLF1 3576575v. 1

49.     International charges its subsidiaries, including the SPHC Companies, a fee (the "Administrative Services Fee") for the Administrative Services. International calculates the Administrative Services Fee for each subsidiary by allocating, based on each subsidiary's net sales, International's overhead costs, plus 15 percent to account for unallocated costs. International has charged and calculated the Administrative Services Fee in this manner for a number of years.

50.     In addition, International also contracts with various third party vendors for certain additional goods and services required by International's subsidiaries (the "Third-Party Services" and, collectively with the Administrative Services, the "Corporate Services"). Specifically, the Third Party Services include, among others: legal, finance, accounting and tax services provided by outside professionals; certain environmental, health and safety fees; lobbying fees with respect to specific matters; the administration of pension and 401(k) plans; long term disability, medical, dental, life, vision and group liability insurance; equipment leasing, car leases and related expenses; and energy management services. International charges its subsidiaries for the Third Party Services on a cost basis (with no markup) as incurred by the particular subsidiary.

51.     In a given year, both the Debtors and the Operating Subsidiaries typically require certain Third-Party Services.

52.     Michael D. Tellor is an employee of non-debtor Kop-Coat, Inc. ("Kop-Coat"), one of the Debtors' Operating Subsidiaries. Mr. Tellor is the President of SPHC and a director of each of the Debtors. SPHC and Kop-Coat anticipate that Mr. Tellor will devote approximately 70 percent of his working time to the SPHC Companies, and the remainder to other affiliates of the Debtors. In anticipation of the commencement of these chapter 11 cases,

SPHC and Kop-Coat have agreed to allocate the costs of Mr. Tellor's employment pursuant to the terms of a letter agreement dated as of June 1, 2010 (the "Employment Arrangement").

53.     The Debtors will seek approval to enter into, and perform under, (a) an administrative services agreement (the "Administrative Services Agreement") dated as of June 1, 2010 between SPHC and International and (ii) the Employment Arrangement regarding the terms and conditions under which Mr. Tellor will provide services to SPHC.

54.     The Debtors have determined that entering into the Administrative Services Agreement and the Employment Arrangement is in the best interests of their estates. During these chapter 11 cases, the Debtors and the Operating Subsidiaries will require the Corporate Services provided by International under the Administrative Services Agreement. Obtaining those services from or through International is advantageous because it permits the Debtors and the Operating Subsidiaries to benefit from International's expertise, understanding of the Operating Subsidiaries' businesses, economies of scale and existing contractual relationships. If the Debtors and the Operating Subsidiaries were required to provide the Corporate Services themselves or obtain them from third parties, the business of the Operating Subsidiaries would be disrupted and the costs of the Corporate Services would likely increase. In addition, the Operating Subsidiaries, not the Debtors, will pay for the vast majority of the costs of the Corporate Services, including all Administrative Services Fees. In fact, because the Debtors will collect all amounts owed by the Operating Subsidiaries, the Debtors themselves will pay International only for the costs of the Third Party Services specifically attributable to the Debtors and for the allocated cost of certain International employees who will devote substantial portions of their time to the Debtors.

55.     Additionally, the services provided to the SPHC Companies by the International employees under the Administrative Services Agreement and by Mr. Tellor under the Employment Arrangement are essential to the operations of the Debtors.  The Administrative Services Agreement and the Employment Arrangement permit the Debtors to secure the services of experienced employees with significant relevant experience and expertise regarding the SPHC Companies, while paying only for the portion of each employee's time that is actually devoted to the Debtors.

### Confidential Information Provided to Official Committees

56.     The Bankruptcy Code requires committees of creditors (each, a "Committee") appointed under section 1102(a) of the Bankruptcy Code to "provide access to information for creditors who (i) hold claims of the kind represented by that committee; and (ii) are not appointed to the committee." 11 U.S.C. § 1102(b)(3)(A).  During the course of these chapter 11 cases, the Debtors anticipate that any Committee appointed in these cases will request, and the Debtors (upon entry into an appropriate confidentiality agreement) will share, confidential and other non-public proprietary information ("Confidential Information") with such Committee to assist it in fulfilling its role in the chapter 11 process.  To protect the Debtors' Confidential Information shared with any Committee from disclosure to creditors not bound by a confidentiality agreement with the Debtors, the Debtors will seek the entry of an order confirming that a Committee is not authorized or required, pursuant to section 1102(b)(3)(A) of the Bankruptcy Code, to provide access to Confidential Information to any creditor that the Committee represents.

57.     The Debtors, through the Operating Subsidiaries, operate in a highly competitive industry and commonly rely on confidential and proprietary information in the conduct of their businesses.  Thus, the dissemination of Confidential Information to parties who

DLI-6307951v3
RLF1 3576575v. 1

are not bound by any confidentiality agreement directly with the Debtors could have disastrous results for the Debtors. If the Debtors' creditors could require a Committee to give them access to Confidential Information in the Committee's possession, such information easily could become public and could be used by the Debtors' competitors and other parties to the direct detriment to the Debtors.

58.     There can be little doubt that the public dissemination of Confidential Information would cause serious harm to the Debtors' estates. Among other things, disclosure of business costs and proprietary practices could allow competitors to compete for business on an unfair basis. In addition, other Confidential Information, such as compensation levels or other employee information, is of a sensitive nature, and public disclosure of such information would cause morale and similar problems for the Debtors, and potentially violate federal and state privacy laws.

59.     If there were a risk that Confidential Information given by the Debtors to a Committee could be disclosed to any creditor, the Debtors would be strongly discouraged from giving Confidential Information to a Committee in the first place. In fact, the Debtors likely would conclude that it could not give any such information to a Committee for fear of the substantial adverse impact that would result from such disclosure.

60.     The inability of a Committee to gain access to Confidential Information, in turn, would limit the ability of the Committee to fulfill its statutory obligations under the Bankruptcy Code. Thus, the relief sought by the Debtors is not only necessary to preserve and protect Confidential Information for the benefit of the Debtors, but also will ensure that such information can be shared with any Committee to allow any such Committee to fulfill its role in these chapter 11 cases. The requested relief will permit any Committee and its advisors to enter

into confidentiality arrangements with the Debtors without the fear that individual creditors could force them to breach such arrangements. A Committee should not be put in the position of either violating the statute or breaching confidentiality and thereby subject itself to suit by the Debtors and potentially other parties.

61. Finally, the Debtors and a Committee face similar risks if a Committee could be required to provide creditors with access to information that is subject to the attorney-client privilege or similar state, federal or other jurisdictional law privilege, whether such privilege is solely controlled by the Committee or is a joint privilege with the debtor or some other party (collectively, "Privileged Information"). If there is a risk that Privileged Information would be turned over to creditors generally, with the possible loss of the relevant privilege at that time, the entire purpose of such privilege would be eviscerated, and a Committee would be unable to obtain the independent and unfettered advice and consultation that such privileges are designed to foster. As a result, a Committee would be hampered in its ability to fulfill its statutory role in these chapter 11 cases.

## Conclusion

62. The Debtors, in the First Day Pleadings, seek to (a) obtain authorization for necessary postpetition financing and the continuation of a cash management system integral to such financing and (b) establish procedures for the smooth and efficient administration of these chapter 11 cases. For the reasons described herein and in the First Day Pleadings, I believe that the Debtors' prospect for a successful reorganization will be substantially enhanced if this Court grants the relief requested in each of the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 31, 2010

/s/Stephen J. Knoop
STEPHEN J. KNOOP