## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| SPECIALTY PRODUCTS HOLDING CORP., *et al.,*[1] | : | Case No. 10-_____ (___) |
| | : | (Joint Administration Requested) |
| Debtors. | : | |
| | : | |

### MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING (A) DEBTOR SPECIALTY PRODUCTS HOLDING CORP. TO ENTER INTO POSTPETITION CREDIT AGREEMENT AND (B) DEBTORS TO GUARANTY POSTPETITION SECURED FINANCING, (II) GRANTING CERTAIN LIENS, (III) MODIFYING THE AUTOMATIC STAY AND (IV) SCHEDULING A FINAL HEARING

The above-captioned debtors (collectively, the "Debtors") file this motion

(the "Motion") pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States

Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Local Rule 4001-2 of the Local Rules of Bankruptcy

Practice and Procedures of the United States Bankruptcy Court for the District of Delaware

(the "Local Rules"), for the entry of an interim order, substantially in the form annexed hereto as

Exhibit A (the "Interim Financing Order"), and a final order (the "Final Financing Order" and

collectively with the Interim Financing Order, the "Financing Orders"): (i) authorizing

(a) Debtor Specialty Products Holding Corp. ("SPHC") to enter into that certain Credit

Agreement, by and among Chemical Specialties Manufacturing Corp., Day-Glo Color Corp.,

Dryvit Holdings Inc., Kop-Coat Inc., TCI, Inc., RPM Wood Finishes Group Inc., Guardian

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Specialty Products Holding Corp. (0857); and Bondex International, Inc. (4125). The Debtors' address is 4515 St. Clair Avenue, Cleveland, Ohio 44103.

Protection Products Inc., and Dryvit Systems Inc., as borrowers (the "Non-Debtor Borrowers" and collectively with the Debtors, the "Loan Parties"), SPHC as parent and administrative loan party (the "Administrative Loan Party"), Wachovia Capital Finance Corporation (New England) as agent and lender ("Wachovia" or "Agent") and the lenders that are signatories thereto (the "Lenders" and collectively with "Wachovia" the "Secured Parties") substantially in the form attached as Exhibit A to the Interim Financing Order (as amended, modified and in effect from time to time, the "Credit Agreement" and together with any and all other related documents and agreements entered into in connection with or related to the Credit Agreement, the "Loan Documents") and (b) the Debtors to enter into that certain General Continuing Guaranty substantially in the form attached as Exhibit B to the Interim Financing Order (the "Guaranty"), by and among SPHC and Debtor Bondex International, Inc. ("Bondex"), as guarantors, in favor of Wachovia, as agent for the Lender Group (as such term is defined in the Credit Agreement); (ii) granting certain liens; (iii) modifying the automatic stay; and (iv) prescribing the form and manner of notice and setting the time for the final hearing on the Motion (the "Final Hearing"). In support of this Motion, the Debtors incorporate the statements contained in the Declaration of Stephen J. Knoop in Support of First Day Pleadings (the "Knoop Declaration") filed contemporaneously herewith and further respectfully state as follows:

## Background

1.    On the date hereof (the "Petition Date"), each of the Debtors commenced a reorganization case (collectively, the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

HUI-127237v10
RLF1 3576594v. 2

2. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.

3. Debtor SPHC, is a wholly-owned subsidiary of non-debtor RPM International Inc. ("International"). SPHC is the holding company parent of Debtor Bondex, and the direct or indirect parent of certain additional domestic and foreign non-debtor subsidiaries. SPHC, through its subsidiaries, is a leading manufacturer, distributor and seller of various specialty chemical product lines, including exterior insulating finishing systems, powder coatings, fluorescent colorants and pigments, cleaning and protection products, fuel additives, wood treatments and coating and sealants, in both the industrial and consumer markets.

4. The Debtors are defendants in various asbestos-related bodily injury lawsuits filed in various state courts. Those lawsuits generally seek unspecified damages for asbestos-related diseases based on alleged exposures to asbestos-containing products previously manufactured by the Debtors or others.

**Summary of Relief Requested**

5. By this Motion, the Debtors seek entry of an order on an interim and final basis authorizing them to obtain postpetition credit, as set forth below, with Wachovia as Agent and one of the Lenders, along with such other institutions as may become Lenders under the financing arrangement, which, if approved on a final basis, would provide the Debtors and the Non-Debtor Borrowers with postpetition secured credit of up to $40,000,000. On an interim basis, the Debtors are requesting authority to borrow up to $5,000,000.

6. As set forth in additional detail in the Knoop Declaration, Debtor SPHC is a holding company that owns the equity interests in a number of profitable, cash flow positive

- 3 -

operating subsidiaries and in Debtor Bondex, which is no longer an operating company. The proposed asset-backed lending facility will, if approved by this Court, provide the Debtors with sufficient funding to pay for the costs of these Chapter 11 Cases and certain other expenses, supported by the assets and cash flow of the Non-Debtor Borrowers.

7.      The Non-Debtor Borrowers own unencumbered operating assets that will provide the borrowing base for the postpetition financing. SPHC, as the Administrative Loan Party, will be authorized by the Non-Debtor Borrowers to request and receive funds under the Credit Agreement and the funds will, in effect, be upstreamed to the Debtors in the form of intercompany loans.[2]

8.      This structure is particularly beneficial to the Debtors. The non-operating nature of the Debtors limits their access to capital on a stand-alone basis. The assets and cash flow of the Non-Debtor Borrowers, together with the secured guarantees of the Debtors, however, provide the necessary credit support for the proposed postpetition financing.

9.      The Debtors have determined, in the exercise of their sound business judgment, that they require financing to ensure that they can pay the costs of the Chapter 11 Cases and certain other expenses. The proposed postpetition financing will provide them with the necessary funding and constitutes the best alternative available under the circumstances. Moreover, the Debtors have an urgent and immediate need for $5,000,000 of interim funding. The interim financing will assure that the Non-Debtor Borrowers have sufficient liquidity to

---

[2]      Pursuant to the Motion of the Debtors for an Order (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Form; (II) Granting Them an Extension of Time to Comply With the Requirements of Section 345 of the Bankruptcy Code; (III) Authorizing Banks Participating in the Debtors' Cash Management System to Charge Certain Fees and Other Amounts; and (IV) According Superpriority Status to Postpetition Intercompany Claims, filed contemporaneously with this Motion, the Debtors seek authority to treat the intercompany loans as superpriority administrative expense claims subordinate only to the superpriority administrative expense claims of the Agent and the Lenders.

- 4 -

address any contraction in trade credit that may occur as a result of the chapter 11 filings and build working capital. The interim funds will also enable them to demonstrate to their vendors, suppliers and customers that they have sufficient liquidity notwithstanding these chapter 11 filings.

## The Debtors' Marketing Process for Postpetition Financing

10. Prior to the commencement of these Chapter 11 Cases, the Debtors retained Blackstone Advisory Partners LP ("Blackstone") as their financial advisor. Following Blackstone's engagement, the Debtors determined, in the exercise of their sound business judgment, that they may require postpetition financing to pay the costs of the Chapter 11 Cases and satisfy other expenses.

11. Beginning in May 2010, Blackstone contacted approximately seven financing sources, including banks and hedge funds, to gauge their interest in providing financing in connection with the Debtors' anticipated commencement of these Chapter 11 Cases. Five of the parties executed non-disclosure agreements and, in accordance with such agreements, were provided access to a dataroom established by the Debtors in connection with the contemplated postpetition financing. The remaining two parties were existing lenders of International and were provided access to the dataroom, subject to previously existing non-disclosure agreements. Ultimately, the Debtors received five proposals for postpetition financing.

12. The Debtors, with the assistance of Blackstone and their other professionals, reviewed each of the five proposals. Following further discussions with certain of the prospective lenders, the Debtors determined that the proposal submitted by Wachovia was the best available alternative. Among other reasons, the Debtors and their advisors selected

- 5 -

Wachovia because of the favorable pricing and 36-month maturity offered in its proposal. In late May 2010, the Debtors and Wachovia negotiated the terms of the proposed Credit Agreement, including the Loan Documents and the Financing Orders.

## Overview of Material Terms of the Loan Documents[3]

### I. Material Terms of the Credit Agreement

13. In accordance with Bankruptcy Rule 4001(c) and Local Rule 4001-2, the principal terms of the Credit Agreement are summarized below:

(a) <u>Borrowers</u>. The following non-Debtor operating subsidiaries of SPHC and other entities acceptable to Wachovia with assets to be included in the Borrowing Base (as defined below): Chemical Specialties Manufacturing Corp.; Day-Glo Color Corp.; Dryvit Holdings Inc.; Kop-Coat Inc.; TCI, Inc.; RPM Wood Finishes Group Inc.; Guardian Protection Products Inc.; and Dryvit Systems Inc. See Credit Agreement, definition of "Borrowers."

(b) <u>Guarantors</u>. The Debtors. See Guaranty, definition of "Guarantors."

(c) <u>Agent</u>. Wachovia . See Credit Agreement, definition of "Agent."

(d) <u>Lenders</u>. Wachovia and other institutions that may become parties to the Credit Agreement from time to time. See Credit Agreement, definition of "Lender Group."

(e) <u>Type, Amount and Availability of Funds</u>. The Credit Agreement will consist of a senior revolving credit facility with a maximum commitment of $40,000,000 (the "Maximum Credit") subject to the Borrowing Base and other terms set forth in the Credit Agreement (the "Revolving Loans") (including, but not limited to, an initial Revolving Loan limit of $20,000,000, subject to, among other things, completion of satisfactory due diligence, field examination and appraisals reasonably satisfactory to the Agent), with a sublimit available for letters of credit ("LCs") issued by Wachovia and arranged by the Agent in an amount not to exceed $10,000,000. See Credit Agreement, definition of "Maximum Revolver Amount;" §§ 2.10 and 2.14.

(f) <u>Maturity Date</u>. The earliest to occur of (a) three years after the date of entry of the Credit Agreement and (b) upon the Lenders exercising the right to terminate upon the occurrence of an Event of Default. See Credit Agreement, § 3.4.

---

[3] The summary of the material terms of the Loan Documents is intended only to assist the Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the Loan Documents, as it may be modified by the Financing Orders.

(g)     Use of Proceeds. The proceeds of the Credit Agreement shall be used to finance the costs associated with these Chapter 11 Cases and for the Loan Parties ongoing working capital, capital expenditure and general corporate needs. The Debtors shall not use the proceeds for any purpose that is prohibited under the Bankruptcy Code. See Credit Agreement, § 6.13.

(h)     Borrowing Base. Revolving Loans and LCs may be provided to the Loan Parties subject to availability under the borrowing base (the "Borrowing Base"), which will be calculated as follows:

(i)     85% multiplied by the net amount of the Non-Debtor Borrowers' eligible domestic accounts receivable; plus

(ii)    the lesser of (A) 65% multiplied by the value of eligible inventory,[4] or (B) 85% of the Net Liquidation Percentage (as defined below) multiplied by the value of eligible inventory of Non-Debtor Borrowers' eligible inventory multiplied by the value thereof; minus

(iii)   applicable reserves.

"Net Liquidation Percentage" shall be determined based on the projected recovery of the eligible inventory on net orderly liquidation value basis, net of estimated liquidation expenses, all as set forth in the most recent appraisal of such inventory in form and containing assumptions and appraisal methods satisfactory to the Agent, by an appraiser acceptable to Agent and upon which Agent and Lenders are expressly permitted to rely. See Credit Agreement, definition of "Borrowing Base" and "Net Liquidation Percentage".

(i)     Interest Rates. At Non-Debtor Borrowers election, funds outstanding under the Credit Agreement accrue interest at a rate per annum equal to:

(i)     Base Rate (as defined below) plus 1.50% in the case of Base Rate Loans; or

(ii)    LIBOR Rate (as defined below) plus 2.50% in the case of LIBOR Rate Loans.

"Base Rate" means the greatest of (i) the prime lending rate as announced from time to time by Wells Fargo Bank, N.A., (ii) the Federal Funds Rate plus 0.50% and (iii) the three month LIBOR Rate (which rate shall be determined on a daily basis) plus 1.00%.

"LIBOR Rate" means the rate per annum rate appearing on Bloomberg L.P.'s Page BBAM1/(Official BBA USD Dollar Libor Fixings) (or on any successor or

---

[4]     The value of each category of eligible inventory will be determined at the lower of cost or market.

substitute page of Bloomberg L.P., or any successor to or substitute for Bloomberg L.P.). See Credit Agreement, definitions of "Base Rate" and "LIBOR Rate;" § 2.5.

(j)     Superpriority. The Lenders will be entitled to an allowed superpriority administrative claim for all amounts due and owing by the Debtors pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors, whether now in existence or hereafter incurred by Debtors, including, without limitation, any obligation, liability or indebtedness of Debtors to any Non-Debtor Borrower or other affiliate of Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code. See Credit Agreement, § 6.17(e); Interim Financing Order, ¶ 2.2.

(k)     Senior Liens. Pursuant to section 364(c)(2) of the Bankruptcy Code, the Loan Documents will be secured by a first priority perfected security interest in the Debtors' now owned or hereafter acquired real and personal property and assets (but subject to valid, perfected purchase money security interests, capital leases and other preexisting liens set forth in the Credit Agreement (the "Permitted Liens") and the Carve-Out (as defined below)) (collectively, the "Collateral"), including, subject to entry of the Final Financing Order, all such claims, causes of action or property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to the Bankruptcy Code, applicable law or otherwise, including without limitation inter alia, sections 542, 544, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code (collectively, the "Avoidance Actions"). See Credit Agreement, § 17.14(b); Interim Financing Order, ¶ 2.1; Security Agreement substantially in the form attached as Exhibit C to the Interim Financing Order (the "Security Agreement").

(l)     Junior Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, the Loan Documents provide the Secured Parties with certain junior security interests in and liens upon the Collateral as security for Debtors' obligations arising under the Credit Agreement, subject only to the Carve-Out. See Credit Agreement, § 17.14(b); Interim Financing Order, ¶ 2.1; Security Agreement.

(m)     Carve-Out. The security interests of the Agent granted under the Credit Agreement will be subordinate to the payment of the following (such amounts being the "Carve-Out"):

(i)     allowed and unpaid fees pursuant to section 1930 of Title 28 of the United States Code and to the Clerk of the Bankruptcy Court and any fees payable to the Office of the United States Trustee; and

(ii)     the unpaid and outstanding reasonable fees and expenses of attorneys, accountants and other professionals retained by the Debtors and any committee(s) under section 327 or 1103(a) of the Bankruptcy Code (collectively, the "Professionals"), which fees and expenses are approved by a final order of the Court pursuant to

- 8 -

Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"), and which are actually (A) incurred before the delivery date of a written notice to Debtors by Agent of the triggering of such carve-out (the "Carve Out Notice"), in a cumulative, aggregate sum not to exceed $2,500,000 (the "Pre-Default Carve Out"), and (B) incurred on or after the delivery date of the Carve-Out Notice, which Allowed Professional Fees, less the amount of any retainers, if any, then held by such Professionals, in a cumulative aggregate sum not to exceed $2,500,000 (the "Post-Default Carve Out" together with the Pre-Default Carve Out, collectively, the "Professional Fee Carve Out"). See Credit Agreement, § 7.14(c); Interim Financing Order, ¶ 2.3.

(n)     Default Pricing. Upon default, the principal balance of all amounts outstanding under the Credit Agreement shall bear interest at a rate that is 2 percent (2%) per annum in excess of the rate of interest then applicable to such amounts outstanding or such other obligations from time to time. See Credit Agreement, § 2.5(c).

(o)     Expenses. All costs and expenses of the Agent in connection with the Credit Agreement, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees, fees and expenses of any consultants and other out of pocket expenses are obligations of the Debtors that must be paid upon demand. See Credit Agreement, § 15.7.

(p)     Events of Default. The usual and customary events of default for a credit facility of this type (each an "Event of Default" and collectively, the "Events of Default"). See Credit Agreement, § 8.

(q)     Remedies on Default. During the continuance of any Event of Default, without further order of, application to, or action by, the Court, the Agent may (i) accelerate all amount outstanding under the Credit Agreement or other Loan Documents; (ii) terminate all commitments made by the Non-Debtor Borrowers under the Credit Agreement; and (iii) subject to the automatic stay provisions in the Financing Orders, exercise all other rights and remedies available under the Loan Documents or applicable law. See Credit Agreement, § 9.

(r)     Covenants. Usual and customary affirmative and negative covenants for asset based facilities of this type. See Credit Agreement, §§ 5 and 6.

(s)     Representations and Warranties. Usual and customary for a facility of this type. See Credit Agreement, §4.

(t)     Indemnification. The Loan Parties agree to certain indemnities. See Credit Agreement, § 10.3.

- 9 -

## II.    Material Terms of the Guaranty

(a)    <u>Guarantors</u>. The Debtors. <u>See</u> Guaranty, preamble.

(b)    <u>Guarantied Obligations</u>. All of the liabilities and obligations now or hereafter existing or arising under any Loan Document, whether for principal, interest, fees, expenses or otherwise, and also includes any and all expenses incurred by the Agent or the Lenders in enforcing any rights under the Guaranty (collectively, the "<u>Guarantied Obligations</u>"). <u>See</u> Guaranty, ¶ 2.

(c)    <u>Performance Under Guaranty</u>. In the event that any Borrower fails to make any payment of any Guarantied Obligations, on or prior to the due date thereof, each Guarantor immediately shall cause, as applicable, such payment in respect of the Guarantied Obligations to be made. <u>See</u> Guaranty, ¶ 4.

(d)    <u>Waivers</u>. The Guarantors agree to waive certain rights. <u>See</u> Guaranty, ¶ 6.

## Relief Requested

14.    By this Motion and for the reasons set forth below, pursuant to sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2, the Debtors respectfully request that this Court enter the Financing Orders, <u>inter alia</u>:

(a)    under sections 363, 364(c) and (e) of the Bankruptcy Code, authorizing (i) Debtor SPHC to enter into the Credit Agreement, as parent and Administrative Loan Party and (ii) Debtors to enter into the Guaranty and pledge their assets as security to obtain postpetition financing, which, would provide the Loan Parties with postpetition secured credit of up to $40,000,000, and to perform such other and further acts as may be contemplated by, or required in connection with, the Loan Documents;

(b)    under section 364(c)(1) of the Bankruptcy Code, granting superpriority administrative expense claim status to the claims of the Secured Parties against the Debtors, as guarantors, subject only to the Carve-Out;

(c)    under section 364(c)(2) of the Bankruptcy Code, granting to the Secured Parties certain first priority security interests in and liens upon the Collateral as security for the Debtors' obligations arising under the Credit Agreement, subject only to the Permitted Liens and the Carve-Out;

- 10 -

(d)     under section 364(c)(3) of the Bankruptcy Code, granting to the Secured Parties certain junior security interests in and liens upon the Collateral as security for Debtors' obligations arising under the Credit Agreement, subject only to the Carve-Out;

(e)     under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent set forth in the Credit Agreement; and

(f)     scheduling the Final Hearing and establishing the form and manner of notice thereof.

## Basis for Relief

## I.     Approval of the Credit Agreement Under Section 364(c) of the Bankruptcy Code

15.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code,[5] a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

16.     Because the Debtors propose to obtain credit as guarantors under the Credit Agreement that is entitled to superpriority administrative status and secured by non-

---

[5]     Section 364(c) of the Bankruptcy Code provides as follows:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -
     (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
     (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
     (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

- 11 -

priming liens, the approval of the Credit Agreement is governed by section 364(c) of the Bankruptcy Code.

17.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense." See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

18.     Courts have articulated a three-part test to determine whether a debtor may obtain credit under section 364(c) of the Bankruptcy Code:

(a)     the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); see also In re Ames Dep't Stores, 115 B.R. at 37-39.

- 12 -

*The Debtors Are Unable to Obtain Unsecured Credit*

19.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such [unsecured] credit is unavailable." Id. at 1088; see also Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

20.     The Debtors' entry into the Credit Agreement is the culmination of an extensive prepetition process that was conducted in accordance with the Debtors' business judgment. The Credit Agreement is the result of good faith, arm's-length negotiations between the Loan Parties and the Agent after an extensive search by Blackstone for suitable postpetition financing to be used to fund, among other things, the costs associated with the administration of these Chapter 11 Cases. Blackstone's extensive efforts to locate a suitable lender or group of lenders willing to extend postpetition credit to the Debtors' did not uncover any entity willing to do so solely on an unsecured basis pursuant to sections 364(a) or (b) of the Bankruptcy Code and allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

*The Credit Agreement is Necessary to Preserve the Assets of the Estate*

21.     As set forth above, the Debtors require postpetition financing primarily to assure that they have sufficient funds to finance these Chapter 11 Cases. Accordingly, the financing provided under the proposed Credit Agreement is necessary to ensure that the Debtors have the ability to proceed with these Chapter 11 Cases and maximize the value of their estates

- 13 -

for the benefit of all stakeholders. Timely approval of the relief requested herein is imperative to the success of the Debtors' Chapter 11 Cases.

22. As described in the Knoop Declaration, the Debtors commenced these Chapter 11 Cases to fairly and permanently address their asbestos liability. To achieve this goal, the Debtors must ensure they have access to adequate amounts of capital needed to fund all fees and expenses related to these Chapter 11 Cases. Without access to postpetition financing, the ability of the Debtors to reorganize under the Bankruptcy Code may be jeopardized. Approval of the Credit Agreement is, therefore, necessary to maximize the value of the Debtors' estates.

*The Terms of the Credit Agreement Are Fair, Reasonable and Adequate*

23. As described above, the Credit Agreement represents the best available alternative. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); cf. Group of Inst. Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

HUI-127237v10
RLF1 3576594v. 2

24.     The Debtors respectfully submit that they have exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to obtain credit under the Credit Agreement.  The terms of the Credit Agreement are fair and reasonable, and are in the best interests of the Debtors' estates. Accordingly, the Court should grant SPHC authority to enter into the Credit Agreement as Administrative Loan Party and the Debtors authority to enter into the Guaranty as guarantors, thereby permitting them to obtain funds from the Lenders on the secured and administrative superpriority basis described above, pursuant to section 364(c) of the Bankruptcy Code.

## II.     Provisions that Potentially Implicate Local Rule 4001-2

25.     Rule 4001-2 of the Local Rules requires that certain provisions contained in the Credit Agreement be highlighted and that the Debtors provide justification for the inclusion of such highlighted provision(s).  The Debtors believe that the following provisions of the Credit Agreement and Financing Orders are required to be separately identified and their inclusion justified in accordance with Local Rule 4001-2:

(a)     Subject to entry of the Final Financing Order, a grant to the Lenders of a secured first priority lien on the Debtors' Avoidance Actions;  See Credit Agreement, § 17.14(b).

(b)     A carve-out for the benefit of professionals retained by the Debtors and any official committee appointed in the Chapter 11 Cases as set forth in paragraph 2.3 of the Interim Financing Order; See Credit Agreement, § 17.14(c); Interim Financing Order, ¶ 2.3.

(c)     The Debtors' waiver of the ability to surcharge the Collateral without the prior written consent of the Agent.  See Interim Financing Order, ¶ 4.2.

26.     These provisions are typically found in debtor-in-possession financing agreements, and the Lenders would not have agreed to provide financing to the Loan Parties absent such provisions.

- 15 -

27.    Lien on Avoidance Action Proceeds.  Subject to entry of the Final

Financing Order, the Lenders will be granted a lien on Avoidance Actions.  The Debtors submit

this is appropriate because the Debtors do not at this time anticipate filing any Avoidance

Actions.  Moreover, courts in this district and elsewhere have supported the granting of liens on

avoidance actions.  See In re Xerium Technologies, Inc., No. 10-11031(KJC) (Bankr. D. Del.

Apr. 28, 2010) (approving the granting of liens on avoidance actions to postpetition lenders); In

re Source Interlink Cos., No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009) (same); In re Ritz

Camera Centers, Inc., No. 09-10617 (MFW) (Bankr. D. Del. Mar. 27,2009) (same); In re

Gottschalks Inc., No. 09-10157(KJC) (Bankr. D. Del. Feb. 13, 2009); In re Tropicana Entm't,

LLC, No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (same); In re Silver Cinemas Int'l, Inc.,

No. 00-1978 (Bankr. D. Del. Aug. 11,2000) (same); In re Trans World Airlines, 163 B.R. 964,

974 (Bankr. D. Del. 1994) (same).

28.    Carve-Out.  Further, with the inclusion of provisions for the payment of

the expenses included in the Carve-Out, neither the Interim Financing Order nor Final Financing

Order directly or indirectly deprives the Debtors' estates or other parties in interest of possible

rights and powers by restricting the services for which professionals may be paid in these cases.

See Ames, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals

representing parties in interest because "[a]bsent such protection, the collective rights and

expectations of all parties-in -interest are sorely prejudiced").  Generally, the proposed Financing

Orders subject the security interests and administrative expense claims of the Lenders to

payment of the expenses under the Carve-Out, as described above.  In Ames, the court found

such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that

official committees and debtors' estates can retain assistance from counsel.  See id. at 41.

HUI-127237v10
RLF1 3576594v. 2

29. <u>506(c) Waiver</u>. No costs or expenses of administration that have or may be incurred at any time during the Chapter 11 Cases may be charged against Agent or any Lender, their respective claims or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of Agent. Section 506(c) of the Bankruptcy Code allows the estate to surcharge the collateral of a secured creditor to pay the reasonable and necessary costs and expenses of preserving or disposing of such creditor's collateral to the extent of any benefit received. <u>See</u> 11 U.S.C. § 506(c). In connection with the provision of debtor-in-possession financing, lenders commonly request a waiver of a debtor's ability to surcharge such lender's collateral. Here, the Lenders are lending new money to the Debtors, thereby benefiting the Debtors' estates. Further, this Court has authorized similar section 506(c) waivers in other instances. <u>See, e.g.</u>, <u>In re Magic Brands, LLC</u>, No. 10-11310 (BLS) (Bankr. D. Del. May 17, 2010) (approving 506(c) waiver as part of the debtor in possession financing); <u>In re Xerium Technologies, Inc.</u>, No. 10-11031(KJC) (Bankr. D. Del. Apr. 28, 2010) (same); <u>In re East West Resort Development V, L.P., L.L.L.P</u>, No. 10-10452(BLS) (Bankr. D. Del. Mar. 11, 2010) (same); <u>In re Lazy Days' R. V Inc.</u>, No. 09-13911 (KG) (Bankr. D. Del. Nov. 6, 2009) (same); <u>In re Source Interlink Cos.</u>, No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009) (same); <u>In re Ritz Camera Centers, Inc.</u>, No. 09-10617 (MFW) (Bankr. D. Del. Mar. 27, 2009) (same).

## III.   Modification of the Automatic Stay

30. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The Credit Agreement and the proposed Financing Orders contemplate the modification of the automatic stay (to the extent applicable), to the extent necessary to permit the Secured Parties to perform any act authorized or permitted under, or by virtue of, the Financing Orders or the Credit Agreement.

HUI-127237v10
RLF1 3576594v. 2

31.     Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are fair and reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court modify the automatic stay in accordance with the terms set forth in the proposed Financing Orders and the Credit Agreement.

**IV.     Interim Approval of the Credit Agreement**

32.     Pursuant to Bankruptcy Rule 4001(b) and (c) and Local Rule 4001-2(c), the Debtors respectfully request that the Court (a) conduct an expedited preliminary hearing on this motion, (b) enter the Interim Financing Order approving the Credit Agreement on an interim basis, pending the Final Hearing and entry of the Final Financing Order, and (c) schedule the Final Hearing.

33.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a hearing to consider the relief requested on a final basis. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Simasko Prod. Co., 47 BR 444, 449 (D. Colo. 1985); see also Ames, 115 B.R. at 38. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., Simasko, 47 B.R. at 449; Ames, 115 B.R. at 36.

- 18 -

34.     The Debtors have an urgent and immediate need to borrow up to $5,000,000 under the Credit Agreement. Although the Debtors do not anticipate that, over the long-term, the Non-Debtor Borrowers will use the credit facility for their ongoing working capital, capital expenditure and general corporate needs, an initial borrowing is critical for a number of reasons. First, the initial borrowing is necessary to provide sufficient liquidity in the event the Non-Debtor Borrowers experience any contraction in trade credit as a result of the filing of these Chapter 11 Cases. Second, the Non-Debtor Borrowers are entering a period in their business cycles where they build their working capital and the funding is needed to ensure sufficient liquidity for the working capital build. Third, the interim borrowing is important because it will enable the Non-Debtor Borrowers to clearly demonstrate to their vendors, suppliers and customers that the Non-Debtor Borrowers have sufficient liquidity, despite any perceived uncertainty created by these Chapter 11 Cases, to fund their ongoing operations. Absent authorization to obtain credit on an interim basis pending a Final Hearing, the Debtors may suffer immediate and irreparable harm because the Non-Debtor Borrowers, which are direct or indirect subsidiaries of SPHC, may temporarily have insufficient liquidity to meet their ongoing obligations. The interim relief requested herein is vital because it will prevent any disruption in the operations of the Non-Debtor Borrowers and make certain that the Debtors have a meaningful opportunity for a successful reorganization.

## Good Faith

35.     The terms and conditions of the Credit Agreement are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Therefore, the Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the Credit Agreement, or any interim or final order of this Court pertaining

- 19 -

thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

### Request for Final Hearing

36.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 25 days following the entry of the Interim Financing Order, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

37.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

38.     Notice of this Motion has been provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the law firms with the largest number or scope of pending asbestos personal injury cases against the Debtors, as identified in the Debtors' chapter 11 petitions; (c) counsel to International; (d) the Agent; (e) counsel to the Agent; (f) the holders of the twenty (20) largest unsecured claims against the Debtors' estates; (g) the Internal Revenue Service; (h) PNC Bank, N.A.; and (i) certain other parties, if any, identified in the certificate of service filed with the Court.  The Debtors submit that no other or further notice need be provided.  As this Motion is seeking first day relief, notice of this Motion will be served on all parties required by Local Rule 9013-1(m).

### No Prior Request

39.     No prior request for the relief sought in this Motion has been made to this or any other court.

HUI-127237v10
RLF1 3576594v. 2

WHEREFORE the Debtors respectfully request that the Court enter an Interim Financing Order substantially in the form attached hereto as <u>Exhibit A</u>, (i) granting the relief sought herein on an interim basis, (ii) prescribing the form and manner of notice and setting the time for the Final Hearing and (iii) granting such other and further relief as the Court may deem proper.

Dated: May 31, 2010

Respectfully submitted,

Daniel J. DeFranceschi (DE 2732)
Paul N. Heath (DE 3704)
Zachary I. Shapiro (DE 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street, P.A.
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Robert J. Jud (TX 24041217)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

PROPOSED ATTORNEYS FOR DEBTORS

HUI-127237v10
RLF1 3576594v. 2