# EXHIBIT A

## Credit Agreement

CREDIT AGREEMENT

by and among

CHEMICAL SPECIALTIES MANUFACTURING CORP.,
DAY-GLO COLOR CORP.,
DRYVIT HOLDINGS INC.,
KOP-COAT INC.,
TCI, INC.,
RPM WOOD FINISHES GROUP INC.,
GUARDIAN PROTECTION PRODUCTS INC.
and
DRYVIT SYSTEMS INC.
as Borrowers

SPECIALTY PRODUCTS HOLDING CORP.,
Debtor and Debtor-in-Possession
as Parent

THE LENDERS THAT ARE SIGNATORIES HERETO
as the Lenders,

and

WACHOVIA CAPITAL FINANCE CORPORATION (NEW ENGLAND)
as the Agent

Dated as of June __, 2010

# TABLE OF CONTENTS

1. DEFINITIONS AND CONSTRUCTION. .................................................................................. 1
   1.1 Definitions .............................................................................................................. 1
   1.2 Accounting Terms ................................................................................................. 1
   1.3 Code ...................................................................................................................... 1
   1.4 Construction ......................................................................................................... 2
   1.5 Schedules and Exhibits ......................................................................................... 3

2. LOANS AND TERMS OF PAYMENT. .................................................................................. 3
   2.1 Revolver Advances. ............................................................................................... 3
   2.2 Borrowing Procedures and Settlements. ............................................................. 4
   2.3 Payments; Reductions of Commitments; Prepayments. ...................................... 10
   2.4 Overadvances ...................................................................................................... 14
   2.5 Interest Rates and Letter of Credit Fee: .............................................................. 15
   2.6 Crediting Payments .............................................................................................. 16
   2.7 Designated Account ............................................................................................. 16
   2.8 Maintenance of Loan Account; Statements of Obligations .................................. 17
   2.9 Fees ...................................................................................................................... 17
   2.10 Letters of Credit. .................................................................................................. 17
   2.11 LIBOR Option. ...................................................................................................... 20
   2.12 Capital Requirements. .......................................................................................... 23
   2.13 Appointment of Administrative Loan Party as Agent for Requesting Loans and
        Receipts of Loans and Statements. ...................................................................... 24
   2.14 Limitation on Loans and Letters of Credit ........................................................... 25
   2.15 Joint and Several Liability. ................................................................................... 25

3. CONDITIONS; TERM OF AGREEMENT. .............................................................................. 26
   3.1 Conditions Precedent to the Initial Extension of Credit ...................................... 26
   3.2 Conditions Precedent to all Extensions of Credit ................................................ 26
   3.3 Bankruptcy Matters .............................................................................................. 26
   3.4 Maturity ................................................................................................................. 27
   3.5 Effect of Maturity .................................................................................................. 27
   3.6 Early Termination by Borrowers .......................................................................... 28
   3.7 Conditions Subsequent ........................................................................................ 28

4. REPRESENTATIONS AND WARRANTIES ............................................................................ 28
   4.1 Due Organization and Qualification; Subsidiaries. .............................................. 28
   4.2 Due Authorization; No Conflict ............................................................................ 29
   4.3 Governmental Consents ....................................................................................... 29
   4.4 Binding Obligations; Perfected Liens. .................................................................. 30
   4.5 Title to Assets; No Encumbrances ....................................................................... 30
   4.6 Jurisdiction of Organization; Location of Chief Executive Office; Organizational
       Identification Number; Commercial Tort Claims. ................................................ 30
   4.7 Litigation. ............................................................................................................. 31

| | | |
|---|---|---|
| 4.8 | Compliance with Laws | 31 |
| 4.9 | No Material Adverse Change | 31 |
| 4.10 | Fraudulent Transfer | 31 |
| 4.11 | Employee Benefits | 32 |
| 4.12 | Environmental Condition | 32 |
| 4.13 | Intellectual Property | 32 |
| 4.14 | Leases | 32 |
| 4.15 | Deposit Accounts and Securities Accounts | 32 |
| 4.16 | Complete Disclosure | 32 |
| 4.17 | Material Contracts | 33 |
| 4.18 | Patriot Act | 33 |
| 4.19 | Indebtedness | 33 |
| 4.20 | Payment of Taxes | 33 |
| 4.21 | Margin Equity Interests | 34 |
| 4.22 | Governmental Regulation | 34 |
| 4.23 | OFAC | 34 |
| 4.24 | Employee and Labor Matters | 34 |
| 4.25 | [Reserved] | 35 |
| 4.26 | Eligible Accounts | 35 |
| 4.27 | Eligible Inventory | 35 |
| 4.28 | Locations of Inventory and Equipment | 35 |
| 4.29 | Inventory Records | 35 |
| 4.30 | Financing Order | 35 |
| 4.31 | Super-Priority Administrative Expense | 35 |
| **5.** | **AFFIRMATIVE COVENANTS.** | **36** |
| 5.1 | Financial Statements, Reports, Certificates | 36 |
| 5.2 | Collateral Reporting | 36 |
| 5.3 | Existence | 36 |
| 5.4 | Maintenance of Properties | 36 |
| 5.5 | Taxes | 36 |
| 5.6 | Insurance | 37 |
| 5.7 | Inspection | 37 |
| 5.8 | Compliance with Laws | 38 |
| 5.9 | Environmental | 38 |
| 5.10 | Disclosure Updates | 38 |
| 5.11 | Formation of Subsidiaries | 38 |
| 5.12 | Further Assurances | 39 |
| 5.13 | Lender Meetings | 40 |
| 5.14 | Material Contracts | 40 |
| 5.15 | Location of Inventory and Equipment | 40 |
| 5.16 | Assignable Material Contracts | 40 |
| **6.** | **NEGATIVE COVENANTS.** | **40** |
| 6.1 | Indebtedness | 41 |
| 6.2 | Liens | 41 |
| 6.3 | Restrictions on Fundamental Changes | 41 |

| | 6.4 | Disposal of Assets................................................................................... 41 |
|---|---|---|
| | 6.5 | Change Name......................................................................................... 41 |
| | 6.6 | Nature of Business ................................................................................ 41 |
| | 6.7 | Prepayments and Amendments.............................................................. 42 |
| | 6.8 | Change of Control.................................................................................. 42 |
| | 6.9 | Restricted Junior Payments .................................................................. 42 |
| | 6.10 | Accounting Methods .............................................................................. 43 |
| | 6.11 | Investments; Controlled Investments ................................................... 43 |
| | 6.12 | Transactions with Affiliates.................................................................. 43 |
| | 6.13 | Use of Proceeds..................................................................................... 44 |
| | 6.14 | Limitation on Issuance of Equity Interests .......................................... 44 |
| | 6.15 | Consignments........................................................................................ 44 |
| | 6.16 | Bankruptcy............................................................................................ 44 |
| | 6.17 | Excess Availability ............................................................................... 45 |
| | 6.18 | Solvency Certificate ............................................................................. 45 |
| 7. | | FINANCIAL COVENANT. .................................................................................. 45 |
| 8. | | EVENTS OF DEFAULT. ...................................................................................... 45 |
| 9. | | RIGHTS AND REMEDIES. .................................................................................. 48 |
| | 9.1 | Rights and Remedies.............................................................................. 48 |
| | 9.2 | Remedies Cumulative ............................................................................ 49 |
| 10. | | WAIVERS; INDEMNIFICATION. ....................................................................... 49 |
| | 10.1 | Demand; Protest; etc ............................................................................. 49 |
| | 10.2 | The Lender Group's Liability for Collateral......................................... 49 |
| | 10.3 | Indemnification ..................................................................................... 50 |
| 11. | | NOTICES............................................................................................................... 51 |
| 12. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. .............................. 52 |
| 13. | | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS. ....................... 53 |
| | 13.1 | Assignments and Participations. ........................................................... 53 |
| | 13.2 | Successors ............................................................................................. 56 |
| 14. | | AMENDMENTS; WAIVERS. ................................................................................ 56 |
| | 14.1 | Amendments and Waivers. .................................................................... 56 |
| | 14.2 | Replacement of Certain Lenders........................................................... 58 |
| | 14.3 | No Waivers; Cumulative Remedies ...................................................... 59 |
| 15. | | AGENT; THE LENDER GROUP.......................................................................... 59 |
| | 15.1 | Appointment and Authorization of Agent ............................................ 59 |
| | 15.2 | Delegation of Duties ............................................................................. 60 |
| | 15.3 | Liability of Agent.................................................................................. 60 |
| | 15.4 | Reliance by Agent................................................................................. 61 |
| | 15.5 | Notice of Default or Event of Default................................................... 61 |
| | 15.6 | Credit Decision ..................................................................................... 61 |

| 15.7 | Costs and Expenses; Indemnification | 62 |
|---|---|---|
| 15.8 | Agent in Individual Capacity | 63 |
| 15.9 | Successor Agent | 63 |
| 15.10 | Lender in Individual Capacity | 64 |
| 15.11 | Collateral Matters | 64 |
| 15.12 | Restrictions on Actions by Lenders; Sharing of Payments | 65 |
| 15.13 | Agency for Perfection | 66 |
| 15.14 | Payments by Agent to the Lenders | 66 |
| 15.15 | Concerning the Collateral and Related Loan Documents | 66 |
| 15.16 | Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 66 |
| 15.17 | Several Obligations; No Liability | 67 |

| 16. | WITHHOLDING TAXES. | 68 |
|---|---|---|

| 17. | GENERAL PROVISIONS. | 71 |
|---|---|---|
| 17.1 | Effectiveness | 71 |
| 17.2 | Section Headings | 71 |
| 17.3 | Interpretation | 71 |
| 17.4 | Severability of Provisions | 71 |
| 17.5 | Bank Product Providers | 71 |
| 17.6 | Debtor-Creditor Relationship | 72 |
| 17.7 | Counterparts; Electronic Execution | 72 |
| 17.8 | Revival and Reinstatement of Obligations | 72 |
| 17.9 | Confidentiality. | 73 |
| 17.10 | Lender Group Expenses | 74 |
| 17.11 | Survival | 74 |
| 17.12 | USA PATRIOT Act | 74 |
| 17.13 | Integration | 74 |
| 17.14 | Effect of Financing Orders | 74 |

# EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit B-1 | Form of Borrowing Base Certificate |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit L-1 | Form of LIBOR Notice |
| Schedule A-1 | Agent's Account |
| Schedule A-2 | Authorized Persons |
| Schedule C-1 | Commitments |
| Schedule D-1 | Designated Account |
| Schedule E-2 | Existing Letters of Credit |
| Schedule P-1 | Permitted Investments |
| Schedule P-2 | Permitted Liens |
| Schedule R-1 | Real Property Collateral |
| Schedule 1.1 | Definitions |
| Schedule 3.1 | Conditions Precedent |
| Schedule 3.7 | Conditions Subsequent |
| Schedule 4.1(b) | Capitalization of Borrowers |
| Schedule 4.1(c) | Capitalization of Borrowers' Subsidiaries |
| Schedule 4.6(a) | States of Organization |
| Schedule 4.6(b) | Chief Executive Offices |
| Schedule 4.6(c) | Organizational Identification Numbers |
| Schedule 4.6(d) | Commercial Tort Claims |
| Schedule 4.7(b) | Litigation |

| | |
|---|---|
| Schedule 4.12 | Environmental Matters |
| Schedule 4.13 | Intellectual Property |
| Schedule 4.15 | Deposit Accounts and Securities Accounts |
| Schedule 4.17 | Material Contracts |
| Schedule 4.19 | Permitted Indebtedness |
| Schedule 4.28 | Locations of Inventory and Equipment |
| Schedule 5.1 | Financial Statements, Reports, Certificates |
| Schedule 5.2 | Collateral Reporting |
| Schedule 6.6 | Nature of Business |
| Schedule 6.17 | Excess Availability |

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT (this "Agreement"), is entered into as of June __, 2010 by and among the lenders identified on the signature pages hereof (each of such lenders, together with their respective successors and permitted assigns, are referred to hereinafter as a "Lender", as that term is hereinafter further defined), **WACHOVIA CAPITAL FINANCE CORPORATION (NEW ENGLAND)**, a Massachusetts corporation, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent"), SPECIALTY PRODUCTS HOLDING CORP. an Ohio corporation ("Parent"), CHEMICAL SPECIALTIES MANUFACTURING CORP., a Maryland corporation; DAY-GLO COLOR CORP., an Ohio corporation; DRYVIT HOLDINGS INC., a Delaware corporation; KOP-COAT INC., an Ohio corporation; TCI, INC., a Georgia corporation; RPM WOOD FINISHES GROUP INC., a Nevada corporation; GUARDIAN PROTECTION PRODUCTS INC., a Delaware corporation; and DRYVIT SYSTEMS INC., a Rhode Island corporation; (individually each, a "Borrower" and collectively, "Borrowers").

The parties agree as follows:

1. **DEFINITIONS AND CONSTRUCTION.**

    1.1 **Definitions**. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1.

    1.2 **Accounting Terms**. Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the financial statements of Parent most recently received by Agent prior to the date hereof. Notwithstanding anything to the contrary contained in GAAP or any interpretations or other pronouncements by the Financial Accounting Standards Board or otherwise, the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is unqualified and also does not include any explanation, supplemental comment or other comment concerning the ability of the applicable person to continue as a going concern or the scope of the audit. When used herein, the term "financial statements" shall, where applicable, include the notes and schedules thereto. Whenever the term "Parent" or "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise.

    1.3 **Code**. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4  **Construction**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, (a) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Collateralization, and (b) in the case of obligations with respect to Bank Products (other than Hedge Obligations), providing Bank Product Collateralization) of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (i) unasserted contingent indemnification Obligations, (ii) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (iii) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider to remain outstanding without being required to be repaid.  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.  All references to Borrower, Guarantor, Agent and Lenders pursuant to the definitions set forth in the recitals hereto or Schedule 1.1 hereto, or to any other person herein or therein, shall include their respective successors and assigns.  An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 14.1 or is cured in a manner satisfactory to Agent, if such Event of Default is capable of being cured as determined by Agent.  All references to the term "good faith" used herein when applicable to Agent or any Lender shall mean, notwithstanding anything to the contrary contained herein or in the UCC, honesty in fact in the conduct or transaction concerned.  Borrowers and Guarantors shall have the burden of proving any lack of good faith on the part of Agent or any Lender alleged by any Borrower or Guarantor at any time.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".  This Agreement and other Loan Documents may use several different limitations, tests or

measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms. This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Agent and the other parties, and are the products of all parties. Accordingly, this Agreement and the other Loan Documents shall not be construed against Agent or Lenders merely because of Agent's or any Lender's involvement in their preparation.

1.5 **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## 2. **LOANS AND TERMS OF PAYMENT.**

2.1 **Revolver Advances**.

(a) Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender with a Revolver Commitment agrees (severally, not jointly or jointly and severally) to make revolving loans ("Advances") to Borrowers in an amount at any one time outstanding not to exceed the lesser of:

(i) such Lender's Revolver Commitment, or

(ii) such Lender's Pro Rata Share of an amount equal to the lesser of:

(A) the Maximum Revolver Amount less the sum of (1) the Letter of Credit Usage at such time, plus (2) the principal amount of Swing Line Loans outstanding at such time, and

(B) the Borrowing Base at such time less the sum of (1) the Letter of Credit Usage at such time, plus (2) the principal amount of Swing Line Loans outstanding at such time.

(b) Amounts borrowed pursuant to this Section 2.1 may be repaid without penalty or premium and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement. The outstanding principal amount of the Advances, together with interest accrued thereon, shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

(c) Anything to the contrary in this Section 2.1 notwithstanding but without duplication of other reserves or eligibility criteria, Agent shall have the right (but not the obligation) to establish, increase, reduce, eliminate, or otherwise adjust reserves from time to time against the Borrowing Base, or the Maximum Revolver Amount in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate, including (i) reserves in an amount equal to the Bank Product Reserve Amount, (ii) the Bankruptcy Reserve, and (iii) reserves with respect to (A) sums that Parent or its Subsidiaries are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and have failed to pay, and (B) amounts owing by Parent or its Subsidiaries to

any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien which is a permitted purchase money Lien or the interest of a lessor under a Capital Lease), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral.

2.2 **Borrowing Procedures and Settlements**.

(a) **Procedure for Borrowing**. Each Borrowing shall be made by a written request by an Authorized Person delivered to Agent. Unless Swing Line Lender is not obligated to make a Swing Line Loan pursuant to Section 2.2(b) below, such notice must be received by Agent no later than 1:00 p.m. on the Business Day that is the requested Funding Date specifying (i) the amount of such Borrowing, and (ii) the requested Funding Date, which shall be a Business Day; provided, however, that if Swing Line Lender is not obligated to make a Swing Line Loan as to a requested Borrowing, such notice must be received by Agent no later than 1:00 p.m. on the Business Day prior to the date that is the requested Funding Date. At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time. In such circumstances, Administrative Loan Party agrees that any such telephonic notice will be confirmed in writing within twenty-four (24) hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

(b) **Making of Swing Line Loans**. In the case of a request for an Advance and so long as either (i) the aggregate amount of Swing Line Loans made since the last Settlement Date, minus the amount of Collections or payments applied to Swing Line Loans since the last Settlement Date, plus the amount of the requested Advance does not exceed $4,000,000, or (ii) Swing Line Lender, in its sole discretion, shall agree to make a Swing Line Loan notwithstanding the foregoing limitation, Swing Line Lender shall make an Advance in the amount of such requested Borrowing (any such Advance made solely by Swing Line Lender pursuant to this Section 2.2(b) being referred to as a "Swing Line Loan" and such Advances being referred to as "Swing Line Loans") available to Borrowers on the Funding Date applicable thereto by transferring immediately available funds to the Designated Account. Anything contained herein to the contrary notwithstanding, the Swing Line Lender may, but shall not be obligated to, make Swing Line Loans at any time that one or more of the Lenders is a Defaulting Lender. Each Swing Line Loan shall be deemed to be an Advance hereunder and shall be subject to all the terms and conditions (including Section 3) applicable to other Advances; except, that, all payments on any Swing Line Loan shall be payable to Swing Line Lender solely for its own account. Subject to the provisions of Section 2.2(d)(ii), Swing Line Lender shall not make and shall not be obligated to make any Swing Line Loan if Swing Line Lender has actual knowledge that (A) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing, or (B) the requested Borrowing would exceed the Availability on such Funding Date. Swing Line Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 3 have been satisfied on the Funding Date applicable thereto prior to making any Swing Line Loan. The Swing Line Loans shall be secured by Agent's Liens, constitute Advances and

Obligations hereunder, and bear interest at the rate applicable from time to time to Advances that are Base Rate Loans.

(c)     **Making of Loans**.

(i)     In the event that Swing Line Lender is not obligated to make a Swing Line Loan, then promptly after receipt of a request for a Borrowing pursuant to Section 2.2(a), Agent shall notify the Lenders, not later than 4:00 p.m. on the Business Day immediately preceding the Funding Date applicable thereto, by telecopy, telephone, or other similar form of transmission, of the requested Borrowing. Each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 10:00 a.m. on the Funding Date applicable thereto. After Agent's receipt of the proceeds of such Advances, Agent shall make the proceeds thereof available to Borrowers on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated Account; provided, however, that subject to the provisions of Section 2.3(d)(ii), Agent shall not request any Lender to make, and no Lender shall have the obligation to make, any Advance if (A) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (B) the requested Borrowing would exceed the Availability on such Funding Date.

(ii)     Unless Agent receives notice from a Lender prior to 12:00 noon on the date of a Borrowing, that such Lender will not make available as and when required hereunder to Agent for the account of Borrowers the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers on such date a corresponding amount. If any Lender shall not have made its full amount available to Agent in immediately available funds and if Agent in such circumstances has made available to Borrowers such amount, that Lender shall on the Business Day following such Funding Date make such amount available to Agent, together with interest at the Defaulting Lender Rate for each day during such period. A notice submitted by Agent to any Lender with respect to amounts owing under this Section 2.2(c)(ii) shall be conclusive, absent manifest error. If such amount is so made available, such payment to Agent shall constitute such Lender's Advance on the date of Borrowing for all purposes of this Agreement. If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Administrative Loan Party of such failure to fund and, upon demand by Agent, Borrowers shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Advances composing such Borrowing.

(d)     **Protective Advances and Optional Overadvances**.

(i)     Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to Section 2.2(d)(iv), Agent hereby is authorized by Borrowers and the Lenders, from time to time in Agent's sole discretion, (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) at any time that any of the

other applicable conditions precedent set forth in Section 3 are not satisfied, to make Advances to, or for the benefit of, Borrowers on behalf of the Lenders that Agent, in its Permitted Discretion deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations) (any of the Advances described in this Section 2.3(d)(i) shall be referred to as "Protective Advances").

(ii)     Any contrary provision of this Agreement or any other Loan Document notwithstanding, the Lenders hereby authorize Agent or Swing Line Lender, as applicable, and either Agent or Swing Line Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make Advances (including Swing Line Loans) to Borrowers notwithstanding that an Overadvance exists or thereby would be created, so long as (A) after giving effect to such Advances, the outstanding Revolver Usage does not exceed the Borrowing Base by more than $4,000,000, (B) after giving effect to such Advances, the outstanding Revolver Usage (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Maximum Revolver Amount.  In the event Agent obtains actual knowledge that the Revolver Usage or the Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Agent may make such Overadvances and provide notice as promptly as practicable thereafter), and the Lenders with Revolver Commitments thereupon shall, together with Agent, jointly determine the terms of arrangements that shall be implemented with Borrowers intended to reduce, within a reasonable time, the outstanding principal amount of the Advances to Borrowers to an amount permitted by the preceding sentence.  In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders.  In any event:  (1) if any unintentional Overadvance remains outstanding for more than thirty (30) days, unless otherwise agreed to by the Required Lenders, Borrowers shall immediately repay Advances in an amount sufficient to eliminate all such unintentional Overadvances, and (2) after the date all such Overadvances have been eliminated, there must be at least five (5) consecutive days before intentional Overadvances are made.  The foregoing provisions are meant for the benefit of the Lenders and Agent and are not meant for the benefit of Borrowers, which shall continue to be bound by the provisions of Section 2.5.  Each Lender with a Revolver Commitment shall be obligated to settle with Agent as provided in Section 2.2(e) for the amount of such Lender's Pro Rata Share of any unintentional Overadvances by Agent reported to such Lender, any intentional Overadvances made as permitted under this Section 2.2(d)(ii), and any Overadvances resulting from the charging to the Loan Account of interest, fees, or Lender Group Expenses.

(iii)     Each Protective Advance and each Overadvance shall be deemed to be an Advance hereunder; except, that, no Protective Advance or Overadvance shall be eligible to be a LIBOR Rate Loan and, prior to Settlement therefor, all payments on the Protective Advances shall be payable to Agent solely for its own account.  The Protective

Advances and Overadvances shall be repayable on demand, secured by Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances that are Base Rate Loans. The ability of Agent to make Protective Advances is separate and distinct from its ability to make Overadvances and its ability to make Overadvances is separate and distinct from its ability to make Protective Advances. For the avoidance of doubt, the limitations on Agent's ability to make Protective Advances do not apply to Overadvances and the limitations on Agent's ability to make Overadvances do not apply to Protective Advances. The provisions of this Section 2.2(d) are for the exclusive benefit of Agent, Swing Line Lender, and the Lenders and are not intended to benefit Borrowers in any way.

(iv)   Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary: (A) no Overadvance or Protective Advance may be made by Agent if such Advance would cause the aggregate principal amount of Overadvances and Protective Advances outstanding to exceed an amount equal to ten (10%) percent of the Maximum Revolver Amount; and (B) to the extent any Protective Advance causes the aggregate Revolver Usage to exceed the Maximum Revolver Amount, each such Protective Advance shall be for Agent's sole and separate account and not for the account of any Lender and shall be entitled to priority in repayment in accordance with Section 2.2(b).

(e)   **Settlement**.   It is agreed that each Lender's funded portion of the Advances is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Advances. Such agreement notwithstanding, Agent, Swing Line Lender, and the other Lenders agree (which agreement shall not be for the benefit of Borrowers) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Advances, the Swing Line Loans, and the Protective Advances shall take place on a periodic basis in accordance with the following provisions:

(i)   Agent shall request settlement ("Settlement") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent (A) on behalf of Swing Line Lender, with respect to the outstanding Swing Line Loans, (B) for itself, with respect to the outstanding Protective Advances, and (C) with respect to Borrowers' or their Subsidiaries' Collections or payments received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 5:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Advances, Swing Loans, and Protective Advances for the period since the prior Settlement Date. Subject to the terms and conditions contained herein (including Section 2.2(g)): (1) if the amount of the Advances (including Swing Line Loans and Protective Advances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Pro Rata Share of the Advances (including Swing Line Loans and Protective Advances) as of a Settlement Date, then Agent shall, by no later than 3:00 p.m. on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Swing Line Loans and Protective Advances), and (2) if the amount of the Advances (including Swing Line Loans and Protective Advances) made by a Lender is less than such

Lender's Pro Rata Share of the Advances (including Swing Line Loans and Protective Advances) as of a Settlement Date, such Lender shall no later than 3:00 p.m. on the Settlement Date transfer in immediately available funds to Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Swing Line Loans and Protective Advances). Such amounts made available to Agent under clause (2) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Line Loans or Protective Advances and, together with the portion of such Swing Line Loans or Protective Advances representing Swing Line Lender's Pro Rata Share thereof, shall constitute Advances of such Lenders. If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)     In determining whether a Lender's balance of the Advances, Swing Line Loans, and Protective Advances is less than, equal to, or greater than such Lender's Pro Rata Share of the Advances, Swing Line Loans, and Protective Advances as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral.

(iii)     Between Settlement Dates, Agent, to the extent Protective Advances or Swing Line Loans are outstanding, may pay over to Agent or Swing Line Lender, as applicable, any Collections or payments received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Advances, for application to the Protective Advances or Swing Line Loans. Between Settlement Dates, Agent, to the extent no Protective Advances or Swing Line Loans are outstanding, may pay over to Swing Line Lender any Collections or payments received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Advances, for application to Swing Line Lender's Pro Rata Share of the Advances. If, as of any Settlement Date, Collections or payments of Borrowers or their Subsidiaries received since the then immediately preceding Settlement Date have been applied to Swing Line Lender's Pro Rata Share of the Advances other than to Swing Line Loans, as provided for in the previous sentence, Swing Line Lender shall pay to Agent for the accounts of the Lenders, and Agent shall pay to the Lenders (other than a Defaulting Lender if Agent has implemented the provisions of Section 2.2(g)), to be applied to the outstanding Advances of such Lenders, an amount such that each such Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the Advances. During the period between Settlement Dates, Swing Line Lender with respect to Swing Line Loans, Agent with respect to Protective Advances, and each Lender (subject to the effect of agreements between Agent and individual Lenders) with respect to the Advances other than Swing Line Loans and Protective Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Line Lender, Agent, or the Lenders, as applicable.

(iv)     Anything in this Section 2.3(e) to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting

settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.2(g).

(f)     **Notation**.  Agent, as a non-fiduciary agent for Borrowers, shall maintain a register showing the principal amount of the Advances owing to each Lender, including the Swing Line Loans owing to Swing Line Lender, and Protective Advances owing to Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)     **Defaulting Lenders**.  Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit or any Collections or proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments (i) first, to Swing Line Lender to the extent of any Swing Line Loans that were made by Swing Line Lender and that were required to be, but were not, repaid by the Defaulting Lender, (ii) second, to the Issuing Lender, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, repaid by the Defaulting Lender, (iii) third, to each non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of an Advance (or other funding obligation) was funded by such other non-Defaulting Lender), (iv) to a suspense account maintained by Agent, the proceeds of which shall be retained by Agent and may be made available to be re-advanced to or for the benefit of Borrowers as if such Defaulting Lender had made its portion of Advances (or other funding obligations) hereunder, and (v) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (L) of Section 2.3(b)(ii).  Subject to the foregoing, Agent may hold and, in its Permitted Discretion, re-lend to Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender.  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fee payable under Section 2.9(b)(ii), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero.  The provisions of this Section 2.2(g) shall remain effective with respect to such Defaulting Lender until the earlier of (A) the date on which the non-Defaulting Lenders, Agent, and Borrowers shall have waived, in writing, the application of this Section 2.2(g) to such Defaulting Lender, or (B) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder.  The operation of this Section 2.2(g) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Agent or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrowers, at their option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to

Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of the Letters of Credit); provided, however, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this Section 2.2(g) and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.2(g) shall control and govern.

(h)  **Independent Obligations**. All Advances (other than Swing Line Loans and Protective Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares. It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Advance (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.3  **Payments; Reductions of Commitments; Prepayments**.

(a)  **Payments by Borrowers**.

(i)  Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 2:00 p.m. on the date specified herein. Any payment received by Agent later than 2:00 p.m. shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)  Unless Agent receives notice from Borrowers prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b) **Apportionment and Application**.

(i) So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent (other than fees or expenses that are for Agent's separate account or for the separate account of the Issuing Lender) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates. All payments to be made hereunder by Borrowers shall be remitted to Agent and all (subject to Section 2.3(b)(iv) and Section 2.3(e)) such payments, and all proceeds of Collateral received by Agent, shall be applied, so long as no Application Event has occurred and is continuing, to reduce the balance of the Advances outstanding and, thereafter, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(ii) At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all payments remitted to Agent and all proceeds of Collateral received by Agent shall be applied as follows:

(A) first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents, until paid in full,

(B) second, to pay any fees or premiums then due to Agent under the Loan Documents until paid in full,

(C) third, to pay interest due in respect of all Protective Advances until paid in full,

(D) fourth, to pay the principal of all Protective Advances until paid in full,

(E) fifth, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(F) sixth, ratably, to pay any fees or premiums then due to any of the Lenders under the Loan Documents until paid in full,

(G) seventh, to pay interest accrued in respect of the Swing Line Loans until paid in full,

(H) eighth, to pay the principal of all Swing Line Loans until paid in full,

(I)     ninth, ratably, to pay interest accrued in respect of the Advances (other than Protective Advances) until paid in full,

(J)     tenth, ratably (1) to pay the principal of all Advances until paid in full, (2) to Agent, to be held by Agent, for the benefit of Issuing Lender (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of the Issuing Lender, a share of each Letter of Credit Disbursement), as cash collateral in an amount up to one hundred five (105%) percent of the Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this Section 2.3(b)(i), beginning with tier (A) hereof), (3) ratably, to the Bank Product Providers based upon amounts then certified by the applicable Bank Product Provider to Agent (in form and substance satisfactory to Agent) to be due and payable to such Bank Product Providers on account of Bank Product Obligations, is paid in full,

(K)     eleventh, to pay any other Obligations other than Obligations owed to Defaulting Lenders,

(L)     twelfth, ratably to pay any Obligations owed to Defaulting Lenders; and

(M)     thirteenth, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iii)     Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(e).

(iv)     In each instance, so long as no Application Event has occurred and is continuing, Section 2.3(b)(i) shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(v)     For purposes of Section 2.3(b)(ii), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vi)     In the event of a direct conflict between the priority provisions of this Section 2.3 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the

provisions of Section 2.2(g) and this Section 2.3, then the provisions of Section 2.2(g) shall control and govern, and if otherwise, then the terms and provisions of this Section 2.3 shall control and govern.

(c) **Reduction of Commitments**. The Revolver Commitments shall terminate on the Maturity Date. Borrowers may reduce the Revolver Commitments, without premium or penalty, to an amount (which may be zero) not less than the sum of (i) the Revolver Usage as of such date, plus (ii) the principal amount of all Advances not yet made as to which a request has been given by Administrative Loan Party under Section 2.2(a), plus (iii) the amount of all Letters of Credit not yet issued as to which a request has been given by Administrative Loan Party pursuant to Section 2.10(a). Each such reduction shall be in an amount which is not less than $5,000,000 (unless the Revolver Commitments are being reduced to zero and the amount of the Revolver Commitments in effect immediately prior to such reduction are less than $5,000,000), shall be made by providing not less than ten (10) Business Days prior written notice to Agent and shall be irrevocable. Once reduced, the Revolver Commitments may not be increased. Each such reduction of the Revolver Commitments shall reduce the Revolver Commitments of each Lender proportionately in accordance with its Pro Rata Share thereof.

(d) **Optional Prepayments**. Borrowers may prepay the principal of any Advance in whole or in part, upon not less than five (5) Business Days prior written notice, without premium or penalty.

(e) **Mandatory Prepayments**.

(i) **Borrowing Base**. If, at any time, (A) the Revolver Usage on such date exceeds (B) the Borrowing Base (such excess being referred to as the "Borrowing Base Excess"), then Borrowers shall promptly, but in any event, within one (1) Business Day prepay the Obligations in accordance with Section 2.3(f)(i) in an aggregate amount equal to the Borrowing Base Excess.

(ii) **Dispositions**. Within one (1) Business Day of the date of receipt by any Borrower or any Subsidiary of any Borrower of the Net Cash Proceeds of any voluntary or involuntary sale or disposition by any Borrower or any Subsidiary of any Borrower of assets (including casualty losses or condemnations but excluding sales or dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), or (d) of the definition of Permitted Dispositions), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f)(ii) in an amount equal to one hundred (100%) percent of such Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received by such Person in connection with such sales or dispositions; provided, that, so long as (A) no Default or Event of Default shall have occurred and is continuing or would result therefrom, (B) Administrative Loan Party shall have given Agent prior written notice of Borrowers' intention to apply such monies to the costs of replacement of the properties or assets that are the subject of such sale or disposition or the cost of purchase or construction of other assets useful in the business of Borrowers or their Subsidiaries, (C) the monies are held in a Deposit Account in which Agent has a perfected first-priority security interest, and (D) Borrowers or their Subsidiaries, as applicable, complete such replacement, purchase, or construction within one hundred eighty (180) days after the initial receipt of such monies, then the Loan Party whose

assets were the subject of such disposition shall have the option to apply such monies to the costs of replacement of the assets that are the subject of such sale or disposition or the costs of purchase or construction of other assets useful in the business of Borrowers or their Subsidiaries unless and to the extent that such applicable period shall have expired without such replacement, purchase, or construction being made or completed, in which case, any amounts remaining in the cash collateral account shall be paid to Agent and applied in accordance with Section 2.4(f)(ii); provided, however, that Borrowers and their Subsidiaries shall not have the right to use such Net Cash Proceeds to make such replacements, purchases, or construction in excess of $1,000,000 in any given fiscal year. Nothing contained in this Section 2.3(e)(ii) shall permit Parent or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 6.4.

(iii)    **Extraordinary Receipts**. Within one (1) Business Day of the date of receipt by Borrowers or any of their Subsidiaries of any Extraordinary Receipts, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f)(ii) in an amount equal to one hundred (100%) percent of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(iv)    **Indebtedness**.    Within one (1) Business Day of the date of incurrence by Borrowers or any of their Subsidiaries of any Indebtedness (other than Permitted Indebtedness), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f)(ii) in an amount equal to one hundred (100%) percent of the Net Cash Proceeds received by such Person in connection with such incurrence. The provisions of this Section 2.4(e)(iv) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

(v)    **Equity**. Within one (1) Business Day of the date of the issuance by any Borrower or any Subsidiary of any Borrower of any shares of its or their Equity Interests (other than (A) in the event that Parent or any of its Subsidiaries forms any Subsidiary in accordance with the terms hereof, the issuance by such Subsidiary of Equity Interests to Parent or such Subsidiary, as applicable, (B) so long as no Event of Default has occurred and is continuing, the issuance of Equity Interests by Parent to Equity Sponsor, (C) the issuance of Equity Interests of Parent or any of its Subsidiaries to directors, officers and employees pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the Board of Directors, and (D) the issuance of Equity Interests of Parent or any of its Subsidiaries in order to finance the purchase consideration (or a portion thereof) in connection with a Permitted Acquisition), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f)(ii) in an amount equal to one hundred (100%) percent of the Net Cash Proceeds received by such Person in connection with such issuance. The provisions of this Section 2.4(e)(v) shall not be deemed to be implied consent to any such issuance otherwise prohibited by the terms and conditions of this Agreement.

(f)    **Application of Payments**. Each prepayment pursuant to Section 2.3(e)(i) above, so long as an Application Event shall have occurred and be continuing, be applied first, to the outstanding principal amount of the Advances until repaid in full and any remaining amount shall be retained to cash collateralize the Letters of Credit in an amount equal to one hundred

five (105%) percent of the Letter of Credit Usage and, if an Application Event shall have occurred and be continuing, be applied in the amount set forth in Section 2.3(b)(ii).

2.4 **Overadvances**. If, at any time or for any reason, the amount of Obligations owed by Borrowers to the Lender Group pursuant to Section 2.1 or Section 2.10 is greater than any of the limitations set forth in Section 2.1 or Section 2.10, as applicable (an "Overadvance"), Borrowers shall immediately promptly, but in any event, within one (1) Business Day of the initial occurrence of an Overadvance pay to Agent, in cash, the amount of such excess, which amount shall be used by Agent to reduce the Obligations in accordance with the priorities set forth in Section 2.3(b). Borrowers promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in full on the Maturity Date or, if earlier, on the date on which the Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of this Agreement.

2.5 **Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations**.

(a) **Interest Rates**. Except as provided in Section 2.5(c), all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows:

(i) if the relevant Obligation is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate plus the LIBOR Rate Margin, and

(ii) otherwise, at a per annum rate equal to the Base Rate plus the Base Rate Margin.

(b) **Letter of Credit Fee**. Borrowers shall pay Agent (for the ratable benefit of the Lenders with a Revolver Commitment, subject to any agreements between Agent and individual Lenders), a Letter of Credit fee (in addition to the charges, commissions, fees, and costs set forth in Section 2.10(e)) which shall accrue at a per annum rate equal to the LIBOR Rate Margin times the Daily Balance of the undrawn amount of all outstanding Letters of Credit.

(c) **Default Rate**. Upon the occurrence and during the continuation of an Event of Default and at the election of the Required Lenders,

(i) all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to two (2) percentage points above the per annum rate otherwise applicable thereunder, and

(ii) the Letter of Credit fee provided for in Section 2.5(b) shall be increased to two (2) percentage points above the per annum rate otherwise applicable hereunder.

(d) **Payment**. Except to the extent provided to the contrary in Section 2.9 or Section 2.11(a), interest, Letter of Credit fees, all other fees payable hereunder or under any of the other Loan Documents, and all costs, expenses, and Lender Group Expenses payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the

first (1st) day of each month at any time that Obligations or Commitments are outstanding. Borrowers hereby authorize Agent, from time to time without prior notice to Borrowers, to charge all interest, Letter of Credit fees, and all other fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Group Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when incurred), all charges, commissions, fees, and costs provided for in Section 2.11(e)) (as and when accrued or incurred), all fees and costs provided for in Section 2.9 (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products) to the Loan Account, which amounts thereafter shall constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans. Any interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document or under any Bank Product Agreement that are charged to the Loan Account shall thereafter constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans (unless and until converted into LIBOR Rate Loans in accordance with the terms of this Agreement).

(e) **Computation**. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue. In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f) **Intent to Limit Charges to Maximum Lawful Rate**. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.6 **Crediting Payments**. The receipt of any payment item by Agent shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Account on a Business Day on or before 2:00 p.m. If any payment item is received into Agent's Account on a non-Business Day or after 2:00 p.m. on a Business Day, it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.7     **Designated Account**.  Agent is authorized to make the Advances, and Issuing Lender is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.5(d).  Each Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Advances requested by such Borrower, or on its behalf by Administrative Loan Party, and made by Agent or the Lenders hereunder.  Unless otherwise agreed by Agent and Borrowers, any Advance or Swing Line Loan requested by or on behalf of a Borrower and made by Agent or the Lenders hereunder shall be made to the Designated Account.

2.8     **Maintenance of Loan Account; Statements of Obligations**.  Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers shall be charged with all Advances (including Protective Advances and Swing Line Loans) made by Agent, Swing Line Lender, or the Lenders to Borrowers or for Borrowers' account, the Letters of Credit issued or arranged by Issuing Lender for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account.  Agent shall render monthly statements regarding the Loan Account to Borrowers, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Group Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within thirty (30) days after receipt thereof by Borrowers, Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

2.9     **Fees**.  Borrowers shall pay to Agent,

(a)     for the account of Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

(b)     for the ratable account of those Lenders with Revolver Commitments, on the first (1st) day of each month from and after the Closing Date up to the first (1st) day of the month prior to the Payoff Date and on the Payoff Date, an unused line fee in an amount equal to one-half of one (0.5%) percent per annum times the result of (i) the aggregate amount of the Revolver Commitments, less (ii) the average Daily Balance of the Revolver Usage during the immediately preceding month (or portion thereof).

2.10    **Letters of Credit**.

(a)     Subject to the terms and conditions of this Agreement, upon the request of Administrative Loan Party made in accordance herewith, the Issuing Lender agrees to issue, or to cause an Underlying Issuer, as Issuing Lender's agent, to issue, a requested Letter of Credit.  If Issuing Lender, at its option, elects to cause an Underlying Issuer to issue a requested Letter of Credit, then Issuing Lender agrees that it will enter into arrangements relative to the reimbursement of such Underlying Issuer (which may include, among, other means, by becoming an applicant with respect to such Letter of Credit or entering into undertakings which

provide for reimbursements of such Underlying Issuer with respect to such Letter of Credit; each such obligation or undertaking, irrespective of whether in writing, a "Reimbursement Undertaking") with respect to Letters of Credit issued by such Underlying Issuer. By submitting a request to Issuing Lender for the issuance of a Letter of Credit, Borrowers shall be deemed to have requested that Issuing Lender issue or that an Underlying Issuer issue the requested Letter of Credit and to have requested Issuing Lender to issue a Reimbursement Undertaking with respect to such requested Letter of Credit if it is to be issued by an Underlying Issuer (it being expressly acknowledged and agreed by Borrowers that Borrowers are and shall be deemed to be applicants (within the meaning of Section 5-102(a)(2) of the Code) with respect to each Underlying Letter of Credit). Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be made in writing by an Authorized Person and delivered to the Issuing Lender via hand delivery, telefacsimile, or other electronic method of transmission reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance reasonably satisfactory to the Issuing Lender and shall specify (i) the amount of such Letter of Credit, (ii) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (iii) the expiration date of such Letter of Credit, (iv) the name and address of the beneficiary of the Letter of Credit, and (v) such other information (including, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit. Anything contained herein to the contrary notwithstanding, the Issuing Lender may, but shall not be obligated to, issue or cause the issuance of a Letter of Credit or to issue a Reimbursement Undertaking in respect of an Underlying Letter of Credit, in either case, that supports the obligations of Borrowers or their Subsidiaries (A) in respect of (1) a lease of real property, or (2) an employment contract, or (B) at any time that one or more of the Lenders is a Defaulting Lender. The Issuing Lender shall have no obligation to issue a Letter of Credit or a Reimbursement Undertaking in respect of an Underlying Letter of Credit, in either case, if any of the following would result after giving effect to the requested issuance:

> (vi)     the Letter of Credit Usage would exceed the Borrowing Base less the outstanding amount of Advances (inclusive of Swing Line Loans), or

> (vii)    the Letter of Credit Usage would exceed $10,000,000, or

> (viii)   the Letter of Credit Usage would exceed the Maximum Revolver Amount less the outstanding amount of Advances (including Swing Line Loans).

> (b)     Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(a), each Lender with a Revolver Commitment agrees to fund its Pro Rata Share of any Advance deemed made pursuant to Section 2.10(a) on the same terms and conditions as if Borrowers had requested the amount thereof as an Advance and Agent shall promptly pay to Issuing Lender the amounts so received by it from the Lenders. By the issuance of a Letter of Credit or a Reimbursement Undertaking (or an amendment to a Letter of Credit or a Reimbursement Undertaking increasing the amount thereof) and without any further action on the part of the Issuing Lender or the Lenders with Revolver Commitments, the Issuing Lender shall be deemed to have granted to each Lender with a Revolver Commitment, and each Lender with a Revolver Commitment shall be deemed to have purchased, a participation in each Letter

of Credit issued by Issuing Lender and each Reimbursement Undertaking, in an amount equal to its Pro Rata Share of such Letter of Credit or Reimbursement Undertaking, and each such Lender agrees to pay to Agent, for the account of the Issuing Lender, such Lender's Pro Rata Share of any Letter of Credit Disbursement made by Issuing Lender or an Underlying Issuer under the applicable Letter of Credit. In consideration and in furtherance of the foregoing, each Lender with a Revolver Commitment hereby absolutely and unconditionally agrees to pay to Agent, for the account of the Issuing Lender, such Lender's Pro Rata Share of each Letter of Credit Disbursement made by Issuing Lender or an Underlying Issuer and not reimbursed by Borrowers on the date due as provided in Section 2.10(a), or of any reimbursement payment required to be refunded to Borrowers for any reason. Each Lender with a Revolver Commitment acknowledges and agrees that its obligation to deliver to Agent, for the account of the Issuing Lender, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.10(b) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3. If any such Lender fails to make available to Agent the amount of such Lender's Pro Rata Share of a Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and Agent (for the account of the Issuing Lender) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(c)     Borrowers hereby agree to jointly and severally indemnify, save, defend, and hold the Lender Group and each Underlying Issuer harmless from any damage, loss, cost, expense, or liability, and reasonable attorneys fees incurred by Issuing Lender, any other member of the Lender Group, or any Underlying Issuer arising out of or in connection with any Reimbursement Undertaking or any Letter of Credit; provided, however, that Borrowers shall not be obligated hereunder to indemnify for any loss, cost, expense, or liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of the Issuing Lender, any other member of the Lender Group, or any Underlying Issuer. Borrowers agree to be bound by the Underlying Issuer's regulations and interpretations of any Letter of Credit or by Issuing Lender's interpretations of any Reimbursement Undertaking even though this interpretation may be different from Borrowers' own, and Borrowers understand and agree that none of the Issuing Lender, the Lender Group, or any Underlying Issuer shall be liable for any error, negligence, or mistake, whether of omission or commission, in following Borrowers' instructions or those contained in the Letter of Credit or any modifications, amendments, or supplements thereto.    Borrowers understand that the Reimbursement Undertakings may require Issuing Lender to indemnify the Underlying Issuer for certain costs or liabilities arising out of claims by Borrowers against such Underlying Issuer. Borrowers hereby agree to jointly and severally indemnify, save, defend, and hold Issuing Lender and the other members of the Lender Group harmless with respect to any loss, cost, expense (including reasonable attorneys fees), or liability incurred by them as a result of the Issuing Lender's indemnification of an Underlying Issuer; provided, however, that Borrowers shall not be obligated hereunder to indemnify for any such loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other member of the Lender Group. Borrowers hereby acknowledge and agree that none of the Issuing Lender, any other member of the Lender Group, or any Underlying Issuer shall be

responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any Letter of Credit.

(d)     Borrowers hereby authorize and direct any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

(e)     Any and all issuance charges, usage charges, commissions, fees, and costs incurred by the Issuing Lender relating to Underlying Letters of Credit shall be Lender Group Expenses for purposes of this Agreement and shall be reimbursable promptly, but in any event, within one (1) Business Day by Borrowers to Agent for the account of the Issuing Lender; it being acknowledged and agreed by Borrowers that, as of the Closing Date, the usage charge imposed by the Underlying Issuer is one-half of one (0.5%) percent per annum times the undrawn amount of each Underlying Letter of Credit, that such usage charge may be changed from time to time, and that the Underlying Issuer also imposes a schedule of charges for amendments, extensions, drawings, and renewals.

(f)     If by reason of (i) any change after the Closing Date in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by the Issuing Lender, any other member of the Lender Group, or Underlying Issuer with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(iii)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or

(iv)     there shall be imposed on the Issuing Lender, any other member of the Lender Group, or Underlying Issuer any other condition regarding any Letter of Credit or Reimbursement Undertaking,

and the result of the foregoing is to increase, directly or indirectly, the cost to the Issuing Lender, any other member of the Lender Group, or an Underlying Issuer of issuing, making, guaranteeing, or maintaining any Reimbursement Undertaking or Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Administrative Loan Party, and Borrowers shall pay within thirty (30) days after demand therefor, such amounts as Agent may specify to be necessary to compensate the Issuing Lender, any other member of the Lender Group, or an Underlying Issuer for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, however, that Borrowers shall not be required to provide any compensation pursuant to this Section 2.10(f) for any such amounts incurred more than one hundred eighty (180) days prior to

the date on which the demand for payment of such amounts is first made to Borrowers; provided further, however, that if an event or circumstance giving rise to such amounts is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof. The determination by Agent of any amount due pursuant to this Section 2.10(f), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

2.11 **LIBOR Option.**

(a) **Interest and Interest Payment Dates.** In lieu of having interest charged at the rate based upon the Base Rate, Borrowers shall have the option, subject to Section 2.11(b) below (the "LIBOR Option") to have interest on all or a portion of the Advances be charged (whether at the time when made (unless otherwise provided herein), upon conversion from a Base Rate Loan to a LIBOR Rate Loan, or upon continuation of a LIBOR Rate Loan as a LIBOR Rate Loan) at a rate of interest based upon the LIBOR Rate. Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto; (ii) the date on which all or any portion of the Obligations become due and payable pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof. On the last day of each applicable Interest Period, unless Borrowers properly have exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder. At any time that an Event of Default has occurred and is continuing, at the written election of the Required Lenders, Borrowers no longer shall have the option to request that Advances bear interest at a rate based upon the LIBOR Rate.

(b) **LIBOR Election.**

(i) Borrowers may, at any time and from time to time, so long as Borrowers have not received a notice from Agent, after the occurrence and during the continuance of an Event of Default, of the election of the Required Lenders to terminate the right of Borrowers to exercise the LIBOR Option during the continuance of such Event of Default, elect to exercise the LIBOR Option by notifying Agent prior to 2:00 p.m. at least three (3) Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline"). Notice of Borrowers' election of the LIBOR Option for a permitted portion of the Advances and an Interest Period pursuant to this Section shall be made by delivery to Agent of a LIBOR Notice received by Agent before the LIBOR Deadline, or by telephonic notice received by Agent before the LIBOR Deadline (to be confirmed by delivery to Agent of a LIBOR Notice received by Agent prior to 5:00 p.m. on the same day). Promptly upon its receipt of each such LIBOR Notice, Agent shall provide a copy thereof to each of the affected Lenders.

(ii) Each LIBOR Notice shall be irrevocable and binding on Borrowers. In connection with each LIBOR Rate Loan, Borrowers shall, jointly and severally indemnify, defend, and hold Agent and the Lenders harmless against any loss, cost, or expense actually incurred by Agent or any Lender as a result of (A) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of any LIBOR Rate Loan other than on the

last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, or expenses, "**Funding Losses**"). A certificate of Agent or a Lender delivered to Administrative Loan Party setting forth in reasonable detail any amount or amounts that Agent or such Lender is entitled to receive pursuant to this Section 2.11 shall be conclusive absent manifest or demonstrable error. Borrowers shall pay such amount to Agent or the Lender, as applicable, within thirty (30) days of the date of its receipt of such certificate.

(iii)  Borrowers shall have not more than five (5) LIBOR Rate Loans in effect at any given time. Borrowers may only exercise the LIBOR Option for proposed LIBOR Rate Loans of at least $1,000,000.

(c)  **Conversion**. Borrowers may convert LIBOR Rate Loans to Base Rate Loans at any time; provided, however, that in the event that LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any automatic prepayment through the required application by Agent of proceeds of Borrowers' and their Subsidiaries' Collections in accordance with Section 2.4(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, Borrowers shall, jointly and severally indemnify, defend, and hold Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with Section 2.11(b)(ii).

(d)  **Special Provisions Applicable to LIBOR Rate**.

(i)  The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the LIBOR Rate. In any such event, the affected Lender shall give Administrative Loan Party and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Administrative Loan Party may, by notice to such affected Lender (A) require such Lender to furnish to Administrative Loan Party a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (B) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under Section 2.12(b)(ii)).

(ii)  In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation or application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Administrative Loan Party and Agent promptly shall transmit the notice to each other Lender and (A) in the case of any

LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (B) Borrowers shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(e) **No Requirement of Matched Funding**. Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.

2.12 **Capital Requirements**.

(a) If, after the date hereof, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital or reserve requirements for banks or bank holding companies, or any change in the interpretation, implementation, or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Administrative Loan Party and Agent thereof. Following receipt of such notice, Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within thirty (30) days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that, Borrowers shall not be required to compensate a Lender pursuant to this Section for any reductions in return incurred more than one hundred eighty (180) days prior to the date that such Lender notifies Administrative Loan Party of such law, rule, regulation or guideline giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided, further, that if such claim arises by reason of the adoption of or change in any law, rule, regulation or guideline that is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

(b) If any Lender requests additional or increased costs referred to in Section 2.11(d)(i) or amounts under Section 2.12(a) (any such Lender, an "Affected Lender"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would

eliminate or reduce amounts payable pursuant to Section 2.11(d)(i) or Section 2.12(a), as applicable, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. Borrowers agree to pay all reasonable out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment. If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrowers' obligation to pay any future amounts to such Affected Lender pursuant to Section 2.11(d)(i) or Section 2.12(a), as applicable, then Borrowers (without prejudice to any amounts then due to such Affected Lender under Section 2.11(d)(i) or Section 2.12(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.11(d)(i) or Section 2.12(a), as applicable, may seek a substitute Lender reasonably acceptable to Agent to purchase the Obligations owed to such Affected Lender and such Affected Lender's Commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and Commitments, pursuant to an Assignment and Acceptance Agreement, and upon such purchase by the Replacement Lender, such Replacement Lender shall be deemed to be a "Lender" for purposes of this Agreement and such Affected Lender shall cease to be a "Lender" for purposes of this Agreement.

2.13 **Appointment of Administrative Loan Party as Agent for Requesting Loans and Receipts of Loans and Statements**.

(a) Each Borrower hereby irrevocably appoints and constitutes Administrative Loan Party as its agent and attorney-in-fact to request and receive Loans and Letters of Credit pursuant to this Agreement and the other Financing Agreements from Agent or any Lender in the name or on behalf of such Borrower. Agent and Lenders may disburse the Loans to such bank account of Administrative Loan Party or a Borrower or otherwise make such Loans to a Borrower and provide such Letters of Credit to a Borrower as Administrative Loan Party may designate or direct, without notice to any other Borrower or Guarantor. Notwithstanding anything to the contrary contained herein, Agent may at any time and from time to time require that Loans to or for the account of any Borrower be disbursed directly to an operating account of such Borrower.

(b) Administrative Loan Party hereby accepts the appointment by Borrowers to act as the agent and attorney-in-fact of Borrowers pursuant to this Section 2.13(a). Administrative Loan Party shall ensure that the disbursement of any Loans to each Borrower requested by or paid to or for the account of any Borrower, or the issuance of any Letter of Credit for a Borrower hereunder, shall be paid to or for the account of such Borrower.

(c) Each Borrower and other Guarantor hereby irrevocably appoints and constitutes Administrative Loan Party as its agent to receive statements on account and all other notices from Agent and Lenders with respect to the Obligations or otherwise under or in connection with this Agreement and the other Financing Agreements.

(d)     Any notice, election, representation, warranty, agreement or undertaking by or on behalf of any other Borrower or any Guarantor by Administrative Loan Party shall be deemed for all purposes to have been made by such Borrower or Guarantor, as the case may be, and shall be binding upon and enforceable against such Borrower or Guarantor to the same extent as if made directly by such Borrower or Guarantor.

(e)     No purported termination of the appointment of Administrative Loan Party as agent as aforesaid shall be effective, except after five (5) days' prior written notice to Agent.

2.14    **Limitation on Loans and Letters of Credit**. Notwithstanding anything to the contrary set forth in this Agreement or any of the other Loan Documents, unless and until Agent shall have (a) completed all legal and business due diligence with respect to the Loan Parties, the results of which are in all respects satisfactory to Agent, (b) conducted a field examination of the assets of Loan Parties, the results of which are in all respects satisfactory to Agent, and (c) obtained appraisals with respect to the Inventory, Real Property, Equipment and Intellectual Property of Loan Parties, addressed to Agent by an appraiser reasonably acceptable to Agent, incorporating assumptions and methodologies acceptable to Agent and the results of which are acceptable to Agent: (i) in no event shall the aggregate outstanding amount of Loans and Letters of Credit exceed $20,000,000, (ii) the Maximum Revolver Amount shall be $20,000,000 and (iii) the Borrowing Base shall equal the lesser of the amount determined under the definition thereof and $20,000,000.

2.15    **Joint and Several Liability**.

(a)     All Borrowers shall be liable, on a joint and several basis, for all Obligations, including, without limitation, all amounts due to Agent and Lenders under this Agreement and the Other Documents, regardless of which Borrower actually receives the Advances or other proceeds of the Obligations or the manner in which Agent and Lenders account for such Advances or other Obligations on its books and records or for any other reason. The Obligations with respect to Advances made to a Borrower, and the Obligations arising as a result of the joint and several liability of a Borrower hereunder, with respect to Advances made to the other Borrowers hereunder, shall be separate and distinct obligations, but all such Obligations shall be primary obligations of all Borrowers. The Obligations arising as a result of the joint and several liability of a Borrower hereunder with respect to Advances or other Obligations shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the validity or enforceability, avoidance or subordination of the Obligations of the other Borrowers or of any promissory note or other document evidencing all or any part of the Obligations of the other Borrowers, (ii) any incapacity or lack of power, authority or legal personality of any other Borrower or other Person, (iii) the absence of any attempt to collect the Obligations from the other Borrowers or any other security therefor, or the absence of any other action to enforce or failure to realize the full value of the same, (iv) any amendment (however fundamental) replacement variation, assignment termination and/or the waiver, consent, extension, forbearance or granting of any indulgence by Agent or Lenders with respect to any provisions of any instrument evidencing the Obligations of the other Borrowers, or any part thereof, or any other agreement now or hereafter executed by the other Borrowers and delivered to Agent or Lenders, (v) the failure by Agent, Lenders or any other Person to take any steps to perfect and maintain its

Lien in, or to preserve its rights and maintain its security or collateral for the Obligations of the other Borrowers, (vi) the election of Agent, Lenders or any other Person in any proceeding instituted under Title 11 of the United States Code, as amended ("Bankruptcy Code"), of the application of Section 1111(b)(2) of the Bankruptcy Code, (vii) the disallowance of all or any portion of the claim(s) of Agent, Lenders or any other Person for the repayment of the Obligations of the other Borrowers under Section 502 of the Bankruptcy Code, (viii) any insolvency, liquidation, administration or similar procedure or corporate action in respect of any other Borrower and/any or legal proceedings or procedures by any of the other Borrowers' creditors or (ix) any other circumstances which might constitute a legal or equitable discharge or defense of the other Borrowers. With respect to the Obligations arising as a result of the joint and several liability of a Borrower hereunder with respect to Advances, Letters of Credit or other Obligations, each Borrower waives, until the Obligations shall have been paid in full and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which Agent, Lenders or any other Person now has or may hereafter have against Borrowers, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to Agent, Lenders or any other Person. Upon any Event of Default and for so long as the same is continuing, Agent and Lenders may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against the other Borrowers or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that none of Agent, Lenders or any other Person shall be under any obligation to marshal any assets in favor of Borrowers or any other Person or against or in payment of any or all of the Obligations.

(b)    Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Borrower may now or hereafter have against the other Borrowers or any other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement.

## 3.    **CONDITIONS; TERM OF AGREEMENT.**

3.1    **Conditions Precedent to the Initial Extension of Credit**.  The obligation of each Lender to make its initial extension of credit provided for hereunder is subject to the fulfillment, to the satisfaction of Agent and each Lender, of each of the conditions precedent set forth on <u>Schedule 3.1</u> (the making of such initial extension of credit by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent ).

3.2    **Conditions Precedent to all Extensions of Credit**.  The obligation of the Lender Group (or any member thereof) to make any Advances hereunder (or to extend any other credit hereunder) at any time shall be subject to the following conditions precedent:

(a)    the representations and warranties of Parent or its Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (<u>except</u>, <u>that</u>, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of

the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date); and

(b)     no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

3.3     **Bankruptcy Matters**

(a)     Debtors shall have commenced voluntary cases under Chapter 11 of the Bankruptcy Code;

(b)     No trustee, examiner or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Borrower or Guarantor or their respective business, properties or assets, including, without limitation, the Collateral and any other property which is security for the Obligations;

(c)     Debtors shall have complied in full with the notice and all other requirements of the Bankruptcy Code in a manner acceptable to the Agent;

(d)     The Interim Financing Order shall have been entered by the Bankruptcy Court and such Interim Financing Order shall be in form and substance satisfactory to the Agent, shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the Agent, and except as otherwise consented to by the Agent at any time, no application or motion shall have been made to the Bankruptcy Court for any stay, modification or amendment of such Interim Financing Order and no stay or motion for a stay with respect to same shall have been entered or made;

(e)     On or before the expiration of the Interim Financing Orders but in any event no later than the date which is sixty (60) days following the date of the commencement of the Chapter 11 Cases, unless Agent has agreed to and the Bankruptcy Court has approved an extension of the Interim Financing Order, the Final Financing Order shall have been entered by the Bankruptcy Court and such Final Financing Order shall be in form and substance satisfactory to the Agent, and as provided in the definition thereof shall be a Final Order, except as otherwise consented to by the Agent;

(f)     This Agreement, the other Loan Documents and all guaranties, instruments and documents to be executed and thereunder and/or related thereto, shall have been duly authorized by the Financing Order then in effect entered by the Bankruptcy Court in the Chapter 11 Cases, and no stay or motion for a stay with respect to same shall have been entered or made; and

(g)     The Agent shall have received evidence, in form and substance reasonably satisfactory to the Agent, of unpaid and accrued amounts entitled to the benefit of the Carve-Out as of the date hereof.

3.4     **Maturity**. This Agreement shall continue in full force and effect for a term ending on the third (3rd) anniversary of the date hereof (the "Maturity Date"). The foregoing

notwithstanding, the Lender Group, upon the election of the Required Lenders, shall have the right to terminate its obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default.

3.5 **Effect of Maturity**. On the Maturity Date, all commitments of the Lender Group to provide additional credit hereunder shall automatically be terminated and all of the Obligations immediately shall become due and payable without notice or demand and Borrowers shall be required to repay all of the Obligations in full. No termination of the obligations of the Lender Group (other than payment in full of the Obligations and termination of the Commitments) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitments have been terminated. When all of the Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent.

3.6 **Early Termination by Borrowers**. Borrowers have the option, at any time upon ten (10) Business Days prior written notice to Agent, to terminate this Agreement and terminate the Commitments hereunder by repaying to Agent all of the Obligations in full.

3.7 **Conditions Subsequent**. The obligation of the Lender Group (or any member thereof) to continue to make Advances (or otherwise extend credit hereunder) is subject to the fulfillment, on or before the date applicable thereto, of the conditions subsequent set forth on Schedule 3.6 (the failure by Borrowers to so perform or cause to be performed such conditions subsequent as and when required by the terms thereof, shall constitute an immediate Event of Default).

4. **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, Parent and Borrowers jointly and severally make the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true, correct, and complete, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1 **Due Organization and Qualification; Subsidiaries.**

(a)     Each Loan Party (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)     Set forth on <u>Schedule 4.1(b)</u> is a complete and accurate description of the authorized Equity Interests of each Borrower, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding. Other than as described on <u>Schedule 4.1(b)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of each Borrower's Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument. No Borrower is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

(c)     Set forth on <u>Schedule 4.1(c)</u> (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement), is a complete and accurate list of Parent's and Borrowers' direct Subsidiaries, showing:  (i) the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by each Borrower. All of the outstanding Equity Interests of each Subsidiary has been validly issued and is fully paid and non-assessable.

(d)     Except as set forth on <u>Schedule 4.1(c)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of any Loan Parties' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument. Loan Party is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of any Parent's or Borrowers' Equity Interests or any security convertible into or exchangeable for any such Equity Interests.

4.2     **Due Authorization; No Conflict**.

(a)     As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

(b)     As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to any Loan Party, the Governing Documents of any Loan Party or its Subsidiaries, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Loan Party or its Subsidiaries except to the extent that any such conflict, breach or default could not individually or in the aggregate reasonably be expected to have a Material Adverse Change, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (iv)  require any

approval of any Loan Party's interest holders or any approval or consent of any Person under any Material Contract of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Change.

4.3  **Governmental Consents**.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the Closing Date; except, that, with respect only to Debtors, the entry of the Financing Order is also required.

4.4  **Binding Obligations; Perfected Liens**.

(a)  Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(b)  Agent's Liens are validly created, perfected (other than (i) in respect of motor vehicles that are subject to a certificate of title and as to which Agent has not caused its Lien to be noted on the applicable certificate of title, and (ii) any Deposit Accounts and Securities Accounts not subject to a Control Agreement as permitted by Section 6.11, and subject only to the filing of financing statements, and the recordation of the Mortgages, in each case, in the appropriate filing offices), and first priority Liens, subject only to Permitted Liens which are either permitted purchase money Liens or the interests of lessors under Capital Leases.

4.5  **Title to Assets; No Encumbrances**.  Each of the Loan Parties has (i) good, sufficient and legal title to (in the case of fee interests in Real Property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good and marketable title to (in the case of all other personal property), all of their respective assets reflected in their most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby.  All of such assets are free and clear of Liens except for Permitted Liens.

4.6  **Jurisdiction of Organization; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims**.

(a)  The name of (within the meaning of Section 9-503 of the Code) and jurisdiction of organization of each Loan Party and each of its Subsidiaries is set forth on Schedule 4.6(a) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement).

(b)     The chief executive office of each Loan Party is located at the address indicated on Schedule 4.6(b) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement).

(c)     Each Loan Party's tax identification numbers and organizational identification numbers, if any, are identified on Schedule 4.6(c) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement).

(d)     As of the Closing Date, no Loan Party holds any commercial tort claims that exceed $500,000 in amount, except as set forth on Schedule 4.6(d).

4.7     **Litigation**.

(a)     There are no actions, suits, or proceedings pending or, to the knowledge of any Borrower, after due inquiry, threatened in writing against a Loan Party that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Change.

(b)     Schedule 4.7(b) sets forth a complete and accurate description, with respect to each of the actions, suits, or proceedings with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, $1,000,000 that, as of the Closing Date, is pending or, to the knowledge of any Borrower, after due inquiry, threatened against a Loan Party, of (i) the parties to such actions, suits, or proceedings, (ii) the nature of the dispute that is the subject of such actions, suits, or proceedings, (iii) the status, as of the Closing Date, with respect to such actions, suits, or proceedings, and (iv) whether any liability of the Loan Parties' in connection with such actions, suits, or proceedings is covered by insurance.

4.8     **Compliance with Laws**. No Loan Party (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

4.9     **No Material Adverse Change**. All historical financial statements relating to the Loan Parties that have been delivered by Borrowers to Agent have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the Loan Parties' consolidated financial condition as of the date thereof and results of operations for the period then ended. Since April 30, 2010, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Change with respect to the Loan Parties; provided, that, neither the commencement of the Chapter 11 Cases nor the default under any agreement to which any Debtor resulting solely from the commencement of the Chapter 11 Cases shall not be deemed a material adverse change for purposes of this Section

4.10 **Fraudulent Transfer**.

(a) Each Borrower is Solvent.

(b) No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

4.11 **Employee Benefits**. Except as set forth on Schedule 4.11, no Loan Party nor any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

4.12 **Environmental Condition**. Except as set forth on Schedule 4.12, (a) to each Borrower's knowledge, no Loan Party's properties or assets has ever been used by a Loan Party, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to each Borrower's knowledge, after due inquiry, no Loan Party's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party, and (d) no Loan Party nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or Environmental Liability that in the case of (a) through (d), individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

4.13 **Intellectual Property**. Each Loan Party owns, or hold licenses in, all trademarks, trade names, copyrights, patents, and licenses that are necessary to the conduct of its business as currently conducted, and attached hereto as Schedule 4.13 (as updated from time to time) is a true, correct, and complete listing of all material trademarks, trade names, copyrights, patents, and licenses as to which any Borrower is the owner or is an exclusive licensee; provided, however, that Borrowers may amend Schedule 4.13 to add additional intellectual property so long as such amendment occurs by written notice to Agent not less than thirty (30) days after the date on which the applicable Loan Party acquires any such property after the Closing Date.

4.14 **Leases**. Each Loan Party enjoys peaceful and undisturbed possession under all leases material to their business and to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no material default by the applicable Loan Party exists under any of them.

4.15 **Deposit Accounts and Securities Accounts**. Set forth on Schedule 4.15 (as updated pursuant to the provisions of the Security Agreement from time to time) is a listing of all of the Loan Parties' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

4.16 **Complete Disclosure**. All factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished by or on behalf of a Loan Party in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) hereafter furnished by or on behalf of a Loan Party in writing to Agent or any Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. The Projections delivered to Agent on May 10, 2010 represent, and as of the date on which any other Projections are delivered to Agent, such additional Projections represent, Borrowers' good faith estimate, on the date such Projections are delivered, of the Loan Parties' future performance for the periods covered thereby based upon assumptions believed by Borrowers to be reasonable at the time of the delivery thereof to Agent (it being understood that such Projections are subject to uncertainties and contingencies, many of which are beyond the control of the Loan Parties, that no assurances can be given that such Projections will be realized, and that actual results may differ in a material manner from such Projections).

4.17 **Material Contracts**. Set forth on Schedule 4.17 (as such Schedule may be updated from time to time in accordance herewith) is a reasonably detailed description of the Material Contracts of each Loan Party as of the most recent date on which Borrowers provided a Compliance Certificate pursuant to Section 5.1; provided, however, that Borrowers may amend Schedule 4.17 to add additional Material Contracts so long as such amendment occurs by written notice to Agent on the date that Borrowers provides a Compliance Certificate. Except for matters which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change and the Event of Default resulting from the filing of the Chapter 11 Cases, each Material Contract (other than those that have expired at the end of their normal terms) (a) is in full force and effect and is binding upon and enforceable against the applicable Loan Party and, to Borrowers' knowledge, after due inquiry, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified (other than amendments or modifications permitted by Section 6.7(b)), and (c) is not in default due to the action or inaction of the applicable Loan Party.

4.18 **Patriot Act**. To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act"). No part of the proceeds of the loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.19 **Indebtedness**. Set forth on Schedule 4.19 is a true and complete list of all Indebtedness of each Loan Party outstanding immediately prior to the Closing Date in excess of $250,000 that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Closing Date.

4.20 **Payment of Taxes**. Except as otherwise permitted under Section 5.5, all material tax returns and reports of each Loan Party required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all material assessments, fees and other governmental charges upon a Loan Party and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable or are being actively contested and adequate reserves with respect thereto are being maintained. Each Loan Party has made adequate provision in accordance with GAAP for all taxes not yet due and payable. No Borrower knows of any material proposed tax assessment against a Loan Party that is not being actively contested by such Loan Party diligently, in good faith, and by appropriate proceedings; provided such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.21 **Margin Equity Interests**. No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Equity Interests. No part of the proceeds of the loans made to Borrowers will be used to purchase or carry any such Margin Equity Interests or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors of the United States Federal Reserve.

4.22 **Governmental Regulation**. No Loan Party is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Loan Party nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.23 **OFAC**. No Loan Party nor any of its Subsidiaries is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC. No Loan Party nor any of its Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. No proceeds of any loan or other financial accommodation made or provided hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

4.24 **Employee and Labor Matters**. There is (a) no unfair labor practice complaint pending or, to the knowledge of any Borrower, threatened against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party which arises out of or under any collective bargaining agreement and that

could reasonably be expected to result in a material liability, (b) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against any Loan Party that could reasonably be expected to result in a material liability, or (c) to the knowledge of Borrowers, after due inquiry, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. All material payments due from Loan Parties on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Borrowers, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

4.25 **[Reserved]**.

4.26 **Eligible Accounts**. As to each Account that is identified by Borrowers as an Eligible Account in a Borrowing Base Certificate submitted to Agent, such Account is (a) a bona fide existing payment obligation of the applicable Account Debtor created by the sale and delivery of Inventory or the rendition of services to such Account Debtor in the ordinary course of Borrowers' business, (b) owed to Borrowers without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation, and (c) not excluded as ineligible by virtue of one or more of the excluding criteria (other than Agent-discretionary criteria) set forth in the definition of Eligible Accounts.

4.27 **Eligible Inventory**. As to each item of Inventory that is identified by Borrowers as Eligible Inventory in a Borrowing Base Certificate submitted to Agent, such Inventory is (a) of good and merchantable quality, free from known defects, and (b) not excluded as ineligible by virtue of one or more of the excluding criteria (other than Agent-discretionary criteria) set forth in the definition of Eligible Inventory.

4.28 **Locations of Inventory and Equipment**. The Inventory and Equipment (other than vehicles or Equipment out for repair and Inventory and Equipment not in excess of $500,000 in the aggregate) of the Loan Parties are located only at, or in-transit between or to, the locations identified on <u>Schedule 4.29</u> (as such Schedule may be updated pursuant to Section 5.15).

4.29 **Inventory Records**. Each Loan Party keeps correct and accurate records itemizing and describing the type, quality, and quantity of its Inventory and the book value thereof.

4.30 **Financing Order**. The Financing Order has been duly entered, is valid, subsisting and continuing and except as otherwise expressly consented to by the Agent and the Lenders, has not been vacated, modified, reversed on appeal, or vacated or modified by any Bankruptcy Judge or District Court Judge and is not subject to any pending stay and on and after

the date any other Financing Order is entered by the Bankruptcy Court, such other Financing Order shall have been duly entered, valid, subsisting and continuing and shall not have been vacated, modified, reversed on appeal, or vacated or modified by any Bankruptcy Judge or District Court Judge and shall not be subject to any pending stay.

4.31 **Super-Priority Administrative Expense**. All Obligations of the Debtors incurred during the pendency of the Chapter 11 Cases or thereafter shall, in addition to being secured by the Collateral, constitute claims entitled to super-priority under Section 364(c)(1) of the Bankruptcy Code, as more fully set forth in the Financing Orders, with the priority of such super-priority subject to the Carve-Out to the extent set forth in the Financing Orders.

5. **AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, each of the Loan Parties shall comply with each of the following:

5.1 **Financial Statements, Reports, Certificates**. Deliver to Agent, with copies to each Lender, each of the financial statements, reports, and other items set forth on Schedule 5.1 no later than the times specified therein. In addition, each Borrower agrees that Loan Party will have a fiscal year different from that of Borrowers. In addition, each Borrower agrees to maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP. Each Loan Party shall also (a) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to its sales, and (b) maintain its billing systems/practices as approved by Agent prior to the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Agent.

5.2 **Collateral Reporting**. Provide Agent (and if so requested by Agent, with copies for each Lender) with each of the reports set forth on Schedule 5.2 at the times specified therein. In addition, Borrowers agree to use commercially reasonable efforts in cooperation with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule.

5.3 **Existence**. Except as otherwise permitted under Section 6.3 or Section 6.4, at all times maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of organization) and all rights and franchises, licenses and permits material to its business; provided, however, that no Loan Party shall be required to preserve any such right or franchise, licenses or permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lenders.

5.4 **Maintenance of Properties**. Maintain and preserve all of its assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted and Permitted Dispositions excepted, and comply with the material provisions of all material leases to which it is a party as lessee, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest.

5.5　**Taxes**.　Cause all assessments and taxes imposed, levied, or assessed against any Loan Party, or any of their respective assets or in respect of any of its income, businesses, or franchises to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest and so long as, in the case of an assessment or tax that has become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such assessment or tax. Each Loan Party will make timely payment or deposit of all tax payments and withholding taxes required of it and them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Agent with proof reasonably satisfactory to Agent indicating that Parent and its Subsidiaries have made such payments or deposits.

5.6　**Insurance**.　At Borrowers' expense, maintain insurance respecting each of the Loan Parties' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. Each Borrower also shall maintain (with respect to each of the Loan Parties) business interruption, general liability, product liability insurance, director's and officer's liability insurance, fiduciary liability insurance, and employment practices liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be with responsible and reputable insurance companies acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to Agent. All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for not less than thirty (30) days (ten (10) days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation. If any Borrower fails to maintain such insurance, Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Administrative Loan Party shall give Agent prompt notice of any loss exceeding $500,000 covered by its casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7　**Inspection**.　Permit Agent and each of its duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and

employees at such reasonable times during normal business hours and intervals as Agent may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Administrative Loan Party; provided, however, absent an Event of Default, such inspections, appraisals, valuations, examinations, discussions shall be limited to two (2) in any twelve (12) consecutive month period.

5.8 **Compliance with Laws**. Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.9 **Environmental**.

(a) Keep any property either owned or operated by any Loan Party free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

(b) Comply, in all material respects, with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests,

(c) Promptly notify Agent of any release of which any Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party and take any Remedial Actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law, and

(d) Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Agent with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of Loan Parties, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against Loan Party, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

5.10 **Disclosure Updates**. Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to Agent or the Lenders contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.11 **Formation of Subsidiaries**. At the time that any Loan Party forms any direct Subsidiary or acquires any direct Subsidiary after the Closing Date, such Loan Party shall (a) within ten (10) days of such formation or acquisition (or such later date as permitted by Agent in its sole discretion) cause any such new Subsidiary to provide to Agent a joinder to the Guaranty and the Security Agreement, together with such other security documents (including mortgages

with respect to any Real Property owned in fee of such new Subsidiary with a fair market value of at least $500,000), as well as appropriate financing statements (and with respect to all property subject to a mortgage, fixture filings), all in form and substance reasonably satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary); provided, that, the Guaranty, the Security Agreement, and such other security documents shall not be required to be provided to Agent with respect to any Subsidiary of Parent that is a CFC if providing such documents would result in adverse tax consequences or the costs to the Loan Parties of providing such Guaranty, executing any security documents or perfecting the security interests created thereby are unreasonably excessive (as determined by Agent in consultation with Administrative Loan Party) in relation to the benefits of Agent and the Lenders of the security or guarantee afforded thereby, (b) within ten (10) days of such formation or acquisition (or such later date as permitted by Agent in its sole discretion) provide to Agent a pledge agreement (or an addendum to the Security Agreement) and appropriate certificates and powers or financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary reasonably satisfactory to Agent; provided, that, only sixty-five (65%) percent of the total outstanding voting Equity Interests of any first tier Subsidiary of Parent that is a CFC (and none of the Equity Interests of any Subsidiary of such CFC) shall be required to be pledged if pledging a greater amount would result in adverse tax consequences or the costs to the Loan Parties of providing such pledge or perfecting the security interests created thereby are unreasonably excessive (as determined by Agent in consultation with Administrative Loan Party) in relation to the benefits of Agent and the Lenders of the security or guarantee afforded thereby (which pledge, if reasonably requested by Agent, shall be governed by the laws of the jurisdiction of such Subsidiary), and (c) within ten (10) days of such formation or acquisition (or such later date as permitted by Agent in its sole discretion) provide to Agent all other documentation, including one or more opinions of counsel reasonably satisfactory to Agent, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance or other documentation with respect to all Real Property owned in fee and subject to a mortgage). Any document, agreement, or instrument executed or issued pursuant to this Section 5.11 shall be a Loan Document.

5.12 **Further Assurances**. At any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect Agent's Liens in all of the assets of the Loan Parties (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent in any Real Property acquired by the Loan Parties, after the Closing Date with a fair market value in excess of $500,000, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents; provided, that, the foregoing shall not apply to any Subsidiary of any Borrower that is a CFC if providing such documents would result in adverse tax consequences or the costs to the Loan Parties of providing such documents are unreasonably excessive (as determined by Agent in consultation with Administrative Loan Party) in relation to the benefits of Agent and the Lenders of the benefits afforded thereby. To the maximum extent permitted by applicable law, each of Parent and Borrowers authorizes Agent to execute any such Additional Documents in the applicable Loan

Party's name, as applicable, and authorizes Agent to file such executed Additional Documents in any appropriate filing office. In furtherance and not in limitation of the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of Parent and its direct Subsidiaries and all of the outstanding Equity Interests of Parent and its direct Subsidiaries (subject to exceptions and limitations contained in the Loan Documents with respect to CFCs).

5.13 **Lender Meetings**. Within ninety (90) days after the close of each fiscal year of Borrowers, at the request of Agent or of the Required Lenders and upon reasonable prior notice, hold a meeting (at a mutually agreeable location and time or, at the option of Agent, by conference call) with all Lenders who choose to attend such meeting at which meeting shall be reviewed the financial results of the previous fiscal year and the financial condition of Parent and its Subsidiaries and the projections presented for the current fiscal year of Borrowers.

5.14 **Material Contracts**. Contemporaneously with the delivery of each Compliance Certificate pursuant to Section 5.1, provide Agent with copies of (a) each Material Contract entered into since the delivery of the previous Compliance Certificate, and (b) each material amendment or modification of any Material Contract entered into since the delivery of the previous Compliance Certificate. No Borrower is in material breach or in default in any material respect of or under any Material Contract except (i) in the case of Debtors only, as a result of the commencement of the Chapter 11 Cases, and (ii) in the case of Debtors only, to the extent that the other party's right to exercise any remedies, terminate such agreement, cease to perform or take any other action thereunder are at all times subject to the automatic stay or otherwise not permitted under the Bankruptcy Code. As of the Closing Date, no notice of the intention of any other party thereto to terminate any Material Contract has been received by or on behalf of any Borrower.

5.15 **Location of Inventory and Equipment**. Keep each Loan Parties' Inventory and Equipment (other than vehicles and Equipment out for repair and Inventory and Equipment not in excess of $500,000 in the aggregate) only at the locations identified on <u>Schedule 4.28</u> and their chief executive offices only at the locations identified on <u>Schedule 4.6(b)</u>; <u>provided, however</u>, that Borrowers may amend <u>Schedule 4.28</u> or <u>Schedule 4.6(b)</u> so long as such amendment occurs by written notice to Agent not less than ten (10) days prior to the date on which such Inventory or Equipment is moved to such new location or such chief executive office is relocated and so long as such new location is within the continental United States, and so long as, at the time of such written notification, Administrative Loan Party provides Agent a Collateral Access Agreement with respect thereto.

5.16 **Assignable Material Contracts**. Use commercially reasonable efforts to ensure that any Material Contract entered into after the Closing Date by any Loan Party that generates or, by its terms, will generate revenue, permits the assignment of such agreement (and all rights of Loan Parties, as applicable, thereunder) in such Person's lenders or an agent for any lenders (and any transferees of such lenders or such agent, as applicable).

6.    **NEGATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, the Loan Parties will not do any of the following:

6.1    **Indebtedness**.  Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    **Liens**.  Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes**.

(a)    Other than in order to consummate a Permitted Acquisition, enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests, except for (i) any merger between Loan Parties; provided, that, a Borrower must be the surviving entity of any such merger to which it is a party and in no event shall any Debtor merge with any non-Debtor, (ii) any merger between a Loan Party and Subsidiaries of such Loan Party that are not Loan Parties so long as such Loan Party is the surviving entity of any such merger, and (iii) any merger between Subsidiaries of Borrowers, which Subsidiaries are not Loan Parties,

(b)    Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for (i) the liquidation or dissolution of non-operating Subsidiaries of Parent with nominal assets and nominal liabilities, (ii) the liquidation or dissolution of a Loan Party (other than any Debtor) or any wholly-owned Subsidiary of any Borrower so long as all of the assets (including any interest in any Equity Interests) of such liquidating or dissolving Loan Party or Subsidiary are transferred to a Loan Party that is not liquidating or dissolving, or (iii) the liquidation or dissolution of a Subsidiary of Parent that is not a Loan Party (other than any such Subsidiary the Equity Interests of which (or any portion thereof) is subject to a Lien in favor of Agent) so long as all of the assets of such liquidating or dissolving Subsidiary are transferred to a Subsidiary of Parent that is not liquidating or dissolving, or

(c)    Other than Bondex International, Inc., suspend or go out of a substantial portion of its or their business, except as permitted pursuant to clauses (a) or (b) above or in connection with the transactions permitted pursuant to Section 6.4.

6.4    **Disposal of Assets**.  Other than Permitted Dispositions, Permitted Investments, or transactions expressly permitted by Sections 6.3 and 6.11, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any of Parent or its Subsidiaries assets.

6.5    **Change Name**.  Change the name of any Loan Party, organizational identification number, state of organization or organizational identity; provided, however, that Loan Parties may change their names upon at least ten (10) days prior written notice to Agent of such change.

6.6　**Nature of Business**.  Make any change in the nature of its or their business as described in Schedule 6.6 or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, however, that the foregoing shall not prevent any Borrower from engaging in any business that is reasonably related or ancillary to its or their business.

6.7　**Prepayments and Amendments**.

(a)　Except in connection with Refinancing Indebtedness permitted by Section 6.1,

(i)　optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of Parent or its Subsidiaries, other than (A) the Obligations in accordance with this Agreement, and (B) Permitted Intercompany Advances,

(ii)　make any payment on account of Indebtedness that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions, or

(b)　Directly or indirectly, amend, modify, or change any of the terms or provisions of

(i)　any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness other than (A) the Obligations in accordance with this Agreement, (B) Permitted Intercompany Advances, and (C) Indebtedness permitted under clauses (c), (h), (j) and (k) of the definition of Permitted Indebtedness,

(ii)　any Material Contract except to the extent that such amendment, modification, or change could not, individually or in the aggregate, reasonably be expected to be materially adverse to the interests of the Lenders, or

(iii)　the Governing Documents of any Loan Party or any of its Subsidiaries if the effect thereof, either individually or in the aggregate, could reasonably be expected to be materially adverse to the interests of the Lenders.

6.8　Change of Control.  Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9　**Restricted Junior Payments**.  Make any Restricted Junior Payment; provided, however, that, so long as it is permitted by law, and so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom,

(a)　Borrowers may make distributions to former employees, officers, or directors of Borrowers (or any spouses, ex-spouses, or estates of any of the foregoing) on account of redemptions of Equity Interests of Borrowers held by such Persons, provided, however, that the aggregate amount of such redemptions made by Borrowers during the term of this Agreement plus the amount of Indebtedness outstanding under clause (l) of the definition of Permitted Indebtedness, does not exceed $1,000,000 in the aggregate,

(b)     Borrowers and Guarantors (other than Parent) may pay dividends in cash, from legally available funds therefor, to Parent in an aggregate amount not to exceed $5,000,000 during any twelve (12) month period, solely for the purpose of paying expenses that are due and payable and actually incurred by Parent in connection with (i) the ordinary corporate governance and maintenance arising out of the relationship between such Borrower or Guarantor (other than Parent) and Parent (in Parent's capacity as the direct or indirect owner of all of the issued and outstanding Equity Interests of such Borrower) and (ii) administrative expense claims incurred in connection with the Chapter 11 Cases, including, without limitation, the fees and expenses of the professionals whose retention is approved by the Bankruptcy Court prior to the occurrence and continuation of an Event of Default; provided, that, the proceeds of any such dividends shall be immediately applied by Borrowers to pay such expenses, and

(c)     Borrowers may make distributions to former employees, officers, or directors of Borrowers (or any spouses, ex-spouses, or estates of any of the foregoing), solely in the form of forgiveness of Indebtedness of such Persons owing to Borrowers on account of repurchases of the Equity Interests of any Borrower held by such Persons; provided, that, such Indebtedness was incurred by such Persons solely to acquire Equity Interests of any Borrower.

6.10    **Accounting Methods**.    Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.11    **Investments; Controlled Investments** .

(a)     Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

(b)     Other than (i) an aggregate amount of not more than $250,000 at any one time, in the case of Parent and its Subsidiaries (other than those Subsidiaries that are CFCs), (ii) amounts deposited into Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for Parent's or its Subsidiaries' employees of, and (iii) an aggregate amount of not more than $250,000 (calculated at current exchange rates) at any one time, in the case of Parent that are CFCs), make, acquire, or permit to exist Permitted Investments consisting of cash, Cash Equivalents, or amounts credited to Deposit Accounts or Securities Accounts unless Parent or its Subsidiaries, as applicable, and the applicable bank or securities intermediary have entered into Control Agreements with Agent governing such Permitted Investments in order to perfect (and further establish) Agent's Liens in such Permitted Investments. Except as provided in Section 6.11(b)(i), (ii), and (iii), Parent shall not, or shall not permit its Subsidiaries to, establish or maintain any Deposit Account or Securities Account unless Agent shall have received a Control Agreement in respect of such Deposit Account or Securities Account.

6.12    **Transactions with Affiliates**.    Directly or indirectly enter into or permit to exist any transaction with any Affiliate of Parent or any of its Subsidiaries except for:

(a)     transactions (other than the payment of management, consulting, monitoring, or advisory fees) between Parent or its Subsidiaries, on the one hand, and any

Affiliate of Parent or its Subsidiaries, on the other hand, so long as such transactions (i) are fully disclosed to Agent prior to the consummation thereof, if they involve one or more payments by Parent or its Subsidiaries in excess of $250,000 for any single transaction or series of related transactions, and (ii) are no less favorable, taken as a whole, to Parent or its Subsidiaries, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate,

(b)     so long as it has been approved by Parent's board of directors or the board of directors of its applicable Subsidiary's (or comparable governing body) in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) of a Borrower or its applicable Subsidiary,

(c)     so long as it has been approved by Parent's board of directors or the board of directors of its applicable Subsidiary's (or comparable governing body) in accordance with applicable law, the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of Parent's and its Subsidiaries in the ordinary course of business and consistent with industry practice, and

(d)     transactions permitted by Section 6.3 or Section 6.9, or any Permitted Intercompany Advance.

(e)     [transactions described on attached Schedule 6.12.]

6.13    **Use of Proceeds**.  Use the proceeds of any loan made hereunder for any purpose other than (a) on the Closing Date, (i) to pay any fees and expenses incurred in connection with the transactions contemplated hereby and in connection with the Chapter 11 Cases and (ii) to pay transactional fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, and (b) thereafter, consistent with the terms and conditions hereof, for its lawful and permitted purposes.

6.14    **Limitation on Issuance of Equity Interests**.  Except for the issuance or sale of common stock or Permitted Preferred Equity Interests by Borrowers, issue or sell or enter into any agreement or arrangement for the issuance and sale of any of its Equity Interests.

6.15    **Consignments**.  Consign any of its or their Inventory having an aggregate value at any time in excess of $1,000,000, or sell any of its or their Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale.

6.16    **Bankruptcy**.  The Borrowers and the Guarantors shall not seek or consent to, any of the following:

(a)     without the prior written consent of the Agent and the Lenders, any modification, stay, vacation or amendment to any Financing Order;

(b)     the use of cash collateral of Agent and Lenders under Section 363 of the Bankruptcy Code;

(c)     to surcharge the Collateral pursuant to Section 506(c) of the Bankruptcy Code;

(d)     to seek relief under the Bankruptcy Code, including without limitation, under Section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or any Lender as provided herein, in the Financing Agreements or in the Financing Order;

(e)     a claim against any Borrower or Guarantor (now existing or hereafter arising of any kind or nature, including any administrative expense of the kind specified in Sections 105, 326, 330, 331, 503(a), 503(b), 506(c), 507(b), 546(c), 546(d) or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations, except to the extent of the Carve-Out to the extent such lien and Indebtedness are permitted hereunder;

(f)     any security interest or lien on any Collateral having a priority equal or superior to the security interest or lien of the Agent other than as permitted hereunder;

(g)     any order seeking authority to take any action prior to the effectiveness of a plan of reorganization that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents; or

(h)     any plan of reorganization unless all of the Obligations are to be paid in full in cash or other immediately available funds and the arrangements provided for herein terminated pursuant thereto.

6.17     **Excess Availability**.  Borrowers and Guarantors shall not permit any Borrower to have, at any time, Eligible Accounts and Eligible Inventory in an aggregate amount less than that which would constitute the basis for Advances under the formula set forth in the definition of Borrowing Base, of less than the amount set forth next to such Borrower on Schedule 6.17 hereto.

6.18     **Solvency Certificate**.  Not later than five (5) Business Days after the end of each calendar month, Borrowers shall deliver to Agent a certificate, executed by the chief financial officer or other senior officer of each Borrower, confirming that as of the last day of the full calendar month just ended, each Borrower was Solvent, which certificate shall be accompanied by such supporting materials as Agent may reasonably require.

7.     **FINANCIAL COVENANT.**

Each Borrower covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, Borrowers will comply with the following financial covenant:

**Fixed Charge Coverage Ratio**.  At any time that the Excess Availability of Borrowers is less than $5,000,000, Borrowers shall have a Fixed Charge Coverage Ratio, measured on a month-end basis of not less than 1.25:1.00.

8.     **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1     If any Borrower fails to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of three (3) Business Days, or (b) all or any portion of the principal of the Obligations;

8.2     If any Loan Party or any of its Subsidiaries:

(a)     fails to perform or observe any covenant or other agreement contained in any of (i) Sections 3.6, 5.1, 5.2, 5.3 (solely if a Borrower is not in good standing in its jurisdiction of organization), 5.6, 5.7 (solely if a Borrower refuses to allow Agent or its representatives or agents to visit a Borrower's properties, inspect its assets or books or records, examine and make copies of its books and records, or discuss Borrowers' affairs, finances, and accounts with officers and employees of Borrowers), 5.10, 5.11, 5.13, 5.14, or 5.15 of this Agreement, (ii) Sections 6.1 through 6.16 of this Agreement, (iii) Section 7 of this Agreement, or (iv) Section 6 of the Security Agreement;

(b)     fails to perform or observe any covenant or other agreement contained in any of Sections 5.3 (other than if a Borrower is not in good standing in its jurisdiction of organization), 5.4, 5.5, 5.8, and 5.12 of this Agreement and such failure continues for a period of ten (10) days after the earlier of (i) the date on which such failure shall first become known to any officer of a Borrower or (ii) the date on which written notice thereof is given to a Borrower by Agent; or

(c)     fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and such failure continues for a period of thirty (30) days after the earlier of (i) the date on which such failure shall first become known to any officer of a Borrower or (ii) the date on which written notice thereof is given to a Borrower by Agent;

8.3     If one or more judgments, orders, or awards for the payment of money involving an aggregate amount of $1,000,000, or more (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) is entered or filed against a Loan Party or any of its Subsidiaries, or with respect to any of their respective assets, and either (a) there is a period of thirty (30) consecutive days at any time after the entry of any such judgment, order, or award during which (i) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (ii) a stay of enforcement thereof is

not in effect, or (b) enforcement proceedings are commenced upon such judgment, order, or award;

8.4    If an Insolvency Proceeding other than the Chapter 11 Cases is commenced by a Loan Party or any of its Subsidiaries;

8.5    If an Insolvency Proceeding other than the Chapter 11 Cases is commenced against a Loan Party or any of its Subsidiaries and any of the following events occur:  (a) such Loan Party or such Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party or its Subsidiary, or (e) an order for relief shall have been issued or entered therein;

8.6    If a Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Borrowers and their Subsidiaries,  that are Loan Parties, taken as a whole;

8.7    If there is a default in one or more agreements to which a Loan Party or any of its Subsidiaries is a party with one or more third Persons relative to a Loan Party's or any of its Subsidiaries' Indebtedness involving an aggregate amount of $1,000,000 or more, and such default (a) occurs at the final maturity of the obligations thereunder, or (b) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's or its Subsidiary's obligations thereunder;

8.8    If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

8.9    If the obligation of any Guarantor under the Guaranty is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement);

8.10    If the Security Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent of Permitted Liens, first priority Lien on the Collateral covered thereby, except (a) as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement, (b) with respect to Collateral the aggregate value of which, for all such Collateral, does not exceed at any time, $500,000, or (c) as the result of an action or failure to act on the part of Agent; or

8.11    The validity or enforceability of any Loan Document shall at any time for any reason  (other than solely as the result of an action or failure to act on the part of Agent) be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its

Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Loan Document.

8.12    The occurrence of any of the following:

(a)    any Financing Order shall be revoked, remanded, vacated, reversed, stayed, rescinded or, without the consent of the Agent, modified or amended on appeal or by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not be entered within sixty (60) days following the entry of the initial Interim Financing Order, unless Agent has agreed to and the Bankruptcy Court has approved an extension of the Interim Financing Order;

(b)    any "Event of Default" as defined in the Financing Orders;

(c)    the conversion of any of the Chapter 11 Cases to a Chapter 7 case under the Bankruptcy Code;

(d)    dismissal of any of the Chapter 11 Cases or any subsequent Chapter 7 case of any Borrower or Guarantor, either voluntarily or involuntarily;

(e)    any failure by any Borrower or Guarantor to observe or perform any of the material terms or conditions of any material order, stipulation or other arrangements entered by or with the Bankruptcy Court in the Chapter 11 Cases;

(f)    the granting of a lien on or other interest in any property of any Borrower or Guarantor, or administrative expense claim, by any Bankruptcy Court or District Court Judge which is superior to or ranks in parity with the lien on the Collateral of the Agent granted in this Agreement, the Security Agreements, the other Loan Documents or the Financing Orders other than the Carve-Out and Permitted Liens to the extent permitted hereunder;

(g)    any plan of reorganization which does not contemplate the payment in full in immediately available funds of all Obligations on the date of the effectiveness of such plan is confirmed without the consent of the Agent and the Lenders;

(h)    any administrative expense claim is allowed in the Chapter 11 Cases having priority over or ranking in parity with the Obligations, other than the Carve-Out (to the extent that the security interests of the Agent may be subordinate to the payment of the Carve-Out under the terms of any Financing Order); or

(i)    a trustee, an examiner or any other disinterested person with expanded powers is appointed in the Chapter 11 Cases pursuant to Section 1104 of the Bankruptcy Code or other applicable law.

9. **RIGHTS AND REMEDIES.**

9.1 **Rights and Remedies**. Upon the occurrence and during the continuation of an Event of Default, Agent may, and, at the instruction of the Required Lenders, shall (in each case under clauses (a) or (b) by written notice to Administrative Loan Party), in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, do any one or more of the following:

(a) declare the Obligations (other than the Bank Product Obligations), whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by Borrowers;

(b) declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with (i) any obligation of any Lender hereunder to make Advances, (ii) the obligation of the Swing Line Lender to make Swing Line Loans, and (iii) the obligation of the Issuing Lender to issue Letters of Credit; and

(c) exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents or applicable law.

The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in Section 8.4 or Section 8.5, in addition to the remedies set forth above, without any notice to Borrowers or any other Person or any act by the Lender Group, the Commitments shall automatically terminate and the Obligations (other than the Bank Product Obligations), inclusive of all accrued and unpaid interest thereon and all fees and all other amounts owing under this Agreement or under any of the other Loan Documents, shall automatically and immediately become due and payable and Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by Borrowers.

9.2 **Remedies Cumulative**. The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

10. **WAIVERS; INDEMNIFICATION.**

10.1 **Demand; Protest; etc.** Each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any Borrower may in any way be liable.

10.2    **The Lender Group's Liability for Collateral**. Each Loan Party hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

10.3    **Indemnification**. Each Loan Party shall pay and jointly and severally indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery (provided, that, no Borrower shall be liable for costs and expenses (including attorneys fees) of any Lender (other than WCFC) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrowers' and their Subsidiaries' compliance with the terms of the Loan Documents (provided, however, that the indemnification in this clause (a) shall not extend to (i) disputes solely between or among the Lenders or (ii) disputes solely between or among the Lenders and their respective Affiliates; it being understood and agreed that the indemnification in this clause (a) shall extend to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand), (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by a Borrower or a Subsidiary of a Borrower or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of a Borrower or a Subsidiary of a Borrower (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which a Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto. WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF

ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.

11. **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to any Borrower or Agent, as the case may be, they shall be sent to the respective address set forth below:

| | |
|---|---|
| If to a Borrower: | SPECIALTY PRODUCTS HOLDING CORP. |
| | _____ |
| | _____ |
| | Attn: _____ |
| | Fax No.: _____ |
| with copies to: | CALFEE, HALTER & GRISWOLD LLP |
| | 1400 KeyBank Center |
| | 800 Superior Avenue |
| | Cleveland, OH 44114-2688 |
| | Attn: Karl Beus, Esq. |
| | Fax No. 216 241-0816 |
| If to Agent: | WACHOVIA CAPITAL FINANCE CORPORATION (NEW ENGLAND) |
| | c/o Wells Fargo Capital Finance, LLC |
| | 12 East 49th Street |
| | New York, New York 10017 |
| | Attn: Mr. Robert Strack |
| | Fax No.: 212-454-4589 |
| with copies to: | OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C. |
| | 230 Park Avenue |
| | New York, New York 10169 |
| | Attn: Andrew M. Kramer, Esq. |
| | Fax No.: 212-682-6104 |

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that, (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except, that, if not given

during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

12. **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a) THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b) THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK STATE OF NEW YORK INCLUDING, IN THE CASE OF DEBTORS, EXCEPT TO THE EXTENT THAT, WITH RESPECT ONLY TO DEBTORS, SUCH ACTIONS OR PROCEEDINGS ARE REQUIRED BY APPLICABLE LAW TO BE TRIED AND LITIGATED IN THE BANKRUPTCY COURT; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH OF PARENT AND BORROWERS AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b).

(c) TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF PARENT AND BORROWERS AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH OF PARENT AND BORROWERS AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.