**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| SPECIALTY PRODUCTS HOLDING | : | Case No. 10-11780 (JKF) |
| CORP., *et al.*,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | **Hearing Date:  January 11, 2011 @ 11:00 a.m.** |
| | : | **Objection Deadline:  November 29, 2010 @ 4:00 p.m.** |

**MOTION OF COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS TO ESTABLISH AN ESTIMATION METHODOLOGY**

The Committee of Asbestos Personal Injury Claimants (the "Committee"), by and

through its undersigned counsel, hereby submits this Motion for an evidentiary hearing to

consider the estimation methodology to be considered in these cases, and contends that at the

conclusion of such hearing that the Court establish the use of an aggregate estimation based on

the Debtor's historical claim resolution data as the method for estimating the Debtors' present

and future asbestos liabilities, and in support thereof, represents as follows:

<u>BACKGROUND</u>

1.      On May 31, 2010 (the "Petition Date"), Specialty Products Holding Corp.

("SPHC") and Bondex International, Inc. ("Bondex", together with SPHC, the "Debtors") filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

2.      SPHC is wholly owned subsidiary of non-debtor RPM International, Inc.

("International"), the direct parent of Bondex, and the direct or indirect parent of certain other

---

[1]      The last four digits of the debtors' taxpayer identification numbers follow in parentheses: Specialty Products Holding Corp. (0857) and Bondex International, Inc. (4125).  The Debtors' address is 4515 St. Clair Avenue, Cleveland, Ohio 44103.

domestic and foreign non-debtor subsidiaries.  SPHC was known as RPM, Inc. until May 26,

2010, five (5) days before it filed its Chapter 11 Case.

3.      The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      Neither SPHC nor Bondex has any ongoing business operations.

5.      Bondex has no assets.  SPHC's assets consist solely of its direct and indirect

ownership in its operating subsidiaries.

6.      According to the Debtors, Bondex was served with its first asbestos-related

lawsuit in 1980, and SPHC received its first asbestos-related lawsuit in 1992.

7.      As of the Petition Date, the Debtors were defendants in approximately 15,000

pending asbestos-related bodily injury lawsuits.  A significant portion of these lawsuits involve

mesothelioma claims.

8.      On June 10, 2010 (the "Formation Date"), the Office of the United States Trustee

("UST") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  [Docket

No. 75].  The Committee was thereafter reconstituted by the UST on October 18, 2010.  [Docket

No. 457].

9.      The reconstituted Committee now consists of ten (10) personal injury claimants

suffering from asbestos-related diseases.  Each individual member of the Committee is

represented by his or her personal tort counsel on the Committee.

10.      On the Petition Date, the Debtors filed a Complaint for Injunctive and Declaratory

Relief Extending and Applying the Automatic Stay to Certain Non-Debtor Affiliates docketed as

Adversary Proceeding No. 10-51085. [Docket No. 9].  The Debtors and the Committee entered

into an agreed order effectively staying all litigation against the Debtors' non-debtors affiliates. [Adv. Proc. Docket No. 9].

11.      On October 11 and 12, 2010, the Debtors filed two Motions to conduct discovery pursuant to Bankruptcy Rule 2004 with respect to information that the Debtors contend they require to estimate their asbestos liabilities.  The Committee has filed Objections to both Motions.

## PRELIMINARY STATEMENT

12.      The Debtors' discovery motions and the Committee's objections place squarely at issue the estimation methodology to be implemented in these cases.[2]  Specifically, while the Debtors seek to conduct an estimation through a challenge to their pending claims, the Committee contends that such a methodology, for various practical and legal reasons, will not yield an accurate, reliable or useful estimation for purposes of reaching a consensual chapter 11 plan in these cases.

13.      Because it makes little sense to embark on an expensive and litigious discovery process in advance of a determination of whether the Debtors' proposed discovery protocol can be useful to this Court and the parties, the Committee urges the Court to consider first the

---

[2] The Debtors have asked the Court to permit them to use personal injury questionnaires or PIQs, an estimation process that violates the individual claimants' right to trial, is not supported by case law, and has already been proven, in this Court, to be wasteful and inefficient. *See* Motion for an Order Directing the Submission of Information by Current Asbestos Claimants. ([Document No. 436]).  **The Committee has filed Objections to this Motion and incorporates herein by reference its arguments** set forth in the (i) Objection of the Official Committee of Unsecured Creditors to Motion of the Debtors Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure for an Order Directing the Submission of Information by Current Asbestos Claimants [Docket No. 498]; (ii) Amended Objection of the Official Committee of Asbestos Creditors to the Motion of the Debtors for an Order Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure Directing Production of Information by Claims Processing Facilities for Certain Asbestos Personal Injury Trusts [Docket No. 517]; and (iii) Motion of the Official Committee of Asbestos Personal Injury Claimants To Compel the Debtors to Turnover Asbestos Claims Database [Docket No. 500].

efficacy (or, more accurately, lack thereof) of the Debtors' proposed estimation protocol before making any decision with respect to the Debtors' discovery motions.

14.     The Committee further seeks to have the Court order the parties to prepare estimates of the Debtor's aggregate liability through an analysis of the Debtors' historical record of claims resolution in the tort system.

### The Court Should Order the Use of an Estimation Protocol That Estimates Aggregate Liability Based on Historical Data

15.     The purpose of section 524(g) of the Bankruptcy Code is to provide the claimants with fair compensation that best approximates the existing tort system so as to permit debtor companies to emerge from bankruptcy with the ability to forge ahead with viable commercial futures. *See In re Grossman's Inc*., 607 F.3d 114, 127 (3d Cir. 2010) (Section 524(g) provides companies "who are seeking to fairly address the burden of thousands of current asbestos injury claims *and unknown future claims* ... a method to pay their current asbestos claims and provide for equitable treatment of future asbestos claims." *Id. quoting* 140 Cong. Rec. S4523 (Apr. 20, 1994) (emphasis added in opinion).

16.     While the Bankruptcy Code contemplates estimation of liabilities, it is "silent as to the manner in which contingent or unliquidated claims are to be estimated." *Bittner v. Borne Chem. Co.,* 691 F.2d 134, 135 (3d Cir. 1982).  Thus, the method of estimation that most fairly and efficiently fits the particular facts and circumstances of a specific case is committed to the sound discretion of the Bankruptcy Court. *In re Trident Shipworks, Inc.,* 247 B.R. 513, 514 (Bankr. M. D. Fla. 2000).  Ultimately, the estimation methodology chosen must serve the purposes of the Code.  *Bittner,* 691 F.2d at 135.  Thus, an estimation procedure should expedite the administration of the bankruptcy estate, be fair to all parties, and protect the claimants' individual rights. *Id*. at 135-36.

4

17.     The Committee contends that the appropriate methodology for determining aggregate asbestos liability is estimation by reference to the Debtors' own claims history.  *See, e.g., In re Eagle Picher Indus., Inc.,* 189 B.R. 681, 684-86 (the correct approach is to begin with the data in the debtor's data claim database); *In re Armstrong World Indus., Inc.,* 348 B.R. 111 (D. Del. 2006);  *In re Owens Corning*, 322 B.R. at 725; *In re Federal-Mogul Global*, 330 B.R. at 157 (same).  The factors that should enter into a court's estimate of a debtor's aggregate asbestos liability are:  (1) the past claims resolution history of the debtor company; and (2) foreseeable trends that would have affected the resolution of claims in state court. *See Armstrong*, 348 B.R. at 123-24; *Owens Corning*, 322 B.R. at 721-25; *Federal-Mogul*, 330 B.R. at 155; *Eagle-Picher Industries, Inc*., 189 B.R. at 690-91.

18.     A company's pre-petition settlement and judgment history in the tort system is the best indicator of its liability for asbestos claims.  As all claims in bankruptcy must be given the value they would have in the state tort system, the historical record of state court claims resolution provides the best available data for determining and estimating an asbestos manufacturer's aggregate liabilities for present and future asbestos claims.

19.     According to the Debtors, they were served with their first asbestos-related lawsuit in 1980,[3] and have been in the state tort system for over twenty (20) years.  Thus, the Debtors have years of experience litigating asbestos claims and have resolved thousands of claims. In doing so, Debtors have made litigation and settlement decisions which must, by their very nature have been in the Debtors' best interest.  As such any settlement must also have reflected the Debtor's own evaluation of the actual value of the settled claims.  That history has created a track record and universe of information that makes it possible to easily, fairly and

---

[3]     Informational Brief of the Debtors, p. 4 [Docket No. 7].

objectively estimate the Debtor's liability here.  This data does not, as Debtors argue, represent a sterile analysis of claims without context.  Rather, this is data is derived from claims which have passed through the crucible of litigation and settlement negotiations and therefore, represents the professional and considered opinion *of the Debtors' legal representatives* as to what these fully litigated and presented claims were worth.  The resolution of these claims provides the benchmark for determining the settlement value of unresolved claims, and deriving a reasonable estimate of the Debtors' aggregate liability for pending and future claims.

20.    Because prior resolution history includes settled claims, the Debtors' own historical claims information, by its very nature, includes a consideration of whether other asbestos-defendants may have contributed to a particular claimant's injury.  This factor would be an inherent part of assessing the merits and risks of making any settlements or proceeding to trial with regard to a particular claim.

21.    The estimation procedure advocated by the Committee is a conservative and efficient process that has been in place since Johns Manville Corporation first employed the procedure in 1982.  Importantly, this procedure, while using a debtor's claims resolution history as a benchmark, has the ability and flexibility to consider other critical factors and has been employed in numerous cases since the litigants in the *Johns Manville* case used it successfully. *See e.g., In re Federal-Mogul Global, Inc.,* 309 B.R. 133 (D. Del. 2005); *Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, 322 B.R. 719 (D. Del. 2005); *In re Armstrong World Industries, Inc.*, 348 B.R. 111 (D. Del. 2006).

22.    In the *Owens Corning* case, cited above, United States District Court Judge John P. Fullam denied Credit Suisse's request for individual discovery and instead, scheduled an estimation hearing, ruling that "the data now available – the Debtor's claim history, the

experience in other cases, etc. – viewed in light of the expert testimony at the scheduled hearing, should probably suffice for Claims Estimation purposes." *See* Order, *In re Owens Corning*, Nos. 00-3837-3854 (Bankr. D.Del. Aug. 19, 2004) [Dkt. No. 12520] (Ex. 2); *see also In re Owens Corning*, Nos. 00-3837-3854 (Bankr. D. Del. Nov. 22, 2004) (Memorandum and Order Denying Motion to Establish Procedures to Obtain a sample of Medical Records at 1, Ex. 3) (discovery of a "sample" of individual claimants' medical records was not necessary and would create delay and expense.)

23.    Importantly, the reasons proffered in *Owens Corning* to support the request for production of individual claimants' medical histories, namely that the information was necessary to demonstrate that certain aspects of their litigation history would distort their liability, is materially indistinguishable from the proffer made by the Debtor in their Motion for an Order Directing the Submission of Information by Current Asbestos Claimants. ([Document No. 436]). Judge Fullam properly rejected the proposed discovery on the grounds that this information was "already reasonably well known" and could easily be included in the experts' testimony and analysis without further discovery. *Id.* at 2. *See Owens Corning*, 322 B.R. at 719. As a result of these decisions, the court was able to decide the amount of Owens Corning's current and future asbestos liability by reviewing its claims litigation and resolution history and weighing the testimony of experts proffered by the several parties. *See id.* at 721-22.

24.    To the extent that there is any validity in the Debtors' contention that the present claims should have a lower recovery value as a result of payments made the various asbestos trusts (a contention that the Committee believes is entirely without merit), the Debtors' experts can incorporate this assumption into their estimation just as assumptions have been made to account for actual foreseeable trends that would have affected the resolution of claims in state

court, such as tort reform. *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 723 (D.

Del., 2005) ("The question to be resolved is the extent to which adjustments should be made to

historical values to account for these probable changes.")

25.    The Court should adhere to the proven method for estimating asbestos claims

based upon the Debtors' historical data.  No court has ever estimated a company's aggregate

asbestos-related liability using the individual questionnaires as the Debtors have proposed. *See,*

*e.g.,* Hearing Transcript at 284-285, *In re W.R. Grace & Co.* (Bankr. D.Del. Sept. 15, 2009) (No.

01-01139) (excerpt attached as Ex. 1) (testimony by Dr. Mark Peterson that a methodology based

on questionnaires, was "unusual" and, to his knowledge, had never been approved by a court in

the "history of estimation").[4]  As detailed in Dr. Peterson's affidavit and in the Committee's

objections to the Debtors' proposed Rule 2004 discovery, the methodology proposed by the

Debtor would be costly, burdensome, and disruptive.  Further it would result in the provision of

incomplete and unquestionably inaccurate data, all in order to come up with a value for claims

that is wholly hypothetical and unreliable.

26.    Moreover, the Debtors' concern that use of their own claims resolution history

will result in an over-estimation of their liability, is simply not borne out by experience, Indeed,

the Committee is unaware of a single asbestos chapter 11 proceeding  where a debtor using these

time-tested procedures found its asbestos liability to be over-estimated.

27.    The traditional approach for estimating asbestos liabilities may not be perfect, but

no estimation ever is. However, the estimation protocol proffered by the Committee is the only

protocol that has been refined through years of bankruptcy litigation and experience.  As a

---

[4] At the time of filing of this Motion, the Committee has pending a Motion for Turnover of the Debtors' Asbestos Claims Database (Dkt. No. 500, the "Database Motion").  This Motion seeks turnover of records which will enable the Committee to use the Debtors' claim resolution history as the proper method for estimating the Debtors liability. The Debtors have flatly rejected requests for this information.

result, this protocol has emerged (and has been accepted by courts around the country) as the fairest and most efficient way to administer the claims of thousands and thousands of truly injured claimants, and establish reasonable limits on the liability of the culpable companies.   In short, it is the only estimation protocol advanced in this Court "serves the purposes of the Code." *Bittner,* 691 F.2d at 135.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that this Court grant this Motion, set a schedule for an evidentiary hearing on the estimation protocol to be implemented in this case, after a sufficient period for discovery of the parties' expert witnesses, and such other and further relief as the Court deems just and equitable.

Dated:  November 14, 2010
Wilmington, Delaware

MONTGOMERY McCRACKEN
WALKER & RHOADS, LLP

By:     */s/ Natalie D. Ramsey*
          Natalie D. Ramsey, Esquire (DE Bar No. 5378)
          Laurie A. Krepto, Esquire (DE Bar No. 4109)
          1105 North Market Street, Suite 1500
          Wilmington, DE 19801
          (302) 504-7800

          *Counsel for the Committee of*
          *Asbestos Personal Injury Claimants*