## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPECIALTY PRODUCTS HOLDING CORP., et al.,[1] | Case No. 10-11780 (JKF) |
| Debtors. | Jointly Administered |
| | **Hearing Date: December 19, 2011 at 9:30 a.m.** |
| | **Objection Deadline: December 2, 2011 at 4:30 p.m.** |

### MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS AND THE FUTURE CLAIMANTS' REPRESENTATIVE FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO PROSECUTE CLAIMS ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Asbestos Personal Injury Claimants (the "Committee") and

Eric D. Green, the Future Claimants' Representative (the "FCR," and collectively, with the

Committee, the "Movants"), hereby move for entry of an order authorizing Movants to prosecute

certain claims on behalf of the Debtors' estates including, *inter alia*, claims for (i) avoidance and

recovery of fraudulent transfers, (ii) damages proximately related to directors' and officers'

breaches of fiduciary duties and RPM International's aiding and abetting those breaches, (iii)

illegal dividends, and (iv) unjust enrichment.  In Support of this Motion, Movants respectfully

state as follows:

### PRELIMINARY STATEMENT[2]

1.      The Movants seek authority under *Official Comm. of Unsecured Creditors of*

*Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en

banc) ("*Cybergenics II*"), to file a complaint on behalf of the estates asserting claims arising out

---

[1] The last four digits of the debtors' taxpayer identification numbers follow in parentheses:  Specialty Products Holding Corp. (0857) and Bondex RPM International, Inc. (4125).  The Debtors' address is 4515 St. Clair Avenue, Cleveland, Ohio  44103.

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings assigned to them in the body of this Motion.

the improper and fraudulent transfer from Debtor Specialty Products Holding Corp. ("SPHC") of over 75% of SPHC's value but none of its liabilities (including substantial current and future asbestos-related liabilities to the persons represented by the Movants) to its now corporate parent, RPM International, Inc. ("International"). A draft of the proposed Complaint is being filed as an exhibit hereto under seal.[3]

2.        Movants must assert these claims because the Debtors will not, and indeed cannot, credibly do so. First, the Debtors have already stated in open Court that following a purportedly "extensive" investigation, they have determined that International has no liability to the estates, and indeed intended to prosecute a declaratory judgment action (the "Declaratory Judgment Action") *using the Debtors' resources* solely for the benefit of International.[4] Second, SPHC's Board of Directors is not independent, having been hand-picked by International, with two of the three directors having previously served as officers of International and being putative defendants in the contemplated litigation. Third, one of the directors named in the Complaint is also SPHC's CEO, who is on leave from International and was only appointed to this position in the days immediately preceding the Debtors' bankruptcy filing. Fourth, the Debtors' special corporate counsel, whom Bondex paid at least $1.31 million[5] in the year preceding the Petition Date to advise the Debtors regarding their bankruptcy filing, is also a defendant in the contemplated litigation, having played an integral role in aiding and abetting the alleged fraud. Fifth, Debtors' bankruptcy counsel also represents International, and thus has conflicts of interest

---

[3] Because the Debtors have designated each and every page of their production – which includes numerous indisputably public documents – as "Confidential" under the Agreed Protective Order Governing Confidential Information [D.I. 471] in this proceeding, and because some of the allegations set forth in the draft Complaint derive from those documents, the exhibit is being filed under seal  The Movants reserve all rights to challenge the propriety of Debtors' confidentiality designations and anticipate doing so in connection with any Complaint that is ultimately filed.
[4] Debtors' bankruptcy counsel billed the estate at least 131.3 hours for preparation of a complaint intended to commence the Declaratory Judgment Action.
[5] This amount includes the $735,000 retainer Bondex paid to Calfee in connection with these cases.

that prohibit it from pursuing the claims asserted in the Complaint for the benefit of the Debtors'

estates.  In short, the key decision makers for the Debtors are the very individuals who

participated in transactions that isolated the majority of the assets of the RPM empire, in order to

prevent asbestos victims from reaching all but a small fraction of the assets that should properly

be available to satisfy their claims.

3.      Indeed, the filing of these Bankruptcy Cases is the beginning of the final step in

the scheme to protect International, the intended and primary beneficiary of the Debtors'

bankruptcy filings.  Since the bankruptcy itself is part of the scheme to protect International, the

Debtors cannot be entrusted to investigate or pursue International and its cohorts properly and

thoroughly.

4.      Although International has not appeared in these cases – formally or informally –

its influence cannot be understated.  Relying on the Board and the CEO that International

selected to pursue its agenda, the sole purpose of these cases is to fully and finally insulate

International from all personal injury claims relating to the manufacture, sale, and/or distribution

by the Debtors of asbestos and/or asbestos-containing products ("Bondex-related asbestos

claims") against International.  On the day that these cases were filed, International issued a

public statement that emphasized the benefits that *it* would obtain through a section 524(g)

injunction entered in these Bankruptcy Cases.  While International has been enjoying the benefits

of the section 105 injunction obtained at the very start of these case, the Debtors have been

primarily engaged (and using their limited assets) in an effort to provide International with

leverage to reduce its contribution to the desired section 524(g) injunction by pursuing a novel

and aggressive estimation theory that, by definition, would result in a lower estimation of the

Debtors' asbestos liabilities.

5.       Most notably, acting completely at odds with the interests of their respective chapter 11 estates and contrary to their fiduciary duty to maximize the value of those estates, the Debtors intended to pursue litigation aimed at establishing that the Debtors have no claims against International.  Their investigation of potential claims relating to the 2002 Restructuring appears to have been, at best, woefully deficient.  The Debtors nevertheless repeatedly have represented to the Court that such investigation provides a basis to use estate resources to pursue the Declaratory Judgment Action *in favor of International.*  As Debtors' counsel stated to the Court:

> You will not be surprised to learn that we've looked at [claims against the Parent] … But we've looked into it, *we've extensively looked into it*.  We don't believe any claims exist … [and] what we're going to do in the next week or so, maybe two week[s], is we're going to file a declaratory judgment action on behalf of the debtors asking for a declaration that there are no such claims ….

(Hr'g Tr. July 14, 2010 [D.I. 236], at 33:1-16.) (emphasis supplied.)[6]  But for the Court's expressed concern at the Debtors' intention to seek to cut off all claims against International through the prosecution of the Declaratory Judgment Action, the Debtors would have pursued that course.

6.       When asked by Movants to produce those records upon which they relied, the Debtors took more than *fifteen* months to produce what appears to be only some of those records.  Further, well more than one-half of these records were produced after the Debtors

---

[6]The Debtors have not filed the Declaratory Judgment Action.  At the March 28, 2011 hearing, the Debtors' counsel informed the Court and the Movants that the Debtors no longer intended to file the Declaratory Judgment Action, but reserved the Debtors' rights to revisit the issue.  (Hr'g Tr. March 28, 2011 [D.I. 1135], at 73:25-74:8 ("Now, at this point, just by way of update, I would tell Your Honor that given where we are, we determined not to file a declaratory judgment action as we discussed in July and October and accordingly, I would just withdraw all the comments I made about that at both the July and October hearings.  Having said that, we obviously reserve our right to revisit that issue as circumstances develop, but I wanted Your Honor to know by way of update that that's where we are at this point.").)  To date, the Debtors have given no indication to the Movants that their position with respect to claims against International has changed.

represented to the Movants and the Court that "[w]e've turned over literally everything that's been requested …." (Hr'g Tr. 3/28/11 at 40:7.)   In fact, in the last month alone, the Debtors have produced over a third of the total documents produced.  If a thorough investigation had been done, these records should have been available and produced immediately, with perhaps only a small delay to complete a privilege review.  That they were not produced raises significant questions as to either the quality of the investigation itself or the Debtors' motives in delaying the Movants' efforts to properly evaluate these potential claims.

7.       Still more troubling is the recent revelation that ***International caused the destruction of numerous hard drives and computer equipment*** containing a vast amount of historical information regarding the 2002 Restructuring.  Disclosed by the Debtors ***only within the last month***, it appears that many of the documents requested by the Movants were destroyed in August 2009, ***nine months prior to the Debtors' bankruptcy filing*** and at a time when International admits it was contemplating options including this bankruptcy proceeding.[7]  It is unclear whether the Debtors only recently learned of the destruction of the equipment and hard drives[8], or whether they concealed this from Movants.  Either way, Movants' ability to obtain all of the information sought regarding the 2002 Restructuring has been significantly delayed and impeded.  The Movants must now turn to non-party discovery with less than seven months

---

[7] It is also clear that International ***knew*** at the time of the destruction of this evidence of the potential that claims relating to the 2002 Restructuring would be asserted.  Not only had similar claims been asserted by asbestos plaintiffs in the tort system, but also the Debtors were investigating these potential claims.  International was named as a defendant for Bondex-related asbestos liabilities in state litigation as early as May, 2006.  *See* Joseph and Sybil G. Baer v. Georgia-Pacific Corporation, et al., In the 98th Judicial District Court of Travis County, Texas, Trial Court Cause No. D-1-GN-04-003598.  Indeed, the destruction of the hard drives and equipment occurred  just two months after International was dismissed in a case in which it was sued, along with RPM, Inc. and Bondex International, for liability based on allegations of being the alter ego of the Debtors was concluded. *See* William and Sharon Willis v. 84 Lumber Company, et al. in the Circuit Court of the Seventh Judicial District, Sangamon County, State of Illinois at Case No. 2007-L-0327, and while a case was still pending in the  MDL in the Eastern District of Pennsylvania.  *See* Mark W. Stratmann v. Bondex International, et al., Civil Action No. 09-CV-80031.

[8] The failure of the Debtors' counsel to issue a litigation hold letter during its investigation and in anticipation of a bankruptcy filing is yet another indication of the lack of independence and diligence they have shown in connection with these claims.

remaining on the statute of limitations. These facts demonstrate that either the Debtors did not conduct the thorough investigation they claim, or deliberately acted to delay discovery of the facts. Either way, the investigation can no longer be controlled by the Debtors.

8.      Despite these delays and roadblocks, the Movants, to the extent possible, have diligently investigated the Debtors' pre-petition transactions over the course of these bankruptcy cases in furtherance of their own fiduciary duties. Based upon their investigation to date, the Movants have concluded, *inter alia*, that the following claims should be brought on behalf of the Debtors' estates against International, its affiliates, its officers and directs, certain professionals and other third parties:[9] (i) avoidance of fraudulent transfers, actual and constructive, related to certain transactions in 1999 and 2002, together with punitive damages for wanton, malicious and willful misconduct; (ii) conspiracy related to the certain transactions in 1999 and 2002, together with punitive damages; (iii) unjust enrichment related to certain transactions in 1999 and 2002; (iv) fraudulent disregard of the corporate form between International and SPHC; (v) illegal dividends related to certain transactions in 2002 given the known asbestos-related liabilities then in existence; (vi) breach of fiduciary duty, including the duties of good faith, loyalty and to refrain from self-dealing and self-enrichment; (vii) aiding and abetting a breach of fiduciary duty; (viii) waste of corporate assets and facilitating the transfer of such assets for inadequate consideration; and (ix) spoliation/willful destruction of critical evidence despite knowledge of ongoing strategy decisions, litigation and associated document retention requests.

9.      The Debtors are well aware of the Movants' efforts to discover and investigate these claims. These efforts have been the subject of numerous meetings, correspondence and formal discovery requests since the filing of these cases.

---

[9] Each of these claims is specified with more particularity in section I.A herein, as well as the draft Complaint attached hereto as **Exhibit A.**

10.       The incestuous relationships among the Debtors and the targets of the Complaint, together with the Debtors' conduct thus far as regards these claims and the Movants' investigation thereof, clearly demonstrate that any demand on the Debtors to bring and prosecute this action would be futile.

11.       Accordingly, as explained more fully below, the Movants request immediate authority to prosecute the Subject Claims, and any additional claims relating to the 2002 Restructuring that may be identified through further discovery.[10]

## JURISDICTION

12.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 1103(c)(5), 1107(a) and 1109(b).

## FACTUAL BACKGROUND

A.       **Procedural Background**

13.       On May 31, 2010 (the "Petition Date"), SPHC and Bondex International, Inc. ("Bondex" collectively, with SPHC, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (the "Bankruptcy Code"), commencing the above-captioned bankruptcy cases (the "Bankruptcy Cases").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[10] While a draft Complaint has been filed under seal to assist the Court in evaluating the claims identified to date, the Movants are continuing additional investigation and third party discovery and expect that any final Complaint that will be filed prior to the expiration of the statute of limitations, will reflect additional factual support for the Subject Claims set forth in the attached draft Complaint, as well as additional causes of action.

14.      On June 10, 2010, the Office of the United States Trustee appointed the Committee pursuant to Bankruptcy Code section 1102 [D.I. 75].  The Committee was thereafter reconstituted by the UST on October 18, 2010 [D.I. 457], and again on December 14, 2010 [D.I. 666].

15.      On September 10, 2010, the Debtors filed their Application for An Order Appointing Eric D. Green as Legal Representative for Future Asbestos Claimants [D.I. 374].  On October 18, 2010, this Court entered its Order Appointing Eric D. Green as Legal Representative for Future Claimants [D.I. 449].

### B.  Overview of the Complaint

16.      The factual background related to the estate causes of action, including the corporate background, corporate restructurings, and historical asbestos liabilities, is set forth in detail in the proposed complaint attached hereto as **Exhibit A** (the "Complaint").

17.      To briefly summarize, the Complaint details the facts behind a multinational, multibillion dollar corporation's decade-long plan to unfairly and fraudulently escape the asbestos-related legal obligations it owes to unwitting consumers and their families. Specifically, International, its subsidiaries, and officers and directors, with the assistance of their attorneys (collectively, the "Defendants"), undertook a course of conduct that ultimately resulted in the transfer of approximately 75% of the Debtors' assets to a Byzantine corporate structure consisting of a series of holding companies and subsidiaries (the "2002 Restructuring").  These same transactions condemned the Debtors as the corporate repository of the massive asbestos liability that Defendants knew they owed, and which far exceeded the value of the Debtors' remaining assets.  The Defendants conceived and executed this reorganization when the RPM entities faced not only an explosion of asbestos related claims, but also the impending exhaustion of available insurance coverage.

18.        In the years preceding their bankruptcy filing, the Debtors, acting in concert with International and the attorneys named herein, embarked on a course of conduct designed to fraudulently conceal the true purpose of the reorganization, by, *inter alia*: (1) paying the Debtors' asbestos liability settlements via pooled corporate accounts that concealed that the Debtors were not the real payors; (2) obfuscating the true relationship amongst the corporate entities as it related to those entities that manufactured and sold asbestos-containing products; (3) using numerous name changes involving entities all with various iterations of the initials RPM, until the eve of the bankruptcy filing when RPM, Inc. filed a name change to its current iteration "SPHC"; and (4) destroying the very electronic documents and communications that would have revealed their fraudulent purpose.  It was only after the Defendants believed that the statute of limitations for the fraudulent transfers they obtained from Debtors SPHC had expired, that International, at the direction of its founding family, the Sullivans, and the company's officers and directors, put the Debtors into bankruptcy.

19.        Through prosecution of the Complaint, the Movants seek to hold International, the Sullivan family, their fellow affiliated officers and directors, and others who participated in the scheme accountable for their role in attempting to prevent those victims from recovering the compensation to which they are entitled.  To carry out their own fiduciary duties to the Debtors' estates, the Movants seek the authority to recover damages sufficient to compensate the thousands of victims of asbestos-related personal injury claims caused by exposure to the Debtors' asbestos products.

### C.  Movants' Efforts to Investigate Estate Claims

20.        Since the inception of these chapter 11 proceedings, the Committee has made it a priority to investigate the Debtors' historical structure and in particular the 2002 Restructuring. Shortly after the Petition Date, the Debtors and the Committee agreed to expedited discovery as

part of an agreed order entered in an adversary proceeding initiated by the Debtors.  This

particular adversary proceeding, also filed on the Petition Date,[11] sought entry of an order

extending the automatic stay to International and its affiliates.  Pursuant to the Agreed Order

Regarding Debtors' Request for Extension or Application of the Automatic Stay to Non-Debtor

Affiliates, Adv. Pr. No. 10-51085 [D.I. 19], the Committee served its first sets of Interrogatories

and Requests for Production of Documents on June 25, 2010, and proposed a reasonable

schedule for expedited discovery.  The requests sought both paper records and electronically

stored information in the possession or control of the Debtors relevant to the 2002 Restructuring.

Documents the Debtors' presumably compiled and reviewed as part of their self-described

"extensive" investigation.

     21.      In the more than 15 months that have passed since the "expedited" discovery was

served, the Debtors have produced a relatively limited number of documents, over one-third

(37%) of which were produced in the last month, and then only after repeated requests, demands

and ultimately threats to resort to the Court for enforcement.  And even then, the production

appears to be deficient in quality and quantity of the production.  The slow pace of this

production has been outrageous in itself, and given that the Debtors announced in July 2010 that

they had already thoroughly investigated potential claims against International, and their

affiliates, and were certain that no valid claims existed, it is alarming.  All of the documents

relevant to investigating potential estate claims against International should have been identified,

organized and reviewed by the Debtors prior to July 14, 2010, yet the Debtors have parsed out

these materials to the Movants in sporadic productions over the past year.[12]

---

[11] *See* Main Case [D.I. 9]; Adv. Pro. No. 10-51085 [D.I. 1].

[12] On September 10, 2010, the agreed deadline for production of all responsive documents, the Debtors produced
266 documents that included only publicly-available documents, such as corporate press releases, annual reports,
and SEC filings, and indicated more documents were to be on a rolling basis, without providing any timeframe.  The

22.        Most distressing of all, and despite specific discovery requests directed toward, and meet-and-confer sessions dedicated solely to, the discovery of electronically stored information ("ESI"), the Debtors informed the Movants just last month that International destroyed a substantial amount of ESI in August 2009, a mere nine months before the Debtors' bankruptcy filing.  The Movants contend that the numerous hard drives and other computer hardware that were destroyed contained a vast amount of historical information of critical relevance to this proceeding[13].  And this was not a routine destruction: the Debtors' bankruptcy filing was already in the planning stages, and International had been sued in asbestos-related actions in the tort system under various theories including piercing the corporate veil and successor liability.  (*See* Hr'g Tr. 7/14/10 at 33:2-4 (Mr. Gordon: "I mean, those issues have come up in the state court litigation for years, and there's been allegations that the parent has some responsibility for what happened here . . . .").)[14]  The most troubling aspect of this critical fact is that the destruction either was withheld from the Movants for over 15 months, or was never uncovered by the Debtors, despite their purportedly "extensive" investigation.

23.        The actions of the Debtors throughout the discovery process, including the failure to notify the Movants of the August 2009 destruction of the server, are indicative of the Debtors' failure to fulfill one of their most fundamental fiduciary duties – the evaluation of potential claims held by the estates.  By doing so, the Debtors have allowed much of the two-year post-petition period for filing estate claims to dwindle away.  The Movants have no choice at this

---

Debtors continued to provide sporadic document productions in October, November, December 2010 and January and on February 1, 2011, what the Debtors' deemed to be their "final" production.  The seven productions over this timeframe omitted complete financial information and internal communications and records necessary to investigate estate causes of action.  After extensive correspondence from the Movants specifically identifying deficiencies with the Debtors' production, and several meet and confers, the Debtors resumed document production, with nine additional document productions between September 23 and November 9, 2011.

[13] This equipment became the property of International as part of the 2002 Restructuring, having previously belonged to Debtor SPHC.

[14] *See also supra* note 7.

point but to take complete control of the investigation and seek authority under *Cybergenics* to

pursue any derivative claims arising out of the 2002 Restructuring.

## ARGUMENT

### I.  The Movants Clearly Satisfy the *Cybergenics* Standard for Derivative Standing

24.    It is not reasonably disputable that derivative standing is warranted on the facts of

this case.  The Third Circuit has made plain that derivative standing is warranted in instances,

such as the present case, where the debtor in possession is unable or unwilling to pursue estate

claims.  *See Cybergenics II*, 330 F.3d at 553 (finding that Bankruptcy Code evinces "Congress's

approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts'

equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-

possession unreasonably refuses to pursue an avoidance claim" and that such finding "is

consistent with the received wisdom that '[n]early all courts considering the issue have permitted

creditors' committees to bring actions in the name of the debtor in possession if the committee is

able to establish' that a debtor is neglecting its fiduciary duty.") (quoting 7 *Collier on

Bankruptcy* ¶ 1103.05[6][a] (15th rev. ed. 2002)); s*ee also In re Centaur, LLC*, No. 10-10799

(KJC), 2010 Bankr. LEXIS 3918, at *13 (Bankr. D. Del. Nov. 5, 2010) ("There is no dispute that

under [*Cybergenics II*], the Third Circuit has held that bankruptcy courts can confer derivative

standing upon creditors' committees to bring actions to recover property for the benefit of the

estate.").

25.    While *Cybergenics II* did not specifically set forth the procedures for allowing

creditors derivative standing, "[t]he Third Circuit expressed its agreement with guidelines

established by the Second and Seventh Circuits that entitlement to derivative standing requires:

(1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3)

permission of the bankruptcy court to initiate the action." *Centaur*, 2010 Bankr. LEXIS 3918, at

*13 (citing *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145

(D. Del. 2004)). As explained in detail herein, the estates have colorable and potentially

extremely valuable claims, and the conflicting loyalties of the Debtors render them incapable of

effectively evaluating or pursuing them.

### A.        The Subject Claims Are Colorable

26.        The facts at bar, both set forth herein and in the attached draft Complaint, show a

scheme designed and implemented to strip valuable assets away from these estates, with the sole

purpose of moving these assets beyond the reach of the Debtors' tort claimants. If the Court

accepts the factual allegations set forth in the draft Complaint as true – which it must at this stage

of the proceedings – the Complaint undoubtedly states a "colorable claim."[15]

27.        To establish a colorable claim, the "derivative standing test requires the Court to

decide whether the Committee has asserted 'claims for relief that *on appropriate proof* would

support a recovery.'" *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I

Holdings, Inc.),* 313 B.R. 612, 631 (Bankr. D.N.J. 2004) (emphasis added) (internal quotation

omitted), *rev'd in part and remanded sub nom. Official Comm. Of Asbestos Claimants v. Bank of

N.Y. (In re G-I Holdings, Inc.)*, 2006 U.S. Dist. LEXIS 45510  "Because the creditors' committee

is *not required to present its proof*, the first inquiry is much the same as that undertaken when a

---

[15] Indeed, Movants are not even *required* to provide a draft complaint with this Motion. *See Official Comm. Of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510, at *45-46 (D.N.J. June 21, 2006) ("Although the Committee did not file a proposed complaint in conjunction with its motion for leave to prosecute the . . . [c]laims, it did file a summary of claims to be asserted by the Committee. The motion was sufficiently detailed to provide the Bankruptcy Court with enough information to determine standing." (internal citations omitted)).. The Movants are not required to present proof of the Subject Claims (as defined below) for the Court to grant this Motion. *See In re MIG, Inc.*, Case No. 09-12118 (KG), 2009 Bankr. LEXIS 4313, at *4 (Bankr. D. Del. Dec. 18, 2009) (citing *Unsecured Creditors Comm. Of Debtor STN Enters. V. Noyes (In re STN Enters.)*, 779 F.2d 901, 905-06 (2d Cir. 1985)) (court examines whether "committee presents . . . claims for relief that *on appropriate proof* would support a recovery") (emphasis added).

defendant moves to dismiss a complaint for failure to state a claim." *Id.* at 631 (quoting *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (quoting *Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999)) (emphasis added).   "When considering a motion to dismiss, a court must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts." *G-I Holdings,* 313 B.R. at 631 (citations omitted).   "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle him or her to relief." *Id.* (citations, quotations, and marks omitted); *see also In re STN Enters.*, 779 F.2d at 905-06 (the bankruptcy court need not conduct a "mini-trial" to determine whether a "colorable" claim exists).

28.      Based upon their investigation to date, the Movants have concluded, *inter alia*, that the following claims (collectively, the "Subject Claims") should be initiated on behalf of the Debtors' estates:

a.      claims to avoid, as actual fraudulent transfers pursuant to 11 U.S.C. § 544(b), 11 U.S.C. § 550(a), and applicable non-bankruptcy law, transfers and obligations made in 1999 (the "1999 Transfers and Obligations") and in 2002 (the "2002 Transfers and Obligations"), and to recover the property or value of the property transferred to International, their affiliates, or third parties for the benefit of International, with interest;

b.      claims to avoid, as constructively fraudulent transfers pursuant to section 11 U.S.C. § 548(a)(1)(B),11 U.S.C. § 550(a), and applicable non-bankruptcy law, the 1999 Transfers and Obligations and the 2002 Transfers and Obligations, and to recover the property or value of the property transferred to International, their affiliate, or third parties for the benefit of International, with interest and to seek punitive damages for the fraudulent, wanton,

14

malicious or willful conduct that is the basis for the constructively fraudulent transfers;

c.    claims for compensatory and/or punitive damages based on International's conspiring with RPM, Inc. (now SPHC) to effectuate the fraudulent conveyance of the 1999 Transfers and Obligations and the 2002 Transfers and Obligations;

d.    claims for appropriate restitution of International's unjust enrichment from the actual and/or constructive fraudulent transfers of the 1999 Transfers and Obligations and the 2002 Transfers and Obligations;

e.    claims for disregard of the corporate form between International and SPHC, because the form was used as a sham to perpetrate a fraud on SPHC's creditors primarily for International's direct benefit;

f.    claims for illegal dividends in the 2002 Transfers and Obligations, based on International's active procurement and participation in the declaration of RPM, Inc.'s (now SPHC's) dividends in 2002, when RPM, Inc.'s asbestos-related personal injury liabilities exceeded its assets and International knew that its receipt of the dividends was improper and yet reaped the benefits of the improper dividend;

g.    claims for International's breach of fiduciary duties to RPM Inc. and RPM Inc.'s creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of RPM, Inc.'s ownership of numerous profitable industrial and consumer market entities to International, and to recover monies International took for its own benefit and to the disadvantage of RPM Inc.'s creditors;

h.    claims against one or more of RPM, Inc.'s officers and directors for breach of their fiduciary duties to RPM Inc. and RPM Inc's creditors, including the duty of good faith, the duty of loyalty to always act in RPM, Inc.'s and RPM, Inc.'s creditors' best interest, and the duty to avoid self-dealing and self-enrichment at RPM, Inc.'s and RPM, Inc.'s creditors' expense, by, among other things, orchestrating, authorizing, and carrying out the transfer of RPM, Inc.'s ownership of numerous profitable industrial and consumer market entities to International and recovery of the proximately caused damages from these breaches;

i.    claims against International for aiding and abetting one or more of RPM, Inc.'s directors for breach of their fiduciary duties to RPM Inc. and RPM Inc's creditors, including the duty of good faith, the

duty of loyalty to always act in RPM, Inc.'s and RPM, Inc.'s creditors' best interest, and the duty to avoid self-dealing and self-enrichment at RPM, Inc.'s and RPM, Inc.'s creditors' expense, by, among other things, orchestrating, authorizing, and carrying out the transfer of RPM, Inc.'s ownership of numerous profitable industrial and consumer market entities to International and recovery of the proximately caused damages from these breaches;

j.      claims against one or more of RPM, Inc.'s officers and directors for waste of RPM, Inc.'s corporate assets, for facilitating the transfer of RPM, Inc.'s ownership of numerous profitable industrial and consumer market entities to International for inadequate consideration and for the improper purpose of segregating RPM, Inc.'s asbestos-related liabilities away from the company's profit centers;

k.      claims against Calfee (as defined below) for aiding and abetting one or more of RPM, Inc.'s directors for breach of their fiduciary duties to RPM Inc. and RPM Inc's creditors, including the duty of good faith, the duty of loyalty to always act in RPM, Inc.'s and RPM, Inc.'s creditors' best interest, and the duty to avoid self-dealing and self-enrichment at RPM, Inc.'s and RPM, Inc.'s creditors' expense, by, among other things, orchestrating, authorizing, and carrying out the transfer of RPM, Inc.'s ownership of numerous profitable industrial and consumer market entities to International and recovery of the proximately caused damages from these breaches; and

l.      claims against International for spoliation of evidence by, in August 2009, willfully causing the destruction of numerous computer hard drives and almost 7,000 pound of computer hardware containing a vast amount of Debtors' historical asbestos-related information, despite the Debtors' bankruptcy already being in the planning stages, and despite knowledge of ongoing asbestos-related litigation and associated document retention requirements

29.      As described above, and as demonstrated by the well-pleaded allegations in the draft Complaint, the Subject Claims are sufficiently colorable for the Court to grant Movants authority to prosecute the Subject Claims on behalf of the Debtors' estates.

## B.      Any Demand on the Debtors to Bring the Subject Claims Would Be Futile

30.      The overlapping relationships between the Debtors and the putative defendants render the Debtors incapable of effectively and credibly investigating and prosecuting the

Subject Claims.  The Debtors' own conduct also leaves no doubt of their unwillingness to prosecute the Subject Claims.

31.        Movants are thus not required to make a demand that the Debtors themselves prosecute the Subject Claims.[16]  As set forth more fully below, such demand is deemed futile because the Debtors and its officers, directors, and professionals are inextricably connected with International and its officers and directors, all of whom are named defendants in the Complaint. *See In re La. World Exposition*, 832 F.2d 1391, 1397-98 (5th Cir. 1987) (court would not remand so that committee could make formal demand upon debtor, where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers); *Official Comm. Of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) (demand presumptively futile where would-be defendants were employees and insiders of the debtor); *Official Comm. Of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, Nos. 01-11353 & 02-04553, 2003 WL 21956410, at *3 (Bankr. D. Del. Aug. 14, 2003) (demand would be futile where debtor's counsel has conflict of interest sufficient to effectively disqualify counsel from pursuing the otherwise colorable action); *In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) (creditors' committee excused from making a demand on a debtor to pursue action against its officers, directors and controlling shareholders where such a demand would be futile).

    **i. The Extensive Conflicts of Interest of the Debtors' Officers and Directors Prevent Debtors' from Properly Discharging their Obligations as Debtors in Possession with Respect to the Subject Claims.**

32.        These Chapter 11 Cases present a quintessential example of the fox guarding the henhouse.  Stephen Knoop, Michael D. Tellor, and Glenn R. Hasman, each appointed in 2010,

---

[16] Movants made a formal demand on October 12, 2011 on the Debtors to turn over prosecution of the Subject Claims to Movants.  The Debtors have not consented as of the date hereof.

are the only directors on the Boards of SPHC and Bondex.[17]  The Debtors' directors' interests are clearly aligned with International[18] and the other putative defendants, which include two of the three directors on the Debtors' boards.  Neither SPHC nor Bondex has a single director on its board of directors who is capable of independently investigating and analyzing the appropriateness of the Subject Claims.  *Cf. Katell v. Morgan Stanley Group*, No. 12343, 1993 Del. Ch. LEXIS 5, *15-17 (Del. Ch. Jan. 14, 1993) (holding that for purposes of determining demand futility in a derivative action, the presumption of director disinterestedness is rebutted where a less than a majority of directors are disinterested  transaction to be presumed disinterested) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Kaufman v. Beal*, No. 6485, No. 6526, 1983 Del. Ch. LEXIS 391, *8-9 (Del. Ch. Feb. 25, 1983) (holding that "the controlling factor should be whether the demand would have been futile because a majority of the directors of the corporation could not have impartially considered the request") (internal citation omitted).

33.        Each of the current board members of SPHC and Bondex was selected by International and the prior board of SPHC[19], which consisted of individuals who have served as officers of International and/or board members of other International affiliates, and who were also responsible for stripping Bondex of its assets and implementing the 2002 Restructuring.

---

[17] *See* Debtors' Responses and Objections of Debtors to First Set of Interrogatories, attached hereto as **Exhibit B**; Bondex's *Statement of Financial Affairs* [D.I. 241] (the "Bondex SOFA"), at Question 21; SPHC's *Statement of Financial Affairs* [D.I. 243] ("SPHC SOFA"), at Question 21.

[18] In addition to the Debtors' conflicts described herein, upon information and belief Mr. Knoop and Mr. Hasman have a significant financial interest in International.  *See* Stephen J. Knoop–Stock Portfolio, Equity Hive, http://www.equityhive.com/main/Individual/assetview.aspx?i=1224031 (valuing Mr. Knoop's International  stock portfolio as of November 13, 2011 at approximately $1.95 million) (November 13, 2011);  Glenn R. Hasman–Stock Portfolio, Equity Hive, http://www.equityhive.com/main/Individual/assetview.aspx?i=1224029 (valuing Mr. Hasman's International  stock portfolio as of November 13, 2011 at approximately $655,000 and Mr. Hasman's wife's at approximately $368,000) (November 13, 2011).  Printouts of these web pages are attached as **Exhibit C**.

[19]  *See* Unofficial Transcript of August 9, 2010 Section 341 Hearing (the "8/9/10 341 Transcript"), at 14.  A copy of the 8/9/10 341 Transcript is attached hereto as **Exhibit I**.

Indeed, Debtors' current board members were selected at a time when the chapter 11 filings and potential fraudulent transfer actions were being contemplated.[20]

34.         While SPHC claims to have three employees, Knoop, Hasman and Tellor,[21] Knoop and Tellor are not employees of either Debtor, but rather provide services to the Debtors pursuant to an administrative services agreement between International and SPHC as discussed below.  Bondex has two employees, Hasman and John Fleming, who serve as Treasurer and President, respectively.  Ironically, Mr. Fleming was removed from Bondex's board of directors on May 26, 2010, days before the Bankruptcy Cases were filed.[22]

35.         Mr. Knoop, who is currently CEO and Director for both SPHC and Bondex, is also the Senior Vice President of Corporate Development for International.[23]  Knoop served as Vice President of Corporate Development of SPHC  until October, 2002 when, as part of the 2002 Restructuring, Knoop became Vice President of Corporate Development for International.[24] Prior to becoming Vice President of Corporate Development for SPHC in 1996, Knoop was a partner at Calfee, Halter & Griswold LLP ("Calfee").  As set forth in the Complaint, Mr. Knoop is one of the officers of SPHC against whom the Debtors' estates have colorable claims.

36.         Mr. Hasman, the Vice President, Treasurer, Secretary and Director of SPHC and Secretary and Director of Bondex, was also involved in the implementation of the 2002 Restructuring.  Hasman served as Vice President of Finance and Communications of SPHC prior to October of 2002 when, as part of the 2002 Restructuring, he became Vice President of Finance

---

[20]  As set forth in response to Question 9 of both the Bondex SOFA and SPHC SOFA, at least as early as June 2009, the Debtors were working with counsel related to a potential bankruptcy filing.
[21]  *See* Unofficial Transcript of July 9, 2010 Section 341 Hearing (the "7/9/10 341 Transcript"), at 18.  A copy of the 7.9.10 341 Transcript is attached hereto as **Exhibit H**.
[22]  *See* Bondex SOFA, at Question 22.
[23]  Two months after the Petition Date, Mr. Knoop commenced a temporary leave from his position at International during the pendency of the Chapter 11 Cases.
[24]  *See* RPM International, Inc. 2006 Annual Report, RPM_INTL 0000173, 0000238 (VP of Corporate Development).

and Communications at International.  Hasman now reports to Knoop in his multiple roles with

both SPHC and Bondex.  *See* 7/9/10 341 Transcript, at 20.  As set forth in the Complaint, Mr.

Hasman is one of the officers of SPHC against whom the Debtors' estates have colorable claims.

37.     Mr. Tellor, who acts as President, Chief Operating Officer and Director of SPHC

and Secretary and Director of Bondex, is also not an employee of either Debtor.  *See* 7/9/10 341

Transcript, at 10.  Tellor is an employee of non-debtor Kop-Coat, Inc.,[25] and simply acts as

President of SPHC pursuant to the Administrative Services Agreement between International and

SPHC.  Tellor began with SPHC in August of 1985, became president of Rust-Oleum

Corporation in 1994 and continued as President of Rust-Oleum till his retirement in 2008.  As

part of the 2002 Restructuring Tellor was one of three presidents of the consumer group.

Accordingly, Tellor, like Knoop and Hasman, was involved in the implementation of the 2002

Restructuring.  Tellor rejoined the RPM Entities in May 2010, likely in anticipation of the

bankruptcy filing.  With respect to Tellor's responsibilities at SPHC, he reports to Knoop and

Hasman, and with respect to his responsibilities at Kop-Coat, to the COO of International.  *See*

7/9/10 341 Transcript, at 20.

38.     As discussed above, the Debtors' assertion at the beginning of these Chapter 11

cases that they intended to commence the Declaratory Judgment Action illustrates that the

Debtors' directors do not possess the independence necessary to determine whether

commencement and prosecution of the Subject Claims are in the best interest of the Debtors'

estates.[26]  In fact, this Court noted its concern regarding the inherent conflict in the Debtors'

proposed declaratory action, cautioning the Debtors:

---

[25]  See Letter Agreement dated June 1, 2010, attached hereto as **Exhibit D**.
[26] The appointment of conflicts counsel to litigate the Subject Claims cannot cure the underlying infirmity presented by the lack of independence of the Debtors' officers and directors.

Well, I think that is going to be an issue, Mr. Gordon. I mean the debtors do need to maximize the value of the estate, not to minimize it, and to the extent that somebody else thinks there's value there and the debtor is saying, No, there isn't, I mean the debtor doesn't have to be in all accord with everything that the creditors agree with, but nonetheless, to institute the action when somebody is looking at those issues is very curious.

…

[T]he debtors' interests, if anything, it would seem, just without knowing the facts, but just as a legal matter, it would seem that the debtors' interest would be to look for contributions from its parent, not so say, My parent doesn't have anything to do with this.

…

So, that is troubling, and I think it does raise some issues of conflict.

Hr'g Tr. 7/14/10 at 35:25-37:44.

39.        In summary, the Debtors' Directors and Officers have conflicts of interest that prevent them from independently and fairly investigating, evaluating and pursuing causes of action relating to the 2002 Transaction.

40.        As the only truly independent entities with fiduciary duties to maximize the value of the Debtors' estates, the Movants should be granted standing to prosecute the Subject Claims.

### ii.        Debtors' Counsel's Conflicts Disqualify them from Commencing an Action against International and/or its Officers and Directors.

41.        Similar to their clients, the Debtors' attorneys have significant conflicts of interest that would prevent them from vigorously prosecuting the claims asserted in the Complaint.[27]  *See*

---

[27] *See* Hr'g Tr. 7/14/10 at 31:3-14 ("THE COURT: Alright, so, if I understand, to the extent that Jones Day or that the Committee, if not the debtor, or some entity, commences litigation against some or all of these entities, then I'm not going to be faced with a circumstance where Jones Day cannot either represent the debtor or the other side, whoever its going to be – Well, it can't be, I guess, the other side, the people who are sued. It will have to be representation of the debtor. If there's a conflict then conflicts counsel will be appointed. Is that the understanding? MS. RAMSEY: That has been my assumption from the conversations, Your Honor.").

[27] The Committee requested, in its *Limited Objection of Committee of Asbestos Personal Injury Claimants to the Application of the Debtors to Retain and Employ Jones Day as Counsel, Nunc Pro Tunc as of the Petition Date* [D.I. 159] (the "Limited Objection"), a supplemental representation that Jones Day's current representation of International will not prevent or otherwise limit its ability to advise and/or represent the Debtors in taking such adverse actions and/or commencing such litigation against the non-debtor subsidiaries of SPHC as appropriate for

*generally Valley Media*, 2003 WL 21956410, at *2 (stating that demand would be futile where debtor's counsel has a conflict of interest sufficient to effectively disqualify counsel from pursuing the otherwise colorable action).  In connection with these Bankruptcy Cases, the Debtors retained Calfee as special corporate counsel.  Calfee presently advises International and continues to serve as its general outside counsel.[28]  Calfee is the same firm that acted as counsel on behalf of all of the SPHC-related entities, International, and RPM Funding Corp[29] (collectively, the "<u>RPM Entities</u>") in the 2002 Restructuring.  Upon information and belief, not only did Calfee play an integral role in devising and effectuating each of the transactions that were part of the 2002 Restructuring, but it was the only counsel involved in the 2002 Restructuring for any of the RPM Entities.  Interestingly, Calfee's integral role in the 2002 Restructuring, including its role as counsel to the reorganizing entities, was not disclosed in its retention application (filed June 11, 2010) or Calfee's declaration in support of retention.  *See Declaration of Thomas F. McKee* [D.I. 80], at ¶3(c) (stating only that Calfee "has represented or currently represents certain of the current and former officers and directors of the Debtors, International, the Nondebtor Affiliates and the Nondebtor SPHC Subsidiaries," and providing a non-exclusive list of 17 individuals among that group).

42.    Moreover, the Debtors' general bankruptcy counsel, Jones Day, is also counsel to International.  As recognized at the hearing on Jones Day's retention application, Jones Day concurrently represents International[30] on matters unrelated to this chapter 11 proceeding.  The Court further recognized that if litigation were commenced against International, conflicts

---

the Debtors' benefit.  The Debtors' objected to this request [D.I. 191] and no averment on these issues has ever been made by Jones Day.
[28] According to the testimony of Mr. Knoop, Calfee essentially acts as Debtors and International's in-house legal department.  *See* 7/9/10 341 Transcript, at 10-11.
[29] See **Exhibit E** and **Exhibit F**, attached hereto .
[30] *See Application of the Debtors for an Order Authorizing them to Retain and Employ Jones Days as Counsel, Nunc Pro Tunc as of the Petition Date* [D.I. 47], Ex. A.

counsel would have to be appointed.[31]  Accordingly, if Jones Day cannot represent the Debtors

in litigation against its current client, International,[32] it surely cannot, consistent with its duty of

loyalty, effectively advise the Debtors regarding any potential litigation against International.

The fact that Jones Day (and Calfee) represents International, also casts serious doubt on the

manner in which the Debtors alleged investigation was conducted.

43.    The facts at bar suggest that the litigation strategy employed here by International

and the Debtors is to frustrate the Movants' ability to effectively conduct their own

investigations of the 2002 Restructuring and to "run out the clock" on the prosecution of these

claims on behalf of the estate.  Under these facts, any demand that the Debtors pursue the

Subject Claims would be futile.

### C.    The Underlying Policy Considerations for the Demand Requirement Have Been Satisfied Obviating the Need for Formal Demand

44.    Policy considerations also support excusing Movants from making a formal

demand with respect to the Subject Claims.  As stated by the *National Forge* court, "[t]he policy

concerns underlying the general requirement of a formal demand are to ensure that the debtor is

(i) informed of the committee's intent to assert the subject claims and (ii) afforded an

opportunity to explain its reasons, if any, for declining to pursue the claims itself." *Official*

*Comm. of Unsecured Creditors of Nat'l Forge Co. (In re Nat'l Forge)*, 326 B.R. 532, 544 (W.D.

Pa. 2005).

45.    Throughout the discovery process, in both meet-and-confer discussions as well as

in correspondence, the Movants candidly discussed how their document requests specifically

---

[31] *See supra* note 26.

[32] The Committee requested, in the Limited Objection, a supplemental representation that Jones Day's current representation of International will not prevent or otherwise limit its ability to advise and/or represent the Debtors in taking such adverse actions and/or commencing such litigation against the non-debtor subsidiaries of SPHC as appropriate for the Debtors' benefit.  The Debtors' objected to this request [D.I. 191] and no averment on these issues has ever been made by Jones Day.

related to the potential estate claims they were investigating.  In fact, the Movants explicitly described the potential claims they were investigating as well as initial evidence on those claims in the context of the Movants continued efforts to obtain relevant discovery from the Debtors in July 2011, to wit:

**Fraudulent Transfer**

The Committee and FCR are currently investigating transactions in both 1999 and 2002.  In 1999, it appears that Bondex was stripped of substantial valuable assets and did not receive reasonably equivalent value.  It also appears from the limited discovery produced to date that Bondex's own senior officers were unaware or had little, if any involvement, in the transactions.  The Committee and FCR are also investigating whether as a result of the 2002 restructuring, RPM International received profitable operating subsidiaries amounting to approximately seventy-five percent of the pre-restructuring assets of RPM, Inc. while leaving that entity, k/n/a Specialty Holding Products Corporation ("SPHC"), with entities such as Bondex and Dryvit, that had no or limited assets to offset substantial present and future tort liability.  We are also investigating whether the dividend related to the 2002 reincorporation may constitute a fraudulent conveyance.

**Conspiracy, Unjust Enrichment, Illegal Dividends, Alter Ego**

The Committee and FCR are investigating whether RPM International conspired to effectuate fraudulent conveyances by means of Delaware reincorporation.  Based upon our review of the documents produced to date, there is some evidence to suggest that RPM International was unjustly enriched, at the Debtors' expense and that some dividends to RPM International may have been illegal.  Furthermore, by causing SPHC to transfer profitable subsidiaries to RPM International, RPM International may be deemed SPHC's alter ego and responsible for payment of asbestos-related claims asserted against SPHC.  The corporate form between RPM International and SPHC may be deemed disregarded if such form was used as a sham to perpetrate a fraud.

**Breach of Fiduciary Duty**

> With respect to an investigation of potential claims for breach of fiduciary duty, there is evidence to suggest that RPM International dominated and controlled SPHC., and despite a fiduciary duty not to use its power to its personal advantage, it used such control to the detriment of SPHC's creditors…. Further, SPHC's officers and directors may have breached their fiduciary duties to SPHC. and its creditors by, among other things, orchestrating, authorizing, and carrying out the transfer of SPHC ownership of numerous profitable industrial and consumer market entities to RPM International.[33]

46.     The policy considerations for the demand requirement have been met.  The Movants previously informed the Debtors of their desire to assert the Subject Claims.  The Movants also afforded the Debtors with numerous opportunities to substantiate the Debtors' oft-stated position that the Subject Claims are meritless.[34]

47.     Coupled with the impending statute of limitations deadline, the clear pattern of continued delay, and the Debtors' inherent conflicts, seeking a formal refusal from the Debtors is futile and the unjustifiable refusal component of the derivative standing test is satisfied.  Accordingly, the Court should exercise its equitable power and authorize Movants to pursue the estates' claims arising from and related to the 2002 Restructuring.

---

[33] *See* Letter from M. Sheppard to G. Gordon, dated July 8, 2011(copy attached as **Exhibit G**).

[34] While the Debtors have offered at various times to provide "a presentation explaining" the 2002 Restructuring (the "Presentation"), no such presentation has actually taken place and has been repeatedly rescheduled.  The Debtors first offered to give the Presentation approximately a year ago.  After repeated requests, the Presentation was finally scheduled for July 12, 2011, for the same date and location as the financial discovery documents meet-and-confer.  Less than one month before the presentation meeting, the Debtors unilaterally cancelled, because the meeting was premature or unnecessary given the data requested by the Movants' financial advisors.  Despite the Committee's response that it and the FCR continued to believe that a Presentation on July 12, 2011 could be beneficial, the Debtors continued to quash the presentation.  The Debtors finally agreed to provide the long awaited Presentation during global case issue discussions that occurred at the end of September, 2011.  But while the Movants worked with the Debtors in the beginning of October to schedule the Presentation before filing the instant motion, the Debtors could not supply a presentation date in advance of November 14, 2011 – the last day a motion could be filed to be heard at the December 19, 2011 omnibus hearing.  The Presentation is currently rescheduled for November 29, 2011.

**II.    Conferring Derivative Standing Upon Movants To Bring The Subject Claims Will Benefit The Estates**

48.    The benefits to the estates warrant the Court permitting Movants to prosecute the Subject Claims.  *See Centaur*, 2010 Bankr. LEXIS 3918, at *15 ("Here, the Committee has demonstrated that the Claims are colorable; however, whether the Committee should be allowed to prosecute the Claims turns on the outcome of the cost/benefit analysis.").  When determining whether the potential cost and benefit renders it worth a committee pursuing litigation, courts within the Third Circuit will examine the following factors:

> 1. Whether the action is likely to benefit the reorganization estate; 2. The probabilities of legal success in the event the action is pursued; 3. Financial recovery in the event of success; 4. Whether appointment of a trustee or another party to bring the action would be preferable; and 5. The cost to the estate in proceeding with the action and the terms relative to any attorneys fees.

*G-I Holdings,* 2006 U.S. Dist. LEXIS 45510, at *40.

49.    This standard is easily satisfied here.  The potential recoveries from the Subject Claims and any other claims that may be identified as discovery proceeds represent a substantial pool of assets that may be used to satisfy the estates' liabilities to unsecured creditors. Given the large amounts at stake, even a relatively small chance of success would weigh strongly in favor of the Movants' pursuit of the Subject Claims.  Here, the likelihood of the Movants prevailing is high.  Successful prosecution of the Complaint could reasonably result in full payment of all of the asbestos creditors, both present and future, of these estates.

50.    The costs and expenses to be incurred in connection with prosecuting the Subject Claims will not be excessive in relation to the potential recovery for the estates.  Although litigation costs are a factor to consider, Movants must only provide the Court with "comfort that their litigation will be a sensible expenditure of estate resources."  *See Adelphia Commc'ns*

*Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.*), 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005) ("[C]omfort … means, as a practical matter, providing the Court with a predicate for concluding that the claims will, if proven, provide a basis for recovery, and that the proposed litigation will not be a hopeless fling.  It also means, as a practical matter, that the prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost.")[35]

51.        In addition, because these are liquidating chapter 11 cases of non-operating Debtors, there is no particular need for the Debtors to remain in control of the Subject Claims. *See Nat'l Forge*, 304 B.R. at 218, 223 (finding in case with liquidating plan that there was "no risk that the Creditors' Committee is usurping the Debtor's role in bringing the Complaint. . . ." because "[a]ny funds that the Creditors' Committee expends in pursuit of the Complaint are funds that would otherwise be available for distribution to its constituents.").

52.        Finally, the Movants are the only independent estate fiduciaries that did not participate in the subject transactions and are not conflicted; thus they are the only parties to this case that can fairly and impartially investigate and pursue the Subject Claims.  As discussed above, undeniable conflicts exist that prevent the Debtors from prosecuting the Subject Claims.

---

[35] Unlike the Declaratory Judgment Action suggested by the Debtors at the outset of the case where the estates would have been charged the professional fees associated for both Debtors' counsel for defending the Declaratory Judgment Action (and therefore International's liabilities to the estates and any potential monetary recovery from it) and the Committee's and the FCR's counsel in opposition thereto, here the estates will only be charged with the expenses associated with prosecuting the claims (with potential for significant recovery) and International's defense costs will be paid by International (not these estates).

## <u>CONCLUSION</u>

53.        For the foregoing reasons, Movants have satisfied the requirements to obtain

authority to prosecute, address, litigate, and, if appropriate, settle the Subject Claims, as well as

any additional claims that may be identified through further investigation and discovery, and to

pursue all other actions, objections and rights with respect to same.  The Movants respectfully

*[Remainder of Page Intentionally Blank]*

request that the Court enter the attached order granting this Motion.

Dated: Wilmington, Delaware
       November 14, 2011

Respectfully submitted,

**MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP**

 /s/  Natalie D. Ramsey
Natalie D. Ramsey, Esquire (DE Bar No. 5378)
1105 North Market Street, Suite 1500
Wilmington, DE  19801
(302) 504-7800

- and -

Mark B. Sheppard, Esquire (admitted *pro hac vice)*
123 South Broad Street, 24th floor
Philadelphia, PA  19109
(215) 772-1500

*Counsel for the Official Committee of
Asbestos Personal Injury Claimants*

- and -

**YOUNG, CONAWAY, STARGATT & TAYLOR, LLP**

*/s/ Edwin J. Harron*
James L. Patton, Jr., Esquire (DE Bar No. 2202)
Edwin J. Harron, Esquire (DE Bar No. 3396)
Sharon M. Zieg, Esquire (DE Bar No. 4196)
Erin Edwards, Esquire (DE Bar No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19801
 (302) 571-6600

*Counsel for the Future Claimants' Representative*