UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| . . . . . . . . . . . . . .. | | |
| IN RE: | . | Case No. 10-11780(JKF) |
| | . | |
| SPECIALTY PRODUCTS | . | |
| HOLDING CORPORATION, et | . | |
| al., | . | |
| Debtors. | . | |
| . . . . . . . . . . . . . .. | | |
| SPECIALTY PRODUCTS | . | Adv. Pro. No. 10-51085(JKF) |
| HOLDING CORP., BONDEX | . | |
| INTERNATIONAL, INC., | . | |
| | . | |
| Plaintiffs, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| EXHIBIT A TO COMPLAINT | . | 5414 U.S. Steel Tower |
| AND JOHN AND JANE DOES | . | 600 Grant Street |
| 1-1000, | . | Pittsburgh, PA 15219 |
| | . | |
| Defendants. | . | January 11, 2013 |
| . . . . . . . . . . . . . .. | | 8:37 A.M. |

TRANSCRIPT OF ASBESTOS LIABILITY ESTIMATION TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:              Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GREGORY GORDON, ESQ.<br>          DANIEL B. PRIETO, ESQ.<br>          THOMAS R. JACKSON, ESQ.<br>2727 North Harwood Street<br>Dallas, TX  75201 |
| | Evert, Weathersby, Houff<br>By:  C. MICHAEL EVERT, JR., ESQ.<br>3405 Piedmont Road, Suite 200<br>Atlanta, GA 30305 |
| | Evert, Weathersby, Houff<br>By:  EDWARD F. HOUFF, ESQ.<br>120 E. Baltimore Street, Suite 1300<br>Baltimore, MD 21202 |
| For the Committee of<br>Asbestos Personal Injury<br>Claimants: | Montgomery, McCracken, Walker &<br>Rhoads<br>By:  NATALIE RAMSEY, ESQ.<br>          MARK B. SHEPPARD, ESQ.<br>          K. CARRIE SARHANGI, ESQ.<br>          KATHERINE M. FIX, ESQ.<br>123 South Broad Street<br>Philadelphia, PA 19109 |
| | Montgomery, McCracken, Walker &<br>Rhoads<br>By:  MARK FINK, ESQ.<br>1105 North Market Street<br>Wilmington, DE 19801 |
| | Motley Rice LLC<br>By:  NATHAN D. FINCH, ESQ.<br>1000 Potomac St. NW, Suite 150<br>Washington, DC 20007 |
| | Waters Kraus Paul<br>By:  SCOTT L. FROST, ESQ.<br>222 N. Sepulveda Blvd., Suite 1900<br>El Segundo, CA 90245 |

```
APPEARANCES (Cont'd):

For Future Claimants            Young Conaway Stargatt & Taylor LLP
Representatives:                By:  EDWIN J. HARRON, ESQ.
                                     SHARON ZIEG, ESQ.
                                     JOHN T. DORSEY, ESQ.
                                     ERIN EDWARDS, ESQ.
                                     JAMES L. PATTON, JR., ESQ.
                                The Brandywine Building
                                1000 West Street, 17th Floor
                                Wilmington, DE 19801

For RPM International:           Thorp, Reed & Armstrong
                                By:  WILLIAM M. WYCOFF, ESQ.
                                     JERRI A. RYAN, ESQ.
                                One Oxford Centre
                                301 Grant Street, 14th Floor
                                Pittsburgh, PA 15219

TELEPHONIC APPEARANCES:

For the Debtors:                Jones Day
                                By: JOHN H. CHASE, ESQ.
                                2727 North Harwood Street
                                Dallas, TX  75201

                                Richards, Layton & Finger, P.A.
                                By:  DANIEL DeFRANCESCHI, ESQ.
                                     ZACHARY SHAPIRO, ESQ.
                                920 North King Street
                                Wilmington, DE 19801

For the Committee of            Montgomery, McCracken, Walker &
Asbestos Personal Injury        Rhoads
Claimants:                      By:  LAURIE KREPTO, ESQ.
                                     DAVIS L. WRIGHT, ESQ.
                                123 South Broad Street
                                Philadelphia, PA 19109

For Wachovia Capital            Otterbourg, Steindler, Houston
Finance Corp.:                  & Rosen, P.C.
                                By:  ANDREW M. KRAMER, ESQ.
                                     ROBERT GONNELLO, ESQ,
                                230 Park Avenue, 29th Floor
                                New York, NY 10169
```

4

TELEPHONIC APPEARANCES (Cont'd):

```
For Honeywell:              McDermott Will & Emery
                            By:  NAVA HAZAN, ESQ.
                            340 Madison Avenue
                            New York, NY 10173

Financial Advisors for      The Blackstone Group
the Debtors:                By:  JAMIE O'CONNELL
                                 PAUL SHEAFFER
                                 DANIEL CASIERO
                            345 Park Avenue
                            New York, NY 10154

Interested Party:           Klehr, Harrison, Harvey &
                            Branzburg
                            By:  DOMENIC PACITTI, ESQ.
                            919 Market Street
                            Wilmington, DE  19801

Interested Party:           Orrick, Herrington & Sutcliffe
                            By:  JONATHAN P. GUY, ESQ.
                                 KATHLEEN A. ORR, ESQ.
                                 RICHARD H. WYRON, ESQ.
                                 JAMES W. BURKE, ESQ.
                            1152 15th Street, N.W.
                            Washington, D.C. 20005

Interested Party:           Hughes, Hubbard & Reed LLP
                            By:  LAUREN ASCHER, ESQ.
                            One Battery Park Plaza
                            New York, NY  10004

Interested Party, Dryvit    Dryvit Systems
Systems:                    By:  NIKKI WAKEMAN

For Garlock Sealing         Rayburn, Cooper & Durham, P.A.
Technologies:               By:   JOHN R. MILLER, ESQ.
                            227 West Trade Street, Suite 1200
                            Charlotte, NC 28202-1672

For RPM International:      Thorp, Reed & Armstrong
                            By:  KAREN GRIVNER, ESQ.
                            One Oxford Centre
                            301 Grant Street, 14th Floor
                            Pittsburgh, PA 15219
```

---

**I N D E X**

PAGE

**WITNESSES FOR THE ACC**

DR. MARK PETERSON

   Continued Cross Examination by Mr. Evert       8

   Redirect Examination by Mr. Sheppard      56

**WITNESSES FOR THE FCR**

RICHARD BRAUN

   Cross Examination by Mr. Jackson      67

DR. THOMAS VASQUEZ

   Direct Examination by Mr. Harron      72

   Cross Examination by Mr. Evert      136

   Redirect Examination by Mr. Harron      196

**REBUTTAL WITNESSES**

DR. CHARLES MULLIN

   Direct Examination by Mr. Evert      200

   Examination by the Court      232

   Continued Direct Examination by Mr. Evert      237

   Cross Examination by Mr. Sheppard      270

**I N D E X (Cont'd)**

|  |  | **PAGE** | |
| **EXHIBITS** |  | **ID.** | **EVD.** |
|---|---|---|---|
| D-78 | Redacted Release | 35 | 57 |
| ACC-162 | Payment Criteria | 64 | 64 |
| ACC/FCR-88 | Richard Braun's Testimony | 66 | 66 |
| ACC/FCR/E-427 | Richard Braun's CV | 66 | 66 |
| ACC/FCR-89 | Dr. Vasquez's CV | 73 | 73 |
| ACC/FCR-1025 | Dr. Vasquez's Report | 78 | -- |
| ACC/FCR-1026 | Dr. Vasquez's Rebuttal Report | 79 | -- |
| ACC/FCR-1027 | Handwritten Slide Overlay | 88 | -- |
| D-86 | Slide of Group Settlement | 156 | -- |
| D-87 | Chart | 201 | -- |
| D-88 | Graph | 209 | -- |
| D-89 | Printout from Claims Database | 219 | -- |
| D-90 | Printout from Claims Database | 219 | -- |

1           THE COURT:  Good morning, Dr. Peterson.  You are
2  still under oath, sir.
3       DOCTOR MARK PETERSON, ACC'S WITNESS, PREVIOUSLY SWORN
4           DR. PETERSON:  Thank you.
5           THE COURT:  And when you're ready, Mr. Evert.
6           MR. EVERT:  Thank you, Your Honor.
7           THE COURT:  Oh, I'm sorry, Mr. Evert, stop the clock.
8  I apologize.  I should have read the list of CourtCall
9  participants.  I apologize.  Let me do that first.
10          We're back on the record in Specialty Products
11 Holding Corporation and the list of participants by phone is
12 Laura Ascher -- Lauren Ascher, I'm sorry, James Burke, Dan
13 Casiero, John Chase, Daniel DeFranceschi, Robert Gonnello,
14 Karen Grivner, Jonathan Guy, Nava Hazan, Andrew Kramer, Laurie
15 Krepto, John Miller, Jamie O'Connell, Kathleen Orr, Domenic
16 Pacitti, Zachary Shapiro, Paul Sheaffer, Nikki Wakeman, Davis
17 Wright, and Richard Wyron.  Are there any changes to counsel's
18 appearance in court this morning?
19          MR. EVERT:  None for the debtors, Your Honor.
20          MR. SHEPPARD:  None for the ACC, Your Honor.
21          MR. DORSEY:  We do have one addition for the FCR,
22 Your Honor, James Patton is here.
23          THE COURT:  I can't hear you.  I'm sorry.
24          MR. DORSEY:  I'm sorry.  I forgot to put the mic on.
25 Mr. Patton is here, Your Honor, on behalf of the FCR.

1          THE COURT:  All right.  Thank you.  Now when you're

2  ready, Mr. Evert.  Thank you.

3          MR. EVERT:  Thank you, Your Honor.  Good morning.

4                  CONTINUED CROSS EXAMINATION

5  BY MR. EVERT:

6  Q    Dr. Peterson, good morning.

7  A    Good morning.

8  Q    I think when we left off yesterday afternoon or evening I

9  guess it was, we were going through or I guess we had just

10 finished going through the Debtors' Demonstrative D-64 which

11 I've got up on the board now.  And just to pick us up where we

12 left off, Dr. Peterson, you'll agree with me that the -- in

13 your formula the tort pay rate times the average settlement

14 value should equal the average resolution value, is that

15 correct?

16 A    Yes.

17 Q    So if we then look at Debtors' Demonstrative D-65 --

18          MR. EVERT:  And, Your Honor, I apologize.  I can't

19 remember if I handed you 65 yesterday.

20          THE COURT:  Yes, you did.

21          MR. EVERT:  Thank you, Your Honor.

22 Q    And this is my effort to make sure that again we're all on

23 the same page.  So in your estimate of the future mesothelioma

24 filings your count after you did your propensity to sue

25 calculations against the debtors in the futures came to 15,392

1  claims, is that correct?  Do you need a copy of your report,

2  sir?

3  A    I believe that or I looked at that yesterday and that's

4  correct.

5  Q    And you used a 2010 average tort settlement value of

6  $126,340, I'm sorry, it was a 2003 to 2010 average, is that

7  right?

8  A    Actually it's 2001 to 2010.

9  Q    I'm sorry.  You established that yesterday, that's right.

10 And you used for that same period a pay rate of 57.9 percent?

11 A    Correct.

12 Q    And would you agree or at least assume I did the math

13 right that 57.9 percent times 126,340 equals $73,150 ballpark?

14 A    Let me just take a quick look at it.

15 Q    Okay.  Please.

16 A    That seems about right.  Right.

17 Q    Thank you.  So what that leads us to then is using the

18 average -- using the average resolution value to combine those

19 two inputs it takes us to a total estimate that you have for

20 the future claims of $1,126,000,000 nominal without discounting

21 and without inflation.  Is that about right?

22 A    I can't see right now.  I don't know.

23 Q    Well based on your nominal estimate is that about right,

24 sir?

25 A    Well we don't present a nominal estimate.  We present an

1  estimate of the value of future claims including a two and a

2  half percent inflation two years after filing and then we have

3  a net present value.  The report doesn't have the nominal

4  value.

5  Q    What is the amount with the two and a half percent

6  inflation, sir?

7  A    I'd have to calculate.  That's over 40 years.  You have to

8  have compound interest.

9  Q    Does my math appear about right?

10  A    I have no idea.

11  Q    Okay.  So if I ask you to assume for me that 15,392 times

12  73,150 equals roughly $1.126 billion, do you have any reason to

13  dispute that?

14  A    I'll be happy to assume it for the question.  Sitting here

15  right now I don't have an opinion one way or another whether I

16  should dispute it.

17  Q    Okay.  If you will assume that for the question then, then

18  I think you would agree with me that this complies with your

19  formula with no inflation for your future claims estimate, is

20  that correct?

21  A    Well the process you've described is correct.  The

22  calculations since I can't verify them I have to regard them as

23  a hypothetical so I can't say it complies.  But the process is

24  correct.

25  Q    Thank you, sir.  Fair enough.

1          MR. EVERT:  Your Honor, if I might approach?

2          THE COURT:  Yes.

3  A    Let me add one other thing.  Since we don't do an --

4  Q    Yes, sir.

5  A    It isn't really my approach because we don't have the

6  nominal -- we don't have the inflation adjustment in there.

7  That's another caveat I would say.

8  Q    Yes, sir, and --

9  A    You don't, we do.

10 Q    Yes, sir.  And you adjusted inflation at two and a half

11 percent, correct?

12 A    Yes.

13 Q    And you also inflated the current claims I think for one

14 year at two and a half percent under the assumption they would

15 get paid after one year, is that right?

16 A    Yes, essentially get paid equally over three years which

17 is the same thing, but yes.

18 Q    And unlike Dr. Vasquez and Dr. Mullin you did no reduction

19 for the aging of the population, is that correct?

20 A    No, I didn't.  I don't think that's appropriate.

21         MR. EVERT:  Your Honor, Demonstrative Debtors' D-66.

22         THE COURT:  Thank you.

23 Q    So, Dr. Peterson, I've got the formula right it sounds

24 like.  We haven't checked my math yet.  You'll agree with me,

25 will you not, that Dr. Vasquez felt that the most recent tort

Peterson - Cont'd Cross/Evert                          12

1  experience was the appropriate time frame that should be used?

2  A    He used the same period as propensity to sue, yes.  I

3  think it was, yes, he used a more limited number of years.

4  Q    He used the last 29 months, is that correct?  He used from

5  -- he used from the beginning of 2008 to May 31, 2010, is that

6  correct?

7  A    His document speaks for itself.  I haven't reviewed it

8  recently.

9  Q    Okay.  And as we discussed yesterday, Dr. Peterson, in

10  past estimations that you have done you have testified that the

11  recent claims experience is the best and makes the most common

12  sense I think as we discussed yesterday, is that right?

13  A    I think it makes the most common sense.  It's kind of a

14  starting position.  But the choice of periods as I described in

15  my direct examination depends upon the circumstances of a

16  particular defendant and what you think the future is likely to

17  be.

18        It's kind of your default starting position but the

19  facts underground might cause you to change it and here, as I

20  described at some length, I changed it because that was what I

21  felt to be in my opinion appropriate to have a longer period of

22  time in order to sample across the different strategies that

23  the debtor used over time because we're uncertain about what

24  they might do in the future.

25  Q    Yes, sir.  Now in Debtors' Demonstrative D-66 we have the

1  same 15,392 future claims which you have estimated based on

2  using your propensity to sue of the very recent period of 2008

3  to 2010, is that right?

4  A    It's the same number.

5  Q    But you used the recent period of 2008 to 2010 for

6  propensity to sue.

7  A    2007 to --

8  Q    I'm sorry.  2007 to 2010.

9  A    2007 to '09 actually.

10 Q    Two year period 2007 to 2009.

11 A    Three year period 2007, '08, and '09.

12 Q    Fair enough.  So if we use Dr. Vasquez's average

13 resolution value for the last 29 months of $57,000 per claim,

14 that would reduce your estimate, assuming my math is right on

15 the attached chart, to $877 million nominal, is that correct?

16 A    I can't agree with that because I don't recall and haven't

17 reviewed recently what his resolution value is if that's his --

18 but if that is the correct number, and I haven't done the

19 calculation -- I can't agree to that.  I just don't -- I don't

20 know.  I'm --

21 Q    Well that's --

22 A    I'm sorry.  I'm not trying to be difficult, I just don't

23 know.

24 Q    And I don't feel like you are, sir, at all.  So let me try

25 to state it in a way that we can just make sure we're in

1  agreement.  If the $57,000 for the recent average resolution

2  value is a correct number and if the math on Debtors'

3  Demonstrative D-66 is correct, that would reduce your nominal

4  estimate of the future claims without inflation and without

5  discounting to $877 million.  Would you agree with that, sir?

6  A    No.  The way you framed it if -- if the two conditions you

7  stated are correct the -- and I assume that the result is what

8  you found, then you're asking me is the result which you found,

9  sure.  I'll make that assumption that you've done this --

10 you've got a lot of good helpers here too and -- and is it

11 lower than my number?  Yes, it's lower than my number.

12 Q    Thank you, sir.  Now let --

13 A    But it wouldn't -- but of course it wouldn't be my

14 forecast.

15 Q    Yes, sir.  I understand that.  You have -- and I'm not

16 trying to change your testimony in terms of what your forecast

17 is.  I'm trying to illustrate the differences if we change the

18 inputs.

19 A    Understand.

20 Q    Is that fair?

21 A    You kind of -- yes, that's fine.

22 Q    Okay.

23        MR. EVERT:  If I may approach, Your Honor?

24        THE COURT:  Yes.  Thank you.

25 Q    Now let's turn to the currents if we could, Dr. Peterson.

1  Same formula, same theory.  You have calculated for the

2  currents that they are currently pending 2,168 mesothelioma

3  claims, is that correct?

4  A    Yes.

5  Q    And if we look at Debtors' Demonstrative D-67 I've gone

6  through the same series of calculations to come up with what is

7  your average resolution value of 73,150 which comports to an

8  estimate for the current claims of $159 million nominal without

9  the one year of inflation included.  Does that sound about

10 right, sir?

11 A    Again, yes.  We didn't present a nominal number but

12 certainly that looks close.  Can I ask a question about Dr.

13 Vasquez?  Is that a nominal number that you presented on the

14 previous exhibit?

15 Q    It's an average of the last 29 months of settlements.

16 A    Is that in -- from his report?

17 Q    Correct.  From the, well, from the data in his report.

18 Yes, sir.

19 A    All right.  Thank you.

20 Q    Yes, sir.  So if we then go through a similar exercise

21 with the pending claims as we did with the futures as we have

22 in Debtors' D-68, Dr. Peterson --

23      THE COURT:  Thank you.

24 Q    -- then we would see the 2,168 current claims that you

25 have calculated times, again if you will assume for me it is

1 correct, Dr. Vasquez's 29-month average resolution value and

2 that would reduce or at least the math would then come to $124

3 million nominal.  Is that fair, sir?

4 A    That seems about right.  I'm sorry, I have to revisit your

5 asking me to compare your -- the calculation in the end you did

6 using Dr. Vasquez's values and mine.

7 Q    Yes, sir.

8 A    And you asked about my forecast.  I mean that's a

9 hypothetical question to me because I don't know that my number

10 -- we didn't present a nominal, I don't have it, I don't have

11 it in mine, so I can't tell you what ours would have been.  And

12 you asked me is it less than our forecast.  I can't answer that

13 question.  I should have -- should have said no I can't answer

14 it because I don't have that here.  I understand that one of

15 your -- the results of your arithmetic is less than the other

16 and that's about all I can say.

17 Q    Okay.  Well that's fair enough, Dr. Peterson.  What I

18 guess I'm trying to illustrate and I think you'll agree with

19 me, sir, is that if we take the period of time that Dr. Vasquez

20 recommends that we use and it's a similar period of time to the

21 period of time that you used for propensity to sue which is the

22 more recent data, it reduces your forecast -- it would reduce

23 your forecast.  Is that fair?

24 A    Surely it's a lower number.

25 Q    Right.  And --

1  A    There are a number of differences between Dr. Vasquez's

2  approach and mine.  In the end we are quite close but his

3  estimates are somewhat lower than mine and this is one of the

4  reasons why.

5  Q    Yes, sir.  And so what I'm trying to illustrate, Dr.

6  Peterson, is you used a 2007 through 2009 period to calculate

7  propensity to sue.

8  A    Yes.

9  Q    And what I'm simply trying to illustrate is if we had used

10 a roughly similar period of 2008 to 2010 the most recent

11 experience to calculate the dollars associated with that your

12 forecast would come down, is that correct?

13 A    Well certainly.  And that's in my sensitivity analysis.  I

14 showed that and reviewed it and discussed it.  And I think I

15 even testified that it's within the -- a range of reason using

16 that other number.  I have no difficulty with that.  It's just

17 I don't think it's as good a number as I used and as good a

18 period for the reasons I testified about.

19      But it's lower, it lower here, it's -- I did the

20 actual calculations in my sensitivity analysis and certainly

21 it's lower and it's within the range of reason.  And Dr.

22 Vasquez's whole report is a reasonable approach and certainly

23 the results of his forecast with all of his assumptions is one

24 that I would, you know, I don't think it's quite as good as

25 mine but I would accept it as an appropriate forecast in this

1  case.

2  Q    Yes, sir.  And I appreciate that very much.  And what I'm

3  merely trying to do through these demonstratives is try to

4  explain a little bit of what the magnitude of the difference

5  would be and I know that these are rough numbers and I

6  appreciate you bearing with me.

7  Q    Yes.  But I'm just trying to say that -- I agree with the

8  general gist of your questions and I also agree that they're

9  rough numbers and subject to certain assertions that I can't

10 verify now, but I can also tell you that we've done that

11 precise set of calculations and they're in my report and

12 they're in the sensitivity analysis and they show the general

13 point that you're making.

14 Q    Yes, sir.  I guess they're not quite in your report this

15 way which is why I was trying to illustrate it.  But we don't

16 need to argue about that.

17 A    We agree about the point.

18 Q    Excellent.  Thank you, Dr. Peterson.  So on Page 16 of

19 your report, you probably will not need to refer to it, you

20 describe how you found seven percent of the pending claims to

21 be old claims, that is claims that were not yet resolved and

22 unlikely to ever be paid, is that right?

23 A    That's more -- it may have been precisely what I said but

24 it's certainly what I meant.

25 Q    It's certain?  I'm sorry, sir, I didn't hear you.

1  A    I agree with your statement.

2  Q    Okay.  Thank you, sir.  And as we discussed in your

3  deposition your forecast did not account for claims that would

4  have been filed in the future but that would have fallen into

5  the abandoned category, is that right, sir?

6  A    Yes.  We looked at that and again that would be about a

7  five percent reduction.  I had meant to include it in the

8  sensitivity analysis.  It was an oversight.  But it would have

9  reduced it in a similar manner is it's effect upon pending

10 claims.  Perhaps a five percent reduction.  It's in the --

11 basically again it's in the range that Dr. Mullin describes as

12 being immaterial because it's a pretty small number.  But it

13 probably is an adjustment that should be taken.

14 Q    Dr. Peterson, I appreciate it.  You've skipped a lot of

15 slides for me because I calculated it at six percent, you said

16 five percent.  We'll play with that a little bit and I won't

17 argue with you about that.

18 A    We've both mellowed from yesterday.

19 Q    Yes, sir.

20      MR. EVERT:  Your Honor, I'm sorry, I've been taking

21 great liberties with my ability to approach.  I'm sorry.

22      THE COURT:  That's all right.  Thank you.

23 Q    Dr. Peterson, I have put up on the ELMO Debtors'

24 Demonstrative D-73 and I want you to help me with this.  You

25 may recall that your number for currently pending claims were

1 2,168, is that right?

2 A    Yes.

3 Q    And what you just indicated to me is that a five percent

4 abandonment rate of those claims and the future claims would

5 have been a correct adjustment, is that fair?

6 A    No.  I'm saying that the overall effect on the forecast

7 would have been about five percent.

8 Q    Oh, I see.  Well then maybe we do need to walk through the

9 calculations.  When you looked at the abandoned claims it was

10 about six percent of the claims that had been filed during that

11 period, is that fair, sir?

12 A    What period?

13 Q    During the period of the abandoned claims, that is the

14 pre-2005 claims in your report.

15 A    Actually could you -- could I have that question read back

16 please?

17 Q    Sure.  When you calculated the number of abandoned claims

18 from pre-2005 it was six percent of the claims that had been

19 filed during that period of time, is that correct, sir?

20 A    Sitting here right now I don't recall.

21 Q    Do you recall that you calculated as 156 abandoned claims?

22 Do you recall that, sir?

23 A    Yes.

24 Q    I'm going to switch on you.

25            THE COURT:  Thank you.

1  Q    Dr. Peterson, if we look at Debtors' Demonstrative D-70,

2  you found that without duplicates prior to -- in claims filed

3  prior to 2005 totaled 2,614 claims.  Do you agree with that,

4  sir?  I think there is a chart in your report if you need to

5  review it.  It's Page 13.

6  A    I heard the whisper.  Thank you.

7  Q    Oh, sorry.  The whisperers.  Yeah.  You may have been able

8  to hear me thinking, Dr. Peterson, maybe that's what it was.

9  And again, sir, I know you're going to have to assume my math

10 is correct.

11 A    Well your with dupes are the -- no.  Oh, yeah, oh you just

12 lifted this off our table.  Yes.

13 Q    That's correct.  I just gave you subtotals, sir.

14 A    Yes.  Looks about right.

15 Q    Thank you, sir.  And also does it look about right that

16 there were 5,875 claims filed in the 2005 to 2010 period?

17          THE COURT:  That's without duplications, correct?

18          MR. EVERT:  That's correct, Your Honor.  That's after

19 the -- without dupes is when they've taken out the incorrect

20 double naming.

21 A    Not adding the numbers but just roughly looking at them

22 that appears to be about right.  I'll accept that.

23 Q    And, Dr. Peterson, I will tell you math is not my strong

24 point so as I think it was -- it was either you or -- I think

25 it was you that said math wasn't yours which was not comforting

1 so.  But we'll go with -- we'll go with ballpark.

2 A    Actually I said I was bad with numbers.

3 Q    Ah.  So if we then take those numbers, Dr. --

4 A    That was a joke of course.

5 Q    If we take those numbers, Dr. Peterson, and we look at

6 your abandonment rate here in Debtors' D-71 --

7          THE COURT:  Thank you.

8 Q    -- that comes to six percent of the claims does it not,

9 sir?

10 A    Could you put the last slide back up?

11 Q    I'll be glad to.

12 A    Okay.  You can go back.  I just wanted to --

13          THE COURT:  Apparently spelling is also not a strong

14 suit.

15          MR. EVERT:  Oh, Judge, I was hoping you weren't going

16 to pick that up.

17          MR. SHEPPARD:  For the record I wasn't going to say

18 anything.

19          MR. EVERT:  These are aboandon (sic) claims, Your

20 Honor.

21 A    I just took it to represent your accent, that's it.

22                    (Laughter)

23 Q    No, that just adds more syllables, Dr. Peterson, it

24 doesn't change the spelling.

25                    (Laughter)

1  Q    I'm from southern Pennsylvania.

2  A    And I'm from western Pennsylvania.  Even further west.

3  You asked me a question.  Six percent.

4  Q    Six percent.  Yes, sir.

5  A    That looks about right.

6  Q    And then likewise, Dr. Peterson, if we then apply that six

7  percent to the filings between 2005 and 2010 as illustrated in

8  Demonstrative D-72 we would get 350 expected abandoned claims,

9  is that right, sir?

10            THE COURT:  Thank you.

11  A    I think your calculation is correct but I'm not sure I

12  agree with your characterization.

13  Q    So for some reason six percent of the claims prior to 2005

14  would be abandoned but six percent of the claims after 2005 --

15  A    Oh.

16  Q    -- wouldn't be abandoned?  Is that what you're saying,

17  sir?

18  A    Oh, that's your expectation of over time what it would be.

19  Some of them -- all right, I understand your question.  I'm not

20  sure still.  I understand your calculation.  I'm not yet

21  prepared to agree with the characterization.

22  Q    Fair enough, Dr. Peterson.  Let me restate this question

23  then.  So are you saying that even though six percent of the

24  claims would be abandoned prior to 2005, six percent of the

25  claims would not be abandoned going forward?

1 A    Well not necessarily.  You're talking about the rate of a

2 particular period.  It's not necessarily the same as what we're

3 seeing now.

4 Q    Is that a reasonable forecast?

5 A    I have not thought about it.  I don't have an opinion.

6 Q    Okay.  Dr. Peterson, do you know how much money the

7 debtors in their entire history have paid to resolve claims

8 that were older than five years?

9 A    Some but not much.  It's much of course because it's, you

10 know, but it's not much relative to the numbers we've been

11 talking about in this case.

12 Q    Would $32,000 be the correct number, Dr. Peterson?

13 A    I don't recall.

14 Q    You do not know if $32,000 is the correct number or not?

15 A    I know that -- I know that there are not many claims that

16 are resolved at that point.  I don't know if the 32,000 is a

17 correct number.

18 Q    All right.  Then again I'll return to Debtors' D-73, Dr.

19 Peterson.  If you would agree with me which I think you said

20 you don't, so if you would assume for me that the change that

21 we discussed in your deposition of accounting for abandoned

22 claims was made to the current claims, we would assume that the

23 current claims would reduce to 1,818 claims as illustrated on

24 Debtors' D-73.  If six percent of those claims were abandoned.

25 A    I don't agree with the -- with the process you're going

1  through.

2  Q    All right.  Well then let me ask the question this way.

3  If six percent of the claims were abandoned as they were prior

4  to 2005, would you agree with me that that would result in a

5  reduction of the pending count to 1,818 claims?

6  A    Well that's just math.

7  Q    So you would agree with me that that's just math.

8  A    That's just math.  I wouldn't characterize it, but it's

9  just math.

10 Q    Okay.  And if we then valued those 1,818 claims instead of

11 your original estimate, in other words we took a count for

12 abandoned claims, and we valued those at my assumed $57,000

13 number from Dr. Vasquez's period, his 29-month period, that

14 would reduce your current claim estimate to $104 million

15 nominal not adjusted for inflation.

16 A    You're doing math and, fine, you can do the math that you

17 want.  I don't agree with the characterization.  I don't accept

18 the assumptions.  And so I would not accept the

19 characterization of it as a forecast of liability and so I

20 think that's my answer.

21 Q    But my math is at least consistent with your formula as

22 we've described it here this morning.  Is that fair, sir?

23 A    It appears to not be obviously wrong.  That's about as far

24 as I can go.  But I'm not going to validate it obviously

25 sitting here.  I haven't done the calculations.  If you want to

1  give me a calculator I can do that, but I don't have any reason

2  to think that there's something wrong with it, but I haven't --

3  I can't say it's right.

4          THE COURT:  Well may I ask a question because these

5  charts have confused me and I apologize but I'm confused.   It

6  seems to me that what's happened is that you have subtracted

7  350 which was the estimate of the --

8          MR. EVERT:  Abandoned claims, Your Honor.

9          THE COURT:  From 2005 to 2010 from the total 2168

10 that was the calculation of claims -- I don't know what that

11 calculation is because on your total Exhibit 70, the pre-2005

12 without dupes claims total 2614.  So I don't know where the

13 numbers are coming from and where you're doing the math from.

14         MR. EVERT:  Your Honor, the 2,168 claims Dr. --

15         THE COURT:  Yes.  Which is what?

16         MR. EVERT:  That is Dr. Peterson's current pending

17 claim count for which I think he has agreed he did not adjust

18 for abandoned claims.

19 A    May I comment on that?

20         THE COURT:  It's his current claim count for what

21 period?

22         MR. EVERT:  Currently pending at the petition date.

23         THE COURT:  All right.  Then how is it valid to

24 subtract the 350 from the 2168 current claims when it

25 apparently represents an abandoned period for only 2005 to

1  2010?

2         MR. EVERT:  Because, Your Honor, 98 percent of the,

3  well, he already took out the abandoned claims prior to 2005.

4  They're already gone.  So there are no claims in the current

5  claim count prior to 2010 -- I mean 2005.

6         THE COURT:  All right.  One second.  All right.  I

7  see what you're doing.  Thank you.

8         MR. EVERT:  Thank you, Your Honor.

9  A    May I make my comment now?

10  Q    Certainly, Dr. Peterson.  Please.

11  A    You're subtracting the 350 from the 2168 which has already

12  taken out the abandoned claims and valuing them as of the date

13  of the bankruptcy.  Presumably one values them at that point in

14  time, the 2168 claims are there, what is the value of those

15  claims?  They have a certain probability of being paid or not

16  paid and valued.  And that's the assumption that that's the

17  value and that they are valued as of that date.  They're not --

18  these -- you're essentially implying, I think, that in the

19  future there would be 350 of these claims that would get

20  abandoned somehow.  But that's -- if they're going to get

21  valued as of that particular bankruptcy date the future for

22  them is not an issue if that's the date of valuation, on that

23  date they have this value.

24  Q    I understand that, Dr. Peterson, but if they had remained

25  in the tort system which is how you did your calculations, they

1  would have been abandoned without payment, correct?

2  A    They may or may not have been.

3  Q    Well the history --

4  A    Some of them already may have been from those filings.

5  Q    That's correct and so in fact some of them may already

6  have been abandoned so the 2,168 is high for that reason,

7  correct?

8  A    No, I mean they have been -- they're no longer a pending

9  claim if they've been -- if the plaintiff's lawyer has

10 withdrawn the claim or accepted a dismissal.

11 Q    Dr. Peterson, in the tort system we agree that a certain

12 number of claims get abandoned and never get resolved.  You

13 have indicated that in your papers, correct?

14 A    I agree with that.

15 Q    You have made no adjustment to the pending claims for

16 them, for some percentage of them to be abandoned which we all

17 agree would occur, correct?

18 A    I'm saying some of that abandoned, some of it may have

19 already happened by them withdrawing their claim.  In addition

20 this assumes that the rate of abandonment in this group is the

21 same as the past.

22 Q    Fair enough, sir, it does do that.  But we all agree that

23 some of the claims are going to be abandoned.  I'm just trying

24 to illustrate if it was similar to the abandonment rate that

25 you found in your report this is roughly what it would look

1  like, correct, sir?

2  A    Subject to the fact that some of them may already have

3  been abandoned and --

4  Q    Fair enough, sir.  Now I want to turn if I can, Dr.

5  Peterson, to the group claims and this is a slide that you used

6  in your direct.  Do you remember it, sir?

7  A    Yes.

8          MR. EVERT:  Your Honor, I apologize.  I don't know if

9  it has an individual number.  It's Page 4 of the debt that the

10  ACC and FCR handed you yesterday.

11          THE COURT:  Of Exhibit 1019?

12          MR. EVERT:  Yes, Your Honor.

13          THE COURT:  All right.

14  Q    Now first of all, Dr. Peterson, you will agree with me

15  that the only group claims excluded by Dr. Mullin were the 17

16  Simmons, Lanier, and Cooney settlements that have been

17  described at great length here in this courtroom, is that

18  right?

19  A    That's what he said and I believe we've confirmed that.

20  Q    I'm sorry.  I didn't hear your answer.

21  A    I believe that's correct, yes.

22  Q    Okay.  And this is your attempt as I understand it to

23  identify other group claims, is that right, sir?

24  A    I wouldn't characterize it that way.  It was -- this was

25  done and put in our report because group claims I've been

1  saying for quite awhile are an important element of

2  understanding the liabilities.  They're handled differently.

3       I agree with Dr. Mullin that group settled claims

4  aren't typically given the same level of individual

5  consideration as ones settled one at a time and so they're

6  important for a number of reasons and we did this calculation

7  before I knew that Dr. Bates was only excluding 17 large group

8  settlements from Madison County among three lawyers so this is

9  independent of his work and I did it for reasons other than

10 what you suggest.

11 Q    And as I understand it, sir, you identified these by

12 merely going into the database and finding claims that settled

13 on the same day, is that correct?

14 A    With the same law firm.

15 Q    And you --

16 A    Well, no, it wasn't that.  Then you would -- then we

17 looked at them.  I looked at all and found some of them were

18 actually, for example the Cooney firm also was handling the

19 O'Brien claims, some of them at least, and a number of the

20 O'Brien claims were in the group.  Actually they weren't -- I

21 don't know that we included them in our count or not.  I don't

22 remember.  But there was more than what you -- than just simple

23 of that calculation.

24 Q    And notwithstanding the fact, Dr. Peterson, that we are

25 here talking about only mesothelioma claims, these groups

1 included all disease types, is that right?

2 A    Well that was the group.

3 Q    And it was this process I think, Dr. Peterson, that also

4 resulted in your use of this slide that is Page 31.

5            MR. EVERT:  Your Honor, of the demonstrative exhibit.

6            THE COURT:  1019?

7            MR. EVERT:  1019.

8 Q    Is that correct?  It's the same claims, right, Dr.

9 Peterson?

10 A    It's the same variable.  We have a group identifier

11 variable in our data set and this -- we used that same variable

12 for this graphic, yes, that's correct.

13 Q    So if one mesothelioma claim was settled on the same day

14 with the same law firm as four non-malignant claims, you

15 counted that as a group settlement, is that fair?

16 A    It was in my two to five group but for purposes of my

17 testimony and analysis I treated that as -- all five of those

18 claims as individual settlements.

19 Q    And I think you've said before and I think you said it

20 just a minute ago that individual cases and group settlements

21 generally are not looked at individually, is that right, sir?

22 A    I think I testified that some are, the large value claims

23 are typically negotiated on, specifically on the qualities of

24 the characteristics of the claim.  The process -- I mean that

25 has more significance and so my understanding is typically the

1  law firms will and Bondex will discuss the characteristic or I

2  would expect they would -- I don't know what Bondex -- I have

3  no access to the Bondex lawyers -- would consider those cases a

4  little bit more closely if they're going to be paying $300,000

5  for a claim that's part of a group.

6         But if you're paying ten claims, meso claims, all

7  $100,000, there's less consideration because that's part of the

8  overall deal.

9  Q   I'm sorry, sir, I'm not sure I followed your answer.  My

10  question is you had said before I think and will agree with me

11  that individual cases in group settlements are generally not

12  looked at individually, isn't that correct, sir?

13  A   I don't even understand -- if I said that I'm not sure I

14  understand.

15         MR. SHEPPARD:  I'm not sure I understand that

16  question.

17         MR. EVERT:  Okay.  All right.  Well.

18         THE COURT:  I didn't understand it either so.

19         MR. EVERT:  Well.

20         THE COURT:  If you could restate it maybe it would

21  help all of us.

22         MR. EVERT:  I'll be glad to, Your Honor.

23         THE COURT:  All right.

24  Q   In the 17 Simmons, Lanier, and Cooney settlements that Dr.

25  Mullin excluded, will you agree with me that the cases were

1 negotiated on an aggregate basis and the individual cases were

2 not individually evaluated?

3 A    I can't say that for all the claims in those groups, no.

4 Q    Would you agree with me that that is typically the case of

5 large-scale settlements of this nature?

6 A    No, I wouldn't agree with that.

7 Q    Okay.  Do you still have your deposition from yesterday up

8 there, sir?  I'm sorry, your deposition taken in this case?

9 A    I understood what you meant.  I believe so.

10 Q    If you do, sir, could I ask you to look at Page 203?

11 A    Just a second.  Let me make sure I've got it.

12            THE COURT:  Is it possible to make that clear?

13            MR. EVERT:  Your Honor, I could move it around.

14 A    No, I don't.

15            THE COURT:  All right.

16 Q    Can I get it?

17 A    Oh, yes, what is this?  I'm sorry, I do have it.  I have a

18 minuscript here.

19 Q    Thank you, sir.  Could you look at Page 203 please?

20            MR. EVERT:  Is that better, Your Honor?

21            THE COURT:  Yes.  Thank you.

22 A    I have 203.

23 Q    Looking at Line 13 could I ask you if you were asked this

24 question and you gave this answer?

25 "Q    Do you have an opinion on why a defendant would be willing

1  to pay a claim before conducting enough of an investigation

2  through discovery to determine whether that company's product

3  is going to be identified by the plaintiff?"

4  Q    You answered.

5  "A    Usually that happens in the context of group settlements

6  where a defendant is accessing, is able to relieve itself of

7  liability for a large number of claims.  It's a business

8  decision.  It's a wholesale, in some sense, it's a wholesale

9  business decision.  And again as both Dr. Mullin and I

10 recognize that, that the individual cases in group settlement

11 generally are not looked at individually.  It's just a deal to

12 buyout claims.

13         "Some of those claims are put on the deal before the

14 debtor, whoever that company is, had a chance to assess, spend

15 the money and assess and put the plaintiffs through providing

16 them with the information about exposure.

17         "But I think I've never seen a situation where the --

18 I'm sure it's happened, I just haven't seen it -- where a

19 defendant agrees to pay that claim unless they show some proof.

20 The standard process is that they have to bring, if they don't

21 bring it through, if they don't provide evidence of exposure

22 before the settlement deal and it's a condition of getting paid

23 and that's done, that's a standard way that these kind of group

24 settlements have been setup since the mid-1990's."

25 Q    Was that your answer, sir?

1  A    But it isn't what you asked me.  It is my answer.

2  Q    Thank you, sir.

3  A    It isn't my answer because I said generally in there and

4  you asked me do all claims in these group settlements -- are

5  they settled without being considered individually.  I wouldn't

6  agree with that.  I'd agree with my answer here.  That's fine.

7  The answer is fine.

8  Q    Thank you, Dr. Peterson, and I appreciate your clearing

9  that up.

10          THE COURT:  Thank you.

11 A    Thank you.

12 Q    Dr. Peterson, I have handed you what has been marked as

13 Debtors' Demonstrative Exhibit D-78.  Could you take a look at

14 that, sir, and tell me when you've familiarized yourself with

15 it?

16 A    Sure.  It will take me a couple minutes.

17          THE COURT:  May I just inquire.  This has names in

18 it.  Is that going to be a redacted exhibit?

19          MR. EVERT:  We will redact it, Your Honor.  That's

20 our mistake.

21                         (Pause)

22 Q    Did you generally familiarize yourself with the document,

23 Dr. Peterson?

24 A    Not yet.

25 Q    Okay.

1  A    I've read it.  I've kind of read it rather rapidly.

2  Q    It's a release is it not, Dr. Peterson?

3  A    It is that.

4  Q    And it's a release like I'm sure many you have seen over

5  the years in the past in your review of cases like these, is

6  that right?

7  A    Well I mean it has the properties of a release, yes.

8  Q    And is this the kind of proof you were talking about is

9  typically required in the group settlements in terms of product

10 exposure?

11 A    I think not.  I don't know.  I don't know what the debtors

12 accepted.

13 Q    Well --

14 A    This is not necessary -- this doesn't make a

15 representation of satisfying whatever terms there were.  I

16 don't know if this is a group settlement or not.

17 Q    All right.  Let me ask you to look at the last page, Dr.

18 Peterson, and will you agree with me that this is a client of

19 the Simmons Cooper firm?

20 A    The last page?

21 Q    Yes, sir.  Where it was --

22 A    The notary page or the page before?

23 Q    The very last page where it shows approved by Simmons

24 Cooper.

25 A    Oh, yeah, I missed that.  Thank you.  I was interested in

1  who it was.

2  Q    And the Simmons Cooper firm is the Simmons firm that we've

3  referred to when we speak of the Simmons, Lanier, and Cooney

4  settlements, is that correct?

5  A    Correct.

6  Q    And will you look at Paragraph 3 for me please, Dr.

7  Peterson, and let me ask you if this is what it says.  That the

8  claimant was exposed to and inhaled asbestos fibers released by

9  asbestos-containing products manufactured, developed, sold, and

10 distributed by the Reardon Company, RPM, Inc., and/or Bondex

11 International, Inc. and then there is three boxes to check.

12 You can either check prior to March 1, 1966 or the second box

13 is between March 1, 1966 and May 31, 1972 or the third box is

14 after May 31, 1972.  Is that what it says, sir?

15 A    Yes.

16 Q    And do you see any other indication in this release of a

17 proof or allegation of product exposure of the claimant?

18 A    Well the proof of the demonstration of evidence of such

19 exposure need not be contained in a release, there could be

20 another document I'm unaware of.  In this particular document

21 this is the only representation of that topic.

22      I don't know if -- first of all I don't know if there

23 are other documents given independently to the debtor about

24 this case.  I have no idea and the Court here can have no idea.

25 And I don't know if this was acceptable to Bondex as one of the

1 things they accepted.  A lot of these agreements have the

2 opportunity for them to arbitrate if they don't accept it.  I

3 don't know any of those kinds of matters.

4        This doesn't -- I mean this has the representation of

5 exposure, yes, it does.  I don't know if there are other

6 representations for this case.  I don't even know that it's in

7 Group 7.

8 Q   All that's fair, sir.  My question is is in this

9 particular release is that the only allegation of exposure

10 contained in the release?

11 A   That's all I saw doing a very quick read of it.

12 Q   And if I were to represent to you that this is the kind of

13 proof that was required in the Simmons, Cooney, and Lanier

14 settlements that would be not a typical in your experience in

15 group settlements.  Is that a fair statement, sir?

16 A   I don't know how common this is or not.

17 Q   Okay.  You have certainly seen this before in similar

18 situations before in your experience, is that correct, sir?

19 A   I don't think I've ever seen this kind of a document, no.

20 Q   Okay.  Let me ask you, Dr. Peterson, do you find it

21 somewhat unusual that 100 percent of the Cooney claimants in

22 the Cooney deals settlements excluded by Dr. Mullin qualified

23 for payment?

24 A   I don't know that that's true.

25 Q   Assume it to be true, sir.  I think it's actually on one

Peterson - Cont'd Cross/Evert                    39

1  of Dr. Vasquez's slides for later today that 100 percent of the

2  Cooney claimants under their settlement qualified for payment.

3              THE COURT:  Pardon me.  I just am not familiar.  Is

4  this the document that sets the payment?  Because this document

5  for example says it's for $1.  So, yes, I mean that may be a

6  payment but it's a $1 payment.  Is this the evidence of the

7  payment?

8              MR. EVERT:  No, Your Honor, this is the release and

9  the --

10             THE COURT:  Yes.

11             MR. EVERT:  -- affidavit of exposure and the releases

12  typically say $1 and other valuable consideration instead of

13  the actual settlement amount.

14             THE COURT:  All right.  So there is no way to know

15  from this document whether this individual got anything

16  including the dollar that's represented on this release, is

17  that correct?  I mean this isn't the totality of the settlement

18  documents.

19             MR. EVERT:  The only -- what you would find, Your

20  Honor, in the 17 settlement agreements that have been discussed

21  at great length with you you'll recall there is an exhibit with

22  the name of --

23             THE COURT:  Yes.

24             MR. EVERT:  -- the claimants.  This claimant's name

25  would appear on one of those settlement agreements with an

Peterson - Cont'd Cross/Evert                    40

1  assigned dollar amount.

2          THE COURT:  All right.  Okay.  I'm sorry.  Your

3  question was assuming -- I'm sorry, I lost it.  The essence,

4  perhaps you better restate it, was you were asking about Dr.

5  Vasquez having an exhibit that indicated that 100 percent of

6  the Cooney claimants qualified for payment and whether that was

7  unusual but I don't have the full question.  I'm sorry.

8          MR. EVERT:  Thank you for -- thank you, Your Honor,

9  though, thank you for bringing me back.

10 Q    So the fact that the Cooney claimants, 100 percent of them

11 qualified from a product exposure perspective under the

12 settlement arrangement is vastly different from the

13 individually litigated and evaluated claims.  Would you agree

14 with that?

15 A    You have to re-read that question it's --

16 Q    All right.  Maybe here's the easy way to ask it.  Would

17 you agree with me Dr. Peterson that given that 100 percent of

18 the Cooney claimants in the -- within the 17 settlement

19 arrangements that we've discussed qualified for payment would

20 indicate that the product exposure requirements were not

21 terribly difficult to meet?

22 A    I don't understand or agree with the premise.  I have

23 reviewed the settlements of the 17 cases.  I have reviewed the

24 settlement documents.  And I have seen that in the Cooney

25 settlements there are not people listed with zero values.  But

1  I wouldn't expect that they were listed in the settlement

2  agreement because that's delineating all the monies being

3  distributed to people.

4        I don't know we find that on the same dates that the

5  law firms are settling large number of group, group settlements

6  that they also settle about a large number -- they also agree

7  to dismiss a number a claims.  That dismissal doesn't need to

8  be a part of the group settlement agreement.  That can be

9  independent agreement.  These are a list of people we're going

10 to dismiss, there's no reason to put them on the list of people

11 that are going to get paid because they're not going to get

12 paid.

13       So, again, there would be and can be separate

14 documents and that often happens, separate documents showing

15 that these cases are dismissed.  So you wouldn't expect that

16 they'd be in the documents that have been provided to me.

17 Nevertheless they were part of the negotiation.  So I don't

18 agree that they weren't part of the overall settlement on that

19 date.  We'll take this amount of money for these cases and in

20 addition we've got this list of 36 cases that we couldn't up

21 and we'll dismiss them.  That's the nature of these discussions

22 often and it -- how it's memorialized is not the same obviously

23 from case to case so I can't -- just because I've read these

24 documents and don't see a delineation of the zero resolutions

25 doesn't mean that they weren't part of the deal so I can't

1 agree with your premise that there were no -- that none of the

2 Cooney deals included dismissals of claims.  I would find that

3 unlikely but it could happen.

4 Q    All right.

5           MR. SHEPPARD:  Your Honor, I hate to interrupt but

6 perhaps some of the confusion here is the fact that Mr. Evert

7 is referring to a Simmons's release and now he's asking

8 questions about a Cooney settlement.  So perhaps we could get

9 that cleared up.

10           MR. EVERT:  All right.

11           MR. SHEPPARD:  And I don't have a copy of the release

12 so.

13 Q    Then let me ask you about Simmons and maybe we'll just --

14 I'm just trying to make a simple point, Dr. Peterson.  If over

15 90 percent, I think the number is 94 percent but I don't have

16 it right at hand, of the Simmons's claimants in the 17

17 settlement arrangements that Dr. Mullin has excluded and been

18 talked about in great amount in this court, if 94 percent of

19 those claimants qualified for payment and were paid and it was

20 94 percent of all the Simmons's claimants from 2007 to 2010,

21 would you not agree with me that the product exposure

22 requirements for that settlement could not have been terribly

23 difficult to meet?

24 A    I don't think the conclusions follows from the assumed

25 premise.

1  Q    Okay.  Would you agree with me then, sir, that that is a

2  dramatically higher payment rate than occurred in non-group

3  settlements?

4  A    Well first of all I don't know that what you represented

5  is true and I won't accept it.

6  Q    Thank you.  Would you assume it to be true for purposes of

7  the question?

8  A    If you assume that rate that would not only be lower than

9  the rate of dismissals and zero pays among non -- among

10 individually reviewed claims, but would also be far lower than

11 the rate of dismissals among group settlements as a whole

12 because 36 percent of all cases resolved on the same day with

13 group settlements are zero paid cases and dismissal cases.  So

14 overall it's 36 percent.

15      You maybe have identified a subset of those claims

16 where it's nine percent.  I don't, again, assuming your

17 question is correct and I have no reason to assume it.  All

18 that is is that among an overall group of -- an overall result

19 that 36 percent of the resolutions involved with group

20 settlements are for no money.

21      For this law firm it's nine percent and that's just,

22 you know, all right, I have no -- it's going to vary from firm

23 to firm.  Doesn't surprise me in the least.  I think it's --

24 Q    It's --

25 A    -- I think it's -- that would be a lower rate than

1 basically all other groups or all other cases whether they're

2 settled in groups or settled individually so.  And, you know,

3 the Simmons's settlements are kind of odd anyway.

4 Q    All right.  Well let's talk about group settlements again

5 for just a second, Dr. Peterson, because when you say group

6 settlements you're referring to much more as we discussed than

7 the 17 Simmons, Lanier, and Cooney settlements are you not,

8 sir?

9 A    There are many more settlements.  Those are very large

10 ones but among -- certainly there are a lot more group

11 settlements than those 17.  Even --

12 Q    Yes, sir.

13 A    -- even Dr. Mullin acknowledged there would be more.

14 Q    And that's what you tried to illustrate in this

15 demonstrative that you used yesterday which was Page 4 of

16 Exhibit 1019, is that right, sir?  That's what you tried to

17 illustrate, is that right?

18 A    What was --

19 Q    That there were -- your version of group settlements.

20 A    Oh, yes, I think that's a fair characterization.

21 Q    Okay.  And you were here for Jeffrey Simons's testimony

22 were you not, Dr. Peterson?

23 A    Some but not all.

24 Q    Okay.  Were you here for the part of Jeffrey Simons's

25 testimony where he testified that he had never engaged in a

1 group settlement of his claims, that they were all individually

2 evaluated and negotiated claims?

3 A    I've heard him say that.  I don't remember if I heard it

4 yesterday.

5 Q    Okay.  And so you don't recall if you heard that he said

6 it was his ethical obligation, you can't remember if you were

7 here for that?

8 A    I know that's his statement and if you were going to

9 testify to group settlements I would expect that's what he

10 would have said.

11 Q    And were you here when he said that very often he had

12 settlement negotiations ongoing with Bondex and a number of

13 cases at the same time and may have settled cases at the same

14 time, but they were all individually evaluated?

15 A    He's told me that.  I think I mean the nature of -- I

16 would acknowledge that our operational definition of a group

17 settlement would probably include some cases where they really

18 are individual settlements.  The law firm felt all of them.

19 I'd be interested, haven't looked at, but I'd be interested in

20 seeing what's the value distribution among those cases but --

21 but I accept Mr. Simons's representation of his own cases and

22 his view of ethical positions.  I understand that very clearly.

23 Q    So even though all of his cases were individually

24 evaluated and Dr. Mullin's point in excluding the Simmons,

25 Lanier, and Cooney cases were that they were not individually

1  evaluated, would it surprise you that in your definition of

2  group settlements you have eliminated 56 percent of the Simon

3  Greenstone cases as group settlements?

4  A    I don't know.  He has a relatively small number of cases.

5  But I think there are cases in group settlements that are

6  individually reviewed as I have testified several times here

7  now.  There are some group settlements that we have identified

8  as group settlements that probably are individually reviewed.

9  I mean so I think there's some error in that, it's inevitable,

10 because I don't have all these agreements.  I didn't have

11 access, we weren't given the agreements for all of these cases

12 and so I can't say definitively what the nature of those deals

13 were.  But I have described the process and I'd expect that

14 there's some noise and error in it, yet.

15          It's the general -- it is -- it is not a matter that

16 calculate -- that affects the precise calculations, it's a

17 description of the overall process of how the litigation is

18 done for my forecast.  With regard to Dr. Mullin's regression

19 analysis and our removal of those cases, did we remove too

20 many?  Did we remove too few?  I can't say that with any

21 precision.

22          My point is that if you remove cases, most of which

23 would have been actually a group settlement, you cannot

24 replicate his results.  You asked me earlier is replicability

25 an important quality of scientific work.  Yes, it is.  And we

1  could not replicate.  You change the sample to be more -- it

2  certainly would be more consistent with his representations of

3  what his sample should be than his, but are there some

4  individual cases that -- the barrier is not clean and when you

5  remove these cases you don't get anything near his results and

6  it shows that there is instability to his analysis and it can't

7  meet the quality of scientific inquiry and confirmation that

8  you asked me about yesterday, replicability.  So that's why I

9  think that his analysis is not reliable.

10  Q    In your definition of group settlements you have

11  unquestionably eliminated claims that Jeffrey Simon testified

12  to yesterday were individually evaluated and negotiated, is

13  that correct, sir?

14  A    I don't know that.  I'll accept your representation.  I

15  would -- I wouldn't be surprised that some of that was done.  I

16  was aware of that at the time.  And as I -- I've answered that.

17  Q    And will you agree with me, sir, that Dr. Mullin's point

18  in limiting his exclusion of group settlements to the 17

19  Simmons, Lanier, and Cooney claims is that those settlements

20  clearly did not involve individual evaluation of claims but

21  instead were resolved on an aggregate basis?

22  A    I don't agree with that.  I think some of them probably

23  were individually evaluated.  And that --

24  Q    Dr. Peterson --

25  A    And that isn't a justification for running a poor

1  regression analysis.

2  Q    Dr. Peterson, can I ask you if you agree with the

3  following statement?  Mass litigation presents special threats

4  to the fairness of our justice system raising the following

5  possibility that defendants faced with a great number of claims

6  may be forced to make significant settlements even when

7  liability is unlikely.

8         Such nuisance settlements might be made for at least

9  two reasons.  First, settlement might obviate extraordinary

10 litigation expenses and, second, given enough trials a

11 defendant can expect to lose even if there is a low probability

12 of liability in each case.  Do you agree with that statement,

13 sir?

14 A    Let me read it again.  Who wrote this?

15 Q    It's from an article entitled Resolution of Mass Torts:

16 Toward A Framework for Evaluation of Aggregative Procedures by

17 Mark Peterson and Molly Selvin in 1988.

18 A    I thought I recognized it.

19 Q    I thought you would, sir, that's why I asked.  Do you

20 agree with that statement?

21 A    I wouldn't -- I would agree with the general points here,

22 I don't think I would agree with everything.  This was a time

23 when I had -- was really not involved with asbestos litigation

24 in any depth, but I would -- let me look through it again.  I

25 would agree with the general points that law firms --

1  defendants will settle cases, large numbers of cases to

2  eliminate the probability of liability which may be low, but if

3  you're going to get a $6 million judgment out of a group of 100

4  cases that you're settling, one of them is enough to make it

5  worthwhile and you don't know which of the 100 it's going to

6  be, it's worthwhile settling them.  That's the last point.

7           And I think I probably wouldn't agree entirely -- I

8  wouldn't characterize the extraordinary and it's probably the

9  only word I would disagree with in this now.  They can be

10 extraordinary, but they're not going to try 100 cases obviously

11 and so the litigation expenses for those cases probably would

12 not be terribly great.  I understand that issue better now than

13 I did then.

14 Q    So I'm just trying to understand your answer, Dr.

15 Peterson, do you --

16 A    That's a fair comment.

17 Q    -- do you agree with this statement that you wrote in

18 1988?

19 A    Not entirely.

20 Q    Okay.  Let me ask you about this statement.  Do you agree

21 with this statement?  Defendant's interests may also conflict.

22 Defendants with modest market share and files that hold little

23 incriminating evidence may best be served by striking

24 agreements with plaintiffs that offer modest certain payments

25 with little scrutiny of claims and minimal attorney investment.

1  A    Well certainly there are a number, probably a substantial

2  number of defendants who have concluded that.  I think that

3  that's an appropriate statement.

4  Q    You wrote that statement too didn't you, Dr. Peterson?

5  A    I don't recall.  I guess I did.  I mean I, you know, I

6  don't disagree with that at all.

7  Q    And that was after seven more year's experience in the

8  asbestos litigation because that was in 1995, is that right?

9  A    Well this one shows I had some better familiarity with

10 what -- how cases were actually being resolved, yes.

11 Q    So, Dr. --

12 A    And that's probably why I agree with this one but not

13 entirely with the previous one.

14 Q    So, Dr. Peterson, let me show you Debtors' Demonstrative

15 D-74 and I think we can do this relatively quickly because

16 we're back to simple math.

17            THE COURT:  Thank you.

18 Q    If we were to use Dr. Mullin's average of 45 -- average

19 resolution value of $45,000 per individually evaluated and

20 litigated claim and multiply that times your remaining pending

21 claims after abandonment, it would reduce the estimate of the

22 value of those claims to $82 million.  Would you agree I did

23 the math and the calculations correctly?

24 A    I'll accept that it's correct math.  I don't agree with

25 your characterization of any of that.

1  Q    Yes, sir, I understand you don't agree with the

2  characterization.  But I did the calculations correctly as we

3  discussed prior and plugged it into the formula correctly.

4  A    It looks -- it doesn't appear to be grossly wrong.  I

5  can't stand -- I can't accept or verify the exact calculation

6  like you're asking me to.

7  Q    Dr. Peterson, I think my eighth grade algebra teacher told

8  me the same thing, that it did not appear to be grossly wrong

9  so I'm glad to hear that again.

10 A    My third grade teacher told me when looking at my

11 handwriting I should learn to type as quickly as possible.

12 Q    Well let me ask you to look at Debtors' Demonstrative

13 D-75.

14          THE COURT:  I keep getting stuck.  Thank you.

15 Q    And, Dr. Peterson, this is merely the same calculation if

16 we applied Dr. Mullin's $45,000 average resolution value to the

17 1,818 remaining claims after abandonment it would reduce the

18 forecast for the future claims to $651 million nominal.  Will

19 you agree that I did the calculations correctly and they are

20 not grossly inaccurate?

21 A    The numbers look ballpark if that's what you're asking me

22 is can I do an approximate evaluation of the quality of your

23 math it looks like you have not made gross errors but beyond

24 that I can't say anything and I of course don't agree with any

25 of this.  Well, I think that the reduction of six percent is

1  not inappropriate and that was kind of what I said earlier with

2  regard to the analysis we ran that taking care of the abandoned

3  claims would reduce the liability in the order of magnitude

4  around that.  At the very beginning I acknowledged that.  The

5  $45,000 I think is a rather silly number.

6  Q   Yes, sir.  I understand.  So if we would look at Debtors'

7  Demonstrative D-76, Dr. Peterson.

8            THE COURT:  Thank you.

9  Q   I just want to try to put in one place if I can all the

10 things that we've talked about and I understand of course, sir,

11 that you don't agree with my characterizations.  But we

12 discussed did we not, sir, that your base case without the

13 inflation and without discounting is roughly $1.285 billion

14 nominal, is that correct, sir?

15            THE COURT:  Do we have to go through this nominal

16 versus non-nominal and the inflations again, Mr. Evert?

17 Because the witness hasn't agreed with that statement and

18 otherwise I mean I think he's agreed that your math looks like

19 it's the math but he doesn't agree with the assumptions.  Do we

20 have to go through it again?

21            MR. EVERT:  I'm sorry, Your Honor, I wasn't going to

22 try to go through it.  I was just trying to be clear for the

23 record that it did not include the inflated number which is why

24 it doesn't match exactly with the numbers in Dr. Peterson's

25 report, it's slightly lower.  But I wasn't trying to

1  re-litigate the issue, Your Honor.

2            THE COURT:  All right.

3            MR. EVERT:  My apologies.  Merely trying to put it

4  all in one place.

5  Q    Maybe here's the easiest way to ask you, Dr. Peterson.  I

6  know you don't agree with the characterizations.  Would you

7  agree with me that these are the numbers that we've discussed

8  here this morning?

9  A    You've got them, you can add them up, I can't sit here and

10 recall every number.  This is just --

11 Q    Okay.

12 A    -- this is just -- I can't add any constructive to this.

13 Q    And, Dr. Peterson, the last thing that I'd like to use

14 here -- well let's see, have I got this right?  Unfortunately

15 the only one I have is the one with markings on it.  This is

16 Slide 24.  Sorry.  From your demonstratives of yesterday.

17 A    Yes.

18 Q    And I just want to ask a question to make sure I

19 understand it.  We're covering up my markings.  That's much

20 more official.  No.

21 A    I should have looked more quickly.

22 Q    Yeah, exactly.  It was the nuclear launch codes.

23 A    Ut-oh.

24 Q    I just want to make sure, Dr. Mullin, I'm sorry, Dr.

25 Peterson -- I didn't mean to offend you.

1 A    Oh, you offended him too I'm sure.

2 Q    The red bars are -- well first of all these are numbers by

3 the filing year of the case --

4 A    Yes.

5 Q    -- is that correct?

6 A    Yes.  Among the -- basically the estimated liabilities of

7 the claims filed in a particular year.

8 Q    All right.  So I think I'm reading this correctly.  Can we

9 look at 2003?  So this illustrates that the debtors committed

10 to pay roughly $60 million in settlements in claims that were

11 filed in 2003, is that correct?

12 A    Yes.

13 Q    And the pink -- so that's paid in the year that the -- I'm

14 sorry, let me strike that.  The red bars represent dollars paid

15 on claims that were filed in that year, is that correct?

16 A    That's it.  You got it.

17 Q    And the pink bars represent commitments to pay claims

18 where the commitment was made in that year but the case was not

19 necessarily filed in that year.

20 A    No, it's --

21 Q    Is that correct?

22 A    No, it's the same as the first.  Those are cases filed go

23 to the cases filed in 2006, you know, whatever, that's hard to

24 see.  The third one from the left, those were filed in a

25 particular year, six, yes, is 2006.  Those are cases filed in

1  2006 that were subject to an SBNDA agreement.  And then that

2  SBNDA agreement may have been reached a year or two later,

3  probably were.

4  Q    Okay.  So the very small bar let's say it's a million

5  bucks, we don't know what it is, but the very small pink in

6  2006 you're saying that's for committed payments for a claim

7  that was filed in 2006 that have not been paid, is that

8  correct?

9  A    Yes.

10 Q    All right.  And the green bars are your estimate of the

11 claims that were filed in that year, is that right?

12 A    The green bar is among those claims that are still pending

13 and they were filed in 2006, what do we forecast those claims

14 would be, the payments would be for those claims?

15 Q    Thank you, sir.

16 A    Surely.

17 Q    I appreciate your patience with me and my poor math.

18 Those are all the questions I have.

19 A    Your math didn't seem poor, just uncertain.

20        MR. SHEPPARD:  Your Honor, may we take a five-minute

21 recess?

22        THE COURT:  Wait until I make sure Mr. Evert is done.

23        MR. SHEPPARD:  Oh, okay, Your Honor.

24        MR. EVERT:  Yes, Your Honor.  I'm sorry.

25        THE COURT:  You are finished?

1          MR. EVERT:  Yes, those are all the questions I have.

2          THE COURT:  Are you going to have redirect?

3          MR. SHEPPARD:  Briefly, Your Honor.

4          THE COURT:  Yes.  We'll take a five-minute recess.

5          MR. SHEPPARD:  Thank you.

6                      (Audio off)

7          MR. SHEPPARD:  Thank you, Your Honor.

8          THE COURT:  Dr. Peterson, are you ready?

9          THE WITNESS:  I am, thank you.

10          THE COURT:  All right.  Mr. Sheppard.

11          MR. SHEPPARD:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13 BY MR. SHEPPARD:

14 Q    Dr. Peterson, good morning.

15 A    Good morning.

16 Q    Let me start with some of the calculations that Mr. Evert

17 walked you through on the cross examination and you recall

18 doing that, sir?

19 A    Yes.  I don't recall the specific numbers but I do recall

20 the calculations.

21 Q    Okay.

22          MR. SHEPPARD:  One second, Your Honor, I want to just

23 get these in the right order.

24          THE COURT:  Mr. Evert, did I get back the redacted

25 exhibit?

Peterson - Redirect/Sheppard                    57

1          MR. EVERT:  Your Honor, thank you so much.

2          THE COURT:  While he's --

3          MR. EVERT:  You did not.  I have it.  If I may

4   approach?

5          THE COURT:  Yes, please.  I just want the record to

6   reflect I have a redacted Exhibit 78.  Thank you.

7          MR. EVERT:  Your Honor, actually we would move its

8   admission as an exhibit.  I think there's no objection to 78.

9          MR. SHEPPARD:  None, Your Honor.

10  A    My version is redacted too.

11         THE COURT:  All right.  Let me make a note please

12  here.  Debtors' Exhibit 78 is a --

13         MR. EVERT:  It's D-78, Your Honor, is how it's

14  marked.

15         THE COURT:  D-78 is admitted.

16         MR. EVERT:  Thank you, Your Honor.

17         THE COURT:  All right, Mr. Sheppard, go ahead.

18         MR. SHEPPARD:  Thank you, Your Honor.

19  Q    Dr. Peterson, you remember Mr. Evert showed you a bunch of

20  slides up here?  And I'm putting up Debtors' Demonstrative 65.

21  And I think he asked you whether or not this was your high base

22  or high case average settlement value of 126,340, is that

23  right?

24  A    Yes.

25  Q    Okay.  And that this average tort resolution value of

1 73,150 that that's based upon the product of the two boxes that

2 we talked about yesterday, right?

3 A    Yes.  That's the -- I didn't do this precise calculation

4 here but it appears to be right.

5 Q    And that if you do all of that that you come out

6 somewhere, according to Mr. Evert, in the ballpark of 1.126

7 million or billion dollars nominal, right?  And then he asked

8 you well what if you were to reduce that --

9 A    Let me add it isn't nominal as we ordinarily do it because

10 we do have inflation.  Yes, actually it's correct but, yes, I

11 take that back.

12 Q    And that number, Mr. or Dr. Peterson, was based upon a

13 period of time that you chose to calculate the average

14 settlement value, isn't that right?

15 A    It's one of the two.

16 Q    Okay.

17 A    It's not my main -- it's an alternative forecast.

18 Q    Right.  The alternative.  And you chose either 2003 to

19 2009 or 2001 to 2009, is that correct?

20 A    Except they both went to 2010, otherwise yes.

21 Q    I'm sorry.  2010.  Thank you.  Then he asked you if you

22 would reduce that time period down to about 29 months I think

23 he said and you end up with $57,000 and that's the Debtors'

24 Demonstrative 66, right?

25 A    That was his representation, yes.

1  Q    Now, Dr. Peterson, in your professional opinion do you

2  think it's appropriate to limit it to those 29 months?

3  A    Not, well, it's a -- I think it's a problematic time

4  because it was the period when the SBNDs were being made which

5  really distorted the settlement values in my opinion and we

6  don't know if those really are settlements.  So it kind of

7  picked the very worst time with the quality of data of data

8  that I would regard as most questionable.  So I think that's a

9  poor reason to use that.

10  Q    So you considered a shorter time period but you rejected

11  it based upon the reasons that you just gave, right?

12  A    And others.  I mean the primary reason is it's better to

13  include -- to sample across the various kinds of settlement

14  strategies that they were changing every year or two and so I

15  thought it was -- you didn't want to just stick with this kind

16  of the strategy that they had gone to pre-bankruptcy.

17  Q    And that was for the future claims that Mr. Evert asked

18  you to do that and then he also asked you to do it on the

19  pending claims which is Debtors' Demonstrative 68.  Same set of

20  questions, Dr. Peterson, did you consider shortening the time

21  period for the pending claims?

22  A    Sure, I considered it and I decided that was

23  inappropriate.

24  Q    For the reasons that you just discussed, is that correct?

25  A    Yes.  One could do it, I didn't think it was the best way

1  to do it.

2  Q    Okay.  Now I apologize, I got writing on this.

3           UNIDENTIFIED SPEAKER:  Do you have a clean copy?

4           MR. SHEPPARD:  Of which one?

5           UNIDENTIFIED SPEAKER:  Do you have a clean copy of

6  D-78.

7           MR. SHEPPARD:  I might.

8           UNIDENTIFIED SPEAKER:  If I can borrow it.

9           MR. SHEPPARD:  Your Honor, I wrote on mine.

10          THE COURT:  Which exhibit are you going to?

11          MR. SHEPPARD:  D Demonstrative 73, Your Honor,

12 Debtors' demonstrative.  Let me do it this way, Your Honor.

13 Maybe I can do it without the demonstrative.

14          THE COURT:  Do you want to put mine up on the screen?

15 Jim?  Let him use mine.  Just hand it back please.

16          MR. SHEPPARD:  Thank you, Your Honor.

17 Q    Now, Dr. Peterson, Mr. Evert also talked to you about your

18 calculation of the number of pending claims.  Do you recall

19 that?

20 A    Yes, he did.

21 Q    And he showed you what was marked as Defendant's

22 Demonstrative 73 and he suggested to you in that line of

23 questioning that you should have subtracted an additional 350

24 cases or claims, is that correct?

25 A    Yes.

1  Q    Okay.  Now did you consider that possibility, Dr.

2  Peterson?

3  A    We did consider the possibility that there may be some

4  additional claims over that time.

5  Q    And why didn't you do it, sir?  I'm sorry, Dr. Peterson.

6  A    Well in part because a lot of them had already been

7  dismissed in the time period that I said and we had already

8  taken out 156.

9  Q    And that you felt that you had --

10 A    Dealt adequately with the issue.

11 Q    With the issue of the stale claims, correct?

12 A    For the pending claims, yes.

13 Q    Okay.  All right.  And then in another series of

14 demonstrative slides, again Mr. Evert walked you through your

15 calculation and this time he changed the input down to Dr.

16 Mullin's average settlement value of $45,000.  Do you recall

17 that?

18 A    Yes.

19 Q    Okay.  Do you recall how Dr. Mullin calculated his average

20 value of $45,000, Dr. Peterson?

21 A    I believe it was from his subset of the cases excluding,

22 well actually I think -- I'd have to see the exhibit from his

23 testimony, his demonstrative, but I think it included the

24 elimination of defense costs as well as it was only a subset of

25 the claims, it wasn't all of them.

1  Q    So is it fair to say that that average settlement value

2  was the value that Dr. Mullin calculated after he started

3  subtracting all of those things he talked about in his direct,

4  right?

5  A    Certainly that and it's just from a subset of claims, it

6  isn't all of the claims.  It's just -- it's an inappropriate

7  number to use --

8  Q    Right.

9  A    -- for both those reasons.  I could discuss in detail what

10  those steps are but they didn't have defense costs.  I think

11  that was in.  And they also were just for the cases that he

12  called individually reviewed as I recall.

13  Q    Okay.

14  A    And they systematically eliminated cases from Madison

15  County and three of the most prominent lawyers including Mr.

16  Lanier, he's -- the debtors' own lawyers called him a

17  particularly effective lawyer who was dangerous and, you know,

18  there's just no justification for eliminating settlements by

19  those law firms from his calculation that he used for all

20  claims.  It's a terrible step.

21  Q    So the input that Mr. Evert asked you to put into your

22  calculation in D-74 and D, I'm sorry, D-74 and D-75 is $45,000.

23  That's not a real average of the claims is it, Dr. Peterson?

24  A    Certainly it's an average of a subset of the claims and

25  it's systematically by a subset of the claims, yes.

Peterson - Redirect/Sheppard                    63

1  Q    Okay.  Well did you ever consider using $45,000 as your

2  average settlement value for your calculation, Dr. Peterson?

3  A    No.

4  Q    Why not?

5  A    Well it wasn't a number that represented the historic

6  payments by this company in any period.

7  Q    Okay.  So if we then take a look at the summary here which

8  was D-76.

9  A    This one is going to haunt my dreams.  Yes.

10 Q    So the top one, assuming Mr. Evert's math is correct which

11 I'm prepared to do for sure, this is a your base case, right,

12 not adjusted for inflation at the top.

13 A    I've seen your math so I'm not sure.  You're a good

14 verifier but, yes, I beg your pardon.

15 Q    And this one down at the bottom is the number that they're

16 suggesting if you would remove those cases that they said you

17 should remove that you didn't, correct?

18 A    Yes, that's kind of with all those eliminations.

19 Q    Okay.  Now I guess, Dr. Peterson, the last thing I'd like

20 to show you is that Mr. Evert showed you a settlement agreement

21 from the Simmons firm that was marked D-78 and was admitted

22 into evidence in your cross.  Do you recall that, sir?

23 A    Yes, I have it.

24 Q    Okay.  And that's a settlement agreement from 2007

25 relating to a group claim, correct?

1 A    I don't know that it's a group claim, that was his

2 representation.

3 Q    Okay.  Well I'm prepared to accept that as well.  Let me

4 show you a settlement agreement with the Simmons firm dated --

5 hold on one second.  Sorry, Your Honor -- December of 2008,

6 it's a release of claims through December 31st, 2008 with the

7 Simmons firm.  And I'm going to show you, Dr. Peterson, the

8 payment criteria that is highlighted there.

9              MR. SHEPPARD:  This is ACC Exhibit 162, Your Honor.

10             THE COURT:  You need to focus it a little better

11 please.  It's Exhibit which please?

12             MR. SHEPPARD:  ACC-162, Your Honor.

13             THE COURT:  All right.  Thank you.

14 Q    You see that?

15 A    I see the yellow section.  I'd like to read it.  All

16 right, I've read it.

17 Q    Is that payment criteria the payment criteria that you

18 were referring to or representative of the payment criteria you

19 were referring to in your cross with Mr. Evert?

20 A    Yes.

21             MR. SHEPPARD:  Your Honor, we'd move ACC-162.

22             MR. EVERT:  No objection, Your Honor.

23             THE COURT:  It's admitted.

24             MR. SHEPPARD:  No further questions.

25             THE COURT:  One second please.  Any recross?

1           MR. EVERT:  No, Your Honor.

2           THE COURT:  Will you need Dr. Peterson again?

3           MR. SHEPPARD:  Your Honor, that's a loaded question,

4  but not for purposes of this trial.

5           THE COURT:  Will you be -- will the debtors be

6  calling Dr. Peterson again or can he be excused?

7           MR. EVERT:  No, Your Honor.

8           THE COURT:  You're excused, Dr. Peterson.  Thank you.

9           THE WITNESS:  Thank you very much, Your Honor.

10          MR. EVERT:  Your Honor, for the record I rise to

11  renew our motion to strike Dr. Peterson's testimony under Rule

12  702 and Daubert and its progeny.

13          THE COURT:  That motion is denied.

14          MR. EVERT:  Thank you, Your Honor.

15          MS. RYAN:  Your Honor, if we could just have on the

16  record that RPM International joins in that motion although I

17  understand your ruling.  I just want the record to reflect that

18  RPM International joins in that motion.

19          MR. SHEPPARD:  Thank you, Your Honor.

20          THE COURT:  All right.  That motion is denied.  One

21  second please.  Ms. Zieg.

22          MS. ZIEG:  Good morning, Your Honor.  Sharon Zieg of

23  Young Conaway Stargatt & Taylor on behalf of the future

24  claimants representative.  Your Honor, as we indicated on the

25  record at the end of yesterday's hearing the FCR is going to

1 proffer Richard Braun's testimony related to the appropriate

2 discount rate to be utilized in these proceedings by

3 declaration.   That declaration is on our exhibit list

4 ACC/FCR-88 and we would move for the admission of that exhibit.

5          THE COURT:  Any objection?

6          MR. JACKSON:  No objection, Your Honor.

7          THE COURT:  Exhibit 88 is admitted.

8          MS. ZIEG:  In addition, Your Honor, we would move for

9 the admission of Exhibit ACC/FCR/E-427 which is Mr. Braun's

10 declaration I mean is Mr. Braun's CV.

11          THE COURT:  That Exhibit E-40 -- 427, excuse me,

12 Exhibit E-427 is admitted but give me a minute please.

13          MS. ZIEG:  May I approach, Your Honor?  I actually

14 have a copy of --

15          THE COURT:  Yes.

16          MS. ZIEG:  -- E-427 to put in your binder.

17          THE COURT:  All right.  Thank you.  Thank you.  All

18 right.

19          MS. ZIEG:  At this time, Your Honor, the FCR would

20 move for the, excuse me, would offer Mr. Braun as an expert to

21 render an opinion -- as an expert in rendering opinions for

22 corporate finance and the appropriate discount rate to be

23 applied to that calculation.

24          MR. JACKSON:  No objection.

25          THE COURT:  He is so accepted.

1          MR. JACKSON:  Mr. Braun, would you step up, please?

2          THE COURT:  Mr. Braun, I think you will be subject to

3  cross examination after you're under oath, sir.

4          MR. BRAUN:  Thank you.

5          COURTROOM DEPUTY:  Please stand and raise your right

6  hand.

7                RICHARD BRAUN, FCR'S WITNESS, SWORN

8          COURTROOM DEPUTY:  Please be seated.

9          THE COURT:  Mr. Jackson.

10          MR. JACKSON:  I'm kind of giving him a second to sort

11  of get settled in.

12          THE COURT:  Sure.  That's fine.

13          MR. JACKSON:  All right.  Are you in, Mr. Braun?

14  Good morning.

15          THE WITNESS:  I mostly am so that's fine.

16                        CROSS EXAMINATION

17  BY MR. JACKSON:

18  Q    All right.  Good morning.  I just have a very few number

19  of questions so I'll do this as fast as I can.  First, if I

20  understand it correctly you've never done a discount rate for

21  an asbestos liability proceeding before this one, is that

22  correct?

23  A    Correct.

24  Q    And we agree, do we not, that if we were doing discounted

25  cash flow analysis for purposes of looking at insolvency that

1  the weighted average of capital would be the appropriate rate

2  to apply, correct?

3  A    Well, I mean it's more than just for insolvency.  It's in

4  -- for the valuation of a company you would typically in the

5  discounted cash flow analysis use a discount rate called the

6  weighted average cost of capital and --

7  Q    Okay.  Thank you, Mr. Braun.

8  A    -- most --

9  Q    I'm sorry.

10 A    -- practitioners do and we do as well.

11 Q    Okay.  And it's also true that in the purpose of coming up

12 with a discount rate in this proceeding you assumed that the

13 calculation of Dr. Vasquez was correct?

14 A    Well, I assumed that there were uncertainties associated.

15 In other words it could be too conservative or it could be too

16 aggressive.  I have no way because I'm not an asbestos expert

17 in order to determine whether it's too aggressive or too

18 conservative so I assume that those two risks offset each other

19 and I relied upon them in terms of looking at them, but I

20 certainly won't sit here and tell you I think that they are

21 absolutely from the word of God.

22 Q    To use a phrase my friend Mr. Evert likes to use a lot,

23 fair enough.  Then if I understand what you said is you made no

24 adjustment to your proposed discount rate because of any

25 particular errors that could be in the calculation of Dr.

1 Vasquez, is that fair?

2 A    Well, based on the assumption that there could be errors

3 on the high side, there could be errors on the low side, they

4 could be too aggressive, they could be too conservative, it

5 seemed to us not too reasonable to add in a control premium

6 because that would adjust for the possibility that the

7 projections were too aggressive and ignore completely the

8 possibility that they were too conservative.

9 Q    And we can agree, can we not, sir, that the future is

10 undoubtedly going to change in some way that we have a

11 difficulty predicting today?

12 A    Yes, I think if we were sitting here 40 years from now

13 we'd probably find out that things were different than they

14 thought -- we thought they'd be.

15 Q    High insight is always better than foresight.

16 A    Well, sometimes history is misleading as well, but, yes, I

17 guess it's always better to be a Monday morning quarterback.

18 If I could make my bets on Monday I'd make a lot more than.

19 Q    Again, fair enough, and if we could just the system that

20 way.  And it is also true, isn't it, sir, that you made

21 absolutely no effort to account for any risk that can occur

22 from changes or advances in medical care as it relates to

23 mesothelioma claims in your calculation of a discount rate?

24 A    I'm not qualified to make those kind of medical

25 determinations and frankly I don't know if anyone is.

1  Q    And nor did you try to make any calculation of the risk

2  associated with changes in the future relating to medical costs

3  in general, is that fair?

4  A    I think that's fair and, again, I would argue that no one

5  is.

6        MR. JACKSON:  As I promised you, Mr. Braun, that's

7  all I have.  Thank you very much.

8        THE WITNESS:  Thank you.

9        THE COURT:  Ms. Zieg?

10        MS. ZIEG:  I have no further questions, Your Honor.

11        THE COURT:  You're excused.  Oh, I should ask, is

12  anyone recalling Mr. Braun?

13        MR. JACKSON:  No, Your Honor.

14        THE COURT:  You're excused, sir.  Thank you.

15        THE WITNESS:  Thank you, Your Honor.

16        MR. EVERT:  Your Honor, I'm sorry.  I gave you the

17  wrong D-76.  I just gave the corrected one to the ACC.  If I

18  could just replace it.

19        THE COURT:  Could I just throw this one away?

20        MR. EVERT:  You -- that would be wonderful.

21        THE COURT:  All right.  Thank you.

22        MR. EVERT:  Thank you.

23        MR. HARRON:  Your Honor, the --

24        THE COURT:  Mr. Harron?

25        MR. HARRON:  -- FCC and FCR -- or the FCR is going to

1  call Dr. Vasquez at this time.  I mean I need a moment just to
2  reorganize.
3          THE COURT:  Oh, certainly.  We'll take -- do you want
4  -- do you need a recess, Mr. Harron?
5          MR. HARRON:  I don't think we need a recess.  It'll
6  take about two minutes and then --
7          THE COURT:  All right.  That's fine.
8          MR. HARRON:  -- I'll roll over there and put the
9  brakes on.
10          THE COURT:  Sure.  Thank you.
11          MR. EVERT:  We'll carry him, Your Honor, if
12  necessary.
13          MR. HARRON:  That may put two of us on crutches.
14      MR. EVERT:  Can you get the angle right?
15          MR. HARRON:  I think so.  I think so.  Put on the
16  brakes.
17          UNIDENTIFIED SPEAKER:  I hope you raised your hourly
18  rate.
19          THE COURT:  While Mr. Harron is getting oriented do
20  you folks get me the revised exhibit list or is that something
21  you're going to file after today is over?
22          UNIDENTIFIED SPEAKER:  I think Mrs. Ramsey is going
23  to address --
24          THE COURT:  Later.
25          UNIDENTIFIED SPEAKER:  -- shortly.

1          THE COURT:  All right.

2          MR. GORDON:  Your Honor, for the debtors we're still

3    working on ours as well, but I think later in the day we'll

4    have something to present.

5          THE COURT:  Okay.  Thank you.

6          MR. HARRON:  Can you hear me okay, Your Honor --

7          THE COURT:  Yes, sir.

8          MR. HARRON:  -- or should I use the lavalier?

9               THE COURT:  No, that's fine.

10         MR. HARRON:  At this time, Your Honor, we'd like to

11   call Dr. Thomas Vasquez.

12         THE COURT:  Dr. Vasquez.  Good morning.

13         COURTROOM DEPUTY:  Please raise your right hand.

14          DR. THOMAS VASQUEZ, FCR'S WITNESS, SWORN

15         COURTROOM DEPUTY:  Please be seated.

16         MR. HARRON:  Your Honor, may my colleague approach

17   with a few exhibits?

18         THE COURT:  Yes.  Thank you.

19                    DIRECT EXAMINATION

20   BY MR. HARRON:

21   Q    Good morning, Dr. Vasquez.

22   A    Good morning.

23   Q    Now, before we begin I'd ask you to check your person and

24   confirm for the record that your phone was left outside the

25   courtroom.

1  A    I would not forget.  Thanks.

2  Q    Thank you.  Dr. Vasquez, by whom are you employed?

3  A    A company called ARPC.

4  Q    And what is ARPC?

5  A    ARPC is an economic consulting firm that specializes in

6  mass torts and other forms of litigation.

7  Q    And what do you do at ARPC?

8  A    I'm partner at ARPC.  I work on virtually a full range of

9  the types of engagements we have.

10 Q    And what were you asked to do in connection with this

11 proceeding?

12 A    I was asked to estimate the future cost of resolving all

13 pending and future claims against Bondex, asbestos related.

14         MR. HARRON:  At this time, Your Honor, I'd like to

15 introduce ACC/FCR Exhibit, it's already been premarked as E-89.

16 If my colleague may approach.  It's Dr. Vasquez's CV.

17         THE COURT:  All right.  Thank you.

18         MR. HARRON:  And I believe by agreement I can -- may

19 request that it be entered into evidence on an uncontested

20 basis.

21         THE COURT:  It's --

22         MR. EVERT:  No -- I'm sorry.

23         THE COURT:  I'm sorry.

24         MR. EVERT:  No objection.

25         THE COURT:  It's admitted.

1          MR. HARRON:   Thank you, Your Honor.

2    Q    Dr. Vasquez, please describe your educational background.

3    A    A undergraduate degree in mathematics from the State

4    University of New York at Potsdam and a Ph.D. in economics from

5    Clark University.

6    Q    And describe your professional experience after receiving

7    your Ph.D.

8    A    I was first employed in the Office of the Secretary of

9    Treasury, Office of Tax Analysis in 1972.   There I was a -- my

10   responsibility was to build databases and models to estimate

11   the behavioral and effects of tax and regulatory policy and to

12   forecast the future liability -- or future revenues of the U.S.

13   Government.

14   Q    And next --

15   A    After --

16   Q    Pardon me.

17   A    I'm sorry.   From there in the mid seventies I joined the

18   staff of the Joint Tax Committee, U.S. Congress; did similar

19   things there, not forecasting future revenues, but analyzing

20   the economic and behavioral effects of tax and regulatory

21   policy.   I stayed there until I was the director -- or I'm

22   sorry, I left there in '76, became the chief economist for the

23   New York State Economic Development Board, went back to

24   treasury in the late seventies to head the revenue forecasting

25   staff of the Office of the Secretary, established my own firm

1   in 1983 and did similar work for private clients.

2          So I was building economic models, doing forecasting

3   for virtually every state in the U.S., well 44 of the states,

4   then began doing it for foreign countries.  I did it for maybe

5   20, 30 foreign countries, everything from Egypt and Pakistan to

6   St. Thomas to Guam, a number of foreign countries.  I sold my

7   company to KPMG -- KPMG Peat Marwick somewheres along the way

8   and then expanded my operation into doing privatization and

9   evaluation work.

10  Q    And just for the record are you able to confirm that the

11  CV we've submitted into evidence is an accurate description of

12  your educational and professional experience?

13  A    The one I gave you did.

14          MR. HARRON:  I'll represent to the Court that that's

15  the same one we've submitted into evidence.

16          THE COURT:  All right.

17  Q    Well, let's turn to the asbestos context.  Please describe

18  for the Court your work with asbestos starting outside of the

19  bankruptcy context.

20  A    Well, outside of the bankruptcy context and -- outside of

21  the bankruptcy context probably started in the mid -- I think

22  -- I believe started in the mid-nineties with Fiberboard

23  fairness hearings which was an issue of whether or not the

24  global settlement reached by Fiberboard was fair in a financial

25  dollar amount sense.  And then after that there was -- it was

1  probably dominated by mergers and acquisition activities.  So

2  these were issues where investors, buyers and sellers of

3  companies were interested in making sure they understood what

4  the asbestos taint was for companies that had a history of

5  asbestos litigation.  Certainly some insurance coverage cases,

6  but more dominated I think by merger and acquisition activity.

7  Probably the last component would be financial reporting.  So

8  for a number of companies I produced forecast every year for

9  them for their 10-Ks and financial statements.

10 Q    And at what point in your career did you -- did there come

11 a point in your career when you worked with Dr. Nicholson?

12 A    In 1991, which is my entrance into the asbestos arena, I

13 was engaged to do a forecast of similar to what I'm doing here

14 in the National Gypsum bankruptcy case and at that point there

15 wasn't a methodology like everyone uses today.  It was a --

16 there was a number of different approaches, but we had felt

17 that developing a forecast of the incidence of mesothelioma

18 would be the foundation that we needed in order to do a

19 forecast.  We needed to know how many future mesothelioma

20 deaths there would be, how many future lung cancer deaths there

21 would be and I viewed Dr. Nicholson as the expert of all

22 experts and so I consulted with him at that time in order to

23 build this forecasting of the incidence of disease.

24 Q    You mentioned the National Gypsum bankruptcy, let's

25 continue on with bankruptcy and I'd ask you to describe for the

1 Court your experience in asbestos-related bankruptcies.

2 A     I think after National Gypsum the next bankruptcy was

3 Owens Corning, there I was asked by the debtor to forecast

4 their future costs, Dana bankruptcy, Oglebay Norton.  I think

5 that may be it.

6 Q     In National Gypsum was it the FCR that retained you?

7 A     No, in National Gypsum it was the unsecured creditors

8 committee.

9 Q     What about in Oglebay Norton?

10 A     The debtor.

11 Q     And you mentioned Owens Corning was the debtor who

12 retained you?

13 A     Owens Corning was the debtor.

14 Q     And in those cases did you provide testimony to the Court?

15 A     Yes, I did.

16 Q     Has any Court ever declined to qualify you as an expert?

17 A     No.

18 Q     Has any Court ever determined that your testimony was not

19 helpful?

20 A     No.

21 Q     Now, does your methodology change depending on whether

22 you've been retained by a debtor or by a future claimants'

23 representative?

24 A     No.

25 Q     Are the opinions you will offer today based on scientific

1 methodology and within a reasonable degree of scientific

2 certainty for the purposes for which they're offered?

3 A    Yes.

4         MR. HARRON:  At this point, Your Honor, I'd make Dr.

5 Vasquez available to the debtors for voir dire.

6         MR. EVERT:  But, Your Honor, with your indulgence

7 we'll defer our questions as to Dr. Vasquez's qualifications

8 until his testimony -- we'll renew our motion under Rule 702

9 and Daubert to strike his testimony based on the Rules of 702

10 and the Daubert requirements.

11         THE COURT:  All right.  You're offering him as an

12 expert in the area of estimation?

13         MR. HARRON:  Your Honor, I'd like to offer Dr. -- the

14 future rep would like to offer Dr. Vasquez as an expert in

15 forecasting future liability.

16         THE COURT:  All right.  He's permitted to offer an

17 opinion in that area and I will hear whatever motion there is

18 to strike his testimony when it's made.

19         MR. EVERT:  Thank you, Your Honor.

20         MR. HARRON:  And at this point, Your Honor, I believe

21 with past practices during this case I'd like to offer and mark

22 his -- Dr. Vasquez's report and rebuttal report as

23 demonstrative exhibits for the record.

24         THE COURT:  All right.

25         MR. HARRON:  Your Honor, his report is 1025.  The

1  rebuttal report is 1026.  And if my colleague may approach

2  we'll hand up copies of the rebuttal report.

3           THE COURT:  All right.  Thank you.

4  BY MR. HARRON:

5  Q    Dr. Vasquez, have you determined an estimate of the

6  debtors, and when I say debtors I'm referring to Bondex and

7  HVAC collectively, their liability to pay indemnity dollars for

8  pending and future mesothelioma claims?

9  A    Yes, I have.

10  Q    And have you prepared slides to assist the Court -- or to

11  assist you with explaining the results of your work to the

12  Court?

13  A    Yes, I have.

14  Q    And I believe you've previously been handed what has been

15  marked ACC/FCR-1024 which consists of 23 pages of a

16  presentation, is this a true and accurate copy of what you've

17  prepared?

18  A    Yes, I was just looking for a number and I don't see one

19  on here, but --

20  Q    The ACC/FCR exhibit number it's a sticker.  It may not

21  have been adhered to your --

22  A    I have the sticker, just not a number, that's all.

23  Q    Is this the presentation you prepared?

24  A    Yes, it is.

25  Q    I'd like to direct your attention to Page Number 2 from

1  the slide.

2  A     Yes.

3  Q     And what is the -- your estimate of the debtors'

4  mesothelioma liability?

5  A     Well, I did -- as you hinted in your question, I provided

6  separate estimates for pending claims and future claims and

7  they were both computed in nominal dollars and in present value

8  terms.  So pending claims a nominal value of about $182

9  million, but as the footnote states approximately 50 million of

10 that amount is not something I estimated.  It's the amount that

11 was settled for -- settled but not documented claims.  So I --

12 my estimate of the remaining population would be approximately

13 $132 million.  For future claims $1.4 billion for a grand total

14 of approximately $1.6 billion in nominal terms.

15        So that's every pending claim and every future claim

16 until the last claim has been filed against -- and resolved

17 against the company.  Present value terms and being discounted

18 at 3.45 percent reduces the $1.6 billion nominal total to

19 approximately $1.1 billion.

20 Q     And just for the record at present value what's the value

21 of the pending claims and the future claims separately?

22 A     For pending claims $177 million and future claims $934

23 million.

24 Q     And what is the source of the present value that you

25 applied?

1 A    The discount rate?  The --

2 Q    Right.  The discount rate.  Thank you.

3 A    The discount rate was provided to me by counsel.

4 Q    And why was it necessary to apply a discount rate to

5 determine the present value?

6 A    Well, these claims and the amounts paid stretch over the

7 next approximately 40 years.  So you certainly wouldn't want to

8 value a claim paid in 1950 the same as you would today.  So you

9 want to put them in present value terms to make them comparable

10 to other current expenses.

11 Q    And is this the only run of your forecast that you

12 prepared?

13 A    No, there's a -- there's two separate parts to the answer.

14 I'll give you the -- the first is that there are two forecasts

15 that I rely on, one is -- one uses an incidence curve from

16 KPMG, ARPC incidence curve, and the second is a incidence

17 that's produced by a process called Peto and they produce

18 different forecasts of the future incidence of disease.  I

19 applied my parameters to both of those and averaged those two

20 which is what the $1.1 billion represents.  Secondly, we did do

21 some alternative scenarios, some sensitivity analysis, but

22 those aren't included in these numbers.  These -- this is my

23 what I would describe as my base case forecast.

24 Q    And does your forecast include defense costs?

25 A    No, it does not.

1  Q    Are you familiar with the reports pared (sic) -- pardon

2  me, prepared by Drs. Peterson and Mullin in this case?

3  A    Yes, I am.

4  Q    And with the testimony that they have given in this case,

5  both live in court this week and in depositions?

6  A    Yes.

7  Q    And have you compared your forecast to the forecasts

8  offered by Drs. Mullin and Peterson?

9  A    Yes, I have.

10 Q    And does Page 3 of your presentation depict that

11 comparison?

12 A    Yes, it does.  This is comparing on a net present value

13 terms.  So if you look at the top row that's the same numbers

14 that we saw for present value in the prior slide adding to 1.1

15 billion.  For Dr. Peterson at the time before his -- at the

16 time provided a number of different scenarios.  For this

17 purpose as I noted at the bottom of the table I've used his

18 upper forecast, so that would be his high forecast that he

19 presented in his original report.  For Dr. Mullin it's his

20 current estimate of approximate $120 million.

21        So compared to mine it would -- without going into

22 detail, but just at a top level dollar issue Dr. Peterson would

23 be about 23 percent higher than I am and Dr. Mullin is

24 approximately 90 percent lower than I am.

25 Q    Now, I'd like to direct your attention for a moment to the

1 pending claim column and the amount for Dr. Mullin.  What did

2 Dr. Mullin estimate to be the value of the pending claims?

3 A    He estimated a total value of 41 million of which 30

4 million are settled but not documented, so $11 million for all

5 the remaining pending claims.

6 Q    And when you say all the remaining pending claims

7 approximately how many pending mesothelioma claims?

8 A    I don't remember the exact number, but 15, 16, 1700, right

9 in that area.

10 Q    And under Dr. Mullin's forecast there's $11 million

11 allocated to resolve those remaining claims?

12 A    That's correct.

13 Q    If I told you the number of pending claims was about 2,000

14 would that sound right?

15 A    Well, the total number of pending claims including settled

16 but not documented is about 2300 claims.

17 Q    And I'm -- I would direct your attention to the notes on

18 the page, the source of the values from Dr. Mullin's forecast

19 where did you get these numbers?

20 A    Well, the footnote is pretty clear where the -- it shows

21 the page of his report and modified for one adjustment which

22 was -- and I believe I have this right, in his original report

23 he did not accept any of the settlement amount for settled but

24 not documented claims, but subsequently as I understand it he

25 was informed by counsel that 30 million of the 50 million total

1  were accepted.

2  Q    And the numbers that Dr. Mullin testified in court are

3  different than his report to some extent, correct?

4  A    I'm not sure if they're different for pending claims.

5  They are in total.

6  Q    Thank you for that clarification.  And what is depicted on

7  Page 4?

8  A    Well, Page 4 is the same comparison, myself, Dr. Peterson,

9  Dr. Mullin, but done in nominal terms, and I thought that this

10 would be useful given that a lot of the testimony that I've

11 heard over the last few days was really focused on nominal

12 amounts.  So I thought it would be more useful in my

13 presentation to focus primarily on nominal amounts.

14 Q    And so these amounts make their way into the record.

15 Could you identify the nominal amounts for the future forecast

16 for Drs. Peterson and Mullin?

17 A    Sure.  Dr. Peterson's, again, using his upper higher

18 forecast approximately $2 billion which is the sum of about 200

19 million on pending claims and 1.8 billion on -- for future

20 claims.  For Dr. Mullin $170 million total, 41 million pending

21 claims and 129 million future claims.  And the proportions are

22 about the same in the sense of comparing the forecast.  Dr.

23 Peterson is about 26 percent higher and Dr. Mullin is about 90

24 percent lower.

25 Q    Did you compare Dr. Mullin's forecast and your forecast

1  against the debtors' history of resolving claims in the tort

2  system?

3  A    Yes, yeah.

4  Q    And is that comparison reflected on Page 5?

5  A    Sure.  It probably needs a -- yes, it is.

6  Q    What --

7  A    It needs a little explanation I think.  The --

8  Q    That was my next question.  What does it show?

9  A    That's fair.  The -- if you look at the blue columns on

10 the left, and I think there's been a number of these charts

11 that have now been used, all of which look very similar, but

12 conceptually what we're trying to do here is look at history

13 and history you can't just look at how much was actually paid

14 historically because there's claims and inventory that will be

15 paid at some point.  So you value all of those and you pull

16 them back in time to the year that they were filed.

17         So the snapshot you're trying to look at then is for

18 the claims filed in every one of the years what is the value

19 associated with them independent of when it's paid.  You don't

20 care whether it's paid five years from now or 10 years from

21 now.  You want it associated with the year that it's filed in.

22 And so all of the blue bars on the left are the sum of paid

23 amounts, commitments, settled but not documented and pending

24 claims and shuffled into the year that they were filed.

25         As soon as we get to 2010 or the beginning of the --

1  and I'll warn you up front I have a slight color problem, so if

2  I don't get this quite right, it looks to me like red as the

3  top part of the bar and yellow at the bottom and what this is

4  depicting is Dr. Mullin's future forecast, year-by-year, with

5  the amounts associated with the year that they would be filed

6  in and his methodology is the yellow bar -- or I'm sorry the

7  yellow shaded bars at the bottom of the graph, and admittedly

8  this is a visual.  It's not explaining very much, but what

9  we're seeing is some fairly high blue bars in history, and then

10  we go into the future and under Dr. Mullin's forecast

11  everything disappears and not surprisingly since this is my

12  slide mine looks much better.

13       So I mean you look at the red bars and it starts

14  approximately where history begins and then tails off in the

15  future much like Dr. Mullin's does, but of course all the bars

16  are much, much higher and there's much more liability in each

17  year.

18  Q    Now, based on the year in which a claim is filed with the

19  debtors what was -- or what is the value of the claims pending

20  against the debtors?  I think you have it broken in your --

21  A    Yeah, though I --

22  Q    I just want to get the numbers into the record.

23  A    If -- though I think that the number of 137 that's labeled

24  as pending is a bit off, but as you look at the legend we've

25  split everything into the past and into the future and this is

1   the -- this is where we really have a color problem, but I

2   understand from this slide that as I look at history there is a

3   different shade of blue or something on the left side.

4   Q    Yeah, we made the unfortunate choice of selecting blue and

5   purple, but --

6   A    And -- but what this is that the -- what I would consider

7   to the blue bars which are -- which start at the horizontal

8   axis and start going up are what has been paid in the past, put

9   back into the year when they were filed.  The other shade of

10  blue or purple or whatever it is is the amount associated with

11  pending claims and those are the two things that need to be

12  added together in order to understand the complete valuation of

13  all the claims filed in that year.

14  Q    And what are the two amounts for pending and past just

15  expressed in --

16  A    Well, if you at the legend past was about approximately

17  $454 million, pending including settled but not documented is

18  137, 135.

19  Q    And the amount of Dr. Mullin's future forecast?

20  A    A hundred and twenty-nine million as compared to my 1.4

21  billion.

22  Q    And just to be clear the forecast from Dr. Mullin to which

23  you referred is the forecast in which she deducts for implicit

24  defense and several share and other things?

25  A    That's correct.  So this is his forecast and there was

1 discussion over the last few days of what his forecast would be

2 if you added back implicit defense and added back his

3 calculation of several, but this is his calculation having

4 eliminated all of those components.

5 Q    And I believe we heard from Dr. Mullin when he testified

6 earlier this week that he has an alternative forecast of $600

7 million for futures, have you -- were you here for that

8 testimony?

9 A    Yes, I was.

10 Q    And if we were to draw that forecast on this slide does

11 that look about right?

12 A    Yes, it does.

13         THE COURT:  Is there a page for that?  I'm sorry.

14         MR. HARRON:  Your Honor, this is just a -- it's a

15 handwritten overlay on Page 5.  If I were more mobile I would

16 have had the -- approached and had the witness do it.  I took a

17 shortcut.  We'll mark this and move it into the record.

18         THE COURT:  All right.

19         UNIDENTIFIED SPEAKER:  Is there a copy of that?

20 Could I have a copy of that?

21         MR. HARRON:  Yes, if -- Your Honor, with your

22 indulgence we've marked it as ACC/FCR-1027, at the next break

23 we'll make photocopies and distribute it.

24         THE COURT:  All right.  That's fine.

25 Q    Dr. Vasquez, I'd now like to shift your focus to the

1 methodology you applied in developing your forecast.  If you

2 would please explain the steps of your methodology.

3 A    You know, it's -- there's clearly been a lot of discussion

4 about methodology in the last few days, but what it boils down

5 to is that there's really two parts to the methodology.  The

6 first part is you have to establish the starting point for your

7 extrapolation and what I mean by that is you have to decide on

8 how many claims there will be filed in the first year and how

9 many of those will be paid, the average amount that they'll be

10 paid, but you have a set of parameters that really produce the

11 underlying focus of the forecast and once you've done that you

12 then have to have a way to extrapolate that out over time.  And

13 those are the two pieces that I think everyone has been talking

14 about and at various points they talk about how do you do the

15 extrapolation and at other points how do you establish this

16 starting point if you will.

17        So I have on this slide I'm saying that the forecast

18 is very heavily dependent on Bondex's historical experience

19 because that gives you the starting point.  There may be

20 different ways to view the historical experience, but in one

21 fashion or another it tells you where to start.  It tells you

22 what they've been paying and settlement amounts recently.  It

23 tells you how many claims have been filed.  It tells you how

24 many have been paid.  You look at those very carefully and you

25 use those.

1          The second, and I think that there may be some
2    methodologies that don't do it this way, but I'm not aware of
3    them, at that point everyone extrapolates using the same
4    concept which is tell me how many asbestos-related diseases
5    there will be each year going out into the future and that
6    allows you to extrapolate out.  If, for example, in 10 years
7    there would be only half of the number of mesotheliomas that'll
8    be -- that -- mesothelioma deaths in the U.S. then you all else
9    equal expect half the number of claims because you're a
10   universe that you can -- that can file claims has reduced in
11   half.

12          So both of those components are very, very important
13   and I do want to focus the second one quite a bit because it's
14   a -- it drives a lot of what I believe is some
15   misinterpretation of historical data and has a pretty -- a very
16   dramatic effect on future liability, but both are equally
17   important.

18          So if I look at historical experience to get the
19   starting point I think there's different jargon that's been
20   used, but fundamentally there's three pieces that matter, one
21   is what percent of all the individuals in the U.S. that die
22   from mesothelioma will file a claim against the company and
23   we've seen numbers over the last few days, you know, it's 10
24   percent, it's 50 percent, it varies by year, but knowing what
25   percent of the claims will file against the company is a key

1  item.

2        The second is not everyone of those claims will be

3  paid.  So you have to worry about the quality of the claim,

4  whether they can prove their case.  A large percent can be

5  dismissed.  A large percent can be paid and it can vary by

6  year, but you have to know what percent is being paid.

7        The third is once you know who is being paid how much

8  on average are they being paid and it's certainly true that,

9  you know, if you combine the percent of claims that are paid

10 with average indemnity you'll only -- you then have an all of

11 resolution rate.  There's -- mathematically there's no magic to

12 the order that you do it in, but you have to have those three.

13       Now, in addition, it's just not -- it's simple

14 arithmetic that you go through and you look at the last year or

15 two.  I mean I think there's other factors and those factors

16 have been talked about quite a bit over the past few days, one

17 of them is group settlements and what, if anything, does group

18 settlements do your -- to your thought process about what's

19 happened in the future, will it continue -- I mean in the past,

20 will it continue in the future.  So there's a number of issues

21 that you want to look at for group settlements.

22       And, finally, and I wouldn't dismiss this, that I

23 think institutional knowledge and what I mean by that is, you

24 know, people that like myself and others that work in the field

25 deal with enough solvent defendants, enough bankrupt defendants

1 that we follow at a high level what's going on.  We know

2 whether the propensity to sue for lung cancer is increasing,

3 what is the effect of advertising.  Those are the sorts of

4 issues that we're following all the while.

5        And so one of the questions that we tend to ask is

6 whether or not the company is kind of inline with the general

7 trends that we see or whether it's out of line and if it's out

8 of line why and we follow that quite carefully.  So I wouldn't

9 dismiss that at all, and the only reason I'm raising it is that

10 I think it's -- it really is a combination of the company's own

11 historical experience, how you extrapolate it and what else is

12 happening in the asbestos environment and those things together

13 produce your forecast.

14 Q    Now, are you aware of any reliable methodology that

15 doesn't -- that isn't derived in part from the curve of future

16 incidence of mesothelioma deaths?

17 A    Did you -- if you used the word credible in there then I

18 would say no.

19 Q    And, in fact, is it your understanding that for the

20 forecast they've prepared in this case, Drs. Peterson and

21 Mullin, both use some form of extrapolation from the curve of

22 incidence of future mesothelioma deaths?

23 A    Absolutely.

24 Q    Now, let's turn from general methodology to Bondex, and I

25 would direct your attention to Page 8 of your presentation.

1  What are the most significant attributes of Bondex's historical

2  -- or pardon me, the debtors' historical settlements and

3  verdicts?

4  A    We -- on the last slide we went through the most important

5  historical variables which is how many claims are filed, how

6  many claims are paid and the ones that are paid how much are

7  they paid.  This is just laying out a high level overview of

8  those three parameters.

9        So if we look at the two columns on the left the

10  first column is claims filed against Bondex and, you know, as

11  everyone has talked over the last few days it's relatively low

12  in the early two thousands.  So in 2000 and 2002 it's averaging

13  about 326 claims a year.  2003 to 2006 it's starting to grow

14  quite substantially to almost 900 claims a year and then it's

15  been marching up ever since.  So we're, you know, hitting a

16  thousand fifty, 1100 claims in 2008 and so forth.

17        And in 2010, and if you look at the note 2010 is

18  annualized, it's based on five months worth of data, but it

19  looks like something in the neighborhood of 1400 claims that'll

20  be filed and would have been filed in 2010 if not for the stay.

21  Right next to it is a column labeled U.S. incidence -- U.S.

22  incidents and the only -- not the only, to me the most

23  important observation of looking at that column is that the

24  incidence is declining.

25        So for using our forecasting model of the incidence

1  of mesothelioma it's telling us that it peaked probably

2  somewheres around 2003, maybe 2002.  So it was -- if you can

3  think of the incidence of mesothelioma as a bell-shaped curve

4  and at some point it peaks and then it starts coming back down.

5  Well, ours peaks at around 2002 or thereabouts then starts

6  declining.  So as you look at this it's, you know, about 3100

7  in 2007 and by the time you get to 2010 it's about 2900.  So

8  you have this anomaly where -- not anomaly, but you have this

9  interesting fact that U.S. incidence is declining and the

10  claims filed against Bondex is increasing.

11  Q    Maybe we should pause on incidence for a moment.  The

12  Court has heard testimony repeatedly about the Nicholson curve.

13  You've talked a bit about your use of the Nicholson and the

14  Peto curve.  Do you use the same Nicholson curve as the

15  Nicholson curve utilized by Dr. Mullin and Dr. Peterson?

16  A    No, it may be useful to describe the evolution of this.

17  In 1982 Dr. Nicholson produced his report which provided a

18  forecast of mesothelioma deaths over the next 40 years or so.

19  In 1991 we worked with Dr. Nicholson to modify his forecast in

20  a number of minor ways.  I would describe it as tinkering.  Dr.

21  is the -- was, I'm sorry, the expert expert and we made some

22  relatively minor modifications to it and that was used for a

23  long period of time unadjusted, but in the last say 10 years or

24  so we've begun to update that model and that forecast every

25  year and the reason is that people are just living longer and

1  they're living longer because they're not smoking as much, a

2  number of different reasons, but what's happened is that

3  because they're living longer there's more mesothelioma deaths.

4          So the -- and I'm not suggesting that it's a perfect

5  trade off that they're just dying from something different, but

6  the fact of the matter is the longer you live the higher the

7  probability of contracting mesothelioma and that's what

8  happening.  So as we were looking at the -- at -- and I should

9  back up, we -- there's a way to calibrate or to look at how

10 well the forecast is doing because the government produces

11 counts of the number of deaths from mesothelioma every year and

12 what we've seen before we started to update for new mortality

13 rates is that we were way underestimating the total number of

14 mesotheliomas.

15         The original model that I had worked on had

16 mesotheliomas peaking at about 1996 or 1997.  Well, they

17 haven't peaked yet.  So there -- you know, we're in 2010, 2011

18 and it looks like they're finally staying relatively flat, but

19 they have not declined.  So the original model was off by 15

20 years.  It's -- it had it peaking in '97, instead it peaks in

21 2012 -- I'm sorry, two thousand -- yeah, 2012 roughly.

22         The current model as I've said we've updated and now

23 it peaks around 2002 or 2003, but we're beginning to see again

24 that we're underestimating the number of mesotheliomas, that

25 there's something going on and then certainly part of it is

1  people are living longer, but I think there's other factors

2  that we don't quite know that is making the incidence models

3  underforecast the future number of mesothelioma deaths.  I'm

4  not sure if I got off track.  I apologize --

5  Q    All right.  That --

6  A    -- if I did, but it's a -- but the point I think was that

7  we have evolved that model over time and if you look at the

8  three we have what we call the updated model which is updated

9  as of a year ago.  It's -- Dr. Nicholson (sic) uses the

10  original model done in 1982 by Dr. Nicholson and --

11  Q    You said Dr. Nicholson used, were you referring to Dr.

12  Peterson or Dr. Mullin?

13  A    No, I'm sorry.  Dr. Peterson uses the original 1982

14  incidence forecast from Dr. Nicholson.  Dr. Mullin still

15  carries the label KPMG incidence forecast so I presume that

16  it's related to what was done then, but his model still peaks

17  in 1997, and, in fact, what's interesting is that -- or what

18  you observe is that Dr. Mullin's incidence model is 25 percent

19  under the true count for the total number of mesothelioma

20  deaths which is what happens if you're not updating it every

21  year.  So he undercounts mesothelioma deaths by 25 percent.

22  Q    Dr. Vasquez, turning to the other columns on Page 8, did

23  you make any observations relating to the number of dismissed

24  claims, percent paid, average indemnity, any of those items?

25  A    Yeah, I mean I think my -- most of my focus was on the

1  last two columns, the percent paid and average indemnity.  We

2  looked at the percent paid and there's kind of two outliers or

3  certainly two numbers that are quite different than the rest,

4  one in 2009 and one in the very early period, 2000 to 2002, and

5  both cases they were reasonably close to 70 percent or so of

6  the total number of claims that were filed were actually paid.

7  If you get away from those two years you're talking something

8  in the neighborhood of 54, 55 percent of the claims were paid

9  and it's relatively stable.

10        So what happens?  Well, you know, what anecdotally it

11 looks like happened is that early on, just like most

12 defendants, you pay a high percent of your claims and it's --

13 you know, there wasn't that many claims that were being

14 resolved.  If you look at that period 62 of them so it's not a

15 lot, but they were paying 70 percent of those claims.

16        2009 I think is a different story.  2009 is -- has

17 group settlements in there, and as I think has been discussed

18 over the last few days in group settlements a higher percent

19 are paid than they are when they're individually reviewed.  So

20 that has the effect of kicking up the payment rate from

21 something in the mid-fifties to close to 70 percent, but the

22 interesting part though is that when that happens so -- and

23 maybe just as an example if we look at 2008 to 2009, 2008 we're

24 paying about 55 percent of the claims, it jumps way up to 70

25 percent in 2009, but look at what happens to the average

1  indemnity that was paid to those claims.  It was $108,000 in

2  2008 when we only paid 55 percent and then it falls to $80,000

3  when we paid 70 percent and that's kind of precisely what I

4  think everyone has been talking about the last few days which

5  is in group settlements what happens is you pay more, but you

6  pay them -- each one that you pay you pay less.  And as it

7  turns out in a forecasting sense it gives you a great deal of

8  comfort, and the comfort that it gives you is that if you have

9  two variables like percent paid and average indemnity that are

10 moving in opposite directions it stabilizes the average amount

11 that you're paying for every claim that you resolve.

12         So, again, and I'm not sure if I'm saying this very

13 clearly, but what I'm trying to say is that when you pay more

14 of the claims you pay lower dollars, when you pay fewer of the

15 claims you pay higher dollars, but on average it doesn't move

16 very much because those things offset one another.  So that

17 helps a great deal and gives you I'll describe it as comfort as

18 you're doing your forecasting.

19         So those are things that I take from here.  I'm

20 troubled that claims are increasing dramatically in the face of

21 declining incidents, but I know that there may be problems with

22 the incidence forecast and I get a certain amount of comfort

23 from both the percent paid and average indemnity and there's

24 stability each one individually as well as there's stability

25 combined.

1  Q    Now, when you compared the filed claims that appear in

2  Column 1 against the resolved claims did you make any

3  observations about the impact on inventory?

4  A    I'm sorry.  I didn't understand that.

5  Q    Yeah, I spoke too quickly.  I'm sorry.  When you compared

6  the filed claims to the resolved claims did you draw any

7  conclusions about the impact of the inventory of unresolved

8  claims?

9  A    I'm sorry.  You're exactly right.  The -- as you -- one of

10 the things that you clearly do want to pay attention to is

11 whether or not resolutions are keeping pace with filings or

12 whether or not what's really happening here is that you're

13 resolving at a much slower rate and you're just building up an

14 inventory of unresolved claim.  Unambiguously Bondex is

15 building an inventory of unresolved claims.

16 Q    And, Dr. Vasquez, now I'd like to focus your attention on

17 the note which says Bondex claims filed as annualized for 2010.

18 Did you have complete data available to you for the entire

19 calendar year of 2010?

20 A    No, I did not.

21 Q    What data did you have?

22 A    I had data through the end of May of 2010 and I would

23 probably describe it as kind of partial data through the end of

24 May.  It wasn't -- I'm trying -- what I meant to say was that

25 the data through the end of May was not complete.

1  Q    Let's flip for a moment to Page 10 if you would, Dr.

2  Vasquez.

3  A    Perhaps I should -- it would be useful just to back up for

4  one second which is as I was starting to say I was of -- the

5  thing that I was probably most concerned about in looking at

6  the history is that I'm seeing an increase in the filing of

7  mesothelioma claims while incidence is going down and I'm in a

8  sense desperate to understand whether that's continuing in

9  2010.  I want the most recent information I could possibly

10  have.

11        There are issues with how you deal with a part year

12  and the issues become quite complicated which is what this

13  slide is getting to, but I think in this case that it is an

14  important enough issue to understand whether or not claims were

15  falling or leveling off that I do not want to discard the

16  information that was in 2010 and I'm saying this because I

17  think it's very, very important that I get some idea of what's

18  happening in 2010.  I'm certainly not going to do it if I can't

19  trust the data that I have, but I think it became very

20  important to me to have a general idea of whether or not claims

21  were increasing or not again because as we look at -- well --

22  as we look at the --

23  Q    Perhaps we should look at --

24  A    -- at the claim count -- well, perhaps I'm beating this to

25  death.

1  Q    I'm switching you around here.

2  A    The entire issue here is is that to me it was very

3  important that I understand what's happening in 2010 and when I

4  casually looked at the first five months it looked like it was

5  dramatically increasing again over what happened in 2009 so I

6  wanted to have a complete year.

7  Q    Okay.  So let's -- I'm confusing these slides.   I

8  apologize.  So let's start with Number 9.

9  A    I think I'm getting you all out of order here.  The --

10 Q    Okay.  And --

11 A    Here this is -- this depicts filings in 2010 and we have

12 an electronic database that was supplied to us by the debtor

13 and if I just did a tabulation of claims filed in 2010 there's

14 437 claims, mesothelioma claims on the database, but, and this

15 is not unique to Bondex at all, it's not unique to Verus, their

16 claims processor, there's a lag from the time that a claim was

17 filed until it gets entered on the database for all the reasons

18 you might think.  It takes time to type it in.  It has to go

19 from local counsel's office and to Verus' office.  It has to

20 follow a path if you will.  So every claim processor there's

21 always a problem in how you deal with very recent data.

22         We estimate, and I'll show how we estimate it in a

23 minute, that the 437 was a pretty dramatic undercount of how

24 many claims were actually filed by the end of May.  We think

25 that there was another 165 claims, that had the debtor remained

1  solvent and continued the process.  In September and October of

2  2010 I look back to how many claims were filed by the end of

3  May I think it would 602 claims, that would be 437 on the

4  database, another 165 for a total of 602.

5          Once I have that number for the claims filed through

6  the end of May that's five-twelfths of the year and so the

7  remaining year would be about another 800 claims for a total of

8  1400 claims.  And that extrapolation to the full year is

9  another thing that we tested, and the issue was if you look

10 back in time how stabilize is the relationship between claims

11 filed January through May to those filed through the end of the

12 year and it was terrifically stable.  So there wasn't any kind

13 of seasonality that was involved.  It was pretty even filing

14 through the entire year and that happens every year in the

15 past.  So I felt very comfortable with annualizing and that's

16 how we produced 1430 claims, but I think the key is explaining

17 the derivation of the 165 claims.

18 Q    Let's turn to that, does Page 10 illustrate how you

19 determined the hundred and sixty -- pardon me, the 165 claims?

20 A    Yes.

21 Q    And explain to the Court --

22 A    We received --

23 Q    -- how you determined it was appropriate to add to the

24 database through May an additional hundred -- an estimated 165

25 claims.

1  A    We received two databases from the debtor, one was a cut

2  of the database at the end of April of 2010 and the second was

3  a cut of the claimant database at the end of May, so we able to

4  compare the number of claims in two points of time.

5        If you look at the first column of this table that's

6  labeled April database when we looked at the April database

7  there was 80 claims that were filed in January, 89 in February,

8  109 in March and then fell dramatically to 25 in April.  Of

9  course, there was nothing in May because this was a database at

10 the end of April.  So the 25 first of all looks pretty

11 suspicious, right?  We're running along at 90 to 100 claims a

12 month and then it falls to 25.

13       We then get an end of May database, which is the

14 second column in this table, and interesting enough January is

15 now 83 mesothelioma claims, it went up by three, February is

16 96, it went up by seven, March is 121, it went up by 12, and

17 April, that funny looking month with only 25 claims in it is

18 all of a sudden 110 claims, it went up by 85 claims.  And if

19 you look at the bottom row of this table where it says total

20 January through April when we did the April database there was

21 only 303 claims, when we looked at it again through the same

22 period of time, through the end of April, the May database

23 tells us it's 410 claims.  So in one month's time we added 107

24 claims to the database, all right, and that's solely for the

25 period through April.

1          And, again, nothing wrong with the way that Verus or

2   the debtor was processing claims.  We see this with every

3   defendant there is.  I mean it's -- there's always a lag and

4   then we got the -- you know, I looked further at the filings in

5   May under the May database, even though it says May data data

6   we meant to say May database, and we get that same funny

7   looking number.  You know, in May -- in the April database

8   April was 25.  I look in May and in the May database it's 27,

9   same thing that we saw in the prior month.  And given what we

10  know about every other solvent defendant, given this data it

11  tells us a lot about what we need to do to adjust the total

12  number of claims for the end of May.

13         And, again, we're asking the question, if we were

14  looking -- you know, if we were sitting here in October,

15  November, December of 2010 and we looked at all the claim

16  filings by the end of May how many claims would there be, and

17  what this is saying is that if I had database cut at the end of

18  June I'd see another 107 claims and if I had a database at the

19  end of July I'd see another 20 and so forth and when I add them

20  together I get the 165.  That was on the prior table if you put

21  that -- if you could just put that back for a second.

22         So all this is is it just recognizing the obvious

23  fact that it takes a while to process the claims.  We happen to

24  have not only kind of overall institutional knowledge about

25  what that lag is, but we got the lag specific to Bondex.  So it

1 was a relatively straightforward adjustment, and that's the

2 derivation of the 165 claims that gives us a total of 602

3 claims filed against the company through the end of May.

4 Q    Now, Dr. Mullin has testified to utilizing a fiscal year

5 approach ending with May 31st.  Do you know how Dr. Mullin

6 treated the May claim count for his forecast purposes?

7 A    He assumed that the 27 that was sitting there for the

8 month of May was the right number, and so he did not -- I mean

9 probably the more direct answer is he did not include 165

10 claims that I did.

11 Q    And, Dr. Vasquez, there's been a lot of discussion this

12 week about group settlements.  Did you analyze the group

13 settlements for the debtors in the context of your work here?

14 A    Yes, I did.

15 Q    And is that what's reflected on Page 10?

16            THE COURT:  Page 11?

17            MR. HARRON:  Pardon me, Page 11.  Thank you, Your

18 Honor.

19 A    That's a bit of a summary.  I mean I think we did a lot

20 more than what's presented on this table.  The -- you know, as

21 you look at the last three to four years of the company's

22 resolutions, and I think this was testified over the two --

23 over the last few days, half of the resolutions and almost

24 three-quarters of the dollars were associated with these group

25 settlements from these three firms.  So one issue that was very

1  clear is that group settlements are playing are pretty

2  important role in resolutions over the last three, four years.

3       The second and I would like to point out is that I

4  limited this table to the three law firms simply to get in

5  lockstep with Dr. Mullin and his analysis, but the fact is that

6  there are hundreds of other claims that were certainly by any

7  appearance seem to be resolved in groups, I mean in fairly

8  large numbers.  When you have 50 to 100 claims resolved by the

9  same attorney on the same day, similar amounts, it looks and

10 smells like a group.  so I'm not sure why one would exclude

11 those from your count of groups, but, again, just to try to

12 stay on the same path as Dr. Mullin I've limited this table to

13 the three law firms.

14       I think the -- I mean the counts are somewhat

15 interesting.  The -- but what I'm trying to do here is compare

16 the parameters for a group settlement with the parameters for

17 non-groups or individually reviewed I guess.  So if we look at

18 the column labeled percent paid, and this feels so repetitive

19 from everything I've -- I know you've listened to it, I

20 apologize for this, but 90 percent of the claims resolved in

21 groups are paid, and then when you go to non-groups only a

22 third or thereabouts are paid, dramatic difference.

23       And -- but if I look at the last two columns that are

24 -- that's labeled average settlement amount, if we look at the

25 very last column where it says paid only those -- that's the

Vasquez - Direct/Harron                107

1    average paid solely to the claimants that were paid an amount.

2    So it excludes anyone that was dismissed.  And we look at group

3    settlements on average paid about $78,000, for the individually

4    reviewed, I guess for the non-groups or for the groups in these

5    law firms 217,000.

6              THE COURT:  Wait.  I'm sorry.

7              THE WITNESS:  Yeah, I apologize.  In the bottom

8    right-hand corner where it says $217,000.

9              THE COURT:  Yes.

10             THE WITNESS:  That is the amount paid on average to

11   claims that were resolved that were not in these three groups

12   --

13             THE COURT:  Okay.

14             THE WITNESS:  -- not in the groups by these three law

15   firms.

16   A    The amount paid on average to the claimants in these three

17   law firms settling groups was 78,000 which is the number right

18   above the 217, but we know that there's a dramatic difference

19   in the percent that was paid and what we really are interested

20   in is for all the claims resolved, whether they're dismissed or

21   not dismissed, how much on average did you pay and that's what

22   the all resolution column is trying to show which is the

23   average for the groups is $70,000 and all that is is it says I

24   paid $78,000 to the ones I paid, I only paid 90 percent, so if

25   I take 90 percent of 78,000 I get 70,000.  That's -- it's a

1 pretty simple arithmetic exercise.

2          THE COURT:  In other words the -- all resolutions

3 include the claims that would have been dismissed --

4          THE WITNESS:  Exactly right.

5          THE COURT:  -- as part of that settlement.

6          THE WITNESS:  Exactly right.  Exactly right.

7 A    And then I do the same thing for non-groups because the

8 issue that's been raised over and over here is that, you know,

9 we've been -- that we were paying a premium to resolve group

10 claims, and I look at the data.  I have the -- I believe I have

11 the right count of the number of claims.  I've got the right

12 law firms.  I've got -- you know, I know they're in the

13 settlement agreements.  I do the calculations for all of those

14 and it comes to $70,000 and then when I look at the non-groups

15 it comes to $80,000.

16          So I'm not quite sure whether it's a time frame

17 that's different.  There's something that's different, but to

18 me the difference and the point of this table is not that

19 groups are lower than non-groups, what the point of this table

20 is for me is that it doesn't matter very much.  I mean, you

21 know, it's -- I certainly understand that the payment percent

22 is different, the amount that's paid to guys are different, all

23 of those things are different.  Bottom line I don't -- it

24 doesn't matter to me whether it's 70 or $78,000.  To me those

25 are the same numbers.

1        I've got so many other things that are different

2   between these claims.  I've got differences in exposure.  I've

3   got differences in ages.  There's tons and tons of

4   characteristics all of which would easily explain a $9,000

5   difference between these two.  I think it's a non-issue.  So I

6   mean the bottom line is I think for me on group settlements is

7   that a very large percent of their activity over the last three

8   or four years, but I don't care.  I mean it just doesn't really

9   matter very much.

10  Q    Let's --

11       THE COURT:  And what period of time are you looking

12  at on this chart?

13       THE WITNESS:  This I did every -- all the claims from

14  the beginning of time.  I include every claim resolved by

15  Bondex.

16  Q    Let's talk about PIQs for a moment.  Did you use any of

17  the data from the personal injury questionnaires as part of

18  your forecasting work here?

19  A    Yes, I did.

20  Q    And how did you use the PIQ data?

21  A    It's hard to use it, but because it -- I mean it provides

22  additional information about whether they were exposed and all

23  of those sorts of things, but you don't know what they would be

24  paid.  So it has a limited usefulness, but it does have some,

25  and for me the biggest issue was whether or not when I look at

1 the inventory is the inventory more or less of the same quality

2 as what I've paid in the past or is it junk.  And I think we've

3 heard that, you know, as the propensity to sue goes up

4 everything is turning into dismissals and if that's the case

5 then the quality of the inventory of claims must be pretty

6 poor.

7           And there's -- as we talked before there's about 2300

8 pending claims and I got responses, PIQ responses with

9 letters, so some response in about 88 percent of the cases.  So

10 there was -- the response rate was reasonably high, but in 88

11 percent of the cases there was a response and not every one of

12 those you would expect are quality claims, but of the 2300 1700

13 of the claims asserted that they were still meso and also

14 asserted that they had exposure to Bondex.  So 1700 out of the

15 2300, which is somewheres in the neighborhood of three-quarters

16 of all the claims, had those -- both of those characteristics

17 and I can't sit here and tell you that all of those would be

18 paid.  I just don't know the answer to that question, but I do

19 know that 75 percent having some exposure to Bondex places them

20 in roughly the same quality as the claims that we've resolved

21 in the past.

22           And so the way that I used the PIQs was -- they

23 didn't information on how much would be paid, didn't give

24 information on dismissal rates or anything else, but it gave me

25 -- you know, I'm beating this words to death I think, but it

1  gave me comfort at least that the inventory was not

2  deteriorating, that it looked quite similar to the claims that

3  were closed in the past, and that's what this table is trying

4  to depict which is if we look at pending claims and future

5  claims -- well, I'm sorry, if you look at the historical

6  average of pay rate and you looked at the time period 2008 to

7  2010 about 63 percent of all the mesothelioma claims resolved

8  were paid, the other 37 percent were dismissed.  If you look at

9  a more recent time period, 2009 to 2010, it's 67 percent, but

10 it's not that different, right, so we're paying 67 percent of

11 the claims and 33 percent are being dismissed.

12          Now, how do I look at the PIQs?  Well, I don't have

13 those percents that's for sure, but what I can do is, as I said

14 before, look at how many still assert that they're meso, which

15 would be pretty important if you're going to be paid as meso,

16 and secondly do you have exposure and that's what the percents

17 down here.  So if I solely based the pay rate by taking every

18 PIQ claim that still asserted they were meso and asserted that

19 there was some Bondex exposure it would be about 78 percent of

20 the claims would be paid, and if I use 2009 to 2010 about 80

21 percent of all the claims would be paid.  It's in excess of the

22 historical average, but, again, I don't know how many of those

23 will find a way through the filter, could actually prove their

24 evidence or whatever.

25          In order to kind of -- and a bit to test the

1  sensitivity of that assumption I said that what if I excluded

2  it, if I start with all of the claims that say that they were

3  exposed, they had exposure to Bondex, but I excluded all the

4  ones that had minimal exposure, and we define that to be 10 or

5  12 percent of your total exposure, and we said none of those

6  would get paid I'm still at 69 percent and 71 percent, so I'm

7  still in the same ballpark, a little bit better than what I've

8  done historically.

9          So the -- independent of how I look at this with the

10 caveat that ultimately I don't know who's paid and who's not

11 paid from the PIQs the only thing I know is that when I look at

12 it and I throw out claims that have minimal exposure I'm right

13 in the ballpark of historically what's been paid.  So my

14 conclusion was that the inventory looks as solid as

15 historically resolved claims.

16 Q   After you look closely at historical data, observe trends,

17 tested observations with PIQs, could you describe the manner in

18 which you selected your key forecasting parameters, and I'll

19 direct your attention to Page 13 of the exhibit?

20 A   Okay.  Most of these numbers have -- or most of these

21 values have appeared on earlier slides, but -- which -- and I

22 say it at the very beginning that the propensity to sue which,

23 again, the propensity to sue is just taking historical claims

24 filed and dividing it by our estimated incidence, the

25 propensity to sue, positive pay amounts, the amount paid to

1  claims that were actually paid and the pay rate are the three

2  drivers and we need a starting point, and the starting point is

3  generally a tough issue, you look for -- in my mind you look

4  for the most recent years that you can find unless there's some

5  reason that you expect there's something in there that is not

6  sustainable.  And as we look at the bottom here I've computed

7  averaged over three different time period, '07 to -- 2007 to

8  2010, '08 to '10 and '09 to '10 and, you know, there's -- it's

9  not perfectly stable, but it's not dramatically wild either.

10      If I start out with the first column which is

11  propensity to sue, and I'm not sure if I stated this the same

12  way a few minutes ago, but, you know, there was discussion over

13  the last few days of the fact that if you look at the

14  propensity to sue it keeps going up and if you extrapolate the

15  line it gets to above 100 percent.  All right.  And the

16  implication of that in the discussion was that, you know,

17  there's something going on that's going turn around and stop.

18      Well, there's another arithmetic part to that which

19  is -- which relates to what I was talking about earlier on the

20  forecast of incidence.  If we're consistently underestimating

21  future incidence the propensity to sue is going to go up,

22  right, because we're computing a propensity to sue on claims

23  filed divided by our estimate of the number of mesothelioma

24  claims.  If the forecasting model is underestimating that total

25  then the propensity to sue is going to go up as a pure

1 arithmetic answer.  It has nothing to do with what's happening

2 in the real world at all.  We're just doing a terrible job at

3 forecasting incidence and that's part of what's going on here.

4          So the discussion that talks about taking a straight

5 line and exceeding 100 percent I think is a little -- well, a

6 lot naive.  That what we're really -- my guess is what we're

7 really looking at over the last few years is not advertising,

8 not a lot of that stuff; a great deal of it, a significant part

9 of it has to do with the fact that we're underestimating the

10 incidence of mesothelioma.

11          If Dr. Mullin's model underestimates mesothelioma by

12 25 percent it has a big effect on what's happening to the

13 propensity to sue, and the only point being that you don't want

14 to confuse what's happening in a litigation environment and

15 advertising and all of that with the mis-estimate of incidence.

16          And -- so when I look at the numbers while they

17 appear to be unstable for the propensity to sue some part of it

18 unambiguously is due to the forecast of incidence and so I'm

19 less concerned than I otherwise would be.  What it

20 unfortunately tells me is that my futures forecast is too low

21 and it's too low because my incidence is falling off too

22 rapidly.  My incidence is not falling off as poorly as -- I'm

23 not -- I don't quite mean this the way it's going to come out,

24 it's -- the other two incidence forecast fall off much quicker

25 than mine is I guess the kind way of saying it.

1          So -- and that's why I spent so much time on how many

2    claims were filed is that I do feel strongly about this

3    incidence forecast which I think is just not being done very

4    well.

5    Q    And taking all those things in to consider what did you

6    select as the most appropriate calibration period for your

7    work?

8    A    I just took it in the middle.  I took 2008 to 2010, 42 and

9    a half percent.  So I'm -- you know, I mean it certainly went

10   up to, you know, 40 -- almost 49 percent in 2010.  You know, I

11   understand that, you know, part of 2010 was an estimate of mine

12   so it's not final and so I didn't want to give that too much

13   weight.  So I gave kind of an equal weight to the -- you know,

14   36 percent that we see in 2008 and equal weight to the 42 and a

15   half percent in 2009 and an equal weight to the 49 percent in

16   2010.  And to a large -- so what happens is that '08 and '10

17   kind of balance one another out and I end up using the average

18   that holds for 2009.  Excuse me.

19   Q    And then positive pay, average indemnity, the amounts you

20   used for them?

21   A    Yeah, similar logic.  There's not a lot going on in the

22   last three years or so on the combination of positive pay and

23   pay rate.  And we talked before about the fact that even though

24   the positive pay declines to 80,000 we're paying 70 percent of

25   the claims.  So if I'm looking at the overall cost to resolving

Vasquez - Direct/Harron                    116

1  including dismissals it's not moving that much and relatively

2  stable.   So I think there's comfort in those two choices.   I

3  think that the problematic area is propensity to sue.

4  Q    And then the pay rate?

5  A    I'm sorry.   What I attempted to do and I don't --

6  Q    Did you cover them both?

7  A    -- I guess I didn't do it very well is that I was trying

8  to --

9  Q    Yeah.

10  A    -- combine pay rate and average indemnity together which

11  is the way I think you need to think about those.

12  Q    And the averages for 2008, 2010 that are depicted here

13  those are the values that you used to generate the forecast,

14  your forecast here?

15  A    That's correct.   That's correct.   So in the extrapolation

16  period 42 and a half percent of all of the mesos will file a

17  claim against the company, 63 percent of those will be paid and

18  the ones that are paid will receive on average $93,000.   That's

19  a starting point for the extrapolation or for the forecast.

20  Q    Now, I'd like to shift focus again --

21            THE COURT:   Wait one second, please.

22            MR. HARRON:   Pardon me, Your Honor.

23            THE COURT:   Forty-two and a half percent of all

24  mesos, is that correct, will file claims against the debtor?

25            THE WITNESS:   That's correct, and 63 percent of those

1  will be paid.

2              THE COURT:  And the average will be the 93,000?

3              THE WITNESS:  That's correct.

4              THE COURT:  Okay.  Thank you.

5  Q    And you've already testified that you've compared your

6  forecast to the forecast of Dr. Mullin.  I'd like to spend some

7  time talking about that comparison.  I direct your attention to

8  Page 14.

9  A    Yes, I have it.

10 Q    And can you please describe the differences, the material

11 differences you identified between the two forecasts?

12 A    I mean probably the best way to understand how experts are

13 thinking about the issue is to produce something that starts

14 with their estimate and then sequentially item-by-item walk

15 through and alter their assumptions and that tells you in a

16 dollar way how much each one of the assumptions affects the

17 total and explains the difference between your estimate and the

18 other experts.  What this table is doing is it selected some

19 categories, it starts with Dr. Mullin's forecast which we saw

20 earlier is $160 million and all of these are nominal numbers.

21 Q    From the -- for the benefit of the Court is the 160

22 million the amount referenced here on what's been marked D-48

23 that was the subject of Dr. Mullin's testimony?

24 A    Yes, it is.

25 Q    Okay.  So we started with the 160 million to which Dr.

1  Mullin testified.

2  A    All right.  So the first thing that we did was to

3  re-engineer Dr. Mullin's estimate of limiting joint and several

4  to solely several liability and that has the effect -- would

5  have the effect of increasing his forecast by $305 million and

6  I may have said that poorly.  What I'm trying to say is that

7  Dr. Mullin assumes that several liability will hold and

8  generate as 160, now we're going to eliminate that assumption

9  and that adds $305 million.

10 Q    Okay.  And let's --

11 A    The second --

12 Q    -- discuss briefly how you calculated --

13 A    Sure.

14 Q    -- the 305 million and that's on Page 18, and where does

15 the 305 million come from?

16 A    Well, we're trying here to follow Dr. Mullin's approach

17 and if you recall he split compensable claims into three

18 categories, high value, medium value and low value and he had

19 all the kinks and the flat lines and the slopping lines and all

20 of that.

21       If we look at this table for the category for the

22 highly paid claims with the several adjustment in place he

23 estimates that high-value claims are worth or would be paid

24 $120,000 each.  If we eliminate his adjustment to take those to

25 several it would go to $400,000.  So a $280,000 increase in the

Vasquez - Direct/Harron                          119

1   payment going to that claimant from eliminating his adjustment

2   for several.  And his adjustment for several you recall was a

3   very high level adjustment that said it's 70 percent and that's

4   all that this is.  I mean there's no magic to it.  If you start

5   out with $400,000 and you reduce it by 70 percent you end up

6   with 120,000.

7           He did the same thing in the mid-level so he gets to

8   -- he goes from 15,000 to 50,000.  And the reason that there's

9   nothing in the low level is that at this point he still has

10  implicit defense in his estimate and implicit defense -- and

11  his implicit defense argument says there's no indemnity for the

12  lowest group, that those are all implicit defense dollars.  So

13  there's no effect there.

14          The bottom line for all of his compensable claims is

15  that with the several adjustment in there he's paying $29,000 a

16  claim approximately, that would increase to a hundred and --

17  almost 105,000 for an increase of $75,000.  You take $75,000

18  times the number of his claims which is about 3700, you have to

19  add pending claims in there, but you get to 305 million which

20  is exactly the number that we have on the prior table.

21  Q    And that as a percentage?

22  A    So about 21 percent of the reduction.

23  Q    Okay.  And let's talk about the 235 million, what's that?

24  A    That's his implicit defense cost and there's another slide

25  that maybe we can skip, but for implicit defense he had argued

1 that there is --

2         MR. HARRON:   Slide 19, Your Honor.

3 A    For implicit defense he had a different estimate of

4 implicit defense for each one of his high, medium and low.

5 Starting with low which is the easiest one none of it was

6 indemnity.  It was all implicit defense.  So it starts out at

7 zero.  The average is about $25,000 and -- within that group.

8 So if you got rid of implicit defense they now start being paid

9 $25,000.  You do the same thing for a high and middle and you

10 get differences of 75,000 and 70,000.

11         The overall average across all three of his groups is

12 about $57,000, you again multiply it by his 3700 claims and you

13 get $235 million, the same number that we have on the earlier

14 slide.  And if I now take his starting point of 160 million,

15 add in the 540 million for eliminating several and implicit

16 defense I get to $700 million which is the number that he

17 provided --

18 Q    It's the number that appears here --

19 A    It's been a long week, yeah.

20 Q    -- on D-48?

21 A    On whatever day it was.  So that's the derivation if you

22 will of his $700 million, but he went on to add another

23 component of implicit defense and I have to admit until the

24 testimony I was -- I did think that there was just the 235

25 million, but it became very clear that in his treatment of

1 group settlements that that was an attempt to get rid of the

2 defense savings, as he described it, that was attributable to

3 group settlements.  So if you relax that assumption and now you

4 include group settlements in his estimate you get rid of that

5 additional component of implicit defense, which was worth about

6 $155 million.

7 Q    So, in essence, this is -- you describe this as additional

8 implicit defense costs from Dr. Mullin's treatment of group

9 settlements $155 million.  So, in essence, this is an implicit,

10 implicit defense cost that's in Dr. Mullin's forecast?

11 A    Yes, yes.  Thanks.  But it does mean that implicit defense

12 is really the sum of 235 million plus the 155, so it's about

13 $390 million of implicit defense.

14 Q    And if you add the 155 million of the group settlement

15 implicit defense to the 700 million, that brings you to your

16 855 million number?

17 A    Eight hundred and 55 million.  So, the 855 is simply his

18 700 million, and then adding back this additional component of

19 implicit defense.

20 Q    Against your forecast of 1 billion 598 million for a

21 difference of 743 million, right?

22 A    So even after all of those adjustments, we're only halfway

23 there, right?  We went from 160 to 855.  Eight fifty-five, and

24 that's about half of the difference.

25 Q    Let's discuss the rest of the difference.

1          MR. HARRON:  Your Honor, I'd direct your attention to

2   Page 50.

3          THE COURT:  Okay, thank you.

4   A    What this table does is, it could have easily been put on

5   the last table, except there's too many numbers and the table

6   is too long, so we separated it out, to explain what remains.

7   There's $743 million that remains as a difference between his

8   number and my number.  He has 855 million, I have 1.6 billion.

9          This is an attempt to identify the differences and --

10  or the dollar amounts resulting from the differences in

11  assumptions.  We've been talking a lot about incidence curve.

12  And the different between the incidence curves that I use, and

13  my incidence curves are both KPMG Nicholson, as well as the

14  Peto approach, and what Dr. Mullin uses is about $215 million.

15         And let me try to backup for a second and give some

16  context to this.  When we talk about the two steps being, get a

17  starting point and then extrapolate, it's what I'm trying to do

18  here.  So if I look at the first two rows incidence curve and

19  inflation, that's the extrapolation piece and propensity to sue

20  pay rate and miscellaneous, that's really the starting point

21  issues and I'm trying to bifurcate them that way.

22         So I start out with the first, which is the

23  extrapolation piece, I look at incidence curve, $215 million.

24  So is 855, if you add it back, what I believe is at least a

25  step towards the appropriate incidence curve, you're at a

1  little over a billion dollars, right?  You're at a billion,

2  seventy million.  That's just taking the 855 and adding the

3  215.

4        The second line I have here labeled as inflation.  In

5  Dr. Mullin's original estimate, he escalated average indemnity

6  amounts by one percent a year.  He starts out with an inflation

7  rate of two and a half percent, but he says that age affects it

8  by one and a half percentage points and the net effect, then,

9  is one percent.

10       In his --

11 Q    I'd like to pause for a minute.  So it was one percent in

12 Dr. Mullin's report and did that change in the context of Dr.

13 Mullin's testimony that you heard this week?

14 A    Yeah.  He changed it from a one percent escalation rate to

15 zero.  And I'm not -- I don't understand why, but he did.

16 Q    And is that the impact of the 1.9 percent that's reflected

17 on Exhibit D-47?

18 A    I think it's fair to say that in the work papers behind

19 Dr. Mullin's original report, that he had both the one percent

20 and a 1.9 percent in those work papers.  If it came across I

21 was suggesting that there was something hidden, I didn't mean

22 that at all.  But what I do mean is that in his report and in

23 his forecast, the way he describes it, is that I have two and a

24 half percent inflation, I'm going to offset it one and a half

25 percent for the aging effect.  And I'm going to continue to

Vasquez - Direct/Harron                                    124

1  escalate things at one percent a year, going out into the

2  future.  And that's what he altered, going to his recent

3  testimony.  He dropped the one percent escalation and made it

4  zero.  So he has no increase in settlement amounts at all which

5  tells you that if you start out paying $90,000 today, in 2012,

6  that when he reaches 2050, he's still going to be paying

7  $90,000 for mesothelioma.  I mean, that's basically what his

8  assumption is.  And so, what is 90,000 worth in those dollars,

9  I didn't compute it but it's got to be in the $20,000 range or

10 something.  I don't know what the number is.  So I find it a

11 bit foolish, I think.

12          And so what that row does is, it said, let's put the

13 one percent inflation back in.  So, it would just take him back

14 to where he was in his original report.  That would add 138

15 million.  So now we have 855 million, which we started with, we

16 add the 215 million for the incidence curve effect, we add 138

17 million for inflation and we're at something.  We're at --

18 Q    One point -- pardon me, one billion, two hundred and eight

19 million?

20 A    So about 1.2 billion.  We then get to the -- and so, those

21 two pieces really define the differences in the escalation over

22 time.  Now we have a couple starting point issues.  And I'm

23 going to start with the easier one for me which is

24 miscellaneous.  I almost don't know what that is.  I mean, and

25 the difficulty is that when I try to do tabulations of the

1  database to match what Dr. Mullin has for counts and for

2  average dollar amounts, were always different by a little bit.

3  So that's one problem.

4        The second issue is that as he does calculations and

5  work sheets that are very, very precise so they say 13.2

6  percent, he then gets to his report and say, ah, let's just

7  make it 15 percent.  And so, I can't model that and so all I

8  can do is lump it into a category that says, basically, I don't

9  know.  And that's the 98 million.  So, so easy to explain, but

10  impossible to do.

11        The line right above that, propensity to sue pay

12  rate, is quite complicated.  But the short, bottom line version

13  is that the way that Dr. Mullin does it, it appears as though

14  he is using the equivalent of propensity to sue that takes you

15  back to roughly the '06, '07, '08 period.  So he's selecting a

16  period of time that is back, and as we look at these charts, we

17  know the propensity to sue is going up.  So if I'm using a

18  calibration period eight to ten, and he's using one that is

19  six, seven, eight, there is a pretty significant difference

20  because there's a pretty significant difference in the

21  propensity to sue.  That adds $291 million.

22        That, at kind of a high level, explains why we're

23  different.  I do not, you know, I do not believe his incidence

24  curve. I find it incredible that there's no escalation in

25  average settlement amounts.  And I absolutely do not believe

1  that you go back to earlier years for the propensity to sue.

2  And miscellaneous, I have no idea.

3        So I think that if -- a reasonable adjustment to his

4  number has somewhere, you know, in the $1.5 billion range

5  nominal.

6  Q    Okay.  And that nominal on -- the next two slides are --

7        THE COURT:  May I ask a question before you get

8  there?  The propensity to sue issue, if I understand it

9  correctly, is that the starting point, essentially, affects the

10 end point, because where you start on the incidence curve,

11 regardless of which incidence curve you use, affects where they

12 peak and then the ultimate end of any suits would be.

13       THE WITNESS:  You have it exactly right.

14       THE COURT:  Okay, thank you.

15       THE WITNESS:  Exactly right.

16 Q    Dr. Vasquez, that was nominal.  Let's go very quickly

17 because we do have -- we're running the clock.  Let's go very

18 quickly to Slide 16 and just briefly describe what Slide 16

19 shows.

20 A    This is the same slide as we saw before, but I've

21 converted it to a net present value.  So we saw that -- and

22 probably the best number to start with is if we go to the 575

23 million that is labeled in this table as after special

24 adjustments, so that means after several liability and after

25 his first attempt at implicit defense, that's a 700 million

1  nominal.  That's 575 million present value.

2          As you march your way down through the table, and you

3  eliminate the second component of implicit defense, it

4  increases to 662 million.  So his 662 is what's comparable to

5  my $1.1 billion.

6          And I think I went through that too quickly.  And I

7  apologize, but basically, I think once you take out several and

8  you take out implicit defense in both its forms, then you're at

9  the difference of 662 million versus my 1.1 billion.  And the

10 next slide tries to explain, or gives you the present value

11 explanation for the difference, the remaining difference, which

12 is 662 million is where we left him on the prior slide, to my

13 1.1 billion and there's the components, about 130 million

14 incidence curve, 84 million inflation.

15         So if you took those two and only those two which I

16 would describe as the extrapolation component, that adds to

17 what, 214 million which would take you up to almost $900

18 million of present value if you just dealt with those two

19 issues.  And then the remaining propensity to sue and the thing

20 I don't know what it is, is the remaining difference.

21 Q     But when you add in the propensity to sue, the 176, that

22 brings you up to a billion, fifty-two million, approximately?

23 A     That's right.  So it rounds to 1.1 billion, right.

24 Q     Okay.  And did you -- let's turn to Slide Number 20,

25 please.  And what does -- what aspect of your work does Slide

1  20 depict, or Page 20, pardon me.

2  A     All right.  So part of 20 is -- we've seen before, right?

3  We have the blue and whatever other color bars on them, the

4  left representing history.  And on the right we have the

5  futures forecast.  And if you recall on the slide that we had

6  before, the yellow portion, which represents Dr. Mullin's

7  forecast was hardly visible down in the bottom.  Right here

8  where it says $120 million or $160 million, I guess.  What this

9  is now depicting is what Dr. Mullin's forecast would be if we

10 eliminated several and we eliminated the two components of

11 implicit defense.

12        So it moves up not surprisingly, it moves up

13 substantially.  It's still below what you would expect to see

14 from the historical bars that are on this chart, but it moved

15 up substantially.  Then I layered on top of that my forecast of

16 the $1.4 billion of future.  So that's really the same curve as

17 we saw on the earlier chart, no difference at all.

18        And then, and perhaps inappropriately, I added to

19 each one of those bars what would be added to get to Dr.

20 Peterson's high forecast.  And all this is trying to depict is

21 that Dr. Peterson's high forecast is the highest of all three

22 forecasts.  We're relatively close to Dr. Peterson and then

23 further down the chain is Dr. Mullin's forecast.  But it gives

24 you, I think, a nice visual sense of how it stacks up against

25 history.

1  Q    Now, when you referenced the exclusion of the implicit

2  defense costs and I'll refer you back to Page 14, the 721

3  nominal that was on Page 20, does that included adding back in

4  the implicit defense costs that's implicit in his treatment of

5  group settlements?

6  A    Yes.

7  Q    Now, let's talk for a moment about implicit defense costs.

8  You've read Dr. Mullin's report, you've heard him testify, did

9  you consider and evaluate Dr. Mullin's implicit defense

10  reductions?

11  A    Yes, I did.

12  Q    And did you reach any conclusions about them?

13  A    I have issues with both the theoretical foundation as well

14  as the empirical estimation.  I really -- I mean, I've gone

15  through the literature as well and the literature really

16  doesn't, to a large extent, deal with many of the issues that

17  we have here, which is a defendant with, you know, thousands of

18  plaintiffs filing against it.  Most of the literature is

19  one-on-one, two people negotiating.  So, I don't get much

20  comfort from the literature on this issue at all.

21       But to me, and probably even much worse, is that the

22  empirical component, I think, is ill-founded and not very

23  stable.  And if you alter things in a minor way, the models and

24  the estimations just blow up.  And we listened to some of that

25  from Dr. Peterson yesterday.  We had done, actually, a similar

Vasquez - Direct/Harron                                    130

1  exercise on CCR data and Dr. Mullin in his testimony here had a

2  chart from the CCR that dealt with non-malignant claims and

3  there was big bubbles.

4       But in his original report and his work papers, he

5  also worked on mesotheliomas for the CCR as well.  So he did a

6  similar analysis there.  And --

7  Q    Is this your analysis on Page 22?

8  A    Yes, it is.  But to continue with Dr. Mullin's analysis,

9  it was very clear from the work papers that there was an error

10 and the error was in his calculation of the age of the claimant

11 at death, the relevant age.  And he computed death at age of

12 filing instead of age at the time of death.  And so we made

13 that one change, only that one change.  Ran his -- just like

14 Dr. Peterson testified, ran the same exact regression, didn't

15 replace any variables, nothing.  Just corrected age.  And what

16 we end up with is what you see depicted on this chart.

17      The thing in Dr. Mullin's implicit defense world that

18 you can't violate is, you can't have an upward sloping line any

19 place, all right, because an upward sloping line means that as

20 age increases, you're paying them more.  And his theory is that

21 as you age, you get paid less.  So, if you look at any of his

22 analyses, any of his charts, and there's an upward sloping

23 line, you're in trouble.  Well, you run CCR and you do it

24 correctly, with the right age, use the same model, same

25 approach, same everything and you can see the upward sloping

1  line.  And what this is saying is that for the lowest paid
2  claimants in the CCR that as -- so this would be the equivalent
3  of his 50,000 and under for -- I mean, the equivalent in the
4  sense that they're the lowest paid, that that group would get
5  paid more if they were older.  And this happens kind of over
6  and over again.  I doesn't make any difference whether it's
7  issue or how he does other calculations, but this one, this
8  approach in particular of the kinks is just terrifically
9  unstable.  If you do it the right way, it doesn't work.  And
10 probably much more than the theoretical construct, the
11 empirical work is not quite acceptable.
12 Q    Let's focus -- setting aside the theoretical and the
13 empirical and the flaws in the empirical work for a second,
14 let's talk practicalities.  The practical import of Dr.
15 Mullin's implicit defense theory is that he associates
16 settlements of $50,000 or less with the absence of liability.
17 Based on your experience and looking at the facts of Bondex's
18 settlement history and the nature of its product and market
19 share, do you accept the conclusion that low value settlements
20 don't equate to liability?
21 A    Well, I think that there's just confusion a bit here
22 between problems with causality and describing that as implicit
23 defense.  And what I mean by that is that certainly the company
24 asserts and we've heard and I've listened to how low their
25 market share is and when we look at the claimant data, there's

1  exposure to Bondex and then there's a list of 50 other

2  companies that were exposed to their products.  And it's not

3  too surprising that Bondex, in most cases, would not have to

4  pay very much because their causality and their indemnity,

5  therefore, wouldn't necessarily be quite low, if they only

6  accounted for a relatively small share, that it's not

7  surprising that you would find a large number of individuals

8  with very low settlement amounts.

9          So my view is, I wasn't surprised at all that there

10 was a significant number of claims that were under $50,000.

11 It's what I would expect to see.  So my conclusion would be

12 quite different, I guess, just looking at the data, putting

13 aside regressions and kinks and all of those, that having a

14 large percent of claims that were paid low amounts would be

15 perfectly consistent with what my notion would of what Bondex's

16 liability might be.

17         So that combination of, you know, the allegation that

18 they have a low market share and exposure to multiple

19 dependents, you would expect to see a large number of low

20 settlement values.

21 Q    And what's your reaction when Dr. Mullin equates his

22 extraction of implicit defense costs in the settlement history

23 to work that was done extracting punitive damages in the

24 Owens Corning bankruptcy process?

25 A    Well, it's not even in the same ballpark.  In

1  Owens Corning, because I did it, we had claimant data with

2  verdicts and that data, the verdict amounts were split into

3  compensatory and punitive and we had a large number of

4  observations, so real world numbers.  I mean, it wasn't

5  anything made up.  The huge difference between that and what

6  Dr. Mullin did, you could never observe implicit defense,

7  right?  It's implicit.

8              In Owens Corning, we had data, we had numbers for

9  what compensatory, we had number for punitives, so it was not a

10 particularly complicated exercise.  And I don't mean to make

11 light that it was so easy to do, but what I do mean is that you

12 had data, real observations and real numbers, which is not the

13 case here.

14 Q    And, finally, did you evaluate the work Dr. Mullin did in

15 support of his several liability calculations?

16 A    Yes, I did.

17 Q    Did you form any conclusions about that work?

18 A    I mean I did them -- the first conclusion is really that

19 it's unambiguously a legal issue.  But, you know, I did look a

20 bit at his three procedures for determining the several effect

21 and focused mostly on the Texas tort reform example.  And in

22 that calculation he ignores a few things.  I mean as was

23 testified to yesterday, he clearly ignored that there was

24 multiple parts to the Act that have effects that you would

25 normally want to filter out to make sure that you had solely

1 the effect of several.

2          But in addition to that, he ignored the grandfather

3 rules and clauses that were in that law.  So there was a large

4 number of cases that he used as post tort reform examples that

5 really weren't affected by tort reform at all.  They were

6 grandfathered and could be resolved under the prior law.  And

7 when you look at those, what you tend to see is that there was

8 a downward trend in settlements, for whatever reason.  And, so

9 the downward trend that he observes in Texas tort reform was in

10 the underlying litigation that was going on.  It really had

11 likely very little affect from the tort reform itself.

12          MR. HARRON:  May I have just one moment, Your Honor?

13          THE COURT:  Yes.

14          MR. HARRON:  Your Honor, if we may approach, we can

15 provide the Court with a copy of Exhibit 1027.  It's the

16 marked version of Page 5.

17          THE COURT:  All right, thank you.

18          MR. HARRON:  Thank you, Dr. Vasquez.  At this point,

19 we're prepared to pass the witness, Your Honor.

20          THE COURT:  All right, thank you.  I think this may

21 be a good time to break for lunch.  Why don't we reconvene at

22 1:25.  We'll be in recess until 1:25.

23          MR. HARRON:  Thank you.

24          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

25                     (Recess)

1          THE COURT:  Please be seated.  Mr. Sheppard, I think

2  I have found the exhibits that were missing, except that I do

3  not have an Exhibit 426.  They apparently were included in the

4  set of five binders that were handed to me for the trial, but

5  there's not a set down there that were supposed to be witness

6  binders, however, since everyone is using the ELMO and the

7  computer for the witness, I don't think we need the witness

8  set.  So whatever Exhibit 426 is, I don't have that.  And the

9  other thing I do not have is the complete list of what all the

10  exhibits are.  My list ends at something like, I don't remember

11  now, 330 something or other.

12          MR. SHEPPARD:  Yes, Your Honor.  It's my

13  understanding that up to 426 was in the binders, but we'll make

14  sure we get that for you and --

15          THE COURT:  Oh, is 426 --

16          MR. SHEPPARD:  -- we are finalizing the cross

17  referencing of the two lists now, and hope to have that this

18  afternoon.

19          THE COURT:  Okay.  Oh, I apologize 426 is here.  I

20  misread the number, I thought it was 425.

21          MR. SHEPPARD:  Yes.  427 was not in the original

22  binders, Your Honor.

23          THE COURT:  Right, I have that one and that was

24  handed up today.  So I think the issue that I thought I had

25  with binders I don't believe I do have.  I just need the list,

1 I don't have the updated list.

2          MR. SHEPPARD:  We still have the issue with the list

3 Your Honor and we're working on that right now.

4          THE COURT:  All right.  Dr. Vasquez, are you ready?

5          THE WITNESS:  Yes, I am.

6          THE COURT:  All right.  Mr. Evert.

7          MR. EVERT:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9 BY MR. EVERT:

10 Q    Dr. Vasquez, good afternoon.

11 A    Afternoon.

12 Q    Thank you for your time and testimony here.  I just wanted

13 to cover a couple things in your qualifications that we didn't

14 specifically go over.  These will not be big surprises.  You're

15 not an epidemiologist, correct?

16 A    That's correct.

17 Q    You have no medical training, correct?

18 A    That's correct.

19 Q    You have said that you used statistic and econometric

20 principles as a part of your work but you would not consider

21 yourself a statistician or an econometrician, is that right?

22 A    I think what I said is, is that I don't consider myself a

23 theorist, I'm a user of statistics and econometrics.

24 Q    You're a user of statistics and econometrics, you're not

25 an econometrician or a statistician, is that fair enough?

1  A    Well, you know, one of my fields was econometrics so it's

2  -- it was also a long time ago.

3  Q    What you listed on your CV, maybe that's a good way to

4  ask, it's not listed on your CV that you're an econometrician

5  or statistician, is that fair?

6  A    No, it's not.  And I almost feel like I'm quibbling, but

7  it's likely something that I wouldn't put on it.  It'd be like

8  saying I'm a carpenter.  I'm not sure if I --

9  Q    I'm not going to quibble.  You're not an attorney.

10  A    That's correct, absolutely.

11  Q    I figured I'd go with an easy one.  Have you ever

12  submitted your methodology for publication in an academic or

13  scientific journal?  That is the methodology you've used here

14  in this case.

15  A    No.

16  Q    Has your forecasting work every been subjected to academic

17  peer review outside the litigation or bankruptcy context?

18  A    I don't know.

19  Q    Not to your knowledge.

20  A    That's correct.

21  Q    Is there an authoritative book or treatise that explains

22  how to employ your methodology and the steps that are

23  appropriate to take in your methodology?

24  A    Not that I'm aware of.

25  Q    Is your forecast an application of scientific methodology,

1  in your view?

2  A    Yes, it is.

3  Q    And do you agree with me that it's appropriate to judge

4  your work by scientific standards?

5  A    Yes.

6  Q    In general terms is the methodology you've used in this

7  case the same methodology you've used in other bankruptcy

8  forecasts and forecasts you do for public reporting for

9  companies?

10 A    Yes, among other.  I mean, I think for -- not I think, I

11 know, for every asbestos forecast, I use this methodology.

12 Q    And are you aware of any estimation for an asbestos

13 bankruptcy where your projections were significantly off?

14 A    I've never, that I can recall, well, let me backup.  And I

15 apologize for stumbling.  The reason I'm stumbling is that once

16 you leave, you know, my forecasts are forecasts of if the

17 company has remained in the tort system.  And, of course, their

18 ending up in an asbestos trust or something like that.

19        And there are certainly a number of asbestos trusts

20 where I've done forecasts for them, but I'm never asked to do a

21 forecast for a trust that's as though the company remained in

22 the tort system.  So I don't have a reasonable way to compare

23 those, I guess.

24 Q    And please don't apologize for stumbling.  It's a lot

25 easier to stand up here than it is to sit over there, okay?

1  A    Yes, well, I guess, okay.

2  Q    Let me ask you maybe a specific example.  Did your

3  forecast in the Owens Corning case, for example, include a very

4  large number of non-malignancies that were predicted, but never

5  materialized?  Would that be a fair statement?

6  A    Yes, I believe that's right.

7  Q    Okay.

8  A    And part --

9  Q    And --

10 A    Oh, I'm sorry.

11 Q    No, go ahead.

12 A    And there was more unfortunately, like I was talking,

13 trying to describe this morning, there were many more

14 mesotheliomas and lung cancers than I forecast.  So what

15 happened was a pretty violent shift out of non-malignants and

16 into malignant diseases.  So, ultimately, in a dollar sense the

17 number, you're right, was way higher than I had forecast.

18 Q    Okay.  So am I correct that in this case you were seeking

19 to estimate the total settlement dollars that would be paid by

20 the debtors in the tort system, had they stayed in the tort

21 system to resolve pending and future claims?

22 A    Yes.

23 Q    You made no attempt in your forecast, as I understand it,

24 to calculate Bondex's several share of liability, is that

25 correct?

1  A    That's correct.

2  Q    And you made no use in your forecast of Dr. Denise

3  Martin's report on the debtors' historical market share, is

4  that correct?

5  A    That's correct.

6  Q    Does the size of the debtors in this case, whether

7  measured by sales, profits, historical market share or

8  whatever, have a place in your analysis in terms of the Sandy

9  (sic) checks you were talking about?

10 A    About the what checks, I'm sorry?

11 Q    At the end of your testimony today, you were saying checks

12 to see if your forecast was in the realm of reason.  I can't

13 remember the exact --

14 A    The idiot test.

15 Q    Ah.  Okay.  So does the size of debtors in this case,

16 whether measured by sales or profits or historical market

17 share, did that have any place in your analysis for those

18 checks?

19 A    You know, I would presume that all of those things affect

20 the history of the company.  So, I would fundamentally believe

21 that the claims filed, the average indemnity, all of those

22 things are affected by those characteristics.  And then I take

23 those characteristics as the component of my forecast.  So, I

24 guess the answer is yes.

25          THE COURT:  I need to stop the clock.  My remote

1  counsel is not working, again, so I need to close it and

2  reboot, so excuse me just for a minute.

3              COURT CLERK:  I'll reboot it on my --

4              THE COURT:  All right, okay.

5                          (Pause)

6              THE COURT:  Yes, okay, I'm back, too.  All right,

7  we're good.  Thank you.

8              MR. EVERT:  Thank you, Your Honor.

9  Q    Dr. Vasquez, I want to try to make sure I understand your

10 last answer.

11 A    Sure.

12 Q    I was talking about the market share analysis that had

13 been done in this case and I'm going to try to paraphrase it,

14 tell me if I'm wrong.  I think I understood you to say that

15 it's only take into account in your analysis to the extent it

16 is baked into the average settlement numbers.  Is that

17 effectively what you said or did I misunderstand you?

18 A    No, you're mostly right.  I mean, what I -- and maybe I

19 said it poorly, what I meant to say was, average settlement

20 amounts and the pay rates and the claims filed, so the

21 parameters that I rely on for the forecasts.

22 Q    So it's baked into the numbers that you used in your

23 methodology to the extent it is baked in, you used it, but you

24 didn't specifically go and look at it and say, okay, this is an

25 idiot test, or something like that.

1  A    Right.  I didn't try -- I just want to make sure -- I did

2  not try to establish some correlation between market share or

3  type of product or anything like that, and success of claimants

4  in their complaints against Bondex. I did not do that.

5  Q    That's a much better way to say it.  So at some point

6  maybe we should switch sides.

7  A    I feel like I should hold onto my wallet right now.

8  Q    So just to make sure I understand your calculations, the

9  ultimate conclusion of your future claiming right against

10 Bondex is that roughly one in four people that get mesothelioma

11 in the future will have a compensable claim against Bondex, is

12 that right?

13 A    Well, you know, the arithmetic of it, I think is closer,

14 right, it's 63 percent of 42 percent.  So, I mean, you're about

15 right.  And the issue that I have, just a copy at it, is to

16 mention, again, the issue that I have with the forecast of the

17 incidents of mesothelioma.  And if that forecast is too low,

18 which it is beginning to appear that it might be, then it's no

19 longer 24 percent, it's falling over time.

20 Q    But based on the estimate that you put forth in this case,

21 the ultimate result is that 25 percent, roughly, the people who

22 get mesothelioma in the future will have a compensable claim

23 against Bondex, isn't that the 63 percent times the 42 percent?

24 A    No.

25 Q    Okay.

1  A    My forecast into future says, take 24, 25 percent,

2  whatever that number is and multiply it times the number of

3  mesothelioma deaths that are currently in my incidence model as

4  a forecast.  What I'm saying is that in the real world, as we

5  evolve, if we continue the underestimate of mesothelioma by

6  anywhere near the rate that we've seen in the last few years,

7  that percent is going to drop dramatically.  That's all I'm

8  saying.

9  Q    I think I understand.  So what you're effectively saying

10 is, if your estimate of the future incidents of mesothelioma is

11 correct, then 25 percent, roughly of the people who get

12 mesothelioma will have a compensable claim against Bondex, is

13 that right?

14 A    That's exactly right.

15 Q    And, if your estimate of future incidents is high, then

16 the percentage will be lower, is that correct?  I'm sorry.

17 Strike that.  If your estimate of incidents is low, then the

18 percentage will be lower, correct?

19 A    Yeah.

20 Q    And conversely --

21 A    And I don't mean to be too -- but it's not simply that

22 it's low but that it's lower than what the forecast amount is.

23 Q    Okay.

24 A    That I'm lower than -- no.  What I'm trying to say is that

25 if my forecast is lower than what actually occurs for

1  mesothelioma deaths, then it falls over time.

2  Q    Right.  And conversely if it's higher then it grows over

3  time.

4  A    That's correct.

5  Q    Okay.  There we go.  Now, you made no effort, I don't

6  think, in your methodology, to analyze Bondex's legal strategy

7  over time, did you?

8  A    I'm not sure I follow the question, I'm sorry.

9  Q    Okay.  So I think you've agreed in the past that changes

10 in a defendant's legal strategy can change in resolution

11 results over time.

12 A    Yes,.

13 Q    Okay.  And in this case you did not do any analysis of

14 Bondex's legal strategy and change your forecast methodology as

15 a result in anyway, is that correct?

16 A    The -- let me try to make the answer, first of all,

17 direct, which is, I did not attempt to look at the legal

18 strategy and try from that legal strategy to estimate and

19 predict what an outcome might be from that strategy or a

20 different one.

21         What is very clear from the data is that there was

22 changes in strategy over time and in various periods I get

23 different measures as we -- and so in that sense it's in the

24 historical data.  But similar to your question about market

25 share, there wasn't an attempt on my part to say legal strategy

1  A produces this and B produces this.  I did not do that.

2  Q    Right.  And you'll agree, I think, that a defendant in the

3  tort system such as Bondex doesn't care whether the money it

4  spends in litigation goes to a plaintiff, or goes to defense

5  dollars, they ambivalent, right?

6  A    No, I don't agree.

7  Q    Okay.

8  A    You know, I had the -- I guess I can't quite mention the

9  name, but I had a CEO who cornered me after a board meeting

10  because I was in financial reporting, I'm estimating both

11  defense costs and I'm estimating indemnity.  And my

12  presentation was, you know, you're doing fine on indemnity, but

13  your defense costs are going nuts.  His response to me was, you

14  know, all I care about is my market share -- I mean my share

15  price.  He said, if my defense costs goes up, it doesn't affect

16  my share price but if indemnity goes up, it affects my share

17  price.

18        So in his case, for his company, he was more than

19  willing to spend defense dollars but not indemnity dollars.  So

20  I think there's more -- I think it's a little naive to just

21  take this pot and say I don't care how I divide it up, I think

22  there's other economic influences there that affect the

23  decision of businesses and owners.  But I --

24  Q    I don't want to quibble with you either, Dr. Vasquez

25  because I really do appreciate your testimony very much.  Do

1 you remember giving your deposition in this case?

2 A    Yes, I do.

3 Q    And I'll be glad to hand you a full copy of the

4 deposition if you want to see it.

5          THE COURT:  What's the date of it?

6          MR. EVERT:  It is the deposition taken Tuesday,

7 November 13, 2012.

8          THE COURT:  Thank you.

9          MR. EVERT:  In re Specialty Products Holding Corp.

10          THE WITNESS:  Thank you.

11          MR. EVERT:  Yes, sir.

12 Q    And when you get a second, Dr. Vasquez, if you could look

13 at Page 76, Line 18.

14 A    Yes.  And --

15 Q    And --

16 A    I'm sorry.

17 Q    No, no.  You were asked these questions and I want to see

18 if you gave these answers.  Question:  "Now, from the Bondex

19 perspective do you think Bondex cares whether a dollar is paid

20 out the door to a defense lawyer or to a plaintiff?"  Answer:

21 "I don't think that in that sense Bondex would care.  I think

22 that's right.  I mean, that is -- that would be indifferent

23 between those two, I think that's right."  Question:  "At the

24 end of the day if Bondex is acting rationally, they ought to

25 try to reduce the total amount of money that goes out the door

1  related to mesothelioma claims in total, right?"  Answer:

2  "That's right."  Was that your answer at the time, sir?

3  A    Yeah, but I think I'm responding to -- where I'm saying

4  the --

5  Q    Oh, I'm sorry, I apologize.

6  A    That was hard to follow.

7  Q    No.  When you're moving it around, sure.

8  A    Where it says I don't think that in that sense, I mean

9  what I'm responding to there is an arithmetic identity.  That

10 in that sense, you know, does it care which dollar went out the

11 door, I don't think they care.  But I was referring to, in that

12 arithmetic sense, not in an overall sense of share price or

13 anything else.

14 Q    Okay.  Was that your answer?  Okay, thank you, sir.  In

15 your view, did bankruptcy of other defendants play a role with

16 debtors' payment history?

17 A    I haven't studied that, but I would be surprised if it

18 didn't.

19 Q    You would think it would be likely.

20 A    Yeah.

21 Q    I'm sorry, sir, what that a yes?

22 A    I'm sorry, yes

23 Q    I just couldn't hear you.

24 A    Definitely a yes.  Okay.

25 Q    Would the -- well, did you factor into your forecast --

1  well strike that.  I think it's accurate to say that you did

2  not factor into your forecast the availability of newly opened

3  asbestos trusts to pay claimants, is that correct?

4  A    (Inaudible).

5  Q    Maybe I'll ask it this way.  Other than if it's reflected

6  in the historical settlement payments, you did not factor into

7  your analysis newly opened asbestos trusts ability to pay

8  claimants, is that fair?

9  A    Thank you, I was trying to answer it in a way that didn't

10 sound so repetitive but yes, you're right.

11 Q    Now, in your analysis you've used the same analysis window

12 for all of your calculations, is that right, 2008 through May

13 31, 2010, is that right?

14 A    Yes.  For purposes of the forecasts, that's right.  I

15 mean, I display other time periods but I do use the same

16 calibration period for each one of the forecasting variables.

17 Q    And I think you've testified in this case, and frequently

18 in others, that you believe that it's critical and important to

19 use the same window for each, isn't that right?

20 A    Yeah. I mean, there's -- let me try to say it just

21 slightly different, if you don't mind.  I do think that it's

22 important to use the same calibration period.  And maybe a good

23 example is what I was talking about earlier today, where

24 hand-in-hand the average indemnity and the pay rate were

25 moving.  And so if I select a pay rate from one time period and

1 an average indemnity for another they may not be consistent.

2         But, having said that, there's cases where you might

3 conclude that that's the right way to do it.  I mean, it's a

4 case-by-case, but that would be a general rule for me, yes.

5 Q    And I think in this case you said that even going back as

6 far as 2007 would be, I think foolish was the word you used, do

7 you remember that?

8 A    I -- you know, that's the sort of things I say.  The --

9 you know, when I -- first of all, the answer is yes.  I think

10 it would be foolish.

11 Q    Okay.

12 A    And I think it would be foolish because I'm looking at the

13 propensity to sue that I see and it's going up.  And whether,

14 you know, how much of it going up is because of the incidence

15 forecast versus other things I don't know, but it seems pretty

16 clear to me, I wouldn't -- there has to be a cutoff.  I mean,

17 if I go back to 2007, it's a pretty healthy drop.  You would

18 never go back to the propensity to sue that we saw in 1999.

19 So, there's clearly a case where you can go back too far and

20 then it becomes meaningless, I think.

21 Q    And I think it's -- so it's fair to say, I think you were

22 here for Dr. Peterson's testimony, so I think it's fair to say

23 that you disagree with Dr. Peterson on that, is that right?

24 A    You know, I don't -- well, let me answer it this way.  If

25 he was using different time periods, it would violate my

1 general rule and whether he had a good reason for it, I didn't

2 hear.

3 Q    Okay.  I think I asked you at one point if you believed

4 your forecast is better than Dr. Peterson's and you said yes, I

5 think, is that right?

6 A    Yeah, but you'd get that answer if you -- I don't care,

7 with anybody in the room.

8 Q    That was going to be my next question, actually, you're

9 way ahead of me.  You went through some slides in your direct

10 presentation, at the beginning of your direct presentation,

11 that compared your findings to Dr. Mullin's findings after he

12 had separated out payments not related to the value of a claim

13 and attempting to get to the debtors' several share.  Do you

14 remember that, when you used that?

15 A    If I could -- because I'm not sure whether to agree with

16 you or not, but if I say it my way, I think I can.

17 Q    Please do.

18 A    There is a number that starts with Dr. Mullin's number.  I

19 then add back his implicit defense, I add back his several and

20 then I add back his second layer of implicit defense.  And if

21 that's what you're describing to that bottom number which I

22 think as 855 million, then I agree.

23 Q    Actually, my question must have been poor.  You started

24 with Dr. Mullin's number of roughly 125 or $135 million, which

25 was his estimate after he attempted to take out of the

1 historical payments those payments not related to the value of

2 a claim and those payments not related to the debtors' several

3 share of liability.

4 A    I remember the nominal numbers better than the MPBs.  My

5 guess is, the MPB must be 125, right?

6 Q    I think that's correct, sir.  We're saying the same thing?

7 I can pull the slide out if you want --

8 A    Yeah, why don't -- just because I'm getting confused.

9 Q    Now, well -- probably my fault.  This is probably why I

10 have you confused because as usual, my numbers are not very

11 good.  I was referring to the $170 million number on this

12 slide.

13 A    Okay.

14 Q    That is Dr. Mullin's nominal number once he has attempted

15 to model out payments that are not related to the value of a

16 claim and payments that are not related to the debtors' several

17 share, is that right?

18 A    As long as we agree that when you say that he attempted to

19 model, to take out, to be left solely with the value of the

20 claim, is the same as me saying that's he subtracting out his

21 estimate of implicit defense and several, then I'm okay.  I'm

22 not sure I would agree with the way you characterize it, that's

23 all.

24 Q    I think we're saying the same thing.

25 A    Okay.

Vasquez - Cross/Evert                          152

1  Q    I'm certainly fine with that.  In the modeling that Dr.

2  Mullin did to try to separate settlements from other payments

3  unrelated to damages or several share, I think Dr. Mullin

4  testified it's similar to what you did in the <u>Owens Corning</u>

5  case, is that right?  You indicated on direct you thought it

6  was very different, is that right?

7  A    I may have. I think the question blew right past me

8  because it didn't work.

9  Q    Okay.  Is the modeling -- well, let me ask it to you this

10  way.  In <u>Owens Corning</u>, did you model taking punitive damages

11  out of the historical settlements?

12  A    Yes, I did.

13  Q    And you modeled it two ways, as I recall, is that right?

14  A    It's been eight years.  I don't remember.

15  Q    Do you recall if you modeled it both on directly

16  observable verdict data and you also did a regression based on

17  settlements, do you recall?

18  A    I certainly remember verdict data, but I don't have a

19  problem taking your word for it.

20  Q    Okay, thank you, sir.

21  A    Sure.

22  Q    And you'll agree with me that Dr. Mullin's primary support

23  for the relationship and the age correlation, between age and

24  damages that he has, is verdict data, you recognize that, is

25  that right?

1  A    How does -- his reason for the relationship between

2  verdicts and age is from verdict data.

3  Q    Age and damages is from verdict data, yes, sir.  Do you

4  agree with that?

5  A    I thought he was doing that to get himself some comfort

6  that if he looked at a set of data that is unencumbered by

7  settlements and those sorts of things, that he would want to

8  see this negative relationship between age and settlement.

9  Now, if that's what you're saying, I don't disagree at all.

10 That's where he got part of his comfort from.

11 Q    And there was a direct correlation, I think, in those

12 findings and you don't dispute that, isn't that right?

13 A    I don't dispute that there's -- as a mater of fact in my

14 forecast I assume that there's a relationship between

15 settlement amounts and age.  What my issue is, is simply one of

16 omitted variable problems, which is -- I don't think it

17 explains very much of the difference but I would completely

18 agree that age is related to damages.

19 Q    In fact, you did that in your report, you discounted for

20 age in relation to damages, correct?

21 A    That's correct.

22 Q    And you always do it that way, right?

23 A    Yes, I do.

24 Q    In the typical case as the claimant gets older, there's a

25 reduction in claim value, right?

1  A    That's right.  And I'm glad you used the word typical

2  because I have -- there's some unusual defendants out there

3  where the reverse holds, but you're absolutely right.

4  Q    Okay.  Now, Dr. Vasquez, would you agree with me that the

5  accuracy of your projection depends on the assumption that the

6  29 months preceding the bankruptcy filing are the best

7  indicator of what would have happened to Bondex had it stayed

8  in the tort system?

9  A    Yes.

10 Q    And in your view, I think, every time Bondex pays a dollar

11 on a claim it's a reflection of Bondex's admission that its

12 product, in fact, caused a mesothelioma, is that right?

13 A    I'm not sure I care, but okay.

14 Q    Well, it impacts your use of all the settlements, right?

15 All settlements.  All settlements indicate that Bondex, in

16 fact, had a cause of the mesothelioma in that claim, right?

17 A    It seems to be a -- I'm not following.  My point is, and I

18 apologize, it almost feels like I'm being difficult.  My point

19 is that I observe a settlement amount and all I know is that

20 the company was willing to pay that and did.  I don't make a

21 judgment about anything else.

22 Q    Well -- and I'm not -- I don't feel like you're quibbling

23 at all, Dr. Vasquez.

24 A    Okay, thank you.

25 Q    I appreciate your time and your expertise so thank you for

1 helping us out.  I want to talk about, and my point here is to

2 talk about the group settlements.

3 A    Okay.

4 Q    Now, this was the chart I think you used on direct to

5 illustrate your findings in regard to the Simmons, Cooney and

6 Lanier cases, is that right?

7 A    That's correct.

8 Q    And if I understand your testimony you said that yes, you

9 believe that there's a dramatic difference in the way group

10 claims are handled, but you don't think it matters for purposes

11 of your calculations, is that right?

12 A    That's correct.

13 Q    But in order to get to this point and these dollars, Dr.

14 Vasquez, you have to include time periods well outside of your

15 29 month calibration period, is that right?

16 A    Oh, I'm sorry, I understand.  This is across all periods,

17 that's correct.  Every -- all the resolutions, yeah.  No time

18 period.

19 Q    Okay.  And that is significantly more that the 17

20 settlements that were excluded by Dr. Mullin or maybe I should

21 say that were included by Dr. Mullin as the group settlements,

22 is that correct?

23 A    I don't think so.  If it is, I apologize.  What I was

24 attempting here was to include the claims from the three law

25 firms and I thought it added that it was about 16 or 1700

1 claims.  So I thought that that's what this is.

2 Q    Well, let me show you this slide, Dr. Vasquez and let's

3 talk about it.  Do we have copies of this slide?  I should

4 mark it.  What's our next number?  Your Honor, may I approach?

5           THE COURT:  Yes.

6 Q    Can you see that Dr. Vasquez, do you want a copy, want a

7 hard copy?

8 A    No, I think I'm okay.

9 Q    Dr. Vasquez, I want to ask you about this slide that we've

10 marked Debtors' Demonstrative D-86.  These are the Simmons,

11 Lanier and Cooney group settlements from fiscal 2007 through

12 2010, which is a four year period, which is actually longer

13 than your 29 month calibration period, is that right?

14 A    Yeah, that's longer than 29 months.

15 Q    And if you'll look, for me, you will see that the average

16 settlement amount in the group settlements totals $63,960 per

17 claim?

18 A    Yes, I do.

19 Q    And the non-group, that is everything else but these

20 settlements, total $46,196 a claim, is that right?

21 A    Yes, it is.

22 Q    Which is roughly a 40 percent difference, I don't know,

23 40, 50 percent difference.

24 A    Okay.

25 Q    Does that change your view about the importance of group

1  settlements when you only look at the groups inside the

2  calibration period which you have testified it would be foolish

3  to go beyond?

4  A     No.

5  Q     Tell me why.

6  A     A few reasons.  One is that, you know, this calculation as

7  did mine, excluded a number of Simmons, Cooney and Lanier

8  settlements that by all appearance seemed to be a group

9  settlement, but there's no agreement at all.

10 Q     I --

11 A     And --

12 Q     I'm sorry, I know I'm interrupting you.  When you say

13 excluded, during this calibration period, during 2007 to --

14 A     I believe that's right.  I believe that's right, but let

15 me -- I think there's multiple parts to my answer.

16 Q     Okay.

17 A     And I think collectively is the reason that I don't view

18 this as significant.  But that's one of them.  That there are,

19 for even those three law firms, a number of resolved claims,

20 very, very low averages.

21          Secondly, as I was talking this morning, I think

22 there's a lot more group settlements out there.  There's groups

23 of 50 and 100 that were settled historically.  So, there's a

24 lot more group settlements than these three.  So the notion of

25 using these three as representative of the difference between

1  groups and non-groups, I don't think is fair at all.  I don't

2  care what time period you're using.

3          The third issue is that these are Madison County

4  claims, the other claims are predominately outside of Madison

5  County.  We know that Madison County is a higher paying

6  jurisdiction and the only reason for saying that is that there

7  are differences in characteristics of these claims between

8  these group settlements and non-group settlements that includes

9  a long list of items.  It's not just jurisdiction, it's a law

10  firm that represents them and it goes on and on.

11          And so, when I look at the difference, if you

12  adjusted, could adjust for those things, the difference between

13  64,000 and 46,000 to me is not significant at all.  So I would

14  have the same conclusion, whether it's the shorter time period,

15  all the claims, it doesn't take me very far.

16  Q    Okay.  You'll agree with me, Dr. Vasquez, I think, that

17  the critical aspect here is whether or not the settlement

18  groups were individually evaluated or individually litigated.

19  Isn't that the issue here?

20  A    Not for me, no.

21  Q    Okay.  So the fact that during your calibration period,

22  and I think I'm right when I say all of the Simmons, Cooney and

23  Lanier cases, three law firms, resulted in a 50 percent higher

24  average resolution cost, in your mind, is not important.

25  A    You know the -- well, first of all, yes, you're -- I agree

1  that it's not important.

2  Q    Okay.

3  A    But you know the -- I've been involved, not in managing,

4  but in helping defendants price a group settlement.  You don't

5  have documentation, you don't have all the background that you

6  would want, and so it was individually reviewed.  But what you

7  have is, you have the lawyer, you have his history of what his

8  claims look like and on and on.  And similar to what Dr. Mullin

9  did in his imputation of implicit defense costs when he

10 addressed the group settlement issue, what Dr. Mullin did was,

11 he said I've got some claims here that were individually

12 reviewed and I think they probably look like the group

13 settlements, so I'm going to statistically assume that they

14 are.  And he used that to value, if you will, that group

15 settlement.

16       Well, companies are doing that every day.  I mean,

17 that's what we do.  And that estimate isn't necessarily perfect

18 by any means.  But the fact that it's either individually

19 reviewed or not individually reviewed, I don't think tells you

20 a lot about whether or not there was a mistake in the valuation

21 of the group.  I don't think that helps you.  I mean, I hope to

22 think that my estimates of the group are pretty decent.  I

23 think, I hope I was responsive.

24 Q    I'm not sure.  I'll ask another question.  You agreed with

25 me a moment ago that companies are often motivated to enter

1 into these settlements to save defense costs, is that a fair

2 paraphrase?

3 A    Today, did I say that?

4 Q    I beg your pardon?

5 A    Did I say that today?

6 Q    No, I was trying to paraphrase, our discussion of a minute

7 ago about companies trying to spend as little money as they can

8 spend, total defense and indemnity.

9 A    Boy, that's a big leap from what I was agreeing with you.

10 Q    Okay.

11 A    All that I was saying in my response in the deposition is

12 that I agree that arithmetically in that sense, that you

13 shouldn't care whether you spend a dollar here or a dollar

14 there, but that there are these other issues.

15        I mean, the CEO that I'm just describing would not

16 pay, well, obviously, I mean, I'm getting redundant here, but

17 wouldn't pay a penny in defense costs in settling a group

18 settlement, never.

19 Q    Okay.  Let me just ask you a couple more questions about

20 this.  So looking, again, at these 17 settlements that are

21 within you calibration period, it also, I presume, is

22 unimportant to your analysis that the pay rate of the claims,

23 the percentage of individuals paid is over three times higher

24 in the groups than it is in the individually litigated and

25 evaluated cases?

1 A    Are you asking me whether or not -- it certainly matters

2 to me, or did you ask me whether I was surprised?

3 Q    No.  Earlier I asked you if seeing these numbers from your

4 calibration period changed your opinions that the group

5 settlement didn't matter.

6 A    I'm sorry.  Sure.

7 Q    And I think you agreed with me it does not change your

8 opinion.

9 A    Yes, that's correct.

10 Q    And I'm trying to make that on two fronts.

11 A    I see.

12 Q    Notwithstanding the fact that the settlement amount is

13 roughly 40 percent higher, it still doesn't change you opinion,

14 is that right?

15 A    But if I could, if you don't mind.  The reason I'm

16 stumbling a little bit is that we started talking about the all

17 resolution column.  The all resolution column is the product of

18 the percent paid and the pay.  And that's the column that where

19 I said that difference doesn't matter to me.  When I go to the

20 percent paid column the reason that those numbers are more in

21 line is because of the percent paid.

22        If we look at the paid column, then group settlements

23 averaged 69 and non-groups average 165 and I would never want

24 to use that, I would always want to use all resolutions.  So

25 I'm just struggling with your question about percent pay.  If

1  I'm saying that very well.

2  Q    The 50 percent difference in all resolution average

3  doesn't trouble you.

4  A    That's right.

5  Q    Okay.  Thank you, sir.  Dr. Vasquez, I think I can do this

6  much more quickly than I did it with Dr. Peterson.  I think you

7  were here for Dr. Peterson's testimony, correct?

8  A    For a lot of it yes.

9  Q    Okay.  I'm going to put on the screen what's marked as --

10 A    I was here for this.

11 Q    Okay.  And it even -- it's the slide we used with Dr.

12 Peterson, so we really don't need to remark it but I've

13 remarked it again, as D-80, just in case.  Is that formula

14 right, based on your methodology?

15 A    Account paid -- that works.

16 Q    And in your estimate and I'll tell you what, we're not

17 going to fight about what nominal means, we're not going to

18 talk about any of those kind of things, here's my question.  In

19 D-81 did I correctly calculate that your average resolution

20 value is roughly $59,000 per claim in your calculation?

21 A    About 93,000 times something.  You've got to help me.  Oh,

22 maybe have it up on top, I'm sorry, 93,063.

23 Q    I think it's missing a digit but it is on top.  I was

24 trying to make it easier.

25 A    Oh, yeah.

1       THE COURT:  All right, what's the question, I'm

2   sorry?

3       MR. EVERT:  The question is, his average resolution

4   value in his estimate is $59,000 per claim, roughly.

5       THE COURT:  Okay.

6   A    Yeah, but certainly 60 percent of 90,000 is 54,000.  So it

7   looks to me like 59 is probably pretty darn close.

8   Q    And would you agree with me, Dr. Vasquez, that if instead

9   you were to assume an average resolution value of $45,000,

10  which is the average resolution value that Dr. Mullin has

11  testified was reached in the individually evaluated claims,

12  your forecast would be reduced by roughly 25 percent?

13  A    You know, maybe to short circuit this, if you choose a --

14  Q    I'm sorry, I try to move it exactly when you're looking at

15  it.  It's taken years of practice.

16  A    You got it down.

17  Q    Well, thank you very much.

18  A    I think the short version of this is that if you change,

19  however you want to do it, if you change the average tort

20  resolution value by 10 percent, you're going to change my

21  forecast by 10 percent.

22  Q    Okay.  So maybe the easy way to ask the question is, will

23  you agree with me that $45,000 claim value which is the claim

24  value that Dr. Mullin has estimated from the individually

25  litigated and evaluated claims, is roughly a 20 to 25 percent

1 reduction from your $59,000 average resolution value?  More

2 math.

3 A    I'm -- if -- what is it, 45 did you say?

4 Q    $45,000, yes, sir.

5 A    So what I would agree to is that if I take 45 divide it by

6 59 --

7 Q    It is 46 -- sorry.

8 A    -- multiply it be 1.6 billion, which is my nominal number,

9 I'll get a different number.

10 Q    That answers the question.

11 A    Thank you.

12 Q    Believe me, I'm not good enough at math to track you, all

13 right?  Now, your base case forecast does not include any PIQ

14 analysis, is that correct?

15 A    Well, that's not fair, I don't think.

16 Q    Well, I'm not trying to be unfair.

17 A    Oh, okay  I'm sorry.  I should have said no.  I mean or

18 yes, one of the two.

19                    (Laughter)

20        MR. EVERT:  I think I've got him now, Judge.

21        THE COURT:  He's on the ropes.

22        MR. EVERT:  I've staggered him at a minimum.

23        THE WITNESS:  Try -- okay do it again, and I'll give

24 you a yes or no.

25 Q    Your base case forecast, not your alternative scenarios,

1  it does not include factoring in the PIQ analysis, is that

2  correct?

3  A     No.

4  Q     Okay.  Tell me why I'm wrong.

5  A     The -- and hopefully this is not quibbling, but you look

6  at a lot of information and what I testified to this morning is

7  that when I looked at the PIQs, it gave me comfort as much as I

8  could get, that there wasn't a reduction in quality for the

9  remaining inventory.  So in that sense, let me try to put it

10 differently, if the PIQ indicated that all -- that none of the

11 claims were really mesos and none of them had exposure to

12 Bondex, it would have dramatically affected my results.  So

13 what it did was allowed me, in my mind, to continue using the

14 historical relationships.  I am done.

15 Q     Okay.  I'll try this, was it an idiot check?

16 A     You know, pretty darn close.

17 Q     Okay.  All right.  I want to talk a little bit about your

18 estimation.

19 A     It's either me or it's just -- or this is just a little

20 off or something.

21         THE COURT:  No, it's the focus.

22         MR. EVERT:  I'm probably doing it on purpose.  Is

23 that any better, Dr. Vasquez?

24         THE WITNESS:  That's -- a little bit, yes.

25         MR. EVERT:  I'm trying to get --

1          UNIDENTIFIED ATTORNEY:  Mike, I don't think it's
2   going to pick --
3          MR. EVERT:  Oh, okay.
4          UNIDENTIFIED ATTORNEY:  I think it's just the way it
5   is.
6          MR. EVERT:  Well, that looks pretty good.
7          THE WITNESS:  Okay.
8          MR. EVERT:  Is that better?
9          THE WITNESS:  That's fine, yeah.
10          THE COURT:  Is this the ELMO you're using?
11          MR. EVERT:  Yes.
12          THE COURT:  Jan, wait -- how about after court have
13   them check the light.  I'm concerned that maybe the light is
14   burning out.  Okay.  Sorry, go ahead.
15  Q    Sir, I want to talk some about your pending claim count
16  and your 2010 claim count.  So, in your pending claim count,
17  did you exclude claimants that were listed as mesos but who did
18  not file a PIQ?
19  A    I'm sorry.  I thought that your question was going to
20  relate to this.
21  Q    I'm sorry, we're going to get to that in just a second.
22  A    Oh, okay.
23  Q    Your pending claims first before we get to 2010.
24  A    Okay, okay.
25  Q    In your pending claim count, did you exclude claimants

1  listed in the database as mesothelioma claimants but who did

2  not submit a PIQ?

3  A    No.

4  Q    You counted them as mesos as in the database, is that

5  correct?

6  A    That's correct.

7  Q    And then you had a chart -- let me strike that.  I want to

8  make sure I'm using the right report.  You filed a significant

9  errata in this case, did you not, Dr. Vasquez, from your

10  original report?

11  A    Yes.

12  Q    Which -- I think there was an error somewhere in your

13  calculations that changed virtually ever table in the report.

14  A    Yeah, there was.  There was a -- there was a tabulation

15  that affected the first table and the first table affected the

16  second and the third.  So all these tables changed by one or

17  two all over the place.

18  Q    So several weeks after your initial report you filed a new

19  report that attempted to correct those calculations, is that

20  right?

21  A    Yeah, but I would at least like to make it clear that this

22  wasn't, you know, a 10 percent change in some numbers, it was a

23  437 that went to a 435 or something.  It wasn't a significant

24  -- it didn't affect an outcome.

25  Q    Not trying to say you did anything wrong, I'm must making

1  sure I have the right report.

2  A    I'm just defensive, that's all.

3  Q    So the errata report, the one that corrected all the

4  errors, that's the report I should be using, is that correct?

5  A    I would use that one, yes.

6  Q    Okay.  Do you have a copy of your report up there, sir?

7  Your corrected report.

8  A    Yes.

9  Q    Would you turn to Page 39, please?

10            THE COURT:  Is this Exhibit 1025?

11            MR. EVERT:  I believe that's correct, Your Honor.

12            THE COURT:  All right.

13            MR. EVERT:  If Page 39 is Table 8.2, then I think

14  we're -- as we say where I'm from, cooking with gas.

15            THE COURT:  All right, thank you.

16  Q    Are you there, Dr. Vasquez?

17  A    Yes, I am.

18  Q    And as I understand it, this is a change, changes you made

19  in the database counts of mesothelioma after your review of the

20  PIQ?

21  A    Yes.

22  Q    And in 2010 I see that the database had 427 mesotheliomas

23  listed in the database, prior to your adjustment, is that

24  correct?

25  A    That's correct.

1  Q    And then you found ten additional claimants that filed

2  PIQs that indicated that they were mesotheliomas that were

3  listed as something else in the database, is that right?

4  A    I believe that the ten is a net number, that things went

5  both ways.  That there was some claims that were in the

6  database listed as a mesothelioma that changed their mind and

7  then others that were something else and identified themselves

8  as mesotheliomas.

9  Q    Fair enough, sir.  So they went both ways.  It was a net

10 increase of ten mesotheliomas after you analyzed the PIQs, is

11 that right?

12 A    Right.  That's why, you know, if you look back at '07,

13 there a minus four that there's netting that's going on.

14 Q    Right.  So we'll now turn to the exhibit that I put on the

15 ELMO for you, sir.

16 A    Yes.

17 Q    That is the 437 number on this chart, that's Page 9 of the

18 demonstrative, for 2010 filings as of the end of May, correct?

19 A    That's correct.

20 Q    And it says filings entered on the electronic database but

21 that's actually filings on the database as corrected by the

22 PIQs.

23 A    That's right, yes.

24 Q    All right.  Now, Dr. Vasquez, the next number the 165,

25 that is your estimate, correct?

1  A     That's correct.

2  Q     None of those claimants, none of those 165 claimants filed

3  a PIQ, is that right?

4  A     That's correct.  Well, you know, that's actually a great

5  question.  You know, we looked through the PIQs.  There was

6  PIQs alleging -- I may not have this right.  What I was going

7  to say was that there was some PIQs filed that alleged

8  mesothelioma that appeared to us at the time that it must have

9  been claims filed after the end of May or something.  And those

10  claims could potentially be part of the 165, is all I'm saying.

11  So they knew that they filed a claim before the end of May of

12  2010, but it never was in the database and that may explain

13  part of that anomaly.

14  Q     Let me be clear, Dr. Vasquez, that the mesothelioma

15  claimants and their law firms or I'm sorry, the law firms in

16  this case of mesothelioma claimants were notified to file PIQs

17  in every mesothelioma claim they had pending against Bondex

18  prior to May 31, 2010, is that your understanding?

19  A     You know, I don't know with that precision.

20  Q     Okay.  Well, assume for a minute that my recitation was

21  accurate.

22  A     Okay.

23  Q     Very, very few, if any, of these 165 people on this chart

24  filed PIQs, is that right?

25  A     I don't know, but I think, I think you almost have to be

1 right, yeah.

2 Q    Okay.  So there is no evidence that we have, Dr. Vasquez,

3 other than your estimate, that these 165 people even exist, is

4 that right?

5 A    You know, the -- and -- I think that's fair.  This is an

6 estimate.  So, you know, I did not go out and round up people

7 at all.  But I have to admit, I mean, you look at the data and

8 in a kind of statistical sense, or an idiot test sense, I guess

9 in a way you had described it, seeing 27 claims in May makes no

10 sense.

11 Q    But Dr. Vasquez, I just want to be clear, you counted all

12 the PIQs, correct?

13 A    That's correct.

14 Q    And that's all in your 437 number, correct?

15 A    I'm sorry.  Say --

16 Q    On this chart the number 437 --

17 A    Yes, yes.

18 Q    -- that includes your count of the PIQs.

19 A    That's right.

20 Q    And the 165, it's not really an estimate, it's an estimate

21 of an estimate, correct, because you estimated what changes

22 would have been made to the database in previous months and

23 then extrapolated those changes, correct --

24 A    Yes, that's right.

25 Q    -- instead of just relying on the count from the PIQs?

1  A    Yes.

2  Q    And this has a very important impact on your overall

3  propensity to sue calculations and I want to see if you'll let

4  me walk through this.  So Dr. Vasquez, if we were to assume

5  that instead of the 602 claims that you estimated were filed

6  before May 31 and not entered on the database, and instead

7  relied on the PIQs, then we would only have 437 claims through

8  the end of May, correct?

9  A    That's right.

10 Q    And that is roughly -- when we divide by your total of

11 602, roughly 75 percent lower -- it's 75 percent of your

12 estimate, correct, or 25 percent lower, roughly?

13 A    It's 43 sixtieths, or something.

14 Q    Oh, 43 sixtieth, so roughly.  If it was 450, that would be

15 exactly 75 percent, right, just about?

16 A    Good point.

17 Q    Okay.  Now, if we then move to Slide 13, or Page 13 of the

18 demonstrative -- that's not the one I want.  That's got all my

19 notes on it.

20        MR. EVERT:  Your Honor, this lectern is not big

21 enough.

22        THE COURT:  I believe one of the drawers may still

23 pull out, Mr. Evert.

24        MR. EVERT:  Thanks.  It would be just like me to

25 figure that out at the end of the trial, Your Honor.

1  Q    So if you look at Page 13 of the previous demonstrative,
2  your 2010 annualized propensity to sue, based on your estimated
3  number, is 48.8 percent, is that right?
4  A    Yes.
5  Q    And if we reduced that number by 25 percent, if we assumed
6  that the PIQs were right instead of your estimate, and I think
7  I can actually do that math because reducing by 25 percent,
8  those numbers are all divisible by four, we would get 36.6
9  percent propensity to sue in 2010, is that right?
10 A    Yeah.  I mean, I suppose I would -- the only small quibble
11 is the way you state if we assume that the PIQs are correct.
12 I'm just not sure what that exactly means.  I mean, if the PIQ
13 did, in fact, pick up every single mesothelioma that was filed
14 against the company by the end of May, then I would, putting
15 aside that I didn't do the arithmetic, I wouldn't disagree with
16 you.
17 Q    Right.  So if the claimants complied and filed every -- a
18 PIQ in every pending mesothelioma claim, then you would agree,
19 you didn't do the math, but that would be right?
20 A    Yeah.  You know, but we're now, you know, talking
21 arithmetic and a couple things strike me.  The first is that if
22 I, at that point, still didn't trust May, I was just unwilling
23 to do that, it's quite likely I'd take the filings through
24 April.  And say, you know, by April they should be reasonably
25 complete and I blow April up to an annualized total or if I

1  didn't believe April, I may do a month earlier, or something.

2        I think that the issue for me is not mechanics of

3  whether it's 165, or 160, or 140, or, you know, whatever that

4  number is, the issue for me is one of the matter of direction.

5  If I look at it, I'm going to anticipate that there's going to

6  be an increase in propensity to sue going into 2010 because

7  I've watched the increase flow.  If I -- matter of fact, if I

8  saw a propensity to sue that fell from 42 down to 36 from one

9  year to the next, with everything that I know about asbestos

10 litigation, where it stands today and all of that, I'd be -- I

11 would really begin to question the database.  So I don't think

12 -- well, I can't disagree with your arithmetic, I don't want to

13 disagree with your arithmetic.  I think you're trying to make

14 it a bit too arithmetic, rather than, you know, the judgment

15 that someone would bring, or that I would bring, I think, to

16 the table in calculating this if I thought I couldn't use the

17 end of May.  And that would be my sole caveat, not your

18 arithmetic at all.

19 Q    And I appreciate that, Dr. Vasquez, but if we reduced it

20 to 36.6 percent, that would be roughly equivalent with 2008,

21 right?

22 A    Yes.

23 Q    So you would then have an up year in 2009, and back down

24 to 2008 in 2010, that's what we'd have, right?

25 A    Sure.

1  Q    And if we used the number from the PIQs, the 36.6 number,

2  then that's -- and, again, I don't want to try to force you

3  into the math -- but we're averaging three numbers there,

4  right?  To get to your 42.5 percent propensity to sue, you have

5  averaged those last three numbers, correct?

6  A    I wonder if I could just help a bit, which is, you know,

7  on the average indemnity side, I said if I changed average

8  indemnity by 10 percent, I'd be changing my bottom line by 10

9  percent.  If I changed my propensity to sue by 10 percent, I'm

10  going to change my bottom line by 10 percent.  I completely

11  agree.

12  Q    Thank you very much.  And that's what this would do.  If

13  we used the PIQ number of 36.6 percent, it would reduce your

14  propensity to sue by roughly 10 percent -- I'm sorry, it would

15  reduce your total forecast by roughly 10 percent, is that fair?

16  A    As long as we agree that you're asking me an arithmetic

17  question and not what I would do.

18  Q    We agree.

19  A    Okay.

20  Q    Now, I want to talk to you a little bit about incidents.

21  Well, I think I can make this easier.  I think you testified on

22  direct that you believed that Dr. Nicholson's model in terms of

23  the incidents of mesothelioma is low, is that right?

24  A    If I can try to say what I said before, but that wasn't

25  it.  If I go to the original 1982 Nicholson, God bless us all,

1  mesothelioma deaths peaked around 2001, 2002.  Then in my

2  ingenious way in 1991 I tinkered with it and it ended up

3  peaking in 1997, or thereabouts.  So the peak year of

4  mesothelioma came way back by about five years, or so.  We've

5  now redone and updated that version of the KPMG model, and now

6  it peaks back around 2002, or thereabouts.  So with all of the

7  passing of years and all the things that have gone on, we're

8  roughly back to where Dr. Nicholson was in 1982.  And the last

9  thing that I said was that for whatever reason, Dr. Mullin's

10 version of KPMG still peaks around '97 or so.  So those are the

11 models that are sitting out there.  We have a couple that peak

12 around 2001, 2002; one that peaks in 1997.  The ones that peak

13 in 2001 and 2002 tend to be reasonably on target today, but are

14 losing ground.  But the one that Dr. Mullin uses that peaks in

15 1997 has lost a lot of ground.

16 Q    Well, maybe I should ask it this way, Dr. Vasquez.  I

17 think you testified on direct that you believe that Dr.

18 Mullin's incidents model is roughly 25 percent below yours, is

19 that what you said?

20 A    No.  It may be, but I apologize if I did.

21 Q    No.  No.  I probably misheard.

22 A    What I meant to say is that we have data from the federal

23 government, SEER data, and so we've looked to see how well the

24 forecasting model is doing.  The most recent year that we had,

25 because there's a lag in the time that the data is collected

1  until we're able to use it, is 2009.  In 2009 his model is 25

2  percent below the actual in that year.

3  Q    Okay.  So do you have a view of whether Dr. Mullin's

4  future incidence projections on a gross basis are lower than

5  yours?

6  A    Yes, I do.

7  Q    And are they?

8  A    Yes.

9  Q    By how much?

10 A    In -- and I believe in 2009, again, which is the reference

11 point in the year that I checked, therefore, I think that he's

12 about 20 percent below -- lower than I am.  But in addition to

13 that, it's -- and critical for this extrapolation of forecast

14 is the temporal pattern in the decline in mesothelioma deaths

15 over time.  You can imagine that if you have one forecast

16 that's virtually a cliff, versus another one that has a very

17 long tail, that you're going to get a very different future

18 independent of when it peaks.  So you have to look at both,

19 where it peaks and how the tail is running off over time.

20 Q    And you did a couple of things with your incidents

21 forecast, Dr. Vasquez, I believe.  You also employed the Peto

22 model, is that correct?

23 A    That's correct.

24 Q    And, ultimately, you took an average of what you

25 understood the Nicholson model to be and what you understood

1  the Peto model to be for your future incidents projections, is

2  that right?

3  A    I'm not sure if I follow what you mean by what I thought

4  to be the Nicholson model and the Peto model.

5  Q    Well, you came up with a future incidents under the

6  Nicholson model, correct?

7  A    Yes.

8  Q    And you came up with a future incidents under the Peto

9  model, correct?

10  A    That's not quite -- it's an okay way to think about it,

11  but it's -- and, actually, I guess we didn't talk Peto very

12  much this morning at all.  But what Peto does is that it

13  reverse engineers the system.  It says show me your claims,

14  show me where they were exposed, how long they were exposed.

15  If you tell me all of that, I can tell you how many -- how

16  large the population must have been in order to produce that

17  many mesotheliomas.  So it kind of backcast to the surviving

18  population.  You then take that and you run the surviving

19  population out over time and that produces for you a count of

20  mesotheliomas.  And I'm not doing complete justice to what it

21  does, but it's close to that.

22          The distinction between the two, which is an

23  important one, is that Dr. Nicholson's forecast of

24  mesotheliomas is limited to those that are occupationally

25  exposed.  So you have to be a carpenter, an electrician, an

1 installer, something like that, in order to get into his count

2 of being exposed to asbestos and to contract mesothelioma.

3 Peto says you don't have to be those.  You can be a

4 do-it-yourselfer, you can be walking on the street and inhale

5 an asbestos fiber.  It's whoever gets asbestos from whatever

6 source.  So in that sense, it's a broader set of people that it

7 allows to contract mesothelioma.  And I know I'm not -- I'm

8 doing rough justice to it, but roughly that's what it does.

9 Q    I don't have Julian Peto here, so we're not going to get

10 -- could you look at Page 35 of your report, please, sir, Table

11 4.2.  And while you're looking at that, I'll ask you one

12 question.  You're the only forecaster that uses the Peto model,

13 is that correct?

14 A    No.

15 Q    I'm sorry.  In this case.

16 A    Yes.  I'm at 4.2.

17 Q    And if I understand your chart at 4.2 correctly, under the

18 Nicholson KPMG model, you are forecasting a gross future number

19 of mesotheliomas of 18,835 mesothelioma incidents, correct, in

20 the future?

21 A    No.  That's not incidents.  That's claims.

22 Q    I'm sorry.  A gross number of claims of 18,835, you're

23 exactly right.  My apologies.

24 A    Yes.

25 Q    And you're also forecasting under the Peto model a claims

1  incidents, or claims occurring of 23,593, correct?

2  A    That's correct.

3  Q    And you averaged those two numbers together --

4  A    Yes.

5  Q    -- to get your future claims against Bondex that you

6  forecast, is that right?

7  A    That's correct.

8  Q    Now, we would get to a gross incidents by merely dividing

9  those numbers by your propensity to sue, is that right?

10  A    I'm sorry, say that again.

11  Q    We would get to a gross incidents of mesothelioma by

12  dividing those numbers by the propensity to sue?

13  A    No.

14  Q    We would not?

15  A    No.

16  Q    Okay.

17  A    No.  You can do that for the Nicholson KPMG, but for Peto,

18  it isn't a propensity to sue.  It produces the mesotheliomas

19  that would file against the company.  There's not some middle

20  step somehow.  So it's not -- you can't compute a propensity to

21  sue.  That's only a Nicholson construct.

22  Q    Okay.  Well, let's look at Nicholson.  So your forecast of

23  18,835 claims under Nicholson, right?

24  A    That's correct.

25  Q    Divided by your propensity to sue of 43.3 percent --

Vasquez - Cross/Evert                    181

1  A    I thought it was 42.5, but maybe I'm wrong.

2  Q    I might be wrong.  Check it for me.  43.3 or 42.5?

3  A    I was going to let you do that.

4  Q    Somebody over here is going to whip it out before you know

5  it, since it's new numbers.

6  A    Just somehow I thought I remembered that for the average

7  of eight to ten that it was 42.5.  Maybe I screwed it up.

8  Q    You may be right.  Let's call it .425.

9         MR. EVERT:  18,835 divided by .425, anybody?

10        UNIDENTIFIED SPEAKER:  44,317.

11 Q    Forty four thousand, three hundred and seventeen.  Is that

12 ballpark right look like to you, kind of a little more than

13 doubling?

14 A    Okay.

15 Q    In Dr. Peterson's report, he also uses Nicholson, correct?

16 A    A different version, but yes.

17 Q    All right.  And what's different about his version?

18 A    He uses the original 1982 Nicholson.

19 Q    And Dr. Peterson, if you'll take my word for it, has

20 forecast 15 thousand 392 future claims divided by his incident

21 rate -- I'm sorry -- his payment rate of thirty nine and a half

22 percent -- propensity to sue, I'm sorry, I said payment rate; I

23 meant propensity to sue -- and that equals 38,967, ballpark

24 right?

25 A    Okay.

1  Q    Here's a better question.

2  A    Okay.

3  Q    Whatever model you used with Nicholson, and you told me

4  the difference is the way Dr. Peterson uses the original

5  Nicholson rate, this is roughly a 15 percent increase, correct,

6  in the expected incidents, is that right?

7  A    Yes.  Well -- okay.

8  Q    And once you factored in your Peto, it goes up another 10

9  percent, is that fair?

10 A    Sure.  I mean, it's about ten percent, yes.

11 Q    So if you had used Dr. Peterson's Nicholson model, your

12 forecast would be roughly 25 percent lower, and much more in

13 line from an incidence perspective with Dr. Mullin's?

14 A    No.

15 Q    All right.  Tell me why not.

16 A    I don't think I did a very good job the last time but

17 there's two parts to the incidence model that matter; what it

18 is today, and what the temporal pattern is going out into the

19 future.

20 Q    Dr. Vasquez, I don't -- I'm not trying to interrupt you,

21 and you may finish your answer.  I get it that you believe that

22 your estimate may be low, which is what you told us about

23 earlier.  I'm just trying to illustrate, and would ask if you

24 would agree with me --

25 A    If this is -- I apologize.

1  Q    No, please.  Go ahead.

2  A    If it's an arithmetic question that in a different way

3  that says if the claims are 10 percent lower that my forecast

4  would be 10 percent lower, I completely agree with you.

5  Q    I understand that, but it's more important than that.  You

6  agree with me that Dr. Peterson's interpretation of the future

7  incidents of mesothelioma produces a much lower, roughly 15 to

8  25 percent lower forecast of future incidents of mesothelioma

9  than you?

10 A    Right.  That would still be -- that's an arithmetic

11 question, but sure.

12 Q    Okay.  And Dr. Mullin and Dr. Peterson, based on your

13 analysis, are roughly in the same place in terms of their

14 future incidents projections, except Dr. Mullin actually may be

15 slightly higher than Dr. Peterson?

16 A    I don't know what his projection is.

17 Q    All right.  Well, since you estimated on your chart that

18 some of the dollar difference between you and Dr. Mullin was

19 relevant to the fact that his incidents was lower, I figured

20 you must know what his incidents is, or do you not know?

21 A    I'm sorry.  I misinterpreted your question, then.  There's

22 unambiguously a difference between my incidents and Dr.

23 Mullin's.  What I was responding to is I don't know how many

24 gross claims he had, which is I thought what you were asking

25 me.

1  Q    No.  I was looking just generally in percentages.  So as I

2  understand it, just so we're clear, Dr. Peterson's projected

3  future gross incidents of mesothelioma is roughly 25 percent

4  lower than yours.  Isn't that where we are?

5  A    That Dr. Peterson's --

6  Q    Dr. Peterson's.

7  A    Okay.

8  Q    And Dr. Mullin is somewhere between you and Dr. Peterson,

9  is that --

10 A    I'm not sure.

11 Q    Okay.  You don't know the answer to that?

12 A    Yeah.  I don't know the answer to that.  But I would

13 completely agree that the forecasts are quite sensitive to the

14 forecast of the incidents of mesothelioma.  There's no

15 question.

16 Q    Okay.  Just a couple more quick things, Dr. Vasquez.  You

17 observed, when you looked at the debtors' history, that there

18 were claims that were still not resolved after five years, and

19 you agree that those are unlikely to ever be resolved, is that

20 right?

21 A    That's correct.

22 Q    And you agree that if Bondex were to continue in the tort

23 system, those abandoned claims would continue to occur for

24 future filings, is that right?

25 A    That's the unclear part.  When I did the pending claims, I

Vasquez - Cross/Evert                                    185

1 did discard claims that were in excess of five years old.  And

2 I always -- I am a -- I estimate abandoned claims, generally,

3 when I do a forecast.  And -- just to make sure that we're

4 talking about the same thing, abandoned claims are -- you know,

5 when we look at a defendant, some of the claims are resolved

6 for payment, some are formally dismissed, and others are in

7 this NANA land (sic) and they just sit there.  And it's those

8 claims that we consider abandoned claims.  The issue is not

9 that historically there were abandoned claims, which I would

10 agree there is, the issue is, as we look at the resolution rate

11 and what's happening to the temporal pattern of resolutions,

12 can we reasonably expect that there's abandoned claims in the

13 future.  And that's -- it's at that spot that Dr. Mullin and I

14 would disagree.  But we would not disagree that there is a

15 concept of abandoned claims.  He's absolutely right.

16 Q    And I think when we discussed this issue earlier, you said

17 that you did not make an adjustment, but if there was an

18 adjustment, it would be small in the order of two percent, is

19 that fair?

20 A    Yeah.  But I think you asked me enough times that I

21 finally had to cave and give a percent.

22 Q    All right.  And I think you heard my colloquy with Dr.

23 Peterson this morning that he found somewhere in the range of

24 six percent abandoned claims, is that right?

25 A    I didn't hear it this morning.

Vasquez - Cross/Evert                                    186

1  Q    Okay.  All right.  So in any event, you did not make the

2  reduction, correct?

3  A    I did in pending.

4  Q    But not in the futures?

5  A    For the future claims, I did not.

6  Q    Okay.  All right.  Dr. Vasquez, I really only want to

7  cover one more thing, and it's this graph.  And, you know, I'm

8  just not sure it's possible, given yours and my challenges with

9  colors that I can even get it done.  But I want to ask you --

10 A    If you ask me anything about the left side, we're in

11 trouble.

12 Q    Yeah.  We're both in trouble here, Dr. Vasquez, so I'm not

13 sure where this is going to be.  So the light blue line that we

14 can barely see, that's your estimate of the current claims,

15 correct?

16 A    If we can get away from whatever the colors are --

17 Q    Okay.

18 A    -- and see if I can try to put it this way, which is

19 virtually every one, if not every one of these bars -- oh, no.

20 Q    No, I'm going to put it back, I was doing that to you just

21 to prove that I still could.

22                          (Laughter)

23            THE COURT:  Would it help to look at this exhibit?

24            THE WITNESS:  No.

25            THE COURT:  No?

1        THE WITNESS:  Thank you.

2        MR. EVERT:  No.  I'm in the same boat, Your Honor.

3   A    But there's shades in each one of the bars.  And there's

4   on shade at the bottom and then there's another shade up on the

5   top.  And the shade area up on the top is evaluation of pending

6   claims, so claims that have not been paid yet.  And whatever

7   the shade is down in the bottom are claims that have already

8   been paid, and it's all done by filing year.  So I just can't

9   do the colors, but I hope that helps.

10  Q    It does help.  Let me ask and see if maybe we can do

11  colors.  I'm going to hand you this and see if I've -- if you

12  can tell if I've marked where the differentiation of the colors

13  occurs.

14  A    Okay.

15                        (Laughter)

16  Q    Okay.

17  A    Okay.  But I don't -- I wouldn't dispute it.  It's

18  certainly what we -- though I'm not so sure it's right, as I'm

19  looking at it.  But I would agree that the closest year to the

20  red bars is going to have the biggest amount of pending dollar

21  amount that needs.  And as you go back through time, you know,

22  forgetting annual glitches here and there, it should start

23  decreasing as you go back.  So if it does that --

24  Q    So I've tried to mark, and we think we've gotten close,

25  where the distinction is between actual committed and estimated

1  future payments in your estimate, I shouldn't say future,

2  estimated payments to the current claims in your forecast.

3  That was an awful question.  Let me start again.

4  A    All right.

5  Q    Because I think you said the dark blue are actual payments

6  in the year of filing, correct?

7  A    The bottom are actual payments.

8  Q    Correct.  And the top, and we're looking at 2010 and

9  earlier.

10 A    Yes.

11 Q    In the top the light blue is your estimate of the current

12 claims placed in their year of filing?

13 A    Yes.

14 Q    And I've tried to mark --

15 A    These are not claims, now.  These are dollars.

16 Q    Dollars.  Yes.

17 A    Yes.

18 Q    Thank you very much.  And I've tried to mark where the

19 disparity occurs.

20        MR. GORDON:  Do you care if you're way off?

21        MR. EVERT:  Oh, am I way off?  Yeah, I do care.

22        MR. GORDON:  That one's got to be right there.

23        MR. EVERT:  Oh.  Wow.

24        MR. GORDON:  There's a little one there; there's a

25 little one there.

1          MR. EVERT:  All right.  Well, I'm going to go with

2 this one.

3                          (Laughter)

4 Q    Here's my point, Dr. Vasquez.  If we look at the actual

5 expenditures and we ignore for a minute your estimate of the

6 currents and bringing them back, doesn't that largely fit with

7 the hand drawn graph that you've thrown in here?

8 A    What do you mean, largely?

9 Q    That is to say, doesn't this average sort of come right

10 through here?

11          THE COURT:  Average of what?

12          THE WITNESS:  Of what?

13 Q    I'm sorry, the average of the three years, of 2007, 2008,

14 2009, of the actual expenditures, which are the last three full

15 years?

16          THE COURT:  I think you need to properly mark where

17 they actually occur.

18          MR. EVERT:  Somebody get a fresh one and mark it.

19          MR. GORDON:  Do we have a clean one somewhere?  Can

20 we just take a couple minute break to fix this, Your Honor?

21          THE COURT:  Sure.  We'll take a five minute recess.

22          MR. EVERT:  I'm sorry, Your Honor.  My apologies.

23          THE COURT:  That's okay.  Would you like a new

24 colored copy of this and we can start again?

25          MR. EVERT:  That would be wonderful.  It's so hard to

1  get old.

2                        (Recess)

3              THE COURT:  Please be seated.  Dr. Vasquez, are you

4  ready?

5              THE WITNESS:  Yes, I am.

6              THE COURT:  All right.  Mr. Evert.

7              MR. EVERT:  My apologies to the Court, Your Honor.

8              THE COURT:  Not a problem.

9  Q    We have up on the ELMO, Dr. Vasquez, ACC/FCR Demonstrative

10 Exhibit, I think that says 1022.  I just have a couple

11 questions about it.  We've now modified it, as you know --

12 we've reached a stipulation among the parties of where the blue

13 lines, the light blue lines and the dark blue lines end.  Can

14 you see the markings on there?

15 A    Yes, I do.

16 Q    I just have a couple of quick questions.  The black line

17 that was drawn into the right, that is in 2011 and past, that

18 is, I think, either a rough, or an actual attempt to estimate

19 the graph of Dr. Mullin's tort system spend forecast, is that

20 right?  Is that what that black line represents?

21 A    Yes.

22 Q    And would you agree with me, sir, that if you look at the

23 dark blue lines at 2007 and 2008 and 2009, which are the last

24 three full calendar years before the debtors' petition date,

25 that at least in terms of the spending in those years, that's

1  quite consistent with Dr. Mullin's line?

2  A    Just to make sure.  If you're asking whether or not if all

3  we looked at was, you know, how much was actually committed and

4  spent by the company for claims filed in those years, I mean,

5  eyeballing, you know, those black lines, looks okay.

6  Q    And that is, in fact, the tort system experience of the

7  debtors, is that right, sir?

8  A    No.  I mean, no, sorry.  No.

9  Q    That's not the tort -- they did not spend those dollars in

10  the tort system?

11  A    I was misinterpreting your question, then.  I would view

12  their experience in the tort system as the sum of the two

13  colors I can't see.

14  Q    Okay.  But when you say the sum of the two colors, the

15  light blue lines on the top, those are estimates, right?

16  A    Absolutely.

17  Q    And the dark blue lines on the bottom are actual spending,

18  correct?

19  A    Correct.

20  Q    And I presume, Dr. Vasquez, that you would agree with me

21  that your forecast spending from 2011 forward is significantly

22  in excess of any actual year of the debtors, unless you go all

23  the way back to 2003.

24  A    But the way you ask the question causes me a problem,

25  right, because I would disagree that the area underneath the

1 black line is the debtors' historical experience.  So I have to

2 say I don't know whether to say no or yes.

3 Q    We're back there, again, are we.

4         THE COURT:  Mr. Evert, I'm sorry, I'm confused.  I

5 want to make sure I understand what this chart represents.  I

6 thought that the dark blue lines on the bottom were not the

7 debtors' historical experience within the year that these

8 payments are reflected, but were, in fact, reallocated to show

9 the payments that were applied to claims filed in that year?

10        MR. EVERT:  Correct, Your Honor.

11        THE COURT:  Okay.

12 Q    So I guess my question, again, Dr. Vasquez is, you have

13 forecast, I presume, assuming your legend is consistent

14 throughout the chart, the red lines forecast what you would

15 estimate the debtors would pay for claims filed in 2011 and

16 beyond, correct?

17 A    That's correct.

18 Q    And if you look at the actual experience of the debtors,

19 your red lines are significantly higher than any one year

20 except for 2003, correct?  The actual spending of the debtors,

21 correct?

22 A    Oh, the actual dollars that they've spent?

23 Q    Yes.

24 A    Yes.

25 Q    And if you look even at your estimate, including your

1  estimates in the light blue lines, with the exception of 2010,

2  which is virtually entirely an estimate, your red lines are

3  still significantly higher than even any estimate -- and that's

4  horrible; I'm imitating Mr. Finch -- than even any estimated

5  spending in the years?

6  A    I'm not sure what the line is that you just drew.  What is

7  the --

8  Q    Forget the line I just drew.

9  A    Okay.

10  Q    Your red lines, 2011 forward --

11  A    Right.

12  Q    -- are significantly higher than any year other than 2003

13  or 2010, which is almost totally an estimate?

14  A    Yeah.  And I guess putting color aside, we're seeing this

15  chart very different.  That, you know, I look at it and I say

16  that I'm pretty darn consistent with -- I can't read it, but I

17  think with 2010.  And I'm declining off of 2010.

18  Q    And that's fair, Dr. Vasquez.  I guess my question about

19  that, isn't 85 percent of 2010 your estimate of what those

20  claims will be paid?

21  A    Sure.  Because in order to get -- in order to get into

22  that column as a paid claim, you have to have this terrifically

23  unusual circumstance where the claim was filed between January

24  1st of 2010 and May, blankety-blank, whenever it was, and so is

25  both filed and resolved.  So that means the claim was filed and

1  then resolved in a few weeks or something.

2  Q    I don't disagree, Dr. Vasquez.  And that's not what I'm --

3  that's not what --

4  A    I misunderstood, sir.

5  Q    The 2010 blue bar, which you say is consistent with the

6  rest of the graph, the entire blue bar --

7  A    Yes.

8  Q    -- is 85 percent an estimate, correct?

9  A    I think at least that, yeah.

10  Q    Okay.  Whereas, if you go back into '06, '07, '08, those

11  are like 85 percent, 90 percent actuals, correct?

12  A    You know, that's a good observation.  And I guess -- and I

13  keep thinking, and we keep talking about propensities to sue,

14  and all of those sorts of things.  But you're exactly right,

15  that's what this is pointing out, that show we had those

16  anomalies, throw that bar out that was back in 2003, whatever,

17  and take a look at it and the darn thing is ramping up pretty

18  aggressively over this period.  And I wouldn't disagree with

19  someone that says, you know, it's going to ramp up for a while

20  longer.  But I would disagree with an interpretation of this

21  that says that the first red line is too high relative to

22  history.  I just don't see it.

23  Q    Maybe here's the easy way for me to ask.

24  A    Okay.

25  Q    Will you agree with me that every blue line before 2010 is

1  trending down over time?

2  A    What do you mean, the blue --

3  Q    Okay.  Well --

4  A    Oh, oh.  You mean the area underneath the dark marks?

5            THE COURT:  The bottom part.  The bottom portion --

6  Q    No.  The whole -- the entire thing.

7  A    That's what I'm trying to understand.

8  Q    Let me ask it again.

9  A    Yeah, this can't be what you're asking.

10  Q   Counting both blue lines, is 2003 the highest?

11  A   Yes.

12  Q   And then 2004 and 2005 are lower, correct?

13  A   That's correct.

14  Q   2006 is still lower than 2003?

15  A   Yes.

16  Q   2007 is even lower than 2006?

17  A   Yes.

18  Q   2008 is still lower than 2006, the entire blue line?

19  A   Yes.

20  Q   2009 is still lower than 2006?

21  A   Okay.

22  Q   That's a downward trend, Dr. Vasquez.  I don't know how

23  else to say it.

24  A    No.  If I want to compare everything to 2003, then I could

25  agree with you.  What I'm saying is, is that I don't think

1 that's the way to look at this chart.  I would look at this

2 chart and say, you know, '04 and '05 were pretty darn low.  And

3 if I look at it, you know, forget anomalies and forget

4 variation year-in and year-out, that's about as upward slope as

5 you can get.  We have more than a color problem.

6 Q    You're right.  We seriously do have more than a color

7 problem.  Last question I'll ask you.  Is 2006 higher than

8 2007, 2008 and 2009?

9 A    Yes.

10 Q    I want to ask you one question about this chart that you

11 used in your direct.  Do you know what percentage of the

12 dollars -- and this is Slide 22 of Exhibit 1019, I think it

13 was, do you know what percentage of the dollars that the CCR

14 paid are on the left side of the dotted line --

15 A    No.

16 Q    -- versus the right side of the dotted line?

17 A    Sorry.  No.

18 Q    No, that's okay.

19 A    No, I don't know.

20        MR. EVERT:  Thank you for being very patient with me.

21 I have no further questions.

22        THE COURT:  Mr. Harron?

23        MR. HARRON:  Very briefly, Your Honor.

24                    REDIRECT EXAMINATION

25 BY MR. HARRON:

1 Q    I'd like to direct, Dr. Vasquez, attention, if you would,

2 to Page 9 of our exhibit.

3 A    Yes.

4 Q    Why did you believe it appropriate to rely on a 602 claim

5 count for the period January through May 2010 when the PIQs

6 only reflected 437 for that period?

7 A    You know, I don't know, and I don't pretend to know how

8 everyone responded to the PIQs and how they were notified,

9 whether they took it serious.  I don't have any view of that.

10 What I do have a view of is, that when I look at a -- I have,

11 basically, two views.  The one view is that I know that every

12 single company that processes claims has a lag that looks like

13 what I see in Bondex.  So I expect to see a lag.

14          Number two, I was fortunate enough in this case to

15 get back-to-back months where I could look at how many claims

16 would be filed one month later so I can get a very significant

17 way to quantify what that lag was.  And I would, you know --

18 visually, again, I would go back to that table that we don't

19 have up here now where we only had 25 claims in April, and a

20 month later we have well over a 100.  And then, you know, it

21 can't be coincidence, or accident that we have 27 claims in

22 May.  It's not because claims fell off the cliff at the end of

23 April, it's because of processing, which I think everyone would

24 agree to.  Well, not everyone, but most people should agree.

25 Q    And when you utilized your 2010 claim count, did you apply

1  rejection rates derived from PIQ data, or from the historical

2  experience of the company?

3  A    From the historical experience, but as I tried to point

4  out, it appeared to me that the PIQ data was telling us that

5  the quality of the inventory was better than even what we had

6  settled historically.  I used historical experience.

7            MR. HARRON:  I have no further questions.

8            THE COURT:  All right.  Mr. Evert?

9            MR. EVERT:  No additional questions, Your Honor.

10           THE COURT:  Will anyone need Dr. Vasquez on recall?

11           MR. EVERT:  No, Your Honor.

12           THE COURT:  You're excused, sir.  Thank you.

13           THE WITNESS:  Thank you.

14           MR. EVERT:  Your Honor, again, with the Court's

15  indulgence, we would move to strike Dr. Vasquez's testimony on

16  the grounds asserted in our brief under Rule 702 and <u>Daubert</u>.

17           THE COURT:  That motion is denied.

18           MS. RYAN:  Your Honor, again, once again, sorry --

19           THE COURT:  Oh, sorry.

20           MS. RYAN:  -- it takes me some time to walk to the

21  microphone.  Just please note for the record that RPM

22  International joins in the motion made by Michael Evert.

23           THE COURT:  And that motion is denied, as well.

24           MR. HARRON:  Thank you, Your Honor.

25           THE COURT:  Mr. Sheppard.

1          MR. SHEPPARD:  Your Honor, the ACC/FCR rests subject

2  to the agreements that the parties have regarding supplementing

3  the record on the designations and additional documents as part

4  of the post-verdict briefing.

5          MR. FINCH:  One question, Your Honor.  Nathan Finch

6  for the ACC.  There have been a lot of demonstrative exhibits

7  marked.  Does Your Honor want copies of anything that's been

8  marked as a demonstrative?  I mean, normally you don't offer

9  demonstrative exhibits to the jury.

10          THE COURT:  I think I have them all.

11          MR. FINCH:  Okay.  Even if -- sometimes people said I

12  offer something as a demonstrative and sometimes they just

13  marked it.  Do you want the ones that people used that were

14  marked?  I think we should have it for the purposes of --

15          THE COURT:  I thought I had them all.

16          MR. FINCH:  Okay.  All right.  If Your Honor has them

17  all, then I will sit down and shut up.  Thank you, Your Honor.

18          THE COURT:  Yes.  As I explained earlier, whether

19  they're, in quotes, moved or not, they're not being accepted as

20  substantive evidence, but only as demonstratives.  When we're

21  finished today, I will go over the list of exhibits that I have

22  marked here.  It's not going to be in any kind of order except

23  by date, but nonetheless, I will go over them so you can have a

24  list.  Then when you get the transcripts, you can compare them

25  to make sure that I've got everything that was used.

1          MR. FINCH:  Okay.  Thank you, Your Honor.  That was

2  my understanding, as well.  I just wanted to be clear.  Thank

3  you.

4          THE COURT:  All right.  Mr. Dorsey, the FCR rests?

5          MR. DORSEY:  Yes, Your Honor.

6          MR. SHEPPARD:  I'm sorry, John.  I didn't mean to

7  speak for Mr. Dorsey, Your Honor.

8          THE COURT:  Okay.  Any rebuttal?

9          MR. EVERT:  We do have rebuttal, Your Honor.  I would

10  ask the Court for a five minute break so we can get organized.

11  For the Court's information, there's two hours and 42 minutes

12  remaining of which two hours belongs to our side.  We don't

13  think we will use all of that, Your Honor.  So if we can get

14  five or ten minutes to get organized, that will be helpful.

15          THE COURT:  All right.  We'll take a five minute

16  recess.

17          MR. EVERT:  Thank you, Your Honor.

18                    (Recess)

19          THE COURT:  When you're ready, Mr. Evert.

20          MR. EVERT:  Thank you so much.  We would call Dr.

21  Charles Mullin to the stand on rebuttal, Your Honor.

22          THE COURT:  You'll have to re-swear Dr. Mullin.

23        CHARLES MULLIN, Ph.D, REBUTTAL WITNESS, SWORN

24          MR. EVERT:  You got room up there for everything?

25          THE WITNESS:  Dr. Vasquez is definitely taller than

1  me.

2                          DIRECT EXAMINATION

3  BY MR. EVERT:

4  Q    Dr. Mullin, thank you.  Good afternoon.

5  A    Good afternoon.

6  Q    Have you had an opportunity to be here to listen to the

7  testimony of various witnesses who have put forth certain facts

8  relevant to your forecast in this case that you testified to

9  originally?

10  A    I have.

11  Q    And are you here today to try to rebut some of those --

12  some of that testimony that you've heard over the last few

13  days?

14  A    Yes.

15  Q    Well, then, let's get right into it.  I think, if we can,

16  Dr. Mullin.  I think one of the things that was talked about at

17  great length yesterday were some regression analysis that Dr.

18  Peterson did and Dr. Vasquez did in terms of your overall

19  model, is that fair?

20  A    I think the regression analysis was really focused on the

21  transaction cost model of settlements, that portion of the work

22  I did.

23  Q    So I'm going to put on the ELMO, Dr. Mullin, the first

24  page of what has been marked as Debtors' Demonstrative D-87,

25  which is entitled Transaction Cost Model of Settlement

1  Sensitivity Analysis.  Can you tell me what this is?

2  A    Well, Dr. Vasquez in his report had done a regression of

3  settlement amount on age.  And he'd done a regression where it

4  was just a simple linear regression.  And that's really what's

5  reflected in the second column on the chart, is the output

6  that's listed in his report is the top part of that.  The

7  regression coefficient, the standard era, the t-statistic,

8  which is just different ways of saying that you basically, with

9  statistical certainty, for all practical purposes, that age has

10  a significant impact on the settlement amount.  That's a

11  t-statistic of 7.69, translates to effectively statistical

12  certainty.

13  Q    All right.  So, Dr. Mullin, I don't understand anything on

14  this slide, okay.  But I may be the only person in here, or it

15  may be a lot of us.  What was Dr. Vasquez's point, or the point

16  he was attempting to show in running this regression?

17  A    He did it for a very different reason than I was doing it

18  in the transaction cost model of settlement.  This was really

19  for adjusting average settlement values for age, since the

20  population was getting older.  I talked about that a little bit

21  in my affirmative testimony.  But the main point here was that

22  I tried to illustrate it by a calculation that I made, which

23  was the fourth row, which is if you think of what's the impact

24  of being 20 years older.  So if we think of this as comparing a

25  60-year old claimant with mesothelioma to an 80-year old

1  claimant, what's the impact on the settlement amount of that

2  kind of a shift in age.  So --

3  Q    This is of the debtors' data?

4  A    This is on the debtors' data.  And Dr. Vasquez's

5  regression shows that he estimated that on average across all

6  claimants to be about a $40,000 impact.  So the 60-year old

7  would get about 40,000 more in settlement on average than the

8  80-year old.  What I wanted to do with this was really show

9  that this exact same framework really affirms what I tried to

10 say in my affirmative testimony, which was that there's this

11 really sharp distinction between claims that were settled for

12 more that $200,000, which, you know, are driven by the damages

13 and the liability, and claims that were settled for less than

14 200,000.  So I replicated Dr. Vasquez's regression, but I just

15 ran it three times.  I ran it once on the low-value claims,

16 once on the mid-value claims, and once on the high-value

17 claims.

18          And what you see is, for the low-value claims, you

19 get a coefficient estimate of $33, which means each year of age

20 moves the settlement amount $33; or a 20-year movement would

21 have a $660 movement.  It's not statistically significant.

22 There's a six percent chance it's statistically significant and

23 a 94 percent chance that that size of a coefficient is just

24 random noise in the data.

25          Similarly, when you move to the mid-value claims,

1  it's borderline.  It's about a 50/50 odds about whether or not

2  this is statistically significant, which is the bottom line.

3  It might be; it might not be.  It's a coin toss.  And the

4  dollars are a little bit bigger, too, in that a 20-year

5  movement will change the settlement amount by $3,660.  Now,

6  that's for claims that are settling between 50 and 200,000.  So

7  in percentage terms, that's a very small movement.  These are

8  claims that on average were getting the $120,000, and a 20-year

9  movement in age over a mean of 120,000 makes about a $3500

10 difference, so it's not particularly material.

11         In contrast, if you go to the high-value claims,

12 these are claims that are settling for much more money, but

13 here you see the coefficient estimate is almost $7500.  You

14 know, it's 7,488 is what comes out of the regression, in as a

15 t-statistic over 13.  You know, it also is significant with

16 statistical certainty.  It has the 100 percent again.  So the

17 entire result for the whole population when you run it on all

18 claims is being driven by those high-value claims.  When you

19 break it into its pieces you see that's the piece that has the

20 strong relationship, and the rest is not.

21         So whether you do exactly the model I did for the

22 transaction cost model of settlements, or whether you take what

23 Dr. Vasquez did and you run settlements on age, it tells you

24 the same thing.  Claims settled for more that $200,000 are very

25 sensitive to damages.  Claims settled for less than that are

1  basically insensitive to damages.

2  Q    And at the end of the day, in terms of your analysis, what

3  does that mean?

4  A    This is -- this confirms the basic point of what we end up

5  seeing in the transaction cost model of settlement that the

6  low-value claims are mostly driven by the transaction costs.  I

7  mean, we're going to see this in about two more sets of

8  analyses, but the point here is it doesn't matter how you

9  approach this problem.  No matter how you approach it, you see

10  this stark break at about $200,000.

11  Q    Now, did Dr. Vasquez also do a sensitivity analysis?

12  A    He did.  He replicated my transaction cost model of

13  settlement.

14  Q    And is that illustrated in this slide entitled, all of Dr.

15  Vasquez's alternative models have a kink between 200,000 and

16  230,000?

17  A    This is the same slide that I think was used, really, a

18  few days ago which says that across all these alternatives,

19  they all imply that between 70 and $80,000 is what's being paid

20  to avoid the transaction costs.  What I really wanted to turn

21  to here was to go behind these numbers.  There's an exhibit in

22  Dr. Vasquez's rebuttal report, which is Table B-3 on Page 36 of

23  his rebuttal report.

24  Q    Do you have a copy, Dr. Mullin, of his rebuttal report?

25  A    I -- because Dr. Vasquez immediately preceded me, I do

1  have a copy.

2          MR. EVERT:  I'll put it on the ELMO, Your Honor.

3          THE COURT:  Which exhibit is that?

4          MR. EVERT:  It is Exhibit --

5          THE WITNESS:  One thousand twenty-six.

6          THE COURT:  Thank you.

7  Q    Page 36.  Now, if you think I can't see colors --

8          MR. SHEPPARD:  Before we get there, Your Honor, did

9  we mark the last demonstrative, Mike?  Is that --

10         MR. EVERT:  It's all one -- we submitted it as one.

11         MR. SHEPPARD:  Oh, okay.

12         MR. EVERT:  It's all the D-87, yes, sir.

13 Q    Dr. Mullin, is this the chart to which you're referring on

14 Page 36 of Dr. Vasquez's rebuttal report?

15 A    It is.  I don't want to try to go through everything in

16 this chart.  We'd be explaining a lot.

17 Q    We appreciate that, Dr. Mullin.

18 A    So what I want to do is, his second and third columns list

19 where under these 40 alternative models that he considered are

20 the kinks.  So where does it move.  And the important thing to

21 note is, as you just scan down those two columns, every single

22 model has a kink at either 200,000, 210,000, 220, or 230.  No

23 matter what specification is used, that's where the shift

24 occurs.  And you can just scan down, it's really column two,

25 it's 210, 210, 210, we can keep going.  If you were to go to

1 the next page, that continues all the way down.  Line 39, that

2 one's in column two, or under kink two is the 200,000.  But

3 whether you put it in the first kink or the second kink,

4 there's always really a structural change in the data, were we

5 to use the technical econometric term for it, there's a

6 structural change in the data at that point.  It behaves

7 differently after 200,000 than it did before.  And, again, it

8 doesn't matter under any alternative specification.  That's

9 what you always see.

10          The other thing I wanted to look at this for was, Dr.

11 Vasquez correctly replicated my model.  So when he ran the data

12 that was produced, and Bates White produced all its materials,

13 he did replicate it, and the last three columns are the

14 coefficient estimates.  And they are 0.098 for the first

15 stretch of the curve, which is what I illustrated is

16 effectively zero.  It's the flat line that's in the

17 demonstratives I put up before.  The second coefficient is

18 minus 1.2183.  And the third coefficient is minus 3.3780.

19          Why this is important when I look at it is, this is

20 not what Dr. Peterson put up.  When Dr. Peterson asserted

21 yesterday that he had replicated my work, you'll recall that he

22 had different coefficient estimates than that.  So what he put

23 up was not a replication of my work.  So his coefficients, I

24 mean, if I put them side-by-side --

25 Q    I put up another demonstrative slide, Dr. Mullin.  Is this

1  what you're discussing in terms of Dr. Peterson's attempt to

2  replicate your analysis?

3  A    Correct.  He asserted that they had replicated my analysis

4  on the sample of 806 claims, and they knew they had run my code

5  correctly because they got back the same estimates, but they

6  don't have the same estimates.  They have very different

7  estimates, particularly for the high-value claims.  Instead of

8  an estimate of minus 3.37, he has an estimate of minus 2.16.

9  That's not close.  So they didn't replicate my model.

10 Unfortunately, they didn't turn over the code last night, they

11 only turned over the data set and the output of the code, so I

12 don't know what they did wrong.  All I know is, they did not

13 replicate the model that I produced, while Dr. Vasquez did.

14 Q    Now, in that regard, Dr. Mullin, this is Slide 32 from Dr.

15 Peterson's direct testimony of yesterday where he discussed

16 this regression.  Is this to what you were just referring?

17 A    Correct.  He had asserted that the all Mullin cases line

18 was a replication of my model with all the data included.  And

19 you can see -- I mean, it's the same numbers that were on the

20 previous demonstrative.  They aren't the same.  So whatever he

21 did, I don't see the computer code, so I don't know what was

22 actually done, but whatever he did was very different from the

23 model that I implemented.

24 Q    Did you plot the data that Dr. Peterson had in his --

25 A    I did.

1  Q    -- analysis?  I'm sorry.

2  A    I mean, there's enough references to pretty bubble charts,

3  so I went ahead and made another one.

4  Q    Well, at least they're not in different colors, Dr.

5  Mullin.

6                         (Laughter)

7           MR. EVERT:  Do we have another copy of this for the

8  other side?  This is the only --

9           MR. SHEPPARD:  We don't have a copy of that slide.

10           MR. EVERT:  I know you don't.  It was an intentional

11  effort to deceive you, I just got to find the --

12           MR. SHEPPARD:  I'm sure it was not, Mr. Evert.

13           THE WITNESS:  There were four copies in the -- there

14  were four copies in the other room.

15           MR. EVERT:  You handed me four copies, I'm sure, Dr.

16  Mullin, and I am certain that I did something with them.

17           THE COURT:  Are you going to be marking this as a

18  separate exhibit?  It's not in 87, correct?

19           MR. EVERT:  I will mark it as the next exhibit, Your

20  Honor, of D-88, as soon as I can find one to give to the Court.

21  But with the Court's indulgence, can I just use it on the ELMO

22  for now?

23           THE COURT:  Yes.  Sure.

24           MR. SHEPPARD:  No objection, Your Honor.

25           MR. EVERT:  Thank you.

1  Q    I'm sorry, Dr. Mullin, my ineptitude interrupted you.  So

2  did you attempt to plot Dr. Peterson's data that you received

3  last night?

4  A    I did.  I mean, the data I received was the same data I

5  had used, the 806.  He did produce back the same data set.  It

6  had a variable on it that indicated which ones were in included

7  in his 432, and which ones were the ones that he had excluded

8  as not being individually evaluated.  So I restricted the data

9  down to the 432 claims that Dr. Peterson elected to use.  And

10 the main point of this graph is -- I'll give you a moment --

11            THE COURT:  Thank you.

12            MR. EVERT:  Thank you.

13 A    Is if we go back for one moment to the previous

14 demonstrative from Dr. Peterson's testimony, the important

15 thing I want to focus on is, he has a coefficient estimate

16 that's a positive, about .5, for the over 200,000 claims when

17 he restricts to the 432.  So he asserts that there's an upward

18 sloping line in that section of the graph.

19 Q    Positive indicates that the line should slope up?

20 A    Positive should be upward sloping, yes.  And upward

21 sloping, if that's actually what was happening, would be

22 counter to the theory.  So an upward sloping line is counter to

23 the transaction cost model of settlement as it exists in the

24 literature.  So if that was correct, that would be problematic

25 for the theory.

1        So if we go forward and we look at this, it doesn't

2   take an econometrician, or anybody very fancy if you just look

3   at that data, the human eye can look at everything that is

4   above $200,000 and see that if you were to fit a line to it,

5   it's going to be downward sloping, and downward sloping fairly

6   steeply.  And you can see all the mass of the data, basically,

7   following down a straight line with one outlying point.  So I

8   did run that progression, as well, and you do get a

9   statistically significant large negative coefficient.

10       So as you look at it and you see -- you can just look

11  at it, though, and see it's going to be downward sloping.  So

12  how they ran a regression on that data and said that that clear

13  downward trend actually results in an upward trend, I don't

14  know.  Because, again, I don't have their computer code, but I

15  know they did it wrong because the human eye tells me that, and

16  I actually replicated that portion of it and you get a clear

17  downward sloping trend.

18  Q    Which is consistent, I believe, with your affirmative

19  testimony, is that right?

20  A    Correct.  And whatever they did wrong probably on the 432

21  is similar to whatever is wrong in their attempt to replication

22  when I had all 806.  But I don't -- like I said, I couldn't

23  diagnose what was the error because I didn't have the code.

24  Q    Dr. Mullin, this is a -- I want to move now, if I can, to

25  talk about the Simmons, Cooney, Lanier settlements and some of

1 the group settlement claims that have been talked about, if we

2 can.

3 A    Yes.

4 Q    This is a demonstrative that we used yesterday.

5         MR. EVERT:  And, Your Honor, I'm getting the number

6 for you at this moment.  Rebuttal is always a little bit of a

7 challenge.

8 Q    Do you recall this from your affirmative testimony, Dr.

9 Mullin?

10 A    I do.

11 Q    And can you tell me, and just refresh the Court, if you

12 would, what the point of this demonstrative was?

13 A    There were a few points.  One was that when claims are

14 individually evaluated, we saw that less than 30 percent of

15 them were being paid and more than 70 percent, in turn, would

16 be dismissed.  While in the large inventory deals, you had

17 about 90 percent of the claims being paid.  The money was

18 spread much more evenly in the inventory deals, so it was

19 spread over 90 percent of the claims.  An average settlement

20 value of 70,000, because that was going to 90 percent, you had

21 an average resolution cost that's about 63,000.  While, with

22 the individual claims it was much more concentrated, you know,

23 about 170,000 per claim that was actually getting paid, but

24 because closer to one in four were being paid, that was around

25 $45,000 per claim.  And so the motive part that was on an

1  inventory deal, although the average settlement value was

2  lower, because that's only looking at paid claims, the actual

3  per-claim resolution cost was almost $20,000 higher.   In

4  contrast, the defense bills were dramatically lower.   $5,000

5  per claim was expended on the large inventory deals, the 17 of

6  them, in contrast to about 45,000 per claim when you looked at

7  the individual deals.

8           I wanted to go back to this really because to me the

9  most important piece is, is the investigation happening?  Are

10  the claims being evaluated on their own merits or not?  And

11  whether it was Mr. Iola, Mr. Simon, Dr. Peterson, or Dr.

12  Vasquez, I heard a lot of testimony about other types of group

13  transactions.  And there's been a lot about if you see five

14  claims, or ten claims resolved on the same day, is that a group

15  that's more like the inventory deal where no investigation was

16  made and, hence, should be excluded in the same manner from

17  some of the analyses as the inventory claims were; or would

18  those just happen to be a plaintiff attorney sitting down with

19  the defense attorney negotiating five claims at the same time

20  for efficiency, but each is individually evaluated.

21  Q    And the point of that, Dr. Mullin, is that enabled you to

22  then do your forecast and your estimate based on the merits of

23  the claims?

24  A    Correct.  I mean, I wanted to do a forecast that was based

25  on a merit-based forecast.  So when claims are individually

1  evaluated, what are they worth?  So I had done this before in

2  the tabulation, but I recreated some work in my own exploration

3  before, which was if you look at these individually evaluated

4  claims, I did it slightly differently last night, actually,

5  because I had Dr. Peterson's categorization of claims.  So what

6  he sent me was, was a claim settled is the only claim on the

7  date, two claims on the date, three claims on the date, and

8  what size group, according to Dr. Peterson's group, was a claim

9  resolved in.  So I just tabulated based on his group variable

10 what was the average per claim defense cost, because for all

11 the recent data, we have the defense cost on a claim-by-claim

12 basis.

13 Q    Let me stop you there, Dr. Mullin.  I've put up the next

14 demonstrative slide in D-87.  These are -- the numbers in the

15 left-hand column, 1 through 15, are group sizes from Dr.

16 Peterson's groups, is that right?

17 A    Correct.  So Dr. Peterson, if this is a 10, asserted that

18 10 claims were settled with the same plaintiff law firm on the

19 same date.  And so there was an indication that this was a

20 claim that was settled along with nine others.

21 Q    And your effort here was to try to ascertain whether or

22 not the claims in those groups, based on the defense

23 expenditures, had been individually evaluated --

24 A    Right.

25 Q    -- is that right?

1  A    Correct.  We'd seen that over all -- before -- what I

2  presented before was that it's about 45,000 a claim in defense

3  costs was the average when they were being evaluated.  Well, in

4  the inventory deals, it was about 5,000.  So when I went here,

5  you can see that all of these are around that $45,000 number.

6  In some of these, there aren't that many claims in the group,

7  so at the end the sample sizes aren't that big and it moves up

8  and down.  So claims that were one claim settled on -- only one

9  claim on one date would be $56,820.  The largest numbers

10 actually associated with 12 claims.  When 12 claims were

11 evaluated together, we get $66,332.  I don't really think

12 there's the sample sizes here, those aren't meaningful

13 distinctions.  We can see a group of four is down at 15,000,

14 and a group of 14 is down at 15,000, you know.  But all of

15 these are substantial.  They're all consistent with that

16 exploration.

17         In contrast, for groups larger than 15, when you move

18 to a group that was larger than 15, the defense costs really

19 almost disappear.  So the groups that are larger than 15 are

20 groups that have defense costs that are much closer to what you

21 see in the big inventory deals.  So instead of guessing as to

22 where one should draw a line, you can go to the data and it's

23 very informative.  What this tells you, as well, though, is,

24 and this is what's really of critical importance to me, if I

25 look at the totality of all the claims settled between 2007 and

1  2010, 40 percent of them in round numbers, I think it's 42 if

2  my memory is serving right, were resolved in inventory deals.

3  Q    Excuse me.  When you say inventory deals, you mean the

4  Simmons, Lanier and Cooney --

5  A    Correct.

6  Q    -- the 17 Simmons, Lanier and Cooney deals that we have

7  spoken at great length about here --

8  A    That falls into --

9  Q    -- the last five days?

10 A    -- the 2007 to 2010 fiscal year time frame.  So that was

11 about 42 percent of the claims.  About 55 percent of the claims

12 fall into these groups that are sizes 15 or smaller.  Three

13 percent of the claims, three percent of the mesothelioma claims

14 fall into groups larger than 15, okay.

15         And at first, it's probably worth reminding people,

16 if you think of the groups, how can it be only three percent if

17 these are large groups?  The way Dr. Peterson defined groups

18 was claims irregardless of the disease of the claim, settled on

19 the same day.  So most of that three percent, you'll observe a

20 group of 200 claims settled on the same day, of which one or

21 two will be mesothelioma and the rest are not.  You know, to

22 make it simple, say the other -- say it was two mesothelioma

23 claims and 198 non-malignant claims, and then for that three

24 percent there's a judgment call.  The data has really clarified

25 the rest for us, but that three percent, maybe the two

1  mesothelioma claims were lumped in with the 198 non-malignant

2  claims and were not discussed separately.  Maybe they were

3  called out on the side and discussed separately from the 198

4  non-malignant claims.  You know, my numbers in this are

5  hypothetical; I'm not talking about a particular 200 claims,

6  it's just meant to be illustrative.  But, you know, the theme

7  that it's typically a small number of mesothelioma claims means

8  settled on the same date as a large number of other claims is

9  what you see in that three percent.

10      So if you believe that that means they weren't pulled

11 to the side and talked about separately, you could exclude that

12 three percent.  If you believe they probably were discussed

13 separately, you'd include them, but it's such a small number of

14 the claims at this point, it's about -- it's on the order of 25

15 of the claims out of the 806 in the regression I was using, if

16 I say it's not really a regression, but that's -- people have

17 been using that term a lot.  But it's on the order of 25 of the

18 806 claims is what we're talking about that fall into this

19 group where the defense fees don't make it obvious where they

20 belong.

21 Q    The important, or one of the important points is that it

22 furthers your view and belief that you have attempted to

23 capture and been successful in largely capturing the

24 individually evaluated and litigated claims, is that right?

25 A    Correct.  I mean, I have confidence that I have 98 percent

1  of the claims in the right group in the sense of -- or

2  category; I won't use the word group in the same way.  So I

3  have them in the right category as individually evaluated is 55

4  percent with relative certainty.  I have 42 percent that were

5  included within these 17 large deals.  Then there's three

6  percent leftover where it's quite debatable which side of the

7  fence that three percent falls on, but also not material to any

8  of the analysis where you put them.

9  Q    Now, Dr. Mullin, was there also some debate, or dispute

10  about the average settlement values and average resolution

11  values in your report?

12  A    There were lots of different versions that I saw floating

13  around, so, I mean, I want to just revisit it to make it very,

14  very clear where my data come from.

15  Q    Well, revisit it.  Where did your data come from?

16  A    So they're coming from the debtors' claims database,

17  that's what I'm relying on for settlement amounts.  And I

18  created a couple tabulations from that which document on a

19  claim-by-claim basis exactly where my $45,000 average

20  resolution value comes from, and I created two versions of it

21  because one comes in slightly above 45,000, one comes in

22  slightly below.  And I'll wait for you to hand them out, but

23  then I'll try to explain what the difference between the two

24  are.

25          MR. EVERT:  I'm going to mark this one as D-89.

1          THE WITNESS:  Okay.

2          MR. EVERT:  Your Honor, these are Debtors'

3   Demonstratives D-89 and D-90.

4          THE COURT:  Thank you.

5   Q    All right, Dr. Mullin.  I've been able to hand out the

6   demonstratives.  Which one would you like to tackle first?

7   A    We can do them in order, is fine.

8   Q    All right.  What is Debtors' Demonstrative D-89?

9   A    So it is a printout from the claims database.  And what

10  it's showing is the count variables just in index variable

11  counting the rows on the printout.  It's not actually something

12  from the database.  The reference ID are the identifying fields

13  within the database that tell you the unique identification of

14  the claim.  Then there's the resolution amount.  There's a

15  resolution date.  There's a resolution year, which is in fiscal

16  years.  And there's a flag, which is zero if the claim is

17  outside of the 17 Simmons, Lanier, Cooney large inventory

18  deals, it is a zero.  It's a one if the claim was included in

19  one of those 17 inventory deals.

20          But these -- this is explicitly the data, if you go

21  to the very last page of it --

22  Q    So -- excuse me, Dr. Mullin.  I just want --

23  A    Mm-mm.

24  Q    We've admitted into evidence in this case the historical

25  claims database of the debtors.  I think you're aware of that,

1  is that right?

2  A     Yes.

3  Q     This is literally a printout from that database, is that

4  right?

5  A     It's a printout where it has connected to it a flag.  The

6  last column indicates which of these claims from the debtors'

7  claims database were included in the 17 group settlements with

8  Lanier, Cooney and Simmons, and which ones were not.

9  Q     Okay.

10  A     So that's really the only addition.  And then the year

11  variable is just a function of the resolution date, but that's

12  a variable that we constructed.  So the very last page shows

13  the average resolution value for these claims.  And it shows

14  that over the last four years, the average resolution value for

15  -- if I look at all of the claims, is $53,981 per claim.

16  Q     That includes both Lanier, Simmons and Cooney claims and

17  everything else?

18  A     Correct.  I have --

19  Q     So it's all the claims?

20  A     I have 4,000 claims and it comes out at, you know,

21  approximately $54,000.  If I look at individually resolved

22  claims, there's 2,247 of those.  And when I tabulate what is

23  the average resolution value for that, it's $46,196.  And

24  similarly, if I look at the group settlements and I look at the

25  average settlement amount for the ones that are in these 17, I

Mullin - Rebuttal Direct/Evert                    221

1  get $63,959, you know, is what I get there.

2          This is really starting with what's in the debtors'

3  claims database.  The second one, which is D-90 --

4  Q    D-90, yes.

5  A    D-90 is virtually identical, except if we go to the last

6  page of it, you'll note that instead of having 4,000 claims, it

7  has 4,149 claims.  So the additional 149 claims are claims that

8  in the PIQ process had been filed during -- or claims during

9  the PIQ process that had been withdrawn.  If you view those

10 withdrawn claims as dismissals, because they're not going to

11 pay any money on them, so you include those in the average

12 resolution value as a zero payment, the numbers go down a

13 little bit because now you have 149 more zeros.  And if I

14 include those, I end up with -- the group settlement one isn't

15 going to change, but the individually reviewed claims now have

16 an average resolution value of $43,359.  So if I include the

17 withdrawn claims, I get a number a little bit below $45,000 per

18 claim.  If I exclude those and treat them as though they were

19 still pending, I don't treat them as zero pays, I get a number

20 that's around $46,000; it was a little above 45,000.  You know,

21 you can debate whether they should be in, whether they should

22 be out, either way, we're right around $45,000 per claim.

23 Q    And the --

24 A    That's why I've just been using throughout the $45,000 per

25 claim.

1  Q    And the withdrawn claims, I just want to be clear, that

2  resulted from your review of the PIQs, is that right?

3  A    Most of those -- the PIQ wasn't submitted, actually.

4  There'd be a letter.  This came through the whole process, so

5  there'd be a response in some form from counsel stating that

6  they were withdrawing the claim.

7  Q    They no longer had a claim, or the claim had already been

8  resolved, or for some reason the claim was withdrawn?

9  A    Right.  Sometimes a reason was given; frequently no reason

10 was given it was being withdrawn.  They just stated the claim

11 was being withdrawn.

12 Q    Now, there was some discussion during the testimony here

13 over the last several days, Dr. Mullin, in regard to your

14 transaction cost model of settlement and the question of the

15 symmetry of the transaction costs between plaintiffs and

16 defendants.  Do you recall that testimony?

17 A    I do.

18 Q    And, generally, what was that testimony as you recall it?

19 A    It varied.  So I think there's an agreement that in

20 general, defendants generally, the debtors specifically were

21 paying their attorneys not on a contingent basis, but they were

22 paying for the attorney time, while generally, the plaintiff's

23 counsel is on the contingent fee basis.  So there's not an

24 explicit legal fee.  You don't -- you know, settling six months

25 earlier, if you're settling for the same amount, the

1  contingency fee remains the same.

2  Q    So there was some discussion, then, about whether or not

3  the plaintiffs incurred similar legal expenses and costs with

4  their claims as the defendants, is that right?

5  A    Correct.  And it's -- I mean, what the theory really goes

6  to, the costs you incur aren't really what's relevant.  It's

7  the costs you save by settling earlier.  So costs that have

8  already been spent don't matter.  It's what do you save by

9  settling earlier.

10 Q    And how does that differ between a defendant paying an

11 attorney on an hourly rate versus a plaintiff paying his fee on

12 a contingent basis?

13 A    Assuming the contingency rate is time and variant, so if

14 the plaintiff attorney is getting a 30 percent contingency, if

15 they settle with the defendant today for $100,000, they receive

16 -- 30,000 goes to legal fees from the claimant's perspective.

17 If they settle two years from now for $100,000, they still pay

18 $30,000 to the plaintiff firm as a contingency fee.  So there's

19 no real savings.  It goes up and down with the recovery amount,

20 not with the timing of the payment.  While for a defendant, the

21 more hours the attorneys spend, typically the higher the bills

22 are.

23 Q    However, the plaintiff's costs, that is experts and the

24 natures I think we heard from Mr. Iola, they increase, do they

25 not?

1  A    Most definitely.

2  Q    Did you do -- well, have you looked at that issue?

3  A    I have.  I've really pulled together two sets of data.

4  And the main point of them is to demonstrate that the expenses,

5  the nonlegal expenses aren't very different.  Defendants, if

6  you're looking at hotel rooms, expert fees, you know, the

7  non-attorney time, the two have comparable costs.  They're very

8  similar.  It's the attorney time that's the big distinction.

9  Q    Sir, I'm going to put up the next slide in Debtors'

10 Demonstrative D-87.  And if you would, Dr. Mullin, it's

11 entitled plaintiff expenses are a de minimus portion of the

12 total recovery.  Would you explain to the Court what this

13 illustrates?

14 A    Well, this is data on a series of asbestos-related suits

15 where the counsel involved is listed on the first column, the

16 total recovery for the plaintiff is what's listed in the second

17 column, and the expenses are what's in the third column.

18 Q    Where did you get this information?

19 A    The source of data that I have for this information is the

20 -- at least for the higher-value cases, the plaintiffs'

21 attorneys generally advertise them, so they post them on their

22 websites.  And this has been taken from law firm websites where

23 they indicate Baron & Budd claim, they're basically advertising

24 that they recovered, you know, $7,750,000 on behalf of a

25 claimant.  They don't provide the claimant's name.  And they

1  tell you what were the expenses they incurred.  They also tell

2  you what other legal fees they charge.  They give some

3  characteristics; they might tell you it was a pipe fitter, or

4  some generic characteristics about the claimant.  But it's a

5  place where they're self-reporting, so I haven't independently

6  audited this data.  But they're self-reporting on their

7  websites what were their recoveries and what were their

8  expenses.

9          Now, these are high-value cases, so they're higher

10 than typical because that's what a plaintiff's law firm wants

11 to advertise.  But it's reasonable to assume that if it's a

12 high-value case, it had a fair amount of work that went into

13 it, too.

14 Q    Did you compare that to expenses that the debtors incurred

15 in cases in which they took to trial?

16 A    I did.  One thing I'd like to point out on this before we

17 move on, when I heard Mr. Simon discussing the process, he

18 would say, you know, this can be in six figures.  And it --

19 this is consistent with that.  A couple of these are pushing

20 $200,000 of expenses.  There's others that are at 10,000 or

21 50,000, but the overall average is about $55,000 in expenses.

22 Q    Then the next page of Debtors' Demonstrative D-87 is

23 entitled defense expenses are of similar magnitude to potential

24 liability.  Could you tell me what that illustrates?

25 A    So I've listed a series of cases which are actually trials

1  by the debtor.  And in the trials I had available to me all of

2  the legal fees and expenses associated with the matter.  So if

3  we look at these cases, we're getting -- again, the expenses

4  are moving up and down in a range.  They can be as low as

5  35,000 or so, they can be as high as a 100, 120,000, but

6  they're averaging around $75,000.  That's not that different

7  from the $55,000.  The only difference was the 75,000 on one

8  side and 55,000 on the other, the difference in transaction

9  costs wouldn't really be driving the litigation.  But the legal

10 fees are over $200,000, and that's the big difference when you

11 see it.  These are out-of-pocket expenses for defendant.

12 They're paying over $200,000 to attorneys.  And that's the

13 incremental savings that they're observing that the plaintiff

14 doesn't observe by settling earlier.  It doesn't change their

15 legal fees, the timing of settlement, but it really does change

16 them for defendants.

17 Q    Dr. Mullin, since the defense expenses average slightly

18 higher, you're not expressing the opinion that the defense

19 lawyers stay in better hotels, are you?

20          MR. SHEPPARD:  We'll stipulate to that, Your Honor.

21                    (Laughter)

22          MR. EVERT:  I knew that was coming.

23 Q    So, Dr. Mullin, the fact that the costs are not

24 symmetrical, what does that mean for the purposes of the

25 transaction cost model of settlement?

1  A    I mean, the model at its core says that the parties will

2  split the savings.  And when they're not symmetrical, one side

3  is getting a larger savings than the other and it shares it.

4  So if we assume the expenses were to cancel here perfectly and

5  only look at legal fees and call that $200,000, the theory

6  would say if the two sides have equal bargaining power, they'd

7  split it a 100,000 each, you know, if the world was that

8  simple.  The world's not as simple as, you know, the model as

9  it's written in a law, you know, in that law and econ article

10 that, okay, I can just take the number, divide by two and I'm

11 done.  You know, but that's what the theory says.  If we have

12 equally skilled negotiators, they'll split the savings.  And so

13 they both throw their savings into a pot and then each of them

14 take half of it home.  And if they're both throwing an equal

15 amount in, then they both take an equal amount out.  If one's

16 throwing three-quarters of it in, they only get half of it

17 back.  So whoever -- the asymmetry means the party with higher

18 costs ends up with a less favorable settlement relative to the,

19 you know, expected outcome at trial.

20 Q    And was that the result of your calculations when you put

21 the debtors' data into your model in regard to group settlement

22 claims?

23 A    Well, group settlement claims came out almost exactly that

24 way.  I mean, they saved -- they went from paying 45,000 per

25 claim in defense fees to 5,000 per claim.  So they saved

Mullin - Rebuttal Direct/Evert                    228

1  $40,000.  That was the savings.  There the average resolution

2  value, so the payment to the claimant went up by $18,000.  So

3  it went up by 18 out of 40, that's 45 percent, it's not quite

4  50 percent, but they split it in that 45 percent, 55 percent.

5  Q    Now, in Dr. Peterson's testimony, Dr. Mullin, was there a

6  discussion and a demonstrative using his $73,150 average

7  resolution value?

8  A    There -- I replicated his demonstrative with that number.

9  It's not perfectly his.  I didn't have the underlying data, I

10 just saw the demonstrative.  So I replicated so I could show

11 how it changes as you change assumptions.

12 Q    And that's Page 11 of Debtors' Demonstrative D-87, is that

13 right?

14 A    Yes.

15 Q    Can you see the 11 that's up there in the --

16 A    Barely.

17 Q    I finally found the page numbers.  It took me a while.  So

18 tell me, if you would, Dr. Mullin, what this illustrates?

19 A    Well, this was an attempt to replicate what he put up in

20 his testimony, which is the dark red bars are incurred

21 historical -- you know, it's historical payments.  Again, as we

22 were talking just a little bit ago with Dr. Vasquez's chart, by

23 the year in which the claim was filed.  So it says of claims

24 filed in 2003, he has around $55 million of payments.  For

25 claims filed in 2004, he's got $40 million of payments to them.

1  The pink, which sits right on top of the red, was the settled

2  but not documented claims, so settlement commitments in the

3  language I was using before.  You know, so they were committed,

4  but not paid.  The green was pending claims.  So how he valued

5  the pending claims.  And then the blue was future claims.

6  Q    Earlier today Dr. Vasquez put up a similar chart, is that

7  right?

8  A    Correct.

9  Q    It's the one where we had the thrilling courtroom scene

10 where we tried to determine what color was what color?

11 A    Hopefully this is better.  I don't know.

12 Q    And the point of those charts that Dr. Peterson and Dr.

13 Vasquez both showed the Court was what?

14 A    I took the point of them being to show that they're -- if

15 you were to fill in for the pending claims, once you value the

16 pending claims, that the history aligns with their forecasted

17 futures.  That things look like a nice, smooth, continuous

18 function, as opposed to what I said in my rebuttal report to

19 them, which was that there was this jump.  That there was some

20 discontinuity between their forecast and the history.

21 Q    Page 12 of Debtors' Demonstrative D-87, Dr. Mullin, could

22 you tell the Court what that represents?

23 A    So this is -- you walked through with Dr. Peterson a whole

24 series of demonstratives that really resulted in -- if we

25 assume that the average resolution value is $45,000 per claim,

1  and if we account for abandoned claims, assuming six percent of

2  the historical claims and six percent of all future claims will

3  just never get resolved, if we make those two changes and only

4  that, those are the only changes I made to Dr. Peterson's

5  calculations, everything else I leave identical, this becomes

6  his forecast.  It's the exact same claim counts and the same

7  years and everything else.  It also aligns with the history.

8  So there's really two things to take away from this.

9         One is, the way these charts are being constructed,

10 virtually any settlement value that you put in will look

11 reasonable.  Because if you double the settlement value, you

12 double the blue bars, but you also double the height of all the

13 green bars.  So the green bars always scale up to make it so

14 that the last green bar hits the first blue bar because it's by

15 construction, it's the math.  You know, so it really -- these

16 charts don't tell you just because they're smooth, it's right,

17 because they're smooth by construction.  But if I go here with

18 those two changes, you switched, is this 14?

19 Q    This is 14.

20 A    Okay.  What's interesting to me is, if I take Dr.

21 Peterson's forecast and I assume $45,000 per claim, and I

22 assume that six percent of the claims will be abandoned, and

23 now I lay over that the $615 million Nicholson extrapolation,

24 that I think was on my first demonstrative when I testified on

25 Monday, they line up perfectly.  The entire difference between

1  Dr. Peterson's actual forecast and mine in valuation can be

2  explained by those two things.  He uses a $73,000 average

3  resolution value, I use a $45,000 average resolution value.  He

4  does not account for abandoned claims, he leaves them all in; I

5  take the six percent historical rate for abandoned claims, in

6  essence, and account for them.  I did the calculations very,

7  very differently and I broke it down by high-value, mid-value

8  and low-value.  But at the bottom line, that's what it boils

9  down to.  Do you think the right value is 75,000 a claim?  Do

10  you think the right value is 45,000 a claim?  If you think it's

11  45,000 a claim, you get back the forecast that I did.  If you

12  think it's $73,000 a claim, you're pushing towards Dr.

13  Peterson's.  There's differences in interest rates and some

14  other things, but in terms of the nominal dollars, we line up

15  by making those two adjustments.  And that's really what it all

16  boils down to.  It's not that complicated in terms of the

17  differences.

18  Q    And would the same on some level be true -- well, let me

19  back up.  Dr. Mullin, this is Page 13 of Debtors' Demonstrative

20  D-87, and I think you referenced it just a moment ago and we

21  used it in your affirmative testimony.  If you'd refresh the

22  Court as to what this represents?

23  A    Right.  This was -- so the $615 million extrapolation,

24  which was just a simple Nicholson extrapolation that was, I

25  think, in orange on the previous exhibit and is in blue on this

Mullin - Court                                            232

1  one, is that same 615 minutes, the same one.

2          So, if you do 45,000 per claim and you assume that

3  six percent of the claims will be abandoned, the extrapolation

4  off the actual dollars settlement commitments lines up with, if

5  you put the previous one up, what you get if you fill in for

6  the unresolved claims.  You get a stable, consistent picture of

7  the world.  I can fill in historical and I get that number.  I

8  can look at futures and I get that number.  So it doesn't --

9  you know, they should be  -- if you believe the world has been

10 relatively stable, both of these pictures should look right.

11 This picture should look right if you do this construction of

12 completing it by filing year and value pending claims by filing

13 year, and build up should look smooth and continuous, as should

14 the other one when you do it based on settlements incurred.

15         You know, and they've basically been stable.  They've

16 been resolving approximately as many claims as they've been

17 receiving for each of the last four years, so they're in a

18 world that's been stable.  So you would expect both of those to

19 line up.

20                        EXAMINATION

21 BY THE COURT:

22 Q    Dr. Mullin, I think I'm confused about something in the

23 debtor's history, and maybe this is a good place to try to get

24 myself straightened out.  As I understand the testimony, the

25 debtor has essentially made commitments for certain settlement

1  values, particularly in the 17 big settlements that they made,

2  so that they -- but this isn't necessarily the testimony.  I'll

3  just put a spin to it, not as a finding, but as a way of

4  articulating the concept.

5          They wanted to even out their cash flow, and so they

6  would commit to pay X dollars in a set period of time, and I

7  don't know how that matches up to the claim year, filing year

8  in which the claims that were settled in the groups or not were

9  made.  But these charts appear -- all three of the experts

10 appear to have taken those settlement dollars and put them into

11 the year in which the claim was filed.

12 A    So there's two versions of the charts.  So one version, if

13 I go back -- this version we're looking at, actually, is

14 exactly that.  So they're putting it back to the year the claim

15 was filed.

16 Q    Putting the settlement commitment or dollars out?

17 A    The settlement commitment.

18 Q    Commitment.

19 A    The commitment.  Some of the charts you've seen have

20 distinguished between the ones that were actually paid in one

21 color and the ones that were committed but not paid in another

22 color.

23 Q    Yes.

24 A    Some have represented all commitments in a single color.

25 Q    All right.

1  A     So -- and there's other charts, like this one that I have,

2  which is by fiscal settlement year.

3            THE COURT:  What is this one?

4            MR. EVERT:  I'm sorry.  This is Page 13 of D-87, Your

5  Honor.

6            THE COURT:  Oh.  What was the prior one that you just

7  took down, then?

8            MR. EVERT:  I'm sorry.  It was Page 15.

9  Q     Okay.  So, 15 were settlement commitments, and 13 is what?

10 A     They're both settlement commitments.  The difference is,

11 how are they being dated?  Are they being dated by the year in

12 which the claim was filed, or are they being dated by the year

13 in which the commitment was made?  So, when it says fiscal

14 filing year at the bottom, they are being dated by the year the

15 claim was filed.  When it says fiscal settlement year at the

16 bottom, it's being dated by the year in which the settlement

17 occurred.

18 Q     Okay.  So, as a calculation issue, I suppose, when you're

19 basing the calculations on the commitments, regardless of which

20 time period you use, but you're looking at the commitment that

21 the debtors made to expend X dollars, isn't that a driving

22 force to the claim value?  I mean, if the debtors had committed

23 $80,000 as opposed to $100,000 for the same number of claims,

24 that would mean that the resolution at 80,000 paid people less

25 than the resolution at 100,000 for the same number of claims.

1  A    Correct.

2  Q    All right.  I just am not clear how the fact that the

3  debtor chose the settlement numbers is carrying through this

4  evidence because the testimony has all been that the plaintiffs

5  essentially are driving the numbers of claims that are settled,

6  but the debtors are choosing the amounts that are being paid,

7  and I don't -- I'm just not sure how that's affecting those

8  charts.

9  A    I've heard that testimony other times.  I don't think

10 that's how the world works.

11 Q    All right.

12 A    I think the two parties negotiate jointly what the claims

13 get paid.  They -- meaning when a plaintiff sits down, or a

14 plaintiff attorney is negotiating with the defense attorney, I

15 don't think for a moment that the defense attorney decides what

16 the payment is going to be.  The two of them negotiate to a

17 point where they agree.  They'll negotiate, you know, in

18 different ways.  It can be a whole inventory of claims, like

19 the 17, or it can be an individual mesothelioma claim, but I

20 think that's a jointly determined number.

21 Q    And they will also, in your view, then, jointly negotiate

22 the payment terms?

23 A    Correct.  So, the claimant -- the debtor doesn't --

24 presumably if they want to pay later, that's something they

25 have to negotiate for and probably would have to pay a little

1  bit more to convince the other person to delay the payment,

2  because everybody prefers a dollar today to a dollar a year

3  from now.

4  Q    Okay.  And I appreciate your testimony.  I guess where I'm

5  still confused is somehow or other it seems to me that the

6  settlement numbers, the amounts of the settlement, the

7  commitments, regardless of the time paid, are driving this

8  process.  They're driving the values, because everybody is

9  looking at the amounts that the debtor has paid to calculate in

10  the future what the debtor is going to pay, and even your

11  analysis does that, although it does it in a different way by

12  looking at the 45,000 and the $63,000 average settlements.

13  A    Correct.  So, all of us are taking -- in a sense, people

14  say, you know, history is prologue, and go and say, okay, if

15  there's claims with a certain characteristic, if I have a

16  claimant that has a really strong case against Bondex, and

17  that's what I would call a high value claim, and those claims

18  on average are getting close to half a million apiece, when I

19  see other claims that come in with those characteristics I'm

20  going to value those at about a half million apiece, too.

21  So, we are using the history to see, what's a claim with a

22  certain set of characteristics worth?  And that's really why,

23  at least personally, I want to focus on the individually

24  evaluated claims because they're taking those characteristics

25  into account.

1  Q    But they are still settlement dollars for the most part.

2  They're not verdict dollars?

3  A    Almost -- I mean, the verdicts are in my analysis.

4  Q    Yes.

5  A    I think the verdicts are in everybody else's analysis,

6  too.

7  Q    Yes.

8  A    There's -- you know, it's something like 28 or 30, I

9  forget the exact number of verdicts, and ten or so in which

10 they paid money.  So, those aren't -- although they are in the

11 data they aren't driving things because they're so small in

12 count.  But we --

13 Q    Okay.  I just want to be clear that, in fact, your

14 analysis is also based on settlement data.

15 A    Oh, yeah.  Yes.

16        THE COURT:  Okay.  All right.  I think I'm back up to

17 speed.  Thank you, Mr. Evert.

18        MR. EVERT:  Oh, certainly, Your Honor.  And I'm going

19 to ask Dr. Mullin a couple questions, and if the -- because I

20 want to make sure we're on the same page, and if the Court has

21 it, please stop me if the Court is -- if it's not helpful to

22 the Court.

23                CONTINUED REBUTTAL DIRECT/EVERT

24 BY MR. EVERT:

25 Q    This is Page 13 of Debtors' Demonstrative D-87.  Dr.

1  Mullin, the blue bars represent claims -- dollars that the

2  defendant -- that the debtors agreed to settle in the marked

3  year, correct?

4  A    Correct.

5  Q    They might have agreed to pay them ten years later,

6  although that's not right, two or three years later, but these

7  are not paid dollars, these are agreed settlement dollars.  Is

8  that right?

9  A    Correct.  These are agreed settlement -- the vast majority

10 have been paid, but --

11 Q    Yes.

12 A    -- a material subset of them have not been paid.

13 Q    We had been using the term committed for that, correct,

14 committed settlements?

15 A    Committed has -- we've been using to include both the

16 settlements that were paid plus the ones that were agreed to

17 but had deferral terms in terms of when the check needed to be

18 cut, so haven't been paid but were agreed to.

19 Q    Correct.  And so, when we had talked about committed

20 settlements it has been every single claim that was agreed to

21 be settled during that year, even though it may have been

22 agreed to have been paid one or two or three years later?

23 A    Correct.

24 Q    And why is it that you used committed instead of paid?

25 A    Well, if you want to think about how it would have

1  progressed in the tort system, the -- if you date everything on

2  a settlement those are eventually going to get paid, the vast

3  majority are going to get paid, and so as you back it up in the

4  tort system you're going to want to -- you just need to keep a

5  consistent dating metric.  That dating metric can be the filing

6  year of the claim.  It can be the settlement year of the claim.

7  It can even be the diagnosis year of the claim when you're

8  looking at mesothelioma, but you need to date every claim the

9  same way, and the -- so, for the ones that haven't been paid

10  yet you really don't have a payment date, so it really rules

11  out dating it on payment dates because there's just a group for

12  which that's unknown.  And that's -- people have oscillated

13  back and forth.  We don't always have a diagnosis date.  We

14  almost always do, but we don't, so that's used in some cases,

15  but not always, so you typically see people either pick the

16  filing date of the claim or the settlement date of the claim,

17  because those two are pretty much universally known, so it

18  allows you to use a consistent dating metric.  And that's

19  really -- the important piece in the analysis is to always use

20  the same dating metric, otherwise you can be kind of ships

21  passing in the night.

22  Q    And I presume that, as I think you testified before, and I

23  think Mr. Tompkins testified, that some companies use deferred

24  payments to manage their cash flow, so if you use payments you

25  end up with sometimes an artificial assignment of time?

1  A     And it's common for particularly publicly traded companies

2  to want to smooth out their cash flow, so that's -- it's a

3  common arrangement to have, and it's not universal by any

4  means.

5  Q     And I presume the committed settlements, conversely, are

6  driven more by the pace of the litigation, correct?

7  A     Correct.  Frequently if things are up for trial you're

8  either going to try them or you're going to settle them.  You

9  don't get to defer it beyond the trial date.

10  Q     And then if we go to Page 15 of Debtor's Demonstrative

11  D-87, the legend at the bottom of this graph says fiscal filing

12  year, correct?

13  A     Correct.

14  Q     And what that means is you have taken every settled case,

15  whether it has been paid or not, and placed it in the year of

16  its filing, is that correct?

17  A     Correct.

18  Q     And why, on occasion, do you find it appropriate to use

19  the filing year rather than the commitment year?

20  A     Well, I actually like to look at it frequently both ways

21  because the commitment year is really telling you, in a sense,

22  how quickly they're willing to send cash out the door.  The

23  filing year is telling you eventually, with the passage of

24  time, how much was the entire inventory of claims in that year

25  worth?  When both line up, then the world is pretty simple

1 because whether you look at it by settlement year or filing

2 year you have the same story and everything aligns.  When they

3 don't line up and you get very different answers under the two

4 that tells you -- the only way that can happen is if you're in

5 an unstable world.  And if you're in an unstable world then you

6 really need to dig down and try to figure out why it's

7 unstable, and that -- so it's a test to say if I'm stable both

8 of these should line up.  If I'm unstable these will look

9 different.

10 Q    And the stability that you're referring is most prominent

11 in the question of rising propensity to sue and lower claim

12 values as we discussed in your direct testimony.  Is that

13 right?

14 A    Those were the two things, when you looked in the

15 underlying data, yes, was a consistent rising propensity to

16 sue, and there was an equally strong downward trend.  I said

17 the correlation between them was .9 in the average settlement

18 value.  And those two were largely -- I mean, I talked about it

19 at length before, but if you didn't understand why those two

20 things were happening you don't know how to value the claims on

21 a prospective basis.

22 Q    Dr. Mullin, anything else that you want to tell the Court

23 about Slide 15?

24 A    No.

25 Q    So, to the point I think you just raised, there were some

1  questions raised about average settlement amounts and how we

2  should look at them, and I've put up Slide -- Page 16 of

3  Debtors' D-87, and can you tell the Court what that

4  illustrates?

5  A    So, the first really three columns of this are effectively

6  out of Dr. Vasquez's report.  I constructed this a while ago,

7  and the numbers in his report, this reflects his original

8  report, so it's not the 48.8 percent propensity to sue.  In

9  2010 it's slightly different.  But the --

10  Q    I'm sorry.  When you say his original report, do you mean

11  before the errata was filed?

12  A    Correct.

13  Q    Okay.

14  A    Correct.

15  Q    So, as Dr. Vasquez testified, it's not materially

16  different?

17  A    It's not materially different.  It's not going to be

18  materially different for anything I say.  I went to bed.  I

19  didn't try to update all these last night.  So, if I had had

20  more time I would have put in the original ones.  The main

21  point of this is, I mean, when he -- he had a demonstrative

22  that he put up, and on his own demonstrative he noted that the

23  propensity to sue is a filing year calculation, and his average

24  settlement value is a resolution year or a settlement year

25  calculation, so he's not using the same dating metric when he

1  says even though he uses the same years, 2008 to 2010, he's

2  using the claims filed in 2008 to 2010 to calculate his

3  propensity to sue.  He's using the claims settled in 2008 to

4  2010 to calculate his average payment amount.  And if we were

5  getting the same number of claims every year that really

6  wouldn't be a problem.

7          When you have a rising propensity to sue now you have

8  a misalignment.  There's about a one-and-a-half year lag on

9  average between when a claim is filed and when it gets settled,

10  so what this chart does is, I put the two side by side, the

11  claims settled in a year, their average settlement amount.

12  Well, notice it bounces up and down, it's a little noisy, if I

13  look at the claims filed in a year.  So that's telling me of

14  the claims filed in 2004, although the claims settled in 2004

15  have an average value of $155,000, the claims filed in 2004

16  have a value of only $103,000, approximately.  And one of the

17  things you'll notice here is the average settlement value for

18  the claims filed in a year is basically almost always, it may

19  even be always, lower than -- all except 2005, is lower than

20  the average settlement value of the claims resolved in a year.

21          And when you have a rising propensity to sue, that's

22  what you'd expect.  What you're saying is are the incremental

23  claims that you're getting of equal merit to the ones you've

24  been getting earlier, stronger or weaker?  Normally the

25  strongest claims sue defendants earliest, and as the propensity

1  to sue rises you're seeing more and more weaker claims coming

2  into the mix, so you see a declining average settlement value.

3  And that's really what this shows.  It shows that the average

4  settlement value for the claims filed in 2008 was $95,000, even

5  though the average settlement for claims resolved in 2008 was a

6  hundred and six.  So, if we really wanted to focus on those

7  last 29 months, we really should focus on the claims that were

8  filed there, too, because what in effect has happened is Dr.

9  Vasquez uses a 42.5 percent propensity to sue.  2009 is the

10 year that has a propensity to sue very similar to that.  The

11 average settlement value for claims filed at that propensity to

12 sue is $75,000.  That's what we see, although -- and when we go

13 back to 2008, which had a lower propensity to sue, 36.6, the

14 average settlement value is $95,000.

15         Dr. Vasquez uses an average settlement value that's

16 in the -- you know, right in the '90s, so he's using an average

17 settlement value that's consistent with a propensity to sue

18 that's between 31 and 36 percent.  But then he applies that to

19 a 42 and-a-half percent propensity to sue and effectively

20 assumes that that increase, those incremental claims that he's

21 added are going to be just as valuable as the ones that have

22 been suing the debtors previously, even though the evidence

23 shows us they're worthless.

24         Now you can see when the propensity to sue actually

25 rose the claims that were filed at that higher propensity to

1  sue received substantially less money.  It's 75,000 instead of

2  95 or 98,000.  It's a 20 percentage point, 25 percentage point

3  decline, you know, which is also why we don't see their total

4  spend going up.  If the average settlement value is falling,

5  it's offsetting that rising propensity to sue.  And so he's got

6  these out of alignment, which is really where we spent some

7  time earlier.  You have to use the same dating metric.  If

8  you're going to do things by filing year, then do everything by

9  filing year.  If you want to do it by settlement year, then do

10 it by settlement year.  But you can't mix and match because now

11 you're out of alignment.

12 Q    Is this similar to the findings that you discussed in your

13 original testimony concerning the fact that the high-value,

14 mid- value and low-value claims have been extremely stable for

15 the last several years yet the dismissals have been increasing

16 substantially among the individually evaluated claims?

17 A    Correct.  And that's really saying the same thing, which

18 is what we're seeing is the same number of really compensable

19 claims, but more and more claims, and they're either being

20 abandoned or they're being dismissed, those incremental claims,

21 or they're getting paid in the large inventory deal context.

22 Q    So, just because we talked about this a minute ago on this

23 chart, the claims settled in year, that would -- again, that

24 would be the committed settlements in that year, correct?

25 A    Correct.

1  Q    And the claims filed in the year, that would again be

2  taking back those committed settlements to the years in which

3  the claim was filed?

4  A    Correct.

5  Q    So that similar -- claims filed in a similar period of

6  time are compared to each other?

7  A    Yes.

8  Q    Now, Dr. Mullin, Dr. Vasquez and I had a discussion about

9  his similar chart and his modification to this chart.  Could

10 you remind the Court what this is?

11              THE COURT:  Where are you?

12              MR. EVERT:  Oh.  I'm sorry, Your Honor.  This is Page

13 19 --

14              THE COURT:  Thank you.

15              MR. EVERT:  -- of D-87.

16 A    So, this is a chart I constructed.  It's looking at things

17 by fiscal year, and the blue bars and the dotted blue line are

18 what have been on a number of the demonstratives I've put up.

19 So the blue bars are the historical commitments by the year in

20 which -- this is really fiscal filing year.  I see it's not

21 labeled as filing year, but for clarity this is fiscal filing

22 year.  And it's that Nicholson extrapolation going out is the

23 blue line.  And --

24 Q    I'm sorry, Dr. Mullin.  This is fiscal filing year or

25 committed --

Mullin - Cont'd Rebuttal Direct/Evert                247

1  A    Oh --

2  Q    -- this is committed settlements in a fiscal year?

3  A    No.  You're right.  This is fiscal settlement year.  I

4  reversed them.  Thank you.

5           THE COURT:  Wait.  I'm sorry.  What is it now?

6           MR. EVERT:  You're doing it, I'm doing it, we've got

7  to make sure the Judge doesn't do it.

8           THE WITNESS:  Yes.

9           THE COURT:  What is it?

10          MR. EVERT:  This is committed settlements by fiscal

11 year.  So, in -- let me say it to you this way, Judge.  In 2007

12 the debtors committed to pay just under $50 million in claims

13 that year in their management of the litigation.  They may have

14 only paid -- they may have paid more or less than that, but

15 they agreed to settle slightly less than $50 million in that

16 year, if that helps the Court.

17          THE COURT:  All right.

18 Q    So, I'm sorry.  Go ahead, Dr. Mullin.  Fiscal -- committed

19 fiscal settlements.

20 A    So --

21 Q    Fiscal year settlements.

22 A    -- what I was trying to illustrate with this was that Dr.

23 Peterson and Dr. Vasquez both, this one is Dr. Vasquez, but

24 both forecast that the value of claims -- the cash commitments

25 that must be leaving the company in the very near future are

1    going to escalate dramatically.  I mean, to be able -- if the

2    forthcoming claims are going to be valued at 75 million a year,

3    the pending claims are worth over $100 million.  The only way

4    that's feasible is for the cash that the company starts paying,

5    you know, in these settlements commitments, to move from this

6    neighborhood of 50 million up to 75, 80 million, 95 million,

7    depending on what forecast we're looking at, dollars.  There

8    needs to be, in the very near future, a dramatic increase in

9    the settlement commitments of the company to make that work.

10   So, when I said in my reports there's this implausible

11   deviation, the value of the settlement commitments in 2011,

12   2012, 2013, have to escalate dramatically or their forecasts

13   are incorrect.  So, those are the two options.  So it has to go

14   up.

15   Q    Said another way, Dr. Mullin, are you saying that based on

16   the fact that in the tort system the debtors had never

17   committed in excess of -- that looks like about $60 million in

18   a year to resolve their asbestos litigation for that year, it

19   seems implausible to you that if they stayed in the tort system

20   in 2012, that number would be close to $90 million?

21   A    Right.  So -- correct.  What Dr. Vasquez did in his report

22   is he provided a distribution of when the claims would get paid

23   if they had stayed in the tort system.  So he said the pending

24   claims, he'd give a value to them, but he also gave in what

25   years they would have been paid.  He also gave for the future

1  claims a distribution for when they would have been paid.  So

2  he did it by filing year, but he also did it by settlement

3  year.  He said when those -- really by payment year, when those

4  claims would be paid, he did that because he said the payments

5  would get spread through time to account for that when he took

6  the net present value.  So he was putting them in the right

7  year for doing his net present value calculation.

8          So his report provides you his forecast by settlement

9  year.  It doesn't give it in these nice bars, it gives you as

10 commitments by filing year, and then it gives you two

11 distributions, which says this is the distribution of payments,

12 so each filing year gets spread over the next five years in a

13 certain pattern, and similarly, the pending claims get spread.

14 And when you apply his timing of payments to the commitments

15 that are in his report, it produces this graph.

16         So, his graph says that they would have paid $75

17 million in 2011.  They would have paid, you know, more than $80

18 million in 2012.  I'm just applying his distributions of when

19 those payments would have been made.  And that's when I say

20 there's this implausible deviation.  The debtors were on the

21 verge of, the very next year, if they had stayed in the tort

22 system their payments were going to go to 75 million, and

23 almost 90 million the year after that.  These are very large

24 increases from somebody who has been paying on average 50

25 million a year over the last eight years, potentially as much

1  as 55 million a year if we just look at the last four, going up

2  to these numbers doesn't strike me as plausible.  I see nothing

3  that would cause such a dramatic increase in settlement

4  commitments the day after they filed -- after their petition

5  date.

6         And again, the main -- if you account for -- I didn't

7  have the time, so I didn't create the similar demonstratives I

8  did for Dr. Peterson's, but if you switch to $45 per claim you

9  account for abandonment, it doesn't come all the way down, it

10 doesn't align the same way that Dr. Peterson's and mine align,

11 because there's a very large difference in the number of

12 forecast claims.  And he's got about 21,000 future mesothelioma

13 claims while Dr. Peterson has 15,000.  That distinction between

14 15 and 21 causes Dr. Vasquez's forecast to remain above that,

15 of what Dr. Peterson or myself's forecast would give, when

16 you're at $45,000 per claim.

17 Q   Well, you were just referring to the incidence discussion,

18 I think, that I had with Dr. Vasquez.  Tell me about that.  Let

19 me ask you about the incidence curve that you use and Dr.

20 Vasquez's assertion that your incidence curve was lower,

21 somewhere between him and Dr. Peterson?

22 A   So, there are -- I was unaware that ARPC had continued to

23 develop and modify the KPMG curve, so there's at least four

24 different curves floating around that I'm aware of now.

25 There's Nicholson's original 82, there's the curve that came

1  out of the <u>National Gypsum</u> bankruptcy work that Dr. Vasquez was

2  involved in, my partner Dr. Bates was involved in that.

3  Subsequent to that Bates White has continued to work on that.

4  That was back in the early '90s.  It's been 20 years.  So,

5  there's a Bates White incidence curve.  I was unaware there's

6  also now an ARPC version of the Nicholson based curve, so

7  there's at least four versions of this curve at this point.

8          They aren't that different.  I mean, part of this is

9  the height of the curve isn't actually what matters to the

10  forecast, because if you -- right now if you say there's a 40

11  percent propensity to sue, and suppose you make the curve twice

12  as high, but that's all you do, you multiply all the numbers by

13  two, then you're going to have a 20 percent propensity to sue.

14  And when you apply the 20 percent propensity to sue from the

15  historical to all the futures you get the same numbers, so the

16  height of the curve is not actually what matters in these

17  forecasts.  What matters is the shape of the curve, so how

18  quickly is it declining?

19          I mean, I agree with Dr. Vasquez's testimony in this

20  regard that it's are you falling off a cliff, or are you going

21  out at a long tail?  It's that shape of the curve.  And that's

22  a lot of what the work over the years has been on is refining

23  that shape.  So although he's -- I believe he's correct that

24  the KPMG version that Bates White calls the KPMG version, it

25  was really trying to focus on occupational exposure, and it is

1  about 25 percent lower than what you observe in SEER.

2          But the assumption, to say it should line up with

3  SEER is an assumption that says a hundred percent of

4  mesothelioma is caused by occupational exposure.  If that's not

5  true the curve from the occupational exposure model should be

6  below SEER.  If it actually aligns with SEER that's a problem

7  unless you believe every single case of mesothelioma is caused

8  by occupational exposure.  You know?  So, there's a lot of

9  versions of this curve.  We could have a lengthy debate about

10 what's the right one.

11         The -- some of the things that weren't mentioned in

12 that regard in the SEER data is recording in the United States

13 today, and there's a lot of issues with that data, not the

14 least of which is there's a lot of foreign born mesothelioma in

15 that data.  So, one of the reasons that data is consistently

16 above Nicholson and what we're seeing, we see an increasing

17 number of foreign born individuals, and SEER doesn't tell us at

18 what year they immigrated to the United States.  The rest of

19 the world used asbestos for much longer than the United States,

20 so although OSHA came in in '72 in the United States and high

21 temperature products changed, and other products changed in

22 later '70s and '80s and some in the '90s when you get to

23 friction products, in Europe and in other places asbestos was

24 used much more recently.  In many places it's still used today.

25 Q    So, you -- I'm sorry.

1  A    So, immigrants to the United States, if they worked for 20

2  or 30 years in a different country and then come here, were

3  effectively importing mesothelioma, so the SEER should be

4  higher.

5  Q    So, within SEER you've got both foreign claimants and

6  you've got non-asbestos related mesotheliomas?

7  A    Yes.  I mean, foreign born, many are naturalized citizens

8  --

9  Q    Right.

10  A    -- or things, but there is foreign born claimants sitting

11  in the SEER data, because it's just who is currently in the

12  United States being diagnosed.

13  Q    Now, how did you try to control, if at all, for that in

14  your merits analysis?

15  A    Well, I mean, one of the things that I think is the most

16  difficult to deal with in this entire analysis, and so I took a

17  different route where I effectively avoided it, was the whole

18  propensity to sue discussion.  I mean, I didn't annualize -- I

19  mean, I have an annualized number for 2010.  I didn't go

20  through the steps of computing a propensity to sue and a

21  dismissal rate.  I took a different approach of saying how many

22  claims in these different categories am I receiving?  High

23  value, mid value, low value?  And those have been very stable

24  when I look over the last four years.  So I don't need to get

25  into a propensity to sue discussion any longer.  I have a

1  stable basis of claims that I can extrapolate out into the

2  future, and that -- you know, it's a very -- it's not saying

3  how would 2010 have turned out, what about this increasing

4  trend?  You can see that the increasing trend was just passing

5  through to dismissals.

6            So once you've done the work and dug down into it you

7  can see that that whole issue of the increasing propensity to

8  sue is a red herring in the analysis, because it's just more of

9  the claims that were getting dismissed, and it really

10 simplifies the forecast once you make that insight.

11 Q    There were some questions raised, Dr. Mullin, in regard to

12 your calculations in partitioning between the various eras of

13 liability of the debtors.  Do you recall that testimony?

14 A    Yes, I do.

15 Q    And just to refresh everyone, the Reardon era is what?

16 A    In my mind the beginning of time until it was acquired by

17 what's now SPHC in 1960 --

18 Q    In 1966?  And the SPHC era is from 1966 until 1972?

19 A    And it runs from the acquisition until the restructuring.

20 Q    The 1972 formation of Bondex International, which is the

21 Bondex era, is that right?

22 A    Correct.

23 Q    All right.  And tell me what this chart illustrates,

24 please?  This is Slide 21 of Defendants' 87.

25 A    Well, I was asked questions before that I agreed with,

1  which is that 82 percent of the historical money paid was paid

2  to -- or, sorry, 85.2 percent of the historical money paid was

3  paid to a claimant that alleged that at least a portion of

4  their exposure occurred during the SPHC era.  You know -- I

5  just wanted to complete that and show that that's a true

6  statement.  It's also a true statement that 79 percent of the

7  historical payments were paid to claimants that alleged that

8  part of their exposure comes to the Bondex -- comes from the

9  Bondex era.  And about 61 percent of the historical

10 expenditures were paid to claimants who allege that at least a

11 portion of their exposure comes from the Reardon era.  And

12 really, the whole point of the partitioning is if you assign

13 the whole amount to every era a claimant touches you end up

14 with 225 percent of the money.  You know, you have a little bit

15 more than double counted on average.  And the partitioning was

16 really an effort to say if you want to only count every dollar

17 once, and you want to partition it, where should it go?

18 Q    And there was also some testimony, Dr. Mullin, about your

19 analysis of the several share.  Do you recall that?

20 A    Yes.

21 Q    And this was your attempt to strip out the settlement

22 payments that were not representative of Bondex's or the

23 debtors' several share, is that right?

24 A    Yes.  In general.

25 Q    And there have been a number of questions raised about the

1  information available to you in regard to that data, and I've

2  put up Slide 23 from Defendants' -- Debtors' D-87, and if you'd

3  tell the Court what this illustrates?

4  A    Well, I think I gave testimony earlier where I said that I

5  think the number I gave was 98 percent of the claims were filed

6  in jurisdictions that had some type of joint and several

7  liability.  And I subsequently heard a lot of testimony that

8  appeared to contradict what I said, and so I went back and

9  tabulated it in the data again, and I just wanted to make it

10 very clear.

11         So, I've taken, based on there's a categorization in

12 I believe it's -- this one is from Dr. Peterson's report, where

13 he has defined all the states as either joint and several

14 state, a hybrid state, which means it has some modified form of

15 joint and several liability, or a state that practices pure

16 several liability.  And these are actually counts from -- I

17 believe these are his counts, but it shows you that although

18 it's true that joint and several states are the minority of

19 states, they're the majority of claims.  62 percent of the

20 claims are filed in a joint and several state.  35 percent are

21 filed in a hybrid state, something like California would be an

22 example of a hybrid state, and then three percent were filed in

23 several states.  So, it's 97 percent, not the 98 percent I said

24 before, but the point really wasn't is it 95, 98, what's the

25 number?  The real point here is plaintiffs choose venue.  They

1  choose where to file the claim.

2          There's a concept in economics called revealed

3  preference.  If I give you a choice each morning every year --

4  each morning for a year straight, would you like an apple or an

5  orange, and every day you take an orange from me, I don't need

6  to ask you do you prefer apples or oranges?  I know the answer.

7  You have revealed your preference to me.  You know, it's a

8  basic Econ 101 concept.  That's what this is.  The plaintiffs

9  choose where to file the case.  They've spoken with their feet.

10 They don't file in several jurisdictions.  You know, the bottom

11 is a rough breakdown of the U.S. population as it exists today

12 in terms of how much of the population sits in each of those

13 states.

14 Q    62 percent of the claims are filed in joint and several

15 jurisdictions, whereas only 20 percent of the population

16 resides in those states?  Is that right?

17 A    Correct.  So it is a minority of the states, whether you

18 do it by count or by population, but it receives the majority

19 of the mesothelioma claims.

20 Q    They're litigation tourists I guess is what you're saying?

21 Slide 24 of Debtors' D-87 also goes to the question of joint

22 and several.  Dr. Mullin, if you would tell the Court what

23 you're illustrating there?

24 A    Well, I'm really taking -- there was some criticism of my

25 work by Dr. Peterson that said -- I think he came to the

Mullin - Cont'd Rebuttal Direct/Evert                258

1  conclusion that in several jurisdictions the claimants are

2  actually paid more money than in joint and several, and he was

3  referring to the $100,000 average settlement value observed in

4  a several jurisdiction versus the $77,000 average settlement

5  value observed in a joint and several jurisdiction.

6          And what I really wanted to show was that that's a

7  bit misleading in my opinion because it ignores the pay rate,

8  so we're not saying, what does the average claim filed in the

9  jurisdiction get?  That's saying what does the average claim

10 that's paid in the jurisdiction receive?

11         So, although three percent of the claims are filed in

12 a several jurisdiction, we have 130 of them, only 38 were paid,

13 you know, that's resolved claims, 29 percent.  So if we apply

14 that 29 percent to the $100,000, the average resolution amount

15 is 29,646.  I'm going to call that 30,000.  If I go through the

16 same exercise for joint and several states and hybrid states

17 the average resolution value is lowest in a several state.

18 It's 30,000 a claim.  In joint and several states it's 50,000,

19 and in the hybrid states it's 70,000.  So, the fact that the

20 claimant spoke with their feet and filed in joint and several

21 and hybrid jurisdictions is consistent with the fact that they

22 get more money when they file there on average.  They get less

23 money when they file in the several states.

24 Q    Now, Dr. Mullin, this is Slide 26, Page 26 in Debtors'

25 D-87.

1  A     Before we go here I'd like to respond to Dr. Vasquez's

2  graph on my bubble chart of the CCR mesothelioma claims.

3  Q     All right.  Let me see if I can find that for you.

4                          (Pause)

5  Q     Well, we're going to divulge very privileged information,

6  which is that I have horrible handwriting, and I used this to

7  know the questions I wanted to ask Dr. Vasquez, so you're

8  referring to this chart, Dr. Mullin, Page 15 of the earlier

9  demonstrative with Dr. Vasquez?

10  A     I am.

11  Q     And this is the one that I recall I asked Dr. Vasquez if

12  he knew what percentage of the dollars were on each side of the

13  line, and he was unaware?

14  A     Correct.

15  Q     Tell us what this illustrates, if you will?

16  A     A few things.  When I ran this in my report I had 98

17  percent of the money was to claims paid more than $55,000, and

18  it followed the pattern you would expect where it was

19  declining, you know, it has this downward slope, which is that

20  the older claimants -- the younger claimants got more money,

21  that you would expect, and it's really saying for the CCR you

22  had 21 member companies and products that spanned almost every

23  imaginable use.  You'd expect them to be liable to most parties

24  when you had that breadth of reach, and you would expect the

25  vast majority of the settlement payments to be driven by

1  liability.  And that's what the model said, and that's what

2  gave me a lot of comfort.

3          I did -- that is the piece -- it's the one piece in

4  my work where there was a mistake in the code underneath, and

5  we had used the wrong dating convention for the age.  And when

6  we went back and went back to the dating convention we used

7  everywhere else, which is age at diagnosis and ran it, it

8  becomes 99 percent of the money, because if you really -- if

9  you run the whole model, instead of -- it appears that Dr.

10 Vasquez froze the transition point at 55,000.  When I ran the

11 whole model, the model picks the transition point, as well as

12 the slopes of the line.  So if you run the whole model with the

13 age at diagnosis the transition point is actually $45,000, so

14 the dotted line backs up, and 99 percent of the money now is

15 being driven by liability, and one percent of the money is to

16 the left of the dotted line.

17         Now, Dr. Vasquez is absolutely correct that for the

18 one percent of the money on the left hand side of the line when

19 you run that, if you run it you get an upward slope.  And I

20 stated earlier that in general if you get an upward slope,

21 that's contrary to what comes out of the law and economics

22 literature.  You know?  So on its face that's problematic.  And

23 there's two things to note there.  One, it's one percent of the

24 data, so it's not being driven by a lot of mass.  But more

25 importantly, it's to note the same thing that actually Dr.

1  Vasquez noted in his rebuttal report.  We know the CCR data

2  miscategorizes claims, so we know that there are non-malignant

3  claims in the CCR who are categorized as mesothelioma claims.

4  There's also mesothelioma claims categorized as something else,

5  but the important thing here is we know that this data, the

6  technical term in statistics and econometrics is contaminated,

7  so you don't have a pure sample of what you desire, you have

8  some contamination.  You have some claims in there that

9  actually don't have mesothelioma.

10        Now, the important thing here is the non-malignant

11 claimants on average are ten years younger than the

12 mesothelioma claims, so they tend to be young, and they tend to

13 get paid not nearly as much money as a mesothelioma claim.  So

14 it creates low bubbles in the low left hand area because you

15 have young claimants being paid very little money, and if they

16 had mesothelioma that doesn't make sense with the model.  But

17 if they actually are a non-malignant claim it makes a lot of

18 sense.

19        So the real important part of realizing that there's

20 only one percent over there is there's not that many claims.

21 There were hundreds of thousands of non-malignant claims in the

22 CCR database, so even at a very low miscategorization rate you

23 get a number of claims over there.

24        So if you look at it, I had run sensitivity analyses

25 to it, and the real thing is if you do things like drop the

1  claims who are still alive ten years later, figuring because

2  you can match the claimants to the Social Security

3  Administration records, so if the person supposedly had

4  mesothelioma but ten years later they're still alive, you're

5  pretty sure they actually didn't have mesothelioma.

6         You know, so if you do exercises like that, if you

7  match it to alternative databases where you try to, like if you

8  match the CCR to the old <u>Manville</u> data and you try to clean

9  those out, the slope of this line consistently rises.  Every

10 time -- I mean, it levels out.  So it keeps coming up and up

11 and up.  So every time you can identify those non-malignant

12 claims in the data, or another cancer claim, maybe, the line

13 starts to flatten out.  It never gets perfectly straight, but I

14 can't find all the claims, so I know this stays upward sloping

15 no matter what I do.  That's true.  But the slope becomes much,

16 much smaller as I get rid of the non-malignant and other cancer

17 claims that are in the data.  You know, and it -- so I

18 understand what's going on there.  I know that's what the

19 problem is, so it doesn't really bother me.

20        And if you eliminate the two youngest guys in the

21 data I can eliminate two data points.  The two youngest guys

22 that allegedly have mesothelioma that were paid very little,

23 it's actually not the two youngest, but it's two young guys

24 that allegedly have mesothelioma at low values, the slope goes

25 away.  I mean, so this whole result, if those two -- if I have

1  two individuals, I believe they were both -- I know they're

2  under 50, I think they're under 40 is my recollection, but if I

3  eliminate just those two the whole upward slope goes away and

4  it flattens out.

5          So, I mean, he's absolutely right in the critique

6  that upward sloping is problematic, but when you dig down into

7  it in his own rebuttal report he states the reason that I most

8  likely dropped the claims that were living longer was because

9  of this data problem with the CCR that, you know, he inferred.

10  I didn't state that in my report explicitly.  He inferred in

11  his rebuttal report that that's probably why I was doing that.

12  So I think there's an understanding of that issue, and that

13  causes the upward slope.

14  Q    And in addition, Dr. Mullin, just remind me, there -- also

15  there was CCR non-malignant data and verdict data that

16  supported your analysis.  Is that right?

17  A    Correct.  I mean, I view this as supporting it, too, the

18  fact that 99 percent of the money that was paid to mesothelioma

19  claims by the CCR was driven by liability, I would have

20  expected it to be the vast majority.  They said -- because they

21  have pipe and block companies, they have really the whole

22  spread when you look at their 21 member companies.  So it would

23  be hard to find a claimant where there wasn't liability against

24  at least one of their member companies.

25  Q    Do you recall the discussion that we had about inflation

1  with -- with Dr. Vasquez, Dr. Mullin?

2  A    Yes.

3  Q    You were here for that?

4  A    I was.

5  Q    And I want to put up Slide Number 26, which I think is a

6  slide we used previously in your direct examination.  Is that

7  right?

8  A    It appears to be.

9  Q    And would you tell me, Dr. Mullin, what that illustrates?

10 A    This was looking at -- you know, that not -- not

11 accounting for inflation, aging, or discount rates, you're not

12 accounting for any of those, looking at what the nominal

13 expenditure levels would be under different evaluation

14 criteria.

15 Q    And you accounted for inflation in your calculations, but

16 it had offsetting effects.  Is that right?

17 A    Well, I've done it so -- as I said, there is about a one

18 percent decline in the average settlement value, and about a

19 1.9 percent decline in the pay rate are the two things that my

20 underlying analysis had demonstrated.

21 Q    And I'm sorry, I should have put up -- because you

22 referenced the net present value issue, Slide 27 of Debtors'

23 D-87.  If you'd tell the Court what that represents?

24 A    Well, that's taking those nominal expenditures that are

25 spread through time and discounting them back to a present

1   value where -- at three different alternative discount rates.

2   Q    All right.  So tell me, if you would, Dr. Mullin, your

3   thoughts on the discussion about inflation and its use?

4   A    So, I mean, when Dr. Vasquez made the comment that if I

5   don't apply any inflation a $90,000 claim today 40 years from

6   now that's still getting paid 90 is worth 20, I think it

7   mis-characterizes it.  I said there's a one percent offset to

8   the average settlement value.  That's what the claimant is

9   getting paid.

10         So, that -- if you remember, we're multiplying

11  different terms together if you use the mathematical identity,

12  claims times pay rate times average settlement amount equals

13  payments.  I mean, that's a mathematical identity that people

14  aren't going to argue with.  But you're multiplying them

15  together, so the average settlement value is declining by one

16  percent a year.  If I have two-and-a-half percent inflation,

17  that means net of inflation the average settlement value is

18  growing one-and-a-half percent per year.  I'm not applying zero

19  inflation to the average settlement value, it's that the pay

20  rate is also declining, so the pay rate is going down.

21         I didn't -- the math, since you're multiplying them

22  all together, it's just one big net thing.  You have a discount

23  rate, you have an inflation rate, you have two effects of

24  aging, but you just -- the order in which you do the

25  multiplication doesn't matter, so I have inflation on average

Mullin - Cont'd Rebuttal Direct/Evert                266

1 settlement values at one-and-a-half percent.  It's the two-and-
2 a-half percent inflation minus the one percent effect of aging.
3 I also have a declining pay rate when I look at it for tort
4 spend at two percent.  So, that takes you actually to negative
5 .4.  I didn't apply a negative, I left it at zero when I was
6 looking at tort spend.

7        So, when I'm looking at tort expenditures those are
8 the individuals that would actually get paid.  That's the data
9 I had to work with.  All those estimates come from settlement
10 data, so they are appropriate if you're looking at tort spend
11 in terms of pay rates.  If you're looking at liability, or
12 you're going to a different concept, I couldn't run the
13 regressions on the liability for each claim in the same way, to
14 get what it would be there.

15        So, to assume that it's going to be the same, they're
16 correct that when I gave for just the several share of
17 liability calculations I took the conservative step of assuming
18 the pay rate would only fall at half a percent a year instead
19 of the full -- or 1.5 percent that gets you to completely
20 canceling out that you observe in the actual tort settlement
21 payments.  So I did use different rates in the different
22 places, but because you're estimating different things.
23 Q    So, let me make sure I understand.  So, you used a two-
24 and-a-half percent inflation rate, is that right?
25 A    Correct.

1  Q    And you used a one percent offset for declining values in

2  aging, is that correct?

3  A    Correct.  That's what -- the analysis gives a one percent

4  estimate when I did that.

5  Q    And that was relatively similar to what Dr. Peterson did,

6  is that fair?

7  A    The gap is actually fairly different.  I mean, I have two-

8  and-a-half percent inflation minus one percent, so I'm at one-

9  and-a-half percent net inflation.  He was at 2.1 percent

10 inflation minus 1.22, so he actually ended up at .88.  He had

11 about half the inflation rate that I had if you looked at it

12 that way, and Dr. Peterson was at the two-and-a-half.

13 Q    But as I understand what you just said, the 60 year old

14 claimant who would get his claim or her claim resolved in 2020

15 is getting more than the 60 year old claimant who would get his

16 or her claim resolved in 2010, because they are paid in

17 inflated dollars?

18 A    Conceptually, with the math, yes.  I mean, I just

19 multiplied all the numbers together.  I didn't worry about the

20 order in which you multiply them when you're multiplying a

21 series together, but conceptually that's correct.  The

22 adjustment is a one-and-a-half percent increase for inflation,

23 and then a decrease for the pay rate.

24 Q    Dr. Mullin, I know we were rushed in trying to put our

25 rebuttal points together.  Is there anything -- any other

1  testimony that you heard that you would like to rebut?

2  A    There's only one other thing that's coming to mind.  What

3  I thought I heard Dr. Peterson say yesterday, and I heard

4  comments I think of a similar nature from Dr. Vasquez, was I

5  was trying to estimate things that you can't observe.  And I

6  think there was the insinuation that if you can't observe them

7  you can't estimate them.  And, you know, sitting here as an

8  econometrician, that's just not true.

9        I mean, I can look at -- I'm going to use an analogy

10 which is not perfect but pretty good.  It's hard to see the

11 wind.  It's very difficult to look outside and see the wind,

12 but you see the effect of the wind.  And because you see the

13 effect of the wind you know it's windy.  You can feel the wind.

14 You can see it blowing a piece of paper down the street, but

15 it's hard to see.

16        Economists estimate things that aren't observed all

17 the time.  It's our core job.  So when I think of this concept

18 that because you can't observe it you can't estimate it, to

19 make a concrete example of things that economists do every day,

20 they try to figure out what drives people's earnings.  And if

21 we were even to take that to a litigation context, take a

22 discrimination lawsuit, we don't observe in somebody's salary

23 if we have, you know, a white male being paid 80,000 a year,

24 and we don't observe for a minority female something that says

25 well, you would have had 80,000 a year and there's an $8,000

1  deduction for being female and a $10,000 deduction for being a

2  minority, so you're getting paid $62,000.  What we observe is

3  they're getting paid $62,000.  No one gives you the pieces, but

4  economists have reliable tools to estimate the impact of that

5  by looking across a large array of transactions.  They compare

6  them.

7          And so, even though you don't observe that and nobody

8  itemizes it for you, there's very reliable research that

9  documents a gender gap in wages, but I've never seen the job

10 offer that has a line item for it.  Right?  So, these are the

11 things that -- this is what economists do.  You know?  And it

12 may not be the training other people in the courtroom have, but

13 is the training that I have.  You know, the research that I did

14 as an academic was all about robust estimation in a framework

15 where the answer is not observable.  You're trying to estimate

16 things that aren't observable because they're important, and we

17 do that day in and day out as the job an econometrician and an

18 economist.

19 Q    Thank you, Dr. Mullin.  I have no other questions.

20          MR. SHEPPARD:  Your Honor, may we have just a five

21 minute recess to get our act together?

22          THE COURT:  We can, but we do have to leave at six.

23          MR. SHEPPARD:  Your Honor, we'll be as quick as we

24 can.

25          THE COURT:  All right.  We'll take a recess for five

1  minutes.

2                        (Recess)

3            THE COURT:  We'll be able to stay a little longer.

4            MR. SHEPPARD:  Thank you, Your Honor.

5            THE COURT:  Are you ready, Dr. Mullin?

6            THE WITNESS:  Yes.

7            THE COURT:  Okay.  Mr. Sheppard, when you're ready.

8            MR. SHEPPARD:  Thank you, Your Honor.  I was hoping

9  to get a clean one --

10           MR. EVERT:  Yes.  I'm trying.  The problem is --

11 Mark, I'm sorry -- I had bundled them all up, and now they're

12 all totally out of order.

13           THE COURT:  What is it that you need, Mr. Sheppard?

14           MR. EVERT:  Oh, it's -- actually, it's D-87, Your

15 Honor.  It's the exhibits that you've been looking at.

16           THE COURT:  Do you want to use this set?

17           MR. EVERT:  Mark, the Judge is offering you her set.

18           MR. SHEPPARD:  I'm sorry.

19           THE COURT:  Do you want to use this set, my set?

20           MR. SHEPPARD:  If I may, Your Honor?

21           THE COURT:  Yes.  I think I marked up one myself, so

22 you may -- there may be one in here that has my handwriting on,

23 or a couple that --

24           MR. SHEPPARD:  Thank you, Your Honor.

25           THE COURT:  Do you need 88, too?

1          MR. SHEPPARD:  No, I have 88, Your Honor.

2          THE COURT:  All right.

3          MR. EVERT:  Thank you, Your Honor.  I'm sorry.  I

4  bundled all the -- they're now all out of order.

5                   REBUTTAL CROSS EXAMINATION

6  BY MR. SHEPPARD:

7  Q    Okay.  Dr. Mullin --

8          MR. SHEPPARD:  May I proceed, Your Honor?

9          THE COURT:  Oh, yes.  Mr. Sheppard, my handwritten

10 notes on the bottom, I didn't realize that the exhibits were

11 numbered at the top, so my numbers are one page lower than all

12 the numbers that are in that exhibit --

13         MR. SHEPPARD:  Okay.

14         THE COURT:  -- so if you're referring to them, you

15 may want to look at the numbers on the top to be consistent

16 with Mr. Evert.

17         MR. SHEPPARD:  Thank you, Your Honor.

18         THE COURT:  All right.

19 Q    Dr. Mullin, you covered a lot of territory there on

20 rebuttal, and there was some new stuff there, and let me -- let

21 me start with Page 8 of the demonstrative that your counsel was

22 showing you before.  This is the chart that relates to the

23 attorneys' fees, or the attorneys' costs.

24 A    It's -- it's really expenses.  It's not attorneys' fees.

25 Q    Okay.  And you said that you got this information off the

1  web site of these various law firms, is that right?

2  A    I actually believe most, if not all of these come from The

3  David Firm, and these are all the co-counsels who would be more

4  the litigation counsel as opposed to The David Law Firm itself.

5  Q    You're not suggesting, sir, that this is any kind of

6  scientific sample, are you?

7  A    I don't have a scientific sample in that regard, I have

8  just this --

9  Q    You're not suggesting that this is in some way

10  statistically significant, this sample that you chose here, are

11  you?

12  A    It's definitely not a statistically designed sample.

13  That's correct.

14  Q    All right.  Now, Dr. Mullin, you're very familiar with the

15  legal system, I believe you testified, isn't that correct?

16  A    That's a really broad topic.

17  Q    You're familiar with the term discovery, sir?

18  A    I am familiar with the term discovery.

19  Q    Okay.  You're familiar with the fact that you could have

20  asked Bondex's lawyers to subpoena certain information from the

21  committee regarding the legal fees and costs of plaintiffs'

22  attorneys?  Did you ever do that, sir?  Let's leave it there.

23  A    I'm trying to think.  I requested they subpoena a lot of

24  stuff, and it was all denied.  I'm just wondering if that was

25  included or not.

1                          (Laughter)

2   A     I know -- I mean I -- I asked for total recoveries.    I

3   asked for a lot of information.    I honestly can't recall now

4   those requests.    I'm guessing from all the other denials it

5   wouldn't have mattered if I had.

6                          (Laughter)

7   A     But that's -- I don't recall at this point what was in

8   those.

9   Q     Well, let me represent to you, sir, that it --

10            THE COURT:    Do I get an objection in here?

11                         (Laughter)

12            UNIDENTIFIED ATTORNEY:    Move to strike,

13  non-responsive, Your Honor.

14            MR. EVERT:    I've never objected to my own witnesses

15  before, Your Honor, but I'm thinking about it.

16  Q     My point is, Dr. Mullin, you never bothered to ask the

17  plaintiffs' lawyers what their transaction costs were, did you?

18  A     I did.    I think that's some of the reasons that those

19  questions were asked in the depositions of the various

20  plaintiff attorneys is because that was something I wanted to

21  get more information on, and why I think the questions that

22  counsel asked Mr. Iola and Mr. Simon relating to the expenses

23  were asked in their depositions was for that.    I didn't get it

24  through a formal discovery process on plaintiff law firms.

25  Q     And in your transaction cost model it really depends on

Mullin - Rebuttal Cross/Sheppard                    274

1  there being unequal costs on both sides, is that right?

2  A    There's lots of different asymmetries that affect it.  If

3  everything is symmetric, right, bargaining power, transaction

4  costs, information -- information asymmetries, then it's there.

5  Q    And let's just stick with the costs for now.  It's your

6  theory that the costs are unequal one way as opposed to the

7  other.  Is that right?

8  A    Well, I mean, I think the data is very supportive of that,

9  and the fact that one side is on a contingency fee basis while

10 the other pays their attorneys makes that -- there's a question

11 of how large is the asymmetry, but the fact that the asymmetry

12 exists is pretty clear.

13 Q    You didn't account for the opportunity cost of the money,

14 did you, sir, on the plaintiff side, in your model?

15 A    You're talking about the time value?

16 Q    I'm talking about the time value money, and I'm also

17 talking about the opportunity cost, which as an economist I'm

18 sure you understand.

19 A    Are you -- well, the opportunity costs of the claimant, or

20 the opportunity costs of the plaintiff attorney?  Which one are

21 you referring to?

22 Q    To the claimant or the plaintiffs' attorney.

23 A    Well, the plaintiff attorney is being compensated

24 typically in a contingency fee arrangement, and my

25 understanding is, is following an ethical obligation to

1  maximize their client's recovery so I would hope that they

2  aren't saying this claim is not worth it, I'm not going to put

3  the effort in.  I didn't -- I assumed they were acting

4  ethically in that regard as I understand those obligations.

5  With the claimant whether you settle today or four months from

6  now --

7  Q    My question, Dr. Mullin, pretty simply --

8  A    -- the time value of money is --

9  Q    Sorry.  Can I -- did you account for opportunity cost in

10 your model?  Yes or no?

11 A    The opportunity cost of money was de minimus when you're

12 looking over a three to six month time horizon.

13 Q    So that's a no?

14 A    So, no, I didn't do an explicit adjustment.

15 Q    Let's look take a look at this chart that Mr. Evert showed

16 you.  It's Page 19.

17 A    I take that back.

18 Q    I'm sorry.

19 A    In terms of the costs -- we're going fast, and that can be

20 problematic.  In terms of costs the model predicts the outcome.

21 The asymmetry doesn't go into my analysis directly.  The fact

22 -- all these defense cost data, all the plaintiff cost data

23 don't directly enter the empirical analysis.  They're

24 supporting facts that are indicative of the asymmetry.  The

25 econometrics doesn't take those as inputs, because it doesn't

1 take --

2 Q    Okay.  So you didn't take it into account?

3 A    No.  It's imbedded in it.  It's taking everything into

4 account is the point.

5 Q    I'll accept that, Dr. Mullin.  Let's take a look at Page

6 19.  Now, this is a chart that your attorney showed you which

7 was based, I believe, on the amount that Bondex was paying, and

8 you derived from that that there was an implausible deviation,

9 is that right?

10 A    It's not actual cash payments, but it's settlement

11 commitments.

12 Q    Okay.  Settlement commitments, in other words, the amount

13 that Bondex chose to either pay or incur, is that correct?

14 A    It's -- correct.  In a given year the amount of settlement

15 commitments they agreed to.

16 Q    That the debtors decided to pay?  Is that right?

17 A    The two sides, in their negotiation, agreed to resolve

18 claims.

19 Q    All right.  Well, let's suppose that Bondex decided that

20 they were only going to pay $25 million in 2003.  Do you see

21 that?  What happens to the rest of this blue line?  Doesn't it

22 go into the next year?  And if they decide the next year only

23 to pay $30,000 doesn't that go into the next year, sir?

24 A    No.  If they decide not to pay $25 million, presumably

25 about half of the claims they were resolving aren't resolved.

1  They have trial dates and they go to trial.  They can't just

2  push it out indefinitely.  They -- there's a litigation

3  calendar here.  They don't get to unilaterally pick when to

4  settle a claim.  It's a negotiation between two parties.  If

5  they don't agree in time they go to court and a jury sets the

6  value for them.

7  Q    The point here, Dr. Mullin, is this is based on the amount

8  that they decided to pay, is that correct?  And it doesn't

9  account for the backlog in cases if they had decided not to pay

10 that amount, isn't that right?

11 A    I'm only --  I'm not trying to be difficult.  I'll say it

12 once and I'll let it go from now on.  I don't view this as

13 their decision.  I think their decision, they would have paid

14 zero in every year.  If they had had the choice and it was

15 entirely the debtors' decision these would all be zeros

16 forever.  They're paying them against the backdrop of

17 litigation.  They don't unilaterally decide.  This is why I'm

18 having trouble with your construct.

19 Q    You're suggesting, sir, the companies don't set budgets in

20 terms of what they can pay year to year?

21 A    They set that budget against the backdrop, and they

22 definitely manage their cash flow.  I mean, that's -- they

23 definitively manage cash flow, but you don't -- if they could

24 set their budget unilaterally they would have set it lower.

25 Q    Dr. Mullin, this is at Page 26, I think.  Is that right?

1  This is the summary of your different forecasts, is that right?

2  A    It's a summary prior to --

3  Q    And that's my chicken scratch there.  I apologize.

4  A    That's -- that's fine.  It's prior to looking at

5  inflation, aging and discount rates.

6  Q    Okay.  And how much, Dr. Mullin, has Bondex paid since

7  2001 in indemnity payments?

8  A    I don't know if I know the total number.  It's slight --

9  it's north of $400 million from, I think, 2001 through 2010

10  fiscal years.

11  Q    Okay.  So, in the last nine years before they filed for

12  bankruptcy they paid north of $400 million, is that correct?

13  A    That was ten years.

14  Q    Ten years?

15  A    Ten years.  Yes.  They were paying north of 400 million,

16  and for the last eight years about 50 million a year.

17  Q    And it's your estimate, sir, that for the next 40 years

18  the most they're going to pay is 700 million nominal for 545

19  million present value, is that right?

20  A    Yes.  If you extrapolate out on the Nicholson curve 45

21  million starting at a $45,000 resolution value, you're going to

22  come out at about $700 million.

23  Q    So, just so I'm clear again, north of 400 million ten

24  years, about 575 million 40 years?  That's your forecast?

25  A    You switched from nominal and NPV --

1  Q    I apologize.

2  A    So, we're going from 400 million to 700 million.  You've

3  got to remember we have a declining curve.  You don't just add

4  400 million every ten years in the future.

5  Q    All right.  Now, in terms of your estimates here, your

6  average resolution cost is $45,000, is that correct?

7  A    When I'm looking at individually evaluated tort

8  settlements I am using -- it's equivalent to that.  I mean, if

9  you want to assume I did it by high value, mid value and low

10 value, but it's -- it's approximately equivalent to 45,000 per

11 claim.

12 Q    And that $45,000 per claim isn't an average of the claims,

13 is it, Dr. Mullin?

14 A    It's -- I think I just provided an exhibit that showed,

15 depending on how you count the withdrawn claims, it's, for the

16 individually evaluated claims between 2007 and 2010, it's

17 either slightly above 45,000 or slightly below, depending on

18 how you treat the approximately 150 withdrawn claims.

19 Q    It's an average value of a certain subset of claims that

20 you chose to average.  Is that correct, sir?

21 A    Yes.

22 Q    Okay.  It's not an average of all the claims, is that

23 correct?

24 A    No.  I've stated repeatedly it's an average of the ones

25 that were individually evaluated.  It is not taking into that

1  average the inventory deals that were not evaluated on a claim

2  by claim basis.

3  Q    Did Drs. Peterson or Vasquez exclude any claims other than

4  stale claims from their averages, sir?

5  A    I mean, yes, in a technical sense, in that Dr. Vasquez

6  used 2008 to 2010.  Dr. Peterson went -- so he excluded 2007

7  and earlier.

8  Q    Okay.

9  A    Dr. Peterson, in contrast, reached back to 2003 or 2001,

10 when, as we've seen the average settlement values were much,

11 much higher, and came up with a much bigger number.  So, each

12 person has chosen a different set of claims to take an average

13 over to base their forecast off of.

14 Q    Well now, Dr. Mullin, you're the one comparing apples and

15 oranges because if we look at the time periods I can agree with

16 you, sir, that you chose different time periods.  Okay?  But

17 within those time periods did Drs. Peterson and Vasquez not use

18 certain claims in their settlement average calculation other

19 than stale claims?  Yes or no?

20 A    They included all of them, including the large inventory

21 settlements, and are estimating something different from it.

22 Q    So they included all the claims and your average, $45,000

23 average -- what's it called?  I'm sorry.  Average resolution

24 cost?  Is that the term you used?

25 A    It's --

1  Q    It was an average based upon claims you chose to add,

2  correct, Dr. Mullin, within that same time period?

3  A    It's the ones the data told me were individually -- I

4  chose to average the ones that had undergone individual

5  evaluation.  The level of defense expenditure and the

6  documentation told me which claims satisfied that criteria and

7  which ones didn't.  I chose the criteria.  The data told me

8  which ones met it versus which ones didn't.

9  A    It's not an average of the claims?

10         THE COURT:  I think you're beating a dead horse, Mr.

11 Sheppard.  Can -- really --

12 Q    One last set of questions, Dr. Mullin.  If you take Dr.

13 Peterson's average settlement value of $73,000 per claim, okay,

14 and substitute it for your $45,000 per claim, where does that

15 take you in terms of your three estimates?

16 A    I don't have a total claim number.  I didn't forecast how

17 many future claims they would get.  I forecast how many high

18 value, mid value and low value, because those were stable, and

19 I don't know how many future nuisance claims they're going to

20 get.  I think that's a very, very difficult thing to do, so I

21 never constructed an estimate of total claim filings.  I

22 constructed, in my forecast, the number that would be

23 compensable in the tort system.

24 Q    So, your estimate, you just ignored those claims?

25 A    You could -- I mean, I did analysis, but forecasting the

1 claims that are going to get dismissed doesn't really add

2 anything to the process.

3 Q    But there were dismissed claims included in those

4 averages, were there not?

5 A    The average resolution value exercise of applying that to

6 Dr. Vasquez, yes.  I used settlement values for high-value

7 claims, settlement values for mid-value claims, and settlement

8 values for low values.  In my estimate the dismissals were set

9 to the side entirely.  I only looked at the paid claims that

10 fell in the various categories, so in my own work, no.  In

11 trying to explain the differences of what I actually explain

12 was the difference between where my numbers come out and where

13 Dr. Peterson's or Dr. Vasquez's numbers come out, it's a rough

14 approximation, but it's not how I did the work.

15 Q    Okay.  So it's really unfair, I guess is what you're

16 saying, for me to compare your $45,000 average that you

17 calculated to the real average that Dr. Vasquez and Dr.

18 Peterson used, is that right?

19 A    No.

20          MR. SHEPPARD:  Nothing further, Your Honor.

21          THE COURT:  All right.  I need my exhibits back,

22 though.

23          MR. SHEPPARD:  I'm going to give them back to you as

24 soon as I straighten them out.

25          THE COURT:  All right.

1                      (Laughter)

2            THE COURT:  Any -- oh, I'm sorry.  Mr. Dorsey, did

3  you have questions?

4            MR. DORSEY:  Given the hour, Your Honor, I think Mr.

5  Sheppard took all of my time.

6            MR. SHEPPARD:  Did I take all your time?

7            MR. DORSEY:  I'll steal his cigarettes later, so

8  he'll -- he'll suffer for that.

9            THE COURT:  All right.  I think we still have --

10           MR. DORSEY:  I have no questions.

11           THE COURT:  All right.  I think we still have --

12  actually, I think you're still on the clock, if you have a few

13  questions I'm happy to hear them.

14           MR. DORSEY:  I don't think there's anything worth

15  asking, Your Honor.  Thank you.

16           THE COURT:  All right.  Any redirect?

17           MR. EVERT:  No, Your Honor, subject to, as we

18  discussed earlier, our additions to the record and the

19  depositions that we discussed on the first day of this

20  proceeding, the debtors rest.

21           THE COURT:  Do the committee or ACR have any rebuttal

22  witnesses?  You're -- I'm sorry.  You're excused, sir.  Thank

23  you.

24           THE WITNESS:  Thank you, Your Honor.

25           MR. SHEPPARD:  No, Your Honor.  We weren't aware that

1  we were going to be given the opportunity to present rebuttal,

2  so -- no, we don't.  Actually, I'm not sure we would have any

3  time anyway.  It would have to be about a 30 second witness,

4  Your Honor.

5           THE COURT:  I think you've got about 20 minutes or

6  thereabouts left, so if you have something that you need to

7  present, this is the time.  No?

8           MR. SHEPPARD:  Well, Your Honor, let me just confer

9  with counsel.

10                        (Pause)

11          MR. SHEPPARD:  No, Your Honor.  The committee and the

12 FCR rest, as well -- oh, subject, Your Honor, I guess, to the

13 agreement that Mr. Evert just referenced again, and also, Your

14 Honor, I believe that pursuant to your instructions we have

15 prepared, and I understand the debtors may also have prepared

16 exhibit lists for these proceedings, and Ms. Ramsey can now

17 address the Court.

18                        (Pause)

19          MR. SHEPPARD:  Your Honor, may we have two minutes,

20 please?

21                     (Off the record)

22          MS. RAMSEY:  What we're going to propose to the Court

23 is sort of a two-step process.  We have today, the committee

24 and the FCR, have put together what we believe is a fully

25 updated exhibit list and binders that contain the exhibits,

1  although because we had a set -- we've used the set that we had

2  for ourselves, they're double sided, so our intention would be

3  to replace them anyway, with the Court's --

4           THE COURT:  Double sided is find.  I think in this I

5  should have all of the exhibits somewhere.

6           MS. RAMSEY:  And our plan was to take what you have

7  and to replace it with now what's updated, so that you would

8  have what is hopefully the set you'll really need.  And I can

9  explain a little further as we --

10          THE COURT:  Well, I don't want to give you the set

11  I've been using.

12          MS. RAMSEY:  Okay.

13          THE COURT:  I have marks through them.

14          MS. RAMSEY:  Oh.  All right.  Fine.

15          THE COURT:  If you want to take that set, which I

16  think nobody will be using, you're free to do that, but I'm not

17  going to give up the set that I've been working from.

18          MS. RAMSEY:  I understand, Your Honor.  Okay.  We

19  were just trying to make it somewhat simpler for the Court.

20  So, whatever the Court's preference is, is fine.

21          Your Honor, we do have some exhibits that we still

22  need to discuss with the debtors because of the press of time

23  here on the end, and we will both need to supplement anyway to

24  include the demonstratives that were introduced today.  But

25  what I would like to do is go ahead and have admitted documents

1  that are not subject to any objection, so these -- the list I'm

2  about to read you, I believe, are completely by consent, and

3  then we can deal with, in the next couple of days, working out

4  any additional issues with the debtors on their list and our

5  list, and --

6      THE COURT:  All right.  Do the debtors have any

7  objections to the exhibits that you read into the record

8  yesterday, the substantive exhibits that I said I would address

9  today?

10      MS. RAMSEY:  Your Honor, the only objections that

11  were raised yesterday were in two categories, I believe, and I

12  don't have my e-mail in front of me, but --

13      UNIDENTIFIED ATTORNEY:  Maybe I can address that,

14  because I spoke with you yesterday.

15      MR. SHEPPARD:  Your Honor, Mr. Gordon and I spoke

16  about this at a break.  It's --

17      UNIDENTIFIED ATTORNEY:  (Indiscernible).

18      MR. SHEPPARD:  Okay.  And I think that there was a

19  misunderstanding, Your Honor.  We were not tendering the videos

20  to be admitted as substantive evidence.  We understand that the

21  transcripts would be admitted.  The only point we were making

22  was that if the Court wanted the videos as a demonstrative,

23  much in the same way that we have provided the Court with the

24  expert reports and other, you know, evidence --

25      THE COURT:  No, I don't think the videos are

1 necessary.  The transcripts are fine.

2          MR. SHEPPARD:  And I believe, Your Honor, the debtors

3 had also objected to certain designations for Mr. Fleming, and

4 I think we've resolved that and they've withdrawn their

5 objection.

6          THE COURT:  So, as to the exhibits that were read in

7 the record yesterday, there are no objections to those

8 exhibits?

9          MS. RAMSEY:  That's correct, except, Your Honor, that

10 several of them need to be put under seal because they are --

11 they contain confidential claimant information.  Is that

12 correct, Mr. Gordon?

13          MR. GORDON:  Yes.  If I could just be a little more

14 clear for the record, Your Honor?  The ones that Mr. Sheppard

15 was referring to I believe were the Exhibits 231 through 244,

16 and they were listed as exhibits, but they were video

17 depositions.  And the point I made with Mr. Sheppard was we

18 don't view those as exhibits.  To the extent that the ACC or

19 FCR wants to use those, we felt they should have to designate

20 deposition designations and then we would counter designate, so

21 that Your Honor is just given the designations that the parties

22 want to rely on, rather than being given as an exhibit an

23 entire transcript.  And my understanding is that's acceptable

24 -- that's the way we'll proceed, that they'll do designations,

25 and we'll do, if we think it's appropriate, counter

1 designations.  And that's how we would handle those.  So if

2 those are no longer being offered as exhibits, that's 231

3 through 244, but instead will be dealt with through the

4 designation process.

5        THE COURT:  So, 231 to 234 (sic) withdrawn, and I'll

6 get designations.

7        MR. GORDON:  Through 244.

8        MS. RAMSEY:  Through 244.

9        THE COURT:  I'm sorry.  231 through 244 are withdrawn

10 and I'll get designations.

11        MS. RAMSEY:  That's correct, Your Honor.  And we

12 actually have designated those transcripts, but you'll recall,

13 Your Honor, from the discussion the first day, that there was a

14 misunderstanding between the parties and we had agreed that the

15 debtors would be given an opportunity to more -- to look at the

16 transcripts again that we had designated excerpts from, and

17 additionally designate.  We would then review them and possibly

18 --

19        THE COURT:  Yes.

20        MS. RAMSEY:  -- cross designate, and we'll submit

21 them on a schedule acceptable to the Court.

22        THE COURT:  All right.

23        MR. GORDON:  Right.  And the only related issue I

24 should bring up now is on their initial designations they

25 designated the transcripts of Mr. Fleming and Mr. Knoop, whose

1  depositions were taken in this case.  After that both those

2  individuals were subpoenaed by them to appear as witnesses at

3  this hearing.  Both, in fact, did appear, and from our

4  perspective they did appear and then they were not used, they

5  were released.  And because they were available by the party's

6  own subpoena it would be our position that the depositions that

7  were taken in this case cannot be used because the witnesses

8  weren't unavailable, they were available by subpoena from these

9  parties.

10         And again, just to be clear, in the case of Mr.

11  Fleming, I'm not talking about historical depositions.  I'm

12  talking about the deposition of Mr. Fleming taken in this case.

13         THE COURT:  All right.

14         MR. SHEPPARD:  Your Honor, if I may respond to that

15  objection?  I believe under 801(d) these would be admissions of

16  a party, and therefore the availability or unavailability of

17  the witness is immaterial.  They have an --

18         THE COURT:  You folks can brief this.  I'm really not

19  -- I really don't want to hear this tonight.  I don't know

20  anything about them.  You haven't marked them.  I haven't seen

21  them.  So address it in a brief.

22         MR. SHEPPARD:  We will, Your Honor.

23         THE COURT:  Okay.

24         MS. RAMSEY:  Anything else, Mr. Gordon, before I read

25  the list that I understand into the record?  Okay.  Your Honor,

 1  we have agreed on the following exhibits.  Just to be clear,

 2  the Court probably has most of these, or all of them, but I

 3  want to make sure I have read them.  Again, 1 to 43.

 4       THE COURT:  Wait.  Are you redoing something we've

 5  already done?  I don't want to do that.

 6       MR. RAMSEY:  Oh.  Okay.  You have that list?  Okay.

 7  Your Honor, we also have a series of exhibits that are supposed

 8  to be admitted under seal of that group that I gave you, so

 9  should I read that list to you?

10       THE COURT:  Isn't this something, if they're already

11  in, that you've agreed that you're going to do, and hand me

12  something, and a schedule?

13       MS. RAMSEY:  Then we can certainly do that, Your

14  Honor.

15       THE COURT:  I think it would be easier to do that

16  rather than trying to take up the time now and figure out

17  what's going to be redacted, what's going to be under seal, and

18  so forth, because I think you folks probably need some time to

19  talk.

20       MS. RAMSEY:  That's fine, then, Your Honor.

21       MR. GORDON:  Right.  The idea was we would sit down

22  and try to put together a clean list of everything that shows

23  what's been admitted, and what's been withdrawn and the like,

24  so Your Honor has one document that you can refer to, when

25  we're clear on what the exhibits are.

1          THE COURT:  I think that would be helpful for all of

2   us.  Yes.  So, I think the only thing I need to know is when

3   you're going to submit A, the list, and B, whatever it is that

4   -- the changes that you're making, so that I know, for example

5   I'm just going to make up an exhibit, Exhibit 34, for example,

6   is to be kept under seal, you're going to give me something

7   that says put this under seal.  When is that activity going to

8   take place?

9          (Counsel/counsel discussion)

10         MR. SHEPPARD:  Your Honor, I'm not sure what you

11  handed me.  If I may approach?

12         THE COURT:  I handed you D-87, Pages 1 through --

13         MR. SHEPPARD:  I have two through --

14         THE COURT:  My handwriting had number two, but there

15  is a one -- there's a cover sheet.

16         MR. SHEPPARD:  I'll try to find that, Your Honor.

17         (Counsel/counsel discussion)

18         MR. GORDON:  Your Honor, I think what we've agreed to

19  is that we're all going to complete our supplemental

20  submissions, deposition designations and exhibits.  We'll

21  exchange with each other within a week, and then we'll each be

22  given another week to counter, and then we'll get together.  So

23  at the end of the two weeks we'll be able to give you the full

24  list of everything, the exhibits, the deposition designations,

25  and we'll be done.  And that should leave us enough time, then,

1  to know what the record is for purposes of the post-trial

2  briefing schedule.

3          THE COURT:  Okay.  So that's January 25th?

4          MR. GORDON:  Yes.  So, by January 18th we would

5  exchange our additional submissions, and then the 25th we'd

6  complete that process and submit to Your Honor.

7          THE COURT:  All right.  And that will include the

8  deposition designations?

9          MR. GORDON:  Correct.

10         THE COURT:  And this issue about what has to be under

11 seal or if you're going to redact versions, to get the redacted

12 versions.

13         MR. GORDON:  That will probably just be another

14 column on the exhibit that just indicates the one -- and it's

15 not very many, that will indicate it has to be filed under

16 seal.

17         THE COURT:  That's fine.  Okay.  That's fine.  And

18 then, what about the binders?  Are you taking back -- well, I

19 don't want to give you back binders that I've written in, but

20 aside from that are you -- the exhibits that you do not have on

21 the list that you're going to submit am I free to discard

22 because no one is using them?  Or are you going to be arguing

23 them in briefs?

24         MR. GORDON:  No.  If they've been withdrawn, as far

25 as the debtors are concerned they're not going to be argued in

1  the briefs because we're not relying on them or intending to

2  use them in any way.

3          THE COURT:  All right.  So if they're not on your

4  list I can discard the exhibits?

5          MR. GORDON:  Right.

6          THE COURT:  All right.  Nobody will argue them, and

7  they were not considered either as demonstratives or as

8  substantive evidence?

9          MR. GORDON:  That's correct.

10         THE COURT:  Okay.  That's fine.  That's what I will

11  do.  That should shorten a lot of the paperwork.

12         MS. RAMSEY:  Your Honor, may I ask?  For purposes of

13  this final list does the Court want both a list and copies of

14  all the demonstratives that were introduced other than the ones

15  that were marked that were on the easel?

16         THE COURT:  No.  I believe except for the ones that

17  are on the easel I have them all.

18         MS. RAMSEY:  Okay.

19         THE COURT:  I think I do.

20         MR. FINCH:  Can I just check and make sure Your Honor

21  has Demonstrative Exhibits ACC-1000 through -- ACC -- actually,

22  it might be faster if Your Honor just -- if I just ask about

23  specific exhibits that we're not clear about, ACC-1006, which

24  is Dr. Brody's slides, marked for demonstrative purposes?

25         THE COURT:  No.  Oh, yes, I do have those, at least

1  they were marked.  Why don't you do this?  If you think I'm

2  missing something, give it to me.  An extra set won't matter.

3           MR. FINCH:  Okay.

4           THE COURT:  I'll throw them out if I already have a

5  set.  Thank you.

6           MR. FINCH:  Okay.  We will put together a set of

7  everything that was marked for demonstrative purposes and give

8  it to Your Honor.

9           THE COURT:  Okay.  I think that would be better.

10  That way we can put them in binders and I'll make sure I have

11  everything.

12           MS. RAMSEY:  Thank you, Your Honor.

13           THE COURT:  All right.  If the debtor wants to do

14  that, too, that's fine.  If you want to mark up a new set of

15  your demonstratives to make sure --

16           UNIDENTIFIED ATTORNEY:  Sure.

17           THE COURT:  -- that I have them all, put them in a

18  binder, I'll accept them that way.

19           UNIDENTIFIED ATTORNEY:  Okay.

20           UNIDENTIFIED ATTORNEY:  We'll do that.

21           MR. EVERT:  Your Honor, frankly I'm concerned you may

22  have the best set, so we may have to come to you to ask you for

23  a copy of our demonstratives --

24                          (Laughter)

25           MR. EVERT:  -- to be honest.

1          THE COURT:  Well, that's fine.  I will keep the set I

2     have.  I will give it to the good hands of my law clerk to make

3     sure that they stay safe.

4          MR. EVERT:  I do appreciate that, Your Honor, because

5     I'm -- I'm not being completely facetious, so thank you.

6          THE COURT:  Yes.  I understand.  There was a lot of

7     paper being shuffled.

8          UNIDENTIFIED ATTORNEY:  And don't let me near them,

9     Your Honor, because I think I lost the first two pages already.

10         THE COURT:  Well, I am missing the first page of

11    Exhibit 87.

12         UNIDENTIFIED ATTORNEY:  And, Your Honor, I'm looking

13    for them, and I'm thinking my dog ate my homework here.

14         THE COURT:  I believe it was a cover sheet.

15         MR. EVERT:  I think it was a cover sheet as well,

16    Your Honor.  I think it said to CMS on it?

17         THE COURT:  It did.

18         MR. EVERT:  Yes.

19         MR. SHEPPARD:  And I don't have anything that looks

20    like that.

21         MR. EVERT:  Well, I have that.  I can find -- but I

22    don't know what the second page was.

23         THE COURT:  I have Page 2.  It's the bar graph.

24         MR. SHEPPARD:  So, all I was missing was the cover

25    page?

1              MR. EVERT:  That was Page 3.  I mean, that was --

2              THE COURT:  Yes.  You're correct.  That is -- that's

3    your numbered Page 3, my numbered Page 2.  So, I'm missing

4    pages, according to the top column, 1 and 2, the top right

5    corner.

6              MR. SHEPPARD:  In the top right corner?  I'm looking

7    for them, Your Honor.

8              THE COURT:  Oh.  Well, here's what happened -- no.

9    That's the summary.  No.  Never mind.  That's -- what I thought

10   happened didn't.

11             MR. EVERT:  Your Honor, we have them in a slide deck

12   on a computer, I am sure, and so we could reproduce it.

13             THE COURT:  All right.  That would be better anyway,

14   because I think handwriting and stuff has gotten on these.  So,

15   if the debtor will reproduce Exhibit 87, all the pages.  I

16   think they end with 26 -- I'm sorry -- 27, your Slide Number

17   27.  If you will reproduce all of the slides, I think, and give

18   the ACC and FCR copies.

19             MR. EVERT:  Yes.  They had asked for a copy, and we

20   will e-mail them to them, Your Honor, so we will take care of

21   that.

22             THE COURT:  All right.

23             UNIDENTIFIED ATTORNEY:  I appreciate that.

24             THE COURT:  Okay.  Now, the rest of the schedule is

25   fixed, correct, the dates for briefs and arguments and so

1  forth, Your Honor?

2            UNIDENTIFIED ATTORNEY:  Yes.

3            MS. RAMSEY:  Yes, Your Honor.

4            THE COURT:  So, are there any other scheduling

5  matters I need to address?

6            MS. RAMSEY:  I can't think of any right now, Your

7  Honor.

8            THE COURT:  All right.  So I'll expect to get things

9  from you on January 25th.  Don't send me anything before then

10  unless you have a question about something, or need something

11  from me.  Just communicate with Mona.

12            MR. GORDON:  And I believe our next hearing is set

13  for February 4th.  I think it was moved --

14            THE COURT:  I think so, in Delaware.  Yes.

15            MR. GORDON:  You know, there is one other thing, Your

16  Honor, I should mention.  There was actually a second agenda

17  item, which was the motion of the committee, I think in the

18  FCR, as well, for relief from the stay as to RPM International.

19            THE COURT:  Well, you can put that on some agenda,

20  whenever you folks agree.  If you want to do it while you're

21  briefing, okay.  If you want to wait until the briefing is

22  done, fine, but do it before May.

23            MR. GORDON:  All right.  We'll talk about that.

24            MS. RAMSEY:  Yes, Your Honor.  Yes.

25            MR. GORDON:  Okay.  We'll talk about that.

1          THE COURT:  All right.  If it isn't moot and you

2    haven't settled --

3                         (Laughter)

4          THE COURT:  -- by then.

5          MR. GORDON:  We heard that, Your Honor.

6          MS. RAMSEY:  Yes.

7          THE COURT:  Anything else to be addressed?  Well,

8    thank you.  I very much appreciate the collegiality and

9    cordiality that you showed to each other and to the witnesses.

10   It was -- actually, it was very refreshing.  This was a very

11   well tried case and I very much appreciate that.

12         MR. GORDON:  Okay.  Thank you, Your Honor.

13         THE COURT:  And safe travels.

14         UNIDENTIFIED ATTORNEY:  Thank you to you and thank

15   you to your staff for your patience this week.

16         THE COURT:  Yes.  They're really great, my staff.

17   Thanks.

18                      *  *  *  *  *

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

We, JANET PERSONS, COLETTE MEHESKI, ELAINE HOWELL, KAREN DeLUCIA and TAMMY DeRISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of our abilities.


/s/ Janet Persons

JANET PERSONS


/s/ Colette Meheski

COLETTE MEHESKI


/s/ Elaine Howell

ELAINE HOWELL


/s/ Karen DeLucia

KAREN DeLUCIA


/s/ Tammy DeRisi

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.        Date:  January 22, 2013