## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPECIALTY PRODUCTS HOLDING CORP., *et al*.,[1] | Case No. 10-11780 (JKF) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW BY THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS AND ERIC D. GREEN AS THE LEGAL REPRESENTATIVE FOR THE FUTURE ASBESTOS-RELATED PERSONAL INJURY CLAIMANTS

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") conducted a hearing from January 7, 2013 to January 11, 2013 (the "Asbestos Claims Estimation Hearing") to estimate the pending and expected future asbestos personal injury claims and wrongful death claims asserted against Specialty Products Holding Corp. and Bondex International, Inc.

2.      Pursuant to the colloquy following the Asbestos Claims Estimation Hearing, the Court directed the parties to the Asbestos Claims Estimation Hearing to prepare and submit proposed findings of fact and conclusions of law to the Court by February 6, 2013 (the "Submission Deadline").  The Submission Deadline was then extended to February 22, 2013.

---

[1]     The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Specialty Products Holding Corp. (0857) and Bondex International, Inc. (4125) (the "Debtors").  The Debtors' address is 4515 St. Clair Avenue, Cleveland, Ohio 44103.

3.      Attached to this Notice as Exhibit A are the [Proposed] Findings of Fact and Conclusions

of Law prepared by the Official Committee of Asbestos Claimants and Eric D. Green, as the

legal representative for the future asbestos-related personal injury claimants.

February 22, 2013                    **MONTGOMERY, McCRACKEN,**
                                     **WALKER & RHOADS, LLP**

                                      */s/ Natalie D. Ramsey*
                                     Natalie D. Ramsey (DE Bar No. 5378)
                                     Davis Lee Wright (DE Bar No. 4324)
                                     1105 North Market Street, Suite 1500
                                     Wilmington, DE  19801
                                     (302) 504-7800; nramsey@mmwr.com

                                              and

                                     **MOTLEY RICE, LLC**

                                     */s/ Nathan D. Finch*
                                     Nathan D. Finch (admitted *pro hac vice*)
                                     1000 Potomac Street, Suite 150
                                      Washington, DC 20007
                                     (202) 232-5507; nfinch@motleyrice.com

                                     *Counsel for the Official Committee of*
                                     *Asbestos Personal Injury Claimants*

                                              and

                                     **YOUNG, CONAWAY,**
                                     **STARGATT & TAYLOR, LLP**

                                      */s/ Edwin J. Harron*
                                     James L. Patton, Jr. (DE Bar No. 2202)
                                     John T. Dorsey (DE Bar No. 2988)
                                     Edwin J. Harron (DE Bar No. 3396)
                                     Sharon M. Zieg (DE Bar No. 4196)
                                     Rodney Square
                                     1000 North King Street
                                     Wilmington, DE  19801
                                     (302) 571-6600; eharron@ycst.com

                                     *Counsel to Eric D. Green, the Future Claimants'*
                                     *Representative*

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SPECIALTY PRODUCTS<br>HOLDING CORP., *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 10-11780 (JKF)<br><br>Jointly Administered<br><br>**Ref. Docket No.** |

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the Court on the estimation of the aggregate value of the

pending and expected future asbestos personal injury and wrongful death claims[2] asserted against

Specialty Products Holding Corp. ("SPHC") and Bondex International, Inc. ("Bondex" and

together with SPHC, the "Debtors").  The Court has reviewed all of the briefs and supporting

materials filed by each of the Official Committee of Asbestos Claimants (the "Committee"),

Eric D. Green, as the legal representative for the future asbestos-related personal injury claimants

(the "FCR"), the Debtors, and RPM International Inc. ("RPM International");[3] has listened to the

oral arguments of all interested counsel; has heard and weighed the testimony of fact witnesses

---

[1]　　　The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Specialty Products Holding Corp. (0857) and Bondex International, Inc. (4125).  The Debtors' address is 4515 St. Clair Avenue, Cleveland, Ohio 44103.

[2]　　　All subsequent references to "asbestos personal injury claims" include wrongful death claims as well.

[3]　　　Pursuant to the Stipulated Order Regarding the Emergency Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative Seeking Judicial Determination of Status of RPM International Inc. in Asbestos Estimation Trial [D.I. 3233], RPM International was made a party to the contested hearing to estimate the Debtors asbestos personal injury claims with all of the rights and obligations attendant thereto provided; however, RPM International shall not have access to any individualized Personal Injury Questionaire ("PIQ") data (including any information specific to a particular claimant or law firm).

and expert witnesses who testified during the estimation hearing held from January 7, 2013 to

January 11, 2013 (the "Asbestos Claims Estimation Hearing");[4] and has considered the exhibits

and other materials admitted into evidence or otherwise submitted for consideration at the

hearing.[5]

After due deliberation, the Court hereby makes the following Findings of Fact and

Conclusions of Law:

## I.    FINDINGS OF FACT

A.    **Trial Witnesses**

1.    The Court heard live testimony from Mr. Mark Iola, Esq., Mr. Jeffrey Simon,

Esq., Mr. P. Kelly Tompkins, Dr. Denise Martin, Dr. Laura Welch, Dr. Allan Feingold, Dr.

Arnold Brody, Ms. Susan Raterman, Dr. Kim Anderson, Dr. Mark Peterson, Dr. Thomas

Vasquez, Dr. Charles H. Mullin, Mr. James Sinclair, Mr. Richard S. Braun, and Mr. Timothy

Coleman.  The testimony of nineteen witnesses was presented by designations of depositions or

prior trial testimony.  These witnesses included:  Mr. Ibrahim Bedros, Mr. Glenn Bowers, Esq.,

Dr. William Dyson, Mr. C. Michael Evert, Esq., Mr. Thomas D. Fipps, Mr. John Fleming, Ms.

Jeanette Garner, Mr. Patrick Haggerty, Esq., Mr. James Karman, Dr. Gerald Kerby, Mr. Stephen

Knoop, Mr. Harry Lafkas, Jr., Dr. Anup Malani, Mr. Julius Nemeth, Dr. James C. Rock, and Mr.

Thomas Sullivan.

**Witnesses Regarding Debtors' Asbestos Litigation History**

---

[4]    Pursuant to the terms of a stipulation entered on June 20, 2012, the Asbestos Claims Estimation Hearing focused on the value of pending and future mesothelioma claims which the parties agreed would equal 94% of the Debtors' liability.  [D.I. 2578].

[5]    The Statement of Admitted Facts contained in the Pretrial Order [D.I. 3334], is incorporated herein by reference.

2.       Mr. Mark Iola ("Mr. Iola") is an attorney and partner at the firm of Stanley &

Iola, LLP in Dallas, Texas.   Over the last thirty years, he has specialized in representing

individuals with malignant mesothelioma.  1/9/13 Hr'g Tr. 241:15-19 (Iola).  He testified

regarding his experience prosecuting, settling, and trying cases in the tort system against the

Debtors prior to May 31, 2010 (the "Petition Date").  Mr. Iola is in a unique position to evaluate

litigation against Bondex because he works with a variety of law firms as part of his regular

practice.  Mr. Iola testified that he had "settled somewhere in the vicinity of about 130

mesothelioma claims with Bondex" with an average settlement "somewhere in the vicinity of

about $700,000 per claim."  1/9/13 Hr'g Tr. 260:8-16 (Iola).  Mr. Iola testified that due to his

unique position working with a variety of firms he has more experience than any other plaintiff's

lawyer in the country handling Bondex claims.  1/9/13 Hr'g Tr. 262:11-15 (Iola).

3.       Mr. Jeffrey Simon ("Mr. Simon") is an attorney and partner at Simon Greenstone

Panatier Bartlett, PC in Dallas, Texas.  Mr. Simon testified that he has represented asbestos

personal injury claimants for the last 20 years and that for approximately the past 13 years he has

handled mesothelioma and lung cancer cases exclusively.  1/10/13 Hr'g Tr. 138:12-15 (Simon).

Mr. Simon testified that he brought over 100 cases against the Debtors prior to the Petition Date.

1/10/13 Hr'g Tr. 139:2-7 (Simon), taking at least two cases to verdict against [Bondex].  1/10/13

Hr'g Tr. 156:14-19, 158:11-159:6 (Simon). Simon testified that, in his experience, a confirmed

diagnosis of mesothelioma as well as product identification sufficiently grounded to survive

summary judgment were the most important factors in deciding whether to take a case to trial.

1/10/13 Hr'g Tr. 139:14-18 (Simon).  Mr. Simon testified that when there was a disagreement

about settlement with Bondex, it involved a dispute over product identification.  *See* 1/10/13

Hr'g Tr. 144:11-14 (Simon).  Mr. Simon testified that although Bondex did raise the "chrysotile defense," no jury ever believed the defense.  1/10/13 Hr'g Tr. 141:8-13 (Simon).

4.      Mr. P. Kelly Tompkins ("Mr. Tompkins") served as general counsel of RPM, Inc. from June 1, 1998 until October 15, 2002, the date of RPM International Inc.'s formation. Thereafter, Mr. Tompkins served in the role of general counsel for RPM International from October 16, 2002 until October 31, 2006.  Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶59.  Mr. Tompkins testified about the Debtors' corporate history, the Debtors' production and sale of asbestos-containing products, and the Debtors' history of litigation and settlement of personal injury claims related to these products. 1/7/13 Hr'g Tr. 70:17-102:6 (Tompkins).  Mr. Tompkins testified that the asbestos litigation was clearly focused on Bondex joint compound. 10/12/12 Dep. Tr. 87:3-5 (Tompkins).  During his tenure as general counsel, Mr. Tompkins oversaw the Debtors' asbestos litigation, and the ultimate authority to settle claims resided with him.  1/7/13 Hr'g Tr. 84:9-21 (Tompkins).

5.      Dr. Denise Martin ("Dr. Martin") was engaged by the Debtors and was certified by this Court to testify as an expert in economics and market analysis.  1/7/13 Hr'g Tr. 150:11-12 (Martin).  She testified as to her view of the Bondex brand share of the joint compound market from the period of 1950 to 1977.

6.      In addition to the testimony of Mr. Tompkins and Dr. Martin, the designations of depositions or prior trial testimony of other witnesses provided background regarding the Debtors' asbestos litigation history: Mr. Ibrahim Bedros, Mr. Glenn Bowers, Esq., Dr. William Dyson, Mr. C. Michael Evert, Esq., Mr. Thomas D. Fipps, Mr. John Fleming, Ms. Jeanette Garner, Mr. Patrick Haggerty, Esq., Mr. James Karman, Dr. Gerald Kerby, Mr. Stephen Knoop, Mr. Harry Lafkas, Jr., Mr. Julius Nemeth, Dr. James C. Rock, and Mr. Thomas Sullivan.

**Medical and Science Witnesses**

7.      Dr. Laura Welch ("Dr. Welch"), one of the Committee's medical science experts,

is a board-certified internist and occupational medicine physician who has diagnosed or treated

at least a thousand patients with asbestos-related disease, and she has conducted an extensive

longitudinal epidemiological study of sheet metal workers and asbestos-related lung disease.

1/10/13 Hr'g Tr. 9:5-10:12, 12:22-14:11 (Welch); ACC/FCR Ex. M128.  Dr. Welch is board

certified in both Occupational Medicine and Internal Medicine.  1/10/13 Hr'g Tr. 10:21-22

(Welch).  Dr. Welch has been recognized by state and federal courts as an expert in asbestos-

related epidemiology and causation and has testified before Congress twice on the topic.  1/10/13

Hr'g Tr. 14:1-15 (Welch).  The Court recognized Dr. Welch as an expert in internal medicine,

occupational medicine, epidemiology of asbestos-related diseases and the causation of

mesothelioma.  1/10/13 Hr'g Tr. 14:16-23 (Welch).  Dr. Welch testified about the epidemiology

of asbestos related diseases, the causation of asbestos related diseases, and what the medical

literature reveals about asbestos exposures from working with asbestos-containing joint

compound or other products.  While agreeing that amphibole forms of asbestos are likely more

potent in causing mesothelioma on a fiber per fiber basis, Dr. Welch testified that exposure to

chrysotile asbestos can and does cause mesothelioma in humans.  1/10/13 Hr'g Tr. 15:5-11

(Welch).

8.      Dr. Allan Feingold ("Dr. Feingold") is a medical expert for the Debtors and is a

clinician and lung specialist with over 30 years of experience treating patients.  1/8/13 Hr'g Tr.

55:13-57:7 (Feingold).  He was certified in this case as an expert in pulmonary medicine, B

reader with expertise in diagnostic pathology, epidemiology, and database construction.  1/8/13

Hr'g Tr. 63:1-4 (Feingold).  Dr. Feingold testified about the epidemiology of various forms of

asbestos and their ability to cause mesothelioma in humans.  1/8/13 Hr'g Tr. 64:12-76:2

(Feingold).  He opined that exposure to chrysotile asbestos does not result in deaths from

mesothelioma.  1/8/13 Hr'g Tr. 75:13-14 (Feingold).

  9.  Dr. Arnold Brody ("Dr. Brody"), an expert for the Committee, holds a Ph.D. in

cellular biology and has done extensive work in the area of experimental pathology for asbestos-

related diseases.  1/9/13 Hr'g Tr. 185:20-186:2 (Brody).  Dr. Brody has conducted animal studies

and cellular induction studies to research the potential of the various asbestos fiber types to cause

disease in animals and humans.  In addition to writing more than one hundred scientific articles

and fifty book chapters that relate specifically to the molecular and cellular aspects of asbestos

disease, Dr. Brody has served on the faculty at several medical schools and universities and

lectured on pulmonary anatomy and asbestos disease.  1/9/13 Hr'g Tr. 187:1-11 (Brody);

ACC/FCR Ex. M131.  The Court recognized Dr. Brody as an expert in the fields of cell biology

and experimental pathology.  1/9/13 Hr'g Tr. 188:11-15 (Brody).  The presentation Dr. Brody

used to explain his testimony was marked as ACC/FCR Demonstrative 1006, and his Expert

Report was marked as ACC/FCR Demonstrative 1033.  In accordance with his educational

background, training, and his review of the scientific literature, Dr. Brody confirmed that each

asbestos fiber type, including chrysotile, has been shown to cause mesothelioma as well as all of

the other asbestos-related disease in humans.  1/9/13 Hr'g Tr. 194:25-195:23, 207:8-11 (Brody).

  10.  Ms. Susan Raterman ("Ms. Raterman"), an expert for the Committee, is a certified

industrial hygienist - a profession specializing in the anticipation, recognition, evaluation and

control of workplace and environmental health hazards.  1/9/13 Hr'g Tr. 143:9-10, 15-18

(Raterman).  In addition to writing several articles in the field of industrial hygiene, Ms.

Raterman has previously worked as an inspector for the Occupational Safety and Health

Administration ("OSHA") where she compared air samples from various work and

manufacturing facilities to the permissible exposure limits ("PELs") promulgated by OSHA. 1/9/13 Hr'g Tr. 146:6-13, 147:24-148:9 (Raterman).  Ms. Raterman has also gained vast experience in the field of asbestos, working as a consultant in this area since 1980.  1/9/13 Hr'g Tr. 146:14-147:13, 147:24-148:9 (Raterman); ACC/FCR Ex. M136.  The Court recognized Ms. Raterman as an expert in the field of industrial hygiene.  1/9/13 Hr'g Tr. 145:23-146:2 (Raterman).  Ms. Raterman testified generally concerning:  asbestos fiber release from joint compound and other asbestos containing products; industrial hygiene literature concerning asbestos fiber release from joint compound and other asbestos products; OSHA standards for asbestos; threshold limit values; the state-of-the-art concerning what was known about the hazards of asbestos at various times in medical and industrial hygiene literature; and the Consumer Products Safety Commission ban of asbestos-containing joint compound.  In accordance with her training as a certified industrial hygienist and the past and present consensus among the scientific community, as well as federal agency regulations, Ms. Raterman opined that aside from background levels of asbestos found in ambient air, there is no known safe level of exposure to asbestos, including chrysotile asbestos, below which the risk of disease, including cancer and mesothelioma, does not occur.  1/9/13 Hr'g Tr. 148:10-16, 149:20-150:6 (Raterman).

11.     Dr. Kim Anderson ("Dr. Anderson") is an expert for the Debtors with a 40-year career in human toxicology and industrial hygiene.  1/9/13 Hr'g Tr. 62:20-66:9 (Anderson).  He was certified to testify as an expert human toxicology, industrial hygienist, and risk assessor. 1/9/13 Hr'g Tr. 67:11-16 (Anderson).  Dr. Anderson testified concerning the science of asbestos and its relationship to human toxicology and industrial hygiene.

**Asbestos Claims Estimation Witnesses**

12.     Dr. Mark Peterson ("Dr. Peterson") is the asbestos personal injury claims estimation expert for the Committee.  Dr. Peterson is an acknowledged expert in the field of mass tort estimation, including asbestos personal injury claims estimation.  1/10/13 Hr'g Tr. 180:23-184:10 (Peterson).  The Court certified Dr. Peterson to testify as an expert in the valuation of asbestos mass tort liabilities.  1/10/13 Hr'g Tr. 185:9-11 (Peterson).  Dr. Peterson testified as to the Debtors' total liability for pending and future mesothelioma asbestos personal injury liabilities as of the Petition Date.

13.     Dr. Thomas Vasquez ("Dr. Vasquez") is the asbestos personal injury claims estimation expert for the FCR.   He is an acknowledged expert with extensive experience in estimating asbestos-related liabilities.  1/11/13 Hr'g Tr. 75:17-78:3 (Vasquez).  The Court certified Dr. Vasquez to testify as an expert in forecasting future liability.  1/11/13 Hr'g Tr. 78:13-17 (Vasquez).  Dr. Vasquez testified as to the Debtors' total liability for pending and future mesothelioma claims as of the Petition Date.

14.     Dr. Charles Mullin ("Dr. Mullin") is the asbestos personal injury claims estimation expert for the Debtors.  He is an economist and an econometrician, 1/7/13 Hr'g Tr. 229:13-234:21 (Mullin).  Dr. Mullin never testified as an expert in an asbestos estimation hearing before these cases.  1/7/13 Hr'g Tr. 240:23–241:1 (Mullin).  He was certified to testify as an expert in the fields of economics, econometrics, and the estimation of asbestos-related liabilities.  Dr. Mullin testified that he was charged with "provid[ing] an estimate of the several share of liability arising from the various products, in my reports I define that as the Reardon product line, but the asbestos-containing products that were produced over the years and what would be, you know, their several share of liability in the state court system that arose from that." 1/7/13 Hr'g Tr. 245:21-246:2 (Mullin).

15.     The designation of the deposition transcript of Dr. Anup Malani ("Dr. Malani")
was also submitted.  Dr. Malani holds a Ph.D. in economics and a J.D.  He opined on the
relationship between past settlement values and future trial verdicts and what the law and
economics literature says about the relationship between settlement values and trial verdicts.
11/9/12 Dep. Tr. 16:22-17:10, 22:11-23 (Malani); Debtors' Ex. 95.  Dr. Malani was not offered
as an expert witness at the Asbestos Claims Estimation Hearing and was not recognized by this
Court as one.

### Discount Rate Expert Witnesses

16.     James Sinclair ("Mr. Sinclair") is a Member of Charter Oak Financial
Consultants, LLC, the Committee's financial advisor.  ACC/FCR Ex. E087 at 1.  Mr. Sinclair
was certified to testify as a financial expert.  1/9/13 Hr'g Tr. 219:16-19 (Sinclair).  He testified
regarding the appropriate discount rate for determining the net present value of the Debtors'
asbestos liabilities and concluded that it would be a risk-free rate of 3.70 percent as of the
Petition Date.  1/9/13 Hr'g Tr. 219:24-220:6 (Sinclair).  Mr. Sinclair testified that the "risk-free
rate" has been approved in every case in which he has been involved.  1/9/13 Hr'g Tr. 222:6-15
(Sinclair).

17.     Richard Braun ("Mr. Braun") is a Managing Director of FTI Consulting, Inc.
("FTI"), the FCR's financial advisor.  ACC/FCR Ex. E427 at 1.  He was certified to testify as an
expert in corporate finance.  1/11/13 Hr'g Tr. 66:19-25 (Braun).  He testified by designation
regarding the appropriate discount rate for determining the net present value of asbestos
liabilities and concluded that in his professional opinion, based on his analysis and calculations
involving the Federal Reserve Board Statistical Release, dated June 1, 2010, a blended risk-free
rate of 3.45% as of the Petition Date is appropriate.  ACC/FCR Ex. E088 at 3-4.

18.    Timothy Coleman ("Mr. Coleman") is a Senior Managing Director of Blackstone Advisory Partners L.P., the Debtors' financial advisor. Debtors' Ex. 9 at 2. He was certified to testify as an expert in finance. 1/8/13 Hr'g Tr. 13:21-14:1 (Coleman). He testified regarding two alternative discount rates that he discussed with the Debtors' counsel for determining the net present value of the Debtors' pending and future asbestos liabilities. 1/8/13 Hr'g Tr. 15:20-16:2 (Coleman). He agreed with the Debtors' counsel to apply the weighted average cost of capital rate of 8.2% and the 10-year median pension return rate of 5.5%. 1/8/13 Hr'g Tr. 23:9-13, 28:9-23 (Coleman).

B.    **Corporate History**

**Republic Powdered Metals, Inc.**

19.    Debtor SPHC was incorporated in 1947 in Ohio as Republic Powdered Metals, Inc. ("Republic Powdered Metals I"). Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶1.

20.    From its inception, Republic Powdered Metals I manufactured and sold asbestos-containing products. *See* ACC/FCR Ex. E151 at 2. In October 1963, Republic Powdered Metals I incorporated R.P.M., Inc. as a wholly owned subsidiary. 1/7/13 Hr'g Tr. 72:20-22 (Tompkins).

21.    In March of 1966, Republic Powdered Metals I contractually acquired the assets and liabilities of the Reardon Company ("Reardon"), a company that manufactured a line of consumer home improvement products under the "BONDEX" brand name. Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶3; 3/13/09 Dep. Tr. 32:18-34:25 (Fleming); ACC/FCR Ex. E151 at 2.

22.    One Reardon product that was exceptionally well known was its asbestos-containing joint compound – BONDEX – which had been manufactured since at least 1960. 3/13/09 Dep. Tr. 33:15-18 (Fleming).

-10-

23.     Republic Powdered Metals I acquired Reardon with the goal of entering the "do-it-yourself" or "DIY" consumer market.  1/7/13 Hr'g Tr. 74:8-75:14 (Tompkins); 9/24/12 Dep. Tr. 181:24-182:12 (Fleming); 10/12/12 Dep. Tr. 88:21-89:7 (Tompkins); ACC/FCR Ex. E426 at 1-3.

24.     The purchase allowed Republic Powdered Metals I to expand its sales and to get more involved with retail customers.  3/1/00 Dep. Tr. 50:8-52:6 (Sullivan).  "The sale of Bondex and other Reardon products provide[d] an entree [sic] to the consumer business, a new field for other RPM products."  ACC/FCR Ex. E426 at 3.

25.     Under the terms of the purchase agreement, Republic Powdered Metals I assumed certain Reardon liabilities, including liability for products manufactured or sold by  Reardon pre-transfer that caused bodily injury subsequent to the date of the purchase agreement.  Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶3; ACC/FCR Ex. E309 at RPM 00030 (providing for buyer to "assume all liabilities" except certain those specifically enumerated).

26.     Following the Reardon acquisition, Republic Powdered Metals I internally operated R.P.M., Inc. as the "Republic Powdered Metals Division" and Reardon as the "Reardon Company Division."  1/7/13 Hr'g Tr. 72:22-73:2 (Tompkins); Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶10.

27.     Republic Powdered Metals I's original manufacturing, marketing, and sales efforts continued under the Republic Powdered Metals Division.  *See* ACC/FCR Ex. E072 at 1, Att. A.

28.     The Reardon Company Division continued to manufacture, market, and sell a number of asbestos-containing products, including BONDEX joint compound.  Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶10.

### RPM, Inc. and the Formation of Bondex

29.     On November 9, 1971, Republic Powdered Metals I changed its name to RPM, Inc. and R.P.M., Inc. changed its name to Republic Powdered Metals, Inc. ("Republic Powdered Metals II").  *See* 1/7/13 Hr'g Tr. 73:2-5 (Tompkins).

30.     Between November 1971 and May 1972, RPM, Inc. (n/k/a SPHC) continued to manufacture and sell products, including asbestos-containing products, through both:  (1) the Republic Powdered Metals Division and (2) the Reardon Company Division.  ACC/FCR Ex. E151 at 2.

31.     In May 1972, RPM, Inc. incorporated Bondex International, Inc. ("Bondex") in Ohio as a wholly-owned subsidiary of RPM, Inc.  Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶13.

32.     On May 31, 1972, Republic Powdered Metals II acquired the Republic Powdered Metals Division from RPM, Inc. and assumed its business liabilities.  *See* 1/7/13 Hr'g Tr. 73:6-14 (Tompkins).

33.     Also on May 31, 1972, Bondex acquired or assumed the assets of the Reardon Company Division from RPM, Inc. for $1 and agreed to assume its liabilities.  *See* Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶14; 1/7/13 Hr'g Tr. 73:6-14 (Tompkins); ACC/FCR Ex. E333 at RPM 00417-19; 3/1/00 Dep. Tr. 47:4-48:18, 137:25-139:20 (Sullivan).

34.     As characterized by the Debtors, "the Reardon Company was renamed Bondex Internation, Inc." during 1972 "[t]o take better advantage of the well-known Bondex name[.]" ACC/FCR Ex. E002 at RPM 00530.  Mr. Julius Nemeth ("Mr. Nemeth") announced that "this is a name change only in keeping with the nationally recognized trade name by which we are best known and no other changes in operation and/or ownership have taken place."  ACC/FCR Ex. E334; 3/1/00 Dep. Tr. 48:19-24 (Sullivan).

35.    According to James Karman ("Mr. Karman"), who was on the RPM, Inc. Board of Directors at the time, "it was the "[s]ame management, same everything. [They] just changed the corporate structure." 3/1/00 Dep. Tr. 67:5-10 (Karman). Neither the product line, the distribution, the locations, nor the insurance policies changed. 3/13/09 Dep. Tr. 35:22-36:14 (Fleming); 3/31/10 Dep. Tr. 62:20-25 (Fleming).

36.    After its incorporation, Bondex took over the production of the Reardon Company's basic product line, including the production of its asbestos-containing joint compound. 3/13/09 Dep. Tr. 36:2-11 (Fleming).

37.    Bondex continued to manufacture its asbestos-containing joint compound until at least 1977. *See* Debtors' Amended Post-Trial Brief on Estimation of Asbestos Liability [D.I. 3531] at p. 6.

38.    The same individuals who controlled and directed RPM, Inc. also controlled and directed Bondex's affairs.

39.    In particular, in 1971, Mr. Nemeth was on the RPM, Inc. Board of Directors and was also the President of the Reardon Company. ACC/FCR Ex. E311; 3/2/00 Dep. Tr. 10:15-19 (Nemeth).

40.    In 1972, Mr. Nemeth remained on the RPM, Inc. Board of Directors and was named the President of Bondex. ACC/FCR Ex. E311; 3/2/00 Dep. Tr. 10:5-23 (Nemeth).

41.    From 1972 to 1980, the Bondex Board of Directors included only three individuals: Mr. Karman, Mr. Nemeth, and Mr. Thomas Sullivan ("Mr. Sullivan"). Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶19. At the same time, those three individuals were all on the RPM, Inc. Board of Directors (with Mr. Sullivan as the Chairman of the Board). Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶19.

42.     At the same time, Messers. Karman, Nemeth, and Sullivant served as RPM, Inc.

officers.  Over the period of 1972 to 1978, Mr. Karman was RPM, Inc.'s Vice President,

Secretary, and Treasurer, and from 1979 to 1980, he was RPM, Inc.'s President.  ACC/FCR Ex.

E335.  From 1972 to 1978, Mr. Sullivan was RPM, Inc.'s President, and from 1979 to 1980, he

was the Chairman and CEO.  *Id*.  Mr. Nemeth was also an RPM, Inc. officer from 1957 to 1966

and 1975 to 1988.  Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶22.

**The DAP Transaction Resulted in Bondex Halting All Operations**

43.     On August 3, 1999, RPM, Inc. purchased DAP Products, Inc. ("DAP"), a

Delaware corporation, and DAP Canada Corporation.  *See generally*, ACC/FCR Ex. E340;

ACC/FCR Ex. E338.

44.     In November 1999, and continuing into the following year, Bondex transferred

manufacturing operations and sold assets to DAP and at least one other RPM, Inc. subsidiary -

Zinsser.  *See* 1/7/13 Hr'g Tr. 104:1-14 (Tompkins); *see also* ACC/FCR Ex. E340; ACC/FCR Ex.

E343.

45.     Mr. John Fleming ("Mr. Fleming"), the president of Bondex at the time, testified

that he was unaware that DAP, Inc. would be purchasing the assets of Bondex International, Inc.,

and was similarly unaware of the details of the transaction.  3/3/00 Dep. Tr. 61:4-62:11

(Fleming).

46.     Still a subsidiary of RPM, Inc., Bondex ceased all operations in 1999.  1/7/13

Hr'g Tr. 104:1-3 (Tompkins).  Bondex terminated all of its employees as of July 2000, except for

Mr. Fleming.  Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶23.

**The Debtors are not Operating Entities**

47.     Bondex has no operations or material assets.  ACC/FCR Ex. E122 at 3-4.  It was reincorporated in Delaware on January 1, 2010.  Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶31.

48.     In May 2010, RPM, Inc. changed its name to Specialty Products Holding Corporation ("SPHC").  1/7/13 Hr'g Tr. 73:22-24 (Tompkins); ACC/FCR Ex. E122 at 3.  As of May 31, 2010, SPHC was the parent company of Bondex, as well as the direct parent of eight domestic non-debtor operating companies and the indirect parent of certain other domestic and foreign non-debtor subsidiaries.  ACC/FCR Ex. E122 at 3-4.  SPHC itself has no operations and its assets consist primarily of its direct and indirect ownership interests in its subsidiaries.  ACC/FCR Ex. E122 at 3-4.  The Debtors acknowledge that SPHC has had no operating assets since 1972.  Debtors' Amended Post-Trial Brief on Estimation of Asbestos Liability [D.I. 3531] at 6-7 (citations omitted).

**The Debtors' Bankruptcy Filings Were Planned a Year Before the Petition Date**

49.     On June 1, 2010, the Chairman of SPHC's parent and the ultimate parent of Bondex, RPM International, Frank Sullivan, Jr., held a conference call for investors during which he publicly disclosed that RPM International planned for the Debtors' bankruptcy filing for about a year before the Petition Date.  See ACC/FCR Ex. E083 at 4 ("For most of the past year we have been exploring the structured alternative that we formally initiated yesterday.").

50.     The Debtors' bankruptcy filing was described as "a structured solution to permanently resolve the Bondex asbestos liability issue," and "a substantially better" option from a "financial and finality perspective" compared to "continuing to manage [the litigation] in the tort system."  ACC/FCR Ex. E083 at 4.

51.     RPM International stated that the Debtors intended to use the bankruptcy process in an effort to "shape" their trust liability under the Bankruptcy Code.  ACC/FCR Ex. E083 at 4.

-15-

52.     Based on RPM International's admission, it is undisputed that the Debtors and

RPM International  planned a bankruptcy filing while continuing to defend and settle cases.

Certain of those settlements involved delayed payment schedules, which payments were not

delivered following the Petition Date.  *See, e.g.*, Debtors' Ex. 1 (identifying certain individuals

with extended payment schedules).

C.      **Discovery of Asbestos Liability**

**Asbestos Products**

53.     Reardon began manufacturing asbestos-containing products, including joint

compound in 1960.  Republic Powdered Metals I (n/k/a/ SPHC) continued to manufacture when

it acquired Reardon.  3/13/09 Dep. Tr. 33:15-34:21 (Fleming).

54.     Following Bondex's acquisition of the Reardon Company Division assets and

liabilities from RPM, Inc. (n/k/a SPHC) in 1972, Bondex took over formulating and

manufacturing asbestos-containing products through 1977.  3/13/2009 Dep. Tr. 36:2-11

(Fleming).

55.     The Debtors made and sold a wide range of asbestos-containing products.  *See*

Order Granting in Part and Denying in Part Debtors' Motion for an Order Directing Submission

of Information by Current Asbestos Claimants [D.I. 1466], Ex. A (SPHC/Bondex Mesothelioma

Claim Information Form) (the "PIQ"), at 3 (detailing Bondex/SPHC Product Codes).  The vast

majority of their liability derives from claims arising from exposure to joint compound and

related products manufactured by the Debtors and their predecessors and sold primarily for

consumer use.  1/7/13 Hr'g Tr. 74:3-75:2 (Tompkins).

56.     The Debtors sold their joint compound in two forms:  (1) dry mix, which requires

the user to add water before application, and (2) ready-mix, where the joint compound is already

mixed.  It is beyond dispute that the intended use of asbestos-containing joint compound generates a significant amount of dust, *see* 1/10/13 Hr'g Tr. 149:13-19 (Simon) (discussing Longo video and that "what it conveys is the joint compound is an extremely dusty activity whether you are mixing or sanding or sweeping"); ACC/FCR Demonstrative 1030.

57.    Application of the joint compound results in tremendously high levels of asbestos exposure both for the user and anyone in the general vicinity.  1/10/13 Hr'g Tr. 34:16-35:3 (Welch) (testifying drywall workers probably exposed to 6 million fibers per day).  Exposure takes place either in mixing the product (for dry mix), or in sanding the joints (often repeatedly) and sweeping up afterward (for both ready-mix and dry mix).  *See, generally,* ACC/FCR Demonstrative 1030.

58.    Bondex products were consistently manufactured and sold with packaging that incorporated consumer directions.  These directions included the manner to apply and sand each asbestos-containing product to ensure a smooth finish.  ACC/FCR Ex. E376.

- Bondex's "SX All Purpose Joint Cement" contained asbestos and was sold with packaging that included specific instructions directing the consumer to apply two thin coats of joint cement before using "a fine or medium sandpaper to… remove any unevenness or roughness" from the joint cement.  ACC/FCR Ex. E376 at BON00380.

- Bondex's "All Purpose Joint Cement" prominently displayed on the front of its packaging, "Easy sanding for smooth, invisible finishing," while at the same time stating on the back of the same package in much smaller font, "Caution─ Contains Asbestos Fibres [sic] Avoid Creating Dust."  ACC/FCR Ex. E376 at BON00385.

**Market Share**

59.     Bondex's employees and attorneys as well as plaintiffs' attorneys agree that

Bondex was nationally known for its joint compound products, which were typically marketed to

and used by individuals for DIY home repairs and remodels.  1/10/13 Hr'g Tr. 147:4-24

(Simon); 9/24/12 Dep. Tr. 137:11-17, 137:22-138:10, 181:24-182:23 (Fleming); 11/1/12 Dep.

Tr. 57:17-22 (Bowers); 1/7/13 Hr'g Tr. 129:20-132:4 (Tompkins) (Bondex was "well-known

name" when Mr. Tompkins joined RPM, Inc. in 1996 and that "Bondex was a well-known trade

name certainly in that market [in 1972].").

60.     From 1966, with the acquisition of The Reardon Company ("Reardon") and its

line of Bondex-labeled products, Debtor SPHC touted its prominence in the "maintenance and

protections field" and its "world-wide distribution."  ACC/FCR Ex. E426 at 5-6.  Commenting

on the Reardon acquisition, SPHC stated that Reardon was represented "throughout the United

States and also in the export field …" and highlighted Reardon as a "*major factor* in the home

and retail markets."  ACC/FCR Ex. E426 at 5-6 (emphasis supplied).  As stated in its 1968

annual report:

> The Reardon Company Division has continued to produce good
> progress with its line of famous BONDEX products.  BONDEX is
> carried by leading dealers and distributors throughout the country,
> and again was heavily promoted with very productive advertising
> and sales promotion programs.  Several new items were added to
> the BONDEX line giving broader and more extensive market
> penetration . . . .  We have continued to reach and sell all important
> segments of the American and world-wide markets with the broad
> range of RPM and BONDEX products in 1968.

ACC/FCR Ex. E327 [RPM, Inc. 1968 Annual Report] at SPHC-BONDEX00001735.

61.     Over the years, SPHC continued to promote Bondex-name products aggressively.

SPHC's 1973 Annual Report states: "the Bondex Fleet has carried record volumes of water-

proofing, patch and repair, and do-it-yourself items to retail outlets throughout North America."

ACC/FCR Ex. E002 [RPM, Inc.'s 1973 Annual Report] at RPM00557.  Its 1974 Annual Report

refers to "the nationally marketed" Bondex surface preparation products.  ACC/FCR Ex. E002

[RPM, Inc.'s 1974 Annual Report] at RPM00576.

62.    Sold under at least 19 different names, and sold nationally, *see* 1/10/13 Hr'g Tr.

147:4-23 (Simon), Bondex asbestos-containing joint compound ("Bondex Joint Compound")

was a well-known and popular product in the do-it-yourself market.  1/7/13 Hr'g Tr. 131:22,

132:3-4 (Tompkins).  Bondex's primary demographic was "paint sundry retailers" such as "local

or national hardware chains . . . [and] local and regional paint companies that had their own

company stores."  9/24/12 Dep. Tr. 181:24-182:23 (Fleming).  In addition, the Debtors sold

privately labeled products through such national retailers as Montgomery Ward, J.C.Penney, and

National Paint Distributors, and also contracted with the Government Services Administration.

*See* PIQ at 3; 6/26/03 Dep. Tr. 131:4-12, 131:14-19, 131:21-25, 132:2, 132:4-12, 132:15-133:15

(Fleming); 9/24/12 Dep. Tr. 182:20-23 (Fleming).

63.    From at least 1960, when Bondex Joint Compound was first manufactured, *see*

3/13/09 Dep. Tr. 33:15-18 (Fleming), to June 1978, when the Debtors finally stopped

distributing it to retail outlets, *see* 10/12/12 Dep. Tr. 102:6-13 (Tompkins), the Debtors had sold

over 10 million bags of Bondex Joint Compound.  1/7/13 Hr'g Tr. 186:12-189:23 (Martin).  In

fact, Bondex International's President could not identify a single jurisdiction in the 48

contiguous states where he could rule out the sale of its asbestos-containing products.  9/24/12

Dep. Tr. 138:3-7 (Fleming).

64.    Despite its prevalence in the market, when Bondex's president was asked whether

Bondex was in the same market as U.S. Gypsum, he replied: "Not in your wildest dreams.  Not

even in my wildest dreams."  9/24/12 Dep. Tr. 185:14-15 (Fleming).

65.     Bondex joint compound was primarily sold in 5 and 25 pound bags, *see* 1/7/13 Hr'g Tr. 187:3-6 (Martin), which had a "very, very long shelf life," *see* 9/24/12 Dep. Tr. 247:19-248:1 (Fleming), that "could be years[,] [f]ive years." 9/24/12 Dep. Tr. 247:19-248:1 (Fleming). Therefore, consumers could have been exposed to Bondex Joint Compound well after the product was banned in 1978. Coupled with Bondex's instruction to retailers to make sure that all Bondex Joint Compound was sold prior to the effective date of the Consumer Product Safety Commission's ("CPSC") ban on the sale of these inherently dangerous products, the long shelf life ensured that exposure to Bondex Joint Compound would continue for many years after 1978.

66.     Additionally, the case evaluation materials produced by the Debtors reflected multiple exposures to multiple persons with each use of Bondex Joint Compound. See, e.g., ACC/FCR Ex. E178 at 4; ACC/FCR Ex. E186 at 3; ACC/FCR Ex. E188 at 1-2; ACC/FCR Ex. E196 at 3-4; ACC/FCR Ex. E385 at 2-4; ACC/FCR Ex. E386 at 3; ACC/FCR Ex. E387 at 1; ACC/FCR Ex. E388 at 2; ACC/FCR Ex. E390 at 3-4; and ACC/FCR Ex.E 393 at 2-4. For these reasons, the Debtors' own expert witness conceded that over 40 million people could have been exposed to Bondex Joint Compound. 1/7/13 Hr'g Tr. 190:2-191:2 (Martin).

**Warnings From its own Suppliers Began in the 1960s**

67.     On October 1, 1965, the general sales manager for Johns-Manville Asbestos, which supplied RPM, Inc., sent correspondence to James Karman, President and COO of RPM, Inc., informing him that Johns-Manville would be putting a new caution label on each bag of chrysotile asbestos fiber it shipped. ACC/FCR Ex. E276. Five years later, on August 18, 1970, the same representative sent a second memo to Bondex representatives, informing the company that Johns-Manville was adding a caution label to bags of asbestos fiber manufactured at its A.F.D. mining locations. ACC/FCR Ex. E332.

68.     In spite of Bondex's admitted reliance upon its asbestos suppliers for information related to asbestos hazards, Bondex failed to put similar cautionary language on a single product until 1971 or 1972.  2/20/04 Dep. Tr. 35:1-7, 38:13-40:2 (Fleming); 3/2/00 Dep. Tr. 40:17-42:25 (Nemeth); ACC/FCR Ex. E330 at 17.

69.     Bondex's business records corroborate that it received information as early as December, 1971 verifying that asbestos dust posed a significant danger to the human respiratory system and could cause lung fibrosis or a similar lung disorder.  1/13/06 Dep. Tr.  65:22-66:3 (Fleming); ACC/FCR Ex. E369.

70.     In 1972, the United States Department of Labor, through the office of Occupational Safety and Health Administration ("OSHA"), began regulating the manufacture and sale of asbestos-containing products and mandating that asbestos-containing products contain a warning label.  ACC/FCR Ex. E330 at 17.

71.     With OSHA monitoring Bondex, the Reardon Division, and RPM, Inc. (n/k/a SPHC), the company publicly acknowledged it was "aware that asbestos, lung cancer, mesothelioma and certain other cancers have been associated with exposure, at certain levels, to asbestos fiber."  *See* ACC/FCR Ex. E372 at 11-12.

72.     As a result of OSHA regulations, in approximately 1972 Bondex first placed a caution label on its packaging for asbestos-containing paint, patch and repair products. ACC/FCR Ex. E330 at 17.

73.     On December 14, 1979, OSHA filed citations against Bondex for its failure to comply with employee safety regulations in its manufacturing facility.  ACC/FCR Ex. E143; ACC/FCR Ex. E287.

74.     Among other citations, Bondex was cited for allowing its employees to work in conditions that exposed them to high air concentrations of asbestos fibers and for:  (1) its failure to install air purifying respirators; (2) its failure to establish a respirator program; (3) its failure to provide and require protective clothing; (4) its failure to install any cautionary signage; (5) its failure to dispose of asbestos waste properly; and (6) its failure to properly test the asbestos concentration in the air.  ACC/FCR Ex. E143; ACC/FCR Ex. E287.

**Bondex's Fear of Asbestos Liability**

75.     In August 1975, journalists contacted a Bondex plant manager, Henry Ruby ("Mr. Ruby"), to inquire about the asbestos content of Bondex's Metro Spackle, a product that doctors had confirmed contained 4-12% asbestos, but contained no asbestos-related warning.  ACC/FCR Ex. E290; ACC/FCR Ex. E292.

76.     Mr. Ruby prepared an internal memorandum to Bondex's then president documenting the inquiry.  ACC/FCR Ex. E290; ACC/FCR Ex. E292; ACC/FCR Ex. E001 at BON01021.

77.     A month later, on September 4, 1975, Mr. Karman wrote to Bondex's then president regarding an article in the *Bergen Record*.  Upon reading the article, Mr. Karman concluded that asbestos-containing products that did not contain warnings would ultimately be regulated.  Mr. Karman recommended that the company think about protecting itself, either through asbestos replacement or stronger warnings.  2/20/04 Dep. Tr. 84:22-87:1 (Fleming).

**Product Reformulaiton**

78.     In March 1976, Bondex retained a new chemist, Mr. Ibrahim Bedros ("Mr. Bedros).   2/22/00 Dep. Tr. 22:15-23:5, 24:13-17 (Bedros) to remove asbestos from all Bondex-labeled products.  2/22/00 Dep. Tr. 28:9-29:6 (Bedros); 1/13/06 Dep. Tr. 16-25:5, 83:24-84:7 (Fleming).

79.     Mr. Bedros developed, tested, and produced approximately thirty new asbestos-free formulas in about 7 months.  2/22/00 Dep. Tr. 24:7-12, 25:11-26:6, 36:6-25 (Bedros). Bondex never requested that Mr. Bedros test its asbestos-containing products to determine which products released asbestos fibers when used, nor was Mr. Bedros aware of any such testing ever being conducted.  2/22/00 Dep. Tr. 43:17-44:1 (Bedros).

**Consumer Product Safety Commission**

80.     In June 1977, Bondex's management became aware that the CPSC was considering a proposed ban on asbestos in spackling compounds and wall patching products. ACC/FCR Ex. E297 at BON01220-21.

81.     In an effort to dissuade the CPSC from implementing the asbestos ban, Mr. Nemeth wrote to CPSC on June 20, 1977, stating that Bondex is "a small manufacturer now in [its] 95th year."  ACC/FCR Ex. E297 at BON01221.  He continued:

> We believe that any recall program would have drastic financial impact on many small manufacturers, ourselves included, with no equity for the consumer when comparing a recent but unused purchase and therefore recallable, to earlier purchases already applied or consumed.

ACC/FCR Ex. E297 at BON01221.

82.     On August 15, 1977, the CPSC held a public hearing in Washington, D.C. regarding its proposed ban on consumer patching products.  ACC/FCR Ex. E429 at BON01276-01489.

83.     Bondex's president attended the public hearing and urged the CPSC to delay the asbestos ban to allow companies such as Bondex to have a longer period of time to clear their asbestos stock, distribute it, and allow for its sale.  ACC/FCR Ex. E429 at BON01306-07.

84.     Alternatively, Mr. Nemeth requested that the CPSC simply allow for asbestos-containing joint compound to be labeled for contractor or industrial use only, asserting that such

notice "should then in fact be sufficient to place the consumer on notice and absolve any
manufacturer, wholesaler or retailer of liability as to the ultimate users."  ACC/FCR Ex. E429 at
BON01307; 2/20/04 Dep. Tr. 150:16-152:14 (Fleming).

### The CPSC Issues an Asbestos Ban

85.     After the ban was issued by the CPSC, Mr. Nemeth contacted every Bondex
retailer.  He informed them of the ban, effective June 11, 1978, and warned Bondex retailers that
if they had any Bondex asbestos-containing materials left on their shelves, that they should rotate
their stock to put the hazardous asbestos-containing products in the front.  ACC/FCR Ex. E365.

86.     The rotation of stock, he wrote, would result in the sale of any remaining product,
thus leaving retailers and Bondex free of any unsellable merchandise after the ban took effect.
ACC/FCR Ex. E365.

87.      Two months later, on April 28, 1978, Mr. Nemeth sent a second memo to all
Bondex customers, reiterating the implementation of the upcoming CPSC ban on asbestos
products and advising them, "Don't delay, check now and rotate your stock to avoid having any
unsaleable [sic] merchandise in stock on the ban date.  There is still ample time to clear your
stocks now."  ACC/FCR Ex. E304.

### D.     Debtors' Asbestos Litigation History

88.     According to the Debtors' representatives, Bondex became the subject of personal
injury litigation due to the injuries caused by its asbestos-containing products in the early 1980s.
*See* 3/13/09 Dep. Tr. 39:20-40:15 (Fleming).

89.     The Debtors engaged national coordinating counsel to manage their asbestos
litigation and settlement strategy in the late 1980s.  11/1/12 Dep. Tr. 8:4-10, 50:6-23 (Bowers)

90.     In 2000, the Debtors experienced an increase in the number of asbestos-related
cases.  1/7/13 Hr'g Tr. 109:16-21 (Tompkins); ACC/FCR Ex. E033 at 10.

91.     This swell in litigation coincided with Bondex's delayed identification of asbestos-containing products to the public.  9/24/12 Dep. Tr. 165:4-173:17 (Fleming).  By 2000-2002, Bondex was identifying a considerably larger number of asbestos-containing products than it had identified previously.  9/24/12 Dep. Tr. 165:4-173:17 (Fleming).

92.     Mr. Iola testified that Bondex initially failed to identify all products containing asbestos that the company manufactured and sold.  1/9/13 Hr'g Tr. 251:21-252:6 (Iola).  The discrepancy between the two product disclosure lists arose due to Bondex's failure to properly identify the "private label" versions of products.  9/24/12 Dep. Tr. 165:4-173:17 (Fleming).  Mr. Iola testified that the discovery of these additional products as well as a "how to" presentation for prosecuting claims against Bondex given at a popular and widely-attended seminar for plaintiffs' personal injury lawyers attributed to the increase of claims against Bondex.  1/9/13 Hr'g Tr. 259:13-260:2 (Iola).

93.     The increase in claims asserted against the Debtors also correlated with successful litigation brought against joint compound manufacturers.  9/24/12 Dep. Tr. 173:14-23 (Fleming).

94.     According to the Debtors, International was first named as a defendant in an asbestos-related personal injury lawsuit in early 2006.  *See* ACC/FCR Ex. E101; 9/24/12 Dep. Tr. 61:7-13 (Fleming).

95.     Between 1999 and 2002, RPM, Inc. (n/k/a SPHC) provided the funds used to fund settlement of claims brought against Bondex or the Debtors to the extent not covered by insurance.  1/7/13 Hr'g Tr. 105:17-23 (Tompkins).  During this time, insurance was the source for approximately 90% of payments made to claimants.  1/7/13 Hr'g Tr. 106:2-8 (Tompkins).

96.    From 2002 to 2010 International provided the resources to fund settlement of claims brought against Bondex or the Debtors or the Debtors and International.  1/7/13 Hr'g Tr. 105:6-16 (Tompkins).

**The Debtors' Asserted Defenses**

97.    If SPHC was identified as a defendant along with Bondex, it was for the same product and the same asserted claims as Bondex.  10/8/12 Dep. Tr. 34:9:22 (Haggerty).  RPM International was also named as a defendant in a subset of cases.  10/8/12 Dep. Tr. 34:23-35:4 (Haggerty).  Regardless of whether only Bondex, both Debtors, or both Debtors and RPM International were named as defendants, the same attorneys represented and defended each from asserted asbestos tort claims.  11/1/12 Dep. Tr. 8:4-10, 50:6-23 (Bowers); 10/8/12 Dep. Tr. 34:1-35:4 (Haggerty); 11/20/12 Dep. Tr. 86:11-22 (Evert).

98.    The Debtors defended every case based on the specific facts presented by the case.  9/24/12 Dep. Tr. 67:21-22 (Fleming) ("[Y]ou'd have to consider each individual case on its own merits.")

99.    Neither Bondex nor SPHC ever raised separate or individualized defenses. 1/10/13 Hr'g Tr. 87:2-8 (Iola).

100.    The Debtors were spending in the range of $24.0 to $42.6 million annually in asbestos defense costs, exclusive of indemnity payments, in the five years preceding their bankruptcy filing.  ACC/FCR Ex. E040 at 19  (defense-related payments paid during year ended May 31, 2006 totaled $24.0 million and during year ended May 31, 2007 totaled $27.7 million); ACC/FCR Ex. E042 at 18 (defense-related payments paid during year ended May 31, 2008 totaled $39.7 million and during year ended May 31, 2009 totaled $26.2 million);  ACC/FCR Ex. E043 at 91 (defense-related payments paid during 2010 made prior to the May 31, 2010 Petition Date totaled $42.6 million).

*Market Share*

101.    Although the Debtors would regularly retain economists to testify in support of its asserted position that its nationally known "Bondex" line possessed only a small percentage of the overall market share of joint compound, the reports and any relevant testimony were repeatedly ruled inadmissible by judges.  11/20/12 Dep. Tr. 45:24-46:22 (Evert); 11/1/12 Dep. Tr. 53:15-59:5 (Bowers).

102.    Furthermore, the Debtors' market share was irrelevant when the plaintiff could demonstrate exposure.  *See, e.g.*,  11/7/12 Dep. Tr. 75:1-11 (Iola) (questioning the relevance of a market share defense and noting that the facts and circumstances of an individual case would determine liability).

*Successor Liability*

103.    Neither Bondex nor SPHC ever asserted as a defense that they should be shielded from the liabilities assumed with the 1966 Reardon acquisition.  1/10/13 Hr'g Tr. 90:20–24 (Iola).

104.    Furthermore, SPHC guaranteed settlement payments in cases where claimants and their lawyers demonstrated an intention to litigate claims against SPHC under theories of veil-piercing or alter ego.  1/10/13 Hr'g Tr. 85:19-86:14 (Iola).

105.     Although Ohio Revised Code §2307.97 allegedly limited successor liability in asbestos tort cases for pre-1966 exposure, the Debtors never used the statute as a defense. 9/24/12 Dep. Tr. 130:22-131:11 (Fleming); 10/16/12 Dep. Tr. 167:15-25 (Knoop); 10/8/12 Dep. Tr. 274:13-275:7 (Haggerty); 10/12/12 Dep. Tr. 187:23-189:8 (Tompkins); 1/1/12 Dep. Tr. 52:3-13 (Bowers).

*Chrysotile Defense*

106.    Bondex routinely argued that other types of asbestos fibers were more potent and that exposure to chrysotile asbestos did not cause mesothelioma (the "Chrysotile Defense"). 9/24/12 Dep. Tr. 101:2-16 (Fleming); 10/8/12 Dep. Tr. 233:11-234:11, 122:1-13 (Haggerty); 10/12/12 Dep. Tr. 105:13-25 (Tompkins).  Dr. Allan Feingold routinely testified on the Debtors' behalf regarding the lack of causation between chrysotile asbestos exposure and mesothelioma. 1/10/13 Hr'g Tr. 141:19-142:1 (Simon).

107.    Mr. Iola and Mr. Simon testified that they afforded little weight to the Chrysotile Defense because, in their view, juries were not persuaded by it or by Dr. Feingold.  1/10/13 Hr'g Tr. 141:8-142:1 (Simon); 1/10/13 Hr'g Tr. 90:2-15 (Iola).

E.    **SETTLEMENT HISTORY**

**Authority to Settle**

108.    P. Kelly Tompkins ("Mr. Tompkins") was RPM, Inc.'s General Counsel from 1998 to approximately 2006.  In that capacity, Mr. Tompkins retained asbestos litigation counsel, to defend Bondex and/or the Debtors, consulted with counsel on their case evaluations, authorized settlement amounts, and determined whether to settle or try cases.  10/12/12 Dep. Tr. 25:17-26:2 (Tompkins); 10/16/12 Dep. Tr. 47:3-6 (Knoop); 10/8/12 Dep. Tr. 39:4-9, 71:1-11 (Haggerty); 11/1/12 Dep. Tr. 100:11-101:3 (Bowers) (Tompkins was the "ultimate" decision maker relative to asbestos litigation and strategy for Bondex).  RPM, Inc. required that Bondex obtain approval for every settlement through RPM, Inc.  9/24/12 Dep. Tr. 144:4-145:2 (Fleming); 11/20/12 Dep. Tr. 34:15-23 (Evert); 10/16/12 Dep. Tr. 47:3-6 (Knoop).

109.    The Debtors settled cases in purely several, partially joint and several, and purely joint jurisdictions.  11/20/12 Dep. Tr. 169:6-9, 169:23-170:5 (Evert).  When the Debtors settled claims in purely several jurisdictions, "they never paid for anybody's share but their own."

1/9/13 Hr'g Tr. 281:13-16 (Iola).  The same was true in California and other hybrid jurisdictions

that were effectively several jurisdictions for the Debtors' purposes because of threshold

requirements.  As Mr. Iola testified, "[t]he law didn't allow me to make [the Debtors] pay for

somebody else's responsibility."  1/9/13 Hr'g Tr. 281:13-16 (Iola).

110.     When the Debtors settled claims in partially joint and several jurisdictions, the

Debtors settled only their own several liability to each plaintiff.  Outside of the trial setting, a

plaintiff's aggregate damages may be collected against any defendant.  A settlement therefore

relieves the defendant of the risk of having to pay another settling defendant's share.

111.     Regardless of whether only Bondex, both Debtors, or both Debtors and RPM

International were sued, the settlements to be signed included releases that eliminated liability

for "the Reardon Company, RPM, Inc., RPM International, Inc., and/or Bondex International,

Inc., their divisions, predecessors, successors, successors-in-interest, agents, servants, directors,

officers, employees and assigns.  *See* ACC/FCR Ex. E173; ACC/FCR Ex. E174.

112.     The releases drafted by the Debtors uniformly reflect that each settlement was

reached "only" by and for the benefit of the Debtors, *see* 1/7/13 Hr'g Tr. 120:23-121:2

(Tompkins), and released solely the Debtors and their affiliates.  1/10/13 Hr'g Tr. 85:13-14

(Iola).

### Factors Used to Evaluate Cases

113.     Bondex and RPM, Inc. represented that they "generally settle for amounts each

considers reasonable given the facts and circumstances of each case."  ACC/FCR Ex. E033 at 9.

114.     In 2001, after the number of asbestos claims against Bondex significantly

increased, Mr. Tompkins, then Vice President, General Counsel, and Secretary for RPM, Inc.,

disseminated a list of significant factors to evaluate when determining the settlement value of a

case.  10/12/12 Dep. Tr. 92:2-93:19, 94:23-96:19 (Tompkins); ACC/FCR Ex. E095.

115.   He instructed Bondex management to assess: (1) product identification; (2) credibility of exposure, including the type and duration of exposure; (3) whether exposure was consistent with the typical use of the product; (4) whether exposure was consistent with causing the disease; (5) codefendants and their relative share of liability; and (6) the liability risks of proceeding to trial.  10/12/12 Dep. Tr. 92:2-93:19, 94:23-96:19 (Tompkins); ACC/FCR Ex. E095.  Mr. Tompkins agreed, though, that this list was not exhaustive and that there were any number of factors that went into evaluating the strength of a case.  10/12/12 Dep. Tr. 94:23-95:19 (Tompkins).

116.   The Debtors did not use one set formula to determine the value of a mesothelioma case; rather, there were a number of factors that they considered when assessing case value including:  product identification, existence of dependents (and whether those dependents had special needs), occupation, exposure, jurisdiction, risk of an adverse jury verdict, and identity of plaintiff's counsel.  1/9/13 Hr'g Tr. 264:20-266:12 (Iola); 11/7/12 Dep. Tr. 22:12-23:8 (Iola) (identifying product identification, age, dependents, and dependents' special needs as factors); 10/12/12 Dep. Tr. 116:24-117:19, 118:23-119:10, 119:25-120:13 (Tompkins) (identifying jurisdiction, the jurisdiction's verdict history, asbestos litigation history in the jurisdiction, chances of reversal on appeal, cost, witness credibility, plaintiff's counsel, and others among settlement factors); 9/24/12 Dep. Tr. 78:12-80:24 (Fleming) (stating there are several factors to consider including age, occupation, exposure, extracurricular activities, and jurisdiction); 10/8/12 Dep. Tr. 159:8-164:14 (Haggerty).  Each factor was considered differently in each case.  9/24/12 Dep. Tr. 67:21-22 (Fleming) ("consider each individual case on its own merits"); 10/16/12 Dep. Tr. 101:4-16 (Knoop); 10/8/12 Dep. Tr. 207:15-210:19 (Haggerty); 10/12/12 Dep. Tr. 264:2-265:6 (Tompkins).

117.    Age of a claimant was only one of many factors considered in valuing an appropriate settlement amount.  10/16/12 Dep. Tr. 49:12-17 (Knoop) (admitting age may be consideration but unsure of influence); 10/8/12 Dep. Tr. 205:2-19 (Haggerty) (acknowledging age was one consideration among many factors); 9/24/12 Dep. Tr. 78:12-80:24 (Fleming) (stating age is one of several factors considered, including occupation, exposure, extracurricular activities, and jurisdiction).

118.    Each jurisdiction's governing laws of liability, namely, joint and several, several, or hybrid, also proved to affect Bondex's settlements, but not exclusively of other factors.  *See* 11/1/12 Dep. Tr. 43:23-45:10 (Bowers) (Texas had "very unusual laws at that point" that included an apportionment of liability where for asbestos cases if a defendant was found more than 15 percent responsible, they were still liable jointly and severally); *see also* 10/29/12 Dep. Tr.  85:5-86:19 (Simon) (Simon has had cases in Virginia and Massachusetts which both have joint and several liability and in Texas, which was a hybrid jurisdiction, not a pure joint and several jurisdiction).

119.    In certain instances, the identity of opposing counsel was a critical factor in deciding to settle.  Mr. Tompkins testified that the involvement of Mark Lanier as counsel for the plaintiff raised special concerns because he was a "capable lawyer," and the jurisdiction in which he practiced (Texas) had a reputation at one point for large verdicts.  10/12/12 Dep. Tr. 228:4-228:20 (Tompkins).

120.    Mr. Iola testified that a myriad of reasons were considered in determining the final settlement value of a particular case.  Plaintiffs may have settled cases for less than $50,000 where there was problematic product identification that could overcome summary judgment but

perhaps not enough to succeed at trial or where there existed multiple product identifications. 1/9/13 Hr'g Tr. 276:17-277:19 (Iola).

121.    The Debtors acknowledged that there was no way to review the settlements as a group and determine which factor or factors were more critical.  Individual analysis of each and every settlement would be necessary.  10/12/12 Dep. Tr. 264:25-265:6 (Tompkins); *see also* 9/24/12 Dep. Tr. 67:21-22 (Fleming).

**Trial Risk was a Factor**

122.    The Debtors internal case evaluation documents reflect that often the most important consideration in high value settlements was the risk at trial that a sympathetic plaintiff with colorable product identification testimony would be awarded high damages.  *See, e.g.*, ACC/FCR Ex. E196 (noting decedent had eleven surviving children from two marriages with four daughters 100% dependent on decedent, including one daughter 100% disabled); ACC/FCR Ex. E385 at SPHC-BONDEX00158848 (stating "[p]lease note that [decedent's widow] will be very difficult to cross-examine because of her emotional state and we believe the jury will not hold it against her that she cannot remember exact details."); ACC/FCR Ex. E413 at SPHC-BONDEX00163915 ("Plaintiff is well spoken and speaks slowly, softly and clearly. He is very composed, calm, collected and will make a sympathetic witness if on the stand for a short period of time."); 11/1/12 Dep. Tr. 92:21-93:8 (Bowers) (describing decedent in ACC/FCR Ex. E176 as sympathetic plaintiff due to "very painful situations," including "horrible operation" decedent endured).

123.    The risk of an adverse verdict was so substantial that the Debtors paid to settle cases where they believed product identification was weak or could be challenged when there was a risk of high damages being awarded.  11/20/2012 Dep. Tr. 63:11-13 (Evert); ACC/FCR Ex. E196.

124.    The video depositions of certain of their own corporate executives, which were presented by plaintiffs at trial through video depositions, was recognized by the Debtors' own counsel as possibly not being well received.  11/8/12 Dep. Tr. 260:20-264:11 (Haggerty) (testifying that deposition videos of Misters Fipps, Bedros and Nemeth "had the possibility of not being well received by a jury.").  Mr. Iola testified that after deposing Mr. Nemeth and other corporate representatives that he concluded that Debtors had lied and that the Debtors were "dead in front of a jury."  1/9/13 Hr'g Tr. 250:3-10 (Iola).

125.    The decision to settle in such cases recognized that in instances where the Debtors did not believe there was liability there was still risk.  10/12/12 Dep. Tr. 115:3-9 (Tompkins).  Accordingly, when the Debtors evaluated the claims made, they were aware and acknowledged that every case presented a risk and the threat of an adverse jury verdict.  10/12/12 Dep. Tr. 76:15-20 (Tompkins); 10/29/12 Dep. Tr. 118:22-120:13 (Simon).

126.    Mr. Tompkins testified that the risk of an adverse verdict in an asbestos case was always a settlement consideration.  1/7/13 Hr'g Tr. 110:11-13 (Tompkins).

**Docket Settlements**

127.    The Debtors employed a docket settlement approach to resolve pending asbestos personal injury claims.  1/7/13 Hr'g Tr. 91:10-14 (Tompkins).

128.    The Debtors engaged in docket settlements with certain firms because of the risk associated with the litigation skills of their attorneys.  10/8/12 Dep. Tr. 85:25-86:7 (Haggerty) ("Mark Lanier is a very good trial lawyer, and I was thinking as I sat in his compound, he's got one whole heck of a lot of very good trial layers, and if he decides to make – declare Bondex his target, we will spend a boatload of money defending hundreds of cases and they have to try them against a very good lawyer.").  The Debtors' admission discredits Dr. Mullin's opinion that docket settlements were made purely due to the cost of litigation.  *See*, *e.g.*, 1/8/13 Hr'g Tr.

-33-

182:21–183:12 (Mullin) ("settlements less than 50,000 have no connection to the damages of the claimant.").

129.    Bondex paid a "per-case price" that they negotiated on a gross basis with each plaintiff's firm, delineated by disease (i.e. mesothelioma, lung cancer, asbestosis) and often based off a previously used settlement number.  11/20/12 Dep. Tr. 169:6-9, 169:23-170:5 (Evert).

130.    Bondex required that each plaintiff involved in a docket settlement provide evidence of product identification, a requirement that Bondex maintained in an effort to "get more claims" than it bargained for, or in other words, to resolve the highest number of cases possible for the lowest amount of money within the group settlement.  11/20/12 Dep. Tr. 39:20-40:6, 41:1-19 (Evert).

131.    To the extent that the supporting product identification evidence could not be provided, the Debtors would replace that claimant with another that could provide the appropriate product identification.  11/20/12 Dep. Tr. 39:20-40:6, 41:1-19 (Evert).

132.    Mr. Tompkins had input into the number of plaintiffs involved in a docket settlement and the ultimate aggregate sum.  1/7/13 Hr'g Tr. 107:20-108:7 (Tompkins).  Plaintiffs also had input.  1/7/13 Hr'g Tr. 108:8-10 (Tompkins).

133.    Because each of Mr. Tompkins and the plaintiffs had input into the overall settlement, the Debtors agreed that the settlement was the result of an arm's-length transaction among the parties, 1/7/13 Hr'g Tr. 108:8-13 (Tompkins); and believed that their national coordinating counsel generally got the best deal for Bondex.  1/7/13 Hr'g Tr. 108:23-109:1 (Tompkins).

134.    The Debtors made no representation that their settlement experience would have changed absent the filing of their bankruptcy cases.

### The Debtors Proposed Settlements in "Good Faith"

135.    The settlements entered into by the Debtors were arm's-length transactions, *see* 1/7/13 Hr'g Tr. 108:11-13 (Tompkins), that were negotiated by the parties in good faith.  *See*, *e.g.*,  ACC/FCR Ex. E171 "Motion for Finding of Good Faith Settlement," at ¶ 4 (stating in motion filed in Madison county that "the defendant believes that said settlement is in good faith and should be approved by the Court.").

136.    Furthermore, these settlements represented what the Debtors believed was the best possible deal that could be reached.  1/7/13 Hr'g Tr. 108:23-109:1 (Tompkins) (noting that if national coordinating counsel proposed a settlement that Mr. Tompkins believed it was the "best possible deal").

### Trial Experience

137.     As defendants in the tort system, one or both of the Debtors were named in just under 8,500 mesothelioma lawsuits.  1/10/13 Hr'g Tr. 212:15-213:1 (Peterson); ACC/FCR Demonstrative 1019 at 8.

138.    Mr. Tompkins recollects that Bondex "took cases to trial roughly between the 2004, maybe up through [the] 2010 time period."  1/7/13 Hr'g Tr. 101:22-24 (Tompkins).

139.    During this time, the Debtors resolved approximately 60% of the mesothelioma claims against them by settlement; approximately 40% were dismissed – most of them voluntarily – without payment.  *See generally* 1/10/13 Hr'g Tr. 212:22-213:1 (Peterson); ACC/FCR Demonstrative 1019 at 8 (providing total claims and total resolved claims).

140.    For the 10 years prior to the Debtors' bankruptcy, the Debtors agreed to pay over

$420 million in indemnity payments.  1/7/13 Hr'g Tr. 253:6-254:11 (Mullin); Debtors'

Demonstrative Ex. 9 at p.12.

141.    As of the Petition Date, approximately $60 million in settled claims remained

unpaid.  1/8/13 Hr'g Tr. 289:17-290:9 (Mullin); ACC/FCR Demonstrative 1002 at 7.

142.    Although the Debtors were named in thousands of cases in the tort system – and

settled as many as 5,000 mesothelioma cases – the Debtors tried only 32 cases, of which 30 were

mesothelioma cases, over the course of their entire asbestos-litigation history.  *See* ACC/FCR

Ex. E123.  The range of verdicts in these litigated cases ranged from $185,000 to $2,000,000.

*See* ACC/FCR Ex. E123.

143.    The Debtors' average settlement values, as computed by the Committee's and the

FCR's economic experts, range from $93,201 (based on Dr. Vasquez's calibration period of

2008 through 2010) to $126,340 (based on Dr. Peterson's calibration period of 2001 through

2010).

**Contribution Claims**

144.    Bondex never pursued a claim against its parent company, RPM, Inc., or its

parent holding company, RPM International, in the form of a contribution claim, a cross-claim,

or an indemnification claim.  10/8/12 Dep. Tr. 272:15-273:8 (Haggerty); 10/12/12 Dep. Tr.

286:14-19 (Tompkins).

145.    Bondex never pursued a claim of contribution against codefendants in a single

case, and it never pursued a claim against a bankruptcy trust.  9/24/12 Dep. Tr. 91:10-92:9

(Fleming).  Furthermore, Bondex never filed a cross claim against T.H. Agriculture & Nutrition,

one of several suppliers of asbestos fiber to Bondex.  10/8/12 Dep. Tr. 102:5–11 (Haggerty).

146.    A review of the Debtors own records show that although THAN was a supplier, the amount of asbestos material provided to the Debtors by THAN was dwarfed by that amounts provided by other suppliers.  See ACC/FCR Ex. E.366 (showing various suppliers of asbestos); 1/22/00 Dep. Tr. 59:14-17 (Garner) (agreeing based on the records that she kept that from June 1966 the main supplier to St. Louis was International Fibers and not THAN)..

147.    When Bondex settled a case wherein both Bondex and International were codefendants, Bondex was the only party to pay a settlement, while International was released pursuant to the terms of their indemnification agreement with Bondex.  10/12/12 Dep. Tr. 288:11-289:6 (Tompkins).  The indemnification agreement provided that retroactive as of April 11, 2008, Bondex shall indemnify, defend, and hold International harmless from any loss arising out of a suit against Bondex.  ACC/FCR Ex. E101; 10/12/12 Dep Tr. 285:8-286:11 (Tompkins).

F.    **RPM INTERNATIONAL'S ASSESSMENT OF THE DEBTORS' LIABILITIES**

148.    RPM International established its first asbestos-related reserve during the fourth quarter of fiscal year 2003.  ACC/FCR Ex. E036 at 16.  The reserve, funded by a one-time charge of $140 million, was considered "sufficient to cover [RPM International's subsidiaries'] asbestos related cash flow requirements for approximately three years."  ACC/FCR Ex. E036 at 16.  The reserve was expected last until fiscal year 2006.

149.    During the quarter ending November 30, 2004 (second quarter, fiscal year 2005), International concluded that the $56.0 million balance of the original $140 million reserve "would not likely be sufficient to cover their asbestos-related cash flow requirements for the remainder of the full three-year period originally contemplated by the reserve."  ACC/FCR Ex. E038 at 16.  Therefore, International concluded that an increase of $47.0 million in their existing

reserve would be appropriate cover "any incremental cash flow requirements through fiscal year 2006 not covered by the $140 million reserve."  ACC/FCR Ex. E038 at 16.

150.    By fourth quarter of fiscal year 2005, International was forced to add $16 million to the asbestos reserve.  ACC/FCR Ex. E038 at 16.

151.    In the third quarter of 2006, International retained Crawford & Winiarski ("**C&W**"), an independent, third-party consulting firm with expertise in the area of asbestos valuation work, to assist them in calculating an estimate of their liability for unasserted potential future asbestos-related claims.  ACC/FCR Ex. E039, at Ex. 13.1, p. 51.  As International reported to the SEC, C&W's methodology consisted of an analysis of the historical rate at which the Debtors paid mesothelioma claims, the Debtors' historical settlement averages, and the Debtors' historical defense costs and the relationship of indemnity payments thereto.  ACC/FCR Ex. E039, at Ex. 13.1, p. 51.  Based on the review by C&W, RPM International again increased its reserve at the close of fiscal year 2006.  ACC/FCR Ex. E039, at Ex. 13.1, p. 51.  This time, however, RPM International took an asbestos-related charge of approximately $335.0 million to cover potential future claims through May 31, 2016.  ACC/FCR Ex. E039, at Ex. 13.1, p. 51.

152.    In fiscal year 2008, International added $288.1 million to their existing asbestos reserve to cover potential future claims through May 31, 2028.  ACC/FCR Ex. E041, at Ex. 13.1, p. 58. This brought their total "asbestos-related balance sheet liabilities" as of May 31, 2008 to $559.7 million.  ACC/FCR Ex. E041, at Ex. 13.1, p. 58.  RPM International also disclosed the specific methodology relied on by C&W to calculate its estimates of unasserted potential future asbestos-related claims.  C&W's methodology is similar to that used by Drs. Peterson and Vasquez in their estimations of mesothelioma claims in these chapter 11 cases.  As stated in Note I of the Management Discussion & Analysis:

153.    The methodology used by C&W to project our liability for unasserted-potential-future-asbestos-related claims included C&W doing an analysis of: (a) widely accepted forecast of the population likely to have been exposed to asbestos; (b) epidemiological studies estimating the number of people likely to develop asbestos-related diseases; (c) historical rate at which mesothelioma incidences resulted in the payment of claims by us; (d) historical settlement averages to value the projected number of future compensable mesothelioma claims; (e) historical ratio of mesothelioma-related-indemnity payments to non-mesothelioma indemnity payments; and (f) historical defense costs and their relationship with total indemnity payments.

154.    As part of this review and evaluation process, the credibility of epidemiological studies of our mesothelioma claims, first introduced to management by C&W some two-and-one-half years ago, was validated. At the core of our evaluation process and the basis of C&W's actuarial work on behalf of Bondex, is the Nicholson Study. The Nicholson Study is the most widely recognized reference in bankruptcy trust valuations, global settlement negotiations and the Congressional Budget Offices' work done on the proposed FAIR Act in 2006. Based on our ongoing comparison of the Nicholson Study projections and Bondex's specific actual experience, which continues to bear an extremely close correlation to the study's projections, we decided to extend our asbestos liability projection out to twenty years.  ACC/FCR Ex. E041, at Ex. 13.1, p. 58.

155.    For the year ending May 31, 2010, RPM International advised of the deconsolidation of Bondex and SPHC due to the bankruptcy filing.  ACC/FCR Ex. E043, at Ex. 13.1, p.62.  On May 30, 2010, the day prior to the Petition Date, Bondex had recorded an asbestos related product liability of $397.7 million.  ACC/FCR Ex. E043, at Ex. 13.1, p.62.  In the two years prior to the petition date, RPM International and its subsidiaries made

approximately $162 million in asbestos-related payments.  ACC/FCR Ex. E043, at Ex. 13.1, p.62.

156.    The payments made by RPM International and the Debtors in two years equal the total liability opined to by Dr. Mullin.  In the face of such information, the Court finds it difficult to credit the testimony of Dr. Mullin.

G.    **MEDICAL SCIENCE**

157.    Dr. Mullin did not cite to or testify that he gave any consideration to the Debtors' medical science experts' reports in forming his opinions.  Accordingly, the testimony and the expert reports of the Debtors' medical science experts have not been considered in estimating the Debtors' liabilities.  Even if this Court were to consider the opinions of the Debtors' medical science experts, the ultimate conclusions of the Debtors' estimated pending and future liabilities would not change.

**Dr. Laura Welch**

158.    The Court accepts the testimony of Dr. Laura Welch, a board-certified internist and occupational medicine physician, who has diagnosed or treated at least a thousand patients with asbestos-related disease, and who has conducted an extensive longitudinal epidemiological study of sheet metal workers and asbestos-related lung disease.  1/10/13 Hr'g Tr. 9:5-10:12, 12:22-14:11 (Welch); *see also* ACC/FCR Ex. M128 (Welch CV).

159.    Dr. Welch has published approximately 75 papers in the peer-reviewed medical and scientific literature -  more than a dozen of which involved asbestos disease - and has served as a "peer-reviewer," reviewing articles submitted for publication in industrial and occupational medicine journals around the world.  1/10/13 Hr'g Tr. 12:13-24 (Welch).  One of Dr. Welch's epidemiology studies relating to asbestos was cited in the most recent International Agency for Research on Cancer ("IARC") Monograph on Asbestos.  1/10/13 Hr'g Tr. 10:13-20 (Welch).

160.    Dr. Welch has testified before Congress on asbestos disease and causation on two different occasions.  1/10/13 Hr'g Tr. 14:1-3 (Welch).  She has testified in court in asbestos cases approximately two or three times per year during the last ten years.  1/10/13 Hr'g Tr. 39:4-8 (Welch).

161.    Dr. Welch was recognized by this Court as an expert in internal medicine, occupational medicine, the epidemiology of asbestos related diseases, and the causation of mesothelioma.  1/10/13 Hr'g Tr. 14:16-23 (Welch).  Dr. Welch used slides to explain her testimony which were marked as ACC/FCR Demonstrative 1015, and her Expert Reports were marked as ACC/FCR Demonstrative 1031 and 1032.

162.    While agreeing that the amphibole forms of asbestos are likely more potent in causing mesothelioma on a fiber per fiber basis, Dr. Welch testified that exposure to chrysotile asbestos can and does cause mesothelioma in humans.  1/10/13 Hr'g Tr. 15:5-11, 30:10-33:23 (Welch).

163.    In discussing the foundations of her opinion, Dr. Welch testified about the extent and variety of various epidemiological studies conducted all over the world showing an increased risk of mesothelioma in cohorts of people exposed to chrysotile asbestos.  1/10/13 Hr'g Tr. 16:24-17:25 (Welch).  One such study contains five mesothelioma death cases in miners working at a large open air chrysotile mine in Balangero, Italy.  The Belangero mine did not contain any tremolite contamination.  A follow-up study revealed 27 mesothelioma cases diagnosed, not only among miners, but in other individuals exposed to chrysotile asbestos from the mine who were not direct employees of the mine.  1/10/13 Hr'g Tr. 18:17-20:20 (Welch).

164.    Dr. Welch also discussed a study of workers in a North Carolina textile factory that had eight cases of chyrsotile related mesothelioma.  1/10/13 Hr'g Tr. 20:21-21:23 (Welch).

-41-

165.    With regard to fiber potency, Dr. Welch testified that many of the studies used to calculate potency differences were out of date and contain more mesothelioma cases in the chrysotile exposed cohorts than when they were studied in the late 1990s.  1/10/13 Hr'g Tr. 31:23-33:23 (Welch).

166.    Dr. Welch also testified that the Environmental Protection Agency (the "EPA") convened a science advisory board in 2008 to quantify the differences in fiber types.  This advisory board found that the historical data was not sufficient to conclude that chrysotile asbestos was less potent than amphibole asbestos.  1/10/13 Hr'g Tr. 33:10-34:5 (Welch).

167.    Further, Dr. Welch testified that, based upon both analytical epidemiology studies and mesothelioma case series such as the *Skammertiz* study and the *Greenberg Davies* study, it has been demonstrated that asbestos exposures as brief as a few days cause mesothelioma in humans.  1/10/13 Hr'g Tr. 22:9-24 (Welch).  With respect to chrysotile specifically, the *Madkour* and *Pan* studies demonstrate that very low levels of chrysotile exposure (such as living a mile away from a chrysotile plant) cause mesothelioma.  1/10/13 Hr'g Tr. 22:25-24:14 (Welch); *see also* ACC/FCR Demonstrative 1031 at 42.

168.    With reference specifically to the risk of disease from exposure to asbestos joint compounds, Dr. Welch discussed the difficulty of assembling sufficient workers to conduct a study capable of detecting an increased risk of a rare cancer like mesothelioma in such a population.  1/10/13 Hr'g Tr. 26:1-13 (Welch).  Despite these limitations, Dr. Welch pointed to a number of studies that have consistently shown an increased risk of mesothelioma in dry wall workers and other trade workers, such as painters and carpenters, who were exposed to dust from the use of asbestos-containing joint compounds.  1/10/13 Hr'g Tr. 24:15-26:17 (Welch).  Dr. Welch also discussed the *Fischbein* study, which showed a high rate of asbestosis in drywall

workers, which is significant because in general it takes far more asbestos exposure to cause asbestosis than mesothelioma.  1/10/13 Hr'g Tr. 28:4-29:24 (Welch); *see also* ACC/FCR Demonstrative 1031 at pgs. 56 and 58 of .pdf  (Use of Bondex Compounds Results in Exposures to Asbestos – pgs. 1 and 3) .

169.    Dr. Welch testified that in just one day of drywall work with asbestos containing joint compound, an individual would inhale over 6 million asbestos fibers.  1/10/13 Hr'g Tr. 34:16-35:11 (Welch).

170.    Dr. Welch also testified about the manner in which cumulative exposure causes mesothelioma, and that if someone was exposed to both a chrysotile containing product and products containing amphiboles, it was not medically appropriate to exclude the chrysotile exposures as contributing to cause the mesothelioma.  1/10/13 Hr'g Tr. 36:5-37:23 (Welch).  Finally, Dr. Welch testified that if she saw a patient with mesothelioma and the only asbestos exposure was to asbestos containing joint compound at the levels discussed in the CPSC ban on asbestos joint compound – a half dozen times a year – she would conclude that the joint compound exposure caused the mesothelioma.  1/10/13 Hr'g Tr. 40:2-9 (Welch).  This Court accepts and adopts Dr. Welch's opinions.

### Dr. Allan Feingold

171.    In his thirty-year clinical career, Dr. Feingold has clinically participated in only 10 cases involving mesothelioma.  1/8/13 Hr'g Tr. 55:13-57:7, 92:10-13 (Feingold).  Dr. Feingold has not done any original research in asbestos, has not tested any asbestos products and has not participated in any published epidemiologic studies of workers exposed to asbestos. 1/8/13 Hr'g Tr. 90:8-20 (Feingold).

172.    Although he has written a book about the legal aspects of asbestos medicine, Dr. Feingold has not written any peer-reviewed articles on asbestos disease nor does he serve as a peer-reviewer for any medical or scientific publication.  1/8/13 Hr'g Tr. 90:15-92:5 (Feingold).

173.    Since 1982, when he first began testifying as an expert witness for companies that made or sold asbestos products, Dr. Feingold has reviewed 20,000 litigation cases, testified on behalf of more than 100 different companies, and personally received more than $30 million dollars based on gross billings of approximately $44.5 million.  1/8/13 Hr'g Tr. 92:6-97:3, 94:14-21; 100:25-102:22 (Feingold); *see also* Debtors' Ex. 126.  Dr. Feingold has never testified for a plaintiff in an asbestos case.  1/8/13 Hr'g Tr. 97:24-98:4 (Feingold).

174.    Dr. Feingold's opinion regarding the alleged inability of exposure to chrysotile asbestos to induce mesothelioma is contrary to the IARC statement published in 2012 and the Position Statement on Asbestos from the Joint Policy Committee of the Societies of Epidemiology that was endorsed by 83 different individuals and entities.  1/8/13 Hr'g Tr. 105:21-109:13, 111:12-22 (Feingold).

175.    Dr. Feingold's testimony ignores the testimony of Misters Simon and Iola who testified that the value of the "chrysotile defense" was factored into settlement negotiations.  See e, g, 1/10/13 Hr'g Tr. 141:8-142:1 (Simon); 1/10/13 Hr'g Tr. 90:2-15 (Iola).

176.    This Court rejects the opinions of Dr. Feingold.

**Dr. Arnold Brody**

177.    Dr. Brody holds a Ph.D. in cellular biology and has done extensive work in the area of experimental pathology for asbestos-related diseases.  1/9/13 Hr'g Tr. 185:20-188:2 (Brody).  Dr. Brody has conducted animal studies and cellular induction studies to research the potential of the various asbestos fiber types to cause disease in animals and in humans.  In addition to writing more than one hundred scientific articles and fifty book chapters and

-44-

proceedings that relate specifically to the molecular and cellular aspects of asbestos disease, Dr. Brody has served as faculty at several medical schools and universities and lectured on pulmonary anatomy and asbestos disease. 1/9/13 Hr'g Tr. 186:15-187:11 (Brody); *see* ACC/FCR Ex. M131.  The Court recognized Dr. Brody as an expert in the fields of cell biology and experimental pathology.  1/9/13 Hr'g Tr. 188:11-15 (Brody).  The slides Dr. Brody used to explain his testimony were marked as ACC/FCR Demonstrative 1006, and his Expert Report was marked as ACC/FCR Demonstrative 1033.

178.    In accordance with his educational background, training, and his review of the scientific literature, Dr. Brody confirmed all the asbestos fiber types, including chrysotile, have been shown to cause mesothelioma and all other asbestos-related disease in humans.  1/9/13 Hr'g Tr. 194:25-195:25, 207:8-208:7 (Brody).

179.    Dr. Brody explained that inhaled asbestos fibers have the ability to damage the genetic composition of cells.  1/9/13 Hr'g Tr. 200:17-201:11 (Brody).  Wherever asbestos fibers travel, they are capable of causing injuries at the cellular level.  1/9/13 Hr'g Tr. 193:15-16, 193:21-194:22 (Brody).  The asbestos fibers sometimes will damage the cells and cause the cells to die.  1/9/13 Hr'g Tr. 202:24-203:5 (Brody).

180.    Dr. Brody explained that - with respect to cancer - the greater concern occurs when asbestos fibers change the genetic material within a cell which survives and then passes on asbestos-induced genetic errors through cellular division.  This occurs when asbestos fibers bind with the DNA in dividing cells which results in genetic mutations to the chromosomes of the daughter cells. 1/9/13 Hr'g Tr. 204:1-21 (Brody).  Over the course of many years, this genetic damage is compounded and magnified due to additional damage to future generations of the damaged cell. 1/9/13 Hr'g Tr. 204:22-205:14 (Brody).  Cancer develops, decades later, when a

-45-

single cell with sufficient genetic errors in combination grows into a tumor.  1/9/13 Hr'g Tr. 205:25-206:3 (Brody).

181.    Dr. Brody testified that although many asbestos fibers are originally deposited in the breathing spaces of the lung, Dr. Brody demonstrated they do not all remain there.  Instead, asbestos fibers may translocate from the lung into the fluid flow of the body (blood and lymphatic systems).  1/9/13 Hr'g Tr. 193:1-194:10 (Brody).  In order for cancer to develop, Dr. Brody testified that the asbestos fibers have to reach the target cell, that is, the cell from which the disease develops.  In the case of pleural mesothelioma, the target cells are located on the surface of the pleura of the lung.  1/9/13 Hr'g Tr. 194:14-24 (Brody).  Because of the anatomy of the lymph flow and the physical dimensions of chrysotile fibers, chrysotile fibers are the most common type of asbestos fiber located at the surface of the pleura of the lung - the target site for pleural mesothelioma.  1/9/13 Hr'g Tr. 195:7-23 (Brody).

182.    Dr. Brody testified that chrysotile asbestos is "highly toxic to human and animal mesothelial cells."  1/9/13 Hr'g Tr. 206:11-15 (Brody).  Chrysotile asbestos is "cytotoxic to human/animal macrophages" which kills cells that function as a key component of the body's natural defense mechanism.  1/9/13 Hr'g Tr. 206:16-18 (Brody).  Finally, Dr. Brody testified that in his professional and scientific opinion chrysotile asbestos has been shown to cause mesothelioma in humans.  1/9/13 Hr'g Tr. 207:8-11 (Brody).  This Court accepts and adopts Dr. Brody's opinions.

**Ms. Susan Raterman**

183.    Ms. Raterman is a certified industrial hygienist - a profession specializing in the anticipation, recognition, evaluation, and control of workplace and environmental health hazards. 1/9/13 Hr'g Tr. 143:9-10, 15-18 (Raterman).  In addition to writing several articles in the field of industrial hygiene, Ms. Raterman has previously worked as an inspector for OSHA during which

-46-

she compared air samples from various work and manufacturing facilities to the PELs promulgated by OSHA. 1/9/13 Hr'g Tr. 146:6-13, 147:24-148:9 (Raterman). Ms. Raterman has also gained vast experience in the field of asbestos, working as a consultant in this area since 1980. 1/9/13 Hr'g Tr. 146:14-147:13, 147:24-148:9 (Raterman); *see also* ACC/FCR Ex. M136.

184.    The Court recognized Ms. Raterman as an expert in the field of industrial hygiene. 1/9/13 Hr'g Tr. 145:23-146:2 (Raterman). The slides Ms. Raterman used to explain her testimony were marked as ACC/FCR Demonstrative 1004, and her Expert Report was marked as ACC/FCR Demonstrative 1034.

185.    In accordance with her training as a certified industrial hygienist, the past and present consensus among the scientific community, as well as federal agency regulations, Ms. Raterman confirmed that aside from background levels of asbestos found in ambient air, there is no known safe level of exposure to asbestos, including chrysotile asbestos, below which the risk of disease, including cancer and mesothelioma, does not occur. 1/9/13 Hr'g Tr. 148:10-16, 149:20-150:6 (Raterman).

186.    The hazards of asbestos have been well known for decades. Indeed, Ms. Raterman testified regarding various governmental, scientific and medical studies that documented the dangers of asbestos exposure in the 1960s and 1970s, including, but not limited to the CPSC, the Gypsum Association, OSHA, and studies by Dr. A.N. Rohl, Dr. A.M. Langer, Dr. I.J. Selikoff, Dr. S.A. Fischbein, D.K. Verma, and C.G. Middleton. 1/9/13 Hr'g Tr. 150:7-151:7, 158:15-159:1, 161:2-12, 163:10-23 (Raterman); *see also* ACC/FCR Demonstrative 1034.

187.    Ms. Raterman discussed various joint compound studies conducted in the 1960s, 1970s and 1980s which evaluated air-samples taken during the mixing, sanding, and clean-up of asbestos-containing dry and premixed joint compound products. 1/9/13 Hr'g Tr. 158:15-159:1

-47-

(Raterman).  The studies unanimously revealed that individuals and bystanders working with, and/or in the general vicinity of asbestos-containing joint compound products, were exposed to asbestos fiber concentrations well in excess of OSHA's PELs at these times.  1/9/13 Hr'g Tr. 158:19-159:1, 159:15-19 (Raterman).

188.     OSHA's current asbestos PEL is 0.1 fibers per cubic centimeter, although even at that level OSHA recognizes there is still a significant risk of disease.  1/9/13 Hr'g Tr. 166:6-17 (Raterman).  Based on a review of the relevant scientific literature, an individual working with or around joint compound products may experience exposure ranging from 1.2 fibers per cubic centimeter to 59 fibers per cubic centimeter.  1/9/13 Hr'g Tr. 166:18-167:16 (Raterman).

189.     Ms. Raterman testified that it is more accurate to compare peak exposure concentrations to OSHA's PELs (based on fifteen minute intervals) then to use an eight hour time-weighted average in determining individual exposure to asbestos.  1/9/13 Hr'g Tr. 161:20-162:18 (Raterman).  Ms. Raterman testified that eight hour time-weighted averages are often inappropriate in determining exposure to joint compound products because levels of asbestos exposure vary greatly during the mixing, sanding and cleanup activities compared with other activities during this process.  1/9/13 Hr'g Tr. 161:20-162:6 (Raterman).

190.     On April 28, 1977, the CPSC announced a decision to ban on all consumer patching and other products containing asbestos.  ACC/FCR Ex. E429 at 4-5.  Joint compounds are one of three asbestos-containing products (among 3,000 asbestos-containing products) that have been banned by the federal government.  1/9/13 Hr'g Tr. 171:12-19 (Raterman).  The CPSC found that even minimum exposures to asbestos-containing joint compound products constituted an "unacceptable risk" of death from respiratory cancer, including mesothelioma.  1/9/13 Hr'g Tr. 171:20-172:2, 172:15-173:2 (Raterman).

191.    In order to safely use asbestos-containing joint compound products, the following procedures need to be used in a contained environment: 1) an exhaust vacuum and HEPA filter to filter out asbestos fibers; 2) the use of wet methods to sand the joint compound; and 3) the use of respirators and other protective equipment.  1/9/13 Hr'g Tr. 153:5-154:12 (Raterman).  This Court accepts and adopts Ms. Raterman's opinions.

### Dr. Kim Anderson

192.    Dr. Anderson also testified that he reviewed what he regarded as a representative sample of both resolved asbestos cases where Bondex was a defendant and 151 PIQs.  Despite finding that almost 90 percent of the mesothelioma claimants in the PIQs had made some mention of exposure to Bondex asbestos containing products, 1/9/13 Hr'g Tr. 81:2-8, 106:3-22 (Anderson), he concluded that exposure to asbestos from Bondex products would not have played any role in causing their mesothelioma.  1/9/13 Hr'g Tr. 87:20-88:4 (Anderson).

193.    Dr. Anderson has never designed an epidemiology study of asbestos-exposed workers, 1/9/13 Hr'g Tr. 92:6-8 (Anderson), and is not an epidemiologist.  1/9/13 Hr'g Tr. 92:19-23 (Anderson).  He has published only two articles that relate to asbestos, neither of which are original research.  1/9/13 Hr'g Tr. 93:18-94:10 (Anderson).  One of his articles, which reviewed epidemiology studies related to construction work, was criticized as "misleading" by the authors of some of the studies he was reviewing.  1/9/13 Hr'g Tr. 132:7-14 (Anderson).

194.    Dr. Anderson has not testified before OSHA or submitted any written papers to OSHA in connection with its hearings on asbestos standards.  1/9/13 Hr'g Tr. 95:3-9 (Anderson).  He has never served as a member of the Science Advisory Board for the EPA relating to asbestos.  1/9/13 Hr'g Tr. 95:10-14 (Anderson).  Dr. Anderson was not part of the working group that IARC put together on asbestos issues, 1/9/13 Hr'g Tr. 96:11-13 (Anderson), and none of his papers have ever been cited by IARC.  1/9/13 Hr'g Tr. 113:24-114:3 (Anderson).

195.    Dr. Anderson has served as an expert witness for asbestos defendants in over 500 cases, including over 100 for Bondex. 1/9/13 Hr'g Tr. 100:4-6, 101:4-13 (Anderson). Ninety percent of his litigation consulting work is for asbestos defendants. 1/9/13 Hr'g Tr. 100:18-22 (Anderson). He has never worked for a plaintiff in asbestos litigation.

196.    Over ninety percent of all the asbestos ever used in the United States was chrysotile asbestos. 1/9/13 Hr'g Tr. 107:7-11 (Anderson).  Dr. Anderson agreed that there is a causal relationship between chrysotile asbestos and the disease asbestosis, 1/9/13 Hr'g Tr. 107:16-19 (Anderson), that there is a causal relationship between chrysotile asbestos and pleural plaques, 1/9/13 Hr'g Tr. 108:3-6 (Anderson), and that there is a causal relationship between chrysotile asbestos and various types of lung cancer. 1/9/13 Hr'g Tr. 108:3-6 (Anderson). This is true regardless of whether the chrysotile has tremolite in it or not. 1/9/13 Hr'g Tr. 108:7-25 (Anderson).

197.    Dr. Anderson also admitted that OSHA, the EPA, the Agency for Toxic Substance and Disease Registry, and the National Institute for Occupational Safety and Health have concluded that there is a causal relationship between chrysotile asbestos and mesothelioma. 1/9/13 Hr'g Tr. 112:14-113:6 (Anderson).

198.    Although Dr. Anderson testified on direct that he did not believe there was a causal relationship between chrysotile without the amphibole tremolite in it and mesothelioma, on cross examination he admitted there were epidemiology studies from chrysotile mines in Balangero, Italy that showed such an excess risk of mesothelioma.  Dr. Anderson admitted that there was no tremolite in the chrysotile in the Balangero mines, that the authors of the Balangero studies attributed the mesothelioma there to chrysotile, and that there were no studies (human or

animal) showing that balangeroite (a mineral found in the chrysotile) had any role in causing

mesothelioma. 1/9/13 Hr'g Tr. 67:18-68:25, 72:24-74:20, 115:1-118:13 (Anderson).

199.    Finally, Dr. Anderson has never tested asbestos-containing products to determine

whether or not they have tremolite in them, 1/9/13 Hr'g Tr. 129:12-22 (Anderson), but admitted

that he was aware of published studies that determined that many types of asbestos containing

joint compound contained tremolite as well as chrysotile asbestos.  1/9/13 Hr'g Tr. 130:5-13

(Anderson).  This Court rejects Dr. Anderson's opinions.

H.    **Experts' Estimates of Debtors' Liability**

**Dr. Thomas Vasquez**

200.    Dr. Vasquez has been qualified as an expert on asbestos-estimation issues in, and

his methodology has been endorsed by, courts throughout the country.  *See Owens Corning v.*

*Credit Suisse First Boston*, 322 B.R. 719, 721, 725 (D. Del. 2005) (extolling Dr. Vasquez as a

"well-known and well-qualified expert[] in the field of claim evaluation" and characterizing his

opinion as "persuasive"); *Ahearn v. Fibreboard Corp.*, No. 6:93cv526, 1995 U.S. Dist. LEXIS

11532, at *155 (E.D. Tex. July 27, 1995) (describing Dr. Vasquez as a "distinguished outside

expert[]" and finding that he used "well-established and scientifically reliable methods to

estimate future claims activity"); *In re Dana Corp.*, No. 06-10354 (BRL), 2007 Bankr. LEXIS

4404, at *35 (Bankr. S.D.N.Y. Dec. 26, 2007) (Dr. Vasquez "has extensive experience and

expertise with the estimation of asbestos-related liabilities. . . . The Court finds that . . . Dr.

Vasquez [was] very knowledgeable about the estimation of future asbestos-related liabilities and

[was] reliable in terms of making calculations based on the assumptions that [he] made and the

methodologies [he] employed.") (citations omitted).  Indeed, the presiding judge in this

proceeding has herself recognized the valuable contributions that Dr. Vasquez has made to the

estimation of asbestos-related claims.  *See In re N. Am. Refractories Co.*, No. 02-20198, 2007

Bankr. LEXIS 4721, at *47 n.94 (Bankr. W.D. Pa. Nov. 13, 2007) ("Dr. Vasquez has testified frequently in asbestos-related proceedings and supervised the construction on the KPMG-Nicholson curves that are now used by many asbestos experts.").

201.    In this proceeding, Dr. Vasquez estimated the Debtors' mesothelioma liability at approximately $1.6 billion nominal and $1.1 billion net present value.  1/11/13 Hr'g Tr. 80:15–19 (Vasquez).  The value of pending claims was $182 million nominal, of which amount $132 million was estimated and $50 million was attributable to settled but undocumented claims. 1/11/13 Hr'g Tr. 80:8–13 (Vasquez).  Dr. Vasquez forecasted the Debtors' liability for future mesothelioma claims to be $1.4 billion nominal.  1/11/13 Hr'g Tr. 80:13–14 (Vasquez).  Dr. Vasquez discounted future claims by 3.45% and added that amount to the pending claims calculation to arrive at his total estimate of the value of mesothelioma claims against the Debtors in present value terms.  1/11/13 Hr'g Tr. 80:5–19 (Vasquez).

202.    Dr. Vasquez used two alternate approaches to forecast the future incidence of disease; the incidence of future claims used in his estimate is the average of these two techniques.  1/11/13 Hr'g Tr. 81:11–20 (Vasquez).  Dr. Vasquez also tested alternative scenarios in a sensitivity analysis.  1/11/13 Hr'g Tr. 81:20–22 (Vasquez).  The estimate of $1.1 billion net present value represents his mid-point estimate - what he describes as his "base case forecast." 1/11/13 Hr'g Tr. 81:22–23 (Vasquez).  His estimate of the Debtors' liability for mesothelioma claims is exclusive of any defense costs.  1/11/13 Hr'g Tr. 81:24–25 (Vasquez).

203.    Dr. Vasquez testified that there are two parts to his methodology.  1/11/13 Hr'g Tr. 88:25–89:5 (Vasquez).  Dr. Vasquez first looks at three components in establishing the starting point for his estimation.  1/11/13 Hr'g Tr. 90:18–20 (Vasquez).  Doing so is "very heavily dependent on [the Debtors'] historical experience."  1/11/13 Hr'g Tr. 89:17–25

(Vasquez). The first component is "what percent of all the individuals in the U.S. that die from mesothelioma file a claim against the company." 1/11/13 Hr'g Tr. 90:21–22 (Vasquez). Once he knows how many individuals are likely to sue the Debtors, Dr. Vasquez calculates the percentage of those claims that will ultimately be paid based on the Debtors' history. 1/11/13 Hr'g Tr. 91:2–6 (Vasquez). This component recognizes that the claims filed against the Debtors will be of varying quality. 1/11/13 Hr'g Tr. 91:3–4 (Vasquez). Not every claimant will be able to prove his case: "A large percent can be dismissed. A large percent can be paid, and it can vary by year . . . ." 1/11/13 Tr. 91:4–5 (Vasquez). Once Dr. Vasquez knows who will be paid, Dr. Vasquez calculates "how much on average are [those claimants] being paid." 1/11/13 Hr'g Tr. 91:7–8 (Vasquez). Taken together, these three components establish the starting point for Dr. Vasquez's calculation.

204.    Dr. Vasquez calculated each of these components on the basis of the most recent data available, here using a calibration period of 2008 through 2010. 1/11/13 Hr'g Tr. 115:5–116:15 (Vasquez) ("[Y]ou look for the most recent years that you can find unless there's some reason that you expect there's something in there that is not the same."). Selecting this three-year calibration window diluted the impact of 2010, which was an estimate based on partial year data. 1/11/13 Hr'g Tr. 115:5–21 (Vasquez). Based on this calibration period, Dr. Vasquez used the following values to generate his estimate: 42.5% of the individuals with mesothelioma will file a claim against the Debtors, the Debtors will pay 63% of those claimants, and claimants will receive $93,000 from the Debtors on average. 1/11/13 Hr'g Tr. 116:15–19 (Vasquez).

205.    Dr. Vasquez also explained that, to the extent that the propensity to sue appears to be increasing *ad infinitum*, it is more attributable to forecasting errors in which projected incidence falls off too quickly than to what is happening in the real world. 1/11/13 Hr'g Tr.

113:10–115:4 (Vasquez). The propensity to sue is calculated by dividing the number of
mesothelioma claims filed against the Debtors by overall incidence of mesothelioma. *See*
1/11/13 Hr'g Tr. 113:22–24 (Vasquez). That is, an increasing propensity to sue does not
necessarily mean that the actual claims filed against the Debtors are consistently increasing. *See*
1/11/13 Hr'g Tr. 114:1–3 (Vasquez). As a matter of "pure arithmetic," an increasing propensity
to sue can result just as easily from a forecasting model that predicts the incidence of
mesothelioma will decrease more rapidly than it in fact does. *See* 1/11/13 Hr'g Tr. 113:24–114:1
(Vasquez); *see also* 1/11/13 Hr'g Tr. 251:17–21 (Mullin) ("What matters is the shape of the
curve, so how quickly is it declining? I mean, I agree with Dr. Vasquez's testimony in this
regard that it's are you falling off a cliff, or are you going out at a long tail?"). Dr. Vasquez also
testified that Dr. Mullin's forecast predicts incidence of mesothelioma to decrease more rapidly
than does Dr. Vasquez's forecast. *See* 1/11/13 Hr'g Tr. 114:11–25 (Vasquez). Indeed, the
model used by Dr. Mullin is limited to forecasting occupational exposure whereas Dr. Vasquez's
incorporation of the Peto Approach allows his estimation to capture "do-it-yourselfer[s]" who
inhaled the Debtors' asbestos. See 1/11/13 Hr'g Tr. 178:22–179:7 (Vasquez).

206. The second part of his methodology is to use the historical starting point to
forecast into the future. That is, Dr. Vasquez forecasts "how many asbestos-related diseases
there will be each year going out into the future." 1/11/13 Hr'g Tr. 90:1–11 (Vasquez). Having
observed how likely it is that Debtors will pay a given individual with mesothelioma and how
much those individuals are paid on average, Dr. Vasquez applies those observations to the
forecast of future incidence of mesothelioma to calculate the value of the mesothelioma claims
that the Debtors will receive in the future. 1/11/13 Hr'g Tr. 89:3–16 (Vasquez).

207.    Dr. Vasquez's analysis is not simply arithmetic.  1/11/13 Hr'g Tr. 91:13–15 (Vasquez).  Rather, Dr. Vasquez considered a number of other factors in forming his estimate.  1/11/13 Hr'g Tr. 91:15–16 (Vasquez).  For instance, Dr. Vasquez considered how the Debtors' use of group settlements influenced their settlement history and the likelihood of such practices continuing in the future.  1/11/13 Hr'g Tr. 91:16–21 (Vasquez).  Dr. Vasquez considered whether the Debtors' experience is in line with the general trends observed in the asbestos litigation environment and the reasons for any deviations.  1/11/13 Hr'g Tr. 91:22–92:13 (Vasquez).

208.    Dr. Vasquez testified that he forecasted the future incidence of mesothelioma using an updated version of the Nicholson curve, which reflects that people are living longer, and, as a result, are contracting mesothelioma at a higher rate, than they were when the Nicholson curve was first designed.  1/11/13 Hr'g Tr. 94:11–96:21 (Vasquez).  Dr. Vasquez described how government statistics on mesothelioma deaths bear out that the original model was "way underestimating the total number of mesotheliomas."  1/11/13 Hr'g Tr. 95:8–14 (Vasquez).  Dr. Vasquez testified that he was the only expert to have used an updated Nicholson curve and that Drs. Peterson and Mullin both used versions of the Nicholson curve that predicted peak mesothelioma incidence to have occurred around 2002.  1/11/13 Hr'g Tr. 95:15–96:21 (Vasquez).  Dr. Vasquez testified that mesothelioma deaths only just now appear to be peaking.  1/11/13 Hr'g Tr. 95:16–21 (Vasquez).  Dr. Vasquez testified that his version of the Nicholson curve, which was verified only last year, still appears to be "underestimating the number of mesotheliomas."  1/11/13 Hr'g Tr. 95:22–96:9 (Vasquez).  According to Dr. Vasquez, this helped to explain the fact that the incidence of claims against the Debtors was increasing as the incidence of disease was forecasted to be decreasing.  1/11/13 Hr'g Tr. 98:19–22 (Vasquez).  Dr. Vasquez testified further that the Debtors' claims resolutions were not keeping pace with the

filing of claims against them:  "Unambiguously, Bondex is building up an inventory of

unresolved claims."  1/11/13 Hr'g Tr. 99:5–15 (Vasquez).  Dr. Vasquez testified that the Debtors

paid a larger percent of claims—and achieved dismissals for a smaller percent—when they

resolved claims in groups.  1/11/13 Hr'g Tr. 97:1–21 (Vasquez).  Yet the Debtors' history

demonstrated that when a higher percentage of claimants received payment, such as in group

settlements, each claimant received less on average, which gave "comfort" to Dr. Vasquez that

the amount the Debtors would pay to resolve claims going forward would be stable regardless of

the manner in which the Debtors went about doing so:

> if you have two variables like percent paid and average indemnity that are moving
> in opposite directions it stabilizes the average amount that you're paying for every
> claim that you resolve.
> . . . .  [W]hen you pay more of the claims you pay lower dollars, when you pay
> fewer of the claims you pay higher dollars, but on average it doesn't move very
> much because those things offset one another.  So that helps a great deal and gives
> you I'll describe it as comfort as you're doing your forecasting.

1/11/13 Hr'g Tr. 97:21–98:18 (Vasquez).[6]  Dr. Vasquez testified that the cost to the Debtors of

resolving all of the claims against them was consistent whether those claims were resolved as

part of a group or on an individual basis.  1/11/13 Hr'g Tr. 106:14–108:25 (Vasquez).

---

[6]  Given the inverse relationship between settlement amounts and propensity to sue, it is
important to note that Dr. Vasquez did not calculate his estimate by tracking particular claims
from filing to settlement.  Had he done so, Dr. Vasquez would have needed to calculate the
propensity to sue and the average settlement amount as of the same date to ensure that the
impacts of the two variables offset one another.  Instead, Dr. Vasquez measured the propensity to
sue and the average settlement value as two separate behaviors: one related to claimants and the
filing of claims and a second related to settlements and the amounts that the Debtors agreed to
pay.  The claims Dr. Vasquez considered in calculating the propensity to sue are thus not the
same specific claims that Dr. Vasquez considered in calculating the average settlement value.  In
effect, Dr. Vasquez takes two "snapshots" of two distinct claiming behaviors, and for each of
these two snapshots, Dr. Vasquez appropriately uses the most recent data point available for each
snapshot.

According to Dr. Vasquez, whether claims were part of a group settlement "just doesn't really matter very much." 1/11/13 Hr'g Tr. 109:5–9 (Vasquez).

209.    Dr. Vasquez testified that, in light of the fact that the Debtors' claims incidence was increasing at the same time that overall disease incidence was forecast to be decreasing, it was "very, very important that [he] get some idea of what's happening in 2010" so that he could determine if these trends held. 1/11/13 Hr'g Tr. 100:3–101:6 (Vasquez). According to Dr. Vasquez, however, the 437 claims that the Debtors had listed in their database for 2010 "was a pretty dramatic undercount of how many claims were actually filed by the end of May." 1/11/13 Tr. 101:22–24 (Vasquez).

210.    Dr. Vasquez described the "lag" that commonly exists between the time a claim is filed and the time that it gets entered into a database: "It takes time to type it in. It has to go from local counsel's office and to Verus's office. It has to follow a path if you will." 1/11/13 Hr'g Tr. 101:11–21 (Vasquez). According to Dr. Vasquez, this lag held true here:

> [W]hen we looked at the April database, there [were] 80 claims that were filed in January, 89 in February, 109 in March and then fell dramatically to 25 in April. Of course, there was nothing in May because this was a database at the end of April. So the 25 first of all looks pretty suspicious, right? We're running along at 90 to 100 claims a month and then it falls to 25.
> We then get an end of May database . . . and interesting enough, January is now 83 mesothelioma claims, it went up by three, February is 96, it went up by seven, March is 121, it went up by 12, and April, that funny-looking month with only 25 claims in it is all of a sudden 110 claims, it went up by 85 claims.
> . . . .
> . . . I looked further at the filings in May under the May database. . . . and we get that same funny-looking number. You know, in May—in the April database April was 25. I look in May and in the May database it's 27, same thing that we saw in the prior month.

1/11/13 Hr'g Tr. 103:1–104:9 (Vasquez). Dr. Vasquez thus made a "relatively straightforward adjustment," to correct the number of claims filed against the Debtors through the end of May from 437 to 602. 1/11/13 Hr'g Tr. 104:25–105:3 (Vasquez); 1/11/13 Hr'g Tr. 101:22–102:4

(Vasquez).  Dr. Vasquez was then able to project the Debtors' total number of 2010 claims to be

1428.  *See* ACC/FCR Demonstrative 1025 at Appendix B.  Dr. Vasquez's use of the Debtors'

January - May 2010 filing experience to project the total mesothelioma claim filings for 2010

was supported by the fact that historically the rate at which the Debtors received claims was

consistent throughout the year:  "[T]here wasn't any kind of seasonality that was involved.  It

was pretty even filing through the entire year and that happens every year in the past."  1/11/13

Hr'g Tr. 102:12–15 (Vasquez).

      211.    Dr. Vasquez observed that on average the number of claims filed from January

through December in the years 2007 – 2009 was 2.37 times the number of claims filed from

January through May. Dr. Vasquez then multiplied the 602 claims he estimated the Debtors

received through May 2010 by 2.37 to reach his 2010 claims count of 1,428.  *See* ACC/FCR

Demonstrative 1025 at Appendix B.

      212.    The Debtors criticize Dr. Vasquez for not relying in the PIQ data for purposes of

the 2010 claim count.  But, the Debtors cannot credibly argue that every 2010 claimant received

a PIQ.  The Debtors were relying on an incomplete dataset when distributing PIQs to claimants

in the first place.[7]  The PIQs were only sent to those law firms that had claimants appearing in

the Debtors' database, and the Debtors concede that that database was incomplete.[8]  Claimants

could not possibly have known of the PIQs unless they were represented by counsel that already

had litigation pending against the Debtors as of the Petition Date.  The Debtors effectively ask

the Court to assume that the claims that are missing from their 2010 database consist exclusively

---

[7]      In their first motion to compel submission of PIQs, the Debtors described how they could
not identify all of the claims filed against them when distributing PIQ materials.  *See* Debtors'
Motion to Compel Submission of Personal Injury Questionnaires [D.I. 1918], at 4 n.3.

[8]      *See* Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶¶ 77–78.

of claims filed by law firms that already had litigation pending against the Debtors, since such firms would have received PIQs.  But there is no evidence that this is true, and to the extent it is untrue, the PIQs would not capture all of the claims that were missing from the Debtors' database.

213.    Given that PIQ compliance does not preclude a claimant from recovering in the future from a section 524(g) trust, estimating the Debtors' liability based on the flawed assumption that all eligible mesothelioma claimants submitted a PIQ would have the unfortunate and unfair effect of forcing those who filed a PIQ to subsidize the trust recoveries of those claimants who did not.

214.    Dr. Vasquez also did not "ignore the actual data that was available," as the Debtors claim. See Debtors' Amended Post-Trial Brief, at 72.   Rather, he accounted for the fact that the actual data that was available did not tell the whole story and was thus misleading. Contrary to the Debtors' assertion that the 165 claims Dr. Vasquez identified were "fictional and devoid of any support in the data," the data strongly supports Dr. Vasquez's calculations.  As Dr. Vasquez explained in detail at trial, his calculations are based on his in-depth, month-by-month scrutiny of the claiming activity against the Debtors—Dr. Mullin, by contrast, did not take such a detailed look at the Debtors' claiming history.  *See* 1/11/13 Hr'g Tr. 103:1–105:3 (Vasquez).  In their criticisms of Dr. Vasquez, the Debtors never once offer an alternative explanation of the pattern readily apparent in the Debtors' data.  Assuming, as the Debtors suggest, that the 437 claims captured by the Debtors' records and the PIQs were the only claims filed against the Debtors in 2010 assumes that the Debtors would only ever receive 27 claims for the entire month of May, notwithstanding that they had averaged more than 96 claims a month over the previous 40 months.  Moreover, if one assumes, as the Debtors suggest, that the May dataset is a final

tally of the claims filed through the end of May, it would follow that the April dataset should

have been a final tally of the claims filed through the end of April.  Yet the Debtors' data show

definitively that this is not true—the May dataset identified more than 100 claims that had been

filed before the end of April but did not appear in the April dataset.  1/11/13 Hr'g Tr. 103:18–25

(Vasquez).

215.    According to the Debtors, the additional claims identified by Dr. Vasquez "had

the effect of taking the 2010 claim count to a number never before experienced by the Debtors."

See Debtors' Amended Post-Trial Brief, at 72.  While 2010 represented a new high in claiming

activity against the Debtors, this was no less the case in 2009 or in 2008 or in 2007 or in any year

since 1997, save one.[9]  The rate of increase from 2009 to 2010 is entirely consistent with the

Debtors' history.  The 1,428 claims that Dr. Vasquez calculates for 2010 represent a 12%

increase over 2009 claims, and the 2009 claims themselves represented a 14.7% increase over

the 2008 claims.[10]  Dr. Vasquez did not "take" the Debtors' claim count anywhere; his

conclusions are strongly supported by the Debtors' claims history.  That the Debtors' bankruptcy

filing interrupted the record keeping of the claims filed against them in 2010 is not a suitable

basis for concluding that the Debtors would have received fewer claims in 2010 than they did in

prior years.

---

[9]      Mesothelioma claims filings against the Debtors rose from an average of 326 claims per year between 2000 and 2002 to more than 1000 claims in 2007 alone, and up to 1,273 claims in 2009.  See Claimants' Representatives' Post-Hearing Opening Brief, at 15; see also 1/11/13 Hr'g Tr. 93:9–24 (Vasquez); Debtors' Amended Post-Trial Brief, at 11 ("In 2000, the Debtors were named in only 11 mesothelioma cases, but by 2009 they were named in almost 1,100 mesothelioma cases a year."); cf. Debtors' Demonstrative 3.

[10]      See Claimants' Representatives' Post-Hearing Opening Brief, at 15.  Similarly, the Debtors' 2005 claims represented a 20.8% increase over 2004 claims, and the Debtors' 2003 claims represented a 13% increase over 2002 claims.  A 12% increase in claims from 2009 to 2010 is thus entirely consistent with the Debtors' history, if not on the conservative side.

216.   Dr. Vasquez testified that the PIQ data was of "limited usefulness" in calculating the value of the claims against the Debtors because he could not know what those claimants would be paid.  1/11/13 Hr'g Tr. 109:20–24 (Vasquez).  Nevertheless, Dr. Vasquez did use the PIQ data to test whether the Debtors' inventory of pending claims was "more or less of the same quality as what [they've] paid in the past . . . ."  1/11/13 Hr'g Tr. 110:1–2 (Vasquez).  Dr. Vasquez examined the PIQ data and removing claims that were no longer alleging mesothelioma or that were alleging only minimal exposure to the Debtors' products.  Doing so reduced the potentially compensable claims to approximately 70%, which was roughly commensurate with the rate at which the Debtors paid claims historically.  1/11/13 Hr'g Tr. 111:12–112:8 (Vasquez). This result led Dr. Vasquez to conclude that the inventory of PIQ claims "looks as solid as historically resolved claims."  1/11/13 Hr'g Tr. 112:13–15 (Vasquez).  Finding that the Debtors' pending claims looked similar to the claims that the Debtors had closed in the past gave Dr. Vasquez comfort that it was appropriate "to continue using the historical relationships" to calculate the value of pending and future claims against the Debtors.  1/11/13 Hr'g Tr. 165:5–14 (Vasquez).

### Dr. Mark Peterson

217.   Dr. Mark Peterson is a lawyer and behavioral scientist by training who is a nationally recognized expert on the valuation of asbestos personal injury liabilities.  Dr. Peterson has experience as an expert witness in bankruptcy estimation proceedings and has projected asbestos personal injury liabilities in other contexts, including for trusts, defendants, insurers, and courts.  Dr. Peterson has been recognized as an expert by numerous courts, and his estimation of the number and value of asbestos personal injury claims has been accepted, in numerous cases.  *See, e.g.*, *In re Fed. Mogul Global Inc.*, 330 B.R. 133 (D. Del. 2005) (noting that Dr. Peterson's methodology comes closest to the criteria of *Eagle-Picher*); *In re Nat.*

*Gypsum Co.*, 257 B.R. 184, 198–99 (Bankr. N.D. Tex. 2000) (adopting Dr. Peterson's forecast of

future claims); *In re Armstrong World Indus.*, 348 B.R. 111 (D. Del. 2006) (endorsing Dr.

Peterson's use of the Nicholson model); *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 686

(Bankr. S.D. Ohio 1995) (adopting Dr. Peterson's calculation of open pre-petition claims).

218.    As he does in every case, Dr. Peterson started off his asbestos estimation analysis

work here by trying to understand in depth what drove the value of claims.  He believes that in

order to make a credible forecast, one must "understand what the data mean," which required

him to analyze the factors driving settlements in the court system as opposed to simply doing

mathematical calculations on data.  1/10/13 Hr'g Tr. 189:7–15 (Peterson).  In his testimony, he

outlined what was significant about the Debtors' history once he had had the opportunity to, as

he put it, "really get dirty and dig down and find out what the data might mean."  1/10/13 Hr'g

Tr. 189:12–15 (Peterson).

219.    According to Dr. Peterson, one significant aspect of the Debtors' tort litigation

history was that the litigations "ripened . . . very late."  1/10/13 Hr'g Tr. 189:16–190:4, 192:9–

193:21 (Peterson).  Dr. Peterson testified that there were two reasons for this: first, asbestos

plaintiffs' lawyers had not invested the time and effort necessary to make a case against Bondex,

1/10/13 Hr'g Tr. 193:22–194:7 (Peterson); and second, the do-it-yourself consumers who used

the Debtors' products were not part of a network and thus did not have access to information

about asbestos-related lawsuits in the same way that workers exposed to asbestos on the job did.

1/10/13 Hr'g Tr. 194:8–195:13 (Peterson).

220.    Dr. Peterson explained how asbestos-related claims had become "a significant

financial issue" for the Debtors by 2000 because the average amount that the Debtors had paid in

settlement increased significantly at the same time that the Debtors "were backlogging more and

more claims." 1/10/13 Hr'g Tr. 196:2–197:14 (Peterson). Dr. Peterson testified that "[t]hese results predate the effects" of the bankruptcies of the Debtors' tort system codefendants; asbestos litigation against Bondex had "broke open" and was "already growing." 1/10/13 Hr'g Tr. 198:2–5 (Peterson).

221.     Dr. Peterson testified that "the size of their potential liability exposure as well as the sheer volume of claims" forced the Debtors to respond by adjusting their litigation strategy. 1/10/13 Hr'g Tr. 198:12–199:4 (Peterson). According to Dr. Peterson, the Debtors began settling asbestos-related claims because "an aggressive litigation approach was too expensive." 1/10/13 Hr'g Tr. 199:15–200:7 (Peterson). Dr. Peterson described how the Debtors were able to resolve claims "more cheaply" by settling them in increasingly larger groups. 1/10/13 Hr'g Tr. 200:8–23 (Peterson). Dr. Peterson also described how the Debtors used "conditional settlements" in which the Debtors would agree to a settlement amount for a group of claims with a particular plaintiff law firm, but the actual claims in the group were subject to substitution depending on whether the individual claimants were able to document exposure to the Debtors' products. 1/10/13 Hr'g Tr. 205:12–209:5 (Peterson). Settling claims in large groups in this way allowed the Debtors to reduce the amounts they paid per claim and to stabilize their exposure. 1/10/13 Hr'g Tr. 204:14–205:8 (Peterson).

222.     Turning from the factors influencing his forecast to the forecast itself, Dr. Peterson testified that according to his methodology, the value of the claims against the Debtors is the product of the number of claims, the percentage of claims that get paid, and the average settlement value of a claim. 1/10/13 Hr'g Tr. 210:16–211:3 (Peterson).

223.     Calculation of the number of pending claims cannot be counted simply. *See* 1/10/13 Hr'g Tr. 211:6–212:8 (Peterson). Dr. Peterson examined the Debtors' own database of

asbestos-related claims, 1/10/13 Hr'g Tr. 188:12–15 (Peterson), to identify the number of claims

currently pending against the Debtors.  *See* 1/10/13 Hr'g Tr. 211:6–212:8 (Peterson).  Any

claims more than five years old were excluded from the calculation of pending claims, reflecting

the fact such claims are unlikely to be resolved for payment.  1/10/13 Hr'g Tr. 213:7–23

(Peterson).

224.    To determine the liability for the Debtors' future claims, Dr. Peterson first

projected the number of likely future mesothelioma claims.  1/10/13 Hr'g Tr. 213:25–214:23

(Peterson).  This projection was based on the Nicholson Study's projections of the incidence of

asbestos-related cancers (mesothelioma, lung cancer, and other cancers), which have proven well

confirmed based on the SEER data.  *See* 1/10/13 Hr'g Tr. 215:24–218:1 (Peterson).

225.    Dr. Peterson then calculated the Debtors' historic propensity to sue – i.e., the

percentage of people who actually filed (or will file) a claim against the Debtors—by dividing

the number of people who actually filed a claim against the Debtors for mesothelioma in a

particular year by the number of mesothelioma deaths predicted by the epidemiological model

for that same year.  1/10/13 Hr'g Tr. 218:8–218:16 (Peterson).  The historical propensity to sue

the Debtors was calculated based upon the propensities to sue during the three years immediately

prepetition.  1/10/13 Hr'g Tr. 221:9–23 (Peterson).  This particular period was chosen because a

debtor's most recent experience is typically the best indicator of what to expect in the future.

1/10/13 Hr'g Tr. 221:11–14 (Peterson).  To determine the likely number of asbestos-related

cancer claims that will be filed against the Debtors in years beyond May 2010, Dr. Peterson took

the number of mesothelioma deaths projected by the epidemiological model in each future year

and multiplied that by the propensity to sue.  1/10/13 Hr'g Tr. 218:8–218:16 (Peterson).

226.    Dr. Peterson calculated the projected number of future mesothelioma claims based on two alternate assumptions: (1) a "Stable Propensity" projection, which assumed the propensity to sue would remain unchanged in future years and (2) a "Increasing Propensity" projection, which assumed that, in accordance with the observable increasing trend in claim filings observed in the years immediately prior to the Debtors' bankruptcy, the propensity to sue the Debtors would increase during 2011 through 2014 before leveling off thereafter. 1/10/13 Hr'g Tr. 223:17–226:13 (Peterson). Dr. Peterson testified that the Increasing Propensity model is a far more plausible estimate and is his preferred projection. 1/10/13 Hr'g Tr. 225:9–226:13 (Peterson). No evidence was offered to show why the observable increasing trend in cancer claims might have declined abruptly in 2011.

227.    Dr. Peterson next calculated the percentage of claimants that resolved claims against the Debtors for payment. 1/10/13 Hr'g Tr. 229:14–16 (Peterson). Multiplying the total number of claims against the Debtors by the percentage of claims paid historically provides the number of compensable claims against the Debtors. 1/10/13 Hr'g Tr. 231:4–5 (Peterson). Dr. Peterson calculated the payment percentage used in his forecast by examining two separate periods: (i) from 2001 through 2010; and (ii) 2003 through 2010. 1/10/13 Hr'g Tr. 229:17–20 (Peterson). Dr. Peterson selected these particular ranges to correspond with his calculation of the average settlement payment. 1/10/13 Hr'g Tr. 229:20–230:3 (Peterson).

228.    Dr. Peterson next calculated the average settlement value of the claims that the Debtors resolved historically. 1/10/13 Hr'g Tr. 231:16–21 (Peterson). For this calculation, Dr. Peterson examined the periods: (i) from 2001 through 2010; and (ii) 2003 through 2010. 1/10/13 Hr'g Tr. 231:22-232:1 (Peterson). Because he was uncertain what particular litigation and settlement strategies the Debtors would pursue going forward, he examined the average

settlement amount over long range periods of time so that his calculation would capture "the whole range of settlement strategies" that the Debtors have used.  1/10/13 Hr'g Tr. 231:22–234:9 (Peterson).

229.    Dr. Peterson calculated the total value of the Debtors' pending mesothelioma claims to be approximately $200 million to $213 million.  1/10/13 Hr'g Tr. 234:18–235:22 (Peterson).  This amount accounts for one year's worth of inflation at 2.5%.  1/10/13 Hr'g Tr. 235:24–236:3 (Peterson).  Dr. Peterson calculated the total value of the Debtors' future mesothelioma claims to be approximately $1.64 billion nominal ($1.055 billion net present value).  1/10/13 Hr'g Tr. 236:7–237:13 (Peterson).  The net present value is computed at a discount rate of 3.7%.  1/10/13 Hr'g Tr. 237:12–15 (Peterson).  The sum of the values of present and future claims is the total value of mesothelioma claims against the Debtors, which Dr. Peterson calculated to range from $1.6 million to $1.994 billion (nominal) and $1.1 billion to $1.354 billion net present value with $1.841 billion (nominal) and $1.225 billion net present value being the "most appropriate forecast."  1/10/13 Hr'g Tr. 237:12–238:9 (Peterson).

230.    Dr. Peterson performed a number of sensitivity analyses on his estimate by using a number of alternative assumptions to recalculate the Debtors' liability for mesothelioma claims.  *See* 1/10/13 Hr'g Tr. 238:10–243:16 (Peterson).  These analyses estimated the consequences of the various assumptions made by Dr. Peterson in his calculation of the Debtors' liability for asbestos personal injury claims.  *See* 1/10/13 Hr'g Tr. 238:13–239:9 (Peterson).  When Dr. Peterson used different years to calculate the propensity to sue, the present value of the asbestos claims against the Debtors' estimated liability varied: using a more distant time period decreased the estimate whereas using the most recent years increased the estimate to as much as $1.4 billion net present value.  *See* 1/10/13 Hr'g Tr. 239:12–22 (Peterson).  When Dr. Peterson

applied different epidemiological forecasts, he was able to determine that using these alternative forecasts "wouldn't change the liability significantly." *See* 1/10/13 Hr'g Tr. 239:23–240:22 (Peterson). Finally, when Dr. Peterson tested different time periods for calculating the value of claims, he concluded that using different periods could cause his estimate to increase or decrease but that even the low estimate was "within the range" of his preferred estimate. *See* 1/1/10/13 Hr'g Tr. 241:15–23 (Peterson). While Dr. Peterson considered many of these alternative estimates to be "uninformed" in that they are based on numbers rather than analysis, he concluded that overall the sensitivity analysis corroborated his estimate, which "basically, is in the middle of that range" of the various alternatives. 1/10/13 Hr'g Tr. 241:24–243:16 (Peterson).

### Dr. Charles Mullin

231. Dr. Mullin does not have the same high level of experience and knowledge that Dr. Vasquez and Dr. Peterson have in estimating asbestos claims. Dr. Mullin has never testified in an estimation hearing in an asbestos bankruptcy case. 1/7/13 Hr'g Tr. 240:20–22 (Mullin). In fact, prior to his engagement in this matter, Dr. Mullin had never been admitted as an expert in an asbestos estimation hearing. 1/7/13 Hr'g Tr. 240:23–241:1 (Mullin).

232. Dr. Mullin's methodology is untested and novel. No court has recognized Dr. Mullin's "implicit defense" theory in connection with estimation; rather, Dr. Mullin invented the term for purposes of this estimation. 1/9/13 Hr'g Tr. 13:25–14:8 (Mullin). Dr. Vasquez testified that the literature that Dr. Mullin claims to rely upon "really doesn't, to a large extent, deal with many of the issues that we have here." 1/11/13 Hr'g Tr. 129:15–17 (Vasquez). Although Dr. Mullin asserts that his model is based on literature in law and economics, he admits that the model he constructs based on these materials is itself untested. *See* 1/7/13 Hr'g Tr. 236:22-24, 237:21-238:9 (Mullin) (noting that "theory I'm relying on is the theory that comes out of the law and economics literature," but admitting that he has never used the transaction cost methodology

of eliminating implicit defense costs). Notably, despite the fact that most of the literature he cites predates many of the litigated estimation proceedings, no prior asbestos expert has ever proposed a methodology similar to Dr. Mullin's.

233. While Dr. Mullin asserted that the subtraction of punitive damages in the *Owens Corning* bankruptcy provided support for his disaggregation methodology, Dr. Vasquez, who was actually involved in the *Owens Corning* case, disputed that characterization as being "not even in the same ballpark." 1/11/13 Hr'g Tr. 132:21–133:13 (Vasquez). The punitive damages at issue in *Owens Corning* had been fixed by a court at a definite amount. 1/11/13 Hr'g Tr. 132:25–133:13 (Vasquez) ("In *Owens Corning*, because I did it, we had claimant data with verdicts and that data, the verdict amounts were split into compensatory and punitive and we had a large number of observations, so real world numbers."). Dr. Mullin's "implicit defense costs" here are a theory. No court has ever separately awarded or quantified "implicit defense costs." In spite of this, Dr. Mullin attempts to sort out separate hypothetical components—never even identified by a court or by a party—from integrated settlement amounts. While Dr. Vasquez had actual data on punitive damages to work with in *Owens Corning*, "implicit defense costs" are unobservable and can only ever be guessed at. *See* 1/11/13 Hr'g Tr. 133:5–7 (Vasquez) ("The huge difference between that and what Dr. Mullin did, you could never observe implicit defense, right? It's implicit."). Moreover, implicit defense could represent a positive or negative cost to the Debtors. While punitive damages are only assessed against defendants, "implicit defense costs" if they exist, can be borne by plaintiffs and defendants in equal measure.[11] "Implicit defense costs," therefore, cannot simply be added up in the way that punitive damages can.

---

[11]  *See, e.g.*, 1/11/13 Hr'g Tr. 273:25–276:12 (Mullin) (Q: . . . It's your theory that the costs are unequal one way as opposed to the other. Is that right?  A: Well, I mean, I think the data is very supportive of that . . . .").

234.    Dr. Mullin has not subjected his theory to review in any forum.  He has not published a peer-reviewed article applying his theories to asbestos-related litigation.  1/7/13 Hr'g Tr. 235:21–237:3 (Mullin).  Dr. Mullin has never testified about the concept of subtracting implicit defense costs from a debtor's asbestos liability.  1/7/13 Hr'g Tr. 241:13–16 (Mullin).  While Dr. Mullin has estimated asbestos liabilities in insurance coverage litigation, he has done so in the context of settlement discussions not subject to a court's oversight.  1/7/13 Hr'g Tr. 237:11–20 (Mullin).  And even in those estimations, Dr. Mullin did not apply the implicit defense methodology that he advocates here.  1/7/13 Hr'g Tr. 237:21–238:9 (Mullin).  In short, Dr. Mullin's theory has never been tested by fellow academics or by a court.

235.    The "validation" that Dr. Mullin offers for his theory does not take the place of review by fellow academics or in a court of law.  Dr. Mullin cites Texas tort reform as a "natural experiment" supporting the validity of his methodology.  1/8/13 Hr'g Tr. 209:22–212:14 (Mullin).  However, Dr. Mullin fails to account for a number of "concurrent confounding effects" that make such reliance on the Texas tort reform improper, if not misleading.  1/10/13 Hr'g Tr. 266:2-267:5 (Peterson); ACC/FCR Demonstrative 1019 at 35; 1/11/13 Hr'g Tr. 133:14–134:11 (Vasquez).  For example, Dr. Mullin fails to control for the fact that a large number of the cases he considered to be post-tort reform were in fact grandfathered and subject to prior law.  1/11/13 Hr'g Tr. 134:2–6 (Vasquez).

236.    Similarly, in his testimony, Dr. Mullin cited an analysis of claims from the CCR database as "validation" for his methodology.  1/8/13 Hr'g Tr. 191:22–198:7 (Mullin).  However, the analysis did not deal with mesothelioma claims, as had the analysis that Dr. Mullin had initially presented in his report.  1/8/13 Hr'g Tr. 193:23–196:2 (Mullin); 1/9/13 Hr'g Tr. 23:13–25:24 (Mullin).  Mesothelioma claims are, of course, what we are concerned with in this

estimation.  In fact, the analysis of mesothelioma claims in his report contained an error—Dr.

Mullin computed the claimants' ages at filing rather than at death.  1/9/13 Hr'g Tr. 25:21–27:14

(Mullin).

237.    Indeed, when Dr. Vasquez performed the same regression on the CCR

mesothelioma data that had Dr. Mullin, this time with the age corrected, he found that the

mesothelioma claims did not follow the pattern required by Dr. Mullin's theory and that that data

in fact contradicts, rather than supports, Dr. Mullin's theory.  1/11/13 Hr'g Tr. 129:21–131:11

(Vasquez).  As Dr. Vasquez explained, Dr. Mullin's approach is "just terrifically unstable.  If

you do it the right way, it doesn't work."  1/11/13 Hr'g Tr. 131:8–9 (Vasquez).  Although Dr.

Mullin testified that this error "didn't make any material difference to the analysis," the Court

finds it telling that Dr. Mullin ultimately did not include the mesothelioma data in his direct

testimony at trial.  1/11/13 Hr'g Tr. 130:1–6 (Vasquez); 1/9/13 Hr'g Tr. 26:24–27:14 (Mullin).

While not dispositive in and of itself, this inconsistency nevertheless undermines the credibility

of Dr. Mullin's theory and conclusions.  In sum, the Court finds that the CCR mesothelioma data

does not support Dr. Mullin's conclusions, and that inconsistency undermines the credibility of

the theory that Dr. Mullin used to reach those conclusions.

238.    Furthermore, docket settlements were excluded from Dr. Mullin's analysis

because, based on his inclusion of no-pay resolutions in his denominator in calculating average

settlement value, those cases resulted in higher average settlement values.  1/8/13 Hr'g Tr.

147:8-12 (Mullin).  By excluding the docket settlements, Dr. Mullin was able to artificially

depress the average settlement value used in his computations.  Dr. Mullin asserted that the

higher value achieved in those settlements represented higher values as a result of the fact that

they were not individually negotiated settlements.

239.    Dr. Mullin's conclusions ignore the facts.  The crux of Dr. Mullin's estimation is
that there are three categories of claims: (1) claims settled for more than $200,000, which are
driven by liability; (2) claims settled for an amount between $200,000 and $50,000, which are
driven by liability and "implicit defense costs"; and (3) claims settled for less than $50,000,
which are driven by "implicit defense costs" alone.[12]  Dr. Mullin then estimates the Debtors'
liabilities by forecasting the number of claims in each category and then multiplying by the
average value of the claims in each category.[13]  The Debtors' data, however, does not support Dr.
Mullin's categories.  Indeed, Dr. Vasquez determined that Dr. Mullin's model of the Debtors'
liability, with its inflection points at $50,000 and $200,000, is only the 39th most accurate model
that Dr. Mullin could have chosen to explain the Debtors' data.  *See* 1/8/13 Hr'g Tr. 199:2–7
(Mullin).  Any of the 38 more accurate models would have revealed that there is no significant
differentiation among claims that settled for less than $200,000.  *See* 1/8/13 Hr'g Tr. 200:16–19
(Mullin).  Dr. Mullin himself conceded as much at trial:  "there's a very big difference between
claims that were paid more than 200,000 and claims that were paid less. . . .  So it's coming in
and saying we know the behavior of claims that were settled for more than 200 is profoundly

---

[12]     *See, e.g.*, 1/8/13 Hr'g Tr. 182:21–183:12 (Mullin) ("And that's really where the
econometrics tools came in is they let—so these come out of the data that says settlements less
than 50,000 have no connection to the damages of the claimant.  These are settlements that
generally are in that nuisance category.  Settlements in the range of 50,000 to 200,000 are a
mixture. . . .  And, again, above 200,000 it really is the liability that's the driving force.").

[13]     *See, e.g.*, 1/7/13 Hr'g Tr. 246:13–17 (Mullin) ("And I ultimately put those into four
categories which I viewed as, you know, high-value, mid-value, low-value, and claims that
would be dismissed.  And then for each of those types of claims I continued to analyze to figure
out how much money was associated on average with each of those claim types."); 1/9/13 Hr'g
Tr. 36:11–14 (Mullin) ("Q: And then what you did was take those 300 claims and allocate them
between high, low and medium-value claims. Is that fair?  A: Correct.").

different than the ones that are less." *See* 1/8/13 Hr'g Tr. 200:4–10 (Mullin).  No legitimate

reason was provided to subdivide the Debtors' claims into a third category at $50,000.

240.    Dr. Mullin concedes that his third category of claims—those that do not reflect

liability—may not exist all.  Indeed, he argues that it does not matter "whether you truly believe

that zero to 50 is *de minimis* and 50 to 200 has a material portion of both, or there's a little bit of

liability in the zero to 50 range and a little less in the 50 to 200."  1/8/13 Hr'g Tr. 200:22–25

(Mullin).  Yet Dr. Mullin's entire estimation depends on the premise that certain settlements

reflect liability, that certain others do not, and that he can tell which are which.[14]

241.    Dr. Vasquez's testimony further demonstrates the illogic of Dr. Mullin's

conclusion that claims the Debtors settled for less than $50,000 are claims for which the Debtors

in fact had no liability:[15]

> So my conclusion would be quite different, I guess, just looking at the data,
> putting aside regressions and kinks and all of those, that having a large percent of
> claims that were paid low amounts would be perfectly consistent with what my
> notion would [be] of what Bondex's liability might be.
>     So that combination of, you know, the allegation that they have a low market
> share and exposure to multiple defendants, that you would expect to see a large
> number of low settlement values.

1/11/13 Hr'g Tr. 132:11–20 (Vasquez).  The Court finds having many claims settled for little

amounts is in fact perfectly consistent with what these Debtors' expected liability would be.

Indeed, settling claims for which the Debtors had no liability would be an untenable strategy that

would serve to invite rather than dissuade claims.

---

[14]  *See, e.g.*, 1/8/13 Hr'g Tr. 182:21–183:12 (Mullin) ("And that's really where the econometrics
tools came in is they let—so these come out of the data that says settlements less than 50,000
have no connection to the damages of the claimant.  These are settlements that generally are in
that nuisance category.  Settlements in the range of 50,000 to 200,000 are a mixture. . . .  And,
again, above 200,000 it really is the liability that's the driving force.").

[15]  1/8/13 Hr'g Tr. 185:15-18 (Mullin); 1/8/13 Hr'g Tr. 186:15-22 (Mullin)

242.     Dr. Mullin never forecasted how many future claims the Debtors would receive. Moreover, Dr. Mullin readily admitted that he did not "know how many future nuisance claims they're going to get." 1/11/13 Hr'g Tr. 281:19–20 (Mullin). According to Dr. Mullin, "that's a very, very difficult thing to do, so I never constructed an estimate of total claim filings." 1/11/13 Hr'g Tr. 281:20–21 (Mullin). Yet, as this Court has remarked on prior occasions, settling claims for nuisance value "is pretty much what the debtor would be doing through the 524(g) trust . . . . It's the same thing, you've just taken the claims process and moved it into another vehicle outside the Bankruptcy Court." 11/26/12 Hr'g Tr. 47:17–22. Dr. Mullin testified that "forecasting claims that are going to get dismissed doesn't really add anything to the process." 1/11/13 Hr'g Tr. 281:25–282:2 (Mullin). But Dr. Mullin did not dispute that the Debtors would receive nuisance claims that they would have to resolve. Essentially, Dr. Mullin is testifying that his estimate does not include all of the claims that a potential 524(g) trust would need to resolve postpetition; rather, Dr. Mullin estimates the value of only his chosen subset of claims against the Debtors.

243.     According to Dr. Mullin's theory, the Debtors were paying others' share of liability. Yet Dr. Mullin agreed that the Debtors never sought contribution from other defendants. 1/8/13 Hr'g Tr. 274:9–22 (Mullin). Dr. Mullin's conclusion ignores the plain language of the Debtors' own settlement agreements that make clear they were resolving only their "several share."

244.     Also according to Dr. Mullin's theory, Bondex and SPHC's asbestos liabilities can be divided into three distinct time periods where each Debtor is only responsible for the liabilities during a specific era. Dr. Mullin testified that the "Reardon Era" is the period before 1966 and neither Debtor should be held liable for asbestos claims arising from exposure prior to

the 1966 acquisition of Reardon's assets.  1/8/13 Hr'g Tr. 223:4-224:4 (Mullin).  He further

testified that the "SPHC Era" spans from 1966, when SPHC purchased Reardon, to 1972, when

SPHC transferred the Reardon assets to Bondex, and the "Bondex Era" is the period after 1972.

1/8/13 Hr'g Tr. 223:15-224:24 (Mullin).  However, the Debtors never drew these distinctions in

the tort system and never raised such defenses against one another.  1/10/13 Hr'g Tr. 87:2-8

(Iola); 1/10/13 Hr'g Tr. 90:20-24 (Iola).

245.    Dr. Mullin's date boundaries cannot capture which entity was or could be

responsible for the sale of a particular claimants' product.  Dr. Mullin included in his 8.6% of

historical, 15.6% of pending, "Bondex-era" claims all claims that asserted exposure after 1972,

although clearly some post-1972 exposures would related to product distributed before the spin-

off of Bondex from SPHC given the Debtors admissions regarding the multi-year shelf-life of

their product.

246.    Dr. Mullin's attempt to mathematically partition one Debtor's liability from the

other also ignores the reality of joint and several liability, where if the Debtors were sued

together they would both be liable for any verdicts.  Dr. Mullin testified that at least 97% of the

claims were filed against the Debtors in jurisdictions where some form of joint and several

liability is the law.  1/11/13 Hr'g Tr. 256:19-23 (Mullin).  He also conceded that more than 85%

of the claims from the Debtors' historical claims database alleged exposure during his "SPHC

Era."  1/9/13 Hr'g Tr. 16:1-19 (Mullin).   As a result, the Court finds that SPHC historically

shares liability with Bondex in no less than 82% of the claims against the Debtors.

247.    Dr. Mullin's conclusions are inconsistent with the realities confronting the

Debtors in the tort system.  Dr. Mullin testified that he calculated the value of the claims against

the Debtors based on a reimagined tort system:

Q: Okay. So, in 95 percent of the claims what you're actually measuring has nothing to do with the reality of the tort system; right?

A: It does. It's just—it's one component of it. This is—it is liability. It's their share as though all the codefendants were back with them. So if—I said a few times, if *Johns Manville*, *Eagle Picher*, *U.S.G.*, all those codefendants were in the courtroom with them, it's under that world what they would pay.

Q: Okay. But that's not the world of the United States of America tort system; isn't that right?

A: I mean, those companies have gone through reorganizations. They are not there today.

Q: So they're not in the room, correct, Dr. Mullin?

A: That's correct.

1/9/13 Hr'g Tr. 10:8–22 (Mullin). This reimagining is inconsistent with the way that this Court must estimate the value of the claims against the Debtors. *See Armstrong*, 348 B.R. at 123 ("A court must . . . look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy.") (citation omitted); *Fed. Mogul*, 330 B.R. at 158 ("Pursuant to the first factor of *Eagle Picher*, the focus must be on [the debtor's] actual settlement history in determining what a claim would have been worth but for the bankruptcy."); *Owens Corning*, 322 B.R. at 722 ("[C]laims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy."). This Court has itself recognized that "[t]he validity of a claim is determined by reference to the state law governing the substance of that claim and those state interests are analyzed no differently . . . than if the interested parties were not in bankruptcy." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 n.10 (Bankr. D. Del. 2006) (citations omitted). The Debtors reliance on *Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.)*, 333 B.R. 251, 260 (Bankr. W.D. Pa. 2005) (Fitzgerald, J.), is inappropriate in these cases.

248.    Moreover, Dr. Mullin agreed that asbestos claimants would not accept his proposed amounts in settlement: "I'm not suggesting that in a joint and several State Court that that's what they would accept, because that has transfers of liability embedded into the State

Court rules.  So, in that framework I don't think they would accept that amount."  1/9/13 Hr'g

Tr. 9:19–22 (Mullin).  And as Dr. Mullin pointed out, "98, 99 percent of the claims are filed in

jurisdictions that have some form of joint and several liability rules."  1/9/13 Hr'g Tr. 10:5–7

(Mullin).  However, in order to obtain the relief provided pursuant to section 524(g), the Court is

required to determine as part of the process of seeking confirmation of a plan that at least

seventy-five percent of the claimants whose claims would be subject to the trust would vote in

favor of the plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Dr. Mullin's theory could not satisfy the

requirements of section 524(g).  Indeed, Dr. Mullin himself testified that he did not calculate

how many future claimants will assert claims against the Debtors:  "I don't have a total claim

number.  I didn't forecast how many future claims they would get."  1/11/13 Hr'g Tr. 281:16–17

(Mullin).

249.    Dr. Mullin states that claims resolved in groups were not subject to merit review,

1/8/13 Hr'g Tr. 287:10–288:8 (Mullin), while at the same time he acknowledges that claimants

were paid once they had supplied the necessary documentation.  1/8/13 Hr'g Tr. 249:21–253:1

(Mullin).  These two positions are inconsistent especially given the other evidence before this

Court including the testimony provided by Mr. Tompkins and the plain language of the Debtors'

pre-petition settlement agreements.  1/7/13 Hr'g Tr. 117:7-119:7 (Tompkins) (testifying that

group settlement agreements required an affidavit or deposition testimony confirming product

identification as to Debtors); Debtors' Ex. 21 (settlements required affidavit or deposition

testimony of product identification and confirmation of diagnosis as well as method of dispute

resolution regarding any disagreement).

250.    Finally, the illogic of Dr. Mullin's methodology is illustrated by the vast disparity

between the Debtors' recent mesothelioma claims filing and resolution history and Dr. Mullin's

projections.  Dr. Mullin does not dispute that the Debtors paid more than $400 million over the last ten years to settle claims.  1/11/13 Hr'g Tr. 278:6–16 (Mullin).  Nor does Dr. Mullin dispute that the Debtors have been paying about $50 million annually over the last eight years.  1/11/13 Hr'g Tr. 278:15–16 (Mullin).  Yet his estimate of the future claims concludes that for the next fifty years, the most the Debtors would pay is $700 million (nominal).  1/8/13 Hr'g Tr. 219:20–220:4 (Mullin); *see also* Debtors' Demonstrative 9, at ¶ 152 ("I estimate the value of future claims by forecasting the number of future claims in each year from fiscal year 2011 through 2060.").  There is simply no basis for such a reduction in resolution costs to be found in the Debtors' claims history, in the incidence of mesothelioma in the United States, or in the realities of the tort system.

251.    Dr. Mullin's methodology differed in numerous respects from the generally accepted methodology used by Drs. Peterson and Vasquez.  Dr. Mullin estimated that the present value of mesothelioma claims against the Debtors was approximately $170 million, representing $41 million in pending claims and $129 million in future claims.  1/11/13 Hr'g Tr. 84:20–21 (Vasquez).  In contrast Dr. Peterson estimated that the present value of the mesothelioma claims could be as much as $2 billion dollars, with future claims worth $1.8 billion and pending claims themselves worth $200 million.  1/11/13 Hr'g Tr. 84:17–20 (Vasquez).  Dr. Peterson's estimate was approximately 26% higher—and Dr. Mullin's estimate approximately 90% lower—than Dr. Vasquez's estimate, which occupied the middle ground of the three estimates.  1/11/13 Hr'g Tr. 84:22–24 (Vasquez).

252.    There are a number of reasons that Dr. Mullin's estimate is inconsistent with those prepared by Drs. Peterson and Vasquez.  To begin with, Dr. Mullin used an incidence curve that was consistent with Dr. Peterson's but was less accurate than that used by Dr.

Vasquez. 1/11/13 Hr'g Tr. 96:6–21 (Vasquez). Dr. Mullin's incidence curve has not been

updated as has Dr. Vasquez's to reflect the lower general mortality rate since 1982. 1/11/13 Hr'g

Tr. 96:6–21 (Vasquez). The use of such a curve results in Dr. Mullin undercounting

mesothelioma deaths by approximately 25% as compared to the true count reported by

government statistics. 1/11/13 Hr'g Tr. 96:18–21 (Vasquez). Because forecasted mesothelioma

incidence is used to determine the future number of claims filings against the Debtors, Dr.

Mullin's underestimation of mesothelioma incidence artificially deflates the total number of

future claim filings that the Debtors will receive. *See* 1/10/13 Hr'g Tr. 218:9–16 (Peterson).

253. Moreover, Dr. Mullin did not perform the necessary analysis to adjust the number

of 2010 claims and therefore underestimated the number of claims facing the Debtors and failed

to appreciate the most recent trends in claiming activity against the Debtors. 1/11/13 Hr'g Tr.

105:4–10 (Vasquez). By contrast, and as set forth in detail in paragraph 210 above, Dr. Vasquez

recognized that a claims processing lag caused the claim counts for 2010 to be underreported by

165 claims. 1/11/13 Hr'g Tr. 101:22–102:5 (Vasquez). For example, the Debtors' database

reflected 25 claims in April when reported at the end of April, a number that was updated

upward to 110 just one month later. This results in Dr. Mullin assuming that the 27 claims in

May would not have been revised upward (as had the claims in April) but instead that the

Debtors would in fact receive only 27 claims in the entire month of May. 1/11/13 Hr'g Tr.

105:7–8 (Vasquez). This assumption is inconsistent with the Debtors' claiming history,

according to which the Debtors were consistently receiving about 100 claims per month pre-

petition, and was consistently increasing annually prior to 2010. 1/11/13 Hr'g Tr. 102:8–103:18

(Vasquez); *see also* paragraphs 211-215 *supra* (the 1,428 claims that Dr. Vasquez calculates for

2010 represent a 12% increase over 2009 claims, and the 2009 claims themselves represented a

14.7% increase over the 2008 claims.  Dr. Mullin's assumption of a lower number of claims also results in a lower propensity to sue because propensity to sue is calculated by the number of claims divided by the incidence curve.)  *See* 1/11/13 Hr'g Tr. 112:23–24 (Vasquez).

254.    Moreover, when Dr. Mullin calculates the average settlement value for claims filed in 2009 and 2010, he is necessarily relying on a thin sample of claim settlement amounts that is likely to be misleading.  For instance, Dr. Mullin calculates that the average settlement value for claims filed in 2010 is $75,000.[16]  Dr. Mullin never indicates how many claims he includes in this 2010 "average," but there are unlikely to be many claims that were filed after January 1, 2010, and settled before the Petition Date in May, given that Debtors average a year-and-a-half between filing and settlement.[17]  The Debtors' data demonstrates that the 2009 and 2010 settlement averages calculated by Dr. Mullin are more than 20% lower than the amount he calculates for 2008, which is the most recent reliable sample of the Debtors' claims settlement values given the combination of the lag between filing and settlement and the impact of bankruptcy planning on the Debtors' settlement and payment practices.[18]

255.    In their estimates, Drs. Peterson and Vasquez considered all of the claims against the Debtors within the calibration period.  1/11/13 Hr'g Tr. 280:3–21 (Mullin).  In contrast, Dr. Mullin based his estimation on a chosen subset of the claims against the Debtors.  1/11/13 Hr'g Tr. 279:19–280:2 (Mullin).  Dr. Mullin's analysis was based on the idea that individually litigated claims reflected the Debtors' liability but that the Debtors did not evaluate the merits of claims settled in groups and that the values associated with those claims therefore do not reflect

---

[16]    *See* Debtors' Amended Post-Trial Brief, at 49.

[17]    *See* Debtors' Amended Post-Trial Brief, at 49

[18]    *See* Debtors' Amended Post-Trial Brief, at 49.

the Debtors' liability.  *See* 1/8/13 Hr'g Tr. 287:10–288:8 (Mullin); 1/8/13 Hr'g Tr. 127:10–

133:23 (Mullin).  Dr. Mullin accordingly excluded seventeen "inventory settlements" with three

law firms from his analysis.  1/11/13 Hr'g Tr. 29:14–21 (Peterson); 1/7/13 Hr'g Tr. 275:22 –

277:12 (Mullin).  However, as Dr. Vasquez observed, the Debtors engaged in many more group

settlements than those accounted for by Dr. Mullin:

> but the fact is that there are hundreds of other claims that were certainly by any
> appearance seem to be resolved in groups. I mean in fairly large numbers. When
> you have 50 to 100 claims resolved by the same attorney on the same day, similar
> amounts, it looks and smells like a group.  so [sic] I'm not sure why one would
> exclude those from your count of groups . . . .

1/11/13 Hr'g Tr. 106:5–11 (Vasquez).  While Dr. Mullin testified that he could have used simple

search parameters to identify group claims, he did not do so.  1/8/13 Hr'g Tr. 262:8–23 (Mullin).

Significantly, the seventeen group settlements that Dr. Mullin excluded from his calculation were

claims filed in Madison County, which "is a higher paying jurisdiction."  1/11/13 Hr'g Tr.

157:24–158:9 (Vasquez).  Accordingly, the Court agrees with Dr. Vasquez that "the notion of

using these three as representative of the difference between groups and non-groups  . . .[is not]

fair at all."  1/11/13 Hr'g Tr. 157:24–158:1 (Vasquez).  Indeed, when Dr. Peterson replicated Dr.

Mullin's analysis, this time excluding all group settlements and not just the ones from Madison

County that Dr. Mullin had excluded, "[i]t just completely changed [Dr. Mullin's] results."

1/10/13 Hr'g Tr. 256:8 (Peterson).  Dr. Peterson testified that Dr. Mullin is "relying upon an

analysis that changes greatly when you change the claims that are put into it according—in order

to satisfy the requirements that he states.  It's an unreliable analysis . . . ." 1/10/13 Hr'g Tr.

265:15–20 (Peterson).

        256.    While Dr. Mullin alleged he accounted for the effect of inflation on the settlement

amount over time, his other reductions had the effect of cancelling out inflation entirely.  Dr.

Mullin assumed that in 2050, the Debtors would still be paying the same exact amount per claim that they are paying to settle claims currently—in spite of the fact that that amount of money will, in present value terms, be worth significantly less in the future:

> I have inflation on average settlement values at one-and-a-half percent.  It's the two-and-a-half percent inflation minus the one percent effect of aging.  I also have a declining pay rate when I look at it for tort spend at two percent.  So, that takes you actually to negative 4.  I didn't apply a negative, I left it at zero when I was looking at tort spend.

1/11/13 Hr'g Tr. 265:25-266:6 (Mullin).

257.     The Court rejects the assumptions which underlie Dr. Mullin's estimates in this matter and instead credits the testimony of Dr. Vasquez and Dr. Peterson.  In sum, the Court finds Dr. Vasquez and Dr. Peterson to be more credible witnesses than Dr. Mullin.  Their extensive experience and methodology are more persuasive, and their estimations are likely to be the most accurate.

258.     Dr. Vasquez's methodology has been applied and accepted in several legal proceedings involving debtors that, like those here, faced numerous asbestos personal injury claims.  *See* para 200 *supra.* (identifying courts accepting Dr. Vasquez's methodology).

259.     Dr. Peterson's methodology has also been applied and accepted in several legal proceedings involving not only debtors confronted with substantial asbestos liability claims but also other types of cases.  His methods have been accepted in whole or in part in these cases.  *See* para 217 *supra.* (identifying courts accepting Dr. Peterson's methodology).

260.     Given that mathematical precision is impossible, the Court agrees with Dr. Vasquez's estimate of the Debtors' asbestos liability and concludes that the nominal value of the Debtors' asbestos liability is likely to be between $1.6 billion and $1.841 billion (nominal).  Based on the discussion in paragraphs 263 -268 *infra.*, specifically the testimony of Mr. Sinclair

and Mr. Braun, the net present value of the Debtors asbestos liability is between $1.1 billion and $1.255 billion.

      I.     <u>Expert's Market Share Estimation</u>

      261.    Dr. Mullin failed to cite to or testify about any consideration he may have given to Dr. Martin's market share analysis in forming his opinions.  Nor did Dr. Martin testify regarding the number of possible future claim against the Debtors.  Accordingly, Dr. Martin's opinion on Bondex's estimated market share with respect to the sale of joint compound from the period of 1950 to 1977 should not be considered in estimating the Debtors' liabilities.

      262.    Moreover, Dr. Martin's estimate of Bondex's market share is irrelevant and does not assist the Court with estimating the Debtors' future liabilities because Dr. Martin admitted that she did not conduct an analysis of the number of people that may have been exposed to Bondex products, regardless of her market share analysis.  1/7/13 Hr'g Tr. 190:8-191:2 (Martin).  Furthermore, her reliance on U.S. Gypsum, is misplaced given the testimony of Bondex's own president that the Debtors and U.S. Gympsum were not in the same market in even his "wildest dreams."  9/24/12 Dep. Tr. 185:14-15 (Fleming).

      J.     **<u>Experts' Proposed Discount Rates</u>**

            **James Sinclair**

      263.    In connection with Charter Oak's duties as the Committee's financial advisor, Mr. Sinclair offered an opinion concerning the appropriate discount rate to be applied to the Debtors' aggregate asbestos liabilities as estimated by Dr. Peterson of LAS.  Mr Sinclair was certified to testify as a financial expert.  1/9/13 Hr'g Tr. 219:16-19 (Sinclair).  Mr. Sinclair testified that in his professional opinion, a risk-free rate of 3.70% as of May 31, 2010 is appropriate.  1/9/13 Hr'g Tr. 219:24-220:8 (Sinclair).  Mr. Sinclair testified that risk-free rates of return are associated with U.S. Treasury security rates.  1/9/13 Hr'g Tr. 220:11-14 (Sinclair).

264.    Mr. Sinclair also testified that a risk-free rate is appropriate in the context of mass tort liability since the payments to the involuntary tort creditors are made over a long period of time and one has to present value the liabilities at the time value of money at the lowest possible rate, which would be the U.S. Treasury rates.  1/9/13 Hr'g Tr. 220:18-221:5 (Sinclair).  Mr. Sinclair also testified that no risk should be used to calculate net present value here because mass tort claimants of the type at issue here are involuntary creditors who have not willingly assumed a risk with respect to their future cash flows as other types of creditors might.  1/9/13 Hr'g Tr. 220:18-221:16 (Sinclair).   Mr. Sinclair further testified that using a discount rate based on an investment rate of return is not appropriate in this context because of the risk involved and the impact that fluctuations in investment returns may have on an asbestos trust's ability to pay asbestos claimants as claims are submitted to the trust.  1/9/13 Hr'g Tr. 224:15-226:1 (Sinclair).

265.    The present value of the Debtors' asbestos liabilities projected by Dr. Peterson as of May 31, 2010, discounted by the risk-free rate of 3.70%, is approximately $1.255 billion. 1/10/13 Hr'g Tr. 188:1-11 (Peterson).

### Richard S. Braun

266.    In connection with FTI's duties as the FCR's financial advisor, Mr. Braun offered an opinion concerning the appropriate discount rate to be applied to the Debtors' aggregate asbestos liabilities as estimated by Dr. Vasquez of ARPC.  As agreed to by the Parties, Mr. Braun testified by Declaration and was subject to cross-examination.  He was certified to testify as an expert in corporate finance.  1/11/13 Hr'g Tr. 66:19-25 (Braun).

267.    In addition to his background, knowledge, training and experience, Mr. Braun relied on the Federal Reserve Board Statistical Release, dated June 1, 2010 ("FRB Release") in order to determine risk-free rates of return as of May 31, 2010.  ACC/FCR Ex. E088 at 3.  Mr. Braun testified that risk-free rates of return are associated with U.S. Treasury security rates.

ACC/FCR Ex. E088 at 3-4.  Based on his analysis and calculations involving the FRB Release

data, Mr. Braun testified that in his professional opinion, a blended risk-free rate of 3.45% as of

May 31, 2010 is appropriate.  ACC/FCR Ex. E088 at 3-4.

268.    The present value of the Debtors' asbestos liabilities projected by Dr. Vasquez as

of May 31, 2010, discounted by the blended risk-free rate of 3.45%, is approximately $1.1

billion.  1/11/13 Hr'g Tr. 80:13-81:3 (Vasquez).

**Timothy R. Coleman**

269.    In connection with Blackstone Advisory's duties as the Debtors' financial

advisor, Mr. Coleman offered an opinion concerning the discount rate(s) to be applied to the

Debtors' aggregate asbestos liabilities as estimated by Dr. Mullin of Bates White.  He was

certified to testify as an expert in corporate finance.  1/8/13 Hr'g Tr. 13:21-14:1 (Coleman).

270.    Mr. Coleman testified that he calculated two discount rates using weighted

average cost of capital ("WACC") and the median pension return methods.  1/8/13 Hr'g Tr.

16:21-23 (Coleman).  Mr. Coleman testified that those two methods were selected during

discussions with Debtors' counsel.  1/8/13 Hr'g Tr. 16:3-23 (Coleman).  Mr. Coleman further

testified that he believed the WACC method should be used in this context and that he calculated

a discount rate based on the median pension return at the suggestion of Debtors' counsel.  1/8/13

Hr'g Tr. 16:8-20 (Coleman).  Based on his analysis and calculations, Mr. Coleman testified that

the WACC rate is 8.2% and the 10 year median pension return rate is 5.5%.  1/8/13 Hr'g Tr.

23:9-13; 28:9-23 (Coleman).

The present value of the Debtors' asbestos liabilities projected by Dr. Mullin, discounted

by the WACC rate of 8.2%, is approximately $445 million.  1/8/13 Hr'g Tr. 221:20-222:8

(Mullin).  The present value of the Debtors' asbestos liabilities projected by Dr. Mullin,

discounted by the median pension return rate of 5.5%, is approximately $510 million.  1/8/13

Hr'g Tr. 222:9-10 (Mullin).

## II.    CONCLUSIONS OF LAW

A.    **Governing Legal Standards**

**State law governs**

271.    An estimate pursuant to Section 502(c) is not a finding regarding the validity or

amount of any individual claim.  *See In re Fed. Mogul Global Inc.*, 330 B.R. 133, 154–55 (D.

Del. 2005) ("[A]n estimation of asbestos liability for the limited purposes of plan formulation is

a fruitful endeavor because it promotes the speed and efficiency goals of the Bankruptcy Code,

while not implicating the procedural rights of the individual claimants.").

272.    For bankruptcy purposes, state law governs the validity and amount of a claim.

*Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("[T]he 'basic federal rule' in

bankruptcy is that state law governs the substance of claims, Congress having 'generally left the

determination of property rights in the assets of a bankrupt's estate to state law.'") (citations

omitted) (quoting *Butner v. United States*, 440 U.S. 48, 54 (1979)); *see also Travelers Cas. &

Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) (same).  The scope of a

bankruptcy court's equitable power must be understood in light of the principle that "the validity

of a claim is generally a function of underlying substantive law."  *Raleigh*, 530 U.S. at 24; *see

also Grogan v. Gardner*, 498 U.S. 279, 283–84 (1991) (while the issue of nondischargeability is

a matter of federal law governed by the Bankruptcy Code, the "validity of a creditor's claim is

determined by rules of state law").

273.    The Court of Appeals for the Third Circuit also has recognized that the existence

and validity of claims in bankruptcy are dependent upon state law:

The crucial point to be made is that in the ordinary bankruptcy proceeding the great bulk of creditor claims are claims that have accrued under state law prior to bankruptcy—claims for goods sold, wages, rent, utilities and the like. "The word debt as used by the Act is not confined to the technical common law meaning . . . but it extends to liabilities arising out of breach of contract . . . to torts . . . and to taxes owing to the United States or state or local governments." 1 W. Collier on Bankruptcy ¶ 1.14 p. 88 (14th ed. 1976). Every such claim must be filed and its validity is subject to adjudication by the bankruptcy court. The existence and validity of such claims recurringly depends on state law. Hence, the bankruptcy law is constantly enmeshed in state law questions.

*In re Meyertech Corp.*, 831 F.2d 410,417–18 (3d Cir. 1987) (citations omitted). Similarly, this Court has itself recognized that "[t]he validity of a claim is determined by reference to the state law governing the substance of that claim and those state interests are analyzed no differently . . . than if the interested parties were not in bankruptcy." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 n.10 (Bankr. D. Del. 2006) (citations omitted).

274.    Therefore, state law governs in claims estimation proceedings. *See Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135, 138 (3d Cir. 1982) (in estimating a claim, the "bankruptcy court should be guided by the applicable state law" and is "bound by the legal rules which may govern the ultimate value of the claim"). This rule applies with no less force in the estimation of asbestos-related claims. *See, e.g.*, *Fed. Mogul*, 330 B.R. at 155 ("[T]he estimating court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. It is, after all, a general principle in bankruptcy law that, for bankruptcy purposes, state law governs the validity and amount of a claim.").

**Estimation must be based on tort system values**

275.    In the context of estimating the amount of the pending and future asbestos personal injury liability of a debtor, adherence to this principle of reliance on applicable non-

bankruptcy law requires that the estimation approximate as reliably as possible the likely

amounts that that debtor would, but for the bankruptcy, have had to pay to dispose of pending

and future asbestos personal injury claims against them in the tort system.  As made clear in

*Eagle-Picher,* the court is to estimate the dollar amount of the claims based upon the claimants'

"right to payment":

> The first step in the present estimation process requires that we state what it is that
> we are estimating.  The Bankruptcy Code at § 502( c) makes it clear that we are
> estimating claims, and the term "claim" is defined in the Bankruptcy Code at
> § 101(5)(A) for present purposes as a "right to payment."  And turning again to
> § 502(c)(1), it is "contingent or unliquidated" claims, the value of which we are
> estimating.  This is to be distinguished from estimating the value which claimants
> might take in satisfaction of their claims through some bankruptcy mechanism
> such as a trust of the sort provided for at§ 524(g), and as contemplated in the
> present plan.

*Eagle-Picher*, 189 B.R. at 683 (emphasis added).

276.    The approach utilized by the Court in *Eagle-Picher* for valuing asbestos personal

injury claims based upon the debtor's pre-petition claims history, as it existed in the tort system,

has been used in numerous other asbestos bankruptcy cases, including *Armstrong World

Industries*, *Owens Corning*, and *Fed. Mogul.  See, e.g.*, *In re Armstrong World Indus.*, 348 B.R.

111, 123 (D. Del. 2006) ("Because asbestos claims arise under state law, the claims must be

valued in accordance with substantive state tort law.  A court must therefore look at how a claim

would have been valued in the state court system had the debtor never entered bankruptcy.")

(citations omitted); *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (D. Del.

2005) ("This necessarily means that the claims are to be appraised on the basis of what would

have been a fair resolution of the claims in the absence of bankruptcy."); *see also Fed. Mogul*,

330 B.R. at 155–57.

277.    A debtor is not permitted to use its bankruptcy case to escape or discount its

liability under state tort law.  *See Butner*, 440 U.S. at 56 ("[T]he federal bankruptcy court should

take whatever steps are necessary to ensure that the [claimant] is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued."). Likewise, a bankruptcy court cannot use its equitable powers to impermissibly ignore state law and trample on the due process rights of claimants. *See U.S. v. Noland*, 517 U.S. 535, 541 (1996) ("Decisions about the treatment of categories of claims in bankruptcy proceedings . . . are not dictated or illuminated by principles of equity . . .") (citations omitted).

278.    Similarly, estimation is not the proper forum for raising merit based defenses. How claims ultimately may be resolved by a Section 524(g) trust should not impact the estimation process.  In *Owens Corning*, the U.S. District Court for the District of Delaware specifically rejected the argument that asbestos claims should be valued based on the amounts that may be paid by an asbestos trust post-bankruptcy and held that the value of asbestos-related claims is "necessarily" determined according to the state law that would apply had the debtor never entered bankruptcy. *See Owens Corning*, 322 B.R. at 721–22; *see also In re Fed. Mogul Global, Inc.,* 684 F.3d 355, 379-80 (3d Cir. 2012) (debtor's bankruptcy merely "shifted debtor's asbestos-related liabilities—based on events which had already occurred and for which the [debtor and its] insurers were already potentially responsible—to the post-confirmation trust"; the only alteration in liability risk was "perhaps, through the procedural shift that provides recovery through Trust Distribution Protocols rather than through the tort system. Significantly, those TDPs are mandated by Congress for asbestos trusts and must be approved by the bankruptcy court."); *Nat'l Union Fire Ins. Co. v. Porter Hayden Co.*, 408 B.R. 66, 71-74, 76 (D. Md. 2009) (debtor's legal liability to claimants arose from its tortious acts, independent of judicial determination or settlement, and was not negated by the bankruptcy; claimants should not be penalized because the claims are channeled to a trust).

279.    Section 524(g) of the Bankruptcy Code offers certainty and finality to asbestos defendants, but it does not entitle asbestos defendants to discounts.  The Third Circuit has made clear, bankruptcy does not alter a debtor's underlying liability for asbestos-related claims; rather, a bankruptcy under 524(g) merely "shift[s] [the] debtor's asbestos-related liabilities—based on events which had already occurred and for which the [debtor and its] insurers were already potentially responsible—to the post-confirmation trust."  *In re Fed. Mogul Global, Inc.,* 684 F.3d 355, 379–80 (3d Cir. 2012).  Third Circuit has reasoned that attempting to use a bankruptcy case as leverage to pressure a creditor to accede to liquidating his or her claim in an amount that is less than the amount at which the claim would be valued under non-bankruptcy law may be grounds for dismissing the bankruptcy case as a bad-faith filing.  *See Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),* 200 F.3d 154, 167 (3d Cir. 1999) (holding that the chapter 11 case was a bad-faith filing when, among other things, "[t]he plan's differing treatment of creditors suggests SGL Carbon's petition was not filed to reorganize the company but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms," and its "officers expressly and repeatedly acknowledged [the] Chapter 11 petition was filed solely to gain tactical litigation advantages").

280.    The most logical, indeed the only logical, "quantum of data" from which to estimate a debtor's liability to present and future asbestos personal injury claimants is the number and types of claims filed over that debtor's history of dealing with similar asbestos personal injury cases in the tort system, the share of those claims paid, and the amounts paid to resolve mesothelioma cases.  When estimating tort claims under § 502(c)(1), courts have recognized that verdicts and settlements indicate claims values reliably.  For example, courts have estimated a personal injury claim as equal in value to the nationwide average of unreduced

jury verdicts for similar injuries, *see, e.g.*, *In re Fed. Press Co.,* 116 B.R. 650, 654 (Bankr. N.D.

Ill. 1989), and have valued tort claims based on the value of settlements or the probability of

success. *See, e.g.*, *In re Farley, Inc.,* 146 B.R. 748, 752, 756 (Bankr. N.D. Ill. 1992) (court

estimated a claim based on its settlement value as calculated by multiplying the likely verdict by

the chance of success).

### No Individual Claim Resolved Through Estimation

281.    No individual claimant's claim is allowed or disallowed by this Court's

estimation.  No individual claimant is required to try his or her case to this Court, and no

individual plaintiff is required to provide expert witness reports and expert testimony necessary

to prove the merits of his or her case against one or more Debtors.  *See In re Fed. Mogul Global,*

*Inc.,* 330 B.R. 133, 154-155 (D. Del. 2005) (stating that estimation promotes the speed and

efficiency of the Bankruptcy code while not implicating procedural rights of individual

claimants).

### Established methodology in asbestos bankruptcy cases

282.    Because the Code is silent as to the manner in which estimations are to be

conducted, courts have substantial discretion in determining how to proceed.  *Bittner*, 691 F.2d at

135 ("Despite the lack of express direction on the matter, we are persuaded that Congress

intended the procedure to be undertaken initially by the bankruptcy judges, using whatever

method is best suited to the particular contingencies at issue."); *In re Lloyd E. Mitchell, Inc.*, 373

B.R. 416, 423 (Bankr. D. Md. 2007) ("Neither the Bankruptcy Code nor the Rules dictates any

method for estimating claims; estimation is therefore committed to the reasonable discretion of

the court as befits the circumstances of the case.").  Given the Court's substantial discretion in

this area, any alleged errors in the estimates themselves or in the methods for achieving such

estimates will generally be reviewed for an abuse of discretion only. *See In re Cont. Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993).

283.    Courts in the Third Circuit have, on several occasions, considered the manner in which estimation should be conducted in the context of an asbestos bankruptcy. Although the details involved in estimating the average value of asbestos personal injury claims and aggregate liability are complex, the basic propositions underlying the process are relatively simple: the estimated total asbestos personal injury liability of a debtor consists of the sum of (a) the estimated liability for claims pending but unresolved at the time of filing, plus, (b) the present value of the estimated liability for future claims, i.e., those that can be expected to be filed in the future. Over the years, experts have developed a methodology for applying these basic propositions to actual cases by drawing on the debtor's pre-petition experience, epidemiological projections of the incidence of asbestos-related cancers, and foreseeable trends and patterns in claiming behavior and settlement costs. "The challenge is to strike the proper balance between the two—the debtor's history and the probable changes in the litigation landscape—while keeping in mind the uncertainty of predicting how future claims would be resolved." *Armstrong*, 348 B.R. at 124; *see also id.* ("While it is true that '[t]o attempt an estimation without utilizing information known about these debtors and their history in the handling of claims which have been asserted against them in the past, and their disposition, is to ignore a valuable resource,' it is also true that 'adjustments should be made to historical values to account for … probable changes.'") (internal citations omitted).

284.    Estimation, as its name connotes, is not an exact science. *See Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Fed. Mogul Global, Inc.*), 330 B.R. 133, 155 (D. Del. 2005) ("[A]n estimation by definition, is an approximation and necessarily

involves comparing a known or established quantum of data to the thing being estimated."); *id.*

at 155 (stating that, "estimating future claims is more an imprecise art than a science, and that the

best anyone can do is try to find an estimate that is not unreasonable") (citation omitted); s*ee*

*also Bittner*, 691 F.2d at 135 (estimation requires only "sufficient evidence on which to base a

reasonable estimate").

285.    As the District Court has observed time after time, "since mathematical precision

cannot be achieved in the prediction being undertaken, it is important that we not pretend to have

achieved mathematical accuracy."  *Owens Corning*, 322 B.R. at 725; *see also id.* at 721 ("[W]e

are dealing with uncertainties, and are attempting to make predictions which are themselves

based upon predictions and assumptions."); *Armstrong*, 348 B.R. at 124 ("[T]he Court will not

seek to analyze the estimations before it for mathematical precision, nor will it attempt to reach

its own exact number.").  Instead, the Court's objective is "to assess the parties' experts'

estimations of the pending and future asbestos personal injury liability, and determine how well

these estimations incorporate historical factors and account for changed circumstances in the

asbestos litigation environment."  *Armstrong*, 348 B.R. at 124.

286.    The framework set forth by the court in *In re Eagle-Picher Industries, Inc.,* 189

B.R. 681, 682-83, 692 (Bankr. S.D. Ohio 1995), has proven to be a useful starting point.  The

*Eagle-Picher* court enumerated seven factors that should enter into an estimate of future claims:

1.  First, the estimate should be mainly based upon the history of the company.[19]
2.  Second, the total number of claims to be expected should be estimated.
3.  Third, the estimation of claims should categorize them by disease and occupation, as well as other factors.
4.  Fourth, evaluation of claims should be based upon settlement values for claims close to the filing date of the bankruptcy case.

---

[19]    "This consideration does not, however, rule out the desirability of considering trends general to the industry, particularly regarding the rate of filing of claims." *In re Eagle-Picher Indus.*, 189 B.R. at 690.

5. Fifth, a reasonable rate for indemnity increased with time must be determined so that a future value of filing date indemnity values can be comparable.

6. Sixth, a lagtime gleaned from the tort system must be determined in order that there is accuracy in projecting future values.

7. Seventh, a discount rate must be applied in order to bring the future nominal value of claims back to the filing date.

*See id.* at 690-91.

### Discounting estimation to present value

287.     Courts have consistently adopted a discount rate on the "best and safest investments" in the tort context.  *See, e.g., Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983) (holding that workers' compensation claimant is "entitled to a *risk-free* stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default.") (emphasis added); *In re E. & S. Dist. Asbestos Litig.*, 772 F. Supp. 1380, 1410–11 (E.D.N.Y & S.D.N.Y. 1991) (applying risk-free discount rate to calculate present value of future damages as directed by Second Circuit precedent and *Jones & Laughlin Steel Corp.*) ("[The rate the Court decided on] takes into account the long-term historical and current interest rates less inflation rates to show probable net earnings *on the most conservative investments.*") (emphasis added), *aff'd and rev'd in part on other grounds sub nom In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992).[20]

---

[20]     In the bankruptcy context, the United States District Court for Delaware has adopted the "risk-free" standard and use of the Treasury Bond rate.  *In re CM Holdings, Inc*., 254 B.R. 578, 630 (D. Del. 2000) ("[T]he minimum discount rate should be the rate of interest earned on 'the best and safest investments.' The thirty-year term Treasury Bond rate qualifies as one of the best and safest investments.") (internal citations omitted); *cf. also In re Kellogg Square P'ship.*, 160 B.R. 343, 363 (Bankr. D. Minn. 1993), (reorganization plan proponent must "identify a rate of interest that could be earned on a *risk-free* investment, such as that currently paid on a United States treasury bond of like term"); *cf. also Robichaud v. Theis*, 858 F.2d 392, 396-97 (8th Cir. 1988) (affirming utilization of risk-free discount rate tied to United States government bonds in personal injury action).

288.    Context is significant when using discount rates:  "Courts generally have adopted *lower rates* for discounting *mass tort claims* to be paid over time from a trust."  Gregory M. Gordon et al., *Present Value Discounting of Claims in Bankruptcy*, 17 J. Bankr. L. & Prac. 1 Art. 2, 14 (2008) (emphasis added).

289.    Numerous courts have endorsed the principle that a "risk-free" discount rate is the appropriate means by which to calculate the present value of future asbestos liabilities estimated pursuant to section 502(c) of the Bankruptcy Code.  *See, e.g., Eagle-Picher*, 189 B.R. at 692 (accepting testimony of experts and employing discount rate that experts "understood ... to approximate the current risk-free discount rate"); *In re Fed. Mogul Global, Inc.*, 330 B.R. at 164 (concluding that "the estimate should reflect [the relevant U.S. Treasury discount rate] and also come to some middle ground as to each expert's adjustment for inflation," where experts on both sides used risk-free discount factors); *see also Armstrong World Indus.*, 348 B.R. at 126 n. 20 (adopting the parties' agreed upon discount rate, where experts on both sides had used U.S. Treasury bond rates for their respective calculations of the present value of asbestos liabilities).

B.      **Conclusions as to Debtors' Liability**

**Chrysotile and market share defenses rejected**

290.    Debtors' two medical/science experts Dr. Alan Feingold (a medical doctor) and Kim Anderson, Ph.D. (a toxicologist) provide no basis for the Court to change or reduce its estimate of Bondex's asbestos liability.   Dr. Feingold and Dr. Anderson's opinions, boiled down to their essence, are that over 90 percent of the mesothelioma claims of Bondex plaintiffs are "not medically compensable" based in large part on their long held opinions that chrysotile asbestos cannot cause mesothelioma in humans except in extreme circumstances and that the amount and type of chrysotile asbestos exposures from joint compound work cannot possibly be high enough to cause or contribute to causing mesothelioma.

-94-

291.    The Committee's experts generally, and Dr. Welch specifically, persuasively rebutted the opinions of Drs. Feingold and Anderson.  The Committee's experts testified to the following opinions, which are well supported by a voluminous body of scientific literature: (a) chrysotile asbestos (the type of asbestos used in Bondex's joint compound products) causes mesothelioma; (b) there is no safe level of exposure to any type of asbestos, including chrysotile; (c) that exposures to asbestos that are as brief as a few days can cause mesothelioma; (e) the medical and industrial hygiene literature demonstrates that asbestos exposures from using joint compound result in both the users and any bystanders in the vicinity breathing millions of asbestos fibers in a few hours, which is at levels thousands of times higher than what is found in "background ambient air"; and (f) asbestos containing joint compound has been banned by the United States Government because it determined that exposures from this product as brief as a few days pose an unacceptable risk of cancer.  *See generally* 1/10/13 Hr'g Tr. 16:24-40:12 (Welch); 1/9/13 Hr'g Tr. 147:24-154:12, 167:6-169:7, 170:21-173:19 (Raterman); 1/9/13 Hr'g Tr. 206:4-207:25, 215:2-216:14 (Brody).

292.    Contrary to what Debtors have suggested in this case, there are no "new" developments in the medical or scientific literature since Bondex went into bankruptcy that would support the opinions of Drs. Feingold or Anderson or make the defense of a chrysotile asbestos containing joint compound case any easier.   In fact, the opposite is true.  The Committee's experts described, or the Debtors' experts acknowledged, that several publications from widely respected scientific organizations, which have appeared in the literature since Bondex went into bankruptcy, conclude unequivocally that chrysotile asbestos causes mesothelioma.  These publications include: a 2011, peer-reviewed paper published in Annals of Epidemiology, in which the author reviewed the epidemiology for cohorts of workers exposed

entirely or almost entirely to chrysotile asbestos and concluded that there are numerous

occupational epidemiology and registry and case studies clearly linking all types of asbestos,

including chrysotile, to pleural and peritoneal mesothelioma.  1/10/13 Hr'g Tr. 77:23-78:23

(Welch); *see* ACC/FCR Demonstratives 1016 and 1016A.

293.    In early 2012, the IARC, which is the arm of the World Health Organization

devoted to researching the causes of cancer, published a comprehensive review of the world-

wide literature related to asbestos.  1/9/13 Hr'g Tr. 113:11-114:17 (Anderson); 1/8/13 Hr'g Tr.

105:11-108:5 (Feingold).  IARC concluded, as it has in the past, that epidemiological as well as

other types of medical literature demonstrate that chrysotile asbestos causes mesothelioma in

humans.  1/8/13 Hr'g Tr. 105:11-108:5 (Feingold); s*ee also* ACC/FCR Demonstrative 1009.

294.    In June of 2012, numerous Epidemiology Societies from around the world

published a Position Statement on Asbestos, in which they concluded "[n]umerous well-

respected international and national scientific organizations, through an impartial and rigorous

process of deliberation and evaluation, have concluded that all forms of asbestos are capable of

inducing mesothelioma, lung cancer, asbestosis and other diseases.  These conclusions are based

on the full body of evidence, including the epidemiology, toxicology, industrial hygiene,

biology, pathology, and other related literature published at the time of the respective

evaluations."  1/8/13 Hr'g Tr. 112:5-13 (Feingold).  The Epidemiology Societies went on to

state, "more broadly, evidence from other scientific disciplines also demonstrates that chrysotile

alone causes not only lung cancers (and asbestosis), but also pleural and peritoneal

mesothelioma.  All forms of study – electron microscopy, biological assessments, inhalation

toxicology, and autopsies – indicate that chrysotile, uncontaminated with amphiboles, causes

mesothelioma in both animals and humans."  1/8/13 Hr'g Tr. 113:9-15 (Feingold).

295.    As discussed above at the beginning of the Section of the Court's Findings of Fact concerning the Medical and Scientific Evidence, this is a proceeding to estimate the total liability Bondex faces for pending and future asbestos personal injury cases, not for the Court to decide which set of medical/science experts are correct on the key issues of whether exposure to asbestos from Bondex's asbestos containing joint compound products can cause or contribute to causing mesothelioma.  The medical/scientific issues disputed by the parties here was an issue in virtually every mesothelioma case Bondex ever faced as a defendant in the tort system.  When these issues were tried to a jury, sometimes the jury found in favor of Bondex, and other times in favor of the plaintiff, 1/8/13 Hr'g Tr. 117:17-118:10 (Feingold); 1/10/13 Hr'g Tr. 100:11-101:4, 118:25-119:12 (Iola), but in the vast majority of cases the parties resolved the dispute by settlement long before a verdict was possible.  1/10/13 Hr'g Tr. 199:15-200:23 (Peterson); 1/7/13 Hr'g Tr. 87:20-89:18 (Tompkins).  Based on the uncontradicted testimony of Mr. Simon and Mr. Iola, plaintiffs' attorneys with extensive experience trying cases against and settling cases with Bondex when it was an active defendant in the tort system, the Court finds that the medical/science dispute at the center of every Bondex mesothelioma case was already something the lawyers on both sides were well aware of and took into account in deciding whether and at what price to resolve cases.  1/10/13 Hr'g Tr. 87:9-90:15 (Iola); 1/10/13 Hr'g Tr. 141:1-142:1 (Simon).  Mr. Iola and Mr. Simon each testified without contradiction that the expert opinions proffered by the Debtors on the chrysotile issue in this bankruptcy proceeding were essentially the same expert testimony the Debtors used to defend themselves in the tort system.  1/10/13 Hr'g Tr. 87:9-90:15 (Iola); 1/10/13 Hr'g Tr. 141:1-142:1 (Simon).  Dr. Feingold and Dr. Anderson were regularly retained by Bondex and still are regularly proffered by other joint compound defendants dozens of times a year to testify to exactly the same opinions they offered

here.  1/8/13 Hr'g Tr. 92:6-97:23, 117:3-12 (Feingold); 1/9/13 Hr'g Tr. 97:24-100:11

(Anderson); 1/10/13 Hr'g Tr. 89:3-90:6 (Iola); 1/10/13 Hr'g Tr. 141:19-142:1 (Simon).  Their

opinions on these topics were and are hotly disputed by plaintiffs' experts in every case that goes

to trial, as they were by the Committee's medical/science experts here, except that in a jury trial

in the tort system the plaintiff's experts would testify first, instead of in response to the

defendant's experts as was the case here.

296.    If the Court were called upon to decide the question of whether exposure to

asbestos from Bondex's asbestos containing joint compound products can cause or contribute to

causing mesothelioma, the Court would conclude that it does.  The Court credits the testimony of

Dr. Welch, Dr. Brody, and Ms. Raterman on these issues over the testimony of Dr. Feingold and

Dr. Anderson.  Dr. Welch, Dr. Brody, and Ms. Raterman are far better credentialed in the area of

asbestos and the causation of asbestos diseases generally, and mesothelioma specifically than are

the Debtors' experts – just by way of comparison Dr. Welch and Dr. Brody have dozens of peer

reviewed publications relating to asbestos as compared to Dr. Anderson's two publications and

Dr. Feingold's none.  And, as noted above, the literature supporting the view that chrysotile

asbestos causes mesothelioma is extensive, 1/10/13 Hr'g Tr. 16:12-21:12 (Welch), and every

scientific organization that has studied the issue has concluded that there is a causal relationship

between chrysotile asbestos and mesothelioma.  1/9/13 Hr'g Tr. 112:16-113:6 (Anderson).  In

the world outside of the courtroom, the United States government has determined that asbestos

containing joint compound is so dangerous, even if only used a few times a year, that it banned

the product in 1978.  1/9/13 Hr'g Tr. 170:21-173:15 (Raterman).

297.    In summary, none of the evidence or opinions of Bondex's "medical/science"

experts provide any basis for this Court to discount or reduce its estimate of Bondex's aggregate

asbestos liability.  The Court rejects Dr. Feingold and Dr. Anderson's chrysotile asbestos defense.  This theory provides no basis by which the Court may reduce its estimate of the Debtors' asbestos liability.  Dr. Feingold's and Dr. Anderson's theory that chrysotile asbestos cannot be concentrated enough to cause mesothelioma and that mesothelioma claims against Bondex are therefore not medically compensable is, at best, a debatable question of fact and, at worst, a blatantly erroneous attempt to avoid liability.  The record shows that this theory is not well supported and is already factored into the valuation of claims against the Debtors' in the tort system.  It was repeatedly asserted by the Debtors, Dr. Feingold, and Dr. Anderson in the tort system and was therefore factored into case valuation by parties in the tort system.  Since that time, the theory has only become more medically questionable.  In summary, none of the evidence or opinions of the Debtors' "medical/science" experts provide any basis for this Court to discount their aggregate asbestos liability as a matter of law.

298.    The Court also rejects the market-share defense offered by the Debtors as irrelevant to the estimation inquiry because estimation requires valuing the claims based on what their values would have been in the tort system.  Courts in the tort system have consistently rejected the use of a market share theory of liability in the context of asbestos litigation because even a defendant with a relatively small market share could be liable for a large portion of a plaintiff's damages.  *See, e.g., Starling v. Seaboard Coast Line R.R.*, 533 F. Supp. 183, 190-91 (S.D. Ga. 1982) (denying recognition of market share theory in asbestos litigation context because of lack of "correspondence between the total volume of asbestos produced and the injury caused.").

299.    The Debtors' market share argument also falls short because it makes no attempt to reconcile the Debtors' allegedly small market share with the high frequency with which the

Debtors were named as defendants.  Dr. Martin, the Debtors' market share expert witness, admitted that she did not conduct an analysis of how many people were exposed to Bondex products but conceded that over 40 million people could have been exposed to Bondex Joint Compound.  1/7/13 Hr'g Tr. 190:8-191:2 (Martin).

300.    Furthermore, the Debtor's market share position was considered by parties in reaching settlement agreements in the tort system and is, therefore, already included in the valuation of claims to which the Court must look.  The record before the Court therefore contradicts this theory and shows that it is already factored into the valuation of claims against the Debtors in the tort system.  For all of these reasons, the Court finds no support in the Debtors' market share argument to discount their aggregate asbestos liability as a matter of law.

### Conclusions as to Experts' Liability Estimates

*Mullin's implicit liability and several share rejected*

301.    For the reasons detailed in the Findings of Fact, this Court rejects Dr. Mullin's implicit defense cost methodology.  The Debtors' contention that their "true" liability must be reduced because each historical settlement includes "implicit defense costs" that must be subtracted out from those settlement values is not supported by the record before the Court.  The factors that the Debtors point to in support of their implicit defense cost theory were all considered by parties in the tort system and reflected in the settlements reached which were arm's-length transactions made in good faith.

302.    The Debtors' estimation methodology is also contrary to the unbroken precedent developed by the long line of bankruptcy, district and appellate courts that have addressed the issue of how a court must estimate future asbestos personal injury claims.  The case law is clear that, for estimation purposes, a court must "look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy."  *In re Armstrong World Indus.*, 348

B.R. 111, 123 (D. Del. 2006) (citing *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 721 (D. Del. 2005)); *see also Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Federal-Mogul Global Inc.)*, 330 B.R. 133, 155–57 (D. Del. 2005); *In re W.R. Grace & Co.*, 346 B.R. 672, 674 n.10 (Bankr. D. Del. 2006) (citations omitted); *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 683 (Bankr. S.D. Ohio 1995).  As this Court has recognized, "[t]he validity of a claim is determined by reference to the state law governing the substance of that claim and those state interests are analyzed no differently . . . than if the interested parties were not in bankruptcy."  *In re W.R. Grace & Co.*, 346 B.R. at 674 n.10 (citations omitted).  To accept the Debtors' novel approach requires nothing less than the wholesale rejection of these precedents and the Debtors' own history.  The Court refuses to engage in such an unsupported departure from well-established precedent.  The Court cannot as a matter of law disaggregate the amounts the Debtors paid as settlements into amounts reflecting implicit defense costs and true liabilities consistent with the legal requirement that claims be valued in an estimation proceeding consistent with the realities of the tort system.

303.    Similarly, the Court rejects Dr. Mullin's several-share methodology.  Like the implicit defense cost theory, the Debtors' several share theory ignores the reality of the tort system and the Court's mandate to estimate claims as they would be valued in the tort system.  It also ignores the Debtors' own settlement agreements, which expressly state that those settlements reflect Bondex's *several* share of liability in those cases.

304.    Furthermore, the Court rejects Dr. Mullin's unfounded criticism of Dr. Peterson's and Dr. Vasquez's methodologies.  Dr. Mullin's criticism stems from a flawed assumption that the Court should estimate claims based on something other than their value had the Debtors

remained in the tort system.  But this is exactly the value that the Court must attribute to the

claims.  The Court therefore rejects Dr. Mullin's criticism of Dr. Peterson and Dr. Vasquez,

which amounts to little more than a rehashing of Dr. Mullin's own flawed theories.

### Vasquez and Peterson adopted

305.    The Court rejects the assumptions which underlie Dr. Mullin's estimates in this

matter and instead credits the testimony of Dr. Vasquez and Dr. Peterson.  In sum, the Court

finds each of Dr. Vasquez and Dr. Peterson to be more credible witnesses than Dr. Mullin.  Dr.

Vasquez's and Dr. Peterson's extensive experience and methodology are more persuasive, and

their estimations are likely to be the most accurate.  Moreover, Dr. Vasquez's and Dr. Peterson's

use of a methodology grounded in the Debtors' history has been applied and accepted in several

legal proceedings involving debtors that, like those here, faced thousands of asbestos personal

injury claims.  *See* paras 200 and 217 *supra*.  Dr. Vasquez's and Dr. Peterson's application of

similar methodologies produced results that are consistent with one another and with recent

asbestos bankruptcy experience.

306.    Given that mathematical precision is impossible, the Court agrees that both Dr.

Vasquez's and Dr. Peterson's estimates of the Debtors' asbestos liability are reasonable and

concludes that the Debtors' asbestos liability is likely to be between $1.6 billion and $1.841

billion nominal value and between $1.1 billion and $1.255 billion net present value.

### C.    <u>Conclusions Regarding Appropriate Discount Rate</u>

307.    Consistent with the principles of the case law cited above, the experts for the

Committee and FCR each elected the applicable yield on U.S. Treasury debt, commonly referred

to as the "risk-free rate," to calculate the present value of the Debtors' estimated future asbestos

liabilities.  The Debtors' expert, on the other hand, used higher discount rates based on SPHC's

"weighted average cost of capital" and the median pension return.

308.    The WACC is based on the company's cost of debt and cost of equity along with the appropriate weighting of each in the context of a company's capital structure.  The riskier a company, the higher the required rate of return investors will demand in order to make an investment in a particular company.  While WACC is meant to reflect the risk of a particular company, it has nothing to do with the present value of a future stream of asbestos liabilities.  Since the WACC is a very company-specific rate of return, it is frequently used to discount future projected cash flows to a present value in order to estimate the firm's enterprise value on a debt-free basis.  However, the WACC is not used to determine liabilities and therefore the 8.2% WACC discount rate asserted by Debtors is not appropriate here.

309.    The discount rate is not the proper means to address any risk associated with the accuracy of the estimates.  The Debtors' inclusion of a risk factor concerning the possibility that the estimates are too low actually biases the present value analysis in favor of the assumption that the estimates are too high and impermissibly shifts the risk of loss on future investments to the asbestos claimants.  Debtors' Post-Trial Brief at p. 54; *see also* 1/8/13 Hr'g Tr. 15:16-19 (Coleman); 1/11/13 Hr'g Tr. 68:14-16 (Braun).

310.    With respect to the median pension return rate, that rate also involves several ancillary risks that are additive to and distort the simple measurement of the time value of money.  The use of a median pension return rate or "prudent investor" rate impermissibly shifts the risk of loss to the beneficiaries of a trust.  *See, e.g., In re U.S. Airways Group, Inc.*, 303 B.R. 784, 798 (Bankr. E.D. Va. 2003) (Court rejected application of the reasonably prudent investor rate because "the use of a 'prudent investor' rate impermissibly shifts the risk of loss from adverse stock market performance--such as led to the termination of the [pension plan] in the first instance--to the retirees.").  Moreover, the Debtors' own expert testified that he believes the

median pension return rate is not appropriate here and that he only calculated that rate at the suggestion of Debtors' counsel. 1/8/13 Hr'g Tr. at 16:3-17:5 (Coleman). Consequently, the alternative 5.5% median pension return rate asserted by the Debtors is also not appropriate here.

311.    Based on the foregoing, the risk-free rate of return is the only appropriate discount rate to calculate the present value of the Debtors' asbestos liabilities because it reflects the time value of money as of the Petition Date. The use of any rate other than the risk-free rate is inappropriate because doing so improperly introduces additional risks that are different from and additive to the fundamental time value of money consideration. The Committee's and FCR's estimation experts each used a risk-free discount rate – Dr. Peterson used 3.70% and Dr. Vasquez used 3.45%. The difference between the two is not significant.

## III.    CONCLUSION

For the reasons set forth herein, this Court estimates that the Debtors' present and future liabilities arising from asbestos personal injury claims is between $1.6 billion and $1.841 billion nominal value and between $1.1 billion and $1.255 billion net present value.

An appropriate Judgment and Order will issue.

_____

UNITED STATES BANKRUPTCY JUDGE