## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPECIALTY PRODUCTS HOLDING CORP., *et al.*,[1] | Case No. 10-11780 (JKF) |
| Debtors. | Jointly Administered |

### THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS' AND FUTURE CLAIMANTS' REPRESENTATIVE'S JOINT POST-HEARING REPLY BRIEF ON ESTIMATING THE VALUE <u>OF ASBESTOS PERSONAL INJURY CLAIMS AGAINST THE DEBTORS</u>

Dated: February 22, 2013
       Wilmington, Delaware

MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
Natalie D. Ramsey (No. 5378)
Davis Lee Wright (No. 4324)
1105 North Market Street, Suite 1500
Wilmington, DE 19801
(302) 504-7800

-and-

Mark B. Sheppard (admitted pro hac vice)
Lathrop B. Nelson, III (admitted pro hac vice)
123 South Broad Street, 24th floor
Philadelphia, PA 19109
(215) 772-1500

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Specialty Products Holding Corp. (0857) and Bondex International, Inc. (4125). The Debtors' address is 4515 St. Clair Avenue, Cleveland, Ohio 44103.

-and-

MOTLEY RICE, LLC
Nathan D. Finch (admitted pro hac vice)
1000 Potomac Street, Suite 150
Washington, DC 20007
(202) 232-5507

*Counsel to the Official Committee of*
*Asbestos Personal Injury Claimants*

-and-

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
John T. Dorsey (No. 2988)
Edwin J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600

*Counsel to Eric D. Green, the Future Claimants'*
*Representative*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ........................................................................................ 4

I.  Well-Established Legal Standards Dictate Only One Result. ............................................ 4

    A.  An Estimate Based on the Debtors' Proposed Methodologies Would Disregard Established Precedent and Treat Claimants Unfairly...................................................... 5

    B.  An Estimate That Discounts Liability, Assigns Zero Value to Claims, or Otherwise Fixes Liability Would Be Improper............................................................. 11

II  The Debtors Fail in Their Attempts to Discredit Drs. Vasquez and Peterson and Further Demonstrate the Flaws in Dr. Mullin's Approach. .............................................. 13

    A.  The Debtors' Criticisms of Dr. Vasquez Are Unfounded and Should Be Rejected................................................................................................................. 13

        1.  Dr. Vasquez appropriately calculated the Debtors' 2010 claims count...................... 13

        2.  Dr. Vasquez utilized appropriate calibration periods. .................................................. 17

        3.  Dr. Vasquez appropriately relied on the Peto epidemiological model. ...................... 19

        4.  Dr. Vasquez appropriately considered abandoned claims. ......................................... 21

    B.  The Debtors' Criticisms of Dr. Peterson Are Unfounded and Should Be Rejected................................................................................................................. 23

        1.  Dr. Peterson appropriately considered abandoned claims. ......................................... 23

        2.  Dr. Peterson exercised seasoned judgment in selecting his calibration periods......... 24

        3.  Dr. Peterson's propensity to sue forecast is a conservative estimate of the debtors' historical propensity to sue. ........................................................................ 26

        4.  Dr. Peterson's forecast is unchanged by the increasing age of claimants.**Error! Bookmark not defin**

    C.  Dr. Mullin's Estimate Is Fatally Flawed. ........................**Error! Bookmark not defined.**

        1.  Neither Dr. Mullin's "starting point" extrapolation nor his "New Forecast" applies the well-accepted standard methodology employed by the Claimants' Representatives' experts—instead his estimates are improper mathematical manipulations............................................................................................................. 26

        2.  Dr. Mullin's estimate is inconsistent with the facts.................................................... 32

    D.  The Debtors' Use of THAN Trust Data Has No Relevance to Estimation.................... 36

III. Both as a Matter of Law and Based on the Record Before this Court, There is No Basis for This Court to Find that the Debtors Have No Liability for Claims Arising from Products Manufactured and Sold by Reardon. ......................................................... 38

   A.  This Court Does Not Have Jurisdiction to Grant the Dispositive Relief Sought By the Debtors. ................................................................................................... 39

   B.  The Dispositive Relief Sought by the Debtors Can Only Be Adjudicated in the Context of an Adversary Proceeding. ........................................................... 41

   C.  Even if this Court Had Jurisdiction to Grant the Dispositive Relief Sought, the Debtors Failed to Present Sufficient Evidence Upon Which this Court Can Determine the Validity of Excluding Certain Claims from Estimation. ........................ 42

      1.  The methodology Dr. Mullin used to calculate "Reardon-era" claims is unreliable. ................................................................................................... 43

      2.  The Debtors' choice of law analysis is inapplicable to an estimation of their aggregate asbestos liabilities. ................................................................... 43

      3.  The Ohio statute is an unconstitutional impairment of claimants' rights. .................. 45

IV. Both as a Matter of Law and Based on the Record Before this Court, There Is No Basis for this Court to Find that SPHC Is Not Liable for Claims that Allege Exposure After 1972. ..................................................................................................... 46

   A.  This Court Does Not Have Jurisdiction to Grant the Dispositive Relief Sought By the Debtors. ................................................................................................... 47

   B.  The Dispositive Relief Sought by the Debtors Can Only Be Adjudicated in the Context of an Adversary Proceeding. ........................................................... 48

   C.  Even if this Court Had Jurisdiction to Grant the Relief Sought, the Debtors Failed to Present Sufficient Evidence for this Court to Separately Estimate the Liability of the Debtors. ............................................................................... 49

   D.  Allocation of the Separate "Eras" of Liability Will Not Aid in the Formulation of a Plan. ................................................................................................... 51

V.  The Debtors' Medical Science Arguments Are Irrelevant and Have No Merit ................ 52

   A.  Dr. Anderson's and Dr. Feingold's Testimony Is Irrelevant to Estimation and the Court Should Exclude It ......................................................................... 52

   B.  The Debtors' Medical Science Arguments Are Fundamentally Flawed ........................ 53

      1.  Proposition One:  Feingold/Anderson v. Welch/Brody/Ratterman ............................ 54

      2.  Proposition Two:  Review of the PIQs by Drs. Feingold and Anderson .................... 56

      3.  Proposition Three: that the medical science defense should affect the estimation experts ................................................................................... 57

4.    Proposition Four: The relevant case law has changed or is changing ........................ 58

VI.  The Appropriate Discount Rate Is the Risk-Free Rate ....................................................... 59

CONCLUSION ......................................................................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Optical Corp. v. Spiewak*,
  73 So. 3d 120 ....................................................................................................45

*Berger v. Amchem Prods.*,
  818 N.Y.S. 2d 754 (N.Y. Sup. Ct. 2006) ...........................................................58

*Betz v. Pneumo Abex, LLC*,
  44 A.3d 27 (Pa. 2012) .......................................................................................59

*Bondex Int'l, Inc. v. Hartford Accident and Indemnity Co., et al.*,
  Nos. 08-4735 (6th Cir.) ......................................................................................34

*Butner v. United States*,
  440 U.S. 48 (1979) ...............................................................................................9

*Crawford v. Riley (In re Wolverine, Proctor & Schwartz, LLC)*,
  436 B.R. 253, 262 (D. Mass. 2010) ...................................................................62

*Dadisman v. Moore*,
  384 S.E.2d 816 (W. Va. 1989) ...........................................................................64

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ...........................................................................................52

*Dixon v. Ford Motor Co.*,
  47 A.3d 1038 (Md. Ct. Spec. App. 2012) ..........................................................59

*Dugan v. Pension Ben. Guar. Corp. (In re Rhodes, Inc.)*,
  382 B.R. 550, 560 (Bankr. N.D. Ga. 2008) ........................................................62

*Ford Motor Co. v. Boomer*,
  2013 Va. LEXIS 6 (Va. 2013) ...........................................................................59

*G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.)*,
  No. 02-3626, 2005 WL 1719224 (D.N.J. July 6, 2005) ................................ passim

*Georgia-Pacific, LLC v. Farrar*,
  53 A.3d 424 (Md. Ct. Spec. App. 2012) ............................................................59

*Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.)*,
  333 B.R. 251 (Bankr. W.D. Pa. 2005) (Fitzgerald, J.)........................................44

*Ieropoli v. AC&S Corp.*,
  842 A.2d 919 (Pa. 2004) ....................................................................................45

*In re American Classic Voyages, Co.*,
   367 B.R. 500 (Bankr. D. Del. 2007) ...................................................................60

*In re Armstrong World Indus.*,
   348 B.R. 111 (D. Del. 2006) ...............................................................5, 6, 20, 60

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)...................................................................4, 5, 8, 46

*In re Eagle-Picher Indus.*,
   189 B.R. 681 (Bankr. S.D. Ohio 1995)..........................................................11, 60

*In re Eagle-Picher Indus.*,
   No. MS-1-96-228, 1996 U.S. Dist. LEXIS 17160 (S.D. Ohio Nov. 18, 1996) ...................5, 10

*In re Exide Technologies*,
   303 B.R. 48 (Bankr. D. Del. 2003) ....................................................................60

*In re Farley, Inc.*,
   146 B.R. 748 (Bankr. N.D. Ill. 1992) ............................................................ passim

*In re Federal-Mogul Global Inc.*,
   330 B.R. 133 (D. Del. 2005)..................................................................3, 5, 7, 13

*In re Federal-Mogul Global, Inc.*,
   684 F.3d 355 (3d Cir. 2012)............................................................................8, 46

*In re Federal-Mogul Global, Inc.*,
   C.A. No. 05-59 (JHR), 2005 U.S. Dist LEXIS 17569 (D. Del. Aug. 19, 2005).....................60

*In re G-I Holdings, Inc.*,
   323 B.R. 583 (Bankr. D.N.J. 2005) ...................................................................12

*In re Grossman's Inc.*,
   607 F.3d 114 (3d Cir. 2010).............................................................................45

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) .................................................................10

*In re Keene Corp.*,
   No. 93 B 46090 (SMB), slip op. (Bankr. S.D.N.Y. June 12, 1996) ...........................10

*In re Poole Funeral Chapel*,
   63 B.R. 527 (Bankr. N.D. Ala. 1986) ...............................................................40

*In re U.S. Airways Group, Inc.*,
   303 B.R. 784 (Bankr. E.D. Va. 2003)............................................................61, 62

*In re USG Corp.*,
   290 B.R. 223 (Bankr. D. Del. 2003) ................................................................12

*In re W.R. Grace & Co.*,
   355 B.R. 462 (Bankr. D. Del. 2006) ................................................................12

*In re Wallace's Bookstores, Inc.*,
   317 B.R. 720 (Bankr. E.D. Ky. 2004) ..............................................................12

*Jones & Laughlin Steel Corp. v. Pfeifer*,
   462 U.S. 523 (1983) ........................................................................................60

*Kosa v. Treasurer of the State of Mich.*,
   292 N.W.2d 452 (Mich. 1980) ........................................................................64

*Larson v. Bondex Int'l*,
   Case No. 09-69123, 2010 U.S. Dist. LEXIS 123090 (E.D. Pa., Nov. 15, 2010) ....................58

*Larson v. Bondex Int'l*,
   Case No. 2:08-CV-333 TS (D. Utah, July 21, 2011) ........................................58

*LTV Corp. v. Pension Benefit Guar. Corp. (In re Chateaugay Corp.)*,
   126 B.R. 165 (Bankr. S.D.N.Y. 1991), *vacated, op. withdrawn sub nom. LTV Corp. v.
   PBGC*, 1993 U.S. Dist. LEXIS 21409 (S.D.N.Y. June 16, 1993) ......................61

*Mavroudis v. Pittsburgh-Corning Corp.*,
   935 P.2d 684 (Wash. 1997) ..............................................................................58

*McAskill v. American Marine Holding Co.*,
   9 So. 3d 264 ....................................................................................................58

*Official Asbestos Claimants' Comm. v. Babcock & Wilcox Co. (In re Babcock & Wilcox
   Co.)*,
   274 B.R. 230 (Bankr. E.D. La. 2002) ..............................................................20

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200
   F.3d 154 (3d Cir. 1999) ....................................................................................8

*Ohio ex. Rel. A.J. Rose Mfr.*,
   No. 11AP-379, 2012 WL 4364274 (Ohio Co. App. Sept. 25, 2002) ..................45

*Owens Corning v. Credit Suisse First Boston*,
   322 B.R. 719 (D. Del. 2005) .................................................................... passim

*Parks v. Visteon Corp. (In re Visteon Corp.)*,
   2011 U.S. Dist. LEXIS 49302 (D. Del. May 9, 2011) ..................................11, 40

*Pension Benefit Guar. Corp. v. Belfance (In re CSC Indus. Inc.)*,
    232 F.3d 505 (6th Cir. 2000) .................................................................61

*Pension Benefit Guar. Corp. v. CF&I Fabricators of Utah (In re CF&I Fabricators of*
    *Utah)*, 150 F.3d 1293 (10th Cir. 1998) ....................................................61

*Public Sch. Ret. Sys. of Mo. v. State St. Bank & Trust Co.*,
    640 F.3d 821 (8th Cir. 2011) ...............................................................64

*Robinson v. Crown Cork & Seal Co.*,
    335 S.W.3d 126 (Tex. 2010).................................................................45

*Rutherford v. Owens-Illinois, Inc.*,
    941 P.2d 1203 (Cal. 1997) ...................................................................58

*Schumacher v. Amtico,*
    C.A. No. 2:10-1627 (E.D. Pa. Nov. 2, 2010).............................................58

*Sheffield v. Owens-Corning Fiberglass Corp.*,
    595 So.2d 443 (Ala. 1992) ...................................................................58

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
    530 F.3d 230 (3d Cir. 2008).................................................................48

*Spaur v. Owens-Corning Fiber Glass Corp.*,
    510 N.W.2d 854 (Iowa 1994) ...............................................................58

*Thacker v. UNR Industries, Inc.*,
    603 N.E.2d 449 (Ill. 1992) ...................................................................58

*UNR Indus., Inc. v. Cont'l Ins. Co.*,
    101 B.R. 524 (N.D. Ill. 1989) ...............................................................40

*Valdes v. Cory,*
    189 Cal. Rptr. 212 (Cal. Ct. App. 1983) ..................................................65

*Weaver v. Evans,*
    495 P.2d 639 (Wash. 1972)...................................................................64

## STATUTES

11 U.S.C. § 502(c) ....................................................................13, 60

28 U.S.C. § 157(b)(2)(B) ...........................................................11, 40, 47

28 U.S.C. § 157(b)(2)(O)..................................................................11

28 U.S.C. § 157(b)(5) .................................................................. passim

28 U.S.C. § 2201 .................................................................................................................39, 46

**RULES**

Fed. R. Bankr. P. 3007(b) .............................................................................................................48

Fed. R. Bankr. P. 7001(9) .............................................................................................................48

## PRELIMINARY STATEMENT[2]

The Debtors' opening estimation brief strums the same chords they have been playing

since filing for bankruptcy.  Because the Debtors contend that the tort system has been unfair to

them, they ask this Court to "shape" what they term as their "actual liability."  That is, the

Debtors seek to have this Court supplant their actual historical settlement and trial values with

fictional values determined by, *inter alia*, selectively excluding large portions of the Debtors'

historical claims and artificially deflating the settlement values actually paid to resolve those

claims.  In so doing, they continue in their attempt to achieve in this bankruptcy the massive

reduction of their asbestos liabilities that had proven to be impossible in the tort system.  None of

their efforts to manipulate the estimation of their liabilities serves the purposes of section 524(g).

Drs. Vasquez and Peterson provided the only reliable, credible evidence of the Debtors'

aggregate present and future asbestos liability.  Grounded in the Debtors' actual experience and

conduct in the tort system and informed by years of experience in estimating asbestos liability,

the Claimants' estimation experts applied techniques uniformly accepted by the courts.

In stark contrast, the Debtors offered a fictional, litigation-driven methodology that

results in an estimate of the Debtors' present and future asbestos liability in an amount so low

that over half of it will be allocated to settlement amounts presently owed and unpaid, and the

---

[2]    Defined terms within this brief have the meaning assigned to them in The Official Committee of Asbestos Personal Injury Claimants' and Future Claimants' Representative's Joint Post-Hearing Opening Brief on Estimating the Value of Asbestos Personal Injury Claims Against the Debtors [D.I. 3521] (the "**Claimants' Representatives' Post-Hearing Opening Brief**").

other half represents only **one year** of the Debtors' "relatively stable" indemnity payments since 2003.[3]

As this Court has stated, the Debtors' "actual liability" for mesothelioma claims is "either a determination as a matter of fact as to what the debtors did in fact have to pay [i.e., a judgment] . . . and/or . . . the settlements that the debtor did in fact pay and that the other side accepted."[4] The Debtors, however, have done neither.

In fact the Debtors settled virtually all of the mesothelioma claims during their 30 year history in the tort system.  Yet, the Debtors contend that these settlements that they negotiated— many of which were sworn by them to be in good faith—represent something other than their "actual liability."[5]  The Debtors are also not seeking an estimation based on their verdict history, although they offer no explanation as to why.

Instead, the Debtors seek to have this Court adopt a contrived methodology which attempts to measure not what the Debtors would have paid if they continued in the tort system, but what they might have paid in the Debtors' "ideal world".  However, Dr. Mullin ignores that there are two sides to every settlement.  Dr. Mullin's methodology fails to take the plaintiff—and his motivations, concerns and consent—into consideration.  Tellingly, the Debtors were unable to offer any evidence that any plaintiff would have accepted an amount different from the amount for which his or her case settled.

---

[3]   *See* 1/7/13 Hr'g Tr. 257:1-13 (Mullin).

[4]   12/17/12 Hr'g Tr. at 52:9-13.

[5]   *See* Debtors' Amended Post-Trial Brief on Estimation of Asbestos Liability [D.I. 3531] ("**Debtors' Amended Post-Trial Brief**"), at 66-73.

To accept the Debtors' proffered methodology would require this Court to make a number of novel determinations, none of which have been endorsed by any court. Preliminarily, the Court will have to accept the premise of Dr. Mullin's theory that a defendant's "actual liability" for a tort claim is a subset of, and can be conclusively determined by dissecting, a settlement amount. This "dissection" would further require the Court to make findings that run contrary to the facts and the law. These include: (1) that the Debtors' "actual liability" can be calculated in a manner other than by a legal determination on the merits, (2) that (despite their trial experience) the Debtors would have ultimately prevailed in virtually every case that they took to trial, (3) that the Debtors were paying other defendants' shares of liability in the tort system, and (4) that it is appropriate for the value of a claim to be established in a bankruptcy case in a manner different than it is valued in the tort system.

The hodgepodge of issues raised by the Debtors, including, among other things (1) whether the amounts paid to victims are consistent with the Debtors' market share, (2) the percentage of a settlement amounts that the Debtors' expert estimates were attributable to the Debtors' desire to avoid defense costs, (3) whether, contrary to prevailing medical science and the Debtors' experience in the tort system, the asbestos used in the Debtors' asbestos-containing products does not cause mesothelioma, and (4) the Debtors' newly asserted arguments that claimants are barred from pursuing, in one instance, SPHC's assets and, in the other, assets from either Debtor, are irrelevant to this estimation.

In the context of an asbestos bankruptcy case, an estimation proceeding is conducted to assist the Court in formulating a plan by establishing the contours of a section 524(g) trust sufficient to meet the needs of present and future creditors without implicating the procedural rights of those creditors. *See In re Federal-Mogul Global Inc.,* 330 B.R. 133, 154-55 (D. Del.

2005).  Because establishing such a trust will cap claimants' recoveries for all time, it is the

claimants who bear the risk of an inaccurate estimate.  In short, estimation should assist in

bringing finality to the Debtors' asbestos problems and the chapter 11 process.  Nothing that the

Debtors have proffered assists that goal.

Finally, it bears further mention that the Debtors have led the Court and the claimants

down this time-consuming and expensive road, with apparently no genuine, realistic exit

strategy.  The process has involved intensive discovery, extensive motion practice and briefing,

and has been the subject of numerous lengthy court hearings.  Indeed discovery pursued by the

Debtors proved to be of virtually no assistance in the estimation process, even to the Debtors'

own expert.  The Debtors' tactics of switching gears from a "whole claim" theory to an "implicit

defense cost" theory, as well their advancement of various other novel theories intended to

reduce or eliminate their tort liability, should be viewed for what they are – attempted

manipulation and abuse of the bankruptcy process which should not be countenanced by the

Court.

## **ARGUMENT**

### **I.      Well-Established Legal Standards Dictate Only One Result.**

The Debtors' novel and untested methodologies and legal theories have no basis in law

(or logic) and, if adopted, will keep the parties mired in a legal battle over estimation for years to

come.  The Third Circuit has made clear that to qualify for the relief that an asbestos trust

provides, a debtor must satisfy section 524(g)'s prerequisites, many of which "are specifically

tailored to protect the due process rights of future claimants."  *In re Combustion Eng'g, Inc.*, 391

F.3d 190, 234 n.45 (3d Cir. 2004).  For example, the channeling injunction must be "fair and

equitable" to future claimants, the trust must have mechanisms in place to ensure it "treats

present claims and future demands that involve similar claims in substantially the same manner," and the plan must be approved by 75% of claimants whose claims are affected by the trust. *Id.* (quoting 11 U.S.C. § 524(g)(4)(B)) (internal quotation marks omitted).  If the Court were to adopt the radical approach to estimation proffered by the Debtors, those requirements will not be met.

> **A.    An Estimate Based on the Debtors' Proposed Methodologies Would Disregard Established Precedent and Treat Claimants Unfairly.**

The Debtors ask the Court not to rely on the estimation methodology set forth in *In re Eagle-Picher Indus.,* No. MS-1-96-228, 1996 U.S. Dist. LEXIS 17160 (S.D. Ohio Nov. 18, 1996), and utilized by every court in this District that has performed an estimation of asbestos liabilities,[6] but they fail to cite to a single instance of any court anywhere using another methodology.

Courts in the Third Circuit have consistently applied the methodology utilized in *Eagle-Picher* to estimate asbestos liabilities because it has proven to reliably produce estimates that achieve the goal of striking "the proper balance between . . . the debtor's history and the probable changes in the litigation landscape – while keeping in mind the uncertainty of predicting how future claims would be resolved." *Armstrong*, 348 B.R. at 124.  That this methodology has the debtor's own history as its foundation is not accidental.  Historical settlement values are relied upon because they are the most dependable indicators of future values.  *See Federal-Mogul*, 330

---

[6]    *See, e.g.*, *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005); *In re Armstrong World Indus.*, 348 B.R. 111 (D. Del. 2006); *Federal-Mogul*, 330 B.R. at 133.

B.R. at 162 ("The market is just that, a market; as such, it would not be prudent to second-guess

the historic resolutions that were driven by factors by *both* plaintiffs and defendants. . . .").[7]

Despite the Debtors' suggestions to the contrary, courts in this District have not applied

*Eagle-Picher*'s history-based approach simply because the parties agreed on it.  In each instance,

the extent to which the debtor's history could be relied upon was hotly contested—just as it is

here.  *See Armstrong*, 348 B.R. at 123-24 ("On the one hand, the Plan Proponents emphasize . . .

that the best predictor of the number and value of pending and future asbestos claims is the

debtor's actual historical experience in the tort system.  By contrast, the Opponents caution that

the debtor cannot satisfy its burden [of proof] by merely rolling forward its historical asbestos

claims experience to estimate its future liability." (internal citations and quotation marks

omitted)); *Owens Corning*, 322 B.R. at 721 ("The differences among these estimates reflect the

experts' differing views concerning whether, and to what extent, Owens Corning's extensive pre-

bankruptcy history of asbestos litigation can serve as a reliable guide to the validity and value of

pending and future claims. . . .").

The *Owens Corning* and *Armstrong* courts did not resolve the parties' debate regarding

the reliability of history by discarding history entirely.  Instead, those courts analyzed only

whether any historical anomalies or newly changed circumstances needed to be accounted for in

forecasting future liabilities.  *Armstrong*, 348 B.R. at 124 ("[T]he Court's task will be to assess

---

[7]    The Debtors' suggestion that the settlement history was only relied on in past cases because
the debtors involved in these cases had a substantial share of the market is baseless.  A debtor's
market share simply has no relevance to an estimation of its asbestos liability.  *See Armstrong*,
348 B.R. at 135 n.40 (rejecting debtor's argument that comparison between it and other asbestos
defendants was unfair because it did not distribute or manufacture asbestos products on the same
scale as other companies, and finding that evidence established that the debtor faced a significant
number of claims pre-petition and "will almost certainly be again targeted as a major defendant
when it emerges from bankruptcy").

the parties' experts' estimations of the pending and future asbestos personal injury liability, and determine how well these estimations incorporate historical factors and account for changed circumstances in the asbestos litigation environment."); *Owens Corning*, 322 B.R. at 725 ("The Court's task at this juncture is to decide how well the expert witnesses have accorded appropriate weight to the various factors" that affected past litigation trends).

Importantly, in some instances (like here), adjustments to a debtor's history are not necessary because the various market factors that influence settlements at any given time tend to balance each other out and the debtor's settlement values already reflect the impact of such fluctuations, if any. *See e.g., Federal-Mogul*, 330 B.R. at 161 ("The uncontroverted evidence at trial demonstrated that the market factors that allegedly drove up historic claim resolutions were counterbalanced by other factors, which [the debtor's national trial counsel] testified, were considered by [the debtor] in its settlements values.").[8] This line of cases, and the methodology employed therein, is far from distinguishable from this case—it is right on point.

---

[8] The court went on to state that:

> These [counterbalancing factors] included the strength of exposure evidence, strength of medical evidence, identity of plaintiff's doctor supplying the diagnosis, identity of plaintiff's counsel, jurisdiction where case was pending, plaintiff's ability to get a trial date; plaintiff's economic damages, and the history of asbestos defendants in the jurisdiction.  Furthermore, after it left the CCR, T&N paid out a several share of its liability and did not factor in what a claimant might or might not get from another asbestos defendant.  Also, [national trial counsel] testified that the threat of punitive damages was not factored into the equation. . . .  Dr. Peterson convincingly concluded that factors listed in *In re Owens Corning* had no impact on his forecast because based upon the uncontradicted testimony of [the debtor's national trial counsel], and reflected in the T&N Database, they were already considered in the T&N settlement history.

*Federal-Mogul*, 330 B.R. at 161-62 (internal citations omitted).

The only difference between well-established precedent and this case arises from the fact that the Debtors here seek to *modify* their actual liability instead of just *estimate* it. But as the Third Circuit has made clear, bankruptcy does not alter a debtor's underlying liability for asbestos-related claims; rather, a bankruptcy under section 524(g) merely "shift[s] [the] debtor's asbestos-related liabilities—based on events which had already occurred and for which the [debtor and its] insurers were already potentially responsible—to the post-confirmation trust." *In re Federal-Mogul Global, Inc.,* 684 F.3d 355, 379 (3d Cir. 2012). While section 524(g) offers certainty and finality to asbestos defendants, it does not offer discounts. In fact, the Third Circuit has reasoned that attempting to use a bankruptcy case as leverage to pressure a creditor to accede to liquidating his or her claim at an amount that is less than the amount at which the claim would be valued under non-bankruptcy law may be grounds for dismissing the bankruptcy case as a bad-faith filing. *See Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 167-69 (3d Cir. 1999) (holding that the chapter 11 case was a bad-faith filing when, among other things, "[t]he plan's differing treatment of creditors suggests [the debtor's] petition was not filed to reorganize the company but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms," and its "officers expressly and repeatedly acknowledged [the] Chapter 11 petition was filed solely to gain tactical litigation advantages").

Similarly, precedent from the Third Circuit dictates that a bankruptcy court does not have "the power to create substantive rights that would otherwise be unavailable under the Code." *Combustion Eng'g*, 391 F.3d at 236 (internal quotation marks omitted) (holding that bankruptcy courts cannot exercise equitable powers in a way inconsistent with the Bankruptcy Code). Though the Debtors would have this Court discount the value of claims to less than what they would be worth in the tort system, the Bankruptcy Code nowhere provides for claims to be

devalued in this way.  In fact, devaluing claims as the Debtors advocate is fundamentally inconsistent with what the Bankruptcy Code requires:  "the federal bankruptcy court should take whatever steps are necessary to ensure that the [claimant] is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued."  *Butner v. United States*, 440 U.S. 48, 56 (1979).

In addition to departing significantly from precedent, the Debtors' approach also does nothing to move these cases forward.  Confirmation of any plan incorporating a channeling injunction requires affirmative acceptance by 75% or more of the current claimants.  The Debtors need this acceptance—they cannot cram down the current claimants.  Moreover, confirming a plan over the Claimants' Representatives' objection would be unprecedented and would necessarily call into question the constitutionality of such a plan.  The consent of the Claimants' Representatives is thus a practical necessity in this bankruptcy case.

The Debtors do nothing to explain how their proposed approach of replacing historical settlement values with artificial ones—arrived at by deducting alleged "implicit defense costs" and amounts purportedly in excess of their "several share"—could possibly be "fair and equitable" to future claimants, who would inevitably receive much less than their historical counterparts were such a forecast adopted.  While claimants may ultimately receive less than 100 cents on the dollar for their claims from a section 524(g) trust, that does not mean that the Debtors are entitled to a reduction on the value of those claims *ab initio*.  *See Owens Corning*, 322 B.R. at 721–22 (rejecting argument that asbestos claims should be valued based on the amounts that may be paid by an asbestos trust post-bankruptcy and holding that the value of asbestos-related claims is "necessarily" determined according to the state law that would apply had the debtor never entered bankruptcy).

In contrast, a plan of reorganization based on the estimates offered by the Claimants'

Representatives can, if necessary, be confirmed over the objection of the Debtors and RPM

International.  Numerous courts have found that a section 1129(b) cram down of equity interests

was appropriate where estimates provided the basis to determine that a debtor's liabilities

exceeded the value of its assets and that therefore it was "fair and equitable" to the objecting

equity holders to wipe out their interests in a confirmed plan of reorganization.  For example, in

*Eagle-Picher,* the district court, relying on the bankruptcy court's estimate of asbestos liability,

confirmed a plan of reorganization that crammed down on equity interests over objection:

> It is regrettable that substantial values will be lost upon the cancellation of
> outstanding equity interests or stock.  Holders of equity interests, however, are
> those most at risk in the corporate structure.  In the present case, because of the
> overwhelming asbestos claims, there is simply no value which can be allocated to
> equity interest holders.  Here, creditors will not be receiving full payment, and in
> order for the Plan here presented to be confirmed it is unavoidable that equity
> interests be canceled.

*In re Eagle-Picher Indus.,* 1996 U.S. Dist. LEXIS 17160, at *33; *see also In re Keene Corp.*, No.

93 B 46090 (SMB), slip op. at 20 (Bankr. S.D.N.Y. June 12, 1996) (confirming debtors' plan of

reorganization pursuant to section 1129(b) after determining that debtors' liabilities, inclusive of

estimated future asbestos-related liabilities, exceeded their assets); *In re Johns-Manville Corp.*,

68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("A valuation of the debtor's business is, by virtue of

the statutory language, almost a prerequisite to a determination that a plan satisfies the fair and

equitable test of § 1129(b).  Manville has clearly established, by credible evidence, that its debt

exceeds even the best estimate of its 'going concern' value.  As a result, the post confirmation

value of Equity's interest is zero.").

　　　　The estimation here likely will determine the level of funding required to establish a

section 524(g) trust—which trust funding will cap for all time the recoveries available to satisfy

claims of the individuals who are (or will be) sick and dying as a result of exposure to the

Debtors' products.  *In re Eagle-Picher Indus.*, 189 B.R. 681, 682 (Bankr. S.D. Ohio 1995)

("[T]he purposes of estimation of asbestos claims are, first, so that a proper allocation of plan

funding assets can be made as between the unsecured creditors and the PI Trust created by the

plan, and, second, whether there is any equity available for equity security holders.").  It is the

claimants, particularly future claimants, who ultimately bear the risk of inadequate trust funding.

This is not the context in which radical approaches to claim valuation can be entertained.  An

estimation that ignores what claimants are entitled to under the tort laws of the United States

cannot be the basis of a legitimate plan.

> **B.     An Estimate That Discounts Liability, Assigns Zero Value to Claims, or
> Otherwise Fixes Liability Would Be Improper.**

The Court cannot rule on the merits-based defenses raised by the Debtors or fix the

separate liability of each Debtor in this proceeding without exceeding its jurisdiction and

disregarding the due process rights of asbestos claimants.

Pursuant to Section 157 of the Bankruptcy Code, the liquidation of personal injury tort

claims is specifically excepted from this Court's jurisdiction.  *See* 28 U.S.C. § 157(b)(2)(B), (O).

Only the district court or a state court has jurisdiction to determine the liquidated value of tort

claims.  *See* 28 U.S.C. § 157(b)(5); *Parks v. Visteon Corp. (In re Visteon Corp.)*, 2011 U.S. Dist.

LEXIS 49302, at *10 (D. Del. May 9, 2011) ("The mandate from Section 157(b)(5), that

personal injury tort and wrongful death claims be tried by the district court, effectively deprives

the Bankruptcy Court of jurisdiction to entertain the instant action."); *In re Farley, Inc.*, 146 B.R.

748, 752–53 (Bankr. N.D. Ill. 1992) ("[T]his Court *has no authority* to determine finally a

personal injury claim. . . .  This is but a limited estimation proceeding.").

Though the Court is obligated to "reject unsubstantiated claims, bogus medical evidence

and fanciful theories of causation[,]" it may *only* entertain such defenses "*to the extent they do*

*not interfere with the claimants' constitutional and legal rights*." *In re USG Corp.*, 290 B.R. 223, 225, 227 (Bankr. D. Del. 2003) (emphasis added). The Debtors fail to explain how blanket rulings with respect to any of the defenses that repeatedly failed them in the tort system would not unconstitutionally affect the rights of future claimants. *See G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.)*, No. 02-3626, 2005 WL 1719224, at *2, *4 (D.N.J. July 6, 2005) (forcing the future claimants' representative to defend unknown future claimants against action seeking "preemptive declaration of non-liability based on state law defenses" "does not comport with notions of due process").

Tellingly, the Debtors do not (because they cannot) cite to a single instance of a court discounting or assigning zero value to asbestos claims in the context of an aggregate estimation. Instead, they refer to cases in which merits-based *discovery* has been allowed within an aggregate estimation, such as *In re USG Corp.*, 290 B.R. at 225-27 (holding, in the context of an application for a case management order, that "[a]t this time, debtors will be permitted to *present* their defenses. The Court will not decide now the precise procedural device with which these defenses will be brought before the Court." (emphasis added)), and *In re G-I Holdings, Inc.*, 323 B.R. 583, 622-23 (Bankr. D.N.J. 2005) (holding estimation proceeding should estimate liability of debtor in the aggregate, but noting that "G-I Holdings should be afforded an opportunity to review the claims against the estate and object to those claims that it believes are illegitimate or dispensable as a matter of law"). Additionally, the Debtors refer to cases outside of the context of personal injury aggregate estimation, such as *In re W.R. Grace & Co.*, 355 B.R. 462, 464-65 (Bankr. D. Del. 2006) (considering property damages claims with common questions of fact consolidated under Rule 42(a)), and *In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 722-23

(Bankr. E.D. Ky. 2004) (considering motion for estimation of fraud-based claims arising out of loans and guaranties made to the principal of the debtor).

As courts have frequently acknowledged, fixing liabilities in the manner the Debtors propose would contravene the very purpose of estimation. *Federal-Mogul*, 330 B.R. at 154-55 ("[A]n estimation of asbestos liability for the limited purposes of plan formulation is a fruitful endeavor because it promotes the speed and efficiency goals of the Bankruptcy Code, *while not implicating the procedural rights of the individual claimants*."  The focus of estimation is on the debtor's "aggregate personal injury liability for the creation of a trust, *not the merits* of individual or class of individuals claims" because the latter "would require that each claimant be afforded the procedural protections of the due process clause of the Fifth Amendment, thereby requiring [for] cases that presented disputed issues of fact a trial by jury." (emphasis added)); 11 U.S.C. § 502(c) ("There shall be estimated for purpose of allowance . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . .").  Accordingly, the Court should reject the Debtors' request for merits-based rulings.

**II      The Debtors Fail in Their Attempts to Discredit Drs. Vasquez and Peterson and Further Demonstrate the Flaws in Dr. Mullin's Approach.**

   **A.      The Debtors' Criticisms of Dr. Vasquez Are Unfounded and Should Be Rejected.**

      **1.      Dr. Vasquez appropriately calculated the Debtors' 2010 claims count.**

The Debtors take Dr. Vasquez to task for his determination that the Debtors' 2010 claims count, which the Debtors concede is incomplete, was missing an additional 165 prepetition

claims.[9]  They advocate that Dr. Vasquez should have "simply count[ed] the claims based on the

PIQs" rather than estimate the missing claims.[10]  However, there are many reasons the PIQs do

not adequately address the admitted deficiencies in the Debtors' 2010 claims dataset.

      The Debtors cannot credibly argue that every 2010 claimant received a PIQ.  The PIQs

were only sent to those law firms that had claimants appearing in the Debtors' database, a

database that was incomplete.[11]  The Court has itself previously recognized this fact:  "I'm also

accepting the fact that the debtor may have not served every entity, because the debtor didn't

know, for example, that a particular individual had switched law firms."[12]

      In addition, claimants could not possibly have known of the PIQs unless they were

represented by counsel that already had litigation pending against the Debtors as of the Petition

Date.  The Debtors effectively ask the Court to assume that the claims that are missing from their

2010 database consist exclusively of claims filed by law firms that already had litigation pending

against the Debtors, since such firms would have received PIQs.  But there is no evidence that

this is true, and to the extent it is untrue, the PIQs would not capture all of the claims that were

missing from the Debtors' database.

      It is also reasonable to expect that not all mesothelioma claimants would have responded

to the PIQ even had they received it.  Although the Court's PIQ orders largely reduced the

---

[9]    Debtors' Amended Post-Trial Brief, at 72.

[10]   Debtors' Amended Post-Trial Brief, at 72.

[11]   *See* Pretrial Order [D.I. 3334] at Statement of Admitted Facts, ¶¶ 77–78.  In their first motion
to compel submission of PIQs, the Debtors described how they could not identify all of the
claims filed against them when distributing PIQ materials.  *See* Debtors' Motion to Compel
Submission of Personal Injury Questionnaires [D.I. 1918], at 4 n.3.

[12]   8/27/12 Hr'g Tr. 122:19–22 [D.I. 2991].

number of nonresponsive claimants, it is beyond legitimate dispute that some such claimants still exist.[13]  And the failure to submit a PIQ has no impact on the legitimacy of the subject claim or the ability to recover on the claim.  The Court in fact rejected the argument that claimants should be sanctioned for PIQ non-compliance: "[failure to submit a PIQ] does not preclude these people, whoever they may be, from submitting claims against a trust if one is ever formed later in the future.  But it does prevent them from, at this point, being included in the estimation numbers that the debtor is attempting to use."[14]

Given that PIQ compliance has no impact on a claimant's ability to recover in the future from a section 524(g) trust, estimating the Debtors' liability based on the flawed assumption that all eligible mesothelioma claimants submitted a PIQ would have the unfortunate and unfair effect of forcing those who filed a PIQ to subsidize the trust recoveries of those claimants who did not.

Dr. Vasquez did not "ignore the actual data that was available," as the Debtors claim. Rather, he accounted for the fact that the actual data that was available did not tell the whole

---

[13]   The Debtors themselves asserted that 230 claimants failed to return PIQs even after the Debtors' motions seeking to force claimants to comply with the PIQ process.  According to the first motion to compel, "approximately 1,180 claimants—approximately 33 percent of all **known** Mesothelioma Claimants" had failed to timely submit their PIQs.  Debtors' Motion to Compel Submission of Personal Injury Questionnaires [D.I. 1918], ¶ 7 (emphasis added).  In their second motion to compel, the Debtors asserted that approximately 400 claimants still had not submitted PIQs.  Debtors' Renewed Motion to Compel Compliance with the Court's PIQ Orders [D.I. 2372], ¶ 12.  Finally, at a hearing on the Debtors' Motion for an Order (I) Estimating the Claims of the Noncompliant Claimants at Zero and (II) Precluding the Noncompliant Claimants from Voting on Any Plans in These Cases [D.I. 2762], the Debtors asserted that the number of noncompliant claimants had decreased to 230.  *See* 8/27/12 Hr'g Tr. 125:17–25 [D.I. 2991].

[14]   8/27/12 Hr'g Tr. 116:13–17 [D.I. 2991].

story and was thus misleading.[15]  Contrary to the Debtors' assertion that the 165 claims Dr.

Vasquez identified were "fictional and devoid of any support in the data," the data strongly

supports Dr. Vasquez's calculations.  As Dr. Vasquez explained in detail at trial, his calculations

are based on his in-depth, month-by-month scrutiny of the claiming activity against the

Debtors—Dr. Mullin, by contrast, did not take such a detailed look at the Debtors' claiming

history.[16]  Tellingly, in their criticisms of Dr. Vasquez, the Debtors never once offer an

alternative explanation of the pattern readily apparent in the Debtors' data.  Assuming, as the

Debtors suggest, that the 437 claims captured by the Debtors' records and the PIQs were the only

claims filed against the Debtors in 2010 assumes that the Debtors would only ever receive 27

claims for the entire month of May, notwithstanding that they had averaged more than 96 claims

a month over the previous 40 months.  Moreover, if one assumes, as the Debtors suggest, that the

May dataset is a final tally of the claims filed through the end of May, it would follow that the

April dataset should have been a final tally of the claims filed through the end of April.  Yet the

Debtors' data show definitively that this is not true—the May dataset identified more than 100

claims that had been filed before the end of April but did not appear in the April dataset.[17]  The

Debtors may not like Dr. Vasquez's conclusions, but they never once explain why it makes more

sense to rely on an assumption inconsistent with their claims history than it does to rely on expert

judgment informed by relevant experience and by patterns readily apparent in the data.

---

[15]    *See* Debtors' Amended Post-Trial Brief, at 72.

[16]    *See* 1/11/13 Hr'g Tr. 103:1–105:3 (Vasquez).

[17]    1/11/13 Hr'g Tr. 103:18–25 (Vasquez).

According to the Debtors, the additional claims identified by Dr. Vasquez "had the effect of taking the 2010 claim count to a number never before experienced by the Debtors."[18]  While 2010 represented a new high in claiming activity against the Debtors, this was no less the case in 2009 or in 2008 or in 2007 or in any year since 1997, save one.[19]  The rate of increase from 2009 to 2010 is entirely consistent with the Debtors' history.  The 1,428 claims that Dr. Vasquez calculates for 2010 represent a 12% increase over 2009 claims, and the 2009 claims themselves represented a 14.7% increase over the 2008 claims.[20]  Dr. Vasquez did not "take" the Debtors' claim count anywhere; his conclusions are strongly supported by the Debtors' claims history.  That the Debtors' bankruptcy filing interrupted the record keeping of the claims filed against them in 2010 is not a suitable basis for concluding that the Debtors would have received fewer claims in 2010 than they did in prior years.

## 2. Dr. Vasquez utilized appropriate calibration periods.

The Debtors' assertion that Dr. Vasquez used different dates to calculate the propensity to sue and the average settlement value is true but also meaningless.  According to the Debtors, the year-and-a-half difference in dates means the increasing propensity to sue is not counterbalanced

---

[18]   *See* Debtors' Amended Post-Trial Brief, at 72.

[19]   Mesothelioma claims filings against the Debtors rose from an average of 326 claims per year between 2000 and 2002 to more than 1000 claims in 2007 alone, and up to 1,273 claims in 2009. *See* Claimants' Representatives' Post-Hearing Opening Brief, at 15; *see also* 1/11/13 Hr'g Tr. 93:9–24 (Vasquez); Debtors' Amended Post-Trial Brief, at 11 ("In 2000, the Debtors were named in only 11 mesothelioma cases, but by 2009 they were named in almost 1,100 mesothelioma cases a year."); *cf.* Debtors' Demonstrative 3.

[20]   *See* Claimants' Representatives' Post-Hearing Opening Brief, at 15.  Similarly, the Debtors' 2005 claims represented a 20.8% increase over 2004 claims, and the Debtors' 2003 claims represented a 13% increase over 2002 claims.  A 12% increase in claims from 2009 to 2010 is thus entirely consistent with the Debtors' history, if not on the conservative side.

by the declining settlement average, which they assert leads to inflated values for claims.[21]

However, this conclusion hinges on the erroneous assumption that the claims Dr. Vasquez

considered in calculating the propensity to sue are the same claims that Dr. Vasquez considered

in calculating the average settlement value.[22]  In fact, Dr. Vasquez was not tracking particular

claims from filing to settlement.  Rather, he was measuring two separate behaviors: one related

to claimants and the filing of claims, and a second related to settlements and the amounts that the

Debtors agreed to pay.  Dr. Vasquez took two "snapshots" of two distinct claiming behaviors,

and for each of these two snapshots he used the most recent data point available.

Given that Dr. Vasquez is measuring claiming activity rather than tracking particular

claims, the Debtors' criticism that the value of claims is inflated would hold only if the quality of

claims overall were deteriorating over time.  Yet Dr. Vasquez specifically determined that this

was not the case.  The zero-pay rate has stayed consistent over time, which implies that the

number of meritless claims against the Debtors has not been increasing.[23]  Moreover, Dr.

Vasquez's analysis of the PIQ data provided further support for his conclusions that the quality

of claims the Debtors are receiving is consistent with the quality of the claims that they have

received historically.[24]

Finally, the Debtors' contention that the same exact claims must form the basis of both

the propensity-to-sue calculation and the average-settlement-value calculation is impractical.  As

---

[21]    *See* Debtors' Amended Post-Trial Brief, at 49.

[22]    *Id.*

[23]    *See* 1/11/13 Hr'g Tr. 112:25–113:9 (Vasquez) (describing how average pay rate is relatively stable across three different time periods); ACC/FCR Demonstrative 1024 at 13.

[24]    1/11/13 Hr'g Tr. 110:22–112:15 (Vasquez).

discussed in more detail below, the combination of the lag between filing and settlement and the impact of bankruptcy planning on the Debtors' settlement and payment practices necessarily means that the claims the Debtors received shortly before bankruptcy and quickly resolved are unlikely to provide a reliable sample of the Debtors' claims settlement values.[25]  The Debtors would have Dr. Vasquez calculate an estimate that draws on either their remote claims settlement history or a thin sample of recent claim settlements that are likely to be unrepresentative.[26] While it is readily apparent that it would have been improper for Dr. Vasquez to do so, it is no less apparent why the Debtors would prefer that he did.

### 3.    Dr. Vasquez appropriately relied on the Peto epidemiological model.

The Debtors' contend that "there is simply no reasoned basis to utilize an approach that is materially inconsistent with [the Nicholson] curve" is nonsensical.[27]  But the Debtors offer no reasoned argument why the Peto approach overstates the claims the Debtors will receive in the future.  Instead, the Debtors argue that the "almost universal adoption" of the Nicholson curve means Dr. Vasquez should use that approach exclusively.[28]

The Peto approach is not "materially inconsistent" with the Nicholson curve by any means and, in fact, may be better suited to forecasting the Debtors' future claims given the

---

[25]  *See* Section II.C.2, *infra*.

[26]  Both Dr. Vasquez and Dr. Mullin calculate the total 2010 claims counts based on part-year data.  But relying on incomplete claims-filing data is not problematic in the same way that relying on incomplete settlement data is, because the number of claims filed against the Debtors is beyond the Debtors' control, whereas the Debtors could easily have manipulated the amounts and timing of their most recent settlements in the run-up to the bankruptcy filings.

[27]  *See* Debtors' Amended Post-Trial Brief, at 73.

[28]  *See* Debtors' Amended Post-Trial Brief, at 73.  Moreover, Dr. Vasquez did not "decline" to use the updated Nicholson curve as the Debtors suggest.  Rather, he used it in combination with another approach.  *See*, *e.g.*, 1/11/13 Hr'g Tr. 82:11–20 (Vasquez).

idiosyncrasy of the Debtors' exposure profile and the fact that the Peto approach captures non-occupational exposure (while the Nicholson curve does not).[29]  Moreover, though the Debtors cite the Nicholson curve's "demonstrated accuracy over several decades," their own expert testified that, if anything, the past several decades have taught us that the Nicholson curve tends to underforecast the future incidence of mesothelioma claims compared to the government's SEER statistics.[30]

It also is disingenuous for the Debtors to argue that "universal adoption" is a reason to use a particular methodology.  The Debtors are otherwise eager to reject the universally adopted estimation methodology used by Drs. Peterson and Vasquez in this estimation as well as by other courts in other estimation proceedings and by the Debtors themselves in their own estimation of claims prepetition.  Most significant of all, however, is the fact that—contrary to what the Debtors would have the Court believe—the Peto approach has been commonly adopted by courts estimating asbestos claims.  *See, e.g., Armstrong*, 348 B.R. at 128 (accepting the Peto approach); *Official Asbestos Claimants' Comm. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 274 B.R. 230, 241 (Bankr. E.D. La. 2002) (Peto approach is "recognized in the field and described in Dr. Dunbar's book [on estimating future claims]").

---

[29]  *See* 1/11/13 Hr'g Tr. 178:12–179:8 (Vasquez).

[30]  1/11/13 Hr'g Tr. 251:23–252:1 (Mullin) ("I believe he's correct that the KPMG version that Bates White calls the KPMG version, it was really trying to focus on occupational exposure, and it is about 25 percent lower than what you observe in SEER.").

### 4.    Dr. Vasquez appropriately considered abandoned claims.

The Debtors' argument that Dr. Vasquez erred in not applying an abandoned-claims rate to his future claims projection is unfounded.[31]  Though the Debtors recognize that Dr. Vasquez accounted for abandoned claims in his pending claims count, they nevertheless attempt to assail him for not similarly adjusting his future claims count.[32]  In fact, Dr. Vasquez's decision not to make such an adjustment is not an error but a considered assessment that he could not have confidence in the accuracy of any abandoned-claims rate he might use for future claims.[33]

Dr. Vasquez could not have confidence that any abandoned-claims rate he applied to future claims would be accurate, because the calculation of such a rate would need to draw on older claims that do not reflect the Debtors' more recent claims experience.  That is, because claims are considered abandoned after approximately five years, Dr. Vasquez would have to look at the claims filed from 2003 through 2005 to calculate the abandoned-claims rate for the Debtors' most recent prepetition history from 2008 through 2010.  Calculating an abandoned-claims rate based on such distant claims is improper because the world the Debtors existed in then was very different than the world they existed in right before they entered bankruptcy—in

---

[31]    *See* Debtors' Amended Post-Trial Brief, at 73.

[32]    *See* Debtors' Amended Post-Trial Brief, at 52–53; *see also* 1/11/13 Hr'g Tr. 184:22–186:5 (Vasquez) (describing the reasons for adjusting for abandoned claims in count of pending claims but not forecast of future claims).

[33]    *See* 1/11/13 Hr'g Tr. 185:8-13 (Vasquez).  Although the Debtors assert in their Amended Post-Trial Brief that the abandoned-claims rate should have been 6%, Dr. Vasquez opined that such an adjustment would have been more on the order of just 2%.  1/11/13 Hr'g Tr. 185:16–21 (Vasquez) ("Q And I think when we discussed this issue [at your deposition], you said that you did not make an adjustment, but if there was an adjustment, it would be small in the order of two percent, is that fair?  A Yeah.  But I think you asked me enough times that I finally had to cave and give a percent.").

2003 through 2005 they were resolving fewer claims for less money.[34]  Now that the Debtors

have been paying more claimants larger amounts, it stands to reason that, going forward,

claimants have a greater incentive than they did in the past not to abandon their claims against

the Debtors.  Furthermore, the Debtors received too few claims in the late 1990s and early 2000s

to provide a significant data point for an accurate calculation of abandoned claims.[35]  Finally,

and perhaps most significantly, Dr. Vasquez examined the Debtors' data on abandoned claims

and concluded that the abandoned-claims rate is not stable and predictable, but, rather,

fluctuates.[36]  Indeed, the Debtors themselves concede as much.[37]

     Even though Dr. Vasquez has recognized the utility of an abandoned-claims rate and has

applied such an adjustment to future claims in other cases, he ultimately concluded that there was

not a reliable basis for calculating such a rate here, and that abandoned claims would have a

minimal effect on his ultimate estimate in any event.[38]  It was not erroneous for Dr. Vasquez to

---

[34] Understanding the Debtors' experience with abandoned claims requires referring back to claims filed in early 2000s and late 1990s, but the Debtors' own expert testified "going back further than 2003 [would be] going back into a different world for the debtors."  *See* 1/7/13 Hr'g Tr. 257:10–11 (Mullin); Debtors' Amended Post-Trial Brief, at 24; *see also* 1/10/13 Hr'g Tr. 193:13–17 (Peterson) ("So this is a sharp change between 1996 and 2000.  The number of claims went up tenfold basically, ninefold.  The number of settlements were up threefold.  The values went up enormously up to a half million dollars in the last two years shown here.").

[35] *See* Claimants' Representatives' Post-Hearing Opening Brief, at 15; *see also* 1/11/13 Hr'g Tr. 93:9–24 (Vasquez); Debtors' Amended Post-Trial Brief, at 11 ("In 2000, the Debtors were named in only 11 mesothelioma cases, but by 2009 they were named in almost 1,100 mesothelioma cases a year."); *cf.* Debtors' Demonstrative 3.

[36] *See* 1/11/13 Hr'g Tr. 185:8–13 (Vasquez).

[37] *See* Debtors' Amended Post-Trial Brief, at 34 ("[T]he annual number of claims against the Debtors that were dismissed or abandoned had fluctuated in the past . . . .").(emphasis omitted).

[38] *See* 1/11/13 Hr'g Tr. 185:2–186:5 (Vasquez).

decline to apply an abandoned-claims rate to future claims.  The error lies in the Debtors'

decision to use an unreliable abandoned-claims rate to depress their forecast of future claims.

**B.**     **The Debtors' Criticisms of Dr. Peterson Are Unfounded and Should Be Rejected.**

**1.**     **Dr. Peterson appropriately considered abandoned claims.**

The Debtors allege that Dr. Peterson's conclusion is flawed because he failed to take into

account abandoned claims.[39]  This allegation is simply wrong.  Dr. Peterson reduced the number

of pending claims by 7% (for a reduction of 156 claims) to account for stale or abandoned

claims.

> Q:  Okay.  And then the next slide, Number 9, you do another adjustment to this number, right?
> A:  Yes.  There are—among the pending claims there are a number of claims that have been around for a long time.  The likelihood—the history—the database history shows that the claims are unlikely to be resolved if they have been pending claims that were—have been around for more than five years, and that yields a result of 2,168 pending claims that we're going to evaluate and estimate. [40]

Dr. Peterson did not carry this reduction through to his future claims calculation and

admitted that it could reduce his forecast, by approximately 5%, a difference that both he and Dr.

Mullin agreed was "immaterial" to Dr. Peterson's ultimate conclusion.[41]

---

[39]   Debtors' Amended Post-Trial Brief, at 71.

[40]   1/10/13 Hr'g Tr. 213:7–23 (Peterson); ACC/FCR Demonstrative 1020, at 16; *see also* ACC/FCR Demonstrative 1019, at slide 9.

[41]   *See* 1/8/13 Hr'g Tr. 220:23–221:1 (Mullin) (A five percentage point difference is not material.); 1/11/13 Hr'g Tr. 19:2–12 (Peterson).

### 2. Dr. Peterson exercised seasoned judgment in selecting his calibration periods.

The Debtors next argue that Dr. Peterson's forecast is inaccurate because he selected different calibration periods to determine the propensity to sue versus the average settlement value.[42] This conclusion, too, lacks merit and is not supported by the evidence.

Before reaching the merits of the Debtors' argument, it must be clarified that any suggestion by the Debtors that calibration periods must be identical to result in an accurate forecast is unsupported by the relevant literature and is simply another attempt by the Debtors to misconstrue and mischaracterize the evidence before this Court.  When selecting the appropriate calibration periods, it is indisputable that experts must exercise discretion and judgment.[43]  Dr. Peterson, with over thirty years of experience calculating asbestos-related liabilities and qualified as an expert in that capacity dozens of times, exercised such sound discretion in selecting the time period of 2007 through 2009 to determine the propensity to sue because it represented the "the best indicator of what to expect in the future"[44] and is in line with the calibration periods used by Drs. Mullin and Vasquez. Further, and in spite of the Debtors' misplaced attempt to attack Dr. Peterson's forecast, Dr. Peterson actually projected the most conservative future claiming forecast, a full 5% below the actual propensity to sue in the final full year before the Debtors filed for bankruptcy. This judgment was certainly not "ad hoc," and certainly closer to the post-petition reality the Debtors would have faced than Dr. Mullin's analogous forecast,

---

[42]    Debtors' Amended Post-Trial Brief, at 70–71.

[43]    1/9/13 Hr'g Tr. 17:11–15 (Mullin) ("You're going to have to make certain judgments, and there's a reason there's a level of expertise[.]"); 1/10/13 Hr'g Tr. 220:17–221:8 (Peterson).

[44]    1/10/13 Hr'g Tr. 221:9–23 (Peterson).

which fails to use the Debtors' most recent claims experience and instead relies upon claiming data equivalent to 2006.[45]

Further, Dr. Peterson calculated his average settlement value for the time periods of 2001-2010 and 2003-2010 to fully account for the ever-changing litigation strategies that the Debtors employed pre-bankruptcy in their efforts to minimize defense costs and avoid the risks of litigation.[46] Indeed, Dr. Mullin relied upon the same changing litigation strategy as the primary bases for his various forecasts and as discussed below employs the very same 2003 forward calibration as the "starting point" for all of his various forecasts.[47]

Finally, the Debtors' claim that had Dr. Peterson chosen a more recent calibration period, it would have reduced his forecast by 25% is yet another misstatement of the record.[48] As part of his sensitivity analysis, Dr. Peterson matched settlement value and propensity to sue calibration periods as the Debtors suggest. The result was a mere 14% reduction—not the 25% claimed by the Debtors. Thus even if the Court were to accept that the calibration periods must match, a point that the Claimants Representatives' experts vigorously dispute, Dr. Peterson's aggregate forecast would still exceed $1.05 Billion (NPV)—almost twice that of Dr. Mullin's New Forecast.[49]

---

[45]  1/11/13 Hr'g Tr. 125:11–21 (Vasquez) ("But the short, bottom line version is that the way that Dr. Mullin does it, it appears as though he is using the equivalent of propensity to sue that takes you back to roughly the '06, '07, '08 period.").

[46]  *See* 1/10/13 Hr'g Tr. 228:16–230:3 (Peterson).

[47]  *See* 1/7/13 Hr'g Tr. 256:6–260:20 (Mullin); Debtors' Demonstratives 11–12.

[48]  Debtors' Amended Post-Trial Brief, at 46.

[49]  1/9/13 Hr'g Tr. 241:15–23 (Peterson); *see also* ACC/FCR Demonstrative 1019, at 29.

3.      **Dr. Peterson's propensity to sue forecast is a conservative estimate of the Debtors' historical propensity to sue.**

Third, the Debtors maintain that Dr. Peterson "arbitrarily" assumed that the propensity to sue would increase by 20% from 2010 to 2014.[50]  What the Debtors neglect to mention is that the Debtors' own historic data unequivocally reflects that the propensity to sue would continue to increase from 2010 forward at rates that far surpass the 20% Dr. Peterson projected.[51]  Dr. Peterson conservatively acknowledged that claiming rates could not climb indefinitely, despite the steady increase in claims in the years preceding the filing.  Indeed, Dr. Peterson assumes the opposite, namely that that growth of claiming rates would slow in the years following the filing and eventually fall.  This is, a realistic adjustment that Dr. Mullin's econometric theory fails to take into account.[52]  As a result, Dr. Peterson judiciously reduced the Debtors' *actual* propensity to sue from the imposing *historic* rates of 38.4% in 2008 and 44.8% in 2009.[53]  Such an adjustment is hardly arbitrary.

C.      **Dr. Mullin's Estimate Is Fatally Flawed.**

1.      **Neither Dr. Mullin's "starting point" extrapolation nor his "New Forecast" applies the well-accepted standard methodology employed by the Claimants' Representatives' experts—instead his estimates are improper mathematical manipulations.**

At trial, Dr. Mullin provided two forecasts that purport to forecast the Debtors' liability (i.e. what they would have paid to resolve to asbestos creditors in indemnity to resolve their

---

[50]    Debtors' Amended Post-Trial Brief, at 46.

[51]    1/10/13 Hr'g Tr. 223:17–225:12 (Peterson).

[52]    1/10/13 Hr'g Tr. 223:17–225:12 (Peterson).

[53]    1/10/13 Hr'g Tr. 223:17–225:12 (Peterson); ACC/FCR Demonstrative 1019, at 22.

claims) had they stayed in the tort system.  He further claims that in making these forecasts, he employs methods similar to those used by the Claimants' Representatives' experts.  They are not. Dr. Mullin does not use a forecast method that is at all similar to Dr. Peterson's and Dr. Vasquez's standard methodologies.  Unlike these standard forecasts, Dr. Mullin ignores the realities of the Debtors' recent litigation experience and fails to consider the key elements of a credible forecast, namely, the numbers of future filings, propensities to sue, and rates of paying filed mesothelioma claims.  As a result, each forecast selectively excludes significant numbers of pending mesothelioma claims or large numbers of higher-value mesothelioma settlements. These arbitrary exclusions result in forecasts that significantly understate the future liability of the Debtors had they remained in the tort system.

Dr. Mullin identifies his first extrapolation as the "starting point" for his entire analysis. He reviewed the average amount that the Debtors agreed to pay annually in indemnity payments for mesothelioma claims since 2003 and concluded that they are approximately $50 million per annum. [54]  Dr. Mullin theorized that because these amounts were relatively stable, that a simple extrapolation applied over the Nicholson curve would approximates the Debtors' future liability. He concluded that this exercise yielded a range of between $600 and 800 million (nominal).[55]

---

[54]   1/7/13 Hr'g Tr. 256:6–260:20 (Mullin); Debtors' Demonstratives 11–12.

[55]   1/7/13 Hr'g Tr. 258:8–259:20 (Mullin).



Debtors' Demonstrative No. 12

These annual commitments however cannot provide a reliable basis from which to extrapolate. They do not reflect the Debtors' probable liability for mesothelioma claims actually filed. Each year the Debtors backlogged a growing number of unresolved mesothelioma claims.[56] Between 2007 and 2010, the pool of unresolved cases grew by over 500, representing over half of the number of cases annually resolved during this time period. By ignoring this increasing inventory, Dr. Mullin's analysis understates the level of liability and fails to account for the significant upward trend in case filings. In evaluating the Debtors' pre-bankruptcy obligations, Dr. Mullin considered only the amount of tort settlements that the Debtors **selected**

---

[56]    *See, e.g.*, 1/01/13 Hr'g Tr. 196:12–15 (Peterson).

*to pay each year*—while ignoring both the unresolved and resolved, but unpaid cases.[57]  Had

Bondex settled these pre-petition obligations rather than allowing this backlog to grow, the

settlement payments for those years immediately preceding the bankruptcy filing would be much

higher.  This simple fact also lays bare the fallacy of Dr. Mullin's highest estimate of

approximately $800 million.  As set forth in Claimants' Representatives' Post-Hearing Opening

Brief and shown by Dr. Peterson's testimony and graph therein, an extrapolation based solely

upon the amount Bondex chose to pay, cannot be reliable.[58]

Dr. Mullin's second "tort system forecast" of $700 million (nominal) (previously defined

as his "New Forecast") avoids this fatal flaw.  However, it suffers from others.  Chief among

them is Dr. Mullin's inexplicable exclusion of almost one-half of the settlements in the Debtors'

tort experience.  Specifically, Dr. Mullin excludes  all the cases encompassed within 17 group

settlements with three highly respected plaintiffs' law firms, whom the Debtors and their

asbestos defense counsel admitted presented great adverse trial risk, and many whose cases were

filed in some of the most dangerous jurisdictions for the Debtors.[59]  These settlements alone

represented approximately between 40 percent of the Debtors' higher average resolution[60] value

---

[57]   1/10/13 Hr'g Tr. 244: 13–246:21 (Peterson); ACC/FCR Demonstrative 1019, at 24.

[58]   *See* 1/10/13 Hr'g Tr. 245:5–246:7 (Peterson); ACC/FCR Demonstrative 1019, at 23, 24; *see also* Claimants' Representatives' Post-Hearing Opening Brief, at 62–63.

[59]   1/7/13 Hr'g Tr. 80:12–81:20, 90:9–91:14, 95:17–96:5 (Tompkins); 1/7/13 Hr'g Tr. 274:22–275:4, 276:15–20 (Mullin).

[60]   Although these cases had a higher average resolution value because they had no or fewer zero pays, they have a lower average settlement value.  Had Dr. Mullin used average settlement value instead of average resolution value in making his computations, undoubtedly he would have included these settlements.

mesothelioma settlements.  Yet in arriving at his New Forecast, Dr. Mullin simply ignores them because they were not susceptible to individual review.[61]

Dr.  Mullin's systematic and biased exclusion of approximately 40 percent of the Debtors' past settlements that have higher values is indefensible under any circumstances.  The Debtors' past and future asbestos liabilities are based on the costs of resolving ALL the asbestos claims against it, not a subset of lower valued claims purposely chosen by the Debtors' expert. This arbitrary exclusion allows Dr. Mullin to employ a $45,000 average resolution cost, as the building block of his New Forecast, despite the fact that the average settlement values of all was substantially higher.

---

[61] 1/8/13 Hr'g Tr. 255:18–257:11 (Mullin).

Large "Trial Docket" settlements with three law firms allowed the Debtors to deal with the increasing number of claims and control defense costs

| Type | Individual | Simmons, Lanier, Cooney |
|---|---|---|
| Pay rate | 27% | 90% |
| | X | X |
| Average settlement amount | $170,000 | $70,000 |
| Average resolution cost | $45,000 | $63,000 |
| | + | + |
| Per claim defense costs | $45,000 | $5,000 |
| Total per claim cost | $90,000 | $68,000 |

Debtors' Demonstrative No. 28

In his New Forecast, Dr. Mullin persists in making many of the same mistakes that doom his prior efforts. He persists in rewriting the Debtors' history in the tort system, ignores a substantial portion of the cases actually resolved in that history, artificially and improperly deflates the value of those cases, and, finally, makes untenable assumptions that fly in the face of the evidence and long-accepted estimation practice. In so doing, he substantially understates (by more than half) the Debtors' likely present and future liability arising from asbestos personal injury claims.

Finally, and despite insinuations to the contrary, Dr. Mullin's tort system forecasts are simply not comparable to those by Dr. Peterson and Dr. Vasquez. Dr. Mullin's forecasts each begin with a misrepresentation of the Debtors' recent experience and then incorporate the

observation that as time passes the number of future mesothelioma claims will likely decrease

with forecasted decreases in future mesothelioma deaths.  But Dr. Mullin makes no attempt,

provides no analyses, and employs no expert knowledge or judgment as to how decreases in

future liabilities will compare to decreases in future mesothelioma incidence.  Rather, he

mechanically applies a decrease to biased and unacceptable counts of the past amounts of money

that either Bondex was willing to pay in the face of budget and cash flow constraints and in the

shadow of an impending bankruptcy, or would have had to pay in a fanciful world in which a

subset of high-value cases did not exist.  Dr. Mullin's biased and distorted forecasts cannot be

meaningfully compared to the thoughtful, unbiased and fully articulated expert judgments of Dr.

Peterson and Dr. Vasquez.

### 2.    Dr. Mullin's estimate is inconsistent with the facts.

In addition, the Debtors' estimation should be rejected for the simple reason that Dr.

Mullin's analysis is fundamentally inconsistent with the Debtors' data.  The crux of Dr. Mullin's

estimation is that there are three categories of claims: (1) claims settled for more than $200,000,

which are driven by liability; (2) claims settled for an amount between $200,000 and $50,000,

which are driven by liability and "implicit defense costs"; and (3) claims settled for less than

$50,000, which are driven by "implicit defense costs" alone.[62]  Dr. Mullin then estimates the

Debtors' liabilities by forecasting the number of claims in each category and then multiplying by

the average value of the claims in each category.[63]  The Debtors' data, however, does not support

---

[62]    *See, e.g.*, 1/8/13 Hr'g Tr. 182:21–183:12 (Mullin).

[63]    *See, e.g.*, 1/7/13 Hr'g Tr. 246:13–17 (Mullin) ("And I ultimately put those into four
categories which I viewed as, you know, high-value, mid-value, low-value, and claims that
would be dismissed.  And then for each of those types of claims I continued to analyze to figure
out how much money was associated on average with each of those claim types."); 1/9/13 Hr'g

Dr. Mullin's categories.  Indeed, Dr. Vasquez determined that Dr. Mullin's model of the

Debtors' liability, with its inflection points at $50,000 and $200,000, is only the 39th most

accurate model that Dr. Mullin could have chosen to explain the Debtors' data.[64]  Any of the 38

more accurate models would have revealed that there is no significant differentiation among

claims that settled for less than $200,000.[65]  Dr. Mullin himself conceded as much at trial:

"there's a very big difference between claims that were paid more than 200,000 and claims that

were paid less. . . .  So it's coming in and saying we know the behavior of claims that were

settled for more than 200 is profoundly different than the ones that are less."[66]  Given this

concession it was not surprising that when Dr. Peterson recreated Dr. Mullin's regression

analysis with the accurate (and more appropriate) sample set of true individually settled claims

(432 of the 806 cases Dr. Mullin subjectively classified as individually settled), it failed to

support Dr. Mullin's theory.  There is no reason to subdivide the Debtors' claims into a third

category at $50,000 other than to prop up Dr. Mullin's theory.

In fact, Dr. Mullin concedes that his third category of claims—those that do not reflect

liability—may not exist all.  Indeed, he argues that it does not matter "whether you truly believe

that zero to 50 is de minimis and 50 to 200 has a material portion of both, or there's a little bit of

---

Tr. 36:11–14 (Mullin) ("Q: And then what you did was take those 300 claims and allocate them between high, low and medium-value claims. Is that fair?  A: Correct.").

[64]  *See* 1/8/13 Hr'g Tr. 199:2–7 (Mullin).  Indeed, in the other 39 models, $200,000 was the lower inflection point.  Mapping his theory onto any of these better interpretations of the data would have required Dr. Mullin to argue that the Debtors had no liability for any claim settled for less than $200,000.  It is not surprising that Dr. Mullin selected the 39th-best model rather than make that argument.

[65]  *See* 1/8/13 Hr'g Tr. 200:16–19 (Mullin).

[66]  *See* 1/8/13 Hr'g Tr. 200:4–10 (Mullin).

liability in the zero to 50 range and a little less in the 50 to 200."[67]  Yet Dr. Mullin's entire

estimation depends on the premise that certain settlements reflect liability, that certain others do

not, and that he can tell which are which.[68]  Given his concession that he cannot, Dr. Mullin's

estimate should not be credited by the Court.

Furthermore, Dr. Mullin's assertion that his technique in these cases of deducting

"implicit defense costs" from his forecast and adjusting for the Debtors' alleged "several share"

is no different than what Dr. Vasquez did in *Owens Corning* is nonsensical.[69]  According to Dr.

Vasquez, Dr. Mullin's comparison is "not even in the same ballpark."[70]  In *Owens Corning*, it

was a fact that punitive damages were assessed against the debtors.  These punitive damages had

been fixed by a court at a definite amount.[71]  Here, in contrast, Dr. Mullin's "implicit defense

costs" are merely a theory.[72]  No court has ever separately awarded or quantified "implicit

---

[67]  1/8/13 Hr'g Tr. 200:22–25 (Mullin).

[68]  *See, e.g.*, 1/8/13 Hr'g Tr. 182:21–183:12 (Mullin) ("And that's really where the econometrics tools came in is they let—so these come out of the data that says settlements less than 50,000 have no connection to the damages of the claimant.  These are settlements that generally are in that nuisance category.  Settlements in the range of 50,000 to 200,000 are a mixture. . . .  And, again, above 200,000 it really is the liability that's the driving force.").

[69]  *See* Debtors' Amended Post-Trial Brief, at 32.

[70]  1/11/13 Hr'g Tr. 132:25 (Vasquez).

[71]  1/11/13 Hr'g Tr. 132:25–133:13 (Vasquez) ("In Owens Corning, because I did it, we had claimant data with verdicts and that data, the verdict amounts were split into compensatory and punitive and we had a large number of observations, so real world numbers.").

[72]  A theory that the facts show is entirely litigation driven.  If asbestos cases were really being settled solely to avoid defense costs, surely the Debtors would have raised the issue in their lawsuit against their insurers, where it might have resulted in millions of dollars in additional coverage.  They did not.  Instead, they raised the argument *only* with respect to a single non-asbestos claim.  *See* Debtors' Opening Brief, at 74-77, filed in *Bondex Int'l, Inc. v. Hartford Accident and Indemnity Co., et al.*, Nos. 08-4735 (6th Cir.) (wherein the Debtors argued that their insurer settled a non-asbestos case for the purpose of avoiding defense costs and therefore improperly applied that settlement towards exhaustion of the policy's indemnity limits).  That the

defense costs."  In spite of this, Dr. Mullin attempts to sort out separate hypothetical components—never even identified by a court or by a party—from integrated settlement amounts.  While Dr. Vasquez had actual data on punitive damages to work with in *Owens Corning*, "implicit defense costs" are unobservable and can only ever be guessed at.[73]  Moreover, implicit defense could represent a positive or negative cost to the Debtors.  While punitive damages are only assessed against defendants, "implicit defense costs" if they exist, can be borne by plaintiffs and defendants in equal measure.[74]  "Implicit defense costs," therefore, cannot simply be added up in the way that punitive damages can.

Finally, Dr. Mullin's contention that the same exact claims must form the basis of the propensity-to-sue calculation and the average-settlement-value calculation is wrong.[75]  Because there is a year-and-a-half lag between a claim's filing date and its settlement date, most of the Debtors' most recent claim filings would necessarily be excluded from consideration because they lack a settlement date.[76]  Moreover, a claim's settlement date and amount are subject to manipulation by the Debtors, and it stands to reason that the few claims that the Debtors chose to settle in 2010 while preparing for their imminent bankruptcy are not necessarily representative of their claims inventory or their settlement practices generally.  Therefore, when Dr. Mullin

---

Debtors made no such argument with respect to the asbestos cases shows that they did not believe those cases were being settled for any purpose other than to avoid the "actual liability" the Debtors so commonly refer to in this case.

[73]  *See* 1/11/13 Hr'g Tr. 133:5–7 (Vasquez) ("The huge difference between that and what Dr. Mullin did, you could never observe implicit defense, right?  It's implicit.").

[74]  *See, e.g.*, 1/11/13 Hr'g Tr. 273:25–274:12 (Mullin) ("Q . . . It's your theory that the costs are unequal one way as opposed to the other.  Is that right?  A Well, I mean, I think the data is very supportive of that . . . .").

[75]  *See* Debtors' Amended Post-Trial Brief, at 72–73.

[76]  *See* Debtors' Amended Post-Trial Brief, at 49.

calculates the average settlement value for claims filed in 2009 and 2010, he is necessarily relying on a thin sample of claim settlement amounts that is likely to be misleading.

For instance, Dr. Mullin calculates that the average settlement value for claims filed in 2010 is $75,000.[77] Tellingly, Dr. Mullin never indicates how many claims he includes in this 2010 "average," but there are unlikely to be many claims that were filed after January 1, 2010, and settled before the Petition Date in May, given that Debtors average a year and a half between filing and settlement. Though Dr. Mullin chooses to proceed as though the Debtors' most recent settlement data is unexceptional, the Debtors' data demonstrates that that is simply not so—the 2009 and 2010 settlement averages calculated by Dr. Mullin are more than 20% lower than the amount he calculates for 2008, which is the most recent reliable sample of the Debtors' claims settlement values given the combination of the lag between filing and settlement and the impact of bankruptcy planning on the Debtors' settlement and payment practices.[78]

**D.      The Debtors' Use of THAN Trust Data Has No Relevance to Estimation.**

The Debtors' use of any data derived from the T H Agricultural & Nutrition, LLC ("**THAN**") trust database has no relevance to estimating the Debtors' aggregate asbestos personal injury claims. Both THAN and Bondex International each settled its own share of liability with personal injury claimants and did not settle the other's share.[79] Therefore, any attempt by the Debtors to eliminate or reduce their liability to those claimants who have asserted

---

[77]  *See* Debtors' Amended Post-Trial Brief, at 50.

[78]  *See* Debtors' Amended Post-Trial Brief, at 50.

[79]  1/10/13 Hr'g Tr. 99:11–100:6 (Iola) ("Bondex never paid for THAN, and THAN never paid for Bondex. They both have independent liability both in several liability jurisdictions and joint and several liability jurisdictions."); *see also* 1/8/13 Hr'g Tr. 304:21–305:12 (Mullin) (noting that each company has some underlying share of liability).

and been paid claims from the THAN trust, and future claimants who may file claims against the THAN trust, is without merit.

THAN and its predecessor, Thomas-Haywood Company, distributed asbestos fiber throughout the United States on behalf of Carey-Canadian Mines, Ltd.[80]  THAN was a principal asbestos fiber supplier to Bondex International **prior to June 1966**.[81]  It was not the sole supplier of asbestos fiber to Bondex International.[82]  Personal injury claimants who filed complaints against the Debtors typically identified THAN as a co-defendant in those same complaints.[83] *Both* THAN and Bondex International provided settlement payments in cases.[84]  Additionally, Bondex International never asked for a discount in settling cases because a plaintiff received money from THAN.[85]  Nor did Bondex International ever assert a contribution claim against any other co-defendant or trust, including the THAN trust.[86]

---

[80]  *See* Debtors' Ex. 25, at 22–24.

[81]  *See* Debtors' Ex. 25, at 24.

[82]  1/8/13 Hr'g Tr. 302:25–303:4 (Mullin) ("Q Well, let's just do it this way, THAN or its predecessor was one of the suppliers of asbestos to Bondex, right?  A Correct, that's my understanding.  Q Okay.  That wasn't the only supplier, right?  A No, I don't believe it was the only supplier.").

[83]  1/10/13 Hr'g Tr. 99:11–13 (Iola) ("Q Mr. Iola, was THAN typically a defendant in state court litigation when Bondex was named?  A They were."); *see also* 1/8/13 Hr'g Tr. 304:14–19 (Mullin) (THAN and Bondex International were sometimes treated as co-tortfeasors in the tort system).

[84]  1/10/13 Hr'g Tr. 99:14–16 (Iola) ("Q And in your experience did both THAN and Bondex provide settlements in your cases?  A They did.").

[85]  1/10/13 Hr'g Tr. 99:17–100:6 (Iola) ("Q And do you recall Bondex ever asking for a discount because a plaintiff had received money from THAN?  A Not only did they not ask for one they wouldn't be entitled to one.").

[86]  *See* 1/10/13 Hr'g Tr. 84:3–6 (Iola) ("And I find it interesting in this whole discussion here that I am unaware that Bondex ever filed or prosecuted cross claims for  contribution or indemnity in any of my cases against anyone."); 1/8/13 Hr'g Tr. 274:18–22 (Mullin) ("I'm not aware of [Bondex International] pursuing contribution claims.").

Indeed, claims such as setoff and contribution are only available in the trial verdict setting, not in settlement.  Therefore, assuming the Debtors' argument has any merit, which the Claimants' Representatives do not believe to be the case, at the most, the Debtors would be entitled to an offset for a very small subset of cases—namely, those cases that went to verdict at trial, and of those cases, only the ones involving THAN as a co-defendant.[87]

III.    **Both as a Matter of Law and Based on the Record Before this Court, There is No Basis for This Court to Find that the Debtors Have No Liability for Claims Arising from Products Manufactured and Sold by Reardon.**

The Debtors persist in asking this Court to deprive a class of present and future asbestos personal injury claimants, which has not been identified with any specificity, of the right to have their claims resolved by an Article III or state trial court.  As set forth in detail in the Oppositions to the Declaratory Motions,[88] and incorporated herein by reference, this Court does not have

---

[87]    Moreover, while the THAN trust was initiated as a 100% paying trust, the distribution from the trust was reduced to 30% as of April 1, 2011, and could be reduced even further over time. *See* 1/8/13 Hr'g Tr. 299:13–23 (Mullin) ("Q And it was originally funded as a 100 percent payment trust, isn't that right?  A Yes, it was originally supposed to pay 100 cent dollars . . . . [C]laim[s] in the future in general are receiving 30 cent dollars."); *see also* T H Agric. & Nutrition, L.L.C. Asbestos Pers. Injury Trust, Payment Percentage Notice, http://www.thanasbestostrust.com/Files/20110321_THAN_Payment_Percentage_Notice.pdf. Therefore, those claimants who were paid or will be paid from the THAN trust on or after April 1, 2011, are not receiving full payment from the THAN trust in any event, which further weakens the Debtors' argument.

[88]    On December 5, 2012, Debtors filed the Debtors' Motion for Determination That Neither Debtor Has Liability for Asbestos Personal Injury Claims Arising from Products Manufactured and Sold by The Reardon Company [D.I. 3247] (the "**Reardon Motion**") and the Debtors' Motion for Determination that Specialty Products Holding Corp. is not Liable for Asbestos Personal Injury Claims Arising from Products Manufactured and Sold by Bondex International, Inc. [D.I. 3246] (the "**Bondex Motion**") (collectively, the "**Declaratory Motions**").  On December 14, 2012, the Claimants' Representatives filed a Response in Opposition to the Reardon Motion [D.I. 3306] (the "**Opposition to the Reardon Motion**") and a Response in Opposition to the Bondex Motion [D.I. 3305] (the "**Opposition to the Bondex Motion**")

jurisdiction to conclude, as a matter of law, that neither Debtor is liable for claims based on alleged exposures prior to 1966. To the extent the Debtors intend to seek such declaratory relief in these bankruptcy proceedings, they must do so pursuant to a properly commenced adversary proceeding.[89]

Even if this Court were, solely for estimation purposes,[90] to address the merits of the Debtors' argument that neither Bondex nor SPHC is liable for claims arising from products manufactured and sold by Reardon, there is no basis on the record before it to make such a determination. Devoid from this record is any factual basis for this Court to (1) determine, with any reliability, the claims, present and future, which are based solely on alleged exposure prior to 1966, and (2) assess the impact of the Ohio statute on SPHC and Bondex.

### A.    This Court Does Not Have Jurisdiction to Grant the Dispositive Relief Sought By the Debtors.

The Debtors seek relief that this Court lacks jurisdiction to grant. Bankruptcy courts are vested with jurisdiction to estimate the aggregate value of asbestos claims against a debtor for purposes of plan confirmation, because estimation for such purpose is a "core proceeding:"

---

(collectively, the "Oppositions to the Declaratory Motions"). On December 17, 2012, the Court denied the Declaratory Motions without prejudice. 12/17/12 Hr'g Tr. 135:9–22 [D.I. 3353].

[89]    *See* Opposition to the Bondex Motion, at 7–9; Opposition to the Reardon Motion, at 4. Moreover, since the Court lacks jurisdiction to enter a final order on these issues, any complaint would have to be filed in the district court. *See* 28 U.S.C. § 157(b)(5). Such a declaratory judgment action likely could not survive as against future claimants, though. First, there exists no "actual controversy" pursuant to 28 U.S.C. § 2201 to establish declaratory-judgment jurisdiction with respect to future claimants whose injuries may not even have manifested themselves yet. Further, binding future claimants through a declaratory-judgment action would unquestionably violate their due process rights. *See G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.)*, 2005 WL 1719224, at *4 (D.N.J. July 6, 2005).

[90] To the extent such claims are valued at zero for purposes of estimation, it is the position of the Claimants' Representatives that such claims cannot be channeled to any trust created pursuant to section 524(g).

> (2) Core proceedings include, but are not limited to-
> . . .
> (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11 . . . *but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11 . . . .*

28 U.S.C. § 157(b)(2)(B) (emphasis added).  As a result, while estimation of asbestos claims for purposes of voting and plan confirmation is within this Court's jurisdiction, estimation for purposes of liquidating at no value a class of claims against a debtor based on an argument under state law, is not within this Court's "core proceeding" jurisdiction.  That is because asbestos claimants whose claims are disputed by the Debtors have a Seventh Amendment right to a jury trial in an Article III or state trial court to determine the appropriate liquidated value of their claims.  28 U.S.C. § 157(b)(5); *Parks v. Visteon Corp. (In re Visteon Corp.)*, 2011 U.S. Dist. LEXIS 49302, at *10 (D. Del. May 9, 2011) ("The mandate from Section 157(b)(5), that personal injury tort and wrongful death claims be tried by the district court, effectively deprives the Bankruptcy Court of jurisdiction to entertain the instant action."); *UNR Indus., Inc. v. Cont'l Ins. Co.*, 101 B.R. 524, 526 (N.D. Ill. 1989) (personal injury claims may only be tried "in the district court and a bankruptcy judge may not estimate such claims for purposes of liquidation"); *In re Poole Funeral Chapel*, 63 B.R. 527, 532 (Bankr. N.D. Ala. 1986) ("As to the counts sounding in tort, the plaintiffs are entitled to jury trials in some court for purposes of distribution. The bankruptcy court has the right and duty only to estimate these claims for the purposes of confirming a plan under Chapter 11, and that is a core proceeding");  *Farley*, 146 B.R. at 752–53 (rejecting debtor's request for final determination of debtor's personal injury liability under state law).

Here, the Debtors seek to deprive a class of present and future asbestos personal injury claimants of their right to have their claims resolved by an Article III or state trial court.  As the Debtors attempt here, the debtor in *In re Farley* "argue[d] this Court can finally determine [liability for tort claims under state law], and therefore should estimate at zero."  *Farley*, 146 B.R. at 752.  The debtor "thereby seeks judgment that will collaterally estop the state court claims against it."  *Id*.  The bankruptcy court explained, "[h]owever, this Court *has no authority* to determine finally a personal injury claim. . . .  This is but a limited estimation proceeding."  *Id*. at 752–53 (emphasis added).

The Debtors seek the same relief that the *Farley* court rejected: a final determination that all personal injury claims against Bondex and SPHC arising from alleged exposures prior to 1966 have a liquidated value of zero.  An issue that is beyond the jurisdiction of this Court.

**B.     The Dispositive Relief Sought by the Debtors Can Only Be Adjudicated in the Context of an Adversary Proceeding.**

Even assuming the Debtors can overcome the jurisdictional obstacle to the relief sought, which they cannot, adjudication of liability for claims brought against Bondex and/or SPHC can only be determined in an adversary proceeding.  As set forth in detail in the Opposition to the Reardon Motion, failure to litigate the issue of Bondex and SPHC's liability pursuant to an adversary proceeding would violate basic principles of due process.[91]  By seeking to have this Court reach dispositive relief in the context of estimation, the Debtors seek to circumvent the

---

[91] *Cf. G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.),* 2005 WL 1719224 (D.N.J. July 6, 2005) (entering judgment on the pleadings in action seeking declaratory judgment of non-liability in bankruptcy proceeding, because forcing future claimants representative to defend rights of future claimants would violate their due process rights).

protections that an adversary proceeding confers on parties, as set forth in Rules 7001 through

7087 of the Federal Rules of Bankruptcy Procedure.

> **C.    Even if this Court Had Jurisdiction to Grant the Dispositive Relief Sought, the Debtors Failed to Present Sufficient Evidence Upon Which this Court Can Determine the Validity of Excluding Certain Claims from Estimation.**

In addition to the jurisdictional and procedural impediments to the relief sought, the

Debtors have failed to provide any factual basis for the Court to assess the impact of the Ohio

statute on SPHC and Bondex's liability.

In denying the Reardon Motion, the Court stated that although it could not make a final

determination regarding the applicability of the Ohio asbestos limitation statute, it would

nonetheless hear the evidence regarding the defenses "to the extent the debtor intends to rely on

that statute to say that certain claims shouldn't be estimated[,]" and the Court further required the

Debtors "to show me how [the claims] are subject to that statute."[92]  Notwithstanding this

instruction, the Debtors failed to present sufficient evidence for this Court to make a definitive

determination which claims solely alleged pre-1966 exposure and the enforceability of the Ohio

statute against any claimant or identified class of claimants.

Instead, the undisputed evidence presented by the Claimants' Representatives

demonstrates that prior to their bankruptcy cases, the Debtors never raised the Ohio asbestos

limitation statute as a defense to any claim.[93]  Significantly, there was also no evidence presented

by the Debtors that the Ohio statute would be raised as a defense by the Debtors had they

---

[92]    12/17/12 Hr'g Tr. 134:11–19.

[93]    9/24/12 Dep. Tr. 130:22–131:11 (Fleming); 10/16/12 Dep. Tr. 167:15–25 (Knoop); 10/8/12 Dep. Tr. 274:13–275:7 (Haggerty); 10/12/12 Dep. Tr. 188:13–189:15 (Tompkins); 1/1/12 Dep. Tr. 52:3–13 (Bowers) (the Debtors' national coordinating counsel from 1987 to 2007 did not know of the statute).

remained in, or were they to return to, the tort system.  As such, there is simply no basis for this

Court to conclude that any claims should be valued at zero for purposes of estimation on the

basis that such claims are barred by the Ohio Statute.

> ### 1.    The methodology Dr. Mullin used to calculate "Reardon-era" claims is unreliable.

The record is devoid of any evidence that would permit the Court to estimate the subset

of the declining and de minimis historical 6.1% of claims that Dr. Mullin calculated were

"Reardon-era" only claims[94] that **might** be subject to the Ohio statute.  Because he used a

methodology that classified claims exclusively by date,[95] there is no way of assessing whether

the claims he placed into the "Reardon-era" bucket would even have implicated the Ohio statute.

In addition, Dr. Mullin acknowledged the inherent unreliability in such an experiment.  Dr.

Mullin readily acknowledged that his assignments of "era" were based on generalities, stating

"it's very hard to know in any given year whether or not they [used Bondex], but they're saying I

used it on and off over a 30-year period."[96]

> ### 2.    The Debtors' choice of law analysis is inapplicable to an estimation of their aggregate asbestos liabilities.

Notwithstanding the legal principles governing estimation that require that this Court

estimate a debtor's aggregate liability based on what it would have been had the debtor remained

in the tort system, the Debtors improperly make a choice of law argument available to them only

---

[94]    Dr. Mullin calculated that 5.9% of the PIQ s were based on "Reardon-era" only exposures, *see* Debtors' Demonstrative 52, stating that as the exposed population ages, it will become more likely that future claimants will have been exposed to a far greater degree to product distributed in later time periods.  1/8/13 Hr'g Tr. 232:3–13 (Mullin).

[95]    *See* 1/8/13 Hr'g Tr. 223:9–224:4 (Mullin); Debtors' Demonstrative 49.

[96]    1/8/13 Hr'g Tr. 231:12–14 (Mullin).

because of their bankruptcy—arguing that Ohio law insulates the Debtors from further "Reardon-era" claims.  Relying on a decision addressing choice of law in litigation being conducted against the backdrop of a bankruptcy case,[97] the Debtors contend that a single state's law would cut off liability for all present and future claims.  Without citation, the Debtors assert that the same choice of law rules apply to aggregate claims estimation under section 524(g) as apply to claim adjudication,[98] while ignoring the wealth of authority which conclusively demonstrates that the two are fundamentally different.[99]

Further, in the tort system, each claimant would pursue his or her personal injury claim based on pre-1966 exposures under the state law applicable to his or her claim, including that state's choice of law principals.  As set forth in the Opposition to the Reardon Motion, many states' choice of law analyses would not apply a foreign state's successor liability statute to limit the liability of a successor corporation for the personal injuries and deaths caused by asbestos.[100]  For this reason alone, the Debtors' request must be denied.

Assuming, *arguendo*, the Court were to overcome the procedural bars and reach the merits of the Debtors' requested relief, the application of the Ohio statute that the Debtors seek

---

[97]  *See* Debtors' Amended Post-Trial Brief, at 82 (citing *PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839, 843 (3d Cir. 2005)).

[98]  The Debtors' reliance on *Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.)*, 333 B.R. 251, 260 (Bankr. W.D. Pa. 2005) (Fitzgerald, J.), which addresses choice of law in the context of the adjudication of a single claim, is inapplicable given the facts of the instant cases.

[99]  *See* Section I.B, *supra*.

[100]  *See* Opposition to the Reardon Motion, at 8–9 (*citing O'Brien Corp. v. Hunt-Wesson, Inc.*, No. 16562, 1999 Del. Ch. LEXIS 39, at *18 (Del. Ch. Feb. 25, 1999); *Debnam v. Crane Co.*, 976 A.2d 193, 199–200 & n.6 (D.C. 2009); *Savage Arms, Inc. v. W. Auto Supply Co.*, 18 P.3d 49, 53–54 (Alaska 2001)).

to invoke would be barred due to Delaware's choice of law rules.  As set forth in the Opposition

to the Reardon Motion, under Delaware's "most significant relationship" test, the appropriate

law to apply is that of Missouri, not Ohio, and Missouri has no statutory bar to asbestos personal

injury claims.[101]

### 3.    The Ohio statute is an unconstitutional impairment of claimants' rights.

Even if this Court were to determine that Ohio law applies, Ohio Code Section 2307.97

violates the Ohio Constitution because it applies retroactively and therefore improperly impairs

asbestos claimants' rights.[102]  The Debtors' attempt to distinguish cases that have declared

similar liability-limiting statutes to be unconstitutional conveniently ignores binding Third

Circuit authority and the statements of this Court.  *See In re Grossman's Inc.*, 607 F.3d 114 (3d

Cir. 2010); 12/17/12 Hr'g Tr. 81:16–19 ("Well, I think probably the Third Circuit's put that issue

to bed by saying that the date of first exposure up to the date of confirmation of the plan

constitutes a claim.").  Under Ohio law, a statute is unconstitutional if it applies retroactively and

"impairs vested rights, affects an accrued substantive right, or imposes new or additional

burdens, duties, obligations or liabilities as to a past transaction."  *Ohio ex. Rel. A.J. Rose Mfr.,*

No. 11AP-379, 2012 WL 4364274, at *2 (Ohio Ct. App. Sept. 25, 2002).  Under *Grossman's*,

the claims in these cases vested on the dates of exposure, and this Court should not apply the

unconstitutional Ohio statute.

---

[101]  *See* Opposition to the Reardon Motion, at 9–12.

[102]  *See* Opposition to the Reardon Motion, at 12–16; *see also Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 150 (Tex. 2010) (declaring similar Texas statute unconstitutional); *Ieropoli v. AC&S Corp.*, 842 A.2d 919, 932 (Pa. 2004) (same); *cf. Am. Optical Corp. v. Spiewak*, 73 So. 3d 120, 133 (Fla. 2011) (holding statute that required claimants to demonstrate a new element of an asbestos cause of action unconstitutional).

IV.    **Both as a Matter of Law and Based on the Record Before this Court, There Is No Basis for this Court to Find that SPHC Is Not Liable for Claims that Allege Exposure After 1972.**

For the reasons detailed at length in the Opposition to the Bondex Motion and the Claimants' Representatives' Post-Hearing Opening Brief,[103] the Court may not make a determination in the context of this estimation proceeding that SPHC has no liability for claims alleging exposure after 1972. First, such a determination may be made only in the context of an adversary proceeding in which claimants would likely seek and obtain a ruling that SPHC is liable for Bondex claims.[104] Second, the declaratory relief sought may not be entered at all against future claimants outside the contours of section 524(g).[105] Third, even if this Court addressed the issue of each Debtors' separate liability for pending and future claims the Debtors failed to provide sufficient evidence for this Court to definitely decide that SPHC is not liable for claims alleging exposure after 1972. The only liability this Court can, and should, estimate based on the record, is the portion of liability in which SPHC historically shares. And, fourth,

---

[103] Claimants' Representatives' Post-Hearing Opening Brief, at 81–85.

[104] *See* Opposition to the Bondex Motion, at 7–9; Opposition to the Reardon Motion, at 4. Moreover, since the Court lacks jurisdiction to enter a final order on these issues, any complaint would have to be filed in the district court. *See* 28 U.S.C. § 157(b)(5). Such a declaratory judgment action likely could not survive as against future claimants, though. First, there exists no "actual controversy" pursuant to 28 U.S.C. § 2201 to establish declaratory-judgment jurisdiction with respect to future claimants whose injuries may not even have manifested themselves yet. Further, binding future claimants through a declaratory-judgment action would unquestionably violate their due process rights. *See G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.)*, 2005 WL 1719224, at *4 (D.N.J. July 6, 2005).

[105] *In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 359–60 & n.9 (3d Cir. 2012) (bankruptcy court may grant a channeling injunction "only if" certain "statutory prerequisites" are met) (citations omitted); see also *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 n.45 (3d Cir. 2004) ("There are many statutory prerequisites imposed by § 524(g). . . . Many of these requirements are specifically tailored to protect the due process rights of future claimants.").

contrary to the purpose of estimation, a determination that SPHC has no liability for claims alleging exposure after 1972 would not assist in the formulation of any plan of reorganization.

A.    **This Court Does Not Have Jurisdiction to Grant the Dispositive Relief Sought By the Debtors.**

The Debtors seek dispositive relief that this Court lacks jurisdiction to grant.  As set forth in detail above Bankruptcy courts are vested with jurisdiction to estimate the aggregate value of asbestos claims against a debtor for purposes of plan confirmation, because estimation for such purpose is a "core proceeding:"  *See* 28 U.S.C. § 157(b)(2)(B).  As a result, while estimation of asbestos claims for purposes of voting and plan confirmation is within this Court's jurisdiction, estimation for purposes of liquidating at no value a class of claims against a debtor based on an argument regarding corporate separateness under state law, is not within this Court's "core proceeding" jurisdiction.  That is because asbestos claimants whose claims are disputed by the Debtors have a Seventh Amendment right to a jury trial in an Article III or state trial court to determine the appropriate liquidated value of their claims.  28 U.S.C. § 157(b)(5).

Here, the Debtors seek to deprive a class of present and future asbestos personal injury claimants of their right to have their claims resolved by an Article III or state trial court.  The Debtors seek the same relief that the *Farley* court rejected: a final determination that all personal injury claims against SPHC arising out of products marketed and sold by Bondex should be adjudged at a binding liquidated value of zero.  In other words, no asbestos claimant that bought a Bondex product that caused or contributed to his or her death from mesothelioma will ever be able to bring a claim against SPHC on grounds of, *inter alia*, piercing the corporate veil or alter ego.  The Court cannot do this, however, without violating the claimants' Seventh Amendment right to a jury trial, violating their due process rights, and exceeding section 157(b)(2)(B)

jurisdiction.  *See G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.)*, 2005 WL 1719224, at

*2, *4 (D.N.J. July 6, 2005) (forcing the future claimants' representative to defend unknown

future claimants against action seeking "preemptive declaration of non-liability based on state

law defenses" "does not comport with notions of due process."); *In re Farley*, 146 B.R. at 752–

53.  Because the Debtors ask the Court for relief it cannot give, their request should be rejected.

> **B.      The Dispositive Relief Sought by the Debtors Can Only Be Adjudicated in
> the Context of an Adversary Proceeding.**

As set forth above, even assuming the Debtors could overcome the jurisdictional obstacle

to the relief sought, which they cannot, adjudication of liability for claims brought against SPHC

can only be determined in an adversary proceeding.  The Debtors are effectively requesting entry

of a declaratory judgment by means other than a filed complaint, which violates the Federal

Rules of Bankruptcy Procedure.  Fed. R. Bankr. P. 3007(b) ("A party in interest shall not include

a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim,

but may include the objection in an adversary proceeding."); Fed. R. Bankr. P. 7001(9) ("The

following are adversary proceedings: . . . (9) a proceeding to obtain a declaratory judgment

relating to any of the foregoing . . . ."); *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-*

*Ruffin)*, 530 F.3d 230, 242 (3d Cir. 2008)  As set forth in detail in the Opposition to the Bondex

Motion, failure to litigate the issue of SPHC's liability pursuant to an adversary proceeding

would violate basic principles of due process.[106]  By seeking to have this Court reach dispositive

relief in the context of estimation, the Debtors seek to circumvent the protections that an

---

[106] *Cf. G-I Holdings, Inc. v. Bennet (In re G-I Holdings, Inc.),* 2005 WL 1719224 (D.N.J. July 6,
2005) (entering judgment on the pleadings in action seeking declaratory judgment of non-
liability in bankruptcy proceeding, because forcing future claimants representative to defend
rights of future claimants would violate their due process rights).

adversary proceeding confers on parties, as set forth in Rules 7001 through 7087 of the Federal

Rules of Bankruptcy Procedure.

### C.   Even if this Court Had Jurisdiction to Grant the Relief Sought, the Debtors Failed to Present Sufficient Evidence for this Court to Separately Estimate the Liability of the Debtors.

The Court noted, with respect to the Bondex Motion, that the Court would "determine at

the end of the trial when you show me, *affirmatively*, whether there is or is not liability for those

claims."[107]   The Debtors presented no evidence from which the Court could determine SPHC has

no liability for claims solely alleging exposure after 1972.  The undisputed evidence is that

(1) the Debtors never made any distinction in defending claims based on which entity such

claims were asserted against and (2) SPHC is "co-liable" for no less than 82% of the claims

against the Debtors.[108]

Whenever SPHC was named alongside Bondex, the Debtors retained the same counsel.[109]

And, Bondex never pursued a contribution claim, cross-claim, or indemnification claim against

SPHC.[110]

---

[107]  12/17/12 Hr'g Tr. 135:16–18 (emphasis added).

[108]  1/9/13 Hr'g Tr. 16:1–19 (Mullin) ("Q And if you look at those, 7.7, 7.0, 22.8, 47.7, which represents the amount of liability that is either in Reardon SPHC or SPHC Bondex, or solely SPHC, that comes up to 85.2 percent, is that right? A It's approximately 85 percent."); Debtors' Demonstratives 49–51, 87 at slide 21

[109]  1/7/13 Hr'g Tr. 103:2–25; 11/20/12 Dep. Tr. 22:15–23:4 (Evert) (when working as local counsel for Bondex, firm represented Bondex , RPM, Inc. (now SPHC), and RPM International, Inc.); 11/1/12 Dep. Tr. 8:4–20 (Bowers) (represented all three entities: Bondex, RPM, Inc. (now SPHC), and RPM International (sometime in the mid-2000s)); 10/8/12 Dep. Tr. 34:1–35:4 (Haggerty) (represented Bondex, RPM, Inc. (now SPHC), and RPM International).

[110]  10/8/12 Dep. Tr. 272:15–273:8 (Haggerty); 10/12/12 Dep. Tr. 286:14–287:9 (Tompkins).

While Dr. Mullin attempted to parse the Debtors' liability into "eras," even he acknowledged the inherent unreliability in such an experiment.  With regard to the "Bondex-era" claims, even assuming that Dr. Mullin and his staff correctly pulled the exposure dates alleged by claimants from historic claims files and PIQs,[111] Dr. Mullin testified that he had evaluated the "era" into which a claim might fall by using the dates when the legal entity selling the product changed.[112]  Because a claimant could have been exposed for at least the next five years after the legal entity changed,[113] Dr. Mullin's date boundaries fail to accurately capture which entity was or could be responsible for the sale of a particular claimants' product.  Dr. Mullin included in his 8.6% of historical, 15.6% of pending, "Bondex -era" claims all claims that asserted exposure after 1972, although clearly some post-1972 exposures would related to product distributed before the spin-off of Bondex from SPHC.  Dr. Mullin's assessment is unreliable.  In addition, Dr. Mullin readily acknowledged that his assignments of "era" were based on generalities, stating "it's very hard to know in any given year whether or not they [used Bondex], but they're saying I used it on and off over a 30-year period."[114]

As Dr. Mullin conceded on cross-examination, before his effort to "decompose" (i.e., arbitrarily assign to different "eras" liability that overlapped his defined periods), over 85% of the claims asserted historically against the Debtors could rightly be asserted against SPHC.[115]  Although Dr. Mullin tried to argue that failing to allocate would result in "double counting" the

---

[111]  1/8/13 Hr'g Tr. 153:6–13, 226:7–13, 228:6–18 (Mullin).

[112]  *See* 1/8/13 Hr'g Tr. 223:4–224:4 (Mullin); Debtors' Demonstrative 49.

[113]  Bondex joint compound has a "very, very long shelf life" that could be as long as "five years."  9/24/12 Dep. Tr. 247:19–248:1 (Fleming).

[114]  1/8/13 Hr'g Tr. 231:12–14 (Mullin).

[115]  1/9/13 Hr'g Tr. 16:15–19 (Mullin); *see also* Debtors' Demonstrative 50.

claims into different periods,[116] there is no legal basis for prohibiting a claimant from seeking compensation against the only remaining entity with money—SPHC. Accordingly, any other allocation is necessarily nonsensical and result driven.

> **D.**   **Allocation of the Separate "Eras" of Liability Will Not Aid in the Formulation of a Plan.**

As a practical matter, any effort by the Debtors to obtain a channeling of all of the claims arising from exposure to Bondex-brand asbestos products, while paying an amount attributable to only certain time frames, will not provide a reasonable approximation of the Debtors' liability. In the tort system, each claimant would have the right to individually challenge the application, constitutionality, and interpretation of the Ohio statute, and would have the opportunity to pursue piercing claims against SPHC.

In addition, the Debtors' contention that the Court must separately estimate the liability of each of the two Debtors does not implicate the "Reardon-era" liability, as both Debtors take the position that the Ohio statute bars further claims against them.

With respect to the scope of SPHC's liability, as set forth in detail in the Claimants' Representatives' Post-Hearing Opening Brief,[117] and incorporated herein by reference, there is no basis for this Court to determine that SPHC is not liable for claims alleging exposure after 1972. In fact, the only finding supported by the evidence before this Court is that SPHC is "co-liable" for no less than 82% of the claims against the Debtors.[118]

---

[116]  1/11/13 Hr'g Tr. 254:11–255:17 (Mullin); *see also* Debtors' Demonstrative 87, at slide 21.

[117]  Claimants' Representatives' Post-Hearing Opening Brief, at 81–85.

[118]  1/9/13 Hr'g Tr. 16:1–19 (Mullin) ("Q And if you look at those, 7.7, 7.0, 22.8, 47.7, which represents the amount of liability that is either in Reardon SPHC or SPHC Bondex, or solely SPHC, that comes up to 85.2 percent, is that right? A It's approximately 85 percent."); Debtors'

**V.      The Debtors' Medical Science Arguments Are Irrelevant and Have No Merit**

    **A.      Dr. Anderson's and Dr. Feingold's Testimony Is Irrelevant to Estimation and the Court Should Exclude It**

Nothing adduced by Drs. Anderson and Feingold is relevant to the Court's estimation of the Debtors' asbestos-related personal injury liability.  The Court should therefore disregard their testimony.  As the Claimants' Representatives argued previously, the testimony of Drs. Anderson and Feingold is admissible under Federal Rule of Evidence 702 *only* if such testimony is both relevant *and* reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).

The reasons for the irrelevance of Dr. Anderson and Dr. Feingold's testimony with respect to estimation are manifold.  First, none of the estimation experts—Drs. Peterson, Vasquez, and Mullin—relied on any asbestos-related medical science in rendering their opinions.  Second, Dr. Mullin does not rely on either Dr. Anderson's or Dr. Feingold's analysis of the historical settlement data or PIQs in determining his valuation of the Debtors' pending and future asbestos-related liabilities and Dr. Mullin does not even acknowledge Dr. Anderson's or Dr. Feingold's report in any of the three reports he issued in connection with the estimation.  Moreover, in his many hours on the stand, Dr. Mullin never expressed an estimation that in any way relied on, factored in, or even referred to the issues on which Drs. Anderson and Feingold testified.  Similarly, the Debtors' Amended Post-Trial Brief omits any discussion of how Dr. Anderson's and Dr. Feingold's testimony will assist this Court in determining the facts at issue.

The Debtors have spent over 30 years in the tort system, accumulating tens of thousands of claims resolutions in nearly every relevant jurisdiction, and taking only 30 mesothelioma

---

Demonstratives 49–51, 87 at slide 21.

cases to trial.  The evidence shows that throughout this extensive litigation history, the Debtors

repeatedly raised the chrysotile defenses that Drs. Anderson and Feingold espoused at the

Estimation Hearing, often utilizing the testamentary services of both as expert witnesses, but

they never prevailed.  The Debtors' tort history already incorporates the very defenses,

arguments, and analyses propounded by Drs. Anderson and Feingold.

Dr. Anderson and Dr. Feingold's testimony appears to support the central theme of the

Debtors' asbestos case—the tort system is unfair and bankruptcy should offer the Debtors a

different result.  Together, Drs. Anderson and Feingold have crafted a collective opinion, based

on a dubious analysis of the Debtors' historical settlement documents, that over 90% of the

Debtors' prepetition cases were not medically compensable.  Yet, at no time did the testimony

provided by Dr. Anderson or Dr. Feingold imply that their opinions would result in a shift to the

Debtors' settlement strategy.  Specifically, neither expert offered an opinion that the Debtors

would settle fewer cases going forward, or an opinion that asbestos victims would start bringing

fewer cases going forward.  Drs. Anderson and Feingold do not provide any relevant information

that will assist the Court in estimating the Debtors' pending and future asbestos-related personal

injury liabilities.  For these reasons, their proffered testimony should be excluded by the Court.

**B.**      **The Debtors' Medical Science Arguments Are Fundamentally Flawed**

To the extent the Court determines that it should rule on one or more of the medical

science issues on which testimony was presented, the Debtors' entire medical science case (i.e.

the chrysotile defense) and the arguments they make about it (discussed at pp. 15-23 of their

Amended Post-Trial Brief) form a house of cards that rests on four erroneous propositions: (1)

that Dr. Feingold's and Dr. Anderson's opinions about chrysotile are right while Dr. Welch, Dr.

Brody, and Ms. Ratterman are wrong; (2) that the review of the PIQs by Drs. Anderson and

Feingold means anything; (3) that the chrysotile defense is something that the estimation experts have not already taken into account in their projections of liability; and (4) that the case law governing causation in asbestos cases has changed or is changing.  All of these propositions are wrong, but the rejection by the Court of any one of them renders the whole debate irrelevant for purposes of estimation.

## 1.    Proposition One:  Feingold/Anderson v. Welch/Brody/Ratterman

The Debtors say in their papers "there is no published epidemiological study that demonstrates a cause and effect relationship between uncontaminated chrysotile and mesothelioma."[119]  They rely entirely on Dr. Feingold's and Dr. Anderson's review of the epidemiology literature for this astonishing assertion.  As the Claimants' Representatives pointed out in their brief, neither Dr. Feingold (who has never published a peer-reviewed paper on any subject) nor Dr. Anderson has ever designed or published an original epidemiology study relating to asbestos-exposed workers.  The only thing they rely on for their opinions about the ability of chrysotile to cause mesothelioma is their view of other people's epidemiology studies.[120]  Dr. Feingold's and Dr. Anderson's opinions are nonsense.  They are quintessential "experts for hire,"[121] and their testimony that chrysotile does not cause mesothelioma in humans except in extraordinary circumstances is contradicted by the conclusions of numerous studies.[122]

---

[119]   Debtors' Amended Post-Trial Brief, at 17.

[120]   *See* Claimants' Representatives' Post-Hearing Opening Brief, at 98.

[121]   *See e.g.* 1/8/13 Hr'g Tr. 92:16-98:4 (Feingold); 1/9/13 Hr'g Tr. 97:20-100:6 (Anderson).  Dr. Feingold has reviewed 20,000 litigation cases, testified on behalf of more than 100 different asbestos defendant companies, and personally received more than $30 million dollars based on gross billings of approximately $44.5 million.  1/8/13 Hr'g Tr. 92:16-102:23 (Feingold).  Dr. Anderson has served as an expert witness for asbestos defendants in over 500 cases, including over 100 for Bondex International.  1/9/13 Hr'g Tr. 97:20-100:6 (Anderson).  Ninety percent of

Dr. Welch, in contrast to Drs. Feingold and Anderson, is an expert in the epidemiology of asbestos disease, has been the designer and author of two of the largest epidemiology studies of asbestos-exposed workers ever conducted, has had her papers cited by the most recent IARC Monograph on Asbestos, and has spent most of her career doing research into the cause of asbestos-related disease.  She testified that since 1997 alone, there have been at least a dozen epidemiology studies conducted all over the world showing an increased risk of mesothelioma in cohorts of people exposed to chrysotile asbestos;[123] that there were case series and analytical epidemiology studies supporting her opinion that a few days of chrysotile exposure by itself causes mesothelioma in humans;[124] that exposure to Bondex joint compound for a few days also causes mesothelioma; and that in a mixed-exposure setting, there is no scientifically valid way to exclude chrysotile exposure from contributing to the causation.[125]  Dr. Welch's opinions were supported by the testimony of Dr. Ratterman (that joint compound exposures were enormously high exposures comparable to insulation) and of Dr. Brody (how chrysotile fibers cause

---

his litigation consulting work is for asbestos defendants.  1/9/13 Hr'g Tr. 100:18-25 (Anderson).  Neither has ever testified for a plaintiff in an asbestos case.  1/8/13 Hr'g Tr. 97:24-98:4 (Feingold); 1/9/13 Hr'g Tr. 101:1-3 (Anderson).

[122]  *See* Claimants' Representatives' Post-Trial Opening Brief, at 98-101; 1/9/13 Hr'g Tr. 112:16-113:6 (Anderson); 1/10/13 Hr'g Tr. 18:12-24:14 (Welch); 1/9/13 Hr'g Tr. 188:16-207:11 (Brody).

[123]  1/10/13 Hr'g Tr. 16:12-17:25 (Welch).  Regarding fiber potency specifically, Dr. Welch explained how more recent updates to the mesotheliomas arising in chrysotile exposed cohorts would substantially increase the potency of chrysotile as compared to the amphiboles and that in 2008, a Science Advisory Board convened by the Environmental Protection Agency to quantify the differences in fiber types concluded that the historical data was not sufficient to conclude that chrysotile asbestos was less potent than amphibole asbestos.  1/10/13 Tr. 30:25-34:15 (Welch).

[124]  1/10/13 Hr'g Tr. 22:9-24:14 (Welch).

[125]  1/10/13 Hr'g Tr. 36:4-40:9 (Welch)

mesothelioma on a cellular and genetic level). Dr. Brody's testimony in particular was entirely unrebutted by any expert proffered by the Debtors.

Finally, the debate between the experts over the hazards of chrysotile asbestos is only a debate in courtrooms.[126] Outside the courtroom, in the real world, every scientific agency that has ever studied the question has concluded that chrysotile causes mesothelioma, and that there is no safe level of exposure to it, and asbestos-containing joint compound is banned in this country because even sporadic use of it can kill people.

### 2.    Proposition Two:  Review of the PIQs by Drs. Feingold and Anderson

This is a classic case of "Garbage In/Garbage Out." The Feingold/Anderson review found that almost 90% of the claimants that submitted PIQs had evidence of at least some exposure to a Bondex asbestos-containing product,[127] and that the PIQ claims were not materially different from the claims Bondex International resolved historically in the tort system.[128] Yet Dr. Feingold's and Dr. Anderson's opinions were that over 90% of the mesothelioma claims asserted against the Debtors are "not medically compensable." The results of their questionnaire review rely entirely on their long-held opinions that chrysotile asbestos cannot cause mesothelioma in humans except in extreme circumstances that never occur.

---

[126] Juries hear the "chrysotile debate" in courtrooms around the country every day, yet as both Mr. Iola and Mr. Simon testified without contradiction, most jurors simply do not believe that chrysotile asbestos cannot cause mesothelioma. 1/10/13 Hr'g Tr. 88:2-89:2 (Iola); 1/10/13 Hr'g Tr. 141:1-18 (Simon). Defendants may win cases for other reasons (such as lack of product identification), but even Bondex International's defense lawyers don't really believe in the chrysotile defense. 1/10/13 Tr. 88:2-89:2 (Iola).

[127] 1/9/13 Hr'g Tr. 106:3-22 (Anderson).

[128] 1/9/13 Hr'g Tr. 84:10--15 (Anderson).

If other doctors who do believe chrysotile asbestos causes mesothelioma had reviewed the PIQs, the results would of course have been entirely different from those reached by Drs. Feingold and Anderson.  But there was no need to do so here.  The scheduling orders governing the Estimation Hearing made it quite clear from the outset that individual plaintiffs are not parties to the Estimation proceeding, and that no individual plaintiff was required to provide expert witness reports and expert testimony to prove the merits of his or her case against the Debtors.  All the PIQ review establishes is that if either Dr. Feingold or Dr. Anderson was asked to review mesothelioma cases against the Debtors, each would conclude that exposure to Bondex's joint compound did not cause the mesothelioma, which is exactly what they concluded in all the cases the Debtors hired them in before they went into bankruptcy.

### 3.    Proposition Three: that the medical science defense should affect the estimation experts

The medical scientific issues disputed by the parties here were issues in virtually every mesothelioma case the Debtors ever faced as defendants in the tort system, thus, it is already "baked into" the Debtors' claims resolution history.  When these issues were tried to a jury, sometimes the jury found in favor of the Debtors, and other times in favor of the plaintiff, but in the vast majority of cases the parties resolved the dispute by settlement long before a verdict was possible.  The uncontradicted testimony of Jeffrey Simon and Mark Iola makes clear that the chrysotile defense was already something the lawyers on both sides were well aware of and took into account in deciding whether and at what price to resolve cases.[129]  Because the chrysotile defense is already reflected in the Debtors' claims resolution history, neither Dr. Peterson nor Dr. Vasquez had any need to adjust their estimates because of it.

---

[129]  1/10/13 Hr'g Tr. 88:2-89:2 (Iola); 1/10/13 Hr'g Tr. 141:1-18 (Simon).

### 4.    Proposition Four: The relevant case law has changed or is changing

To the extent that the Debtors argue that the case law governing causation in asbestos

cases has changed or is changing dramatically in its favor,[130] they are wrong.  The mesothelioma

causation case law in the key states where the majority of mesothelioma cases are litigated today

has remained the same—any exposure to asbestos, including chrysotile asbestos, can be a

substantial factor in causing mesothelioma, depending on the facts and circumstances of the

individual case.[131]

In federal court, the courts have issued several rulings after June of 2010, permitting

experts to opine that "each and every exposure to asbestos" can be a substantial factor in causing

mesothelioma.  *See Larson v. Bondex Int'l,* Case No. 09-69123, 2010 U.S. Dist. LEXIS 123090

(E.D. Pa., Nov. 15, 2010); Order, *Larson v. Bondex Int'l,* Case No. 2:08-CV-333 TS (D. Utah,

July 21, 2011) (attached as <u>Exhibit A</u>); Order, *Schumacher v. Amtico,* C.A. No. 2:10-1627, (E.D.

---

[130]  Debtors' Amended Post-Trial Brief, at 77–81.

[131]  *See, e.g.*, *McAskill v. American Marine Holding Co.*, 9 So. 3d 264, 268 (La. App. 2009) (holding that "brief exposures to asbestos have caused mesothelioma" and "every non-trivial exposure to asbestos contributes to and constitutes a cause of mesothelioma"); *Berger v. Amchem Prods.*, 818 N.Y.S. 2d 754, 761-62 (N.Y. Sup. Ct. 2006); *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1207 (Cal. 1997) (a plaintiff "is free to further establish that his particular asbestos disease is cumulative in nature, with many separate exposures each having constituted a 'substantial factor' that contributed to his risk of injury") (internal citations omitted); *Mavroudis v. Pittsburgh-Corning Corp.,* 935 P.2d 684, 687-89 (Wash. 1997) (any exposure to asbestos above background contributes to development of mesothelioma); *Spaur v. Owens-Corning Fiber Glass Corp.*, 510 N.W.2d 854, 861 (Iowa 1994) ("[I]t is not necessary and indeed may be impossible to establish exactly how much one party's asbestos product contributed to the resulting injury.  From the medical evidence presented, the jury could infer that [the defendant's product] was a contributing cause of [plaintiff's] disease."); *Thacker v. UNR Industries, Inc.*, 603 N.E.2d 449, 455 (Ill. 1992); *Sheffield v. Owens-Corning Fiberglass Corp.*, 595 So.2d 443, 456 (Ala. 1992) ("[e]xposure to asbestos for as little as one day can significantly contribute to, cause, and/or aggravate asbestos-related lung diseases.  The injurious effect of ingesting asbestos fibers into the lungs is cumulative.").

Pa. Nov. 2, 2010) (attached as <u>Exhibit B</u>).  In Virginia although the Supreme Court recently decided not to adopt the "substantial factor" test as the causation standard, in many ways the standard of proof there is now easier for asbestos plaintiffs to meet.  In *Ford Motor Co. v. Boomer*, 2013 Va. LEXIS 6 (Va. 2013), a case involving chrysotile exposure from brakes, the Court explicitly recognized that there could be multiple exposures to asbestos that can be a proximate cause of mesothelioma, and held that any exposure to asbestos that is sufficient to cause mesothelioma, which the court expressly noted is a no-safe-threshold disease, can be a proximate cause.  *Id*. at *9, 24.  *Betz v. Pneumo Abex, LLC*, 44 A.3d 27 (Pa. 2012), cited by the Debtors in their pretrial papers, held only that an expert cannot opine that exposure to a single asbestos fiber can be a substantial factor in causing mesothelioma, and expressly declined to decide how much exposure is needed to be a substantial factor in any particular case.  *Id.* at 55-58.  Finally, the case of *Dixon v. Ford Motor Co.*, 47 A.3d 1038 (Md. Ct. Spec. App. 2012) has been criticized by another panel of the Maryland Court of Special Appeals in the case of *Georgia-Pacific, LLC v. Farrar*, 53 A.3d 424, 446 n.5 (Md. Ct. Spec. App. 2012), and is under review by Maryland's highest court.  Far from the wonderful world for asbestos defendants that the Debtors suggest exists now, in fact very little has changed.

## VI.     The Appropriate Discount Rate Is the Risk-Free Rate.[132]

The Debtors erroneously contend that a "weighted average cost of capital" ("**WACC**") or, alternatively, a "prudent investor" discount rate should be used to determine the present value

---

[132]  For the Court's convenience, the Claimants' Representatives have attached as <u>Exhibit C</u> a chart comparing the estimations of Drs. Peterson, Vasquez, and Mullin under the different discount rates offered at trial.

of the Debtors' asbestos liabilities.[133]  This position is both flawed from a financial perspective

and contradicted by the well-established authority cited in the Claimants' Representatives' Post-

Hearing Opening Brief, which authority consistently has held that a "risk-free" discount rate is

the appropriate means by which to calculate the present value of future asbestos liabilities

estimated under section 502(c) of the Bankruptcy Code.[134]  The Claimants' Representatives are

not aware of any contrary authority, and the Debtors did not cite any.  The Debtors choose to

ignore the relevant cases and rely on cases having <u>nothing</u> to do with estimating the present value

of tort liabilities payable over time.[135]  The cases that address the application of the WACC are

focused entirely on valuing a company or its assets.[136]  WACC utilizes a company's ability to

yield a return through investment in its own capital structure.  *See Am. Classic Voyages Co.*, 367

B.R. at 513 (noting expert used "the capital structure, the cost of debt, and the cost of equity" in

WACC calculation); *Exide Techs.*, 303 B.R. at 64 (noting WACC was "based upon a combined

rate of the cost of debt capital and the cost of equity capital").  The WACC has nothing to do

---

[133]  Debtors' Amended Post-Trial Brief, at 90-91.

[134]  *See, e.g., Eagle-Picher*, 189 B.R. at 692 (accepting testimony of experts and employing discount rate that experts "understood . . . to approximate the current risk-free discount rate"); *In re Federal-Mogul Global, Inc.*, C.A. No. 05-59 (JHR), 2005 U.S. Dist LEXIS 17569, at *84-90 (D. Del. Aug. 19, 2005) (concluding that "the estimate should reflect [the relevant U.S. Treasury discount rate] and also come to some middle ground as to each expert's adjustment for inflation," where experts on both sides used risk-free discount factors); *Armstrong*, 348 B.R. at 126 n.20 (Bankr. D. Del. 2006) (adopting the parties' agreed upon discount rate, where experts on both sides had used U.S. Treasury bond rates for their respective calculations of the present value of asbestos liabilities); *see also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983) (holding that workers' compensation claimant is "entitled to a *risk-free* stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default" (emphasis added)).

[135]  Debtors' Amended Post-Trial Brief, at 91.

[136]  *Id.* (citing *In re American Classic Voyages, Co.*, 367 B.R. 500 (Bankr. D. Del. 2007) and *In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003)).

with the types of risk factors[137] the Debtors allege may exist in the forecasts of their asbestos liabilities. The WACC is simply not appropriate for analyzing the Debtors' asbestos liability obligation.

The "prudent investor" rate is similarly inappropriate in the present context. As with the WACC, there is nothing in the "prudent investor" rate that has anything to do with the risk factors discussed by the Debtors' expert. The Debtors' reliance[138] on *Pension Benefit Guar. Corp. v. Belfance* (*In re CSC Indus. Inc.*), 232 F.3d 505 (6th Cir. 2000), *Pension Benefit Guar. Corp. v. CF&I Fabricators of Utah* (*In re CF&I Fabricators of Utah*), 150 F.3d 1293 (10th Cir. 1998), and *LTV Corp. v. Pension Benefit Guar. Corp.* (*In re Chateaugay Corp.*), 126 B.R. 165 (Bankr. S.D.N.Y. 1991), *vacated, op. withdrawn sub nom. LTV Corp. v. PBGC*, 1993 U.S. Dist. LEXIS 21409 (S.D.N.Y. June 16, 1993), is equally misplaced. Those cases do not support the use of the "prudent investor" rate here as they uniformly address the narrow issue of determining the present value of the Pension Benefit Guaranty Corporation's ("**PBGC**") claims for unfunded benefit liabilities. None of these cases address the use of a "prudent investor" rate in the context of determining either the present value of tort claims or estimating the present value of future asbestos liabilities.

More recent decisions explicitly reject the concept of using the "prudent investor" discount rate in the context of determining the present value of PBGC claims because, among other things, doing so shifts the risk of loss to the beneficiaries. *See In re U.S. Airways Group,*

---

[137]  Debtors' Amended Post-Trial Brief, at 90; *see also* 1/8/13 Hr'g Tr. 23:25-24:9 (Coleman) (discussing "market risk premium" in WACC); 1/8/13 Hr'g Tr. 33:22-36:15 (Coleman) (discussing various risks he considered in using WACC).

[138]  Debtors' Amended Post-Trial Brief, at 91.

*Inc.*, 303 B.R. 784, 798 (Bankr. E.D. Va. 2003). In *U.S. Airways*, the court addressed the present value of PBGC claims for unfunded benefit liabilities and *rejected adoption of a reasonably prudent investor rate*. *Id.* at 798. In rejecting application of the reasonably prudent investor rate, the *U.S. Airways* court reasoned that "the use of a 'prudent investor' rate impermissibly shifts the risk of loss from adverse stock market performance—such as led to the termination of the [pension plan] in the first instance—to the retirees." *Id.*[139] The more analogous cases in the PBGC context are those that recognize that shifting the risk to the beneficiaries of a trust is not appropriate in the context of determining the present value of future liabilities. *See U.S. Airways*, 303 B.R. at 798; *Dugan*, 382 B.R. at 560.

In addition to being legally wrong, the Debtors' position is clearly flawed from a logical and financial perspective. Increasing the discount rate is not the proper means to address any uncertainty or risk associated with the accuracy of the estimates. Doing so only reduces the present value of the estimates even further when such estimates may be too conservative to begin with. The Debtors' inclusion of a risk premium in the discount rate analysis ignores the possibility that the estimates are too low and actually biases the present value analysis only in

---

[139]  See also Crawford v. Riley (In re Wolverine, Proctor & Schwartz, LLC), 436 B.R. 253, 262 (D. Mass. 2010) (district court affirmed bankruptcy court's application of PBGC's regulation regarding the discount rate instead of the "so-called 'prudent investor' discount rate found in [the CSC Industries and CF&I Fabricators Circuit Court opinions]"); Dugan v. Pension Ben. Guar. Corp. (In re Rhodes, Inc.), 382 B.R. 550, 560 (Bankr. N.D. Ga. 2008) (bankruptcy court denied claim objection seeking to have PBGC's claim recomputed and stated "[t]he liability for the stream of payments to be made in the future is the liability of PBGC to pension plan beneficiaries and participants; Debtors have no liability for future payments to pension plan beneficiaries and participants or to the PBGC").

favor of the assumption that the estimates are too high.[140]  This results in an upward adjustment of the discount rate, which, in turn, reduces the calculated present value of the estimates.

Selection of the appropriate discount rate involves the simple application of the commonly accepted "time value of money" concept.  The rate of return on U.S. government securities—the "risk-free" rate—is the appropriate discount rate to use here, because it does not bias the analysis and the present value calculation one way or the other as it reflects only the time value of money based on a point in time (in this instance, the Petition Date) without the addition of risk factors.

Even the use of a "risk-free" rate is not entirely free of risk.  Since the Petition Date, the yield on U.S. government securities has continued to decline.  For instance, as of the Petition Date, the yield on 10-year and 30-year U.S. government securities was 3.31% and 4.22%, respectively; however, as of February 15, 2013, the yield on such securities had declined to 2.01% and 3.18%, respectively.[141]  This means that a lump-sum payment that was reduced to a present value using a 3.45% discount rate, invested at today's prevailing risk-free rates of return, would not be sufficient to generate the future cash flows necessary to meet the payments that are forecast to be due over time.  Use of a discount rate greater than 3.45% would reduce such a lump-sum payment further and make the task of generating required cash flows even more difficult.

---

[140]  Debtors' Amended Post-Trial Brief, at 54; *see also* 1/8/13 Hr'g Tr. 15:16-19 (Coleman); 1/11/13 Hr'g Tr. 68:14-16; 69:2-8 (Braun).

[141]  Federal Reserve Board Statistical Release, dated February 19, 2013.

The Debtors' suggestion that using a risk-free rate will somehow generate a windfall for the asbestos trust[142] is simply wrong and ignores the experiences of certain asbestos trusts and the fact that administrators of public pension plans can incorporate higher-risk investment strategies since those plans are backstopped by the state.  As Mr. Sinclair testified, to the extent that certain of the asbestos trusts have invested in higher risk instruments, they were forced to do so since they were underfunded and the trustees attempted to achieve greater returns to meet future obligations.[143]  But as Mr. Sinclair also testified, this strategy is not without significant risk.  He specifically referenced the experience of asbestos trusts, including the *Owens Corning* trust, which lost value in the recent economic downturn.[144]  Thus, the investment in high risk instruments, though creating the possibility of achieving higher rate returns, exposes the trust beneficiaries to a higher risk of loss.  Unlike asbestos trust beneficiaries, public pension fund beneficiaries are protected from risks associated with aggressive investments since the pension funds can call upon the full faith and credit of the state to meet payment obligations if the funds are underfunded.[145]  Consequently, public pension plan administrators are free to employ investment strategies that would not be prudent for asbestos trusts.

---

[142]  Debtors Amended Post-Trial Brief, at 92.

[143]  1/9/13 Hr'g Tr. 226:2-227:8 (Sinclair)

[144]  1/9/13 Hr'g Tr. 225:2-12; 225:16-226:1 (Sinclair).

[145]  *Public Sch. Ret. Sys. of Mo. v. State St. Bank & Trust Co.*, 640 F.3d 821, 839 n.7 (8th Cir. 2011) ("State case law from outside Missouri supports the conclusion that the State of Missouri is contractually obligated to pay retirement benefits to the public-school employees who contribute to the Retirement Systems.  *See, e.g.*, *Kosa v. Treasurer of the State of Mich.*, 292 N.W.2d 452, 461, 465 (Mich. 1980) (noting that the 'contractual obligation [is] between public employees and the Legislature'); *Weaver v. Evans*, 495 P.2d 639, 649 (Wash. 1972) (noting that teachers have a 'legislatively promised' contractual right to a retirement benefit); *Dadisman v. Moore*, 384 S.E.2d 816, 829 (W. Va. 1989) (noting that '[t]he State has a contract with [the retirement system's] members and retirants' and that 'statutorily promised pension benefits'

Unlike the risk-free rate, the WACC and the "prudent investor" rates suggested by the Debtors do incorporate additional risk components and impermissibly shift the risk of loss on future investments to the asbestos claimants.  The use of those rates is therefore not appropriate in the estimation context.

### CONCLUSION

The Claimants' Representatives contend that the proof submitted at the Estimation Hearing conclusively demonstrated that Dr. Peterson's and Dr. Vasquez's forecasts of the Debtors' asbestos-related mesothelioma liabilities are in accord with applicable scientific, methodological, and legal principles.  The Claimants' Representatives therefore respectfully request that the Court adopt their proffered forecasts as the most accurate estimate of the Debtors' projected liabilities for such claims as of the Petition Date.

Dated: Wilmington, Delaware　　**MONTGOMERY, McCRACKEN,**
　　　　February 22, 2013　　　　**WALKER & RHOADS, LLP**

　　　　　　　　　　　　　　　*/s/ Natalie D. Ramsey*

---

create a 'general and moral obligation of the State'); *see also Valdes v. Cory*, 189 Cal. Rptr. 212, 223, 225 (Cal. Ct. App. 1983) (suggesting that both the State and the retirement system are contractually obligated to pay retirants, but noting that 'payment of statutorily defined benefits, upon maturity, is a general obligation of the state'"); *see also* Jennifer Staman, Cong. Research Serv., State and Local Pension Plans and Fiscal Distress: A Legal Overview 5 (2011) ("In some states, there is a specific constitutional provision addressing protection for public pensions as contractual obligations.  At least six states have a constitutional provision that, in general, explicitly provides that membership in, or accrued benefits from, a state's retirement system creates a contract between the state and its employees that cannot be impaired."); Jeffrey R. Brown & David W. Wilcox, Discounting State and Local Pension Liabilities, 99 *Am. Econ. Rev.* 538, 539 (2009) ("In a majority of states, public-sector pension obligations are protected by state constitutional provisions.  In eight states, these constitutional protections take the form of explicit benefit guarantees. . . .  Even state constitutions that do not explicitly guarantee the pension benefits of state and local workers generally do include language protecting contracts.").

Natalie D. Ramsey (DE Bar No. 5378)
Davis Lee Wright (DE Bar No. 4324)
1105 North Market Street, Suite 1500
Wilmington, DE  19801
(302) 504-7800
nramsey@mmwr.com

-and-

Mark B. Sheppard (admitted *pro hac vice*)
Lathrop B. Nelson, III (admitted *pro hac vice*)
123 South Broad Street, 24th Floor
Philadelphia, PA  19109
(215) 772-1500

-and-

**MOTLEY RICE, LLC**

*/s/ Nathan D. Finch*
Nathan D. Finch (admitted *pro hac vice*)
1000 Potomac Street, Suite 150
Washington, DC 20007
(202) 232-5507
nfinch@motleyrice.com

*Counsel for the Official Committee of
Asbestos Personal Injury Claimants*

-and-

**YOUNG, CONAWAY,
STARGATT & TAYLOR, LLP**

*/s/ Edwin J. Harron*
James L. Patton, Jr. (DE Bar No. 2202)
John T. Dorsey (DE Bar No. 2988)
Edwin J. Harron (DE Bar No. 3396)
Sharon M. Zieg (DE Bar No. 4196)

01:13303635.11

Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
eharron@ycst.com

*Counsel to Eric D. Green, the Future Claimants'*
*Representative*