# EXHIBIT D

10/15/13 DRAFT

**FORM OF
SPECIALTY PRODUCTS HOLDING CORP.
ASBESTOS PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

# TABLE OF CONTENTS

**Page**

SECTION I        INTRODUCTION ................................................................. 1

    1.1    Purpose............................................................................. 1

    1.2    Interpretation.................................................................... 1

SECTION II        OVERVIEW ...................................................................... 2

    2.1    Trust Goals....................................................................... 2

    2.2    Claims Liquidation Procedures........................................ 3

    2.3    Application of the Payment Percentage............................ 5

    2.4    Determination of the Maximum Annual Payment and Maximum Available Payment................................................................... 5

    2.5    Claims Payment Ratio...................................................... 8

    2.6    Indirect Trust Claims .................................................... 11

SECTION III        TDP ADMINISTRATION ............................................... 11

    3.1    TAC and FCR ................................................................ 11

    3.2    Consent and Consultation Procedures ........................... 11

SECTION IV        PAYMENT PERCENTAGE; PERIODIC ESTIMATES............................ 12

    4.1    Uncertainty of the Total Personal Injury Asbestos Liabilities............................ 12

    4.2    Computation of Payment Percentage............................. 12

    4.3    Applicability of the Payment Percentage....................... 13

SECTION V        RESOLUTION OF TRUST CLAIMS ............................... 16

    5.1    Ordering, Processing and Payment of Claims ................ 16

    5.2    Resolution of Unliquidated Trust Claims ....................... 20

    5.3    Categorizing Claims as Extraordinary and/or Exigent ....................... 32

    5.4    Indirect Trust Claims .................................................... 34

    5.5    Evidentiary Requirements .............................................. 36

    5.6    Claims Audit Program ................................................... 41

    5.7    Second Disease (Malignancy) Claims ........................... 42

    5.8    Arbitration..................................................................... 43

    5.9    Litigation....................................................................... 45

SECTION VI        CLAIMS MATERIALS.................................................... 45

-i-

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 6.1 | Claims Materials | 45 |
| 6.2 | Content of Claims Materials | 45 |
| 6.3 | Withdrawal or Deferral of Claims | 46 |
| 6.4 | Filing Requirements and Fees | 47 |
| 6.5 | English Language | 47 |
| 6.6 | Confidentiality of Claimants' Submissions | 47 |
| SECTION VII | GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS | 48 |
| 7.1 | Showing Required | 48 |
| 7.2 | Costs Considered | 48 |
| 7.3 | Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity | 49 |
| 7.4 | Punitive Damages | 49 |
| 7.5 | Sequencing Adjustments | 50 |
| 7.6 | Suits in the Tort System | 51 |
| 7.7 | Payment of Judgments for Money Damages | 52 |
| 7.8 | Releases | 53 |
| 7.9 | Third-Party Services | 53 |
| SECTION VIII | MISCELLANEOUS | 53 |
| 8.1 | Amendments | 53 |
| 8.2 | Severability | 54 |
| 8.3 | Governing Law | 54 |
| 8.4 | Merger of Trust Assets with Other Trusts | 54 |

3529533v13

**SPECIALTY PRODUCTS HOLDING CORP.**

**ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES**

The Specialty Products Holding Corp. Asbestos PI Trust Distribution Procedures

("**TDP**") contained herein are established pursuant to the Third Amended Plan Proposed by the

Official Committee of Personal Injury Claimants and the FCR for Specialty Products Holding

Corp. ("**Plan**") and the Specialty Products Holding Corp. Asbestos Personal Injury Trust

Agreement ("**Trust Agreement**" or "**Asbestos PI Trust Agreement**"), which establish the

Specialty Products Holding Corp. Asbestos Personal Injury Trust ("**Trust**" or "**Asbestos PI**

**Trust**").  These TDP provide for the resolution of all Trust Claims for which the Trust has legal

responsibility (hereinafter referred to collectively for all purposes of these TDP as "**Trust**

**Claims**"). [1]

The Asbestos PI Trustees ("**Trustees**") shall implement and administer these TDP in

accordance with the Trust Agreement.  Capitalized terms used herein and not otherwise defined

shall have the meanings assigned to them in the Plan and the Trust Agreement.  For purposes of

these TDP, "Trust Claims" shall not include Asbestos PI Trust Expenses.

**SECTION I**

**INTRODUCTION**

    1.1    **Purpose.**  These TDP have been adopted pursuant to the Trust Agreement.  They

are designed to provide fair, equitable, and substantially similar treatment for all similarly

situated Trust Claims that presently exist and may arise in the future.

    1.2    **Interpretation.**  Except as otherwise may be provided below, nothing in these

TDP shall be deemed to create a substantive right for any claimant.  The rights and benefits, if

---

[1]  These TDP are inapplicable to Settled Trust Claims except for: the Payment Percentage described in section 4.2, the Claims Payment Ratio as described in Section 2.5, and the FIFO Processing Queue and FIFO Payment Queue.

any, provided herein to holders of Trust Claims shall vest in such holders as of the Effective Date of the Plan.

## SECTION II

## OVERVIEW

**2.1    Trust Goals.**  The goal of the Trust is to treat all claimants similarly and equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code. These TDP set forth procedures for processing and paying the Debtors' several shares of the unpaid portion of the liquidated value of all Trust Claims generally on an impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[2]  To that end, these TDP establish a schedule of eight asbestos-related diseases ("**Disease Levels I-VIII**"), all of which have presumptive medical and exposure requirements ("**Medical/Exposure Criteria**"), seven of which have specific liquidated values ("**Scheduled Values**"), four of which have anticipated average values ("**Average Values**"), and five of which have caps on their liquidated values ("**Maximum Values**").

The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values that are set forth in <u>Section 5.2</u> below have been selected and derived with the intention of achieving a fair allocation of the Trust funds as among claimants suffering from different diseases in light of the best available information considering the domestic settlement history of the Debtors and the rights that claimants would have in the tort system absent the bankruptcy.

---

[2] As used in these TDP, the phrase "**in the tort system**" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of the Bankruptcy Code or any other applicable law. References to "tort system" shall include both domestic and foreign tort systems and other foreign claims-resolution systems, where appropriate.

2.2    **Claims Liquidation Procedures.**  Trust Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to <u>Section 5.1(a)</u> below.  The Trust shall take all reasonable steps to resolve Trust Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration. Those steps may include, in the Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in <u>Section 5.2(b)(2)</u> below.  The Trust shall also make every reasonable effort to resolve each year at least that number of Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

The Trust shall, except as otherwise provided below, liquidate all Trust Claims, including Settled Trust Claims as applicable, except Foreign Claims (as defined in <u>Section 5.2(b)(1)</u> below) that meet the presumptive Medical/Exposure Criteria of Disease Levels I-V, VII and VIII under the Expedited Review Process described in <u>Section 5.2(a)</u> below.  Trust Claims involving Disease Levels I-V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Trust's Individual Review Process described in <u>Section 5.2(b)</u> below.  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Trust may offer the claimant an amount up to the Scheduled Value of that Disease Level if the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

In lieu of the Expedited Review Process, a claimant holding a Trust Claim involving Disease Levels IV-V, VII or VIII may seek to establish a liquidated value for the claim that is

-3-

greater than its Scheduled Value by electing the Trust's Individual Review Process.  However, the liquidated value of a Trust Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value, and in any event shall not exceed the Maximum Value for the Disease Level set forth in Section 5.2(b), unless the claim qualifies as an Extraordinary Claim under Section 5.3(a) below, in which case its liquidated value cannot exceed the extraordinary value specified in that provision for such claims.  Disease Level VI (Lung Cancer 2) claims and all Foreign Claims may be liquidated only pursuant to the Trust's Individual Review Process.

Based upon the Debtors' domestic claims settlement history in light of tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.2(b)(3) have been established for each of the Disease Levels IV-V, VII and VIII that are eligible for Individual Review of their liquidated values with the expectation that over time the combination of domestic settlements at the Scheduled Values and those resulting from the Individual Review Process should generally result in the Average Values set forth in Section 5.2(b)(3) for each such Disease Level.

All unresolved disputes over a claimant's medical condition, exposure history and/or the validity or liquidated value of a claim shall be subject to mediation and/or binding or non-binding arbitration pursuant to Section 5.8 below, at the election of the claimant, under the Alternative Dispute Resolution Procedures (the "**ADR Procedures**") to be adopted by the Trust. Trust Claims that are the subject of a dispute with the Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.9 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be

-4-

payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

2.3    **Application of the Payment Percentage.**  After the liquidated value of an Trust Claim (other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) as defined in Section 5.2(a)(3) below) is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, mediation, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on the Payment Percentage described in Section 4 below.  The Payment Percentage shall also apply to all sequencing adjustments paid pursuant to Section 7.5 below.

The initial Payment Percentage (the "**Initial Payment Percentage**") shall be established by the Trustees, with the consent of the Asbestos PI Trust Advisory Committee ("**TAC**") and the Future Claimants' Representative ("**FCR**"), as soon as practicable after the Effective Date. The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Trust, with the consent of the TAC and the FCR, to reflect then-current estimates of the Trust 's assets and liabilities, as well as the then-estimated value of then-pending and future claims.  Any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under these TDP shall receive additional payments only as provided in Section 4.3 below.  Because there is uncertainty in the prediction of both the number and severity of future Trust Claims, and the amount of the Trust's assets, no guarantee can be made of any Payment Percentage that will be applied to Trust Claim's liquidated value.

2.4    **Determination of the Maximum Annual Payment and Maximum Available Payment.**  After calculating the Payment Percentage, the Trust shall estimate or model the

-5-

amount of cash flow, principal, and income year-by-year so that they will be utilized over the entire life of the Trust in a manner that ensures that all present and future holders of Trust Claims are compensated in amounts reflecting the same Payment Percentage.  In each year, based upon the model of cash flow, the Trust shall be empowered to pay out the portion of its funds payable for that year according to the model (the "**Maximum Annual Payment**"). Excluding Settled Trust Claims, to which the Maximum Annual Payment shall not apply, the Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment.

The Payment Percentage and the Maximum Annual Payment figures are based on projections over the lifetime of the Trust. As noted in Section 2.3 above, if such long-term projections are revised, the Payment Percentage may be adjusted accordingly, which would result in a new model of the Trust's anticipated cash flow and a new calculation of the Maximum Annual Payment figures. However, year-to-year variations in the Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Trust's long-term projections. If, in a given year, however, asset values, including earnings thereon, are below projections, the Trust may need to distribute less in that year than would otherwise be permitted based on the applicable Maximum Annual Payment. Accordingly, the applicable Maximum Annual Payment for a given year may be temporarily decreased if the present value of the assets of the Trust as measured on a specified date during the year is less than the present value of the assets of the Trust projected for that date by the cash flow model described in the foregoing paragraph. The Trust shall make such a comparison whenever the Trustees become aware of any information that suggests that such a comparison should be made and, in any event, no less frequently than once every six months. If the Trust

determines that as of the date in question, the present value of the Trust's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Trust based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the "**Temporary Maximum Annual Payment**" (additional reductions in the Maximum Annual Payment can occur during the course of that year based upon subsequent calculations). If in any year the Maximum Annual Payment was temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment. As a further safeguard, the Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year. If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the Trust shall first allocate the amount in question to (a) any Trust Claims (i) based on a diagnosis dated prior to the Effective Date and (ii) subsequently filed with the Trust within one (1) year following the date the Trust first accepts for processing the proof-of-claims forms and other materials required to file a claim with the Trust[3], which are liquidated by the Trust ("**Existing Claims**"), (b) Exigent Hardship Claims, and (c)

---

[3] Exceptions to the satisfaction of this one-year filing requirement will be made where a claimant can show an inability to file within the one-year period caused by extraneous factors beyond the claimant's control.

Trust Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) that have been liquidated by the Trust.

Should the Maximum Annual Payment be insufficient to pay all such claims in full, the available funds shall be paid in proportion to the aggregate value of each group of claims and the available funds allocated to each group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in the FIFO Payment Queue.  Claims in any group for which there are insufficient funds shall maintain their place in the FIFO Payment Queue and shall be carried over to the next year.  If there is a decrease in the Payment Percentage prior to the payment of such claims, any such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Maximum Annual Payment. The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated Trust Claims, provided, however, that if the Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly. The Trustees, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in return for prompter payment (the "Reduced Payment Option").

**2.5**    **Claims Payment Ratio.**  Based upon the Debtors' domestic claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been set, as of the Effective Date, at __% for Disease Level VIII (Category A Claims) that were unliquidated as of the Commencement Date, and __% for claims in all other Disease Levels (Disease Levels II – VII) (Category B Claims) that were similarly unliquidated as of the Commencement Date.  The

Claims Payment Ratio shall not apply to any claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment).

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, __% of that amount will be available to pay claims in Disease Level VIII and __% will be available to pay claims in all other Disease Levels (II – VII) placed in the FIFO Payment Queue described in Section 5.l(c) below.  In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue.  Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue.  If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The __%/__% Claims Payment Ratio and its rollover provision shall apply to all Trust Claims (except claims that, pursuant to Section 2.5 above, are not subject to the Claims Payment Ratio).  The Claims Payment Ratio may be amended by the Committee or TAC, as the case may be, and the FCR prior to the date the Trust first accepts for processing proof-of-claim forms and other materials required to file a claim with the Trust.  Thereafter, both the Claims Payment Ratio and its rollover provision may be continued or recalibrated in order to reflect the actual number of Trust Claims that have been paid pursuant to these TDP.

Notwithstanding any other provision herein, if, at the end of a calendar year, there are excess funds in either Category A or Category B and insufficient funds in the other Category to pay such Category's claims, the Trustees may transfer up to a specified amount of excess funds (the "**Permitted Transfer Amount**" as defined below) to the Category with the shortfall; provided however that the Trustees shall never transfer more than the amount of the receiving Category's shortfall.  The "**Permitted Transfer Amount**" shall be determined as follows: (a) the Trustees shall first determine the cumulative amount allocated to the Category with excess funds bases on the Claims Payment Ratio since the date the Trust last calculated its Payment Percentage; (b) the Trustees shall then determine the cumulative amount that the Trust estimated would be paid to the Category with excess funds since the date the Trust last calculated its Payment Percentage; (c) the Trustees shall then subtract the amount determined in (b) from the amount determined in (a), and the difference between the two shall be referred to as the "Permitted Transfer Amount."  When deciding whether to make a transfer, the Trust shall take into account any artificial failures of the processing queue that may have impacted the amount of funds expended from either Category.  The Trustees shall provide the TAC and the FCR with the Permitted Transfer Amount calculation thirty (30) days prior to making a transfer.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the domestic settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment.  In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

3529533v13

In any event, no amendment to the Claims Payment Ratio may be made without the consent of the TAC and the FCR.  In the case of any amendments to the Claims Payment Ratio, the consent process set forth in Sections 6.7 and 7.7 of the Trust Agreement shall apply.  The Trustees, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment.

2.6    **Indirect Trust Claims.**  As set forth in Section 5.4 below, Indirect Trust Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of these TDP as all other Trust Claims.

**SECTION III**

**TDP ADMINISTRATION**

3.1    **TAC and FCR.**  Pursuant to the Plan and the Trust Agreement, the Trustees shall administer the Trust Agreement and these TDP in consultation with the TAC, which represents the interests of holders of present Trust Claims, and the FCR, who represents the interests of holders of Trust Claims that will be asserted in the future.  The Trustees shall obtain the consent of the TAC and the FCR on any amendments to these TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(e) of the Trust Agreement.  The Trustees shall also consult with the TAC and the FCR on such matters as are provided below and in Section 2.2(d) of the Trust Agreement.  The initial Trustees, the initial members of the TAC and the initial FCR are identified in the Trust Agreement.

3.2    **Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustees shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed.  The Trustees shall not implement such amendment or take such action unless and until the parties have engaged in the

-11-

Consultation Process described in Sections 6.7(a) and 7.7(a), or the Consent Process described in Sections 6.7(b) and 7.7(b), of the Trust Agreement, respectively.

## SECTION IV

## PAYMENT PERCENTAGE; PERIODIC ESTIMATES

**4.1    Uncertainty of the Total Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding the Debtors' total asbestos-related tort liabilities, as well as the total value of the assets available to the Trust to pay Trust Claims.  Consequently, there is inherent uncertainty regarding the amounts that holders of Trust Claims shall receive.  To ensure substantially equivalent treatment of all present and future Trust Claims, the Trustees must determine from time to time the percentage of full liquidated value that holders of present and future Trust Claims will be likely to receive, i.e., the "**Payment Percentage**" described in Section 2.3 above and Sections 4.2 and 4.3 below.

**4.2    Computation of Payment Percentage.**  As provided in Section 2.3 above, the Trustees, with the consent of the TAC and the FCR, shall establish the Initial Payment Percentage after the Plan's Effective Date. The Payment Percentage shall be subject to change pursuant to the terms of these TDP and the Trust Agreement if the Trustees, with the consent of the TAC and the FCR, determine that an adjustment is required.  No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustees shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, if necessary after such reconsideration, change the Payment Percentage with the consent of the TAC and the FCR.  The Trustees shall also reconsider the Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the FCR.

-12-

The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future Trust Claims, the value of the assets then available to the Trust for payment of Trust Claims, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all present and future holders of Trust Claims. When making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories of claims shall receive the same Payment Percentage, but the payment may be deferred as needed pursuant to Section 7.3 below, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

**4.3    Applicability of the Payment Percentage.** Except as provided in this section 4.3, no holder of a Trust Claim for Disease Levels II-VIII shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment. Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.2(a)(3) below. Except as otherwise provided in (a) Section 5.1(c) for Trust Claims involving deceased or incompetent claimants for which the Trust's offer must be approved by a court or through a probate process and (b) the paragraph below with respect to Released Claims, no holder of any Trust Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustees, in their discretion, may cause the Trust to pay a Trust Claim based on the Payment

Percentage that was in effect prior to the reduction if such Trust Claim was filed and actionable with the Trust ninety (90) days or more prior to the date the Trustees proposed the new Payment Percentage in writing to the TAC and the FCR (the "**Proposal Date**") and the processing of such claim unreasonably delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the TAC and the FCR, but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.  However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Trust Claim was liquidated prior to the Proposal Date and who either (a) transmitted[4] an executed release to the Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal  Date, transmitted an executed release to the Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**"). For purposes hereof, (a) a

---

[4] For purposes of this sentence, "**transmitted**" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Trust transmits a release electronically, the release shall be deemed to have been received on the date the Trust transmits the offer notification, and (c) if the Trust places the release in the U.S. mail, postage pre-paid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Sections 2.4 and 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to the Proposal Date, the Trust shall issue a written notice to claimants or claimants' counsel indicating the Trust is reconsidering the Payment Percentage.

There is uncertainty surrounding the amount of the Trust's future assets and liabilities. The Trust's future assets are uncertain because the estimates of those assets do not take into account the possibility that the Trust may recover substantial additional funds from Causes of Action that have been assigned to the Trust, but the amount of funds that may be recovered and the cost of pursuing the Causes of Action are not yet known.  If the Trust successfully resolves a Trust Cause of Action or otherwise receives a substantial infusion of assets, the Trust shall use those assets first to maintain the Payment Percentage then in effect.  There is uncertainty surrounding the totality of the Trust Claims to be paid over time, as well as the extent to which changes in existing law could affect the Trust's liabilities under these TDP.  If the value of the Trust's future assets increases significantly and/or if the value or volume of Trust Claims actually filed with the Trust is significantly lower than originally estimated, the Trust shall use

3529533v13

those proceeds and/or claims savings, as the case may be, first to maintain the Payment

Percentage then in effect.

If the Trustees, with the consent of the TAC and the FCR, decide to increase the Payment

Percentage due to a material change in the estimates of the Trust's future assets and/or liabilities,

the Trustees shall also make supplemental payments to all claimants who previously liquidated

their claims against the Trust and received payments based on a lower Payment Percentage.  The

amount of any such supplemental payment shall be the liquidated value of the claim in question

times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant

with respect to the claim (excluding the portion of such previously paid amounts that was

attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be

suspended in the event the payment in question would be less than $100.00.  The amount of the

suspended payment shall be added to the amount of any prior supplemental payment(s) that

was(were) also suspended because it(they) would have been less than $100.00.  The Trustees

shall pay any aggregate supplemental payments owed to the claimant when the total exceeds

$100.00.

**SECTION V**

**RESOLUTION OF TRUST CLAIMS**

      **5.1**      **Ordering, Processing and Payment of Claims.**

           **(a)**      **Ordering of Claims.**

                  **(1)**      **Establishment of FIFO Processing Queues.**  The Trust shall

order all claims that are sufficiently complete to be reviewed for processing purposes on a FIFO

basis except as otherwise provided herein (the "**FIFO Processing Queue**").  For all claims filed

-16-

on or before the date six (6) months after the date that the Trust first makes available the proof-of-claim forms and other claims materials required to file a claim with the Trust (the "**Initial Claims Filing Date**"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Commencement Date that the specific claim was either filed against one or more of the Debtors in the tort system or was actually submitted to one or more of the Debtors pursuant to an administrative settlement agreement; (ii) the date before the Commencement Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with a Debtor; (iii) the date after the Commencement Date but before the date that the Trust first makes available the proof-of-claim forms and other claims materials required to file a claim with the Trust that the asbestos claim was filed against another defendant in the tort system; (iv) the date after the Commencement Date but before the Effective Date that a proof of claim was filed by the claimant against a Debtor in the Debtors' Chapter 11 cases; or (v) the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Trust, provided such claim is sufficiently complete, as defined in the Trust's claim filing instructions.  If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

-17-

(2)    <u>**Effect of Statutes of Limitations and Repose.**</u>  All unliquidated Trust Claims must meet either: (i) for claims first filed in the tort system against a Debtor prior to the Commencement Date, the statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) for claims not filed against a Debtor in the tort system prior to the Commencement Date, statute of limitations that was in effect at the time of the filing with the Trust.  However, the running of the statute of limitations shall be tolled as of the earliest of: (A) the actual filing of the claim against a Debtor prior to the Commencement Date, whether in the tort system or by submission of the claim to a Debtor pursuant to an administrative settlement agreement; (B) the tolling of the claim against a Debtor prior to the Commencement Date by an agreement or otherwise, provided such tolling was still in effect on the Commencement Date; or (C) the Commencement Date.

If a Trust Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the statute of limitations at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Trust within three (3) years after the Initial Claims Filing Date.  In addition, any claims that were first diagnosed after the Commencement Date, irrespective of the application of any relevant federal, state, or foreign statute of limitations or repose, may be filed with the Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.  However, the processing of any Trust Claim may be deferred at the election of the claimant pursuant to <u>Section 6.3</u> below.

(b)    <u>**Processing of Claims.**</u>  As a general practice, the Trust shall review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

-18-

(c)    **Payment of Claims.**  Trust Claims that have been liquidated under the provisions of these TDP by the Expedited Review Process as provided in Section 5.2(a) below, by the Individual Review Process as provided in Section 5.2(b) below, by mediation or arbitration as provided in Section 5.8 below, or by litigation in the tort system as provided in Section 5.9 below, shall be paid in FIFO order based on the date their liquidation became final (the "**FIFO Payment Queue**"), all such payments being subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein.

Where the claimant is deceased or incompetent and the settlement and payment of the claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Trust has been furnished with evidence that the settlement offer has been submitted to such court or to the probate process for approval.  If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are liquidated on the same date and the respective claimants' asbestos-related diseases were diagnosed on the same date, the position of those claimants in the

-19-

FIFO Payment Queue shall be determined based on the dates of the claimants' births, with older claimants given priority over younger claimants.

     **5.2**    **Resolution of Unliquidated Trust Claims.**  Within six (6) months after the establishment of the Trust, the Trustees, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Trust Claims, which shall include deadlines for processing such claims.  Such procedures shall also require that claimants seeking resolution of unliquidated Trust Claims must first file a proof-of-claim form, together with the required supporting documentation, in accordance with the provisions of <u>Sections 6.1, 6.2, 6.4 and 6.5</u> below.  It is anticipated that the Trust shall provide an initial response to the claimant within six (6) months of receiving the proof-of-claim form.

     The proof-of-claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing.  Irrespective of the Disease Level alleged on the proof-of-claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as merged into the higher Disease Level for both processing and payment purposes.  The proof-of-claim form also shall require the claimant to elect the Expedited Review Process, as described in <u>Section 5.2(a)</u> below, or the Individual Review Process, as described in <u>Section 5.2(b)</u> below, if such election is available under these TDP for the Disease Level alleged by the claimant.

     Upon filing of a valid proof-of-claim form with the required supporting documentation, the claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in <u>Section 5.1(a)</u> above.

-20-

(a)    **Expedited Review Process.**

(1)    **In General.**  The Trust's Expedited Review Process is designed

primarily to provide an expeditious, efficient, and inexpensive method for liquidating all Trust

Claims (except those involving Lung Cancer 2 - Disease Level VI and all Foreign Claims (as

defined below), which shall only be liquidated pursuant to the Trust's Individual Review

Process), including secondary exposure claims, where the claim can easily be verified by the

Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level.

Expedited Review thus provides claimants with a substantially less burdensome process for

pursuing Trust Claims than does the Individual Review Process described in Section 5.2(b)

below.  Expedited Review is also intended to provide qualifying claimants a fixed and certain

claim value.

Thus, claims that undergo Expedited Review and meet the presumptive

Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for

such Disease Level set forth in Section 5.2(a)(3) below.  However, except for claims involving

Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be

subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims

Payment Ratio limitations set forth herein.  Claimants holding claims that cannot be liquidated

by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for

the relevant Disease Level may elect the Trust's Individual Review Process set forth in Section

5.2(b) below.

Subject to the provisions of Section 5.6, the claimant's eligibility to receive the

Scheduled Value for his or her Trust Claim pursuant to the Expedited Review Process shall be

-21-

determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

(2)    **Claims Processing Under Expedited Review.**  All claimants seeking liquidation of a Trust Claim pursuant to Expedited Review shall file the Trust's proof-of-claim form.  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must establish that the occupationally exposed person would have met the exposure requirements under these TDP that would have been applicable had that person filed a direct claim against the Trust.  In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.2(a)(3) above or an asbestos-related disease otherwise compensable under these TDP, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos-containing products or conduct for which SPHC has legal responsibility, and that such secondary exposure was a substantial contributing factor of the claimed disease.

As a proof-of-claim form is reached in the FIFO Processing Queue, the Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination.  If the Medical/Exposure Criteria for a Disease Level are determined to have been met, the Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following

-22-

which the Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

**(3)**      **Disease Levels, Scheduled Values and Medical/Exposure**

**Criteria.**  The eight Disease Levels covered by these TDP, together with the Medical/Exposure Criteria for each, and the Scheduled Values for the six Disease Levels eligible for Expedited Review, are set forth below.  These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Trust Claims filed with the Trust on or before the Initial Claims Filing Date provided in Section 5.1 above for which the claimant elects the Expedited Review Process. Thereafter, for purposes of administering the Expedited Review Process and, with the consent of the TAC and the FCR, the Trustees may: add to, change or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values, or Medical/Exposure Criteria; or determine that a novel or exceptional Trust Claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels.  Because claimants seeking to recover from the Trust who fall within Disease Level VI may not undergo Expedited Review and must undergo Individual Review, no Scheduled Value is provided.

| Disease Level | Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $TBD | (1) Diagnosis[5] of mesothelioma; and (2) Debtor Exposure as defined in Section 5.5(b)(3) below |

---

[5] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of these TDP are set forth in Section 5.5 below.

| Disease Level | Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Lung Cancer 1 (Level VII) | $TBD | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos Related Nonmalignant Disease,[6] (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[7] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |

---

[6] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest x-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against a Debtor or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I, II, III, V and VII. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of these TDP, a "Qualified Physician" is a physician who is board certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.6, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose x-rays and/or CT scan readings are submitted for deceased holders of Trust Claims.

[7] "Significant Occupational Exposure" is defined in Section 5.5(b)(2) below.

-24-

| Disease Level | Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Lung Cancer 2 (Level VI) | NA | (1) Diagnosis of a primary lung cancer; (2) Debtor Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer (Level VII) claims. All claims in this Disease Level shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $[], with such awards capped at $[] , unless the claim qualifies for Extraordinary Claim treatment (discussed in Section 5.3 below). Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[8] In any event, no presumption of validity shall be available for any claims in this category. |
| Other Cancer (Level V) | TBD | (1) Diagnosis of a primary colorectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |

[8] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VII) or Lung Cancer 2 (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer 1 (Level VII), shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| Disease Level | Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Severe Asbestosis (Level IV) | TBD | (1) Diagnosis of asbestosis with ILO[9] of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level III) | TBD | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level II) | TBD | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months Debtor Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I Cash Discount Payment) | TBD | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) Debtor Exposure prior to December 31, 1982. |

**(b)**     **Individual Review Process.**

**(1)**     **In General.**  Subject to the provisions set forth below, a claimant

may elect to have his or her Trust Claim reviewed for purposes of determining whether the claim

would be cognizable and valid in the tort system even though it does not meet the presumptive

Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.2(a)(3) above.  In

---

[9] If the diagnostic images being interpreted in such regard are digital images, then a written report by a Qualified Physician confirming that the images reviewed are with reasonable medical certainty equivalent to those that would qualify for the required ILO grade shall be acceptable as well.

3529533v13

addition or alternatively, a claimant holding a Trust Claim involving Disease Levels II, III, IV, V, VII or VIII may elect to have the claim undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level.  However, except for Disease Level VI and any Foreign Claims, until such time as the Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Trust's Expedited Review Process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under these TDP shall be established only under the Trust's Individual Review Process.  Trust Claims of individuals exposed in Canada who were residents of Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process.  Accordingly, a "**Foreign Claim**" is a Trust Claim or a Trust Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which SPHC has legal responsibility, including under theories of alter-ego or similar theories of derivative liability, occurred outside of the United States and its Territories and Possessions and outside of the Provinces and Territories of Canada.  [TO THE EXTENT THAT THE TRUST RECEIVES FOREIGN CLAIMS, ADDITIONAL PROVISIONS ADDRESSING SUCH CLAIMS WILL BE ADDED TO THESE TDP WHICH PROVISIONS WILL TAKE INTO ACCOUNT RELEVANT PROCEDURAL AND SUBSTANTIVE LAW TO WHICH SUCH FOREIGN CLAIMS ARE SUBJECT]

**A.**    **Review of Medical/Exposure Criteria.**  The Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of a Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I-V, VII or VIII.  In such a case, the Trust shall either deny the claim, or, if the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the  tort system, the Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

**B.**    **Review of Liquidated Value.**  Claimants holding claims in Disease Levels IV-VIII shall also be eligible to seek Individual Review of the liquidated value of their Trust Claims, as well as of their medical/exposure evidence. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for a claim involving Disease Levels IV-V, VII and VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.2(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.3(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in Section 5.3(a) for such claims.  Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid the liquidated value of their Trust Claim later than would have been the case had the claimant elected the Expedited Review Process.  Subject to the provisions of Section 5.6, the Trust shall

devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

(2)    **Valuation Factors to Be Considered in Individual Review.**  The Trust shall liquidate the value of each Trust Claim that undergoes Individual Review based on the historic liquidated values of other similarly-situated claims in the same Disease Level.  The Trust shall thus take into consideration all of the factors that affect the severity of damages and values, including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which SPHC has legal responsibility, prior to December 31, 1982, including under theories of alter-ego (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlement and verdict histories in the Claimant's Jurisdiction for similarly-situated claims; and (vi) the greater of (a) the claimant's law firm's settlement and verdict experience for similarly situated claims contemporaneous to the time when the Trust Claim was filed or (b) the claimant's law firm's settlement and verdict experience in the Claimant's Jurisdiction contemporaneous to the time when the Trust Claim was filed, including all cases where the claimant's law firm satisfies the Trust, on the basis of clear and convincing evidence provided to the Trust, that the claimant's law firm played a substantial role in the prosecution and resolution of the cases, such as actively participating in court appearances, discovery, and/or trial of the cases, irrespective of whether a

-29-

second law firm was also involved and would also be entitled to include the cases in its

"settlement and verdict histories." For the avoidance of doubt, mere referral of a case, without

further direct involvement, will not be viewed as having played a substantial role in the

prosecution and resolution of a case. In liquidating the value of a Trust Claim that undergoes

Individual Review, the Trust shall treat a claimant as living if the claimant was alive at the time

the initial pre-petition complaint was filed or the proof-of-claim form was filed with the Trust

even if the claimant has subsequently died.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim

was filed (if at all) against either of the Debtors in the tort system prior to the Commencement

Date. If the claim was not filed against either of the Debtors in the tort system prior to the

Commencement Date, the Claimant's Jurisdiction may be either (i) the jurisdiction in which the

claimant resides at the time of diagnosis or when the claim is filed with the Trust; (ii) a

jurisdiction in which the claimant experienced exposure to an asbestos containing product, or to

conduct that exposed the claimant to an asbestos containing product, for which SPHC has legal

liability, including under theories of alter-ego or similar theories of derivative liability; or (iii) in

a jurisdiction that describes the claim as one for "exemplary" or "punitive" damages, the

Commonwealth of Pennsylvania, in which case the claimant's damages shall be determined

pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without

regard to its choice of law principles.

[THIS SECTION IS SUBJECT TO FURTHER REVISION PRIOR TO CONFIRMATION]

(3)     **Scheduled, Average and Maximum Values.** The Scheduled,

Average and Maximum Values for domestic claims involving Disease Levels I-VIII are the

following:

-30-

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | TBD | $117,161 | TBD |
| Lung Cancer 1 (Level VII) | TBD | $50,576 | TBD |
| Lung Cancer 2 (Level VI) | NA | $9,358 | TBD |
| Other Cancer (Level V) | TBD | $24,752 | TBD |
| Severe Asbestosis (Level IV) | TBD | TBD | TBD |
| Asbestosis/Pleural Disease (Level III) | TBD | NA | NA |
| Asbestosis/Pleural Disease (Level II) | TBD | NA | $NA |
| Other Asbestos Disease Cash Discount Payment (Level I) | TBD | NA | $NA |

These Scheduled Values, Average Values and Maximum Values shall apply to all domestic Trust Claims filed with the Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above.  Thereafter, the Trust, with the consent of the TAC and the FCR pursuant to Sections 6.7(b) and 7.7(b) of the Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

(4)      **Claims Processing under Individual Review.**  At the conclusion of the Individual Review Process, the Trust shall: (i) determine the liquidated value, if any, of the claim; and (ii) advise the claimant of its determination.  If the Trust establishes a liquidated value, it shall tender to the claimant an offer of payment of the aforementioned determined value multiplied by the applicable Payment Percentage, together with a form of release approved by the Trust.  If the claimant accepts the offer of payment and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

-31-

**5.3**     **Categorizing Claims as Extraordinary and/or Exigent.**

(a)     **Extraordinary Claims.**  "**Extraordinary Claim**" means a Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels IV-VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a facility of a Debtor or its predecessor in interest during a period in which a Debtor or its predecessor was selling, distributing, processing, manufacturing, or otherwise handling asbestos-containing product at that facility or (ii) was at least 75% the result of exposure to asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which SPHC has legal responsibility, including under theories of alter-ego or similar theories of derivative liability, and in either case there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.2(b)(3) for claims qualifying for Disease Levels IV-V, VII and VIII, and five (5) times the Average Value set forth in Section 5.2(b)(3) for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special panel established by the Trust with the consent of the TAC and the FCR (the "**Extraordinary Claims Panel**").  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other Trust Claims, except Exigent Claims (as defined in Section 5.3(b) below), based on its date of liquidation and shall be subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio described above.

-32-

(b)    **Exigent Claims.**  At any time the Trust may liquidate and pay Trust Claims that qualify as Exigent Health Claims or Exigent Hardship Claims (together, "**Exigent Claims**") as defined below.  Exigent Claims may be considered separately under the Individual Review Process no matter what the order of processing otherwise would have been under these TDP.  An Exigent Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other Trust Claims and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above.

(1)    **Exigent Health Claims.**  A Trust Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma (Disease Level VIII) and the claimant is living when the claim is filed.  A claim in Disease Levels IV-VII qualifies as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for the disease level, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant asbestos-related disease.

(2)    **Exigent Hardship Claims.**  A Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V-VIII), and the Trust, in its sole discretion, determines (i) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and

(ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

5.4    **Indirect Trust Claims.**  Indirect Trust Claims asserted against the Trust shall be treated as presumptively valid and paid by the Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and (b) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the Trust would otherwise have had a liability or obligation under these TDP (the "**Direct Claimant**") (and which has not been paid by the Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust and the Protected Parties from all liability to the Direct Claimant and the Indirect Claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law.  In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related Direct Claimant against the Trust, including any rights with respect to the timing, amount, or manner of payment.  In addition, no Indirect Asbestos PI Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant in respect of such Direct Claimant's claim for which the Trust would have liability.

To establish a presumptively valid Indirect Asbestos PI Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Trust and the Protected Parties) or a Final Order provided that such claim is valid under tort law.  In

-34-

any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Trust and the Protected Parties a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Trust and the Protected Parties with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Trust review the Indirect Asbestos PI Claim individually to determine whether the Indirect Claimant can establish under law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Trust had to the Direct Claimant as of the Effective Date of these TDP. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these TDP. Further, the liquidated value of any Indirect Asbestos PI Claim paid by the Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos PI Claim that might be subsequently asserted by the Direct Claimant against the Trust.

Any dispute between the Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures. If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.9 and 7.6 below.

-35-

The Trustees may develop and approve a separate proof-of-claim form for Indirect Trust Claims as provided in <u>Section 6.1</u> below. Indirect Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this <u>Section 5.4</u>, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Trust Claims. Nothing in these TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect Asbestos PI Claim against the Trust subject to the requirements set forth herein.

**5.5    <u>Evidentiary Requirements.</u>**

**(a)    <u>Medical Evidence.</u>**

**(1)    <u>In General.</u>** All diagnoses of a Disease Level shall be accompanied by either (<u>i</u>) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (<u>ii</u>) a history of the claimant's exposure sufficient to establish a 10-year latency period.[10]

**A.    <u>Disease Levels I-IV.</u>** Except for asbestos claims filed against a Debtor or any other defendant in the tort system prior to the Commencement Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of

---

[10] All diagnoses of Asbestosis/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy. However, the Trust may rebut such presumptions.

the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide: (i) for Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in footnote 6 above), (ii) for Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iii) for Disease Levels III and IV, pulmonary function testing.[11]  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Trust as a diagnosis.

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in footnote 6 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; or (iv) for either Disease Level III or IV, pulmonary function testing.

B.    __Disease Levels V-VIII.__  All diagnoses of an asbestos-related malignancy (Disease Levels V-VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a

---

[11] "**Pulmonary function testing**" or "**PFT**" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment that is in material compliance with ATS standards for technical quality and calibration.  A PFT performed in a hospital accredited by the Joint Commission (as defined in Section 5.5(a)(l)(B)), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing.  If the PFT was not performed in a Joint Commission-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other party who is qualified to make a certification regarding the PFT, in the form provided by the Trust, certifying that the PFT was conducted in material compliance with ATS standards.

diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission (formerly known as the Joint Commission on Accreditation of Healthcare Organizations).

        **C.**      **Exception to the Exception for Certain Pre-Petition Trust Claims.**  If the holder of a Trust Claim that was filed against a Debtor or any other defendant in the tort system prior to the Commencement Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Section 5.5(a)(1)(A), or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical evidence to the Trust notwithstanding the exception in Section 5.5(a)(1)(A).

        **D.**      ***Credibility of Medical Evidence.***  Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to one

-38-

or more of the Debtors to settle for payment similar disease cases prior to the Commencement Date, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge using the same methodology and standard, is presumptively reliable, although the Trust may seek to rebut the presumption.  Notwithstanding the foregoing or any other provision of these TDP, any medical evidence submitted by a physician or entity that the Trust has determined, after consulting with the TAC and the FCR, to be unreliable shall not be acceptable as medical evidence in support of any Trust Claim.

In addition, except for Foreign Claims, claimants who otherwise meet the requirements of these TDP for payment of a Trust Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system.  However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review proceeding conducted pursuant to 5.2(b) or any Extraordinary Claim proceeding conducted pursuant to 5.3(a).

      **(b)**    **Exposure Evidence.**

        **(1)**    **In General.**  As set forth above in Section 5.2(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos-containing products of or for which SPHC has liability, or to conduct that exposed the claimant to an asbestos-containing product, for which SPHC otherwise has legal responsibility.  Claims based on conspiracy theories that involve no exposure to an asbestos-containing product sold, distributed, marketed, handled, processed, or manufactured by SPHC , its predecessor or its successor are not compensable under these TDP.  To meet the presumptive exposure

requirements of Expedited Review set forth in <u>Section 5.2(a)(3)</u> above, the claimant must show (<u>i</u>) for all Disease Levels, Debtor Exposure as defined in <u>Section 5.5(b)(3)</u> below prior to December 31, 1982; (<u>ii</u>) for Asbestos/Pleural Disease Level II, six (6) months Debtor Exposure prior to December 31, 1982, plus five (5) years cumulative occupational asbestos exposure; and (<u>iii</u>) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six (6) months of Debtor Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos as defined below.  If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her claim based on exposure to asbestos-containing products, or to conduct that exposed the claimant to an asbestos-containing product, for which SPHC has legal responsibility.

**A.** **<u>Significant Occupational Exposure.</u>** "**Significant Occupational Exposure**" means employment for a cumulative period of at least five (5) years, with a minimum of two (2) years prior to December 31, 1982, in an industry and an occupation in which the claimant (<u>a</u>) handled raw asbestos fibers on a regular basis; (<u>b</u>) fabricated asbestos-containing products such that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (<u>c</u>) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (<u>d</u>) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

**B.** **<u>Debtor Exposure.</u>** "**Debtor Exposure**" means the claimant must demonstrate meaningful and credible exposure, which occurred prior to December

31, 1982, (a) to an asbestos-containing product sold, distributed, marketed, handled, processed, or manufactured by SPHC or for which SPHC otherwise has legal responsibility or (b) to conduct for which SPHC has legal responsibility that exposed the claimant to an asbestos-containing product.  That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant (based on personal knowledge); an affidavit or sworn statement of a family member (based on personal knowledge); an affidavit or sworn statement of a co-worker (based on personal knowledge); by invoices, employment, construction or similar records; or by other credible evidence.  The specific exposure information required by the Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof-of-claim form to be used by the Trust.  The Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.  [THE TDP WILL BE AMENDED TO PROVIDE FOR CRITERIA FOR AFFIDAVITS OF EXPOSURE AND/OR TO PROVIDE LIMITS ON THE TIME FOR REVIEW OF SUCH AFFIDAVITS.]

Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the Trust, not third parties or defendants in the tort system.  The Trust has no need for, and therefore claimants are not required to furnish the Trust, with evidence of exposure to specific asbestos products other than those for which SPHC has legal responsibility, except to the extent such evidence is required elsewhere in these TDP.  Similarly, failure to identify a Debtor's products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Trust, provided the claimant satisfies the medical and exposure requirements of these TDP.

**5.6**    **Claims Audit Program.**  The Trustees, with the consent of the TAC and the FCR, may develop methods for auditing the reliability of medical evidence, including additional

reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including Debtor Exposure, prior to December 31, 1982.  In the event that the Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by disallowing a Trust Claim and/or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

**5.7    Second Disease (Malignancy) Claims.**  The holder of a Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) may assert a new Trust Claim against the Trust for a malignant disease (Disease Levels V-VIII) that is subsequently diagnosed.  Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed at the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

**5.8**     **Arbitration.**

(a)     **Establishment of ADR Procedures.**  The Trust, with the consent of the

TAC and the FCR, shall develop and adopt ADR Procedures[12], which shall provide for pro-bono

evaluation, mediation, and binding or non-binding arbitration to resolve disputes concerning

whether the Trust's outright rejection or denial of a claim was proper, or whether the claimant's

medical condition or exposure history meets the requirements of these TDP for purposes of

categorizing a claim involving Disease Levels I-VIII.  Proceedings under the ADR Procedures

shall also be available for resolving disputes over the liquidated value of a claim involving

Disease Levels II-VIII, as well as disputes over the validity of an Indirect Asbestos PI Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary

requirements that are set forth in Section 5.5 above.  In the case of an arbitration involving the

liquidated value of a claim involving Disease Levels II-VIII, the arbitrator shall consider the

same valuation factors that are set forth in Section 5.2(b)(2) above.  In order to facilitate the

Individual Review Process, the Trust may from time to time develop valuation methodologies

and/or matrices that take into account the valuation factors set forth in Section 5.2(b)(2) above

that enable the Trust to efficiently make initial liquidated value offers in the Individual Review

Process.

With respect to domestic claims, these valuation methodologies and/or matrices are often

referred to as the Individual Review model. Except as provided for arbitrations involving Foreign

Claims, the Trust shall neither offer into evidence or describe any such methodologies and/or

matrices, nor assert that any information generated by the methodologies and/or matrices has any

evidentiary relevance or should be used by the arbitrator in determining the presumed correct

---

[12] To the extent there is any ambiguity or conflict between any provision of these TDP and the ADR Procedures, the provisions of these TDP shall control.

liquidated value in the arbitration. The underlying data that was used to create the methodologies and/or matrices may be relevant and may be made available to the arbitrator but only if provided to the claimant or the claimant's counsel at least ten (10) days prior to the arbitration proceeding.

With respect to all claims eligible for arbitration, the claimant, but not the Trust, may elect either non-binding or binding arbitration.  The ADR Procedures may be modified by the Trust with the consent of the TAC and the FCR.  Such amendments may include the establishment of an Extraordinary Claims Panel to review such claims pursuant to Section 5.3(a) above.

(b)      **Claims Eligible for Arbitration.**  In order to be eligible for arbitration, the claimant must first complete the Individual Review Process set forth in Section 5.2(b) above. Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the Trust, the Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Trust of the rejection in writing.  Individual Review will also be treated as completed if the Trust has rejected the claim.

(c)      **Limitations on and Payment of Arbitration Awards.**  In the case of claims involving Disease Level I, the arbitrator shall not return an award in excess of the Scheduled Value for such claims.  In the case of a non-Extraordinary Claim involving Disease Levels IV-VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.2(b)(4) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the maximum extraordinary value for such a claim as set forth in Section 5.3(a) above.  A claimant

-44-

who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

5.9     **Litigation.**  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Trust pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Trust's available cash only as provided in Section 7.7 below.

## SECTION VI

## CLAIMS MATERIALS

6.1     **Claims Materials.**  The Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the Trust.  The Claims Materials shall include a copy of these TDP, such instructions as the Trustees shall approve, a detailed proof-of-claim form, and a release. A separate claim form for Indirect Trust Claims may be developed.  If feasible, the forms used by the Trust to obtain claims information shall be substantially similar to those used by other asbestos-claims resolution organizations. In developing its claim-filing procedures, the Trust shall make every reasonable effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD.  If requested by the claimant, the Trust shall accept information provided electronically.

6.2     **Content of Claims Materials.**  The proof-of-claim form to be submitted to the Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing.  The proof-of-claim form shall also include a certification by the claimant or

his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil

Procedure.  The proof-of-claim form and release to be used by the Trust shall be developed by

the Trust and submitted to the TAC and the FCR for approval; they may be changed by the Trust

with the consent of the TAC and the FCR. The claimant may, but shall not be required to,

provide the Trust with evidence of recovery from other asbestos defendants and claims-

resolution organizations, except that the Trust may require a claimant holding a Foreign Claim to

provide it with such evidence of recovery or other information that such claimant would be

required to provide pursuant to the substantive law, rules of procedure, or practices in the tort

system in the Claimant's Jurisdiction, so as to enable the Trust to (1) determine whether the

claim would be valid and cognizable in the tort system in the Claimant's Jurisdiction, (2) comply

with the provisions of Section 5.2(b)(1) hereof, and (3) determine the Debtors' share of liability

for the claimant's unpaid damages.

6.3    **Withdrawal or Deferral of Claims.**  A claimant can withdraw a Trust Claim at

any time upon written notice to the Trust and file another claim subsequently without affecting

the status of the claim for statute of limitations purposes, but any such claim filed after

withdrawal shall be given a place in the FIFO Processing Queue based on the date of such

subsequent filing.  A claimant can also request that the processing of his or her Trust Claim be

deferred for a period not to exceed three (3) years without affecting the status of the claim for

statute of limitations purposes, in which case the claimant shall also retain his or her original

place in the FIFO Processing Queue.  During the period of such deferral, a sequencing

adjustment on such claimant's Trust Claim as provided in Section 7.5 hereunder shall not accrue

and payment thereof shall be deemed waived by the claimant.  Except for Trust Claims held by

representatives of deceased or incompetent claimants for which court or probate approval of the

Trust's offer is required, or a Trust Claim for which deferral status has been granted, a claim

shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates

arbitration within six (6) months of the Trust's written offer of payment or rejection of the claim.

Upon written request and good cause, the Trust may extend the withdrawal or deferral period for

an additional six (6) months.

6.4    **Filing Requirements and Fees.**  The Trustees shall have the discretion to

determine, with the consent of the TAC and the FCR, (a) whether a claimant must have

previously filed an asbestos-related personal injury claim in the tort system to be eligible to file

the claim with the Trust and (b) whether a filing fee should be required for any Trust Claims.

6.5    **English Language.**  All claims, claim forms, submissions, and evidence

submitted to the Trust or in connection with any claim or its liquidation shall be in the English

language.

6.6    **Confidentiality of Claimants' Submissions.**  All submissions to the Trust by a

holder of a Trust Claim, including the proof-of-claim form and materials related thereto, shall be

treated as made in the course of settlement discussions between the holder and the Trust and

intended by the parties to be confidential and to be protected by all applicable state and federal

privileges, including, but not limited to, those directly applicable to settlement discussions.  The

Trust shall preserve the confidentiality of such claimant submissions, and shall disclose the

contents thereof only, (i) with the permission of the holder, to another trust established for the

benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of

the Bankruptcy Code or other applicable law, (ii) to such other persons as authorized by the

holder, or (iii) in response to a valid subpoena.  Furthermore, the Trust shall provide counsel for

the holder a copy of any such subpoena immediately upon being served.  The Trust shall on its

own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve any and all privileges.

## SECTION VII

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**7.1**    **Showing Required.**    To establish a valid Trust Claim a claimant must meet the requirements set forth in these TDP.  The Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify a Trust Claim and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.  With respect to a Settled Asbestos PI Claim, a copy of the underlying settlement agreement and release will be required in addition to any other information the Trustees may reasonably request to verify the existence and amounts of the Settled Asbestos PI Claim. Nothing in these TDP shall prohibit the Trust from challenging at any time the validity of a claim and/or whether a claim has been paid, satisfied, settled, released, waived, or otherwise discharged.

**7.2**    **Costs Considered.**    Notwithstanding any provisions of these TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid Trust Claims so that the payment of valid Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Trust so that valid Settled Trust Claims and Trust Claims are not unduly further impaired by the costs of additional investigation. Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the

-48-

validity of any claim against the Trust whatever the costs, or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in <u>Section 5.6</u> above.

7.3     <u>**Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**</u>  Consistent with the provisions hereof and subject to the FIFO Processing Queue and the FIFO Payment Queue, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate valid Trust Claims, and shall make payments to holders of such claims in accordance with these TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision.  In the event that the Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the FCR, suspend the normal order of payment; temporarily limit or suspend payments altogether; and/or offer a Reduced Payment Option as described in <u>Section 2.5</u> above.

7.4     <u>**Punitive Damages.**</u>  Except as provided below for claims asserted by a claimant for compensatory damages that would otherwise satisfy the criteria for payment under these TDP

-49-

but the claimant is foreclosed from payment because the governing law  describes the claim as a

claim for "exemplary" or "punitive" damages  in determining the value of any liquidated or

unliquidated Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory

damages, shall not be considered or allowed, notwithstanding their availability in the tort system.

Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated

against the Trust in the tort system pursuant to Sections 5.9 above and 7.6 below.

The only damages that may be awarded pursuant to this TDP to Alabama Claimants who

are deceased and whose personal representatives pursue their claims only under the Alabama

Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and

common law of the Commonwealth of Pennsylvania, without regard to its choice of law

principles.

### 7.5    Sequencing Adjustments.

(a)    **In General.**  Except for Trust Claims involving Other Asbestos Disease

(Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, a

sequencing adjustment shall be paid on all Trust Claims with respect to which the claimant has

had to wait a year or more for payment, provided, however, that no claimant shall receive a

sequencing adjustment for a period in excess of seven (7) years.  The sequencing adjustment

factor shall be the one-year U.S. Treasury bill interest rate in effect on January 1 of the year in

which the accrual of the sequencing adjustment commences. The rate of the sequencing

adjustment shall be adjusted each January 1 to correspond to the one-year Treasury bill interest

rate then in effect. The applicable sequencing adjustment shall be calculated based only on the

value of the claim specified in Section 7.5(b) or (c) below, subject to the Payment Percentage; any accrued but unpaid sequencing adjustment shall not be included in such calculation.

(b)    **Unliquidated Trust Claims.**  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Trust Claim that meets the requirements of Disease Levels II-V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration.  No sequencing adjustment shall be paid on any claim involving Disease Level I or on any claim liquidated in the tort system pursuant to Section 5.9 above and Section 7.6 below.  The sequencing adjustment on an unliquidated Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim. Sequencing adjustments on all unliquidated claims shall be measured from the date of payment back to the date that is one year after the date on which (a) the claim was filed against a Debtor prior to the Commencement Date; (b) the claim was filed against another defendant in the tort system on or after the Commencement Date but before the Initial Claims Filing Date; (c) the claim was filed with the Bankruptcy Court during the pendency of the Chapter 11 Cases; or (d) the claim was filed with the Trust after the Effective Date.

7.6    **Suits in the Tort System.**  If the holder of a disputed claim disagrees with the Trust's determination regarding the Disease Level of the claim, the claimant's exposure or medical history, the validity of the claim, or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.8 above, the holder may file a lawsuit in the Claimant's Jurisdiction as defined in Section 5.2(b)(2) above. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Trust, all defenses that could have been

asserted by a Debtor) shall be available to both sides at trial; however, the Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or the proof-of-claim form was filed with the Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

7.7    **Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of claims involving Disease Level I, the total amounts paid with respect to such claims shall not exceed the Scheduled Value for such claims.  In the case of non-Extraordinary claims involving Disease Levels II-VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.2(b)(3).  In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section

-52-

5.3 above.  Under no circumstances shall the Trust pay (a) sequencing adjustments pursuant to

Section 7.5 or (b) interest under any statute on any judgments obtained in the tort system.

      **7.8**    **Releases.**  The Trustees shall have the discretion to determine the form and

substance of the releases to be provided to the Trust and the Protected Parties in order to

maximize recovery for claimants against other tortfeasors without increasing the risk or amount

of claims for indemnification or contribution from the Trust or the Protected Parties with respect

to the Trust Claim.  As a condition to making any payment to a claimant, the Trust shall obtain,

for the benefit of the Trust and the Protected Parties, a general, partial, or limited release as

appropriate.   If allowed by applicable law, the endorsing of a check or draft for payment by or

on behalf of a claimant may, in the discretion of the Trust, constitute such a release.  For the

avoidance of doubt, under no circumstances shall the form of release provide for the release of

any claims that a claimant may assert against RPM International, Inc. or RPM International, Inc.

affiliated parties, other than the Trust and the Protected Parties.

      **7.9**    **Third-Party Services.**  Nothing in these TDP shall preclude the Trust from

contracting with another asbestos claims resolution organization to provide services to the Trust

so long as decisions about the categorization and liquidated value of Trust Claims are based on

the relevant provisions of these TDP, including the Disease Levels, Scheduled Values, Average

Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**SECTION VIII**

**MISCELLANEOUS**

      **8.1**    **Amendments.**  Except as otherwise provided herein, the Trustees may amend,

modify, delete, or add to any provisions of these TDP (including, without limitation,

amendments to conform these TDP to advances in scientific or medical knowledge or other

-53-

changes in circumstances), provided they first obtain the consent of the TAC and the FCR pursuant to the consent process set forth in Sections 6.7(b) and 7.7(b) of the Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.  Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustees, in writing, amendments to these TDP.  Any amendment proposed by the TAC or the FCR shall remain subject to Section 8.3 of the Trust Agreement.

8.2    **Severability.**  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

8.3    **Governing Law.**  Except for purposes of determining the validity and/or liquidated value of any Asbestos PI Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the determination of validity and/or liquidation of Trust Claims in the case of Individual Review, mediation, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.2(b)(2) above.

8.4    **Merger of Trust Assets with Other Trusts.**  In order to efficiently administer the Asbestos PI Trust Assets, the Trustees may determine, with the consent of the TAC and the FCR, to combine or merge the Asbestos PI Trust Assets with another trust or trusts established under Section 524(g) of the Bankruptcy Code.  In such an event, the Trustees shall be permitted to obtain claims information maintained by such other 524(g) trusts.

-54-