**EXHIBIT I.A.66**

**NMBFiL ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES**

**FORM OF NMBFiL, INC.**
**ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| SECTION I | INTRODUCTION | 1 |
| 1.1 | Purpose | 1 |
| 1.2 | Termination of NMBFiL Trust Account Under Limited Circumstances | 2 |
| 1.3 | Interpretation | 3 |
| SECTION II | OVERVIEW | 3 |
| 2.1 | Trust Goals | 3 |
| 2.2 | Claims Liquidation Procedures | 4 |
| 2.3 | Application of the Payment Percentage | 5 |
| 2.4 | Determination of the Maximum Annual Payment and Maximum Available Payment | 5 |
| 2.5 | RESERVED | 8 |
| 2.6 | Indirect Trust Claims | 8 |
| SECTION III | TDP ADMINISTRATION | 8 |
| 3.1 | TAC and FCR | 8 |
| 3.2 | Consent and Consultation Procedures | 9 |
| SECTION IV | PAYMENT PERCENTAGE; PERIODIC ESTIMATES | 9 |
| 4.1 | Uncertainty of the Total Personal Injury Asbestos Liabilities | 9 |
| 4.2 | Computation of Payment Percentage | 9 |
| 4.3 | Applicability of the Payment Percentage | 10 |
| SECTION V | RESOLUTION OF TRUST CLAIMS | 13 |
| 5.1 | Ordering, Processing and Payment of Claims | 13 |
| 5.2 | Resolution of Unliquidated Trust Claims | 16 |
| 5.3 | Disease Level, Average Value and Presumptive Medical/Exposure Criteria | 16 |
| 5.4 | RESERVED | 20 |
| 5.5 | Indirect Trust Claims | 20 |
| 5.6 | Evidentiary Requirements | 23 |
| 5.7 | Claims Audit Program | 26 |
| 5.8 | RESERVED | 27 |

-i-

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 5.9 | Arbitration | 27 |
| 5.10 | Litigation | 29 |
| SECTION VI | CLAIMS MATERIALS | 29 |
| 6.1 | Claims Materials | 29 |
| 6.2 | Content of Claims Materials | 30 |
| 6.3 | Withdrawal or Deferral of Claims | 30 |
| 6.4 | Filing Requirements and Fees | 31 |
| 6.5 | English Language | 31 |
| 6.6 | Confidentiality of Claimants' Submissions | 31 |
| SECTION VII | GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS | 32 |
| 7.1 | Showing Required | 32 |
| 7.2 | Costs Considered | 32 |
| 7.3 | Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity | 33 |
| 7.4 | Punitive Damages | 33 |
| 7.5 | Sequencing Adjustments | 34 |
| 7.6 | Suits in the Tort System | 35 |
| 7.7 | Payment of Judgments for Money Damages | 36 |
| 7.8 | Releases | 36 |
| 7.9 | Third-Party Services | 37 |
| SECTION VIII | REPORTING | |
| 8.1 | Medicare | 37 |
| SECTION IX | MISCELLANEOUS | 37 |
| 9.1 | Amendments | 43 |
| 9.2 | Severability | 43 |
| 9.3 | Governing Law | 43 |
| 9.4 | Merger of Trust Assets with Other Trusts | 44 |

# NMBFIL, INC.
## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The NMBFiL, Inc. Asbestos Personal Injury Trust Distribution Procedures ("**TDP**")
contained herein are established pursuant to the Joint Plan of Reorganization of Specialty
Products Holding Corp., Bondex International, Inc., Republic Powdered Metals, Inc. and
NMBFiL, Inc. ("**Plan**") and the Specialty Products Holding Corp., Bondex International, Inc.,
Republic Powdered Metals, Inc. and NMBFiL, Inc. Personal Injury Trust Agreement ("**Trust
Agreement**" or "**Asbestos PI Trust Agreement**"), which establish the Asbestos Personal Injury
Trust ("**Trust**" or "**Asbestos PI Trust**").  These TDP provide for the resolution of all Trust
Claims for which the NMBFiL Trust Account has legal responsibility (hereinafter referred to
collectively for all purposes of these TDP as "**Trust Claims**").[1]

The Asbestos PI Trustees ("**Trustees**") shall implement and administer these TDP in
accordance with the Trust Agreement.  Capitalized terms used herein and not otherwise defined
shall have the meanings assigned to them in the Plan and the Trust Agreement.  For purposes of
these TDP, "Trust Claims" shall not include Asbestos Personal Injury Trust Expenses attributed
to the NMBFiL Trust Account.

## SECTION I

## INTRODUCTION[2]

**1.1**    **Purpose.**  These TDP have been adopted pursuant to the Trust Agreement.  They
are designed to provide fair, equitable, and substantially similar treatment for all similarly situated
Trust Claims that presently exist and may arise in the future.  There is inherent uncertainty

---

[1]  These TDP are inapplicable to SPHC Asbestos Personal Injury Claims and SPHC Asbestos Personal Injury
Indirect Claims, which will be resolved pursuant to the Specialty Products Holding Company Asbestos Personal
Injury Trust Distribution Procedures.

[2]  Capitalized terms used in this Introduction and not defined in the Plan or the Trust Agreement have the meanings
ascribed to them herein.

regarding NMBFiL's total asbestos-related tort liabilities due, in part, to the lack of successful

verdicts against NMBFiL or any settlements by NMBFiL for NMBFiL Asbestos Personal Injury

Claims.  Accordingly, the Trust will not process any claim for payment until after the expiration

of the three-year (3-year) statute of limitations contained in Section 5.1(a) below.  Based on the

number of claims asserted at the expiration of the three-year (3-year) statute of limitations (the

"Assessment Period") and such other criteria as the Trustee believe are relevant, the Trust shall

establish a Maximum Value and Payment Percentage for mesothelioma claims.  For the next two

(2)  years, only claims for the Disease Level for mesothelioma will be resolved pursuant to these

TDP.

       At the end of the two-year (2-year) period in which the Trust shall resolve only

Disease Level claims for mesothelioma, and if all claims for mesothelioma that have been

resolved and paid pursuant to these TDP are paid in full, and the Trustees determine that sufficient

funds remain in the NMBFiL Trust Account to continue to resolve and pay all future demands on

the Trust arising from the Disease Level of mesothelioma in full, then these TDP shall be

reevaluated and may be amended by the Trustees in accordance with the provisions of these TDP

and the Trust Agreement to include additional Disease Levels, their presumptive

Medical/Exposure Criteria, and respective values, based on the information available to them at

that time, including, but not limited to: the amount of money remaining in the NMBFiL Trust

Account, the Trust's experience in resolving claims asserted against the NMBFiL Trust Account,

the number of claims asserted by claimants based on other Disease Levels, forecasts of future

claims by mesothelioma claimants, forecasts of future claims by claimants asserting injuries in

other Disease Levels, and other factual, medical, and legal developments.  This process shall be

repeated every two years thereafter, if necessary.

**1.2    Termination of NMBFiL Trust Account Under Limited Circumstances**.  After the Trust has been open for a period of at least ten (10) years, if at any point all claims asserted pursuant to these TDP have been resolved, there are no claims remaining in the NMBFiL processing queue, at least one (1) year has passed since a Trust Claim under these TDP has been paid, at least one (1) year has passed without a NMBFiL Protected Party asserting a NMBFiL Protected Party Indemnification Claim, and funds or proceeds from the NMBFiL Trust Contributions remain in the NMBFiL Trust Account (the "**Remaining NMBFiL Funds**"), the Trustees, upon consultation with the TAC and the FCR, may cause the Remaining NMBFiL Funds to be contributed to the SPHC Trust Account, treated as a "SPHC Trust Contribution," and used to resolve SPHC Asbestos Personal Injury Claims and SPHC Protected Parties Indemnification Claims in accordance with the Plan and SPHC TDP.[3]

**1.3    Interpretation.**  Except as otherwise may be provided below, nothing in these TDP shall be deemed to create a substantive right for any claimant.  The rights and benefits, if any, provided herein to holders of Trust Claims shall vest in such holders as of the Effective Date of the Plan.

## SECTION II

## OVERVIEW

**2.1    Trust Goals.**  The goal of the Trust is to treat all those asserting NMBFiL Asbestos Personal Injury Claims similarly and equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code.  These TDP set forth procedures for processing and paying NMBFiL's several share of the unpaid portion of the liquidated value of all Trust Claims

---

[3] For the avoidance of doubt, nothing in this Section 1.2, any other provision of these TDP, the SPHC Asbestos Personal Injury TDP, or in the Plan provides or shall be interpreted to provide that any amounts in the SPHC Account are available for or may be used to satisfy any NMBFiL Asbestos Personal Injury Claims, NMBFiL Personal Injury Indirect Claims, or the NMBFiL Protected Parties Indemnification Claims.

generally on an impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[4]   To that end, these TDP allow recovery for those asserting damages arising from mesothelioma (the "**Disease Level**"), and set forth presumptive medical and exposure requirements ("**Medical/Exposure Criteria**"), and a specific average liquidated value (**"Average Value"**).

The Disease Level, presumptive Medical/Exposure Criteria, and Average Value that are set forth in <u>Section 5.3</u> below have been selected and derived with the intention of achieving a fair allocation of the NMBFiL Trust Account in light of the best available information considering the domestic history of NMBFiL (which includes, among other things, that NMBFiL never paid a NMBFiL Asbestos Personal Injury Claim as a result of a settlement or adverse judgment) and the rights that claimants would have in the tort system absent the Reorganization Case.

**2.2**   <u>**Claims Liquidation Procedures.**</u>   Trust Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to <u>Section 5.1(a)</u> below.  The Trust shall take all reasonable steps to resolve Trust Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration.  Those steps may include, in the Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in <u>Section 5.3(a)(2)</u> below.

---

[4] As used in these TDP, the phrase "**in the tort system**" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of the Bankruptcy Code or any other applicable law. References to "tort system" shall include both domestic and foreign tort systems and other foreign claims-resolution systems, where appropriate.

All asserted Trust Claims will undergo the Trust's Individual Review Process described in <u>Section 5.3(a)</u> below.  Notwithstanding that a claim does not meet the presumptive Medical/Exposure Criteria for the Disease Level, the Trust may offer the claimant up to the Maximum Value of the Disease Level if the Trust is satisfied that the claimant has presented a claim for the Disease Level that would be cognizable and valid in the tort system.

The Average Value has been established with the expectation that over time the settlements should generally result in the Average Value set forth herein.

    **2.3**    <u>**Application of the Payment Percentage.**</u>  After the liquidated value of a Trust Claim is determined pursuant to the procedures set forth herein for Individual Review, mediation, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on the Payment Percentage described in <u>Section 4</u> below.  The Payment Percentage shall also apply to all sequencing adjustments paid pursuant to <u>Section 7.5</u> below.

The initial Payment Percentage (the "**Initial Payment Percentage**") shall be established by the Trustees, with the consent of the NMBFiL Asbestos Personal Injury Trust Advisory Committee ("**TAC**") and the NMBFiL Future Claimants' Representative ("**FCR**"), as soon as practicable after the Assessment Period.  The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Trust, with the consent of the TAC and the FCR, to reflect then-current estimates of the NMBFiL Trust Account's assets and liabilities, as well as the then-estimated value of then-pending and future claims.  Any adjustment to the Initial Payment Percentage shall be made only pursuant to <u>Section 4.2</u> below.  If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under these TDP shall receive additional payments only as provided in <u>Section 4.3</u> below.  Because there is uncertainty in the prediction of both the number and severity of future

Trust Claims, and the amount of the Trust's assets, no guarantee can be made of any Payment Percentage that will be applied to Trust Claim's liquidated value.

**2.4    Determination of the Maximum Annual Payment and Maximum Available Payment.** After calculating the Payment Percentage, the Trust shall estimate or model the amount of cash flow, principal, and income year-by-year so that they will be utilized over the entire life of the Trust in a manner that ensures that all present and future holders of Trust Claims are compensated in amounts reflecting the same Payment Percentage. In each year, based upon the model of cash flow, the Trust shall be empowered to pay out the portion of its funds payable for that year according to the model (the "**Maximum Annual Payment**").

The Payment Percentage and the Maximum Annual Payment figures shall be based on projections over the lifetime of the Trust. As noted in Section 2.3 above, if such long-term projections are revised, the Payment Percentage may be adjusted accordingly, which would result in a new model of the Trust's anticipated cash flow and a new calculation of the Maximum Annual Payment figures. However, year-to-year variations in the Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Trust's long-term projections. If, in a given year, however, asset values, including earnings thereon, are below projections, the Trust may need to distribute less in that year than would otherwise be permitted based on the applicable Maximum Annual Payment. Accordingly, the applicable Maximum Annual Payment for a given year may be temporarily decreased if the present value of the assets of the Trust as measured on a specified date during the year is less than the present value of the assets of the Trust projected for that date by the cash flow model described in the foregoing paragraph. The Trust shall make such a comparison

whenever the Trustees become aware of any information that suggests that such a comparison should be made and, in any event, no less frequently than once every one (1) year. If the Trust determines that as of the date in question, the present value of the Trust's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Trust based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the "**Temporary Maximum Annual Payment**" (additional reductions in the Maximum Annual Payment can occur during the course of that year based upon subsequent calculations). If in any year the Maximum Annual Payment was temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment. As a further safeguard, the Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year. If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the Trust shall first allocate the amount in question to any Trust Claims (i) based on a diagnosis dated prior to the Effective Date of the Plan and (ii) subsequently filed with the Trust within one (1) year following the date the Trust first

accepts the proof-of-claims forms and other materials required to file a claim with the Trust[5]

("**Existing Claims**").

Should the Maximum Annual Payment be insufficient to pay all such claims in full, the available funds shall be paid in proportion to the aggregate value of claims and the available funds allocated to claims shall be paid to the maximum extent to claimants based on their place in the FIFO Payment Queue.  Claims for which there are insufficient funds shall maintain their place in the FIFO Payment Queue and shall be carried over to the next year.  If there is a decrease in the Payment Percentage prior to the payment of such claims, any such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Maximum Annual Payment. The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated Trust Claims, provided, however, that if the Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly. The Trustees, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in return for prompter payment (the "**Reduced Payment Option**").

    **2.5**    <u>**RESERVED.**</u>

    **2.6**    <u>**Indirect Trust Claims.**</u>  As set forth in <u>Section 5.5</u> below, NMBFiL Asbestos Personal Injury Indirect Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of these TDP as all other Trust Claims.

---

[5] Exceptions to the satisfaction of this one-year filing requirement will be made where a claimant can show an inability to file within the one-year period caused by extraneous factors beyond the claimant's control.

**SECTION III**

**TDP ADMINISTRATION**

     **3.1**     **TAC and FCR.**  Pursuant to the Plan and the Trust Agreement, the Trustees shall administer the Trust Agreement and these TDP in consultation with the TAC, which represents the interests of holders of present Trust Claims, and the FCR, who represents the interests of holders of demands (as that term is defined in section 524(g)(5) of the Bankruptcy Code) for which NMBFiL has legal responsibility.  Except as set forth in these TDP, including with respect to processing and liquidation of Foreign Claims, the Trustees shall obtain the consent of the TAC and the FCR on any amendments to these TDP pursuant to Section 9.1 below, and on such other matters as are otherwise required below and in Section 2.2(e) of the Trust Agreement.  The Trustees shall also consult with the TAC and the FCR on such matters as are provided below and in Section 2.2(d) of the Trust Agreement.  The initial Trustees, the initial members of the TAC and the initial FCR are identified in the Trust Agreement.

     **3.2**     **Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustees shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed.  The Trustees shall not implement such amendment or take such action unless and until the parties have engaged in the Consultation Process described in Sections 6.7(a) and 7.7(a), or the Consent Process described in Sections 6.7(b) and 7.7(b), of the Trust Agreement, respectively.

**SECTION IV**

**PAYMENT PERCENTAGE; PERIODIC ESTIMATES**

     **4.1**     **Uncertainty of the Total Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding NMBFiL's total asbestos-related tort liabilities. Consequently, there is inherent uncertainty regarding the amounts that holders of Trust Claims

shall receive.  To ensure substantially equivalent treatment of all present and future Trust Claims, the Trustees must determine from time to time the percentage of full liquidated value that holders of present and future Trust Claims will be likely to receive, i.e., the "**Payment Percentage**" described in Section 2.3 above and Sections 4.2 and 4.3 below.

     **4.2**     **Computation of Payment Percentage.**  As provided in Section 2.3 above, the Trustees, with the consent of the TAC and the FCR, shall establish the Initial Payment Percentage after the Assessment Period.  The Payment Percentage shall be subject to change pursuant to the terms of these TDP and the Trust Agreement if the Trustees, with the consent of the TAC and the FCR, determine that an adjustment is required.  No less frequently than once every year, commencing with the first day of January occurring after the Assessment Period, the Trustees shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, if necessary after such reconsideration, change the Payment Percentage with the consent of the TAC and the FCR.  The Trustees shall also reconsider the Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the FCR.

     The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future Trust Claims, the value of the assets then available to the Trust for payment of Trust Claims, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all present and future holders of Trust Claims.  When making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors.

**4.3**    **Applicability of the Payment Percentage.**  No holder of a Trust Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment.  Except as otherwise provided in (a) <u>Section 5.1(c)</u> for Trust Claims involving deceased or incompetent claimants for which the Trust's offer must be approved by a court or through a probate process and (b) the paragraph below with respect to Released Claims, no holder of any Trust Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustees, in their discretion, may cause the Trust to pay a Trust Claim based on the Payment Percentage that was in effect prior to the reduction if such Trust Claim was filed and actionable with the Trust ninety (90) days or more prior to the date the Trustees proposed the new Payment Percentage in writing to the TAC and the FCR (the "**Proposal Date**") and the processing of such claim was unreasonably delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the TAC and the FCR, but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.  However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Trust Claim was liquidated prior to the Proposal Date and who either (a) transmitted[6] an executed release to the Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal  Date, transmitted an executed release to the Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**"). For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Trust transmits a release electronically, the release shall be deemed to have been received on the date the Trust transmits the offer notification, and (c) if the Trust places the release in the U.S. mail, postage pre-paid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Section 2.4 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to the Proposal Date, the Trust shall issue a written notice to claimants or claimants' counsel indicating the Trust is reconsidering the Payment Percentage.

There is uncertainty surrounding the amount of the Trust's future assets and liabilities. There is uncertainty surrounding the totality of the Trust Claims to be paid over time, as well as the extent to which changes in existing law could affect the Trust's liabilities under these TDP. If the value or volume of Trust Claims actually filed with the Trust is significantly lower than

---

[6] For purposes of this sentence, "**transmitted**" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

originally estimated, the Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Trustees, with the consent of the TAC and the FCR, decide to increase the Payment Percentage due to a material change in the estimates of the Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments to all claimants who previously liquidated their claims against the Trust and received payments based on a lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00.  The amount of the suspended payment shall be added to the amount of any prior supplemental payment(s) that was (were) also suspended because it (they) would have been less than $100.00.  The Trustees shall pay any aggregate supplemental payments owed to the claimant when the total exceeds $100.00.

**SECTION V**

**RESOLUTION OF TRUST CLAIMS**

5.1     **Ordering, Processing and Payment of Claims.**

(a)     **Ordering of Claims.**

(1)     **Establishment of FIFO Processing Queues.**  The Trust shall order all claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").  For all claims filed on or before the date six (6) months after the date that the Trust first makes available the proof-

of-claim forms and other claims materials required to file a claim with the Trust (the "**Initial Claims Filing Date**"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Petition Date that the specific claim was filed against NMBFiL in the tort system; (ii) the date before the Petition Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with NMBFiL; (iii) the date after the Petition Date but before the date that the Trust first makes available the proof-of-claim forms and other claims materials required to file a claim with the Trust that the asbestos claim was filed against another defendant in the tort system; or (iv) the date a ballot was submitted on behalf of the claimant in Class 4b for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Trust, provided such claim is sufficiently complete, as defined in the Trust's claim filing instructions.  If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

(2)    <u>Effect of Statutes of Limitations and Repose.</u>  All unliquidated Trust Claims must meet either: (i) for claims first filed in the tort system against NMBFiL prior to the Petition Date, the statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) for claims not filed against NMBFiL in the tort system prior to the Petition Date, the statute of limitations that was in effect at the time of the

filing with the Trust.  However, the running of the statute of limitations shall be tolled as of the

earliest of: (A) the actual filing of the claim against NMBFiL prior to the Petition Date, whether

in the tort system or by submission of the claim to NMBFiL pursuant to an administrative

settlement agreement; (B) the tolling of the claim against NMBFiL prior to the Petition Date by

an agreement or otherwise, provided such tolling was still in effect on the Petition Date; or

(C) the Petition Date.

       If a Trust Claim meets any of the tolling provisions described in the preceding sentence

and the claim was not barred by the statute of limitations at the time of the tolling event, it shall

be treated as timely filed if it is actually filed with the Trust within three (3) years after the Initial

Claims Filing Date.  In addition, any claims that were first diagnosed after the Petition Date but

no later than twelve (12) months following the Effective Date of the Plan, irrespective of the

application of any relevant federal, state, or foreign statute of limitations or repose, may be filed

with the Trust within three (3) years after the date of diagnosis or within three (3) years after the

Initial Claims Filing Date, whichever occurs later.  However, the processing of any Trust Claim

may be deferred at the election of the claimant pursuant to Section 6.3 below.

**(b)**     **Processing of Claims.**  As a general practice, After the Assessment Period, the Trust

shall review its claims files on a regular basis and notify all claimants whose claims are likely to

come up in the FIFO Processing Queue in the near future.

**(c)**     **Payment of Claims.**  Trust Claims that have been liquidated under the provisions of

these TDP by the Individual Review Process as provided in Section 5.3(a) shall be paid in FIFO

order based on the date their liquidation became final (the "**FIFO Payment Queue**"), all such

payments being subject to the applicable Payment Percentage, the Maximum Annual Payment,

the Maximum Available Payment, and the sequencing adjustment provided for in <u>Section 7.5</u> below, except as otherwise provided herein.

Where the claimant is deceased or incompetent and the settlement and payment of the claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Trust has been furnished with evidence that the settlement offer has been submitted to such court or to the probate process for approval.  If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are liquidated on the same date and the respective claimants' asbestos-related diseases were diagnosed on the same date, the position of those claimants in the FIFO Payment Queue shall be determined based on the dates of the claimants' births, with older claimants given priority over younger claimants.

**5.2**    <u>**Resolution of Unliquidated Trust Claims.**</u>  Within six (6) months after the Assessment Period or such other time as the Trustees conclude is appropriate, the Trustees, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Trust Claims, which shall include deadlines for processing such claims.  All claimants seeking resolution of Trust Claims shall be required to file a proof-of-claim form,

-16-

together with the required supporting documentation, in accordance with the provisions of

Sections 6.1, 6.2, 6.4 and 6.5 below.

In order for a Trust Claim to be placed in the FIFO Processing Queue, the party asserting

such Trust Claim must file a valid proof-of-claim form with the required supporting

documentation, after which the claim shall be placed in the FIFO Processing Queue in

accordance with the ordering criteria described in Section 5.1(a) above.

**(a)     RESERVED**

       **(1)     RESERVED**

       **(2)     RESERVED**

       **(3)     Disease Level, Average Value and Presumptive**

**Medical/Exposure Criteria.**          The only Disease Level initially compensable under these

TDP, together with the presumptive Medical/Exposure Criteria, and its Average Value, are set

forth below.  The Disease Level, Average Value, and presumptive Medical/Exposure Criteria

shall apply to all Trust Claims filed with the Trust by entities that submitted a ballot voting on

the Plan.  The Trust shall resolve only Disease Level claims for mesothelioma for the five years

following the Assessment Period.

At the end of the two-year (2-year) period in which the Trust shall resolve

only Disease Level claims for mesothelima, with the consent of the TAC and the FCR, the

Trustees may amend these TDP to include additional Disease Levels, their presumptive

Medical/Exposure Criteria, and respective values, based on the information available to them at

that time, including, but not limited to: the amount of money remaining in the NMBFiL Trust

Account, the Trust's experience in resolving claims asserted against the NMBFiL Trust Account,

the number of claims asserted by claimants based on other Disease Levels, forecasts of future

claims by mesothelioma claimants, forecasts of future claims by claimants asserting injuries in other Disease Levels, and other factual, medical, and legal developments; or determine that a novel or exceptional Trust Claim is compensable even though it does not meet the presumptive Medical/Exposure Criteria for the Disease Level.

| Disease Level | Average Values | Presumptive Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma | $25,000 | (1) Diagnosis[7] of mesothelioma; and (2) Debtor Exposure as defined in Section 5.5(b)(1)(B) below |

**(b)**    **Individual Review Process.**

       **(1)**    **In General.**  All Trust Claims shall undergo the Individual Review Process.   Trust Claims of individuals exposed in Canada who were residents of Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder. Accordingly, a "**Foreign Claim**" is a Trust Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which NMBFiL has legal responsibility, including under theories of alter-ego or similar theories of derivative liability, occurred outside of the United States and its Territories and Possessions and outside of the Provinces and Territories of Canada.[8]

       **A.**    **Review of Presumptive Medical/Exposure Criteria.**

Through the Individual Review Process, each Trust Claim will receive individual consideration. If a Trust Claim fails to meet the presumptive Medical/Exposure Criteria for mesothelioma.  In such a case, the Trust shall either deny the claim, or, if the Trust is satisfied that the claimant has

---

[7] The requirements for a diagnosis of a mesothelioma claim that may be compensated under the provisions of these TDP are set forth in Section 5.6 below.

[8] Prior to the Trust's processing of Foreign Claims, and notwithstanding anything in the TDP to the contrary, the Trustees shall implement separate claim valuation, claim form and arbitration criteria, and evidentiary requirements to govern the resolution of Foreign Claims.

presented a claim that would be cognizable and valid in the tort system, the Trust can offer the claimant a liquidated value amount up to the Average Value for mesothelioma.

### B.    Reserved.

### (2)    Valuation Factors to Be Considered in Individual Review.

When examining claims under Individual Review, the Trust shall thus take into consideration all of the factors that affect the severity of damages and values, including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which NMBFiL has legal responsibility, prior to December 31, 1982, including under theories of alter-ego (for example, alternative causes, and the strength of documentation of injuries); and (iv) the industry of exposure.  In liquidating the value of a Trust Claim under the procedures outlined herein, the Trust shall treat a claimant as living if the claimant was alive at the time the initial pre-Petition Date complaint was filed or the proof-of-claim form was filed with the Trust even if the claimant has subsequently died.

For these TDP, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against NMBFiL in the tort system prior to the Petition Date.  If the claim was not filed against NMBFiL in the tort system prior to the Petition Date, the Claimant's Jurisdiction may be either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced exposure to

an asbestos containing product, or to conduct that exposed the claimant to an asbestos containing product, for which NMBFiL has legal liability, including under theories of alter-ego or similar theories of derivative liability; or (iii) in a jurisdiction that describes the claim as one for "exemplary" or "punitive" damages, the Commonwealth of Pennsylvania, in which case the claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles.

**(3)      Average and Maximum Values**.

| Disease Level | Average Value | Maximum Value |
|---|---|---|
| Mesothelioma | $25,000 | TBD |

The Average Value shall apply to all NMBFiL Trust Claims filed with the Trust by entities that submitted a ballot voting on the Plan as provided in Section 5.1 above. Thereafter, the Trust, with the consent of the TAC and the FCR pursuant to Section 6.7(b) and Section 7.7(b) of the Trust Agreement, may change this valuation amount for good cause and consistent with other restrictions on the amendment power.

**(4)      Claims Processing under Individual Review.** At the conclusion of the Individual Review Process, the Trust shall: (i) determine the liquidated value, if any, of the claim; and (ii) advise the claimant of its determination. If the Trust establishes a liquidated value, it shall tender to the claimant an offer of payment of the aforementioned determined value multiplied by the applicable Payment Percentage, together with a form of release approved by the Trust. If the claimant accepts the offer of payment and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Trust shall disburse payment subject to the limitations of the Maximum Available Payment.

     **5.3**     **RESERVED.**

     **5.4**     **Indirect Trust Claims.**  NMBFiL Asbestos Personal Injury Indirect Claims asserted against the Trust shall be treated as presumptively valid and paid by the Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Bankruptcy Code or subordinated under Section 509(c) of the Bankruptcy Code, and (b) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the Trust would otherwise have had a liability or obligation under these TDP (the "**Direct Claimant**") (and which has not been paid by the Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust and the NMBFiL Protected Parties from all liability to the Direct Claimant and the Indirect Claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law.  In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related Direct Claimant against the Trust, including any rights with respect to the timing, amount, or manner of payment.  In addition, no Indirect Asbestos PI Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant in respect of such Direct Claimant's claim for which the Trust would have liability.

     To establish a presumptively valid NMBFiL Asbestos Personal Injury Indirect Claims, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Trust and the NMBFiL Protected Parties) or a Final Order provided that

such claim is valid under tort law.  In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Trust and the NMBFiL Protected Parties a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Trust and the NMBFiL Protected Parties with a full release of the Direct Claimant's claim, the NMBFiL Asbestos Personal Injury Indirect Claim will be reviewed individually to determine whether the Indirect Claimant can establish under law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Trust had to the Direct Claimant as of the Effective Date of these TDP.  If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the applicable Payment Percentage.  However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these TDP.  Further, the liquidated value of any NMBFiL Asbestos Personal Injury Indirect Claim paid by the Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any NMBFiL Asbestos Personal Injury Claim that might be subsequently asserted by the Direct Claimant against the Trust.

The Trustees may develop and approve a separate proof-of-claim form for NMBFiL Asbestos Personal Injury Indirect Claims as provided in Section 6.1 below.  NMBFiL Asbestos Personal Injury Indirect Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.5,

which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Trust Claims.  Nothing in these TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting a NMBFiL Asbestos Personal Injury Indirect Claim against the Trust subject to the requirements set forth herein.

     **5.5**     **Evidentiary Requirements.**

**(a)**     **Medical Evidence.**

       **(1)**     **In General.**  All diagnoses of mesothelioma shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.[9]

        **A.**     **RESERVED.**

        **B.**     **Mesothelioma Diagnosis**.  All diagnoses of mesothelioma shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission (formerly known as the Joint Commission on Accreditation of Healthcare Organizations).

        **C.**     **Certain Pre-Petition Trust Claims.**  If the holder of a Trust Claim that was filed against NMBFiL or any other defendant in the tort system prior to the

---

[9] All diagnoses of mesothelioma shall be presumed to be based on findings that the disease involves a malignancy. However, the Trust may rebut such presumptions.

Petition Date has available a report of a diagnosing physician engaged by the holder or his or her

law firm who conducted a physical examination of the holder, or if the holder has filed such

medical evidence and/or a diagnosis of mesothelioma by a physician not engaged by the holder

or his or her law firm who conducted a physical examination of the holder with another asbestos-

related personal injury settlement trust that requires such evidence, without regard to whether the

claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical

evidence to the Trust.

> **D.    Credibility of Medical Evidence.**  Before making any
payment to a claimant, the Trust must have reasonable confidence that the medical evidence

provided in support of the claim is credible and consistent with recognized medical standards.

The Trust may require the submission of X-rays, CT scans, detailed results of pulmonary

function tests, laboratory tests, tissue samples, results of medical examination or reviews of other

medical evidence, and may require that medical evidence submitted comply with recognized

medical standards regarding equipment, testing methods and procedures to assure that such

evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in

evidence by a state or federal judge at trial or (ii) that is a diagnosis by a physician shown to have

previously qualified as a medical expert with respect to the asbestos-related disease in question

before a state or federal judge using the same methodology and standard, is presumptively

reliable, although the Trust may seek to rebut the presumption.  Notwithstanding the foregoing or

any other provision of these TDP, any medical evidence submitted by a physician or entity that

the Trust has determined, after consulting with the TAC and the FCR, to be unreliable shall not

be acceptable as medical evidence in support of any Trust Claim.

In addition, except for Foreign Claims, claimants who otherwise meet the requirements of these TDP for payment of a Trust Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system.  However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review proceeding conducted pursuant to Section 5.3(a).

**(b)** **Exposure Evidence.**

**(1)** **In General.**  As set forth above in Section 5.3(a), to qualify for the Disease Level, the claimant must demonstrate a minimum exposure to NMBFiL products with asbestos-containing talc, or to conduct that exposed the claimant to  products with asbestos-containing talc for which NMBFiL otherwise has legal responsibility.  Claims based on conspiracy theories that involve no exposure to an asbestos-containing product sold, distributed, marketed, handled, processed, or manufactured by NMBFiL, their predecessors or successors are not compensable under these TDP.  The claimant must show (i) Debtor Exposure as defined in Section 5.5(b)(1)(B) below prior to December 31, 1982; plus (ii) Significant Occupational Exposure to asbestos as defined below.

**A.** **Significant Occupational Exposure.**  "Significant Occupational Exposure" means employment for a cumulative period of at least ten (10) years, with a minimum of two (2) years prior to December 31, 1982, in an industry and an occupation in which the claimant regularly was exposed to Bondo-brand product containing asbestos.

**B.** **Debtor Exposure.**  "Debtor Exposure" means the claimant must demonstrate meaningful and credible exposure, which occurred prior to December 31, 1982, (a) to an asbestos-containing product sold, distributed, marketed, handled, processed,

or manufactured by NMBFiL or for which NMBFiL otherwise had legal responsibility or (b) to conduct for which NMBFiL has legal responsibility that exposed the claimant to an asbestos-containing product.  That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant (based on personal knowledge); an affidavit or sworn statement of a family member (based on personal knowledge); an affidavit or sworn statement of a co-worker (based on personal knowledge); by invoices, employment, construction or similar records; or by other credible evidence.  The specific exposure information required by the Trust to process a claim shall be set forth on the proof-of-claim form to be used by the Trust.  The Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary, including without limitation product testing or other similar indicia to demonstrate that the asbestos-containing product to which the claimant was exposed was contaminated with asbestos.  The Trust shall seek to refrain from applying new or modified exposure criteria to claimants who die (or who have submitted an affidavit of exposure by an affiant who dies) during the pendency of such claimant's claim review.

Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the Trust, not third parties or defendants in the tort system.  The Trust has no need for, and therefore claimants are not required to furnish the Trust, with evidence of exposure to specific asbestos products other than those for which NMBFiL has legal responsibility, except to the extent such evidence is required elsewhere in these TDP.  Similarly, failure to identify NMBFiL's products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Trust, provided the claimant satisfies the medical and exposure requirements of these TDP.

**5.6**    **Claims Audit Program.**    The Trustees, with the consent of the TAC and the FCR, may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including Debtor Exposure, prior to December 31, 1982.  In the event that the Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by disallowing a Trust Claim and/or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

**5.7**    **RESERVED.**

**5.8**    **Arbitration.**

(a)    **Establishment of ADR Procedures.**    The Trust, with the consent of the TAC and the FCR, shall develop and adopt ADR Procedures,[10] which shall provide for pro-bono evaluation, mediation, and binding or non-binding arbitration to resolve disputes concerning whether the Trust's outright rejection or denial of a claim was proper, or whether the claimant's

---

[10] To the extent there is any ambiguity or conflict between any provision of these TDP and the ADR Procedures, the provisions of these TDP shall control.

medical condition or exposure history meets the requirements of these TDP for purposes of categorizing a claim involving the Disease Level.  Proceedings under the ADR Procedures shall also be available for resolving disputes over the liquidated value of a claim involving the Disease Level, as well as disputes over the validity of an NMBFiL Asbestos Personal Injury Indirect Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.5 above.  In the case of an arbitration involving the liquidated value of a claim involving a Disease Level, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(a)(2) above.  In order to facilitate the Individual Review Process, the Trust may from time to time develop valuation methodologies and/or matrices that take into account the valuation factors set forth in Section 5.3(a)(2) above that enable the Trust to efficiently make initial liquidated value offers in the Individual Review Process.

With respect to domestic claims, these valuation methodologies and/or matrices are often referred to as the Individual Review model.  Except as provided for arbitrations involving Foreign Claims, the Trust shall neither offer into evidence or describe any such methodologies and/or matrices, nor assert that any information generated by the methodologies and/or matrices has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that was used to create the methodologies and/or matrices may be relevant and may be made available to the arbitrator but only if provided to the claimant or the claimant's counsel at least ten (10) days prior to the arbitration proceeding.

With respect to all claims eligible for arbitration, the claimant, but not the Trust, may elect either non-binding or binding arbitration.  The ADR Procedures may be modified by the Trust with the consent of the TAC and the FCR.  Such amendments may include the establishment of an Extraordinary Claims Panel to review such claims.

(b)    **Claims Eligible for Arbitration.**  In order to be eligible for arbitration, the claimant must first complete the Individual Review Process set forth in Section 5.3(a) above. Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the Trust, the Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Trust of the rejection in writing.  Individual Review will also be treated as completed if the Trust has rejected the claim.

(c)    **Limitations on and Payment of Arbitration Awards.**  The arbitrator shall not return an award in excess of the Maximum Value set forth in Section 5.3(a)(2) above. A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

5.9    **Litigation.**  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Trust pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Trust's available cash only as provided in Section 7.7 below.

**SECTION VI**

**CLAIMS MATERIALS**

    **6.1**    **Claims Materials.**  The Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the Trust.  The Claims Materials shall include a copy of these TDP, such instructions as the Trustees shall approve, a detailed proof-of-claim form, and a release. A separate claim form for NMBFiL Asbestos Personal Injury Indirect Claims may be developed.  If feasible, the forms used by the Trust to obtain claims information shall be substantially similar to those used by other asbestos-claims resolution organizations. In developing its claim-filing procedures, the Trust shall make every reasonable effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk, CD, zip drive, or similar device.  If requested by the claimant, the Trust shall accept information provided electronically.

    **6.2**    **Content of Claims Materials.**  The proof-of-claim form to be submitted to the Trust shall require the claimant to assert that such claimant has mesothelioma.  The proof-of-claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure.  The proof-of-claim form and release to be used by the Trust shall be developed by the Trust and submitted to the TAC and the FCR for approval; the proof-of-claim form may be changed by the Trust with the consent of the TAC and the FCR.

    **6.3**    **Withdrawal or Deferral of Claims.**  A claimant can withdraw a Trust Claim at any time upon written notice to the Trust and file another claim subsequently without affecting the

status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her Trust Claim be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue.  During the period of such deferral, a sequencing adjustment on such claimant's Trust Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.  Except for Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Trust's offer is required, or a Trust Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Trust's written offer of payment or rejection of the claim.  Upon written request and good cause, the Trust may extend the withdrawal or deferral period for an additional six (6) months.

      **6.4**    **Filing Requirements and Fees.**  The Trustees shall have the discretion to determine, with the consent of the TAC and the FCR, (a) whether a claimant must have previously filed an asbestos-related personal injury claim in the tort system to be eligible to file the claim with the Trust and (b) whether a filing fee should be required for any Trust Claims.

      **6.5**    **English Language.**  All claims, claim forms, submissions, and evidence submitted to the Trust or in connection with any claim or its liquidation shall be in the English language.

      **6.6**    **Confidentiality of Claimants' Submissions.**  All submissions to the Trust by a holder of a Trust Claim, including the proof-of-claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Trust and

intended by the parties to be confidential and to be protected by all applicable state and federal

privileges, including, but not limited to, those directly applicable to settlement discussions.  The

Trust shall preserve the confidentiality of such claimant submissions, and shall disclose the

contents thereof only, (i) with the permission of the holder, to another trust established for the

benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of the

Bankruptcy Code or other applicable law, (ii) to such other persons as authorized by the holder, or

(iii) in response to a valid subpoena.  Furthermore, the Trust shall provide counsel for the holder a

copy of any such subpoena immediately upon being served.  The Trust shall on its own initiative

or upon request of the claimant in question take all necessary and appropriate steps to preserve

any and all privileges.

**SECTION VII**

**GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS**

      **7.1**    **Showing Required.**  To establish a valid Trust Claim a claimant must meet the

requirements set forth in these TDP.  The Trust may require the submission of X-rays, CT scans,

laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence

to support or verify a Trust Claim and may further require that medical evidence submitted

comply with recognized medical standards regarding equipment, testing methods, and procedures

to assure that such evidence is reliable.  Nothing in these TDP shall prohibit the Trust from

challenging at any time the validity of a claim and/or whether a claim has been paid, satisfied,

settled, released, waived, or otherwise discharged.

      **7.2**    **Costs Considered.**  Notwithstanding any provisions of these TDP to the contrary,

the Trustees shall always give appropriate consideration to the cost of investigating and

uncovering invalid Trust Claims so that the payment of valid Trust Claims is not further impaired

-32-

by such processes with respect to issues related to the validity of the medical evidence supporting a Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Trust so that valid Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the Trust whatever the costs, or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.6 above.

**7.3**    **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**  Consistent with the provisions hereof and subject to the FIFO Processing Queue and the FIFO Payment Queue, the Maximum Annual Payment, and the Maximum Available Payment requirements set forth above, following the Assessment Period, the Trustees shall proceed as quickly as possible to liquidate valid Trust Claims, and shall make payments to holders of such claims in accordance with these TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.  In the event that the Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the FCR, suspend the normal order of payment; temporarily limit or

suspend payments altogether; and/or offer a Reduced Payment Option as described in <u>Section 2.4</u>
above.

       **7.4**    **<u>Punitive Damages.</u>**  Except as provided below for claims asserted by a claimant
for compensatory damages that would otherwise satisfy the criteria for payment under these TDP
but the claimant is foreclosed from payment because the governing law  describes the claim as a
claim for "exemplary" or "punitive" damages  in determining the value of any liquidated or
unliquidated Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory
damages, shall not be considered or allowed, notwithstanding their availability in the tort system.
Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated
against the Trust in the tort system pursuant to <u>Sections 5.10</u> above and <u>7.6</u> below.

       The only damages that may be awarded pursuant to this TDP to Alabama Claimants who
are deceased and whose personal representatives pursue their claims only under the Alabama
Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and
common law of the Commonwealth of Pennsylvania, without regard to its choice of law
principles.

       **7.5**    **<u>Sequencing Adjustments.</u>**

       **(a)**    **<u>In General.</u>**  Subject to the limitations set forth below, after the
Assessment Period, a sequencing adjustment shall be paid on all Trust Claims with respect to
which the claimant has had to wait a year or more for payment, provided, however, that no
claimant shall receive a sequencing adjustment for a period in excess of seven (7) years.  The
sequencing adjustment factor shall be the one-year U.S. Treasury bill interest rate in effect on
January 1 of the year in which the accrual of the sequencing adjustment commences. The rate of
the sequencing adjustment shall be adjusted each January 1 to correspond to the one-year

Treasury bill interest rate then in effect. The applicable sequencing adjustment shall be

calculated based only on the value of the claim specified in Section 7.5(b), subject to the

Payment Percentage; any accrued but unpaid sequencing adjustment shall not be included in

such calculation.

> (b)    **Unliquidated Trust Claims.**   A sequencing adjustment shall be payable on

any Trust Claims for which a liquidated value has been established pursuant to the procedures

for Individual Review or arbitration.   No sequencing adjustment shall be paid on any claim

liquidated in the tort system pursuant to Section 5.9 above or Section 7.6 below.   Sequencing

adjustments on all unliquidated claims shall be measured from the date of payment back to the

date that is one year after the date on which (a) the claim was filed against NMBFiL prior to the

Petition Date; (b) the claim was filed against another defendant in the tort system on or after the

Petition Date but before the Initial Claims Filing Date; (c) the claim was filed with the

Bankruptcy Court during the pendency of the Reorganization Case; or (d) the claim was filed

with the Trust after the Effective Date of the Plan.

> **7.6**    **Suits in the Tort System**.  If the holder of a disputed claim disagrees with the

Trust's determination regarding the Disease Level of the claim, the claimant's exposure or

medical history, the validity of the claim, or the liquidated value of the claim, and if the holder has

first submitted the claim to non-binding arbitration as provided in Section 5.8 above, the holder

may file a lawsuit in the Claimant's Jurisdiction as defined in Section 5.3 above.  Any such

lawsuit must be filed by the claimant in his or her own right and name and not as a member or

representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All

defenses (including, with respect to the Trust, all defenses that could have been asserted by

NMBFiL) shall be available to both sides at trial; however, the Trust may waive any defense

and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or the proof-of-claim form was filed with the Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

      **7.7**    **Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Trust an initial payment (subject to the applicable Payment Percentage, and the Maximum Available Payment provisions set forth above) of an amount equal to the greater of (i) the Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, and the Maximum Available Payment provisions above in effect on the date of the payment of the subject installment).

      Under no circumstances shall the Trust pay (a) sequencing adjustments pursuant to Section 7.5 or (b) interest under any statute on any judgments obtained in the tort system.

      **7.8**    **Releases.**  The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the Trust and the NMBFiL Protected Parties in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the Trust or the NMBFiL Protected Parties with respect to the Trust Claim.  As a condition to making any payment to a claimant, the Trust shall obtain, for the benefit of the Trust and the NMBFiL Protected Parties, a general, partial, or limited

release as appropriate.    If allowed by applicable law, the endorsing of a check or draft for

payment by or on behalf of a claimant may, in the discretion of the Trust, constitute such a

release.

     **7.9**    **Third-Party Services.**  Nothing in these TDP shall preclude the Trust from

contracting with another asbestos claims resolution organization to provide services to the Trust

so long as decisions about the categorization and liquidated value of Trust Claims are based on the

relevant provisions of these TDP.

**SECTION VIII**

**REPORTING**

     **8.1**    **Medicare.**

       **(a)**    It is the position of the parties to this Trust Agreement that the NMBFiL

Protected Parties will have no reporting obligations in respect of their contributions to the Trust,

or in respect of any payments, settlements, resolutions, awards, or other claim liquidations by the

Trust, under the reporting provisions of 42 U.S.C. §1395y et seq. or any other similar statute or

regulation, and any related rules, regulations, or guidance issued in connection therewith or

relating thereto ("MSPA"), including Section 111 of the Medicare, Medicaid, and SCHIP

Extension Act of 2007 (P. L. 110-173), or any other similar statute or regulation, and any related

rules, regulations, or guidance issued in connection therewith or relating thereto ("MMSEA").

Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a

final non-appealable decision from the United States Court of Appeals for the Third Circuit or

the United States Supreme Court), or a letter from the Secretary of Health and Human Services

confirming that the NMBFiL Protected Parties have no reporting obligations under MMSEA

with respect to any settlements, payments, or other awards made by the Trust or with respect to

-37-

contributions the NMBFiL Protected Parties have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the NMBFiL Protected Parties, and shall timely submit all reports that would be required to be made by any of the NMBFiL Protected Parties under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust. The Trust, in its role as reporting agent for the NMBFiL Protected Parties, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "CMS") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(b)    As long as the Trust is required to act as a reporting agent for any NMBFiL Protected Parties pursuant to the provisions of Section 8.1(a) above, the Trust shall within ten (10) business days following the end of each calendar quarter, provide a written certification to the party designated in writing by each Protected Party for which the Trust is required to act as reporting agent, confirming that all reports to CMS required by Section 8.1(a) above have been submitted in a timely fashion, and identifying (i) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance, and (ii) any payments to Medicare benefits recipients or Medicare-eligible beneficiaries that the Trust did not report to CMS.

(c)    With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by a Protected Party for which the Trust is required to act as reporting agent, promptly provide copies of the original reports submitted to

CMS, as well as any response received from CMS with respect to such reports; provided, however, that the Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators and/or other personal representatives, as applicable.  With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS and resubmit such reports to CMS, and, upon request by a Protected Party, provide such Protected Party with copies of such resubmissions; provided, however, that the Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators and/or other personal representatives, as applicable.  In the event the Trust is unable to remedy any issues of noncompliance, the provisions of Section 8.1(g) below shall apply.

   **(d)**  As long as the Trust is required to act as a reporting agent for a Protected Party pursuant to Section 8.1(a) above, with respect to each claim of a Medicare benefits recipient or Medicare-eligible beneficiary that was paid by the Trust and not reported to CMS, the Trust shall, upon request by such Protected Party, promptly provide the claimant's name, last four digits of the claimant's Social Security number, the year of the claimant's birth, the claimants' asbestos-related disease, and any other information that may be necessary in the reasonable judgment of such Protected Party to satisfy its obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment.  In the event the Protected Party informs the Trust that it disagrees with the Trust's decision not to report a claim paid by the

Trust, the Trust shall promptly report the payment to CMS.  All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six years following such determination.  The NMBFiL Protected Parties shall keep any information and documents received from the Trust pursuant to this Section 8.1(d) confidential and shall not use such information for any purpose other than meeting obligations under MSPA and/or MMSEA.

(e)    As long as the Trust is required to act as a reporting agent for any Protected Party pursuant to Section 8.1(a) above, the Trust shall make the reports and provide the certifications required by Section 8.1(a) and (b) above until such time as the Protected Party shall determine, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust.  Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 8.1(a) above, and if the Protected Party reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Section 8.1(a) and (b) above.

(f)    Section 8.1(a) above is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that any Protected Party, is, in fact, an "applicable plan" within the meaning of MMSEA, or that any Protected Party has a legal obligation to report any actions undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

(g)     In the event that CMS concludes that reporting done by the Trust in accordance with Section 8.1(a) above is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust or any of the NMBFiL Protected Parties a concern with respect to the sufficiency or timeliness of such reporting, or there appears to a Protected Party a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 8.1(b), (c) or (d) above, or other credible information, then each Protected Party shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide in a timely manner to any Protected Party that elects to file its own reports such information as the electing Protected Party may require in order to comply with MMSEA, including, without limitation, the full reports filed by the Trust pursuant to Section 8.1(a) above without any redactions.  Such Protected Party shall keep any information it receives from the Trust pursuant to this Section 4.12(g) confidential and shall not use such information for any purpose other than meeting obligations under MSPA and/or MMSEA.

(h)     Notwithstanding any other provision hereof, if the Trust is required to act as a reporting agent for any of the NMBFiL Protected Parties pursuant to the provisions contained herein, then such NMBFiL Protected Parties shall take all steps necessary and appropriate as required by CMS to permit any reports contemplated by this Section 8.1 to be filed.  Furthermore, until a Protected Party provides the Trust with any necessary information regarding that Protected Party's identifying information that may be required by CMS's Coordination of Benefits Contractor to effectuate reporting, the Trust shall have no obligation to report under Section 8.1(a) above with respect to any such entity that has not provided such information and the Trust shall have no indemnification obligation under Subsection (j) of this

Section 8.1 to such Protected Party for any penalty, interest, or sanction that may arise solely on account of the Protected Party's failure to timely provide such information to the Trust in response to a timely request by the Trust for such information.

(i)    The Trustees shall obtain prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Trust Claim a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSPA in connection with, or relating to, such Trust Claim and that the NMBFiL Protected Parties also are beneficiaries of such certification. The Trust shall provide a quarterly certification of its compliance with the terms of the immediately preceding sentence to the party designated in writing by each Protected Party for which the Trust is required to act as reporting agent, and shall permit reasonable audits by such NMBFiL Protected Parties, no more often than quarterly, to confirm the Trust's compliance with this Section 8.1(i) during which NMBFiL Protected Parties may request copies of claimant certifications. For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 8.1(i) regardless of whether a Protected Party elects to file its own reports under MMSEA pursuant to Section 8.1(g) above. The NMBFiL Protected Parties shall keep any information and documents received from the Trust pursuant to this Section 8.1(i) confidential and shall not use such information for any purpose other than meeting obligations under MSPA and/or MMSEA.

## SECTION IX

## MISCELLANEOUS

9.1    **Amendments.**  Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of these TDP (including, without limitation, amendments

to conform these TDP to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the TAC and the FCR pursuant to the consent process set forth in <u>Sections 6.7(b)</u> and <u>7.7(b)</u> of the Trust Agreement, except that the right to establish and adjust the Payment Percentage is governed by <u>Section 4.2</u> above.  Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustees, in writing, amendments to these TDP.  Any amendment proposed by the TAC or the FCR shall remain subject to <u>Section 8.3</u> of the Trust Agreement; <u>provided further</u>, however, these TDP may be amended, as set forth above, including with respect to processing and liquidation of Foreign Claims.

**9.2**    <u>**Severability.**</u>  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**9.3**    <u>**Governing Law.**</u>  Except for purposes of determining the validity and/or liquidated value of any Trust Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the determination of validity and/or liquidation of Trust Claims in the case of Individual Review, mediation, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in <u>Section 5.2(a)(2)</u> above.

**9.4**    <u>**Merger of Trust Assets with Other Trusts.**</u>  In order to efficiently administer the assets in the account for the Trust, the Trustees may determine, with the consent of the TAC and the FCR, to combine or merge the assets in the account for Trust with another trust or trusts established under Section 524(g) of the Bankruptcy Code.  In such an event, the Trustees shall be permitted to obtain claims information maintained by such other 524(g) trusts.