# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | **Case No. 10-11780 (PJW)** |
| **Specialty Products Holding Corp.**, *et al.*, | : | |
| | : | **Chapter 11** |
| Debtors. | : | |
| | : | |

| | | |
|---|---|---|
| **Bondex International, Inc.** | : | **Case No. 10-11779 (PJW)** |
| **Specialty Products Holding Corp.** | : | **Case No. 10-11780 (PJW)** |
| **NMBFiL, Inc.** | : | **Case No. 14-11942 (PJW)** |
| **Republic Powdered Metals, Inc.** | : | **Case No. 14-12028 (PJW)** |
| | : | |
| | : | **DISCLOSURE STATEMENT PURSUANT TO** |
| | : | **SECTION 1125 OF THE BANKRUPTCY** |
| | : | **CODE FOR THE JOINT PLAN OF** |
| | : | **REORGANIZATION OF SPECIALTY** |
| | : | **PRODUCTS HOLDING CORP., BONDEX** |
| | : | **INTERNATIONAL, INC., REPUBLIC** |
| | : | **POWDERED METALS, INC. AND** |
| | : | **NMBFiL, INC.** |

DANIEL J. DEFRANCESCHI (DE 2732)
PAUL N. HEATH (DE 3704)
ZACHARY I. SHAPIRO (DE 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

- and -

GREGORY M. GORDON (TX 08435300)
DAN B. PRIETO (TX 24048744)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939

ATTORNEYS FOR DEBTORS

October 20, 2014

**DISCLOSURE STATEMENT DATED OCTOBER 20, 2014[1]**

**SOLICITATION OF VOTES WITH RESPECT TO THE
JOINT PLAN OF REORGANIZATION OF
SPECIALTY PRODUCTS HOLDING CORP., BONDEX INTERNATIONAL, INC., REPUBLIC
POWDERED METALS, INC. AND NMBFiL, INC.**

────────────

**The only Classes entitled to vote on the Joint Plan of Reorganization of Specialty Products Holding Corp., Bondex International, Inc., Republic Powdered Metals, Inc. and NMBFiL, Inc., dated October 20, 2014 and attached hereto as Exhibit I (the "Plan") are Classes 4a (SPHC Asbestos Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims). All creditors holding Asbestos Personal Injury Claims in Classes 4a and 4b are encouraged to read and carefully consider this Disclosure Statement, including the Plan and the matters described under "Risk Factors" in Section V prior to submitting ballots in response to this solicitation. Other than Classes 4a (SPHC Asbestos Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims), all Classes of Claims and Interests are unimpaired under the Plan; i.e., the Plan does not modify, other than by curing defaults and reinstating maturity, the legal, equitable or contractual rights of the holders of such Claims or Interests. This Disclosure Statement is being delivered to you because you are the holder of, or have otherwise asserted, either a Claim or Claims against, or an Interest or Interests in, Specialty Products Holding Corp., Bondex International, Inc., Republic Powdered Metals, Inc. or NMBFiL, Inc. (collectively, the "Debtors").**

────────────

**The boards of directors of the Debtors believe that the Plan is in the best interests of creditors and other stakeholders. All claimants in Classes 4a (SPHC Asbestos Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims) are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 6 of this Disclosure Statement. More detailed instructions are included in the ballots distributed to the claimants holding Asbestos Personal Injury Claims in Classes 4a and 4b. To be counted, your ballot must be duly completed, executed and received by the Debtors' voting agent by 5:00 p.m., prevailing Eastern Time, on December 2, 2014 (the "Voting Deadline"), unless extended by the Debtors in consultation with the Asbestos Personal Injury Committee and the Future Claimants' Representative.**

────────────

**The Confirmation and the Effective Date of the proposed Plan are subject to material conditions precedent. See Section II. There is no assurance that these conditions will be satisfied or waived.**

────────────

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein. If such information or representation is given or made, it may not be relied upon as having been authorized by any of the Debtors. The Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline.

---

[1]  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Joint Plan of Reorganization of Specialty Products Holding Corp., Bondex International, Inc., Republic Powdered Metals, Inc. and NMBFiL, Inc., dated October 20, 2014.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and documents described therein.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Except as otherwise indicated, the Debtors will File all exhibits to the Plan with the Bankruptcy Court and make them available for review on the website of Logan & Company, Inc. ("Logan") at http://www.loganandco.com, no later than 10 days before the Voting Deadline.  The Debtors also will serve the exhibits to the Plan on the parties on the general service list being maintained in the Reorganization Cases on or before 10 days prior to the Voting Deadline.

———————————

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

———————————

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' or the Reorganized Debtors' businesses.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section V.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  Neither the Debtors nor the Reorganized Debtors undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

———————————

**This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

———————————

# TABLE OF CONTENTS

<b>Page</b>

I.    PRELIMINARY STATEMENT ...................................................................................... 1

II.   OVERVIEW OF THE PLAN ......................................................................................... 2

    A.    Introduction ........................................................................................................ 2

    B.    Summary of Classes and Treatment of Claims and Interests ............................ 3

    C.    Voting on and Confirmation of the Plan ........................................................... 6

        1.    Voting Procedures and Requirements .................................................... 6

        2.    Confirmation Hearing ............................................................................ 7

        3.    Confirmation ........................................................................................... 7

        4.    Section 524(g) of the Bankruptcy Code ................................................ 8

        5.    Acceptance .............................................................................................. 8

        6.    Feasibility .............................................................................................. 9

        7.    Best Interests Test; Liquidation Analysis ............................................. 9

            a.    Generally ................................................................................... 9

            b.    Liquidation Analysis ................................................................. 9

        8.    Alternatives to Confirmation and Consummation of the Plan .............. 9

    D.    Formation of Asbestos Personal Injury Trust ................................................. 10

        1.    Creation of Asbestos Personal Injury Trust ........................................ 10

        2.    Qualified Settlement Fund .................................................................... 10

        3.    Asbestos Personal Injury Trustees ...................................................... 10

        4.    Asbestos Personal Injury Trust Termination Provisions ..................... 11

        5.    Asbestos Personal Injury Accounts ..................................................... 11

        6.    Transfers of Property to and Assumption of Certain Liabilities by the Asbestos Personal Injury Trust ................................................................................. 12

            a.    Transfer of Books and Records to the Asbestos Personal Injury Trust ........... 12

            b.    Funding the Asbestos Personal Injury Trust ........................... 12

            c.    Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust ............................................. 13

            d.    Indemnification by the Asbestos Personal Injury Trust ......... 13

            e.    Authority of the Debtors .......................................................... 14

    E.    Asbestos Personal Injury Trust Distribution Procedures ............................... 14

    F.    Conditions Precedent to Confirmation and Consummation of the Plan .......... 14

        1.    Conditions to Confirmation .................................................................. 14

        2.    Conditions to the Effective Date .......................................................... 17

        3.    Waiver of Conditions to Confirmation or the Effective Date .............. 17

        4.    Effect of Nonoccurrence of Conditions to the Effective Date ............. 18

**TABLE OF CONTENTS**
(continued)

III.   HISTORY OF THE DEBTORS ................................................................................ 18

    A.   Historical Overview ..................................................................................... 18

        1.   Corporate History ............................................................................ 18

        2.   Business Operations and Corporate Governance ........................... 19

            a.   Bondex ................................................................................ 19

            b.   SPHC ................................................................................... 19

            c.   Republic .............................................................................. 21

            d.   NMBFiL ............................................................................. 21

    B.   General Overview of the Debtors' Manufacture and Sale of Products Alleged to Contain Asbestos ..................................................................................... 21

            a.   SPHC and Bondex ............................................................... 21

            b.   Republic .............................................................................. 22

            c.   NMBFiL ............................................................................. 22

    C.   History of the Debtors' Asbestos Personal Injury Litigation ........................... 22

            a.   SPHC and Bondex ............................................................... 22

            b.   Republic .............................................................................. 23

            c.   NMBFiL ............................................................................. 23

    D.   Insurance and Coverage Litigation .............................................................. 23

    E.   Determination to File Reorganization Cases ................................................ 24

IV.   EVENTS DURING REORGANIZATION CASES ............................................... 24

    A.   Commencement of Reorganization Cases ................................................... 24

    B.   First Day Relief ........................................................................................... 24

    C.   Appointment of the Official Committee of Asbestos Personal Injury Claimants and Legal Representative ................................................................................ 25

    D.   Injunction Enjoining Parties from Pursuing Derivative Claims Against Certain Parties ............. 27

    E.   Tax Cooperation Agreement ....................................................................... 28

    F.   The Initial Debtors' Requests for Information Under Rule 2004 .................... 28

    G.   Discovery Regarding the 2002 Reorganization and other Subjects .............. 29

    H.   Bar Dates (For Claims Other Than Asbestos Personal Injury Claims) .......... 29

    I.   The Initial Debtors' Exclusive Right to File and Seek Confirmation of a Plan ........... 30

    J.   Preference Adversary .................................................................................. 30

    K.   Mediation of the Reorganization Cases ....................................................... 30

    L.   Estimation Decision and Appeal .................................................................. 30

    M.   Motion of the Asbestos Personal Injury Committee and the Future Claimants' Representative for Standing to Pursue Certain Estate Claims ....................... 31

**TABLE OF CONTENTS**
(continued)

Page

N.     Resolution of the Reorganization Cases and Fairness of Settlement of Dispute Regarding Asbestos Personal Injury Claims ................................................................................................. 32

O.     Motion to Pay Creditors of Republic ..................................................................... 33

V.    RISK FACTORS ............................................................................................................ 33

A.     Plan Confirmation .................................................................................................. 33

B.     The Effective Date May Not Occur ....................................................................... 33

C.     Recoveries on Asbestos Personal Injury Claims Are Subject To Risks Associated With the Businesses of the Obligors Under the SPHC Payment Note .................................. 33

VI.    REORGANIZED DEBTORS .......................................................................................... 35

A.     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ................... 35

B.     Restructuring Transactions ..................................................................................... 35

C.     Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action ........................................................ 36

        1.     Certificates of Incorporation and By-Laws of the Reorganized Debtors ...................... 36

        2.     Directors and Officers of the Reorganized Debtors ........................................ 36

        3.     Employee Arrangements of the Reorganized Debtors ...................................... 36

        4.     Corporate Action .............................................................................. 36

D.     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ........... 36

VII.    DISTRIBUTIONS UNDER THE PLAN .......................................................................... 37

A.     Payment of Administrative Claims ......................................................................... 37

        1.     Administrative Claims in General ........................................................... 37

        2.     Statutory Fees .................................................................................. 37

        3.     Ordinary Course Liabilities .................................................................. 37

        4.     DIP Facility Claims ........................................................................... 37

        5.     Bar Dates for Administrative Claims ....................................................... 37

            a.     General Bar Date Provisions ...................................................... 37

            b.     Bar Dates for Certain Administrative Claims ................................... 38

B.     Payment of Priority Tax Claims ............................................................................. 38

        1.     Priority Tax Claims in General .............................................................. 38

        2.     Other Provisions Concerning Treatment of Priority Tax Claims ...................... 39

C.     Obtaining Cash for Plan Distributions .................................................................... 39

D.     Distributions for Claims Allowed as of the Effective Date ........................................ 39

E.     Method of Distributions to Holders of Claims ......................................................... 39

F.     Compensation and Reimbursement for Services Related to Distributions ...................... 39

G.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ..................... 39

        1.     Delivery of Distributions ..................................................................... 39

**TABLE OF CONTENTS**
(continued)

| | | | |
|---|---|---|---|
| | 2. | Undeliverable Distributions Held by Disbursing Agents | 40 |
| | | a. | Holding and Investment of Undeliverable Distributions | 40 |
| | | b. | After Distributions Become Deliverable | 40 |
| | | c. | Failure to Claim Undeliverable Distributions | 40 |
| H. | Distribution Record Date | | 40 |
| | 1. | No Recognition of Transfers after the Distribution Record Date | 40 |
| | 2. | Treatment of Certain Transfers | 40 |
| I. | Means of Cash Payments | | 40 |
| J. | Timing and Calculation of Amounts to Be Distributed | | 41 |
| | 1. | Timing of Distributions Under the Plan | 41 |
| | 2. | Allowed Claims | 41 |
| | 3. | Compliance with Tax Requirements | 41 |
| | | a. | Withholding and Reporting | 41 |
| | | b. | Backup Withholding | 41 |
| | | c. | Obligations of Distribution Recipients | 42 |
| | 4. | Compliance with Domestic Relations Orders | 42 |
| K. | Setoffs | | 42 |
| L. | Allocation of Payments | | 42 |
| M. | Prosecution of Objections to Claims | | 42 |
| | 1. | Objections to Claims | 42 |
| | 2. | Authority to Prosecute Objections | 42 |
| | 3. | Authority to Amend Schedules | 42 |
| N. | Treatment of Disputed Claims | | 43 |
| O. | Distributions on Account of Disputed Claims Once Allowed | | 43 |
| P. | Enforcement of Bar Date Order | | 43 |
| Q. | Preservation of Rights of Action; Settlement of Claims and Releases | | 43 |
| | 1. | Preservation of Rights of Action by the Debtors and the Reorganized Debtors | 43 |
| | 2. | Settlement of Certain Estate Claims | 43 |
| | 3. | Releases | 44 |
| | | a. | General Releases of Debtors and Reorganized Debtors | 44 |
| | | b. | Release by the Debtors, Reorganized Debtors and International | 44 |
| | | c. | General Releases by Holders of Claims or Interests | 45 |
| | | d. | Injunction Related to Releases | 46 |
| R. | Release of Encumbrances | | 46 |
| S. | Compliance with QSF Regulations | | 46 |

**TABLE OF CONTENTS**
(continued)

|  |  | | Page |
|---|---|---|---|

T.      Discharge, Injunction and Subordination Rights ................................................... 46

    1.      Discharge of Claims ...................................................................... 46

    2.      Injunctions ................................................................................... 46

        a.      General Injunctions ............................................................ 46

        b.      SPHC Asbestos Permanent Channeling Injunction ......................................... 47

        c.      NMBFiL Asbestos Permanent Channeling Injunction ..................................... 48

    3.      Subordination Rights ...................................................................... 48

VIII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................... 48

    A.      Executory Contracts and Unexpired Leases to Be Assumed ........................................ 48

        1.      Assumption Generally ............................................................... 48

        2.      Assumptions of Executory Contracts and Unexpired Leases ............................. 49

        3.      Approval of Assumptions and Assumption Procedures.................................... 49

    B.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases................. 49

    C.      Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures................. 50

    D.      Obligations to Indemnify Directors, Officers and Employees ........................................ 50

    E.      Contracts and Leases Entered Into After the Petition Date ......................................... 51

IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE
PLAN ................................................................................................................ 51

    A.      General .................................................................................. 51

    B.      U.S. Federal Income Tax Consequences to the Debtors ............................................ 51

        1.      Cancellation of Debt Income .......................................................... 51

        2.      Transfers of Cash to the Asbestos Personal Injury Trust............................... 52

        3.      Other Federal Income Tax Consequences ................................................ 52

    C.      U.S. Federal Income Tax Consequences to Holders of Asbestos Claims ............................. 52

    D.      Information Reporting and Backup Withholding..................................................... 52

X.      ADDITIONAL INFORMATION ........................................................................... 52

XI.      RECOMMENDATION AND CONCLUSION .................................................................. 53

## **TABLE OF EXHIBITS**

EXHIBIT I        Joint Plan of Reorganization of Specialty Products Holding Corp., Bondex International, Inc., Republic Powered Metals, Inc. and NMBFiL, Inc.

EXHIBIT II       Voting Procedures

EXHIBIT III      Projections

EXHIBIT IV       Liquidation Analysis

EXHIBIT V        List of Asbestos-Containing Products Sold by Either Specialty Products Holding Corp., Bondex International, Inc. or Republic Powdered Metals, Inc.

## I.      PRELIMINARY STATEMENT

The Debtors are seeking approval of the Plan, a copy of which is attached hereto as Exhibit I.  The purpose of this Disclosure Statement is to provide to creditors who have a right to vote on the Plan adequate information to make an informed determination as to whether to accept (i.e., vote in favor of) or reject (i.e., vote against) the Plan.

Since the inception of the Reorganization Cases of Specialty Products Holding Corp. and Bondex International, Inc. (together, the "Initial Debtors"), the extent of the Initial Debtors' liability for asbestos-related personal injury claims has been the subject of dispute between the Initial Debtors on the one side and the Asbestos Personal Injury Committee and the Future Claimants' Representative on the other.  After litigation and extensive negotiations, including two rounds of mediation, the Initial Debtors, Republic, NMBFiL (together with Republic, the "New Debtors") and International entered into settlement term sheets (together, the "Term Sheets") with the Asbestos Personal Injury Committee, the Future Claimants' Representative and other representatives of the asbestos claimants that settle the dispute and establish the basis for a full resolution of the Debtors' chapter 11 cases.  The Plan implements the settlement by, among other things, providing for the creation and funding of a trust to resolve Asbestos Personal Injury Claims.  The asbestos trust to be created under the Plan will contain two accounts for the resolution of Asbestos Personal Injury Claims and payment of related Asbestos Personal Injury Trust Expenses:  one for holders of SPHC Asbestos Personal Injury Claims and one for holders of NMBFiL Asbestos Personal Injury Claims.  These accounts will be funded as follows for the benefit of holders of Asbestos Personal Injury Claims:

- The trust account for holders of SPHC Asbestos Personal Injury Claims will be funded by (i) an aggregate of $447.5 million in cash paid by one or more of the SPHC Parties and International on the Effective Date and (ii) the SPHC Payment Note issued by the SPHC Parties and International as co-obligors.  The SPHC Payment Note, in substantially the form of Exhibit I.A.108 to the Plan, will (a) bear no interest, (b) mature on the fourth anniversary of the Effective Date, (c) be secured by the SPHC Pledge, and (d) provide for the following scheduled principal payments to the Asbestos Personal Injury Trust, in each case, payable in the form of cash, shares of common stock of International or a combination thereof:  (1) on or before the second anniversary of the Effective Date of the Plan, $102.5 million; (2) on or before the third anniversary of the Effective Date of the Plan, $120 million; and (3) on or before the fourth anniversary of the Effective Date of the Plan, $125 million.

- The trust account for holders of NMBFiL Asbestos Personal Injury Claims will be funded by (i) an aggregate of $2.45 million in cash paid by one or both of NMBFiL and International on the Effective Date and (ii) the NMBFiL Payment Note issued to the Asbestos Personal Injury Trust by NMBFiL and International as co-obligors.  The NMBFiL Payment Note, in substantially the form of Exhibit I.A.72 to the Plan, will be (a) in the principal amount of $50,000, (b) secured by the pledge of 100% of the equity of reorganized NMBFiL plus cash or a letter of credit and (c) due on the first anniversary of the Effective Date.

All Asbestos Personal Injury Claims will be resolved by the Asbestos Personal Injury Trust.  In that regard, the Plan includes asbestos personal injury trust distribution procedures for asbestos claims against each of (i) the SPHC Parties and (ii) NMBFiL that describe a detailed process for treating all claimants asserting Asbestos Personal Injury Claims fairly and equitably.  Each of the trust distribution procedures are attached as Exhibits I.A.66 and I.A.102 to the Plan and are summarized later in this Disclosure Statement.  The trust agreement that will govern the operation of the trust is also attached to the Plan and summarized later in this Disclosure Statement.

**Pursuant to the Plan and section 524(g) of the Bankruptcy Code, the sole recourse for Asbestos Personal Injury Claims will be to the Asbestos Personal Injury Trust.  The holders of Asbestos Personal Injury Claims against the Debtors will no longer have any right to assert Asbestos Personal Injury Claims against the Debtors, International or certain other parties identified in the Plan.**

All other classes of creditors and interest holders of the Debtors are unimpaired by the Plan because it does not modify the legal, equitable or contractual rights of the holders of the claims or interests in those classes, other

than by curing defaults and reinstating maturities.  The specific treatments of other classes of creditors and interest holders of the Debtors are set forth in the Plan and summarized later in this Disclosure Statement.

_____

The only classes that are entitled to vote on the Plan are Classes 4a (SPHC Asbestos Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims).  All holders of Asbestos Personal Injury Claims in those classes are urged to vote in favor of the Plan by no later than 5:00 p.m., prevailing Eastern Time, on December 2, 2014.  See Section II.C. below for voting instructions.

The Debtors' Boards of Directors believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders because it fairly resolves the dispute over the extent of the Debtors' liability for Asbestos Personal Injury Claims and provides a mechanism for the prompt and efficient resolution of such claims on a fair and equitable basis.

**The Asbestos Personal Injury Committee and the Future Claimants' Representative likewise support the Plan.  A combined letter from the Asbestos Personal Injury Committee and the Future Claimants' Representative expressing their views on the Plan is included in the solicitation package you have received.**

## II.    OVERVIEW OF THE PLAN

### A.    Introduction

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as Exhibit I, and the exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  All exhibits to the Plan not presently attached to the Plan will be Filed with the Bankruptcy Court and made available for review on Logan's website at http://www.loganandco.com, no later than 10 days before the deadline to vote on the Plan.  The Debtors also will serve the Exhibits on the parties on the general service list being maintained in the Reorganization Cases no later than 10 days before the deadline to vote on the Plan.

By an order of the Bankruptcy Court dated October 20, 2014, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of Claims or interests of the relevant class to make an informed judgment about the plan . . . ."  11 U.S.C. § 1125(a)(1).

The requirements for Confirmation, including the vote of creditors entitled to vote on the Plan and certain of the statutory findings that must be made by the Bankruptcy Court for a plan to be confirmed, are set forth in Section II.C.  Confirmation of the Plan and the occurrence of the Effective Date are subject to a number of significant conditions, which are summarized in Section II.C.  There is no assurance that these conditions will be satisfied or waived.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan of reorganization are that the plan:  (i) is accepted by the requisite holders of claims and interests in impaired classes of such debtor; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for such debtor; (iii) is feasible; and (iv) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only Classes 4a (SPHC Asbestos Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims) are impaired, and therefore, only holders of Asbestos Personal Injury Claims in Classes 4a and 4b are entitled to vote to accept (i.e., vote in favor of) or reject (i.e., vote against) the Plan.  Because each of the other Classes of Claims is unimpaired, each of these Classes of Claims is deemed to vote to accept the Plan.  In addition,

because the Plan provides for the issuance of the Asbestos Permanent Channeling Injunctions pursuant to section 524(g) of the Bankruptcy Code, the Plan must satisfy the requirements of that section of the Bankruptcy Code as well.  See Section II.C. for a discussion of the applicable Bankruptcy Code requirements for Plan Confirmation.

**B.      Summary of Classes and Treatment of Claims and Interests**

The classification of Claims and Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims or Interests in each Class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Sections VII.A. and B.

**SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN**

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 1<br><br>Priority Claims | On the Effective Date, each holder of an Allowed Claim in Class 1 shall receive cash in an amount equal to such Allowed Claim plus Postpetition Interest thereon, if any, unless the holder of such Claim agrees to less favorable treatment. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | None | 100% |
| Class 2<br><br>Secured Claims | On the Effective Date, unless otherwise agreed by the holder of a Claim and the applicable Debtor or Reorganized Debtor, each holder of a Claim in Class 2 shall receive treatment in accordance with Option A or B below, at the option of the applicable Debtor or Reorganized Debtor.  Any Allowed Deficiency Claim of a holder of an Allowed Secured Claim shall be entitled to treatment as an Allowed Class 3 Claim.<br><br>Option A:  Claims in Class 2 that are Allowed Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option A shall be paid in full in cash plus Postpetition Interest thereon, if any.<br><br>Option B:  Claims in Class 2 that are Timely Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option B shall be Reinstated. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | None | 100% |
| Class 3<br><br>General Unsecured Claims | On the Effective Date, each holder of an Allowed Claim in Class 3 shall receive cash in an amount equal to such Allowed Claim plus Postpetition Interest thereon, if any, unless the holder of such Claim agrees to less favorable treatment. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $5.0 million | 100% |
| Class 4a<br><br>SPHC Asbestos Personal Injury Claims | On the Effective Date, all SPHC Asbestos Personal Injury Claims shall be channeled to the Asbestos Personal Injury Trust, which shall be funded pursuant to Section IV.I.2. of the Plan. All SPHC Asbestos Personal Injury Claims shall be resolved pursuant to the terms of the Asbestos Personal Injury Trust Agreement and the SPHC | **Impaired**<br><br>Entitled to Vote | N/A | As determined by the SPHC Asbestos Personal Injury Trust Distribution Procedures (see Exhibit I.A.102 to the Plan and |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| | Asbestos Personal Injury Trust Distribution Procedures from the SPHC Trust Account. Pursuant to section 524(g) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any SPHC Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any SPHC Asbestos Personal Injury Claim. | | | Section II.E. hereto) and the extent of funding pursuant to Section IV.I.2. of the Plan. |
| Class 4b<br><br>NMBFiL Asbestos Personal Injury Claims | On the Effective Date, all NMBFiL Asbestos Personal Injury Claims shall be channeled to the Asbestos Personal Injury Trust, which shall be funded pursuant to Section IV.I.2. of the Plan. All NMBFiL Asbestos Personal Injury Claims shall be resolved pursuant to the terms of the Asbestos Personal Injury Trust Agreement and the NMBFiL Asbestos Personal Injury Trust Distribution Procedures from the NMBFiL Trust Account.  Pursuant to section 524(g) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any NMBFiL Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any NMBFiL Asbestos Personal Injury Claim. | **Impaired**<br><br>Entitled to Vote | N/A | As determined by the NMBFiL Asbestos Personal Injury Trust Distribution Procedures (see Exhibit I.A.66 to the Plan and Section II.E. hereto) and the extent of funding pursuant to Section IV.I.2. of the Plan. |
| Class 5<br><br>Intercompany Claims | On the Effective Date, each holder of an Allowed Claim in Class 5 shall be Reinstated, subject to the Restructuring Transactions provisions of Section IV.B. of the Plan. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $430 million | 100% |
| Class 6<br><br>Stock Interests | On the Effective Date, Stock Interests of the Debtors shall be Reinstated, and holders of such Stock Interests shall retain such Interests. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | N/A | N/A |

The Estimated Amounts of Claims shown in the table above are based upon the Debtors' review of their books and records and may be revised following the Debtors' analysis of the Claims Filed.  Further, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim.

While the SPHC Asbestos Personal Injury Claims (Class 4a) and the NMBFiL Asbestos Personal Injury Claims (Class 4b) are impaired, the table does not include an estimate of the aggregate amount of such Claims or the recoveries of holders of such Claims in respect thereof because the amounts of such claims will later be determined by the Asbestos Personal Injury Trust pursuant to the applicable Asbestos Personal Injury Trust Distribution Procedures.

### C.    Voting on and Confirmation of the Plan

#### 1.    Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of reorganization are entitled to vote to accept or reject a plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturities.  Classes of claims and equity interests that are not impaired are not entitled to vote on a plan and are conclusively presumed to have accepted that plan.  Because all Classes other than Classes 4a (SPHC Asbestos Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims) are unimpaired, only holders of Asbestos Personal Injury Claims in Classes 4a and 4b may vote on the Plan.  For a summary of the classifications of Claims and Interests pursuant to the Plan, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired under the terms of the Plan, see Section II.B.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes.  By order of the Bankruptcy Court, voting procedures have been established, which include certain vote tabulation rules that temporarily allow or disallow certain Claims for voting purposes only.  These voting procedures, including the tabulation rules, are described in the solicitation materials provided with your ballot and on Exhibit II to this Disclosure Statement.

**The voting procedures attached hereto as Exhibit II set forth detailed instructions concerning the voting of Classes 4a (SPHC Asbestos Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims).  Please refer to Exhibit II for more information regarding the voting of Asbestos Personal Injury Claims.**

**Voting on the Plan by each holder of an Asbestos Personal Injury Claim in Classes 4a and 4b is important.  Please carefully follow all of the instructions contained on the ballot or ballots provided to you.  All ballots must be completed and returned in accordance with the instructions provided.**

**To be counted, your ballot or ballots must be received by 5:00 p.m., prevailing Eastern Time, on December 2, 2014 at the address set forth on the preaddressed envelope provided to you.  It is of the utmost importance to the Debtors that you vote promptly to accept the Plan.**

**If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please call the Debtors' voting agent, Logan & Company, Inc., at (973) 509-3190.**

**Votes cannot be transmitted orally or by facsimile or electronic mail.  Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is <u>received</u> by Logan & Company, Inc. before the deadline to vote on the Plan.**

### 2. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing has been scheduled for December 10, 2014 at 3:30 p.m., prevailing Eastern Time before the Honorable Peter J. Walsh, United States Bankruptcy Judge for the District of Delaware.  Judge Walsh will convene the Confirmation Hearing on December 10, 2014 in the United States District Court for the District of Delaware, J. Caleb Boggs Federal Building, 844 N. King Street, 4th Floor, Wilmington, Delaware 19801 in Courtroom 4B.  The Honorable Sue L. Robinson, District Court Judge for the United States District Court for the District of Delaware, will jointly preside, with the Honorable Peter J. Walsh, over the Confirmation Hearing.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court and/or the District Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector.  Any such objections must be Filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### 3. Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court and/or the District Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors and equity interest holders;

- the Plan is feasible and Confirmation will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or the Reorganized Debtors;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date; and

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Reorganized Debtors have been made.

4.        **Section 524(g) of the Bankruptcy Code**

The Plan contemplates establishing the Asbestos Personal Injury Trust pursuant to section 524(g) of the Bankruptcy Code to be funded by the Debtors and/or International.  The Asbestos Personal Injury Trust will pay all qualifying Asbestos Personal Injury Claims.  The Plan contains an injunction preventing any Entity from, directly or indirectly, pursuing a SPHC Asbestos Personal Injury Claim against SPHC Parties or any other SPHC Protected Party, and a NMBFiL Asbestos Personal Injury Claim against NMBFiL or any other NMBFiL Protected Party, and all Entities must look to the Asbestos Personal Injury Trust for resolution of such Claims.  In order to confirm a plan of reorganization containing a trust with all of the features provided in section 524(g), the Bankruptcy Court and/or the District Court must find, among other things, the following:  (a) that the trust is to assume the liabilities of a debtor that "has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by" asbestos; (b) "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;" (c) "the actual amounts, numbers, and timing of such future demands cannot be determined;" and (d) "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."

To issue a section 524(g) channeling injunction, the Bankruptcy Court and/or the District Court also must find that the channeling injunction is to be implemented in connection with a trust that pursuant to the plan meets the following requirements:  (a) the trust must "assume the liabilities of a debtor which . . . has been named as a defendant in personal injury, wrongful death, or property damage actions" seeking damage caused by asbestos or asbestos-containing products; (b) the trust must "be funded in whole or in part by the securities of 1 or more of the debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;" (c) the trust must "own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of . . . each such debtor; . . . the parent corporation of each such debtor; or . . . a subsidiary of each such debtor that is also a debtor;" (d) the trust must "use its assets or income to pay claims or demands;" and (e) the trust will "operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner."

If a debtor can obtain the required findings from the Bankruptcy Court and/or the District Court and structure the trust to satisfy each of the above requirements, section 524(g) authorizes the issuance of a channeling injunction requiring the relevant claimants to seek resolution and payment solely from the trust.
Section 524(g)(4)(B)(ii) provides, however, that the injunction is applicable against future claimants only if a future claims representative is appointed in the bankruptcy cases and only if the Bankruptcy Court and/or the District Court determines that the application of the injunction to future claimants is "fair and equitable . . . in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party."  Further, to obtain the channeling injunction provided in section 524(g), a separate class or classes of claimants whose claims are to be addressed by the trust must be established and vote, by at least 75 percent of those voting, in favor of the plan. Finally, assuming the plan satisfies these criteria, then "any proceeding that involves the validity, application, construction, or modification of such injunction . . . may be commenced only in the district court in which such injunction was entered, and such court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy."  If the time for appeal of the order that issues or affirms the plan has expired, the injunction shall be valid and enforceable and may not be revoked or modified by any court.

5.        **Acceptance**

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept/in favor of the plan.  Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.  In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in an impaired class.  Further, to the extent that confirmation of a plan is sought pursuant to section 524(g) of the Bankruptcy Code, a class of asbestos claims is deemed to accept if at least

two-thirds in dollar amount and 75 percent in number of claims vote to accept/in favor of the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

6.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires a finding that Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). For purposes of determining whether the Plan meets this requirement, the Debtors have prepared the projections set forth in Exhibit III hereto. Based upon the Projections and the fact that International is a co-obligor on the SPHC Payment Note and the NMBFiL Payment Note, the Debtors believe that their reorganization under the Plan will meet the feasibility requirements of the Bankruptcy Code.

7.      **Best Interests Test; Liquidation Analysis**

a.      **Generally**

Notwithstanding acceptance of a plan by each impaired class, for a plan to be confirmed, the Bankruptcy Court must determine that the plan is in the best interest of each holder of a claim who is in an impaired class and has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim that has a value, as of the date such plan is consummated, at least equal to the value of the distribution that such class member would receive if the debtors proposing the plan were liquidated under chapter 7 of the Bankruptcy Code on such date. The Debtors have considered the effect that the conversion of the Reorganization Cases to cases under chapter 7 of the Bankruptcy Code would have and have concluded that the Plan provides value to holders of Asbestos Personal Injury Claims in Classes 4a and 4b at least equal to the value such holders would receive under a chapter 7 liquidation. The Debtors therefore believe that the Plan satisfies the best interests test for each class of impaired Claims.

b.      **Liquidation Analysis**

The information contained in Exhibit IV hereto contains a liquidation analysis that assumes a hypothetical chapter 7 liquidation of the Debtors in which a trustee appointed by the Bankruptcy Court would liquidate the respective Debtors' properties and interests in property. The liquidation analysis reflects the potential range of recoveries in a liquidation net of the costs associated with the liquidation. As shown in the analysis, in certain cases the proceeds from the sales of the Debtors' assets will be substantially reduced by buyers' likely concerns regarding asbestos liability risk, by the risk of transitioning critical business functions in a relatively short period of time, and by the expedited time frame for selling seven separate businesses. In addition, the analysis shows the significant costs associated with the asset sales and the liquidation process in certain cases, including trustee fees, professional fees and additional brokerage fees. These costs must be paid from the proceeds of the liquidation.

As the liquidation analysis demonstrates, a chapter 7 liquidation of the Debtors would result in recoveries to holders of Class 4a and 4b Asbestos Personal Injury Claims that are no greater than the potential range of recoveries under the Plan. The Debtors accordingly believe that the Plan satisfies the best interests test.

8.      **Alternatives to Confirmation and Consummation of the Plan**

The Debtors have evaluated other alternatives to the Plan, including alternative structures and terms of the Plan. While the Debtors have concluded that the Plan is the best alternative given the current circumstances of their chapter 11 cases and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, or any other party in interest in the Reorganization Cases, could attempt to formulate and propose a different plan or plans of reorganization.

### D.    Formation of Asbestos Personal Injury Trust

#### 1.    Creation of Asbestos Personal Injury Trust

As of the Effective Date, the Asbestos Personal Injury Trust will be created. The Asbestos Personal Injury Trust is intended to be one or more "qualified settlement funds" within the meaning of the Treasury Regulations issued under section 468B of the Internal Revenue Code of 1986, as amended (the "IRC"). The purpose of the Asbestos Personal Injury Trust will be to, among other things: (1) resolve all Asbestos Personal Injury Claims in accordance with the Plan, the Asbestos Personal Injury Trust Documents and the Confirmation Order; (2) preserve, hold, manage, maximize and liquidate the assets of the Asbestos Personal Injury Trust for use in resolving Asbestos Personal Injury Claims; and (3) qualify at all times as one or more qualified settlement funds.

#### 2.    Qualified Settlement Fund

The Asbestos Personal Injury Trust is intended to be treated for U.S. federal income Tax purposes as one or more "qualified settlement funds" as described within section 1.468B-1 et seq. of the Treasury Regulations promulgated under section 468B of the IRC. For all U.S. federal income Tax purposes transfers to the Asbestos Personal Injury Trust will be treated as transfers to a trust satisfying the requirements of section 1.468B-l(c) of the Treasury Regulations by the Debtors and the Reorganized Debtors, as transferors, for distribution to holders of Asbestos Personal Injury Claims and in complete settlement of their Asbestos Personal Injury Claims. Any income on the assets of the Asbestos Personal Injury Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to applicable Tax withholding and reporting requirements.

The Asbestos Personal Injury Trustees will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Asbestos Personal Injury Trust and will be required by the Asbestos Personal Injury Trust Agreement to (a) timely file such income Tax and other returns and statements of the Asbestos Personal Injury Trust and timely pay all Taxes required to be paid from the assets of the Trust as required by law, (b) comply with all Tax withholding obligations, as required under the applicable provisions of the IRC, any state law and the respective regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the Asbestos Personal Injury Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations promulgated under section 468B of the IRC, and (d) take no action that could cause the Asbestos Personal Injury Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations promulgated under section 468B of the IRC. The Debtors, the Reorganized Debtors and International will have no rights to any refund or reversion with respect to any assets of the Asbestos Personal Injury Trust or any earnings thereon, within the meaning of section 1.468B-3(c)(2) of the Treasury Regulations.

Following the funding of the Asbestos Personal Injury Trust (and in no event later than February 15th of the calendar year following the date of the Asbestos Personal Injury Trust Agreement), the Reorganized Debtors will provide, or cause to be provided, to the Asbestos Personal Injury Trustees a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of cash or other property to the Asbestos Personal Injury Trust, the transferor will provide, or cause to be provided, to the Asbestos Personal Injury Trustees a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

#### 3.    Asbestos Personal Injury Trustees

On the Confirmation Date, effective as of the Effective Date, in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures, the individuals selected jointly by the Asbestos Personal Injury Committee and the Future Claimants' Representative (as identified in Exhibit IV.G to the Plan), will be appointed to serve as the Asbestos Personal Injury Trustees for the Asbestos Personal Injury Trust.

The Asbestos Personal Injury Trustees will be, and will act as, the fiduciaries to the Asbestos Personal Injury Trust in accordance with the provisions of the Asbestos Personal Injury Trust Documents and the Plan. Subject to the Plan and the Asbestos Personal Injury Trust Documents, the Asbestos Personal Injury Trustees have the power to take any and all actions that they may consider necessary, appropriate or desirable to fulfill the purpose of the Asbestos Personal Injury Trust, including receiving and holding the assets of the Asbestos Personal Injury Trust and exercising all rights and powers with respect thereto and entering into arrangements with third parties.

Each Asbestos Personal Injury Trustee will serve until the earliest of the end of his or her term, his or her death, his or her resignation, his or her removal and the termination of the Asbestos Personal Injury Trust. An Asbestos Personal Injury Trustee may resign at any time and may be removed at the recommendation of the other trustees with the approval of the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties or for other good cause.

No Asbestos Personal Injury Trustees will be permitted to, during the term of his or her service, hold a financial interest in, or act as attorney or agent or serve as any other professional for, the Debtors, the Reorganized Debtors or International or any individual who holds an Asbestos Personal Injury Claim.

### 4.      Asbestos Personal Injury Trust Termination Provisions

The Asbestos Personal Injury Trust is irrevocable, but will automatically dissolve on the date which is 90 days after the first to occur of the following:

- the date on which the Asbestos Personal Injury Trustees decide to dissolve the Asbestos Personal Injury Trust because (A) the Asbestos Personal Injury Trustees deem it unlikely that any new Asbestos Personal Injury Claim will be filed against the Asbestos Personal Injury Trust, (B) all Asbestos Personal Injury Claims duly filed with the Asbestos Personal Injury Trust have been resolved, to the extent possible based upon the funds available to the Asbestos Personal Injury Trust through the Plan, or disallowed by a final, non-appealable order, and (C) twelve (12) consecutive months have elapsed during which no new Asbestos Personal Injury Claim has been filed with the Asbestos Personal Injury Trust;

- the Asbestos Personal Injury Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses (including without limitation Asbestos Personal Injury Trust Expenses) of the Asbestos Personal Injury Trust in a manner consistent with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order; or

- that date which is twenty-one (21) years less ninety-one (91) days after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date of execution of the Asbestos Personal Injury Trust Agreement, to the extent that any rule against perpetuities shall be deemed applicable to the Asbestos Personal Injury Trust.

### 5.      Asbestos Personal Injury Accounts

On or prior to the Effective Date, the SPHC Trust Account and the NMBFiL Trust Account will be established and maintained in federally insured domestic banks in the name of the Asbestos Personal Injury Trust, which funds shall be used to resolve SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims, respectively. The SPHC Trust Account and the NMBFiL Trust Account shall be funded as set forth in Section IV.I.2. of the Plan.

6.      **Transfers of Property to and Assumption of Certain Liabilities by the Asbestos Personal Injury Trust**

a.      **Transfer of Books and Records to the Asbestos Personal Injury Trust**

On the Effective Date or as soon thereafter as is reasonably practicable, at the sole cost and expense of the Asbestos Personal Injury Trust (which cost and expense shall be reasonable) and in accordance with written instructions provided to the Reorganized Debtors by the Asbestos Personal Injury Trust, the Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, to the Asbestos Personal Injury Trust copies of those books and records that are necessary for the defense of Asbestos Personal Injury Claims, including without limitation the historical asbestos personal injury claims database maintained by the Debtors, deposition transcripts, product identification evidence, claims settlement and payment information, and indexes and summaries relating to any such documents.  These books and records shall not include documents that were made part of the record at the estimation trial because such documents are publicly available.  Pursuant to the Plan and the Confirmation Order, to the extent the Debtors or Reorganized Debtors, as applicable, provide any privileged books and records, such transfer shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records.  If the preservation of privilege pertaining to such books and records is challenged or disapproved by the Bankruptcy Court or the District Court and if the Asbestos Personal Injury Trust determines that it needs access to such information, the Reorganized Debtors will, at the sole cost and expense of the Asbestos Personal Injury Trust (which cost and expense shall be reasonable), retain the books and records and enter into arrangements to permit the Asbestos Personal Injury Trust to have access to such books and records, to the extent such access does not result in the destruction or waiver of any applicable privileges.  Further, pursuant to the Plan and the Confirmation Order, none of the Debtors, the Reorganized Debtors, International, or any of International's affiliates shall be liable for violating any confidentiality or privacy protections as a result of transferring the books and records to the Asbestos Personal Injury Trust, and the Asbestos Personal Injury Trust shall, upon receipt of the books and records, take appropriate steps to comply with any such applicable protections.  If the Asbestos Personal Injury Trust does not issue written instructions for the transfer or retention of such books and records within 180 days after the Effective Date, or if the Asbestos Personal Injury Trust so requests, the Reorganized Debtors may (and shall, if the Asbestos Personal Injury Trust so requests, but at the sole cost and expense of the Asbestos Personal Injury Trust (which cost and expense shall be reasonable) and subject to the Reorganized Debtors' right to retain books and records it needs to preserve), destroy any such books and records, and the order of the Bankruptcy Court or the District Court entered during the Reorganization Cases with respect to the retention of books and records shall be deemed superseded by Section IV.I.1. of the Plan.

b.      **Funding the Asbestos Personal Injury Trust**

(1)      **SPHC Initial Payment**

On the Effective Date, one or more of the SPHC Parties and/or International on behalf of and as a contribution to such SPHC Parties will pay an aggregate of $447.5 million in cash to the Asbestos Personal Injury Trust.  Such payment shall be deposited into the SPHC Trust Account.

(2)      **SPHC Payment Note**

On the Effective Date, the SPHC Parties and International, as co-obligors, shall issue the SPHC Payment Note.  All payments made under the SPHC Payment Note shall be deposited into the SPHC Trust Account.

(3)      **SPHC Registration Rights Agreement**

The SPHC Registration Right Agreement shall be finalized and executed by the parties thereto at least 30 days prior to the date of a scheduled principal payment to the Asbestos Personal Injury Trust under the SPHC Payment Note if International intends to make such payment, at least in part, in the form of common stock of International.

### (4)    NMBFiL Initial Payment

On the Effective Date, NMBFiL and/or International on behalf of and as a contribution to NMBFiL shall pay an aggregate of $2.45 million in cash to the Asbestos Personal Injury Trust.  Such payment shall be deposited into the NMBFiL Trust Account.

### (5)    NMBFiL Payment Note

On the Effective Date, NMBFiL and International, as co-obligors, shall issue the NMBFiL Payment Note. All payments made under the NMBFiL Payment Note shall be deposited in the NMBFiL Trust Account.

### (6)    Interest Trigger Date

If the Effective Date does not occur prior to October 31, 2015, (1) the aggregate funding amount of $795 million provided for in Section IV.I.2.a. and b. of the Plan and (2) the aggregate funding amount of $2.5 million provided for in Section IV.I.2.d. and e. of the Plan, shall be deemed to accrue simple interest at the rate of 3.45 percent per annum from and after October 31, 2015 through the Effective Date.  Such deemed accrued interest shall be added to each of such funding amounts based on the proportion of each funding amount to the total funding amount.

### c.    Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust

In consideration for the property transferred to the Asbestos Personal Injury Trust pursuant to Sections IV.I.2. and I.3. of the Plan and in furtherance of the purposes of the Asbestos Personal Injury Trust and the Plan, the Asbestos Personal Injury Trust shall assume all liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims, and the Reorganized Debtors and the Protected Parties shall have no liability or responsibility, financial or otherwise, therefor.  Except as otherwise provided in the Plan, the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures, the Asbestos Personal Injury Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, regarding such Asbestos Personal Injury Claims that the Debtors or the Reorganized Debtors have or would have had under applicable law.

### d.    Indemnification by the Asbestos Personal Injury Trust

**1.**    The Asbestos Personal Injury Trust shall protect, defend, indemnify and hold harmless each NMBFiL Protected Party from and against any NMBFiL Asbestos Personal Injury Claim; provided, however, payment of any and all NMBFiL Protected Party Indemnification Claims, which include defense and other related fees and costs, may only be made from funds in the NMBFiL Trust Account.  Notwithstanding the forgoing, International and its direct and indirect subsidiaries may not assert any claim against the Asbestos Personal Injury Trust or the NMBFiL Trust Account for contribution, reimbursement, subrogation or indemnification on account of or with respect to (i) any NMBFiL Asbestos Personal Injury Claim or NMBFiL Asbestos Personal Injury Indirect Claim paid by the Debtors or International, and its direct and indirect subsidiaries, prior to NMBFiL's Petition Date, or (ii) the funding of the Asbestos Personal Injury Trust or NMBFiL Trust Account by the Debtors or International.

**2.**    The Asbestos Personal Injury Trust shall protect, defend, indemnify and hold harmless each SPHC Protected Party from and against any SPHC Asbestos Personal Injury Claim; provided, however, payment of any and all SPHC Protected Party Indemnification Claims, which include defense and other related fees and costs, may only be made from funds in the SPHC Trust Account.  Notwithstanding the forgoing, International and its direct and indirect subsidiaries may not assert any claim against the Asbestos Personal Injury Trust or the SPHC Trust Account for contribution, reimbursement, subrogation or indemnification on account of or with respect to (i) any SPHC Asbestos Personal Injury Claim or SPHC Asbestos Personal Injury Indirect Claim paid by the Debtors or International, and its direct and indirect subsidiaries, prior to the SPHC Parties' Petition Date, or (ii) the funding of the Asbestos Personal Injury Trust or SPHC Trust Account by the Debtors or International.

e.      **Authority of the Debtors**

Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to enable the Reorganized Debtors to implement effectively the provisions of the Plan and the Asbestos Personal Injury Trust Agreement.

**E.      Asbestos Personal Injury Trust Distribution Procedures**

The SPHC Asbestos Personal Injury Trust Distribution Procedures, which are attached to the Plan as Exhibit I.A.102, and the NMBFiL Asbestos Personal Injury Trust Distribution Procedures, which are attached to the Plan as Exhibit I.A.66, set forth procedures for processing and paying the Asbestos Personal Injury Claims. These procedures will be binding on the holders of all Asbestos Personal Injury Claims.  The Asbestos PI Trust Distribution Procedures provide, among other things, for the resolution of Asbestos Personal Injury Claims pursuant to the terms of the Asbestos Personal Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures, and that resolution of an Asbestos Personal Injury Claim by the Asbestos Personal Injury Trust will result in a full or partial release of such Claim against the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures. In the event that an Indirect Asbestos Personal Injury Claim is disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code, the right of a holder of such disallowed Claim under applicable non-bankruptcy law to set off payments by the Asbestos Personal Injury Trust against such holder's liability to an asbestos personal injury claimant shall be preserved.

The Asbestos Personal Injury Trustees will implement and administer the Asbestos Personal Injury Trust pursuant to the Asbestos Personal Injury Trust Distribution Procedures. The goal of the Asbestos Personal Injury Trust Distribution Procedures is to provide fair, equitable, and substantially similar treatment for all Asbestos Personal Injury Claims channeled to the Asbestos Personal Injury Trust that may presently exist or may arise in the future. To that end, the Asbestos Personal Injury Trust Distribution Procedures set forth procedures for processing and, if valid, paying claims generally on an impartial, first-in-first-out basis, with the intention of enabling each holder of a valid Claim against the Asbestos Personal Injury Trust to receive a payment from the Asbestos Personal Injury Trust of the unpaid portion of the liquidated value of Asbestos Personal Injury Claims that is at a level proportionate to other similar claimants and that is calculated by reference to the level of settlements, verdicts or judgments that claimants have historically received in their respective tort systems.

The Asbestos PI Trust Distribution Procedures establish a schedule of different asbestos-related diseases ("Disease Levels"), all of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria") and specific liquidated values ("Scheduled Values"), and may also have anticipated average values ("Average Values"), and caps on their liquidated values ("Maximum Values"). The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values, and Maximum Values have all been selected and derived with the intention of achieving a fair allocation of the Asbestos Personal Injury Trust funds as among claimants suffering from different disease processes in light of the best available information considering the settlement history of the Debtors and the rights claimants would have in the tort system absent the bankruptcy.

**F.      Conditions Precedent to Confirmation and Consummation of the Plan**

**1.      Conditions to Confirmation**

The following shall be conditions to Confirmation unless such conditions shall have been duly waived pursuant to Section VIII.C. of the Plan:

1.      The Confirmation Order shall have been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is entered separately by the Bankruptcy Court, shall have been fully affirmed by the District Court), and shall be reasonably acceptable in form and substance to the Parties.

2.      The Trust Documents shall be (a) acceptable in all respects to the Asbestos Personal Injury Committee and the Future Claimants' Representative and (b) consistent with section 524(g) of the Bankruptcy Code

and the terms of the Plan.  All Exhibits to the Plan drafted by the Debtors shall be in form and substance reasonably acceptable to the Parties.

3.    The Bankruptcy Court and the District Court acting jointly, or the Bankruptcy Court or the District Court acting separately shall have made the following findings, each of which shall be contained in the Confirmation Order and each of which, if the Confirmation Order is entered separately by the Bankruptcy Court, shall be fully affirmed by the District Court:

a.    The Asbestos Permanent Channeling Injunctions are to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.    The Asbestos Personal Injury Trust, as of the Effective Date, shall assume all liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims, and, upon such assumption, no Protected Party shall have any liability or responsibility, financial or otherwise, therefor.

c.    As of the Petition Date, each Debtor had been named as a defendant in a personal injury or wrongful death action seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

d.    The Asbestos Personal Injury Trust will be funded in whole or in part by securities of the Reorganized Debtors and by the obligation of the Reorganized Debtors to make future payments, which payments may be funded by contributions from International to the Reorganized Debtors.

e.    The Asbestos Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of each of the Reorganized Debtors.

f.    The Asbestos Personal Injury Trust shall use its assets or income to pay Asbestos Personal Injury Claims, including Demands.

g.    Each of the Debtors is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos Permanent Channeling Injunction.

h.    The actual amounts, numbers and timing of such future Demands cannot be determined.

i.    Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

j.    The terms of the Asbestos Permanent Channeling Injunctions, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan.

k.    For each Debtor, the Plan establishes, in Class 4a (SPHC Asbestos Personal Injury Claims) and Class 4b (NMBFiL Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal Injury Trust.

l.    Each of Class 4a (SPHC Asbestos Personal Injury Claims) and Class 4b (NMBFiL Asbestos Personal Injury Claims) has voted, by at least 75% of those voting, in favor of the Plan.

m.    Pursuant to court orders or otherwise, the Asbestos Personal Injury Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims, that provide reasonable assurance that the Asbestos Personal Injury Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims, including Demands, in substantially the same manner.

n. Each Protected Party is identifiable from the terms of the Asbestos Permanent Channeling Injunctions by name or as part of an identifiable group, and each Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on a Debtor to the extent that such alleged liability arises by reason of one or more of the following:

i. such Entity's ownership of a financial interest in any Debtor, Reorganized Debtor, any past or present affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor;

ii. such Entity's involvement in the management of any Debtor, Reorganized Debtor or predecessor in interest of any Debtor or Reorganized Debtor;

iii. such Entity's service as an officer, director or employee of any Debtor, Reorganized Debtor, any past or present affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor or Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor; or

iv. such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor or Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling a financial interest in any Entity as part of such transaction.

o. The Future Claimants' Representative was appointed as part of the proceedings leading to the issuance of the Asbestos Permanent Channeling Injunctions for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the Asbestos Permanent Channeling Injunctions and transferred to the Asbestos Personal Injury Trust.

p. Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Asbestos Permanent Channeling Injunctions is fair and equitable with respect to individuals that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of any such Protected Party.

q. The Plan and the Asbestos Personal Injury Trust Documents comply with section 524(g) of the Bankruptcy Code in all respects.

r. The Plan and its Exhibits are a fair, equitable and reasonable resolution of the liability of the Debtors for the Asbestos Personal Injury Claims.

s. The Future Claimants' Representative has adequately and completely fulfilled his duties, responsibilities and obligations as the representative for the individuals referred to in Section VIII.3.p. of the Plan in accordance with section 524(g) of the Bankruptcy Code.

t. Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to (i) all known creditors and holders of Interests, (ii) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Asbestos Personal Injury Committee and the Future Claimants' Representative), (iii) all parties to Unexpired Leases and

Executory Contracts with the Debtors, (iv) all taxing authorities listed on the Debtors' Schedules or in the Debtors' Claims database, in each case, (v) the Department of the Treasury by service upon the District Director of the Internal Revenue Service, (vi) state attorney generals and state departments of revenue for states in which any of the Debtors have conducted business, and (vii) the Securities and Exchange Commission, (A) in accordance with the solicitation procedures governing such service and (B) in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b).  Such transmittal and service were adequate and sufficient to bind, among other parties, any holder of an Asbestos Personal Injury Claim, and no other or further notice is or shall be required.

5.      The Bankruptcy Court and the District Court, as required, shall have entered the Asbestos Permanent Channeling Injunctions, which may be included in the Confirmation Order and which shall contain terms reasonably acceptable to the Parties.

**2.      Conditions to the Effective Date**

The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section VIII.B. of the Plan:

1.      The District Court or the Bankruptcy Court and the District Court acting jointly shall have entered an order (contemplated to be part of the Confirmation Order) in form and substance reasonably acceptable to the Parties approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to effectuate, implement and consummate the Plan and the Restructuring Transactions, including the execution, delivery and performance of contracts, instruments, releases and other agreements or documents created in connection with the Plan and the Restructuring Transactions.

2.      The Confirmation Order has been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is separately entered by the Bankruptcy Court, has been fully affirmed by the District Court) and shall have become a Final Order.

3.      The Confirmation Order and the Asbestos Permanent Channeling Injunctions shall be in full force and effect.

4.      The Asbestos Personal Injury Trustees shall have been selected and shall have executed and delivered the Asbestos Personal Injury Trust Agreement.

5.      Each of the documents and agreements contemplated by the provisions and Exhibits of the Plan to be executed and delivered as of the Effective Date shall have been fully executed and delivered in form and substance acceptable to the Debtors and shall be fully enforceable in accordance with their terms.

The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time on the date that the Debtors or Reorganized Debtors file a notice with the Bankruptcy Court stating that Effective Date has occurred because each of the conditions to the Effective Date have been satisfied or waived in accordance with the Plan.

**3.      Waiver of Conditions to Confirmation or the Effective Date**

The conditions to Confirmation set forth in Section VIII.A. of the Plan and the conditions to the Effective Date set forth in Section VIII.B. of the Plan may be waived in whole or part in writing by the Debtors, subject to the consent of International, the Asbestos Personal Injury Committee and the Future Claimants' Representative, at any time without an order of the Bankruptcy Court or the District Court.  Confirmation and the Effective Date will occur irrespective of whether any claims allowance process or related litigation has been completed.

4.      **Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C. of the Plan, then upon joint motion by the Debtors, International, the Asbestos Personal Injury Committee and the Future Claimants' Representative made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section VIII.D. of the Plan, (1) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (2) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights, including any claims or defenses, of the Parties or any other party in interest.

## III.     HISTORY OF THE DEBTORS

### A.      Historical Overview

1.      **Corporate History**

Debtor SPHC was incorporated under the name Republic Powdered Metals, Inc. on May 26, 1947 in Ohio. On October 26, 1963, Debtor Republic was incorporated in Ohio under the name R.P.M., Inc. as a wholly-owned subsidiary of SPHC with no assets.  In March 1966, SPHC, pursuant to an asset purchase agreement dated February 11, 1966 (the "Reardon Asset Purchase Agreement"), acquired substantially all the assets and contractually assumed certain liabilities of The Reardon Company ("Reardon"), a Missouri corporation, including liability for products manufactured or sold by Reardon pre-transfer which caused bodily injury subsequent to the date of the Reardon Asset Purchase Agreement.  Reardon manufactured a line of consumer home improvement products under the brand name "Bondex," including a powdered waterproof cement paint that never contained asbestos and an asbestos-containing joint compound.  Reardon also produced a number of other asbestos-containing products that did not use the Bondex name.

Following the Reardon acquisition, SPHC internally operated a "Republic Powdered Metals Division" and a "Reardon Company Division."  SPHC's original manufacturing, marketing and sales efforts continued under the Republic Powdered Metals Division.  The Reardon Company Division continued to manufacture, market and sell a number of asbestos-containing products, including Bondex joint compound.

On November 9, 1971, SPHC changed its name from Republic Powdered Metals, Inc. to RPM, Inc.  Also on that date, Debtor Republic changed its name from R.P.M., Inc. to Republic Powdered Metals, Inc.  Between November 1971 and May 1972, SPHC continued to manufacture and sell products, including asbestos-containing products, through both (1) the Republic Powdered Metals Division and (2) the Reardon Company Division.

In May 1972, SPHC incorporated Bondex in Ohio as an independently operated and wholly-owned subsidiary.  On May 31, 1972, Bondex acquired or assumed from SPHC the assets, property and liabilities of the Reardon Company Division of SPHC.  After Bondex's incorporation, Bondex took over the production of Reardon's basic product lines, including the production of its joint compound.  On May 31, 1972, Republic acquired or assumed from SPHC the assets and liabilities of the Republic Powdered Metals Division of SPHC.  As a result of the 1972 transactions, SPHC became a holding company with no operating assets.  Bondex ceased selling asbestos-containing joint compound in 1977 and, by the early 1980s, asbestos content had been eliminated from the entire Bondex product line.  Republic continued to manufacture a line of roofing and exterior maintenance products, some of which contained asbestos until the mid- to late-1980s.

Bondex ceased operations in 1999 and sold its assets to sister companies DAP Products, Inc. ("DAP") and Zinsser Co., Inc. ("Zinsser"), with the majority of the assets going to DAP.  From and after that time, Bondex's sole activity was the litigation and settlement of asbestos-related claims.  As of July 2000, Bondex had terminated all of its employees except for John A. Fleming.

On June 18, 2002, the SPHC Board of Directors approved a transaction and subsequently incorporated International in Delaware on July 29, 2002.  On August 29, 2002, SPHC entered into an Agreement and Plan of Merger with International and RPM Merger Company (an Ohio corporation) wherein International became the parent holding company of SPHC, and SPHC became an intermediate holding company.  This transaction is the subject of the Renewed Standing Motion discussed in Section IV.M.

Bondex was reincorporated in Delaware on January 1, 2010.  As of May 31, 2010, SPHC was the parent company of Bondex, as well as the direct parent of eight domestic operating companies (the "Operating Subsidiaries") and the indirect parent of certain other domestic and foreign non-debtor subsidiaries.  Republic is a wholly-owned subsidiary of RPM Industrial Holding Co., and RPM Industrial Holding Co. is a wholly-owned subsidiary of International.

The entities that ultimately became NMBFiL, Dynatron Corporation ("Dynatron") and the H. Talbot Co. ("Talbot"), were incorporated in 1957 and 1955, respectively.  On June 30, 1983, SPHC acquired the successor to Talbot, and on June 8, 1993, SPHC acquired the successor to Dynatron.  On December 22, 1995, the successor to Talbot changed its name to Mar-Hyde Corporation.  On January 1, 1997, Mar-Hyde Corporation and the successor to Dynatron merged, and on December 16, 1999, NMBFiL, the merged entity, changed its name to Bondo Corporation.

Until October 15, 2002, SPHC was the direct and ultimate parent corporation of NMBFiL.  At that time, as part of the 2002 transaction discussed above, RPM Consumer Holding Company ("Consumer") became the direct parent of NMBFiL, and International became the ultimate parent.  On May 6, 2005, DAP Products Inc., a wholly-owned subsidiary of Consumer, became the direct parent of NMBFiL such that Consumer and International are now NMBFiL's indirect parents.  In 2007, NMBFiL sold substantially all its assets to 3M Company, including the Bondo name, and changed its name to NMBFiL.  In connection with the sale, NMBFiL and International, jointly and severally, agreed to indemnify 3M Company and other parties from certain losses, as set forth in the asset purchase agreement dated November 2, 2007 among Bondo Corporation, International, 3M Company and 3M Innovative Properties Company.

### 2.    Business Operations and Corporate Governance

#### a.    Bondex

Bondex has been defunct since 1999 and currently has no operations or material assets.  The officers of Bondex, as appointed by its Board of Directors, are:  Stephen J. Knoop—Chief Executive Officer; Glenn R. Hasman—Assistant Secretary; Michael D. Tellor—Secretary; John A. Fleming—President and Treasurer; Tracy D. Crandall—Assistant Secretary.  The Board of Directors of Bondex consists of the following directors:  Stephen J. Knoop, Glenn R. Hasman and Michael D. Tellor.  Pursuant to the Plan, on or after the Confirmation Date, Bondex will lease a storage facility located in Medina, Ohio from International and sublease the facility to an Affiliate for a profit.

#### b.    SPHC

SPHC, formerly known as RPM, Inc., is an intermediate holding company with no operations other than managing its subsidiaries.  Its assets consist primarily of its direct ownership of the Operating Subsidiaries and its indirect ownership interests in certain other domestic and foreign non-debtor subsidiaries.  The officers of SPHC, as appointed by its Board of Directors, are:  Stephen J. Knoop—Chief Executive Officer; Glenn R. Hasman—Vice President, Treasurer and Secretary; Michael D. Tellor—President; and Tracy D. Crandall—Assistant Secretary.  The Board of Directors of SPHC consists of the following directors:  Stephen J. Knoop, Glenn R. Hasman and Michael D. Tellor.  The sole stockholder of SPHC is non-debtor International.

The Operating Subsidiaries are manufacturers, distributors and sellers of various specialty chemical product lines, including exterior insulating finishing systems, powder coatings, fluorescent colorants and pigments, cleaning and protection products, fuel additives, wood treatments and coatings and sealants, in both the industrial and consumer markets.  Their family of products includes those marketed under brand names such as CCI, Chemspec,

Day-Glo, Dryvit, Guardian, Mohawk, Kop-Coat, TCI and Valvtect.  During fiscal year 2014,[2] SPHC and its Operating Subsidiaries (the "SPHC Companies") generated consolidated revenues of approximately $410.74 million and operating income of approximately $53.2 million.  During fiscal year 2010, the SPHC Companies generated consolidated revenues of $ 319.573 million and operating income of $27.33 million.  A description of the Operating Subsidiaries is as follows:

Kop-Coat Inc.: Kop-Coat, Inc. ("Kop-Coat") is composed of three reporting segments: ValvTect, which is a supplier of fuel additives to fuel markets, truck stops, fleets, railroads and the marine industry, Kop-Coat Protection Products, which is a specialty manufacturer of wood protection chemical blends as well as pasture, crop, and forest protection chemical blends, and Kop-Coat Marine & Pool, which is a supplier of coatings for marine applications. Kop-Coat Protection Products sells to forest product manufacturers and distributors. Kop-Coat Marine & Pool sells through West Marine (mass market retailer) and distributors that resell to boatyards and independent marine retailers.

Chemical Specialties Manufacturing Corp.: Chemical Specialties Manufacturing Corp. ("Chemspec") manufactures cleaning and protection products for a variety of commercial and consumer applications including upholstery cleaning, deodorization, smoke and fire restoration, rug care, stain removal, leather care, traffic lane cleaning, chewing gum removal, detergents, and hard floor products and protectants.  Customer distribution focuses on three main segments: professional cleaning, healthcare, and education.

Day-Glo Color Corp.: Day-Glo Color Corp. ("Day-Glo") manufactures a wide range of special effect colorants and conventional color pigment dispersions. Day-Glo sells to individuals and color consuming industries including plastics, graphics, paints and coatings, dyes and textiles.

RPM Wood Finishes Group, Inc.: RPM Wood Finishes Group, Inc. ("WFG") is composed of three diverse operating units: Chemical Coatings, a producer of color and coating solutions for kitchen cabinets, wood furniture, molding, flooring and factory-finished architectural components, Mohawk Finishing Products, a producer of professional wood, leather and vinyl touch-up and repair products, and Westfield Coatings, a supplier of custom formulated-coatings for furniture, cabinets and other wood products. Customers include original equipment manufacturers ("OEMs"), distributors with the ability to reach smaller OEMs, furniture retailers, and kitchen cabinet manufacturers.  In 2012, WFG acquired Finishworks, a supplier of industrial wood coatings to certain local communities and the geographical regions surrounding those communities.

Guardian Protection Products Inc.: Guardian Protection Products Inc. ("Guardian") is a manufacturer of furniture protection products and operates together with WFG, although WFG is a separate legal entity.

TCI, Inc.: TCI, Inc. ("TCI") manufactures electrostatically applied powder coatings for commercial applications including store fixtures and displays, outdoor power equipment, automotive parts, fitness equipment, outdoor furniture, electrical equipment and office furniture. TCI sells to both OEMs, who directly manufacture products that require a product finish (70% of sales) and contract coaters who receive outsourced work from OEMs (30% of sales).

Dryvit Holdings, Inc.: Dryvit Holdings, Inc. is the holding company of Dryvit Systems, Inc. ("Dryvit"), a manufacturer of Exterior Insulation and Finish Systems and Textured Acrylic Finish Systems for use in commercial and residential applications.  The systems are highly energy efficient, lightweight engineered cladding systems with a vast array of finish options to suit any design consideration and is available in a number of system configurations to meet any climate or building condition.  End users are generally plastering contractors.  Dryvit brand products are sold to professional contractors through a nationwide network of exclusive distributors.

RPM Holdco Corp.: RPM Holdco Corp. ("RPM Holdco") is an intermediate holding company in the International corporate structure, the primary purpose of which is to act as the holding company for International's foreign (non-US) business entities.  SPHC, through three of the Operating Subsidiaries, owns an indirect minority interest in RPM Holdco totaling 21.4% of the common shares.

---

[2]    The Debtors' fiscal year runs from June 1 to May 31.

Prior to the Petition Date, International, the SPHC Companies' ultimate parent, provided a wide range of a corporate and administrative services to the SPHC Companies in exchange for a fee.  These services included, among other things: information technology services; business development services; tax preparation and advice; travel agency services; credit card processing; environmental, health and safety services; property management; human resources services; lobbying services; finance, accounting and legal services; purchasing services; and capital expenditure consulting.  International also contracted with various third party vendors to obtain various goods and services required by International's subsidiaries, including, among others: legal, finance, accounting and tax services provided by outside professionals; certain environmental, health and safety fees; lobbying fees with respect to specific matters; the administration of pension and 401(k) plans; long term disability, medical, dental, life, vision and group liability insurance; equipment leasing; car leases and related expenses; and energy management services. International charged its subsidiaries for these third-party vendor services.

After the Petition Date, on June 1, 2010, SPHC and International entered into an Administrative Services Agreement to memorialize the administrative services International would provide to the SPHC Companies following the Petition Date and the related payment obligations.  The Bankruptcy Court entered an order on June 30, 2010, authorizing the Debtors to enter into the Administrative Services Agreement.

Also on June 1, 2010, SPHC and Kop-Coat entered into an employment arrangement (the "Employment Arrangement") that provided for Mr. Tellor, an employee of Kop-Coat, the president of SPHC, and director for each of SPHC and Bondex to devote 70 percent of his and two other accounting and administrative employees' working time to the SPHC Companies and allocate the costs pursuant to the terms of the Employment Arrangement.  The Bankruptcy Court entered an order on June 30, 2010, authorizing the Debtors to enter into the Employment Arrangement.

The SPHC Companies currently participate in a group purchasing program operated by International.  This program provides the SPHC Companies with several benefits, including the procurement of critical raw materials that can be difficult to source and the ability to purchase raw materials at discounts that are offered by suppliers to International primarily because of the size of International's purchasing program.  These raw materials include resin compounds, corrugated packaging materials, and other critical inputs.

### c.    Republic

Republic is a leader in building restoration, and provides exclusive products for roof and wall restoration, including an extensive line of roof coatings.  During fiscal year 2013, Republic generated revenue of approximately $25 million.  As of August 31, 2014, Republic had approximately 30 full- and part-time employees.  The officers of Republic, as appointed by its Board of Directors, are:  J.K. Milliken—President; Michael J. Drumm—Treasurer; Edward W. Moore—Secretary; Ronald A. Rice—Assistant Secretary; and Tracy D. Crandall—Assistant Secretary. The Board of Directors of Republic consists of the following directors:  Ronald A. Rice and Edward W. Moore.

### d.    NMBFiL

NMBFiL currently has no business operations.  The officers of NMBFiL, as appointed by its Board of Directors, are:  Edward W. Moore—President; Francis Robert Hunter, III—Treasurer; and Tracy D. Crandall—Secretary.  The Board of Directors of NMBFiL consists of the following director:  Edward W. Moore.  Pursuant to the Plan, on or after the Confirmation Date, NMBFiL will lease a storage facility located in Medina, Ohio from International and sublease the facility to an Affiliate for a profit.

### B.    General Overview of the Debtors' Manufacture and Sale of Products Alleged to Contain Asbestos

### a.    SPHC and Bondex

Bondex brand joint compound was the product that gave rise to the overwhelming majority of asbestos claims filed against SPHC and Bondex.  In that regard, only about 1% of SPHC's and Bondex's historical cases and

1% of their pending claims make any mention of products sold under private label agreements that did not bear the Bondex brand name.

SPHC and Bondex acquired their asbestos containing joint compound operations as a part of the Reardon acquisition in 1966. Most products manufactured and sold by SPHC and Bondex did not contain asbestos, and joint compound was a very small part of the Reardon product line. The Bondex name was used by Reardon for other products, including a waterproof cement paint (the original "Bondex" product) that accounted for a very large percent of the company's sales and never contained asbestos. Reardon was producing an asbestos-containing joint compound under the name "Bondex" by at least 1965.

The main manufacturing facility for the Bondex line of products was located in St. Louis, Missouri. There was also a smaller manufacturing facility in Toms River, New Jersey and a small warehouse in California. The St. Louis facility had fewer than forty employees from 1972 to 1976, and the New Jersey facility, with eight or nine employees, was about one quarter of the size of the St. Louis plant.

During the time period that Bondex asbestos containing joint compound was manufactured and sold, asbestos fiber was acquired from a limited number of sources. T.H. Agriculture and Nutrition L.L.C. was one of the major suppliers. All of the asbestos fiber used in Bondex brand joint compound was of the chrysotile variety.

Neither Reardon nor the Debtors were large sellers of joint compound. Bondex branded joint compound was consumer oriented and sold primarily in small quantity containers in hardware stores for the do-it-yourself market. The majority was sold in five pound bags.

From 1950 to 1977, the estimated total net sales for all products in the Reardon and Bondex product lines, including non-asbestos-containing products, ranged on an annual basis from a low of $2 million to more than $5 million, while the joint compound sales were just a fraction of that, ranging from $330,000 to less than $800,000 a year. A list of the asbestos-containing products sold by either SPHC, Bondex or Republic or their predecessor The Reardon Company and, based upon information and belief, the years during which each product was sold is attached hereto as Exhibit V.

### b.    Republic

On May 31, 1972, Republic purchased the assets and assumed the liabilities associated with the product line of the Republic Powdered Metals Division of what is now SPHC. From that time forward, Republic continued to manufacture a line of roofing and exterior maintenance products. Some of those products contained asbestos until the mid- to late-1980s.

### c.    NMBFiL

NMBFiL's purported asbestos-related liabilities derive principally from its manufacture of automobile body filler or other automobile repair products that contained talc that plaintiffs have alleged was contaminated with asbestos. NMBFiL did not use asbestos in the manufacture of any of its products.

## C.    History of the Debtors' Asbestos Personal Injury Litigation

### a.    SPHC and Bondex

The first mesothelioma case against Bondex was filed in 1980. SPHC received its first asbestos-related lawsuit in 1992. From 1980 until 1999, SPHC and Bondex were sued on less than 1,500 claims, of which less than 150 were mesothelioma claims, and paid, inclusive of insurance, a total of less than $5 million on asbestos-related indemnity costs.

In the early 2000s, as the major suppliers and manufacturers of asbestos products sought bankruptcy protection, the volume of claims filed against SPHC and Bondex increased significantly. In 2000, SPHC and Bondex were named in only 11 mesothelioma cases, but by 2009 they were named in almost 1,100 mesothelioma

cases a year.  Almost half of all people annually diagnosed with mesothelioma were suing SPHC and Bondex. Since 2000, Bondex and/or SPHC have resolved approximately 27,000 asbestos-related personal injury claims at a total asbestos-related indemnity cost of approximately $380 million.  As of the Petition Date, Bondex and/or SPHC were defendants in approximately 15,000 pending asbestos-related lawsuits, approximately 2,700 of which were pending mesothelioma-related bodily injury lawsuits.  SPHC's and Bondex's historical payments in respect of asbestos personal injury claims based on alleged diseases other than mesothelioma represents a small fraction of the payments made with respect to mesothelioma claims.

### b.    Republic

The first asbestos-related lawsuit was served on Republic in 1990.  Since that time, Republic has been named in more than 5,000 asbestos-related claims, many of which were dismissed without payment.  The filings against Republic have been somewhat erratic over this period; high volumes of claims were filed in 1997 (1,551) and 2000 (2,057), but relatively few claims were filed in the years before or after.  During the period between 2000 and 2010, Republic averaged approximately 140 claims per year.  Since 2005, Republic has not settled any claims and many claims have been dismissed without payment.  Nonetheless, Republic has continued to incur significant professional fees defending the lawsuits and has no insurance coverage for asbestos claims.  Moreover, Republic expects to face a continuing stream of asbestos lawsuits in the future.

Many claims against Republic appear to have been the result of name confusion with SPHC.  This is likely the result of the fact that, historically, SPHC has been known by three names:  (a) from its inception through 1971, it was known as Republic Powdered Metals, Inc; (b) from 1971 through April 2010, it was known as RPM, Inc.; and (c) from April 2010 it has been known as SPHC.  The remaining claims appear to have been based on Republic's historical manufacture of certain roofing and exterior maintenance products that contained asbestos.

### c.    NMBFiL

The first asbestos-related lawsuit against NMBFiL was served in 1998.  Since that time, more than 1,100 asbestos personal injury lawsuits have been filed against NMBFiL.  From 2002 to 2005, the number of claims filed per year rose from 22 in 2002 to 584 in 2005.  From 2006 to 2010, the rate of filings dropped precipitously, averaging fewer than 5 claims per year.  In 2011, the rate of new claims began to rise again, from 14 in 2011 to 127 in 2013.  NMBFiL has never been found liable in any of these lawsuits, and it has never settled a claim.

### D.    Insurance and Coverage Litigation

Prior to 1985, RPM, Inc. purchased and obtained certain comprehensive general liability, umbrella and excess insurance policies through certain insurance companies.  In February 1994, Bondex entered into a cost sharing agreement with five of its primary insurers due to increasing asbestos litigation.  The agreement required that Bondex pay approximately 10-12% (while the insurance companies paid the remaining 88-90%) of any costs arising out of the defense and settlement of all asbestos-related claims.  This cost sharing agreement existed through 2002.

Until 2003, approximately 90 percent of SPHC's and Bondex's asbestos liability was covered by insurance. In that year, however, certain of the Initial Debtors' and Republic's third-party insurers claimed exhaustion of coverage, and ceased making any payments.  On July 3, 2003, the Initial Debtors and Republic filed suit in the district court for the Northern District of Ohio at Case No. 1:03CV1322 for declaratory judgment, breach of contract and bad faith against theses third-party insurers, challenging their assertion that their policies covering asbestos-related claims had been exhausted.  In November 2008, the district court for the Northern District of Ohio granted summary judgment in favor of the insurers.  In 2011, the United States Court of Appeals for the Sixth Circuit affirmed the Ohio District Court's ruling.  The parties did not appeal the Sixth Circuit Court of Appeals' ruling to the United States Supreme Court.  Accordingly, there are no insurance assets that can be contributed to the Asbestos Personal Injury Trust for the benefit of holders of SPHC Asbestos Personal Injury Claims.

NMBFiL has minimal insurance coverage for asbestos-related claims, with total limits of coverage of approximately $3 million. A small portion of NMBFiL's defense costs, ranging from five to fifteen percent

depending on the coverage years implicated, are reimbursed by this insurance. A few additional insurers issued policies to NMBFiL with minimal coverage limits, but they have made no payments under those policies because of, among other things, alleged coverage defenses, the discrete time periods covered by the policies, and insolvencies. NMBFiL's insurers are NMBFiL Protected Parties. No insurance assets will be contributed to the Asbestos Personal Injury Trust for the benefit of holders of NMBFiL Asbestos Personal Injury Claims.

###        E.        Determination to File Reorganization Cases

During 2000 and in 2001, a substantial number of companies that were significant defendants in asbestos personal injury cases filed for bankruptcy. These companies included Armstrong World Industries, Inc., The Babcock & Wilcox Company, Federal-Mogul, GAF Corporation, Owens Corning, Pittsburgh Corning Corporation, W.R. Grace & Co. and USG Corporation. Following the bankruptcy filings of these defendant companies, the number of asbestos cases filed against SPHC and Bondex increased significantly, as did SPHC's and Bondex's asbestos-related costs. In fact, in the years prior to the Petition Date, settlement demands significantly escalated and SPHC and Bondex incurred asbestos costs in the range of approximately $60 million to $82 million per year from fiscal years 2005 through 2009. The increasing cost of managing and resolving SPHC's and Bondex's asbestos-related litigation led the Initial Debtors to conclude that the filing of the Reorganization Cases was necessary.

On July 26, 2014, the Debtors and International entered into the Term Sheets setting forth the parties' agreements in principle on a consensual plan of reorganization that included the Initial Debtors as well as Republic and NMBFiL. Republic and NMBFiL Filed their chapter 11 cases to effectuate the agreements outlined in the Term Sheets and pursue confirmation and consummation of the Plan.

## IV.        EVENTS DURING REORGANIZATION CASES

###        A.        Commencement of Reorganization Cases

On May 31, 2010, the Initial Debtors each commenced a reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On August 15, 2014, NMBFiL Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On August 31, 2014 Republic commenced a chapter 11 case. The Reorganization Cases are being jointly administered as In re Specialty Products Holding Corp., Case No. 10-11780 (PJW). Neither International nor the Operating Subsidiaries are debtors in the Reorganization Cases.

The Reorganization Cases of the Initial Debtors were assigned to Chief U.S. Bankruptcy Judge Judith K. Fitzgerald of the United States Bankruptcy Court for the Western District of Pennsylvania, sitting by designation in Delaware. On June 5, 2013, the Reorganization Cases of the Initial Debtors were reassigned to the Honorable Peter J. Walsh following Judge Fitzgerald's retirement. The Reorganization Cases of the New Debtors were also assigned to the Honorable Peter J. Walsh.

###        B.        First Day Relief

On their Petition Date, the Initial Debtors Filed a number of motions seeking typical "first-day" relief in chapter 11 cases (collectively, the "First Day Motions"), as well as a declaration in support thereof. The purpose of these motions was to establish procedures for the smooth and efficient administration of these cases. In particular, the "first day" motions sought authority to: (a) administer the Reorganization Cases of the Initial Debtors jointly for procedural purposes; (b) appoint a claims and noticing agent; (c) (i) file a consolidated list of creditors, (ii) file a consolidated list of the thirty asbestos plaintiffs' firms with the largest scope or number of asbestos cases, and (iii) establish notice procedures for asbestos claimants; (d) continue use of the existing cash management system and bank accounts and waive the requirements of section 345 of the Bankruptcy Code; and (e) obtain debtor in possession financing. The relief sought in each of the motions was granted by the Bankruptcy Court.

Pursuant to an order entered on July 1, 2010 [D.I. 156], the Bankruptcy Court authorized the Initial Debtors, on a final basis, to enter into a postpetition revolving credit facility, governed by a postpetition credit

agreement dated as of June 2, 2010 (as amended, the "<u>Credit Agreement</u>"), between certain of the Initial Debtors' non-debtor subsidiaries, as borrowers, the Initial Debtors, as guarantors, the lenders from time to time party thereto and Wells Fargo Capital Finance, LLC, as successor by merger to Wachovia Capital Finance Corporation (New England), as the agent.  The Credit Agreement provided for a secured revolving line of credit in the principal amount of $40,000,000 that was due to mature on June 2, 2013.  The Credit Agreement has since been amended to, among other things, extend the maturity date until June 2, 2016.  That amendment was approved by order of the Bankruptcy Court [D.I. 3854] on May 20, 2013.

The New Debtors commenced their cases primarily to pursue confirmation and consummation of the consensual plan of reorganization contemplated by the term sheets executed by the Parties as of July 26, 2014.  In connection with the commencement of the New Debtors' chapter 11 cases, they requested that certain relief granted to the Initial Debtors under the First Day Motions be extended to them.  The Bankruptcy Court granted such request and, in addition, entered orders authorizing the New Debtors to continue using their bank accounts and authorizing Republic to (i) provide certain utility providers with adequate assurance of payment; (ii) pay certain employee-related obligations; (iii) pay certain customer warranty obligations; and (iv) pay certain accrued tax obligations.

### C.    Appointment of the Official Committee of Asbestos Personal Injury Claimants and Legal Representative

On or about June 10, 2010, the United States Trustee appointed the Asbestos Personal Injury Committee pursuant to section 1102 of the Bankruptcy Code.  [See D.I. 75].  The Asbestos Personal Injury Committee was reconstituted by the U.S. Trustee on October 18, 2010 [D.I. 457] and again on December 14, 2010 [D.I. 666].  In addition, by order dated October 18, 2010 [D.I. 374], the Bankruptcy Court approved the appointment of Professor Eric D. Green as the Future Claimants' Representative in the Initial Debtors' cases and by order dated September 25, 2014 [D.I. 5017] in the New Debtors' cases.  The current membership of the Asbestos Personal Injury Committee and the professional advisors to the Asbestos Personal Injury Committee and the Future Claimants' Representative are as follows:

1.      **ASBESTOS PERSONAL INJURY COMMITTEE**

**Asbestos Personal Injury Committee Members
and their Respective Counsel:**

Myron Butler
c/o James L. Ferraro, Esq.
The Ferraro Law Firm, P.A.

Deborah Papaneri as representative for the
Estate of Charles Papaneri
c/o Robert E. Paul, Esq.
Paul Reicht & Myers, P.C.

James L. Mongelluzzo
c/o Bruce E. Mattock, Esq.
Goldberg, Persky & White, P.C.,

Roy and Wanda Leggett
c/o Jeffrey Simon, Esq.
Simon Greenstone Panatier Bartlett, PC

Antonietta DiMeglio
c/o Ethan Early, Esq.,
The Early Law Firm, LLC

Lloyd H. Lohr
c/o Constantine Paul Venizelos, Esq.
Kelly & Ferraro LLP,

David A. Kalil
c/o Peter A. Kraus
Waters & Kraus, LLP

Victor Dillbeck
c/o John Barry Julian, Esq.
Gori Julian & Assoc., P.C.,

Charles A. Wilson
c/o Perry J. Browder, Esq.
Simmons Hanly Conroy LLC

Zdenek Machalka (Chair of the Asbestos Personal Injury
Committee)
c/o John D. Cooney, Esq.
Cooney & Conway

David Eggers as representative for the
Estate of Jane Young
c/o Brian T. Fitzpatrick, Esq.
Belluck & Fox, LLP

**Counsel:**

Montgomery, McCracken, Walker & Rhoads, LLP
Natalie D. Ramsey, Esq.
1105 North Market Street, Suite 1500
Wilmington, DE 19801

Montgomery, McCracken, Walker & Rhoads, LLP
Mark B. Sheppard, Esq. and Peter Breslauer, Esq.
123 South Broad Street, 24th Floor
Philadelphia, PA 19109

**Conflicts Counsel:**

Motley Rice, LLC
Nathan D. Finch, Esq.
3333 K Street NW, Suite 450
Washington DC, 20007

**Financial Advisors:**

Charter Oak Financial Consultants, LLC
James P. Sinclair
Bradley M. Rapp
430 Center Ave.
Mamaroneck, NY 10543

**Asbestos Related Personal
Injury Consultant:**

Legal Analysis Systems, Inc.
Mark A. Peterson
970 Calle Arroyo
Thousand Oaks, CA 91360

2.      **ASBESTOS PERSONAL INJURY FUTURE CLAIMANTS' REPRESENTATIVE**

**Future Claimants' Representative:**

Professor Eric D. Green
Resolutions, LLC
125 High Street
Suite 2205
Boston, MA 02110

**Financial Advisor:**

FTI Consulting, Inc.
Conor Tully
Matthew Diaz
Three Times Square, 11th Floor
New York, NY 10036

**Counsel:**

Young, Conaway, Stargatt & Taylor, LLP
James L. Patton, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801

**Claims Evaluation Consultants:**

Analysis Research Planning Corporation
Thomas Vasquez
1220 19th Street, NW, Suite 700
Washington, DC 20036

D.      **Injunction Enjoining Parties from Pursuing Derivative Claims Against Certain Parties**

On May 31, 2010, the Initial Debtors Filed a complaint [Adv. D.I. 1][3] and a motion [Adv. D.I. 2] (together, the "Initial Debtors' 105 Motion") for injunctive relief extending and applying the automatic stay to certain non-debtor affiliates, including International.  Specifically, the Initial Debtors' 105 Motion requested an order prohibiting and enjoining current and potential claimants from filing or continuing to prosecute derivative claims against International and its non-debtor affiliates.  On June 4, 2010, the Bankruptcy Court entered a temporary restraining order [Adv. D.I. 13] granting the requested relief for 14 days.  Following a hearing on the Initial Debtors' 105 Motion on June 15, 2010, the Initial Debtors and Asbestos Personal Injury Committee agreed to an order granting a preliminary injunction for 60 days [Adv. D.I. 19].  The parties later amended the agreed order [Adv. D.I. 47], extending the injunction indefinitely, subject to later challenge by the Asbestos Personal Injury Committee.

In November of 2011, the Bankruptcy Court entered an order closing the adversary proceeding [Adv. D.I. 83].  The order provided that the adversary proceeding would be reopened upon the filing of a motion by the Debtors, the Asbestos Personal Injury Committee or the Future Claimants' Representative, with any filing fees waived.  On May 14, 2012, the Asbestos Personal Injury Committee Filed a motion seeking to reopen the adversary proceeding and dissolve the injunction [Adv. D.I. 85] (the "Motion to Dissolve").  The Initial Debtors and International objected to the Motion to Dissolve [Adv. D.I. 88, 89], and, at a hearing held on March 4, 2013, the Court denied the Motion to Dissolve without prejudice.

On August 31, 2014, NMBFiL Filed a complaint [Adv. D.I. 1][4] and motion [Adv. D.I. 3] and Republic Filed a complaint [Adv. D.I. 1][5] and motion [Adv. D.I. 4] (collectively, the "New Debtors' 105 Motions") for injunctive relief extending and applying the automatic stay to certain parties, including International.  Specially, the New Debtors' 105 Motions requested orders prohibiting and enjoining current and potential claimants from filing or continuing to prosecute Asbestos Personal Injury Claims against the Protected Parties.  On September 3, 2014, the Bankruptcy Court entered temporary restraining orders [Case No. 14-50662, Adv. D.I. 10; Case No. 14-50663, Adv. D.I. 10] granting the requested relief for 28 days.  The Court entered an order granting a preliminary injunction on September 26, 2014 [Case No. 14-50662, Adv. D.I. 23; Case No. 14-50663, Adv. D.I. 24].

---

[3]   The adversary proceeding is styled Specialty Products Holding Corp. v. Antonelli, et al., Case No. 10-51085 (Bankr. D. Del.).

[4]   The adversary proceeding is styled NMBFiL, Inc. v. Alexander et al., Case No. 14-50662 (Bankr. D. Del.).

[5]   The adversary proceeding is styled Republic Powdered Metals, Inc. v. Abbott et al., Case No. 14-50663 (Bankr. D. Del.).

E.        **Tax Cooperation Agreement**

On August 9, 2010, the Initial Debtors Filed a motion for an order authoring them to enter into a tax cooperation agreement among SPHC, Bondex and certain non-debtor domestic subsidiaries (collectively, the "SPHC Subgroup") and International [D.I. 297].  The tax cooperation agreement, which had an effective date of June 1, 2010, addresses, among other things, (i) the allocation among the parties of the tax liability attributable to the group of corporations affiliated with International within the meaning of section 1504(a) of the IRC (collectively, the "International Group"), (ii) the payment to International of the SPHC Subgroup's share of the International Group's taxes, (iii) the compensation of the SPHC Subgroup for the use of their tax attributes by the International Group and (iv) the procedures that will govern the parties' rights and responsibilities with respect to tax matters.  On September 20, 2010, the Bankruptcy Court entered an order authorizing the Initial Debtors to enter into the tax cooperation agreement [D.I. 393].

F.        **The Initial Debtors' Requests for Information Under Rule 2004**

In October and November of 2010, the Initial Debtors Filed four separate motions seeking discovery of information pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, which allows examinations related to the liabilities and financial condition of the debtor, among other things (collectively, the "Discovery Motions").  By the Discovery Motions, the Initial Debtors sought information that the Initial Debtors' claims estimation expert believed he needed to prepare an estimation of the Initial Debtors' asbestos liability in the most accurate manner.

Specifically, the Initial Debtors Filed separate motions:  (i) seeking information from all asbestos personal injury claimants in the form of a personal injury questionnaire [D.I. 436] ("PIQ Motion"); (ii) seeking production of certain information from certain claims-processing facilities for certain asbestos personal injury trusts [D.I. 437] (the "Trust Discovery Motion"); (iii) seeking production of historic claims databases of certain former asbestos defendants by certain asbestos personal injury trusts [D.I. 559] (the "Historic Claims Databases Motion"); and (iv) seeking production of certain information and documents relating to recoveries on mesothelioma claims from certain law firms that have, since 1995, filed, or had a financial interest in, lawsuits against either of the Debtors asserting claims for asbestos personal injuries on behalf of clients [D.I. 558] (the "Law Firm Motion").

Pursuant to the PIQ Motion, the Initial Debtors sought authorization from the Bankruptcy Court to disseminate to all asbestos personal injury claimants with lawsuits pending against one or more of the Initial Debtors a proposed questionnaire seeking certain basic information regarding the claimants' asbestos claims.  The Initial Debtors included with the PIQ Motion a form questionnaire.  Various parties, including the Asbestos Personal Injury Committee and the Future Claimants' Representative, Filed objections, and the Initial Debtors Filed responses and other pleadings in support of the PIQ Motion.  During negotiations to resolve the objections, the Initial Debtors agreed to make modifications to their requests in an effort to reach agreement with the objecting parties.  The objectors continued to oppose the Initial Debtors request for, among other things, information regarding (a) the amount of payments current mesothelioma claimants received from codefendants of the Initial Debtors and other third parties and (b) the amount of payments current mesothelioma claimants received from asbestos trusts (collectively, the "Payment Amount Data").  Following several hearings before the Bankruptcy Court regarding the PIQ Motion, the Bankruptcy Court ultimately denied the Initial Debtors' request to require the mesothelioma claimants to provide the Payment Amount Data but otherwise approved the proposed questionnaire, as modified by agreement among the parties.  On July 20, 2011, the Bankruptcy Court entered the PIQ Order, which reflected these rulings.  Following a series of orders entered by the Bankruptcy Court compelling compliance with the PIQ Order, approximately 2,800 personal injury questionnaires were submitted by mesothelioma claimants.

With respect to the Trust Discovery Motion, various parties, including the Asbestos Personal Injury Committee and the Future Claimants' Representative, Filed objections and other pleadings in opposition, and the Initial Debtors Filed responses and other pleadings in support of the Trust Discovery Motion.  The Bankruptcy Court entered an order on August 3, 2011 denying the Trust Discovery Motion without prejudice [D.I. 1546].

Pursuant to the Historic Claims Databases Motion, the Initial Debtors sought production of historic claims databases of certain former asbestos defendants (collectively, the "Reorganized Codefendants") by certain trusts.  Various parties, including the Asbestos Personal Injury Committee and the Future Claimants' Representative, Filed

objections and other pleadings in opposition, and the Initial Debtors Filed a consolidated reply and a statement in support of the Historic Claims Database Motion.  The Bankruptcy Court entered an order on August 3, 2011 denying the Historic Claims Databases Motion without prejudice [D.I. 1547].

With respect to the Law Firm Motion, various parties, including the Asbestos Personal Injury Committee and the Future Claimants' Representative, Filed objections and other pleadings in opposition, and the Debtors Filed responses and other pleadings in support of the Law Firm Motion.  On October 7, 2011, the Bankruptcy Court issued a memorandum opinion and order denying the Law Firm Motion [D.I. 1737].

On August 17, 2011, the Initial Debtors appealed [D.I. 1574, 1575, 1576] the orders with respect to the PIQ Motion, Trust Discovery Motion and Historic Claims Database Motion (collectively, the "Discovery Orders") and Filed a consolidated motion for leave to appeal [D.I. 1577].  On that same day, the Initial Debtors also Filed a motion for reconsideration of the Discovery Orders, or, in the alternative, to certify the Discovery Orders for an immediate appeal to the United States Court of Appeals for the Third Circuit [D.I. 1573] (the "Motion for Reconsideration or Certification").  The Asbestos Personal Injury Committee and Future Claimants' Representative objected to the Motion for Reconsideration or Certification, and, on October 4, 2011, the Bankruptcy Court entered an order denying the motion [D.I. 1737].  Subsequently, at the request of the Initial Debtors, the appeals were dismissed pursuant to an order of the Bankruptcy Court [D.I. 1768].

G.     Discovery Regarding the 2002 Reorganization and other Subjects

As further described above, in 2002 SPHC undertook a corporate reorganization (the "2002 Reorganization"), which resulted in International, an entity formed at that time, becoming the ultimate parent company in place of SPHC.  In June 2010, the Asbestos Personal Injury Committee served the Initial Debtors with various discovery requests seeking information regarding the 2002 Reorganization, other transactions, and other matters.  The Initial Debtors began producing the requested information in July and September 2010.  All told, in response to the Asbestos Personal Injury Committee 's initial discovery requests, the Initial Debtors produced over 50,000 pages of documents in eight separate productions.  In late 2011, the Initial Debtors produced additional documents in response to subsequent discovery requests by the Asbestos Personal Injury Committee and the Future Claimants' Representative.

In addition, pursuant to an Agreed Order (i) Authorizing Disclosure of Attorney-Client Privileged and/or Work Product-Protected Documents and (ii) Determining that the Applicable Privileges or Protections Will Not be Waived by Disclosure entered by the Court on April 23, 2012 [D.I. 2342], the Initial Debtors, without waiving any applicable privileges or protections, provided to the Asbestos Personal Injury Committee and the Future Claimants' Representative attorney-client privileged and/or work product-protected documents related to the 2002 Reorganization.

H.     Bar Dates (For Claims Other Than Asbestos Personal Injury Claims)

On July 19, 2010, the Initial Debtors Filed their Schedules, identifying the assets and liabilities of their Estates.  Subsequently, on September 30, 2014, the New Debtors Filed their Schedules.  On September 26, 2013, the Asbestos Personal Injury Committee and the Future Claimants' Representative Filed a joint motion seeking, among other things, a bar date for Claims other than Asbestos Personal Injury Claims against SPHC only, which motion was subsequently amended on October 15, 2013 [D.I. 4141, 4195] (as amended, the "Claimants' Bar Date Motion").  The Initial Debtors Filed an objection to the Claimants' Bar Date Motion and a cross motion seeking a bar date for Asbestos Personal Injury Claims against the Initial Debtors and a general bar date for Claims against Bondex [D.I. 4196].  Notwithstanding the parties' disagreement with respect to the imposition of an Bar Date for Asbestos Personal Injury Claims, all parties supported the establishment of a  Bar Date for Claims other than Asbestos Personal Injury Claims.  On September 5, 2014, the Debtors Filed a motion seeking the establishment of certain Bar Dates for Claims other than Asbestos Personal Injury Claims and certain related relief [D.I. 4949].

On September 26, 2014, the Bankruptcy Court entered an order [D.I. 5021] establishing the following Bar Dates for the filing of proofs of Claim in the Reorganization Cases:  (i) November 14, 2014, as the general Bar Date for the filing of proofs of Claim (other than Asbestos Personal Injury Claims); (ii) the later of (a) the general Bar Date and (b) 30 days after the date of an order rejecting an Executory Contract or Unexpired Lease as the general

Bar Date for claims arising out of the rejection of Executory Contracts or Unexpired Leases relating to such Executory Contracts or Unexpired Leases; and (iii) the later of (a) the general Bar Date and (b) 30 days after the date that a notice of an amendment to the Schedules is served on a claimant as the Bar Date for such claimant to file a proof of Claim in respect of the amended scheduled Claim.

I.     **The Initial Debtors' Exclusive Right to File and Seek Confirmation of a Plan**

The Initial Debtors sought and obtained three unopposed extensions of the periods during which they could propose and solicit acceptances of a chapter 11 plan beyond the initial 120-day and 180-day periods for plan proposal and solicitation set forth in section 1121 of the Bankruptcy Code.  The Bankruptcy Court extended the exclusive period during which the Initial Debtors could propose a plan of reorganization through November 11, 2012, and extended the solicitation period for acceptances of such a plan through January 30, 2012.  Following the expiration of the Initial Debtors' exclusivity period, the Asbestos Personal Injury Committee and Future Claimants' Representative Filed a joint plan of reorganization, which was subsequently amended [D.I. 2388].  Likewise, the Initial Debtors Filed a joint plan of reorganization, which was subsequently amended [D.I. 4315].  In accordance with the Terms Sheets, the Parties have agreed that confirmation of such plans of reorganization are stayed and/or adjourned until the occurrence of the Effective Date or termination of the Term Sheets and instead are seeking approval of the Plan.

J.     **Preference Adversary**

On May 31, 2012, the Initial Debtors commenced adversary case number 12-50755 (PJW) in the Bankruptcy Court by filing a complaint to avoid certain preferential transfers totaling $43,725,300.00 to asbestos personal injury claimants (the "Preference Adversary").  After commencing the Preference Adversary, the Initial Debtors obtained an order from the Bankruptcy Court extending the time to serve the defendants identified in the complaint until 90 days after an order confirming a plan of reorganization.  Accordingly, no parties have been served with the complaint underlying the Preference Adversary to date.  Pursuant to the Plan, the Initial Debtors will release the right to pursue recoveries from individuals named as defendants in the Preference Adversary.

K.     **Mediation of the Reorganization Cases**

In November 2011, the Initial Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative and International agreed to mediate the Reorganization Cases of the Initial Debtors before retired judge Daniel Weinstein of JAMS.  The parties attended mediation sessions with Judge Weinstein on February 12, 2012 in New York, New York and on November 6, 2012 in San Francisco, California.  The mediation sessions did not result in an agreement among the parties.

L.     **Estimation Decision and Appeal**

On November 2, 2011, the Court entered a Modified Case Management Order for Estimation of Debtors' Asbestos Personal Injury Liability [D.I. 1793] (the "Estimation CMO") that set forth a schedule and process for estimating the Initial Debtors' liability for current and future asbestos-related personal injury claims.

Pursuant to the time line set forth in the Estimation CMO, the parties engaged in fact and expert discovery. Thereafter, in accordance with the Estimation CMO, they Filed a number of pre-trial motions [D.I. 3239, 3240, 3241, 3242, 3243, 3244, 3245, 3246, 3247, 3248, 3249, 3251, 3252, 3253, 3260, 3261, 3262, 3263, 3274].  At a hearing on December 17, 2012, the Bankruptcy Court denied each of the pre-trial motions without prejudice.

The Bankruptcy Court conducted a hearing to estimate the Initial Debtors' asbestos-related personal injury liability from January 7, 2013 through January 11, 2013 (the "Estimation Trial").  The Estimation Trial involved the testimony of three fact and twelve expert witnesses, designations of several other fact witnesses, and the submission of hundreds of evidentiary and demonstrative exhibits encompassing thousands of pages.  In addition to the presentations and submissions during the Estimation Trial, each of the Initial Debtors, International, the Asbestos Personal Injury Committee, and the Future Claimants' Representative submitted briefs in addition to proposed findings of fact and conclusions of law addressing the factual and legal matters that were raised during the

Estimation Trial.  The Bankruptcy Court heard closing arguments on March 4, 2013.  On May 20, 2013, the Bankruptcy Court issued the Order Determining Estimated Amount of Debtors' Asbestos Liabilities [D.I. 3853] and related Memorandum Opinion in support of the order [D.I. 3852] (together, the "Estimation Decision"), in which it adopted the $1.166 billion estimation proffered by the Future Claimants' Representative's estimation expert, Dr. Thomas Vasquez, and rejected the estimation proffered by the Debtors' expert, Dr. Charles Mullin, who opined that the appropriate estimation was instead less than a third of Dr. Vasquez's amount.  Although the Bankruptcy Court also did not wholly adopt the estimation proffered by the Asbestos Personal Injury Committee's expert, Dr. Mark Peterson, it noted that his conclusions provided support for Dr. Vasquez's estimation and that the two experts' ranges of estimates overlapped.

The Initial Debtors and International each timely Filed notices of appeal of the Estimation Decision. On June 18, 2013, the Initial Debtors Filed a motion for stay pending appeal of the Estimation Decision in the Bankruptcy Court, which motion was supported by International [D.I. 3911, 3971] but opposed by the Asbestos Personal Injury Committee and the Future Claimants' Representative.  On August 20, 2013, the Bankruptcy Court entered an order denying the motion [D.I. 4074].

On June 28, 2013, the Asbestos Personal Injury Committee and the Future Claimants' Representative Filed a motion in the District Court to dismiss the appeals as interlocutory.  The motion to dismiss and each of the appeals have been consolidated for procedural purposes only at Civil Action No. 13-cv-01244-SLR.  The Initial Debtors and International each Filed a motion to certify the Estimation Decision for direct review by the Third Circuit Court of Appeals [D.I. 3912, 3970].  On February 7, 2014, District Court entered a memorandum opinion and order certifying the Estimation Decision for direct appeal to the Third Circuit.  [Misc. No. 13-194-SLR. (D.I. 1)].  On April 4, 2014, the Third Circuit declined to authorize a direct appeal of the Estimation Decision.

On August 29, 2014, the Initial Debtors, International, the Asbestos Personal Injury Committee and the Future Claimants' Representative jointly Filed a motion to stay the appeals and the motion to dismiss the appeals Filed by the Asbestos Personal Injury Committee and the Future Claimants' Representative, pending the completion of the parties' efforts to consummate their settlement through the pursuit of confirmation of a consensual plan of reorganization [Misc. No. 13-194-SLR (D.I. 29)].  By order entered on September 4, 2014, the District Court stayed the appeals and motion to dismiss.

### M.    Motion of the Asbestos Personal Injury Committee and the Future Claimants' Representative for Standing to Pursue Certain Estate Claims

On November 11, 2011, the Asbestos Personal Injury Committee and the Future Claimants' Representative Filed a motion for standing to prosecute certain claims on behalf of the Initial Debtors' estates [D.I. 1799] (the "Standing Motion"), which included a draft complaint Filed under seal.[6]  The claims asserted in the complaint primarily related to the 2002 Reorganization and included claims for (i) fraudulent transfer, (ii) breach of fiduciary duty and aiding and abetting a breach of fiduciary duty, (iii) illegal dividends, (iv) unjust enrichment, and (v) alter ego.  The draft complaint named numerous potential defendants, including International, Calfee, Halter & Griswold, corporate counsel for International, and 27 current and former officers and directors of International and SPHC.  The Initial Debtors and International Filed objections to the Standing Motion [D.I. 1880, 1881].

After the filing of the Standing Motion, the Initial Debtors offered to obtain tolling agreements for the named potential defendants and for other parties identified by the Asbestos Personal Injury Committee and the Future Claimants' Representative.  Ultimately, tolling agreements were received from all the potential defendants and other parties, and, at the Bankruptcy Court's direction, on March 27, 2012 the Initial Debtors Filed a notice [D.I. 2246] attaching executed copies of the tolling agreements.  Based on the provision of these tolling agreements, the Bankruptcy Court continued the Standing Motion.  Because certain of the tolling agreements were effective for only one year, through May 31, 2013, but subject to renewal thereafter, the Bankruptcy Court set a status conference on the Standing Motion for February 25, 2013, the primary purpose of which was to determine whether the one-year tolling agreements would be extended.  At that status conference, the Initial Debtors advised the Bankruptcy Court

---

[6]    This draft complaint was subsequently amended three times, most recently on November 4, 2013.  See D.I. 4281.

that all parties with time-limited tolling agreements had agreed to extend them, and these tolling agreements were subsequently extended through May 31, 2014.  On April 30, 2013, the Initial Debtors Filed copies of the amended tolling agreements with the Bankruptcy Court.  See D.I. 3748.  The tolling agreements for the other parties are effective until 90 days after the occurrence of certain specified events.  On April 19, 2012, the Bankruptcy Court entered an order [D.I. 2336] further continuing the Standing Motion, but subject to the right of the Asbestos Personal Injury Committee and the Future Claimants' Representative to set the Standing Motion for another hearing at any time.

On November 4, 2013, the Asbestos Personal Injury Committee and Future Claimants' Representative Filed a renewed motion for standing to prosecute certain claims on behalf of SPHC's estate [D.I. 4281] (the "Renewed Standing Motion"), which included a revised draft complaint Filed under seal.  The Initial Debtors and International each Filed a limited objection to the Renewed Standing Motion.  At a hearing held on November 13, 2013, the Bankruptcy Court granted the Renewed Standing Motion, and an order was subsequently entered to that effect.  Accordingly, the Asbestos Personal Injury Committee and the Future Claimants' Representative were authorized to commence this estate litigation against International and others named in the complaint made part of the Renewed Standing Motion.  As of the date hereof, the Asbestos Personal Injury Committee and the Future Claimants' Representative have not Filed the complaint.  In accordance with the Term Sheet with the SPHC Parties, the Parties have agreed that prosecution of the estate litigation is adjourned.  However, to be treated as a SPHC Protected Party, each Entity that previously executed a tolling agreement must, if necessary to extend such tolling agreement through the Effective Date, amend its tolling agreement in a manner reasonably acceptable to the Parties to provide for an extension of the tolling period through 30 days after the termination of the Term Sheet or the occurrence of the Effective Date.  Pursuant to the Plan, all claims of the Initial Debtors' Estates, including the claims identified in the draft complaints, against the SPHC Released Parties are deemed settled, released and extinguished.

### N.    Resolution of the Reorganization Cases and Fairness of Settlement of Dispute Regarding Asbestos Personal Injury Claims

In late July 2014, the Debtors and International reached agreement with the Asbestos Personal Injury Committee and the Future Claimants' Representative and others to resolve all Asbestos Personal Injury Claims, settle all disputes in connection with the Estimation Decision and to cooperate in the confirmation of the Plan.  In particular, on July 26, 2014, the Initial Debtors, Republic and International entered into a settlement term sheet with (i) the Asbestos Personal Injury Committee, both in its capacity as the official asbestos claimants' committee in the Initial Debtors' bankruptcy cases and in its capacity as the ad hoc asbestos claimants' committee selected for the purpose of negotiating a pre-packaged or pre-negotiated plan of reorganization for Republic, (ii) counsel for each member of the Asbestos Personal Injury Committee, both in their capacity as counsel for members of the Asbestos Personal Injury Committee and as counsel for the members of the ad hoc asbestos claimants' committee for Republic, and (iii) the Future Claimants' Representative, both in his capacity as the Future Claimants' Representative in the Initial Debtors' bankruptcy cases and in his capacity as the future claimants' representative selected by Republic and ad hoc asbestos claimants' committee, setting forth the parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future asbestos personal injury claims related to the Initial Debtors and Republic.  On the same date, International and NMBFiL entered into a settlement term sheet with (i) an ad hoc committee of law firms representing asbestos claimants that have pursued and presently are pursuing claims against NMBFiL and (ii) the Future Claimants' Representative, in his capacity as the future claimants' representative selected by NMBFiL and the ad hoc committee, setting forth the parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future asbestos personal injury claims related to NMBFiL.  The Term Sheets provide that they will be implemented through the Plan, which incorporates their terms.  For a description of the terms of the Term Sheets that have been incorporated into the Plan, see Section I.

The Debtors, the Asbestos Personal Injury Committee and the Future Claimants' Representative believe that the resolution set forth in the Term Sheets is fair and reasonable and, as a result, holders of Asbestos Personal Injury Claims should vote to accept (i.e., vote in favor of) the Plan that incorporates the resolution.  The Debtors on the one hand and the Asbestos Personal Injury Committee and the Asbestos Futures Representative on the other have differing opinions regarding the extent of the Debtors' liability for Asbestos Personal Injury Claims.  The Debtors believe, for a variety of reasons, that their liability is materially less than the amount they have agreed to pay pursuant to the Term Sheets.  The Asbestos Personal Injury Committee and the Future Claimants' Representative, by contrast, believe that the extent of the Debtors' liability for Asbestos Personal Injury Claims is

materially more than the amount they have agreed to accept pursuant to the Term Sheets.  The dispute was, and absent the resolution would continue to be, subject to costly litigation that is anticipated to continue for a substantial additional period of time.  Both sides, with the assistance of financial and legal advisors, have fully considered the litigation risks, uncertainties, and costs of further litigation, and concluded that the resolution reflected in the Term Sheets is a fair and appropriate resolution of the dispute.  Among other things, the settlement makes available to holders of Asbestos Personal Injury Claims a substantial fund of money from which such claims can promptly, efficiently, and fairly be paid, and enables the Debtors, International, and others to be permanently relieved from the continuing cost and distraction of ongoing litigation of this legacy liability.

### O.      Motion to Pay Creditors of Republic

On September 9, 2014, Republic Filed a motion seeking authority to pay all liquidated, noncontingent and undisputed prepetition claims other than asbestos personal injury claims of third party creditors as they become due in the ordinary course of business in an aggregate amount not to exceed $1.2 million [D.I. 4951].  The Bankruptcy Court granted this motion on September 25, 2014 [D.I. 5018].

## V.      RISK FACTORS

Prior to voting on the Plan, holders of Asbestos Personal Injury Claims in Classes 4a and 4b, as well as entities in non-voting Classes, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Section IX for a discussion of tax law considerations.

### A.      Plan Confirmation

There is no guarantee that that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the Debtors will remain in chapter 11, the amount of the Debtors' present and future asbestos personal injury liabilities will be unresolved and the terms and timing of any plan of reorganization ultimately confirmed in the Reorganization Cases and the treatment of Claims and Interest will be unknown.

### B.      The Effective Date May Not Occur

The Plan provides that there are several conditions precedent to the occurrence of the Effective Date. There is no guarantee as to the timing of the Effective Date.  Additionally, if the conditions precedent to the Effective Date are not satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  In that event, the Plan would be deemed null and void and the Debtors or any other party may propose or solicit votes on an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan.

### C.      Recoveries on Asbestos Personal Injury Claims Are Subject To Risks Associated With the Businesses of the Obligors Under the SPHC Payment Note

The SPHC Payment Note obligates one or more of the Debtors and International to make payments to the Asbestos Personal Injury Trust over a four year period.  Although the SPHC Payment Note may be transferred by the Asbestos Personal Injury Trust, there is no established trading market for the SPHC Payment Note, which means there are uncertainties regarding the price or terms on which the Asbestos Personal Injury Trust could dispose of the notes even with the required consents.  In addition, the businesses of the obligors on the SPHC Payment Note are subject to the following risks:

1.      The operations of International, Reorganized SPHC and Reorganized Republic may be adversely affected by global market and economic conditions.

2.      Global economic and capital market conditions may cause access to capital to be more difficult and/or costs to secure such capital to be more expensive in the future.

3.        Volatility in the equity markets or interest rates could substantially increase pension costs and required pension contributions.

4.        The results of annual testing of goodwill and other intangible assets could require that International incur non-cash impairment charges.

5.        International's indebtedness could have a material adverse impact on its business and the business of SPHC or Republic.

6.        Fluctuations in the supply and prices of raw materials may negatively impact the financial results of International, Reorganized SPHC or Reorganized Republic.

7.        The markets in which International, Reorganized SPHC and Reorganized Republic operate are highly competitive and some of their competitors are much larger than they are and have greater financial resources than they do.

8.        International, Reorganized SPHC and Reorganized Republic depend on a number of large customers for a significant portion of their net sales and, accordingly, significant declines in the level of purchases by any of these key customers could harm their businesses.

9.        Many customers of International, Reorganized SPHC and Reorganized Republic operate in cyclical industries, and downward economic cycles could have a material adverse effect on their businesses.

10.        A loss in the actual or perceived value of the brands of International, Reorganized SPHC and Reorganized Republic could limit or reduce the demand for their products.

11.        The businesses and financial condition of International, Reorganized SPHC and Reorganized Republic could be adversely affected if they are unable to protect their material trademarks and other proprietary information.

12.        The chemical and construction products industries in which International, Reorganized SPHC and Reorganized Republic operate expose them to inherent risks of legal and warranty claims and other litigation-related costs, which could adversely impact their businesses.

13.        Compliance with environmental laws and regulations could subject International, Reorganized SPHC and Reorganized Republic to unforeseen future expenditures or liabilities, which could have a material adverse impact on their businesses.

14.        The businesses of International, Reorganized SPHC and Reorganized Republic are subject to extensive environmental and safety laws and regulations that may restrict or adversely impact their ability to conduct their businesses.

15.        If efforts of International and Reorganized SPHC in acquiring and integrating other companies or product lines or establishing joint ventures fail, their businesses may not grow.

16.        International and Reorganized SPHC derive a significant amount of their revenues from foreign markets, which subject them to additional business risks that could adversely affect their results of operations.

17.        International and Reorganized SPHC could be adversely affected by violations of the U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws.

18.        The operations of International and Reorganized SPHC are subject to the effect of global tax law changes, some of which have been, and may be in the future, retroactive in application.

19.     International, Reorganized SPHC and Reorganized Republic could be adversely affected by failure to comply with federal, state and local government procurement regulations and requirements.

20.     Terrorist activities and other acts of violence or war, natural disasters and other disruptions have negatively impacted in the past and could negatively impact in the future the countries and industries in which International, SPHC and Republic compete, the financial markets through which they access capital and their operations and profitability.

21.     The insurance maintained by International, Reorganized SPHC and Reorganized Republic may not cover every potential risk associated with their operations.

22.     Adverse weather conditions may reduce the demand for some of the products offered by International, Reorganized SPHC and Reorganized Republic and could have a negative effect on their sales.

Additional information regarding these and other relevant risks is contained in International's Annual Report on Form 10-K for the fiscal year ended May 31, 2014, which is available on International's Internet website at www.rpminc.com or may be found on the Internet website of the SEC at www.sec.gov.

## VI.    REORGANIZED DEBTORS

### A.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein (and subject to the Restructuring Transactions provisions of Section IV.B. of the Plan), each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate or other legal Entity, with all the powers of a corporation or other legal Entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.  Except as otherwise provided herein (and subject to the Restructuring Transactions provisions of Section IV.B. of the Plan), as of the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtor, free and clear of all Claims, Encumbrances and Interests.  On and after the Effective Date, each Reorganized Debtor may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees and expenses relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

### B.    Restructuring Transactions

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may take such actions as the Debtors or Reorganized Debtors determine to be necessary or appropriate to effectuate, implement and consummate the Restructuring Transactions, including without limitation the Restructuring Transactions set forth on Exhibit IV.B of the Plan; provided, however, that no Restructuring Transactions other than the Restructuring Transactions set forth on Exhibit IV.B of the Plan shall be implemented prior to the Effective Date without the written consent of the Asbestos Personal Injury Committee and the Future Claimants' Representative, which consent shall not be unreasonably withheld.  The actions to effectuate, implement and consummate the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents that carry out the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (2) the filing of appropriate instruments pursuant to applicable state law.

C.    **Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action**

1.    **Certificates of Incorporation and By-Laws of the Reorganized Debtors**

As of the Effective Date, the Certificate of Incorporation and the By-Laws of each Reorganized Debtor will be in such form as the Debtors may determine.  The initial Certificates of Incorporation and By-Laws of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, each such Entity shall be permitted to amend and restate its Certificates of Incorporation or By-Laws pursuant to applicable state law and the terms and conditions of such constituent documents.

2.    **Directors and Officers of the Reorganized Debtors**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial directors and officers of each Reorganized Debtor shall be the directors and officers of such Debtor immediately prior to the Effective Date.  Each such director and officer shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the Certificate of Incorporation and By-Laws of the relevant Reorganized Debtor (as the same may be amended after the Effective Date) and applicable state law.

3.    **Employee Arrangements of the Reorganized Debtors**

As of the Effective Date, the Reorganized Debtors shall be authorized to:  (a) maintain, amend or revise existing employment, indemnification and other arrangements with their active and retired directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification and other arrangements with active and retired directors, officers and employees; all as determined by the board of directors of the applicable Reorganized Debtor.

4.    **Corporate Action**

Pursuant to section 1142 of the Bankruptcy Code, section 303 of the Delaware General Corporation Law and section 1701.75 of the Ohio General Corporation Law, the following (which shall occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) shall be authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or by any other Entity:  (a) the initial Certificates of Incorporation and By-Laws of the Reorganized Debtors; (b) the initial directors and officers of the Reorganized Debtors; (c) the Distribution of cash pursuant to the Plan; (d) the creation of the Asbestos Personal Injury Trust and the funding thereof; (e) other corporate actions that are necessary or appropriate to effectuate, implement and consummate the provisions of the Plan, including the Restructuring Transactions provisions of Section IV.B. of the Plan; and (f) the adoption, execution, delivery and performance of all contracts, instruments, releases and other agreements and documents related to any of the foregoing (including the Asbestos Personal Injury Trust Agreement, the SPHC Payment Note and the NMBFiL Payment Note).

D.    **Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

Each officer of each Debtor and Reorganized Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary or appropriate to effect and implement the provisions of the Plan.  The secretary or any assistant secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax or similar Tax:  (1) the creation of any Encumbrances; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the execution and implementation of the Asbestos Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust and any transfers to or by the Asbestos Personal Injury Trust; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with

the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing pursuant to the Plan.

## VII.   DISTRIBUTIONS UNDER THE PLAN

### A.   Payment of Administrative Claims

#### 1.   Administrative Claims in General

Except as specified in this Section III.A.1. of the Plan, and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

#### 2.   Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined at the Confirmation Hearing by the Bankruptcy Court or the District Court, as applicable, shall be paid in cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

#### 3.   Ordinary Course Liabilities

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Trade Claims, any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof commencing after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan) shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims or further approval of the Bankruptcy Court.

#### 4.   DIP Facility Claims

Unless otherwise agreed by the DIP Lender, on or before the Effective Date, (i) Allowed DIP Facility Claims shall be paid in full in cash by the applicable Debtor, (ii) the DIP Lender shall (A) receive cancellation without draw of all outstanding letters of credit issued under the DIP Credit Agreement or (B) have such letters of credit extended, refinanced or replaced in the ordinary course of business on or after the Effective Date and (iii) the DIP Lender shall have no further obligation to pay or otherwise fund any Professional fees or disbursements or any Carve-Out Expenses (as such term is defined in the Final Order (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status (B) Modifying the Automatic Stay and (C) Authorizing Debtors to Enter into Agreements with Wachovia Capital Finance Corporation (New England) [D.I. 156]).  The Debtors shall be authorized to take any action necessary or appropriate to cancel, extend, refinance or replace the DIP Credit Agreement.

#### 5.   Bar Dates for Administrative Claims

##### a.   General Bar Date Provisions

Except as otherwise provided in Section III.A.1.e.ii. of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors, pursuant to the procedures

specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 60 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by 120 days after the Effective Date.

### b. Bar Dates for Certain Administrative Claims

#### (1) Professional Compensation

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than 90 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order. A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application. Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) 80 days after the Effective Date or (2) 30 days after the Filing of the applicable Final Fee Application. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims. Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

#### (2) Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Trade Claims, any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes (including Tax audit Claims relating to Tax years or portions thereof commencing after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan, shall not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c. of the Plan.

#### (3) DIP Facility Claims

Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such Claims. Such Claims are allowed in the amount agreed upon between the Debtors and the DIP Lender and shall be satisfied pursuant to Section III.A.1.d. of the Plan.

### B. Payment of Priority Tax Claims

#### 1. Priority Tax Claims in General

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full of the allowed amount of the Priority Tax Claim plus Postpetition Interest, if any, on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

2.      **Other Provisions Concerning Treatment of Priority Tax Claims**

Notwithstanding the provisions of Section III.A.2.a. of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and the holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

C.      **Obtaining Cash for Plan Distributions**

All cash payments to be made pursuant to the Plan shall be funded by the applicable Reorganized Debtor. All cash necessary for a Reorganized Debtor to fund such cash payments pursuant to the Plan shall be obtained through a combination of one or more of the following: (1) such Reorganized Debtor's cash balances and cash generated by the operations of such Reorganized Debtor; (2) any Tax refunds actually received by such Reorganized Debtor; (3) contributions to or on behalf of such Reorganized Debtor by International; or (4) such other means of financing or funding as determined by the board of directors of such Reorganized Debtor.

D.      **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan (including with respect to Asbestos Personal Injury Claims), Distributions to be made on the Effective Date to holders of Claims that are Allowed Claims as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 60 days after the Effective Date or (2) such later date when the applicable conditions of Section V.B. of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section VI.D.2. of the Plan (regarding undeliverable Distributions) or Section VI.G.3. of the Plan (regarding compliance with Tax requirements) are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made pursuant to Section VI.G.2. of the Plan.  Any Claim that is disallowed by order of the Bankruptcy Court (or the District Court) prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the necessity for further Bankruptcy Court approval and the holder of any such Claim shall not be entitled to any Distribution under the Plan.

E.      **Method of Distributions to Holders of Claims**

The Reorganized Debtors or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion shall make all Distributions of cash and other instruments or documents required under the Plan.  Each Disbursing Agent shall serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan.

F.      **Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan shall receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments shall be made on terms agreed to with the Reorganized Debtors and shall not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent.

G.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.      **Delivery of Distributions**

Except for Asbestos Personal Injury Claims, Distributions to holders of Allowed Claims shall be made by a Disbursing Agent (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related

proof of Claim; or (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

2.      **Undeliverable Distributions Held by Disbursing Agents**

a.      **Holding and Investment of Undeliverable Distributions**

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions shall be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address. Undeliverable Distributions shall remain in the possession of the applicable Disbursing Agent pursuant to Section VI.D.2.a. of the Plan until such time as a Distribution becomes deliverable. Undeliverable cash shall be held in segregated bank accounts in the name of the applicable Disbursing Agent for the benefit of the potential claimants of such funds. Any Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtors' investment and deposit guidelines.

b.      **After Distributions Become Deliverable**

On each Quarterly Distribution Date, the applicable Disbursing Agents shall make all Distributions that become deliverable to holders of Allowed Claims (other than Asbestos Personal Injury Claims) during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.

c.      **Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (i) the Effective Date and (ii) the last date on which a Distribution was attempted to be made to such holder shall have its claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property. Unclaimed Distributions shall become property of the respective Reorganized Debtor, free of any restrictions thereon, including the right of any state or other government to escheat such property, and any such Distributions held by a Third Party Disbursing Agent shall be returned to the applicable Reorganized Debtor. Nothing contained in the Plan shall require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

H.      **Distribution Record Date**

1.      **No Recognition of Transfers after the Distribution Record Date**

A Disbursing Agent shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

2.      **Treatment of Certain Transfers**

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

I.      **Means of Cash Payments**

Except as otherwise specified herein, cash payments made pursuant to the Plan to holders of Claims shall be in U.S. currency by checks drawn on a domestic bank selected by the Reorganized Debtors or International, as applicable, or, at the option of the Reorganized Debtors or International, as applicable, by wire transfer from a

domestic bank; provided, however, that cash payments to foreign holders of Allowed Claims may be made, at the option of the Reorganized Debtors or International, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### J.    Timing and Calculation of Amounts to Be Distributed

#### 1.    Timing of Distributions Under the Plan

Except with respect to the SPHC Initial Payment and the NMBFiL Initial Payment, which shall be made on the Effective Date, any Distribution to be made by any Debtor or Reorganized Debtor pursuant to the Plan shall be deemed to have been timely made if made within 60 days after the time therefor specified in the Plan.  Except as otherwise provided in the Plan, no interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

#### 2.    Allowed Claims

On the Effective Date, each holder of an Allowed Claim (other than an Asbestos Personal Injury Claim) shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class. On each Quarterly Distribution Date, Distributions also shall be made pursuant to Section VII.C. of the Plan to holders of Disputed Claims in any such Class that were allowed during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such quarterly Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

#### 3.    Compliance with Tax Requirements

##### a.    Withholding and Reporting

In connection with the Plan, to the extent applicable, each Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision of the Plan to the contrary, each Disbursing Agent shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any cash Distribution to be made under the Plan to pay applicable Tax withholding, requiring Claim holders to submit appropriate certifications or establishing other mechanisms such Disbursing Agent believes are reasonable and appropriate.  To the extent that any Claim holder fails to submit appropriate certifications required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with Tax withholding requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section VI.D.2. of the Plan.

##### b.    Backup Withholding

Without limiting the generality of the foregoing, in accordance with the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Among other things, to receive any post-petition interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.  Non-U.S. holders of Allowed Claims may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form), to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan. Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of post-petition

interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

### c.    Obligations of Distribution Recipients

Notwithstanding any other provision of the Plan, each Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other Tax obligations.

### 4.    Compliance with Domestic Relations Orders

In connection with the Plan, each Disbursing Agent may allocate and make Distributions in compliance with applicable wage garnishment, alimony, child support, and similar domestic relations orders.

### K.    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claim, right or cause of action that the Debtor or Reorganized Debtor may possess against such a Claim holder.

### L.    Allocation of Payments

Amounts paid to holders of Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess being allocated to accrued but unpaid interest on such Claims.

### M.    Prosecution of Objections to Claims

### 1.    Objections to Claims

Objections to Claims (other than Asbestos Personal Injury Claims) must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections shall be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection has not been Filed to a proof of Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or Schedules relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier.

### 2.    Authority to Prosecute Objections

After the Effective Date, the Reorganized Debtors shall have the authority to File (if applicable), settle, compromise, withdraw or litigate to judgment objections to all Claims (other than Asbestos Personal Injury Claims), including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court. After the Effective Date, the Reorganized Debtors may settle, compromise or otherwise resolve any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

### 3.    Authority to Amend Schedules

The Debtors or the Reorganized Debtors shall have the authority to amend the Schedules with respect to any Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.

If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtor shall provide the holder of such Claim with notice of such amendment and such holder shall have 20 days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the Debtor or Reorganized Debtor may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

N.    **Treatment of Disputed Claims**

Notwithstanding any other provisions of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

O.    **Distributions on Account of Disputed Claims Once Allowed**

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.

P.    **Enforcement of Bar Date Order**

In accordance with the Bar Date Order and section 502(b)(9) of the Bankruptcy Code, any Entity that failed to File a proof of Claim by the applicable Bar Date or was not otherwise permitted to File a proof of Claim after the applicable Bar Date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim (other than an Asbestos Personal Injury Claim) against the Debtors (i) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such Entity as undisputed, noncontingent and liquidated; or (ii) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.  All Claims Filed after the applicable Bar Date and for which no Final Order has been entered by the Bankruptcy Court determining that such Claims were timely Filed shall be disallowed and expunged.  Any Distribution on account of such Claims shall be limited to the amount, if any, listed in the applicable Schedules as undisputed, noncontingent and liquidated.

Q.    **Preservation of Rights of Action; Settlement of Claims and Releases**

1.    **Preservation of Rights of Action by the Debtors and the Reorganized Debtors**

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtors shall retain and may enforce, and shall have the sole right to enforce, any claims, demands, rights and causes of action that any Debtor or Estate may hold against any Entity, including any Recovery Actions.  The Reorganized Debtors or their successors may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors holding such claims, demands, rights or causes of action.  Further, the Reorganized Debtors retain their right to File and pursue, and shall have the sole right to File and pursue, any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor.  A nonexclusive schedule of currently pending actions and claims brought by one or more of the Debtors is attached as Exhibit IV.J.1 to the Plan.  In accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any right of action or claim on Exhibit IV.J.1 shall not be deemed an admission, denial or waiver of any claims, demands, rights or causes of action that any Debtor or Estate may hold against any Entity.

2.    **Settlement of Certain Estate Claims**

a.    Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the SPHC Released Parties that are or would have been property of any of the SPHC Parties' Estates or could have been brought by any of the SPHC Parties' Estates, including without limitation Recovery Actions and any claims based upon a legal or

equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud or conspiracy, except for Intercompany Claims, shall be deemed settled, released and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the SPHC Parties, the Reorganized SPHC Parties and their respective Claim and Interest holders and is fair, equitable and reasonable.

b.        Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the NMBFiL Protected Parties that are or would have been property of NMBFiL's Estate or could have been brought by NMBFiL's Estate, including without limitation Recovery Actions and any claims based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud or conspiracy, except for Intercompany Claims, shall be deemed settled, released and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of NMBFiL, Reorganized NMBFiL and their respective Claim and Interest holders and is fair, equitable and reasonable.

c.        Pursuant to Bankruptcy Rule 9019 and in consideration for the Releases and other benefits provided under the Plan, any and all claims against the holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the SPHC Parties, International, or any predecessor or affiliate of the SPHC Parties or International prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), that are or would have been property of any of the SPHC Parties' Estates or could have been brought by any of the SPHC Parties' Estates or any SPHC Protected Party, including without limitation Recovery Actions, and any claims based upon a legal or equitable theory of liability, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the SPHC Parties, International or any predecessor or affiliate of the SPHC Parties or International prior to Petition Date, shall be deemed settled, released and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the SPHC Parties, the Reorganized SPHC Parties and their respective Claim and Interest holders and is fair, equitable and reasonable.

3.        **Releases**

a.        **General Releases of Debtors and Reorganized Debtors**

**Except as otherwise expressly set forth in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors are released from all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date.**

b.        **Release by the Debtors, Reorganized Debtors and International**

**Without limiting any other provision of the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against each of the present and former directors,**

officers, employees, attorneys, accountants, underwriters, investment bankers, financial advisors, appraisers, representatives and agents of the Debtors, and the DIP Lender, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date and in any way relating to, the Reorganization Cases or the Plan, except for the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

Without limiting any other provision of the Plan, as of the Effective Date, the SPHC Parties, the Reorganized SPHC Parties and International, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the SPHC Parties, International, or any predecessor or affiliate of the SPHC Parties or International prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), including without limitation Recovery Actions, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the SPHC Parties, International or any predecessor or affiliate of the SPHC Parties or International prior to Petition Date.

### c. General Releases by Holders of Claims or Interests

Without limiting any other provision of the Plan or the Bankruptcy Code, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors and the Reorganized Debtors under the Plan, each holder of a Claim or Interest that votes in favor of the Plan or is deemed to accept the Plan shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against any of the Parties or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, underwriters, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date and in any way relating to the Reorganization Cases or the Plan (which release shall be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code).

Notwithstanding any provision of the Plan to the contrary, any non-asbestos-related indemnity obligations owed by International to 3M Company, pursuant to the asset purchase agreement dated November 2, 2007 among Bondo Corporation, International, 3M Company and 3M Innovative Properties Company, shall not be released but shall remain in full force and effect after the Effective Date of the Plan.

Notwithstanding any provision of the Plan to the contrary, no provision of the Plan or the Confirmation Order shall (i) modify or affect any pension plan covered by Title IV of the Employment Retirement Income Security Act of 1974, as amended, or (ii) discharge, release, waive or affect the liabilities or responsibilities of any party with respect thereto, except that claims with respect to the pension plans that arise against the Debtors on or before confirmation of the Plan shall be discharged in accordance with the terms of the Plan and the Confirmation Order.  Except with respect to discharged claims as described in the previous sentence, the pension plans and the Pension Benefit Guaranty Corporation shall not be enjoined or precluded from enforcing such liabilities or responsibilities as a result of any provision of the Plan or the Confirmation Order.

d.      **Injunction Related to Releases**

**As further provided in Section IX.B.1.b. of the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan.**

R.      **Release of Encumbrances**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, all Encumbrances against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such Encumbrances, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

S.      **Compliance with QSF Regulations**

The Debtors and the Reorganized Debtors shall take all actions required of them as "transferor," and the Asbestos Personal Injury Trustees shall take all actions required of them as "administrator," pursuant to Treasury Regulations promulgated under section 468B of the IRC.  Pursuant to such Treasury Regulations, the Asbestos Personal Injury Trustees as "administrator" shall be responsible for all tax reporting and withholding requirements in respect of distributions made from the Asbestos Personal Injury Trust.

T.      **Discharge, Injunction and Subordination Rights**

1.      **Discharge of Claims**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims, including any Asbestos Personal Injury Claims (other than Demands) and including any interest accrued on Claims from the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Effective Date, discharge the Debtors from all Claims or other liabilities that arose on or before the Effective Date and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code, or (c) the holder of a Claim based on such debt has accepted the Plan.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of a discharge of all Claims, including any Asbestos Personal Injury Claims (other than Demands), and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim, debt or liability.

2.      **Injunctions**

a.      **General Injunctions**

(1)      **No Actions on Account of Discharged Claims**

**Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability:  (i) commencing or continuing in any manner any action or other proceeding against any Debtor or Reorganized Debtor, or any of its property, other than to enforce any right**

to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any Debtor or Reorganized Debtor, or any of its property, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance against any Debtor or Reorganized Debtor, or any of its property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

(2)    No Actions on Account of Released Claims

As of the Effective Date, all Entities that have held, currently hold or may hold any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of the following actions against any released Entity, or any of its property, on account of such released claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

(3)    Recipients of Distribution Deemed to Consent

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section IX.B. of the Plan.

b.    SPHC Asbestos Permanent Channeling Injunction

Pursuant to section 524(g) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any SPHC Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any SPHC Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related SPHC Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following:

1.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any SPHC Protected Party or any property or interests in property of any SPHC Protected Party;

2.    enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any SPHC Protected Party or any property or interests in property of any SPHC Protected Party;

3.    creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any SPHC Protected Party or any property or interests in property of any SPHC Protected Party;

4.    setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any SPHC Protected Party or any property or interests in property of any SPHC Protected Party; and

5.        proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Personal Injury Trust Documents, except in compliance therewith.

### c.        NMBFiL Asbestos Permanent Channeling Injunction

Pursuant to section 524(g) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any NMBFiL Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any NMBFiL Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related NMBFiL Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following:

1.        commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any NMBFiL Protected Party or any property or interests in property of any NMBFiL Protected Party;

2.        enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any NMBFiL Protected Party or any property or interests in property of any NMBFiL Protected Party;

3.        creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any NMBFiL Protected Party or any property or interests in property of any NMBFiL Protected Party;

4.        setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any NMBFiL Protected Party or any property or interests in property of any NMBFiL Protected Party; and

5.        proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Personal Injury Trust, except in conformity and compliance therewith.

### 3.        Subordination Rights

The classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

## VIII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Executory Contracts and Unexpired Leases to Be Assumed

#### 1.    Assumption Generally

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, including the Restructuring Transactions provisions of Section IV.B. of the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall assume each of its respective Executory Contracts and Unexpired Leases other than those listed on Exhibit V.C to the Plan; provided, however, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit V.C to the Plan to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to Exhibit V.C to the Plan, thus providing for its rejection pursuant to Section V.A.1. of the Plan.  The

Debtors shall provide notice of any amendments to Exhibit V.C to the Plan to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases.  Nothing herein shall constitute an admission by a Debtor or Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

### 2.    Assumptions of Executory Contracts and Unexpired Leases

Each Executory Contract or Unexpired Lease assumed under Section V.A.1. of the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.

### 3.    Approval of Assumptions and Assumption Procedures

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section V.A.1. of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The appropriate procedures for assumption of an Executory Contract or Unexpired Lease are as follows:

(a)    After the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

(b)    Any Entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section V.A.3.a. of the Plan.

(c)    If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease:  (i) the proposed assumption of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtors in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

(d)    If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

(e)    If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection:  (i) the Debtors or Reorganized Debtors may File a reply to such objection no later than 30 days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtors or Reorganized Debtors, as applicable, may designate the Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section V.C. of the Plan and amend Exhibit V.C of the Plan accordingly.

### B.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to

section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or Reorganized Debtor assuming such contract or lease or the assignee of such Debtor or Reorganized Debtor, if any:  (1) by payment of the Cure Amount Claim in cash on the Effective Date or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest.  If there is a dispute regarding:  (1) the amount of any Cure Amount Claim; (2) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  For assumptions of Executory Contracts or Unexpired Leases between Debtors, the Reorganized Debtor assuming such contract may cure any monetary default (1) by treating such amount as either a direct or indirect contribution to capital or Distribution (as appropriate) or (2) through an intercompany account balance in lieu of payment in cash.

C.       **Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures**

On the Effective Date, each Executory Contract and Unexpired Lease listed on Exhibit V.C to the Plan shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract and lease listed on Exhibit V.C to the Plan shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit V.C to the Plan shall not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The appropriate procedures for rejection of an Executory Contract or Unexpired Lease are as follows:

1.       After the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such proposed rejection.

2.       Any Entity wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section V.C.1. of the Plan.

3.       If no objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

4.       If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

5.       If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection, the Debtors or Reorganized Debtors, as applicable, may File a reply to such objection no later than 30 days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

D.       **Obligations to Indemnify Directors, Officers and Employees**

The obligations of each Debtor or Reorganized Debtor to indemnify any individual serving as one of its directors, officers or employees prior to or following the Petition Date by reason of such individual's prior or future service in such a capacity or as a director, officer or employee of any Debtor or other Entity, to the extent provided in the applicable Certificates of Incorporation or By-Laws, by statutory law or by written agreement, policies or procedures of or with such Debtor, shall be deemed and treated as executory contracts that are assumed by the

applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

      E.      **Contracts and Leases Entered Into After the Petition Date**

Notwithstanding any other provision of the Plan, and subject to the Restructuring Transactions provisions of Section IV.B. of the Plan, contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business.  Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

## IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

      A.      **General**

**A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN.  NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.**

**THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS HOLDERS OF CLAIMS OR INTERESTS THAT ARE NOT ENTITLED TO VOTE ON THE PLAN.  IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.**

**FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

      B.      **U.S. Federal Income Tax Consequences to the Debtors**

      1.      **Cancellation of Debt Income**

Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income, which must be included in the debtor's income.  However, if a

discharged liability would be deductible by a debtor upon payment, the discharge does not give rise to COD income. The only liabilities of the Debtors to be discharged pursuant to the Plan are asbestos liabilities, which should be deductible by the Debtors upon payment to the Asbestos Personal Injury Trust.  Accordingly, the discharge should not create any COD income.

**2.        Transfers of Cash to the Asbestos Personal Injury Trust**

The $447.5 million cash to be paid on account of SPHC Asbestos Personal Injury Claims by SPHC, Republic and/or Bondex, and/or by International on behalf of and as a contribution to the SPHC Parties, and the $2.45 million cash to be paid on account of the NMBFiL Asbestos Personal Injury Claims by NMBFiL, and/or International on behalf of and as a contribution to NMBFiL, should be treated as "economic performance" (as required by section 461(h) of the IRC) with respect to the SPHC Asbestos Personal Injury Claims and the NMBFiL Asbestos Personal Injury Claims, respectively, and, accordingly, should be taken into account as a deduction, to the extent not previously taken into account, by the Debtors, as applicable, at the time such cash is paid to the extent that the "all events test" (described in section 461(h)(1) of the IRC) has otherwise been met.  The Asbestos Personal Injury Trust will not have taxable income on receipt of such cash and will not be entitled to deduct payments to claimants as such payments are made.  Future payments on the SPHC Payment Note and the NMBFiL Payment Note should be treated as deductible by the Debtors (including payment made by International as a contribution to the Debtors), as applicable, at the time of such payment unless "economic performance" and the "all events test" are deemed to have been met before then.

**3.        Other Federal Income Tax Consequences**

Other federal income tax consequences to the Debtors may result depending on the terms of the Restructuring Transactions or cancellation of Intercompany Claims that occur with respect to the Debtors.

**C.        U.S. Federal Income Tax Consequences to Holders of Asbestos Claims**

To the extent that payments from the Asbestos Personal Injury Trust to holders of Asbestos Personal Injury Claims in Classes 4a and 4b represent damages on account of personal physical injuries or sickness of such holders, such holders should not recognize gross income under section 104 of the IRC, except to the extent that such payments are attributable to medical expense deductions allowed under section 213 of the IRC for a prior taxable year.

**D.        Information Reporting and Backup Withholding**

As described above in Section VII.J.3., all distributions under the Plan shall be subject to applicable federal income tax withholding and reporting.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**X.        ADDITIONAL INFORMATION**

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  The Debtors will File all Exhibits to the Plan with the Bankruptcy Court that are currently not attached as Exhibits to the Plan and

make them available for review on the website of Logan at http://www.loganandco.com no later than 10 days before the deadline to vote on the Plan.  The Debtors also will serve these supplemental Exhibits to the Plan on the parties on the general service list maintained in the Reorganization Cases no later than 10 days before the deadline to vote on the Plan.  Further, all of the Exhibits may be obtained from the copy services identified in the notice of the Confirmation Hearing.

## XI.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of Asbestos Personal Injury Claims in Classes 4a and 4b, the only Classes entitled to vote on the Plan, to vote to accept (i.e., vote in favor of) the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the deadline to vote on the Plan.

Date:  October 20, 2014

COUNSEL:

DANIEL J. DEFRANCESCHI (DE 2732)
PAUL N. HEATH (DE 3704)
ZACHARY I. SHAPIRO (DE 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

- and -

GREGORY M. GORDON (TX 08435300)
DAN B. PRIETO (TX 24048744)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939

ATTORNEYS FOR DEBTORS

Respectfully submitted,

SPECIALTY PRODUCTS HOLDING CORP. (for itself and on behalf of Bondex International, Inc.)

By:  /s/  Stephen J. Knoop
        Stephen J. Knoop
        CHAIRMAN AND CHIEF EXECUTIVE OFFICER

REPUBLIC POWDERED METALS, INC.

By:  /s/  Tracy D. Crandall
        Tracy D. Crandall
        ASSISTANT SECRETARY

NMBFiL, INC.

By:  /s/  Tracy D. Crandall
        Tracy D. Crandall
        SECRETARY