## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| SPECIALTY PRODUCTS HOLDING CORP., *et al.,*[1] | : | Case No. 10-11780 (PJW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**MEMORANDUM OF LAW OF THE DEBTORS:  (I) IN SUPPORT OF CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF SPECIALTY PRODUCTS HOLDING CORP., BONDEX INTERNATIONAL, INC., REPUBLIC POWDERED METALS, INC. AND NMBFiL, INC.; (II) REQUESTING AUTHORIZATION TO MAKE PLAN MODIFICATIONS; AND (III) REQUESTING AUTHORIZATION TO CONSUMMATE AND IMPLEMENT THE PLAN UPON ENTRY OF THE CONFIRMATION ORDER**

December 8, 2014

DANIEL J. DEFRANCESCHI (DE 2732)
PAUL N. HEATH (DE 3704)
ZACHARY I. SHAPIRO (DE 5103)
RICHARDS, LAYTON & FINGER
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
TELEPHONE: (302) 651-7700

- AND -

GREGORY M. GORDON (TX 08435300)
DAN B. PRIETO (TX 24048744)
PAUL M. GREEN (TX 24059854)
JONES DAY
2727 N. HARWOOD STREET
DALLAS, TEXAS 75201
TELEPHONE: (214) 220-3939

---

[1]    The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Specialty Products Holding Corp. (0857); Bondex International, Inc. (4125); Republic Powdered Metals, Inc. (4388); and NMBFiL, Inc. (2441).  The address of Specialty Products Holding Corp. and Bondex International, Inc. is 4515 St. Clair Avenue, Cleveland, Ohio 44103. The address of Republic Powdered Metals, Inc. and NMBFiL, Inc. is 2628 Pearl Road, Medina, Ohio 44256.

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT .................................................................. 1

II.     BACKGROUND AND OVERVIEW OF THE PLAN .................................... 2

     A.      The Debtors.................................................................................... 2

     B.      The Chapter 11 Cases .................................................................... 3

     C.      Disclosure Statement and Confirmation Hearing ............................... 13

     D.      Overview of the Treatment of Stakeholders ..................................... 13

     E.      Overwhelming Acceptance of the Plan............................................. 14

III.    MODIFICATIONS TO THE PLAN ............................................................ 14

     A.      Request for Authorization to Make Plan Modifications ....................... 14

     B.      Authority for Requested Relief....................................................... 15

IV.     THE PLAN SHOULD BE CONFIRMED ................................................... 17

     A.      The Plan Meets Each Requirement for Confirmation  Under Section 1129(a) of the Bankruptcy Code ..................................... 17

V.      THE ASSUMPTION, ASSUMPTION AND ASSIGNMENT OR  REJECTION OF THE EXECUTORY CONTRACTS AND  UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED ......................................................... 41

VI.     THE TRANSFER OF BOOKS AND RECORDS TO THE  ASBESTOS PERSONAL INJURY TRUST DOES NOT  DESTROY OR WAIVE ANY PRIVILEGES OR PROTECTIONS ................................................................... 42

VII.    THE PLAN SATISFIES THE REQUIREMENTS FOR ENTRY  OF THE ASBESTOS PERSONAL INJURY CHANNELING  INJUNCTIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE ...................................... 46

     A.      The Asbestos Personal Injury Trust Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code .................... 46

     B.      The Debtors' History, the Nature of Asbestos-Related Litigation  and the Facts of These Chapter 11 Cases Support the Findings  Required for Issuance of the Asbestos Permanent Channeling Injunctions.............................. 49

     C.      The Court May Extend the Asbestos Permanent Channeling Injunction to Third Parties.................................................................................. 55

     D.      The Court Has Appointed a Legal Representative To Protect the Rights of Persons Who Might Subsequently Assert Demands............................................. 57

     E.      Entry of the Asbestos Permanent Channeling Injunctions Is Fair and Equitable With Respect to Future Asbestos Claimants ....................................... 58

**TABLE OF CONTENTS**
(continued)

**Page**

VIII.    REQUEST FOR AUTHORITY TO CONSUMMATE AND IMPLEMENT  THE PLAN IMMEDIATELY UPON THE ENTRY OF THE CONFIRMATION ORDER NOTWITHSTANDING 14-DAY STAY OF THE CONFIRMATION ORDER IMPOSED BY OPERATION OF BANKRUPTCY RULE 3020(E) ............... 58

IX.    CONCLUSION........................................................................................................... 60

# TABLE OF AUTHORITIES

**Page**

<small>CASES</small>

Acequia, Inc. v. Clinton (In re Acequia, Inc.),
    787 F.2d 1352 (9th Cir. 1986) .......................................................................20, 22

Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.,
    25 B.R. 484 (Bankr. S.D. Ohio 1982).....................................................................42

Borman's, Inc. v. Allied Supermarkets, Inc.
    706 F.2d 187 (6th Cir. 1983) ...................................................................................42

City of Covington v. Covington Landing Ltd. P'ship,
    71 F.3d. 1221 (6th Cir. 1995) ..................................................................................41

Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.
    P'ship),
    116 F.3d 790 (5th Cir. 1997) ...................................................................................28

Group of Inst'l Investors v. Chi., M., St. P., & P.R.R. Co.,
    318 U.S. 523 (1943)..................................................................................................41

Hanson v. First Bank of S.D.,
    828 F.2d 1310 (8th Cir. 1987) .................................................................................27

In re Am. Capital Equip., LLC,
    688 F.3d 145 (3rd Cir. 2012) ...................................................................................47

In re AOV Indus.,
    31 B.R. 1005 (D.D.C. 1983), aff'd in part, rev'd in part .......................................33

In re Cellular Info. Sys., Inc.,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994)....................................................................38

In re Celotex Corp.,
    204 B.R. 586 (Bankr. M.D. Fla. 1996) ...................................................................16

In re Century Glove, Inc.,
    Civ. A. Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489 (D. Del. Feb. 10,
    1993) .........................................................................................................................28

In re Combustion Eng'g, Inc.,
   391 F.3d 190 (3rd Cir. 2004) ................................................................47

In re Crowthers McCall Pattern, Inc.,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) ....................................................33

In re Drexel Burnham Lambert Grp. Inc.,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................18, 39

In re Eagle-Picher Indus., Inc.,
   203 B.R. 256 (Bankr. S.D. Ohio 1996) .........................................17, 29, 33

In re Econ. Lodging Sys., Inc.,
   205 B.R. 862 (Bankr. N.D. Ohio 1997) ...................................................33

In re First Interregional Equity Corp.,
   218 B.R. 731 (Bankr. D.N.J. 1997) .........................................................18

In re Grand Jury Subpoenas,
   902 F.2d 244, 249 (4th Cir. 1990) ..........................................................44

In re Jersey City Med. Ctr.,
   817 F.2d 1055 (3d Cir. 1987) .................................................................18

In re Johns-Manville Corp.,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986), rev'd in part on other grounds, 78 B.R.
   407 (S.D.N.Y. 1987), aff'd, Kane v. John-Manville Corp., 843 F.2d 636 (2d
   Cir. 1988) ......................................................................................30, 38

In re Lackawanna Detective Agency, Inc.,
   82 B.R. 336 (Bankr. D. Del. 1988) .........................................................17

In re Lapworth,
   No. 97-34529DWS, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998)................24

In re Market Square Inn, Inc.,
   978 F.2d 116 (3d Cir. 1992).................................................................41

In re Martin,
   66 b.R. 921 (Bankr. D. Mont. 1986) .......................................................38

In re Mount Vernon Plaza Urban Redevelopment Corp. I,
   79 B.R. 305 (Bankr. S.D. Ohio 1987).......................................................16

In re New Valley Corp.,
    168 B.R. 73 (Bankr. D.N.J. 1994) ...........................................................................27

In re Placid Oil Co.,
    92 B.R. 183 (Bankr. N.D. Tex. 1988)......................................................................16

In re Richard Buick, Inc.,
    126 B.R. 840 (Bankr. E.D. Pa. 1991) .....................................................................17

In re Rivers End Apartments, Ltd.,
    167 B.R. 470 (Bankr. S.D. Ohio 1994)...............................................................38, 39

In re SGL Carbon Corp.,
    200 F.3d 154 (3d Cir. 1999).....................................................................................27

In re Sherwood Square Assocs.,
    107 B.R. 872 (Bankr. D. Md. 1989) .........................................................................31

In re Sound Radio, Inc.,
    93 B.R. 849 (Bankr. D.N.J. 1988), aff'd in part, remanded in part on other
    grounds, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990)........................28, 39

In re Texaco Inc.,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988).............................................................25, 32, 39

In re Toy & Sports Warehouse, Inc.,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)......................................................17, 25, 35, 39

In re Trans World Airlines, Inc.,
    185 B.R. 302 (Bankr. E.D. Mo. 1995) .....................................................................16

In re Victory Constr. Co.,
    42 B.R. 145 (Bankr. CD. Cal. 1984)........................................................................33

In re W.E. Parks Lumber Co.,
    19 B.R. 285 (Bankr. W.D. La. 1982) .......................................................................31

In re Westinghouse Elec. Corp. v. Republic of the Philippines,
    951 F.2d 1414 (3d Cir. 1991)................................................................................. 45

In re Zenith Elecs. Corp.,
    241 B.R. 92 (Bankr. D. Del. 1999) ..........................................................................27

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
    843 F.2d 636 (2d Cir. 1988) .......................................................................17, 30, 39

McCormick v. Bane One Leasing Corp. (In re McCormick),
    49 F.3d 1524 (11th Cir. 1995) .................................................................................27

NLRB v. Bildisco & Bildisco,
    465 U.S. 513 (1984).................................................................................................41

NLRB v. Bildisco & Bildisco (In re Bildisco),
    682 F.2d 72 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984)..........................................42

Nordhoff Invs., Inc. v. Zenith Elecs. Corp.,
    258 F.3d 180 (3d Cir. 2001)....................................................................................59

Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin.
    Grp.,
    285 B.R. 601 (D. Del. 2002)...................................................................................43

Official Comm. of Unsecured Creditors v. Michelson (In re Michelson),
    141 B.R. 715 (Bankr. E.D. Cal. 1992)....................................................................25

Owens-Illinois Inc. v. Rapid Am. Corp (In re The Celotex Corp.),
    124 F.3d 619 (4th Cir. 1997) ..................................................................................43

Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.),
    755 F.2d 1336 (8th Cir. 1985) ................................................................................39

Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.),
    84 B.R. 167 (B.A.P. 9th Cir. 1988).........................................................................29

Tranel v. Adams Bank & Trust Co. (In re Tranel),
    940 F.2d 1168 ..........................................................................................................33

U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,
    C.A. No. 112-N, 2005 WL 2037353 (Del. Ct. Ch. June 9, 2005) ...........................44

United States v. Doe,
    429 F.3d 450 (3d Cir. 2005)....................................................................................44

Whyte v. Williams (In re Williams),
    152 B.R. 123 (Bankr. N.D. Tex. 1992)....................................................................43

**FEDERAL STATUTES**

11 U.S.C., various sections .......................................................................... *passim*

28 U.S.C. § 1930 .................................................................................................40

**FEDERAL AND STATE RULES**

Federal Rules of Bankruptcy Procedure, various rules ........................................ *passim*

Rule 502(b) of the Delaware Uniform Rules of Evidence ..........................................44

**OTHER AUTHORITIES**

H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5962
    (1977) ............................................................................................................17

H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963
    (1977) ............................................................................................................25

S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 (1978).................17, 25

**MISCELLANEOUS**

7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1123.01[7], at 1123-15 (15th
    ed. rev. 1999) ..................................................................................................22

7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1129.03[11], at 1129-64 (15th
    ed. rev. 1999) ..................................................................................................38

The above-captioned debtors (collectively, the "Debtors") submit this Memorandum of Law: (i) in support of confirmation of the Joint Plan of Reorganization of Specialty Products Holding Corp., Bondex International, Inc., Republic Powdered Metals, Inc. and NMBFiL, Inc. (as it may be further modified, the "Plan"),[2] pursuant to section 1129 of the Bankruptcy Code, (ii) requesting authorization to make Plan modifications; and (iii) requesting a waiver of the 14-day stay of the Confirmation Order imposed by Rule 3020(e) of the Federal Rules of Bankruptcy Procedure.

## I.    PRELIMINARY STATEMENT

Since the inception of the chapter 11 cases of Specialty Products Holding Corp. ("SPHC") and Bondex International, Inc. ("Bondex" and, together with SPHC, the "Initial Debtors"), the extent of the Initial Debtors' liability for asbestos-related personal injury claims has been the subject of significant dispute between the Initial Debtors on the one side and the Asbestos Personal Injury Committee and the Future Claimants' Representative on the other. After litigation and extensive negotiations, including two rounds of mediation, the Initial Debtors, Republic Powdered Metals, Inc. ("Republic"), NMBFiL, Inc. ("NMBFiL" and, together with Republic, the "New Debtors") and their parent corporation RPM International Inc. ("International") entered into settlement term sheets (together, the "Term Sheets") with the Asbestos Personal Injury Committee, the Future Claimants' Representative and other representatives of the asbestos claimants, which settled in principle the dispute and established the basis for a full resolution of the Debtors' chapter 11 cases.

The Plan, which incorporates the settlement, has been accepted by all Classes, including in excess of 99 percent of the only voting Classes, Classes 4a (SPHC Asbestos

---

[2]    Capitalized terms not otherwise defined herein have the meanings given to such terms in the Plan.

Personal Injury Claims) and 4b (NMBFiL Asbestos Personal Injury Claims), under the Plan.

Moreover, although there are thousands of creditors, no objections have been filed with the Court

and all informal objections have been resolved.

The overwhelming acceptance of the Plan and the absence of any opposition to it

are evidence not only of the Plan's fairness but of the fact that the Plan is in the best interests of

all the Debtors' stakeholders.  As will be demonstrated below, the Plan also satisfies all

applicable requirements of the Bankruptcy Code (see Section IV below) and, thus, should be

confirmed.

## II.    BACKGROUND AND OVERVIEW OF THE PLAN

### A.    The Debtors

The Debtors are indirect, domestic subsidiaries of International.  Specialty

Products Holding Corp. is an intermediate holding company whose assets consist primarily of its

direct ownership interests in various non-debtor subsidiaries and its indirect ownership interests

in certain other domestic and foreign non-debtor subsidiaries.  SPHC's direct subsidiaries are

manufacturers, distributors and sellers of various specialty chemical product lines, including

exterior insulating finishing systems, powder coatings, fluorescent colorants and pigments,

cleaning and protection products, fuel additives, wood treatments and coatings and sealants, in

both the industrial and consumer markets.  Their family of products includes those marketed

under brand names such as CCI, Chemspec, Day-Glo, Dryvit, Guardian, Mohawk, Kop-Coat,

TCI and Valvtect.

SPHC is the direct parent of Bondex.  Although Bondex at one time manufactured

and sold various products, including joint compound, it ceased operations in 1999 and currently

has no active business operations or material assets, although on or prior to the Effective Date it

will lease a storage facility located in Medina, Ohio from International and sublease that facility to an affiliate at a profit.

Republic, which is an affiliate of SPHC, is a leader in building restoration and provides exclusive products for roof and wall restoration, including an extensive line of roof coatings.

NMBFiL, which was formerly known as Bondo Corporation, is also an affiliate of SPHC. It was a manufacturer of auto body repair products for the automotive aftermarket and various other professional and consumer applications. In November 2007, NMBFiL sold substantially all of its assets to 3M Company and currently has no active business operations, although on or prior to the Effective Date it will lease a separate storage facility located in Medina, Ohio from International and sublease that facility to an affiliate at a profit.

### B.    **The Chapter 11 Cases**

#### 1.    **Commencement of the Cases**

SPHC and Bondex filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 31, 2010. NMBFiL filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 15, 2014 and Republic filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 31, 2014.

Prior to the commencement of these cases, each of the Debtors was named as a defendant in a substantial number of asbestos personal injury lawsuits filed in a variety of state courts across the United States. In the five years prior to their chapter 11 filings, the Initial Debtors were named as defendants in thousands of asbestos-related lawsuits and incurred asbestos costs in the range of approximately $60 million to $82 million per year from fiscal years 2005 through 2009. Although the Initial Debtors believed they had strong defenses to the

asbestos claims, the increasing cost of managing and resolving this litigation led the Initial Debtors to conclude that the filing of their chapter 11 cases was necessary.

Similarly, Republic was named in over 5,000 asbestos-related claims since it received its first claim in 1990.  Many claims against Republic appear to have been the result of name confusion with SPHC, which was previously known as Republic Powdered Metals, Inc. and RPM, Inc.  Although a substantial number of the lawsuits were dismissed without payment and Republic had not settled any asbestos claims since 2005,[3] Republic was continuing to incur significant professional fees defending the lawsuits and had no insurance coverage for asbestos claims.

NMBFiL was named in more than 1,100 asbestos personal injury lawsuits filed since 1998.  Although NMBFiL did not use asbestos in the manufacture of any of its products, plaintiffs alleged that talc contained in certain of its products was contaminated with asbestos. NMBFiL was never found liable in any of these lawsuits, and it never settled an asbestos-related claim.  Nonetheless, NMBFiL has minimal insurance coverage and incurred substantial professional fees defending these claims.

In view of the cost and extent of the asbestos-related litigation and the likelihood that the litigation would continue well into the future, the New Debtors determined that a section 524(g) resolution of their current and future liability was necessary.  On July 26, 2014, the Initial Debtors, the New Debtors, and International entered into the Term Sheets setting forth the parties' agreements in principle on a consensual plan of reorganization that included each of

---

[3]     Due to a contractual obligation to Bondex, in 2011 Republic was required to satisfy Bondex's settlement, entered into in 2009, of an asbestos-related claim filed by Maria Santana.

the Debtors.  The New Debtors commenced their chapter 11 cases to effectuate the agreements

outlined in the Term Sheets and to pursue confirmation and consummation of the Plan.

2.    **Appointment of the Asbestos Personal Injury Committee and Future Claimants' Representative**

On June 10, 2010, the U.S. Trustee appointed the Asbestos Personal Injury

Committee pursuant to section 1102 of the Bankruptcy Code.  [See D.I. 75].  The Asbestos

Personal Injury Committee was reconstituted by the U.S. Trustee on October 18, 2010 [D.I. 457],

December 14, 2010 [D.I. 666] and again on October 22, 2014 [D.I. 5115].  The members as of

the date of the Plan are:  Myron Butler, c/o James L. Ferraro, The Ferraro Law Firm, P.A.;

Deborah Papaneri as representative for the Estate of Charles Papaneri, c/o Robert B. Paul, Paul

Reicht & Myers, P.C.; James L. Mongolluzzo, c/o Bruce E. Mattock, Goldberg, Persky & White,

P.C.; Roy Leggett, c/o Jeffrey B. Simon, Simon Greenstone Panatier Bartlett, LLP; Antonietta

DiMeglio, c/o Ethan Early, Early, Lucarelli, Sweeney & Meisenkothen (An Association of

Professional LLCs), The Early Law Firm, LLC; Lloyd H. Lohr, c/o Constantine Paul Venizelos,

Kelly & Ferraro LLP; David A. Kalil, c/o Waters & Kraus LLP; Victor Dillbeck, c/o John Barry

Julian, Gori Julian & Associates, P.C.; Charles A. Wilson, c/o Perry J. Browder, Simmons

Hanley Conroy, N.A.; Zdenek Machalka, c/o John D. Cooney, Cooney & Conway; John Philip

Eggers, as representative for the Estate of Jane Young, c/o Brian T. Fitzpatrick, Belluck & Fox,

LLP; and Maci Parmley, successor-in-interest to Harold Hudson, c/o Alan Brayton, Brayton

Purcell; and the Committee is chaired by Mr. Machalka.  With the assistance of counsel and

other advisers, the Committee has been very active in the all aspects of the Debtors' cases,

including numerous investigations, extensive contested litigation, and ultimately the negotiation

of the Term Sheets leading to the Plan.

In addition, by order dated October 18, 2010 [D.I. 374], the Court approved the appointment of Professor Eric D. Green as the Future Claimants' Representative in the Initial Debtors' cases and by order dated September 25, 2014 [D.I. 5017] in the New Debtors' cases. Professor Green has extensive experience with the resolution of asbestos-related personal injury claims and asbestos bankruptcy cases.  He has served as the court-appointed special master in the Ohio (Northern District of Ohio), Connecticut (District of Connecticut) and Massachusetts (District of Massachusetts; Massachusetts Supreme Court) asbestos litigation.  Professor Green has also served as the legal representative for asbestos future claimants in In re Mid-Valley, Inc., In re Federal-Mogul Global, Inc., In re Babcock & Wilcox Co., and In re Fuller-Austin Insulation Co., and remains the future claimants' representative to the asbestos trusts that resulted from those cases.  With the assistance of counsel and other advisors, Professor Green has been extensively involved in all aspects of the Debtors' chapter 11 cases, including discovery, litigation, and negotiation of the Term Sheets.

### 3.    Mediation of the Initial Debtors' Reorganization Cases

About six months after the Initial Debtors filed their chapter 11 cases, the Initial Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative and International agreed to mediate the Reorganization Cases of the Initial Debtors before retired Judge Daniel Weinstein of JAMS.  The parties attended mediation sessions with Judge Weinstein in February, 2012 in New York, New York and in November, 2012 in San Francisco, California. The mediation sessions did not result in an agreement among the parties.

### 4.    Estimation Decision and Appeals

Because of the continuing substantial disagreement among the parties regarding the extent of the Initial Debtors' liability for current and future asbestos-related personal injury claims, Judge Fitzgerald on November 2, 2011 entered an order [D.I. 1793] (the "Estimation

CMO") that set forth a schedule and process for the Court to estimate the liability. Pursuant to the time line set forth in the Estimation CMO, the parties engaged in fact and expert discovery over several months.

At the conclusion of the discovery and after denying without prejudice a series of pre-trial motions filed by both sides, Judge Fitzgerald conducted an estimation trial from January 7, 2013 through January 11, 2013 (the "Estimation Trial"). The Estimation Trial included the testimony of fact and expert witnesses and the submission of evidentiary and demonstrative exhibits. In addition to the presentations and submissions during the Estimation Trial, each of the Initial Debtors, International, the Asbestos Personal Injury Committee and the Future Claimants' Representative submitted post trial briefs and proposed findings of fact and conclusions of law addressing the factual and legal matters that were raised during the Estimation Trial. The Court heard closing arguments on March 4, 2013 and, on May 20, 2013, issued the Order Determining Estimated Amount of Debtors' Asbestos Liabilities [D.I. 3853] and related Memorandum Opinion in support of the order [D.I. 3852] (together, the "Estimation Decision"). Judge Fitzgerald adopted the $1.166 billion estimation proffered by the Future Claimants' Representative and rejected the estimation proffered by the Debtors.

The Initial Debtors and International each filed timely notices of appeal of the Estimation Decision. On June 18, 2013, the Initial Debtors filed a motion for stay pending appeal of the Estimation Decision in this Court, which motion was supported by International [D.I. 3911, 3971] but opposed by the Asbestos Personal Injury Committee and the Future Claimants' Representative. On August 20, 2013, Judge Fitzgerald entered an order denying the motion [D.I. 4074].

On June 28, 2013, the Asbestos Personal Injury Committee and the Future

Claimants' Representative filed a motion in the District Court to dismiss the appeals as

interlocutory.  The motion to dismiss and each of the appeals were consolidated for procedural

purposes only at Civil Action No. 13-cv-01244-SLR.  The Initial Debtors and International each

filed a motion to certify the Estimation Decision for direct review by the Third Circuit Court of

Appeals [D.I. 3912, 3970].  The Initial Debtors and International each filed with the Third

Circuit a request for a direct appeal, and the Asbestos Personal Injury Committee and the Future

Claimants' Representative each filed objections to such requests.  On February 7, 2014, the

District Court entered a memorandum opinion and order certifying the Estimation Decision for

direct appeal to the Third Circuit.  [Misc. No. 13-194-SLR. (D.I. 1)].  On April 4, 2014, the

Third Circuit declined to authorize a direct appeal of the Estimation Decision.

Following the parties' entry into the Term Sheets, the Initial Debtors,

International, the Asbestos Personal Injury Committee and the Future Claimants' Representative

jointly filed a motion to stay both appeals and the motion to dismiss the appeals filed by the

Asbestos Personal Injury Committee and the Future Claimants' Representative, pending the

completion of the parties' efforts to consummate their settlement through the pursuit of

confirmation of a consensual plan of reorganization [Misc. No. 13-194-SLR (D.I. 29)].  By order

entered on September 4, 2014, the District Court stayed the appeals and motion to dismiss.

### 5. <u>Standing to Pursue Certain Estate Claims</u>

In addition to the dispute regarding quantification of the Initial Debtors' asbestos

liabilities, a key issue in the asbestos personal injury dispute has been whether the assets of

International should be available to pay the Initial Debtors' asbestos-related liabilities.  In that

regard, in November 2011, the Asbestos Personal Injury Committee and the Future Claimants'

Representative jointly filed a motion for standing to prosecute certain claims on behalf of the

Initial Debtors' estates [D.I. 1799] (the "Standing Motion"), which included a draft complaint

filed under seal.[4]  The claims asserted in the complaint primarily related to a corporate

reorganization effected by SPHC in 2002 (the "2002 Reorganization") and included claims for

(i) fraudulent transfer, (ii) breach of fiduciary duty and aiding and abetting a breach of fiduciary

duty, (iii) illegal dividends, (iv) unjust enrichment, and (v) alter ego.  The draft complaint named

numerous potential defendants, including International, Calfee, Halter & Griswold, corporate

counsel for International, and 27 current and former officers and directors of International and

SPHC.  The Initial Debtors and International filed objections to the Standing Motion [D.I. 1880,

1881].

After the Initial Debtors obtained tolling agreements from the named potential

defendants and other parties identified as potential defendants  by the Asbestos Personal Injury

Committee and the Future Claimants' Representative, the Court continued the Standing Motion.

In November 2013, the Asbestos Personal Injury Committee and Future Claimants'

Representative filed a renewed motion for standing to prosecute certain claims on behalf of

SPHC's estate [D.I. 4281] (the "Renewed Standing Motion"), which included a revised draft

complaint filed under seal.  At a hearing held on November 13, 2013, the Court granted the

Renewed Standing Motion, and an order was subsequently entered authorizing the Asbestos

Personal Injury Committee and the Future Claimants' Representative to commence this estate

litigation against International and the others parties named in the draft complaint.

As of the date hereof, the Asbestos Personal Injury Committee and the Future

Claimants' Representative have not filed the complaint.  In accordance with the Term Sheets, the

---

[4]     This draft complaint was subsequently amended three times, most recently on November 4, 2013 [See
D.I. 4281].

parties agreed to adjourn the prosecution of the estate litigation.  Pursuant to the Plan, all claims

of the Initial Debtors' estates, including the claims identified in the draft complaint, against the

SPHC Released Parties are deemed settled, released and extinguished.

### 6.    Asbestos Claims Bar Date

On September 26, 2013, the Asbestos Personal Injury Committee and the Future

Claimants' Representative filed a joint emergency motion for an order fixing bar dates for the

filing of proofs of claim for pre-petition non-asbestos claims against SPHC.  On October 15,

2013, the motion was amended to include a request for the establishment of non-asbestos claim

bar dates for Bondex [D.I. 4195] (the "Claimants' Bar Date Motion").

On October 15, 2013, the Initial Debtors filed an objection to the Claimants' Bar

Date Motion and a cross motion seeking bar dates for asbestos claimants as well [D.I. 4196]

(the "Debtors' Bar Date Motion").  On that same date, International filed an objection to the

Claimants' Bar Date Motion and a joinder in the Debtors' Bar Date Motion [D.I. 4202]

(the "Joinder").

On November 5, 2013, November 13, 2013, and February 5, 2014, the Court held

hearings on the Claimants' Bar Date Motion and the Debtors' Bar Date Motion, and ruled that it

would establish a bar date for all claims, including asbestos personal injury claims.  Subsequent

hearings were held to address the scope and design of a plan for providing asbestos claimants

with notice of the bar date, and a motion filed by the Initial Debtors that sought approval of a

notice plan was pending at the time the Term Sheets were executed.  In connection with the

settlement in principle memorialized in the Term Sheets, the parties agreed to seek a stay or

continuance of all matters relating to the asbestos claims bar date, including the motion on the

notice plan, and no further proceedings have occurred with respect to the asbestos claims bar

date.  Upon the effective date of the Plan, the Debtors' request for an asbestos bar date will be

rendered moot and no holder of an Asbestos Personal Injury Claim, including a Demand, will be required to file a proof of claim in these cases.

### 7.    Resolution of the Reorganization Cases

In late July 2014, the Debtors and International reached agreement with the Asbestos Personal Injury Committee and the Future Claimants' Representative and others to resolve all Asbestos Personal Injury Claims, settle all disputes in connection with the Estimation Decision and to cooperate with respect to the confirmation of the Plan.  In particular, on July 26, 2014, the Initial Debtors, Republic and International entered into a settlement term sheet with (i) the Asbestos Personal Injury Committee, both in its capacity as the official asbestos claimants' committee in the Initial Debtors' bankruptcy cases and in its capacity as the ad hoc asbestos claimants' committee selected for the purpose of negotiating a pre-packaged or pre-negotiated plan of reorganization for Republic, (ii) counsel for each member of the Asbestos Personal Injury Committee, both in their capacity as counsel for members of the Asbestos Personal Injury Committee and as counsel for the members of the ad hoc asbestos claimants' committee for Republic, and (iii) the Future Claimants' Representative, both in his capacity as the Future Claimants' Representative in the Initial Debtors' bankruptcy cases and in his capacity as the future claimants' representative selected by Republic and ad hoc asbestos claimants' committee. The settlement term sheet set forth the parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future asbestos personal injury claims against the Initial Debtors and Republic.  On the same date, International and NMBFiL entered into a settlement term sheet with (i) an ad hoc committee of law firms representing asbestos claimants that have pursued and presently are pursuing claims against NMBFiL and (ii) the Future Claimants' Representative, in his capacity as the future claimants' representative selected by NMBFiL and the ad hoc committee, setting forth the parties' agreement in principle on a

consensual plan of reorganization that would resolve all present and future asbestos personal injury claims against NMBFiL.  The Term Sheets provide that they will be implemented through the Plan, which incorporates their terms.

The Plan implements the settlement by, among other things, providing for the creation and funding of a trust to resolve Asbestos Personal Injury Claims.  The asbestos trust to be created under the Plan will contain two accounts for the resolution of Asbestos Personal Injury Claims and payment of related Asbestos Personal Injury Trust Expenses:  one for holders of SPHC Asbestos Personal Injury Claims and one for holders of NMBFiL Asbestos Personal Injury Claims.

The trust account for holders of SPHC Asbestos Personal Injury Claims will be funded by (i) an aggregate of $447.5 million in cash paid by one or more of the SPHC Parties and International on the Effective Date and (ii) the SPHC Payment Note issued by the SPHC Parties and International as co-obligors.  The SPHC Payment Note, in substantially the form of Exhibit I.A.108 to the Plan, will (a) bear no interest, (b) mature on the fourth anniversary of the Effective Date, (c) be secured by the SPHC Pledge, and (d) provide for the following scheduled principal payments to the Asbestos Personal Injury Trust, in each case payable, in International's sole discretion, in the form of cash, shares of common stock of International or a combination thereof:  (1) on or before the second anniversary of the Effective Date of the Plan, $102.5 million; (2) on or before the third anniversary of the Effective Date of the Plan, $120 million; and (3) on or before the fourth anniversary of the Effective Date of the Plan, $125 million.

The trust account for holders of NMBFiL Asbestos Personal Injury Claims will be funded by (i) an aggregate of $2.45 million in cash paid by one or both of NMBFiL and International on the Effective Date and (ii) the NMBFiL Payment Note issued to the Asbestos

Personal Injury Trust by NMBFiL and International as co-obligors.  The NMBFiL Payment

Note, in substantially the form of Exhibit I.A.72 to the Plan, will be (a) in the principal amount

of $50,000, (b) secured by the pledge of 100% of the equity of reorganized NMBFiL plus cash or

a letter of credit and (c) due on the first anniversary of the Effective Date.

C.    **Disclosure Statement and Confirmation Hearing**

On September 26, 2014, the Debtors filed their disclosure statement for the Plan,

dated September 26, 2014 (as amended, the "Disclosure Statement").  The Court entered an order

dated October 20, 2014 [D.I. 5112] (the "Disclosure Statement Order") approving the Disclosure

Statement.  On October 23, 2014, the Debtors filed a solicitation version of the Disclosure

Statement.  In accordance with the Disclosure Statement Order, the Debtors caused copies of the

Disclosure Statement and other Court-approved plan solicitation materials, including ballots, to

be sent to creditors, interest holders and other parties in interest in these chapter 11 cases.  A

hearing to consider confirmation of the Plan (the "Confirmation Hearing") is scheduled to be

held before the Court and the District Court on December 10, 2014.[5]

D.    **Overview of the Treatment of Stakeholders**

The Plan provides for the payment in full of all non-asbestos personal injury

claims and retention by shareholders of 100 percent of their stock.  As to the asbestos personal

injury claimants, the Plan incorporates the settlement reflected in the Term Sheets and provides

for the agreed payments in respect of SPHC Asbestos Personal Injury Claims and NMBFiL

Asbestos Personal Injury Claims to a section 524(g) trust.  All Asbestos Personal Injury Claims

---

[5]    An extensive plan for noticing all creditors of the solicitation and requested confirmation of the Plan,
including the deadlines to submit ballots and file confirmation objections, was prepared by the Debtors'
notice consultant, GCG, Inc., with significant input from and the approval of the Asbestos Personal Injury
Committee, the Future Claimants' Representative and the Committee's notice consultant, Kinsella Media,
LLC.  The notice plan was approved by the Court without objection.  [D.I. 5112].

will be resolved pursuant to the terms of the Asbestos Personal Injury Trust Agreement and the SPHC Asbestos Personal Injury Trust Distribution Procedures or the NMBFiL Asbestos Personal Injury Trust Distribution Procedures, as applicable.  The only Classes that are impaired under the Plan are Class 4a (SPHC Asbestos Personal Injury Claims) and Class 4b (NMBFiL Asbestos Personal Injury Claims).  All other Classes are unimpaired because the Plan does not modify the legal, equitable or contractual rights of the holders of the Claims or Interests in those Classes, other than by curing defaults and reinstating maturities.

As will be shown below, the Plan is fair and equitable and in the best interests of all of the Debtors' creditors and other stakeholders.  It also resolves, once and for all, the Debtors' current and future asbestos personal injury liability by providing the Debtors and other parties with permanent section 524(g) protection.

### E.    Overwhelming Acceptance of the Plan

The Plan has received across-the-board support from all constituencies.  In excess of 99 percent of the claimants voting in Classes 4a and 4b voted to accept the Plan.  Moreover, International, the Asbestos Personal Injury Committee and the Future Claimants' Representative support the Plan, and no creditor or party in interest filed any objection to the Plan.

## III.    MODIFICATIONS TO THE PLAN

### A.    Request for Authorization to Make Plan Modifications

The Debtors request authority to make certain modifications to the Plan (collectively, the "Modifications"), which will be filed prior to the confirmation hearing.

The Modifications are clarifications that have been made by the Debtors in their continuing review of the Plan or in response to an informal objection.  In particular, the Debtors have revised Section IV.J.I, which addresses the preservation of rights of action by the Debtors and the Reorganized Debtors, to delete references to Exhibit IV.J.I, which does not exist.  In

addition, at the request of the California Franchise Tax Board, the Debtors have modified

Sections III.A.1.c. and III.B by deleting certain language regarding when tax audit claims arise

because the Board disputed the Debtors' description.  Furthermore, the Debtors made changes to

Sections IX.A and IX.B.1 to make clear that the Plan will not (a) discharge any debt of a kind

specified in section 1141(d)(6) and (b) affect any setoff or recoupment rights that  the California

Franchise Tax Board may have.

Some modifications have also been made to certain underlying exhibits to the

Plan, including the SPHC Asbestos Personal Injury Trust Distribution Procedures, the NMBFiL

Asbestos Personal Injury Trust Distribution Procedures, and the Asbestos Personal Injury Trust

Agreement.  These changes do not adversely affect the rights of any party and will be presented

at the Confirmation Hearing.

These modifications do not adversely affect or change the treatment of any Claim

against or Interest in any Debtor.  Classes 4a and 4b, the only impaired classes entitled to vote,

are not adversely affected in any way, and no other Claims or Interests are impaired as a result of

the Modifications.

      **B.**      **<u>Authority for Requested Relief</u>**

Section 1127(a) of the Bankruptcy Code provides as follows:

> (a)      The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

11 U.S.C. § 1127(a).  Under this provision, a plan proponent may modify its plan prior to

confirmation so long as the modified plan meets the requirements of sections 1122 and 1123 of

the Bankruptcy Code.  Bankruptcy Rule 3019 provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019.  The Modifications comply with these requirements.

Courts consistently have held that a proposed modification to a plan of reorganization under Bankruptcy Rule 3019 will be deemed accepted by all creditors and equity security holders who previously accepted the plan where the proposed modification does not cause a material adverse change in the treatment of the claim of any creditor or the interest of any equity security holder.  See, e.g., In re Celotex Corp., 204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996) (holding that creditors and equity holders who had accepted the debtor's plan of reorganization were deemed to have accepted modifications that did not adversely change the treatment under the plan of any claims or interests); In re Trans World Airlines, Inc., 185 B.R. 302, 322 (Bankr. E.D. Mo. 1995) ("In light of the immaterial nature of the Modifications, no additional disclosure under section 1125 is required and, pursuant to Bankruptcy Rule 3019, all Holders of Claims and Interests that have accepted the Plan prior to the Modifications are conclusively presumed to have accepted the Plan, as amended by the Modifications."); In re Placid Oil Co., 92 B.R. 183, 190 (Bankr. N.D. Tex. 1988); In re Mount Vernon Plaza Urban Redevelopment Corp. I, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987).

Under these authorities, the Debtors are authorized to make the Modifications to the Plan, and the Modifications should be deemed accepted by the holders of all Claims against and Interests in the Debtors.

## IV.    THE PLAN SHOULD BE CONFIRMED

### A.    The Plan Meets Each Requirement for Confirmation Under Section 1129(a) of the Bankruptcy Code

To confirm the Plan, the Court must find that both the Plan and the Debtors are in compliance with each of the requirements of section 1129(a) of the Bankruptcy Code.  See In re Lackawanna Detective Agency, Inc., 82 B.R. 336, 337 (Bankr. D. Del. 1988) ("Section 1129(a) of title 11 recites the standards which must be met before a plan can be confirmed."); In re Richard Buick, Inc., 126 B.R. 840, 846 (Bankr. E.D. Pa. 1991).  As set forth below, both the Plan and the Debtors meet all the requirements of section 1129(a) of the Bankruptcy Code. Accordingly, the Plan should be confirmed.

### 1.    Section 1129(a)(1) — The Plan Complies with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1); In re Eagle-Picher Indus., Inc., 203 B.R. 256, 270-73 (Bankr. S.D. Ohio 1996) (examining each requirement of chapter 11 to demonstrate that section 1129(a)(1) was satisfied); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) ("[I]n order for a plan of reorganization to pass muster . . . it must comply with all the requirements of Chapter 11 . . . .").

The legislative history of section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that the Plan complies with sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and interests and the contents of a plan, respectively.  See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913 (1978); H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5962, 6368 (1977); see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648-

49 (2d Cir. 1988) (holding that legislative history indicates that section 1129(a)(1) was intended to require compliance with sections 1122 and 1123).

### Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class:

> (a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
>
> (b)    A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

Although section 1122(a) of the Bankruptcy Code prohibits the inclusion of dissimilar claims in the same class, it does <u>not</u> require the placement of all similar claims in one class.  <u>See</u> <u>In re Jersey City Med. Ctr.</u>, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping of similar claims in different classes."); <u>In re First Interregional Equity Corp.</u>, 218 B.R. 731, 738-39 (Bankr. D.N.J. 1997) (same); <u>In re Drexel Burnham Lambert Grp. Inc.</u>, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .").

The Plan meets these requirements.  Article II of the Plan classifies Claims and Interests into seven separate categories.  In particular, Article II of the Plan segregates into separate Classes Priority Claims (Class 1), Secured Claims (Class 2), General Unsecured Claims (Class 3), SPHC Asbestos Personal Injury Claims (Class 4a), NMBFiL Asbestos Personal Injury

Claims (Class 4b), Intercompany Claims (Class 5) and Stock Interests (Class 6).[6]  The number of classes reflects the diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class.

Due to their entitlement to priority status under section 507 of the Bankruptcy Code, Priority Claims have been separately classified in Class 1.  Based on their secured status, Secured Claims have been separately classified in Class 2.  SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims have been separately classified in, respectively, Classes 4a and 4b due to the distinctive bases for such claims and the fact that, unlike all other Classes of Claims, Asbestos Personal Injury Claims are impaired and will be channeled to the Asbestos Personal Injury Trust.  Moreover, due to their unique nature and issues specific to them, Class 5 Intercompany Claims have been classified separately from the Class 3 General Unsecured Claims.  Finally, the Stock Interests of the Debtors have been separately classified to reflect their status as Interests.

## Mandatory Contents of the Plan

Section 1123(a) of the Bankruptcy Code identifies seven requirements for the contents of a plan of reorganization.  Specifically, this section requires that a plan:  (i) designate classes of claims and interests; (ii) specify unimpaired classes of claims and interests; (iii) specify treatment of impaired classes of claims and interests; (iv) provide for equality of treatment within each class; (v) provide adequate means for the plan's implementation; (vi) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution

---

[6]    In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

of voting power among the classes of securities; and (vii) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.  See 11 U.S.C. § 1123(a).  In analyzing a plan's provisions with respect to the selection of officers and directors, a court is to consider "the shareholders' interest in participating in the corporation, the desire to preserve the debtor's reorganization, and the overall fairness of the provisions."  Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1362 (9th Cir. 1986).

The Plan fully complies with each requirement of section 1123(a) described above.  As previously noted with respect to the Plan's compliance with section 1122, Article II of the Plan designates seven separate Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code.  Section III.B of the Plan specifies that Classes 1, 2, 3, 5 and 6 are not impaired under the Plan, as required by section 1123(a)(2) of the Bankruptcy Code.  Section III.B of the Plan specifies that Claims in Classes 4a and 4b are impaired and describes the treatment of such Claims in accordance with section 1123(a)(3) of the Bankruptcy Code.  Further, as required by section 1123(a)(4) of the Bankruptcy Code, the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in such Class, unless the holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest.

In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code, Article IV of the Plan and various other provisions of the Plan provide adequate means for the Plan's implementation.  Specifically, the Plan provides for:  (a) except as otherwise provided in the Plan and subject to the Restructuring Transactions, the continued corporate existence of the Debtors and the vesting of all property of the respective Estates of the Debtors and any

property acquired by a Debtor or Reorganized Debtor under the Plan in the Reorganized Debtors under Section IV.A of the Plan; (b) the consummation of the Restructuring Transactions under Section IV.B of the Plan; (c) certain disposition and lease transactions under Section IV.C of the Plan; (d) the adoption of the corporate constituent documents that will govern the Reorganized Debtors and the identification of the initial boards of directors of the Reorganized Debtors under Section IV.D of the Plan; (e) sufficient cash resources to make all plan distributions pursuant to Section IV.E of the Plan; (f) the creation of, and transfer of certain assets to, the Asbestos Personal Injury Trust under Sections IV.F and IV.I of the Plan; (g) the appointment of asbestos personal injury trustees under Section IV.G of the Plan; (h) the creation and maintenance of the SPHC Trust Account and the NMBFiL Trust Account under Section IV.H of the Plan; (i) the funding of the Asbestos Personal Injury Trust under Section IV.I.2 of the Plan; (j) the transfer of and preservation of rights of action by the Reorganized Debtors, and the release of certain rights of action against the Debtors under Section IV.J of the Plan; (k) the release of all mortgages, deeds of trust, liens or other security interests against the property of the Estate under Section IV.K of the Plan; (l) the authorization to execute various documents and to enter into various transactions to effectuate the Plan and exemption from certain transfer taxes under Section IV.L of the Plan; and (m) the direction to comply with QSF Regulations under Section IV.M of the Plan.

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.  In accordance with that requirement, Section IV.D.1 of the Plan provides that the certificates of incorporation of each Reorganized Debtor will prohibit the issuance of nonvoting equity securities to the extent required under section 1123(a) of the Bankruptcy Code.

Finally, section 1123(a)(7) of the Bankruptcy Code requires that a plan of reorganization "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, which directs the scrutiny of the court to the methods by which the management of the reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the reorganization — i.e., creditors and equity holders.  See 7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1123.01[7], at 1123-15 (15th ed. rev. 1999); see also In re Acequia, 787 F.2d at 1361-62.

The Plan complies with section 1123(a)(7) and ensures that the selection of the officers and directors of each of the Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy.  Section IV.D.2 of the Plan provides that the initial boards of directors of each of the Reorganized Debtors will consist of the directors and officers of each Debtor immediately prior to the Effective Date.  Further, this section of the Plan describes that each such directors and officers will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the terms of the certificates of incorporation and by-laws or similar constituent documents of the applicable Reorganized Debtor and applicable state law.  The Plan's provisions with respect to the selection of directors and officers are consistent with the interests of creditors and public policy.

### Discretionary Contents of the Plan

Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan of reorganization, but are not required.  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the

assumption or rejection of executory contracts and unexpired leases. 11 U.S.C. § 1123(b)(l)-(2).

A plan also may provide for: (i) "the settlement or adjustment of any claim or interest belonging

to the debtor or to the estate;" (ii) "the retention and enforcement by the debtor, by the trustee, or

by a representative of the estate appointed for such purpose, of any such claim or interest," 11

U.S.C. § 1123(b)(3)(A)-(B); or (iii) "the sale of all or substantially all of the property of the

estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11

U.S.C. § 1123(b)(4). Finally, a plan may "modify the rights of holders of secured claims . . . or

. . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may

"include any other appropriate provision not inconsistent with the applicable provisions of

[Title 11]." 11 U.S.C. § 1123(b)(5)-(6).

       As described above, the Plan provides for the impairment of Classes 4a and 4b,

while leaving all other Classes of Claims and Interests unimpaired. The Plan thus modifies the

rights of the holders of certain Claims and leaves the rights of others unaffected. (See Plan

Art. IV.) In particular, Asbestos Personal Injury Claims are channeled to the Asbestos Personal

Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the

related SPHC Asbestos Personal Injury Trust Distribution Procedures and the NMBFiL Asbestos

Personal Injury Trust Distribution Procedures. (See Plan §§ III.B.4, III.B.5.) The Plan also

provides for (i) the assumption, assumption and assignment or rejection of executory contracts

and unexpired leases to which the Debtors are parties (see Plan Art. V) and (ii) the retention and

enforcement of certain claims by the Debtors (see Plan § IV.J).[7]

---

[7]    Moreover, in accordance with section 1123(d) of the Bankruptcy Code, Section V.B of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(l) of the Bankruptcy Code. Additionally, in accordance with Article III of the Plan, certain Claims mayl be Reinstated. All Cure Amount Claims and Reinstated Claims will be determined in accordance with the underlying agreements

Finally, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes numerous other provisions designed to ensure its implementation, which are consistent with the Bankruptcy Code, including: (a) Article IV of the Plan providing for (i) the creation of the Asbestos Personal Injury Trust and (ii) the appointment of the Asbestos Personal Injury Trustees; (b) Article VI of the Plan governing distributions on account of Allowed Claims; (c) Article VII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (d) Article IX of the Plan regarding the discharge of Claims and injunctions against certain actions; and (e) Article X of the Plan regarding retention of jurisdiction by the Bankruptcy Court over certain matters after the Effective Date.

Accordingly, the Plan fully complies with the applicable provisions of the Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(l) of the Bankruptcy Code.

**2.      Section 1129(a)(2) — The Proponents of the Plan Have Complied with the Applicable Provisions of Title 11**

Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply with applicable provisions of the Bankruptcy Code. The legislative history to section 1129(a)(2) indicates that the principal purpose of this section is to ensure compliance with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code. See In re Lapworth, No. 97-34529DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of [section] 1129(a)(2) specifically identifies compliance with the disclosure

---

(continued…)

and applicable nonbankruptcy law, and pursuant to the procedures established herein or, to extent applicable, any separate orders of the Bankruptcy Court. (See Plan §§ III.B and V.B.)

requirements of [section] 1125 as a requirement of [section] 1129(a)(2)."); Official Comm. of

Unsecured Creditors v. Michelson (In re Michelson), 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992)

("Compliance with the disclosure and solicitation requirements is the paradigmatic example of

what the Congress had in mind when it enacted section 1129(a)(2)."); In re Texaco Inc., 84 B.R.

893, 906-907 (Bankr. S.D.N.Y. 1988) (the "principal purpose of Section 1129(a)(2) is to assure

that the proponents have complied with the requirements of section 1125 in the solicitation of

acceptances to the plan"); see also Toy & Sports Warehouse, 37 B.R. at 149

("[Section] 1129(a)(2) requires that the proponent of the plan must comply with . . . the ban on

post-petition solicitation of the plan unaccompanied by a written disclosure statement approved

by the court in accordance with [Bankruptcy] Code §§ 1125 and 1126."); S. Rep. No. 95-989, at

126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 (1978) ("Paragraph (2) [of section

1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter

11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), reprinted

in 1978 U.S.C.C.A.N. 5963, 6368 (1977).  The Debtors have complied with the applicable

provisions of the Bankruptcy Code, including the provisions of section 1125 regarding disclosure

and plan solicitation.

       Section 1125 prohibits the solicitation of acceptances or rejections of a plan of

reorganization from holders of claims or interests "unless, at the time of or before such

solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written

disclosure statement approved . . . by the court as containing adequate information." 11 U.S.C.

§ 1125(b).  In these cases, the Court approved the Disclosure Statement by an the Disclosure

Statement Order, which, among other things, specifically found that the Disclosure Statement

contained adequate information within the meaning of section 1125 of the Bankruptcy Code.  In

addition, the Court considered and, in the Disclosure Statement Order, approved (a) all materials

to be transmitted to those creditors entitled to vote on the Plan (collectively, the "Solicitation

Materials"), (b) the timing and method of delivery of the Solicitation Materials, (c) the rules for

tabulating votes to accept or reject the Plan and (d) the timing and method of publication of a

notice of the Confirmation Hearing and related matters (the "Confirmation Notice").

Thereafter, the Debtors and their agents transmitted solicitation packages to

holders of Claims and Interests and other parties in interest, which packages contained:  (a) the

Disclosure Statement; (b) the Plan (without certain exhibits thereto); (c) the Confirmation

Notice; (d) for parties entitled to vote on the Plan, an appropriate Ballot with a return envelope;

and (e) certain other approved Solicitation Materials.  These Solicitation Materials were

distributed promptly after the entry of the Disclosure Statement Order and in accordance with the

Court's instructions.  In addition, the Debtors caused the General Publication Notice and the

Asbestos Publication Notice to be published in certain newspapers and magazines in accordance

with the Disclosure Statement Order.[8]  (See Disclosure Statement Order ¶¶ 11-12.)  As is

indicated in the Declaration of Kathleen M. Logan (the "Voting Declaration"), following the

distribution of the Solicitation Materials and the publication of the General Publication Notice

and the Asbestos Publication Notice, the Ballots of all holders of Claims that were entitled to

vote and in fact voted were duly tabulated, in accordance with the rules and procedures, as

provided in the Disclosure Statement Order, and Classes 4a and 4b, the only Classes entitled to

---

[8]       As described in the Declaration of Lael D. Dowd (the "Dowd Declaration"), in accordance with the
Solicitation and Tabulation Procedures, the Confirmation Notice was published in the *Cleveland Plain
Dealer, St. Louis Dispatch* and the national editions of *The Wall Street Journal, USA Today* and *The New
York Times* not less than twenty-five calendar days prior to the deadline to objection to confirmation of the
Plan.  Further, as set forth in the Dowd Declaration, a version of the Confirmation Notice targeted to asbestos
personal injury claimants was published in various national consumer magazines, national newspaper
supplements, Canadian newspapers and newspapers throughout the U.S. territories and possessions not less
than twenty days prior to the confirmation objection deadline.

vote, overwhelmingly voted to accept the Plan. (See Voting Declaration, filed contemporaneously herewith.)

The Debtors thus have complied with the applicable provisions of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, and, as a result, the Plan meets the requirements of section 1129(a)(2) of the Bankruptcy Code.

### 3.    Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A plan is considered proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." Hanson v. First Bank of S.D., 828 F.2d 1310, 1315 (8th Cir. 1987); see also In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (the good faith standard in section 1129(a)(3) requires that there must be "'some relation'" between the chapter 11 plan and the "reorganization-related purposes" that chapter 11 was designed to serve) (citations omitted); In re Zenith Elecs. Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." (citations and internal quotation marks omitted)); In re New Valley Corp., 168 B.R. 73, 80 (Bankr. D.N.J. 1994) ("It is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purpose of the Bankruptcy Code."). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the formulation of a chapter 11 plan. See McCormick v. Bane One Leasing Corp. (In re McCormick), 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances

surrounding the plan, . . .  keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.").

In determining whether the plan will succeed and accomplish goals consistent with the Bankruptcy Code, courts look to the terms of the reorganization plan itself.  See In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good faith test provides the court with significant flexibility and is focused on an examination of the plan itself, rather than other, external factors), aff'd in part, remanded in part on other grounds, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990).  The plan proponent must show, therefore, that the plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.  See In re Century Glove, Inc., Civ. A. Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb.  10, 1993) ("A court may only confirm a plan for reorganization if . . .  the 'plan has been proposed in good faith and not by any means forbidden by law. . . .' Moreover, 'where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied'" (citations omitted)); see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (same).

The Plan is designed to effectuate the objectives and purposes of the Bankruptcy Code by providing for the reorganization and rehabilitation of the Debtors, while maximizing the recoveries to parties in interest.  The Plan has been proposed in good faith and in the belief that it will maximize the value of the ultimate recoveries to all creditor groups.  Among other things, the Plan provides for recoveries that the Debtors believe are substantially greater than could be realized if the Debtors were to liquidate.

To arrive at this juncture in these cases, the Debtors actively involved their creditor constituencies in the Plan-formulation process. See Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.), 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (holding that good faith in proposing a plan "also requires a fundamental fairness in dealing with one's creditors").  Through this process, the Debtors have provided substantial information to all constituencies.  As described above and in the Disclosure Statement, the Plan reflects the culmination of arms'-length negotiations and reflects the agreements among the Debtors, International, the Asbestos Personal Injury Committee, the Futures Claimants' Representative and certain other parties.  The Debtors' good faith in proposing the Plan is further evidenced by the overwhelming support of the Plan by Claim holders in Classes 4a and 4b, the only Classes entitled to vote on the Plan. (See Voting Declaration)

The overall fairness of the Plan and the acknowledgment by the Debtors' creditors that the Plan has been proposed in good faith and for proper purposes is demonstrated by (a) the significant settlement achieved in these cases and implemented in the Plan, (b) the support of the Debtors' primary constituencies and the lack of any unresolved objections and (c) the overwhelming acceptance of the Plan by the creditors, in the aggregate, that cast Ballots in accordance with the voting procedures.  See Eagle-Picher, 203 B.R. at 274 (finding that a plan of reorganization was proposed in good faith when, among other things, it was based on extensive arms'-length negotiations among the plan proponents and other parties in interest).  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.

4. **Section 1129(a)(4) — All Payments To Be Made by the Debtors in Connection With These Cases Are Subject to the Approval of the Court**

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). In essence, this subsection requires that any and all fees promised or received in connection with or in contemplation of a chapter 11 case must be disclosed and subject to the court's review. See In re Johns-Manville Corp., 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986), rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, Kane v. John-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re Chapel Gate Apartments, Ltd., 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation"); In re S. Indus. Banking Corp., 41 B.R. 606, 612 (Bankr. E.D. Tenn. 1984) (even absent challenge, a court has an independent duty to determine the reasonableness of professional fees).

In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Bankruptcy Cases, including Professionals' Fee Claims, are subject to the approval of the Court. Section III.A.1 of the Plan provides for the payment of Professionals' Fee Claims and makes all such payments subject to Court approval and the standards of the Bankruptcy Code. The Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Bankruptcy Cases. All such fees and expenses, however, remain subject to final review for reasonableness by the Court. Finally, Article X of the Plan provides that the Court will retain jurisdiction after the Effective

Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.

Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**5.      Section 1129(a)(5) — The Plan Discloses All Required Information Regarding Postconfirmation Management and Insiders**

Section 1129(a)(5) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if the proponent discloses the identity of those individuals who will serve as management of the reorganized debtor, the identity of any insider to be employed or retained by the reorganized debtor and the compensation proposed to be paid to such insider.  In addition, under section 1129(a)(5)(A)(ii), the appointment or continuation in office of existing management must be consistent with the interests of creditors, equity security holders and public policy.

In determining whether the postconfirmation management of a debtor is consistent with the interests of creditors, equity security holders and public policy, a court must consider proposed management's competence, discretion, experience and affiliation with entities having interests adverse to the debtor.  See In re W.E. Parks Lumber Co., 19 B.R. 285, 292 (Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve all creditors and interested parties on an even and loyal basis" (emphasis omitted)).  In general, however, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists. . . ." In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989).  The case law also is clear that a plan may contemplate the retention of the debtor's existing directors and officers.  See,

e.g., <u>Texaco</u>, 84 B.R. at 908 (holding that section 1129(a)(5) was satisfied where notice was provided that the debtor's existing directors and officers would continue to serve in office after plan confirmation).

The Debtors have fully satisfied the requirements of section 1129(a)(5).  The Debtors have disclosed all necessary information and names regarding the Reorganized Debtors' officers and directors. (<u>See</u> Disclosure Statement § III.A.2, Plan § IV.D.2 (providing that the initial directors and officers of each Reorganized Debtor shall be the directors and officers of such Debtor prior to the Effective Date).)  Moreover, the Reorganized Debtors' officers are highly qualified and experienced.

In sum, the appointment of the proposed directors and officers is consistent with the interests of the holders of Claims and Interests and with public policy because the management and directors will be able to serve adequately the interests of all parties.  Accordingly, the Plan fully satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### 6.    Section 1129(a)(6) — The Plan Does Not Provide for Any Rate Change Subject to Regulatory Approval

Section 1129(a)(6) of the Bankruptcy Code is applicable only to debtors subject to governmental regulatory authority and requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  In these cases, section 1129(a)(6) of the Bankruptcy Code is not applicable because the Debtors' businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction or will have jurisdiction after Confirmation.

7.      <u>Section 1129(a)(7) — The Plan Is in the Best Interests of Creditors</u>

The "best interests of creditors" test is set forth in section 1129(a)(7) of the

Bankruptcy Code.  This test requires that, with respect to each impaired class of claims or

interests, each holder of such claims or interests (a) has accepted the plan or (b) will receive or

retain property of a value not less than what such holder would receive or retain if the debtor

were liquidated under chapter 7 of the Bankruptcy Code.  <u>See</u> <u>Tranel v. Adams Bank & Trust</u>

<u>Co. (In re Tranel)</u>, 940 F.2d 1168. 1172 (8th Cir. 1991); <u>In re AOV Indus.</u>, 31 B.R. 1005, 1008-

13 (D.D.C. 1983), <u>aff'd in part</u>, <u>rev'd in part</u>, 792F.2d 1140, 1144 (D.C. Cir. 1986) (if no

impaired creditor receives less than liquidation value, a plan of reorganization is in best interests

of creditors), <u>vacated in light of new evidence</u>, 797 F.2d 1004 (D.C. Cir. 1986); <u>In re Econ.</u>

<u>Lodging Sys., Inc.</u>, 205 B.R. 862, 864-65 (Bankr. N.D. Ohio 1997); <u>Eagle-Picher</u>,  203 B.R. at

266.  A court, in considering whether a plan is in the "best interests" of creditors, is not required

to consider any alternative to the plan other than the dividend projected in a liquidation of all the

debtor's assets under chapter 7 of the Bankruptcy Code.  <u>See</u>, <u>e.g.</u>,  <u>In re Victory Constr.  Co.</u>, 42

B.R. 145, 151 (Bankr. CD. Cal. 1984); <u>see also</u> <u>In re Crowthers McCall Pattern, Inc.</u>, 120 B.R.

279, 297 (Bankr. S.D.N.Y. 1990).

As section 1129(a)(7) itself makes clear, the best interests of creditors test is

applicable only to nonaccepting Claim holders of *impaired* claims and interests.  <u>See</u> 11 U.S.C.

§ 1129(a)(7).  Under the Plan, only Classes 4a and 4b are impaired; consequently, the best

interests test is applicable only to nonaccepting Claim holders in these Classes.  The test requires

that each holder of a claim must either accept the plan or receive or retain under the plan

property having a present value, as of the effective date of the plan, not less than the amount that

such holder would receive or retain if the debtor were liquidated under chapter 7.

To estimate the value that impaired creditors would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Court must first determine the aggregate dollar amount that would be available if each of the Reorganization Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any cash held by the Debtors at the commencement of their chapter 7 cases.

In this case, the Liquidation Value available to holders of Claims in Classes 4a and 4b would be reduced by, among other things, (a) buyers' likely concerns regarding asbestos liability risk, (b) the risk of transitioning critical business functions in a relatively short period of time, and (c) the expedited time frame for selling seven separate businesses.  In addition, significant costs would be associated with the asset sales and the liquidation process, including the compensation of trustees, as well as counsel and other professionals retained by such trustees, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the operation of the Debtors during the pendency of the chapter 7 cases and all unpaid Administrative Claims incurred by the Debtors during the Reorganization Cases that are allowed in the chapter 7 cases, including trustee fees, professional fees and additional brokerage fees.  All these costs must be paid from the proceeds of the liquidation.

Based on the liquidation analysis attached as Exhibit IV to the Disclosure Statement, it is clear that the best interests test is satisfied as to Classes 4a and 4b, which are the only impaired Classes under the Plan, because a chapter 7 liquidation of the Debtors' estates would result in recoveries to holders of Class 4a and 4b Asbestos Personal Injury Claims that are no greater than the potential range of recoveries provided under the Plan.  (See, e.g., Disclosure

Statement, Ex. IV.)  The methodology used by the Debtors and their financial advisors to estimate the total liquidation proceeds available for distribution, as well as the principal assumptions and considerations underlying the liquidation analysis, are described in the Disclosure Statement and Exhibit IV attached thereto.

Based on the liquidation analysis, no dissenting holder of a Claim in Classes 4a and 4b will receive less under the Plan than it would receive in a liquidation of the Debtors' assets.  As a result, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

### 8.    Section 1129(a)(8) — The Plan Has Been Accepted by the Requisite Classes of Creditors and Interest Holders

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan has either accepted the plan or is not impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, a class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8).  11 U.S.C. § 1126(f); see also Toy & Sports Warehouse, 37 B.R. at 150.

Acceptance of a plan of reorganization by an impaired class of claims or interests is determined by reference to section 1126, which identifies the members of a class that may vote on a plan and the number and amount of votes necessary for the acceptance of a plan by a class of claims or interests, and section 524(g), which specifies the number of votes necessary for the acceptance of a plan by a class of asbestos-related claims where the plan contemplates the entry of a channeling injunction with respect to such claims and related future demands.  In particular: (i) section 1126 provides that a plan is accepted (a) by a class of impaired claims if the class members accepting hold at least two-thirds in amount and more than one-half in number of the claims held by the class members that have cast votes on the plan and (b) by a class of impaired

interests if the class members accepting hold at least two-thirds in amount of the interests held by the class members that have cast votes on the plan; and (ii) section 524(g) provides that, as part of confirmation, a plan must designate a separate class of claims to be addressed by a 524(g) trust and be accepted by at least 75 percent of those voting in such class.  Under section 1126(g) of the Bankruptcy Code, however, impaired classes that neither receive nor retain property under the plan are deemed to have rejected the plan.

Applying these standards here demonstrates that the Plan complies with section 1129(a)(8) for all Classes established by the Plan.  Specifically, Classes 4a and 4b have accepted the Plan by a vote in favor in excess of 99 percent of those voting. (See Voting Declaration.)  All other Classes are unimpaired under the Plan and, therefore, are deemed to have accepted the Plan.  Accordingly, section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to all Classes of Claims and Interests.

9.      **Section 1129(a)(9) — The Plan
        Provides for the Payment of Priority Claims**

Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, unless otherwise agreed by the holder, holders of claims of a kind specified in section 507(a)(l) of the Bankruptcy Code — administrative claims allowed under section 503(b) of the Bankruptcy Code — must receive cash equal to the allowed amount of such claims on the effective date of the plan.  Section 1129(a)(9)(B) of the Bankruptcy Code allows deferred cash payments for certain kinds of employee claims.  In addition, section 1129(a)(9)(C) of the Bankruptcy Code provides for the payment of tax priority claims in cash in regular installments.

Under the Plan, the Reorganized Debtors are required to pay these tax priority claims in full in cash on the Effective Date.

Section III.A.1 of the Plan provides that, subject to certain bar dates and unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either: (a) as soon as practicable after the Effective Date; or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes allowed by a Final Order or a Stipulation of Amount and Nature of Claim.  In addition, Administrative Claims based on ordinary course liabilities shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holder of such Administrative Claims or further approval of the Bankruptcy Court.  Allowed Administrative Claims under or evidenced by the DIP Credit Agreement shall be paid in full by the applicable Debtor on the Effective Date or such later time as agreed to by the parties.

Further, Section III.B.l of the Plan provides that Priority Claims against any Debtors (which include Claims entitled to priority other than Administrative Claims and Priority Tax Claims) will be paid on the Effective Date in an amount equal to the Allowed Claim plus Postpetition Interest.  Section III.A.2 of the Plan provides that, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, on the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim, each Allowed Priority Tax Claim will receive payment in full of the allowed amount of the Priority

Tax Claim plus Postpetition Interest.  Accordingly, the Plan satisfies the requirements set forth in section 1129(a)(9) of the Bankruptcy Code with respect to the payment of Priority Claims.

10.    **Section 1129(a)(10) — The Plan Has Been Accepted by at Least One Impaired, Non-Insider Class**

Section 1129(a)(10) of the Bankruptcy Code provides that:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); see In re Martin, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (holding that acceptance by three classes of impaired creditors, exclusive of insiders, satisfied requirement of section 1129(a)(10)).  The Plan satisfies this requirement.  As indicated in the Voting Declaration, Classes 4a and 4b have both accepted the Plan and no "insider," as such term is defined in section 101(31) of the Bankruptcy Code, voted in Classes 4a and 4b.

11.    **Section 1129(a)(11) — The Plan Is Feasible**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  One commentator has stated that this section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable."  7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1129.03[11], at 1129-64 (15th ed. rev. 1999); accord In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994); In re Rivers End Apartments, Ltd., 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994); Johns-Manville, 68 B.R. at 635.

Section 1129(a)(11), however, does not require a guarantee of the plan's success; rather, the proper standard is whether the plan offers a "reasonable assurance" of success. See Johns-Manville, 843 F.2d at 649 (a plan may be feasible although its success is not guaranteed); Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.), 755 F.2d 1336, 1341 (8th Cir. 1985) (same); Rivers End, 167 B.R. at 476 (to establish feasibility, "a plan proponent must demonstrate that its plan offers a reasonable prospect of success and is workable"); In re Drexel Burnham, 138 B.R. at 762 ("'Feasibility does not, nor can it, require the certainty that a reorganized company will succeed.'" (citations omitted).

Courts have identified a number of factors relevant to evaluating the feasibility of a proposed plan of reorganization, including (a) the prospective earnings or earning power of the debtor's business, (b) the soundness and adequacy of the capital structure and working capital for the debtor's postconfirmation business, (c) the debtor's ability to meet its capital expenditure requirements, (d) economic conditions, (e) the ability of management and the likelihood that current management will continue and (f) any other material factors that would affect the successful implementation of the plan. See, e.g., Sound Radio, 93 B.R. at 856; Texaco, 84 B.R. at 910; Toy & Sports Warehouse, 37 B.R. at 151.

The projections that accompanied the Disclosure Statement and International's status as a co-obligor on the SPHC Payment Note and the NMBFiL Payment Note, establish that the Plan is feasible. Specifically, the Projections demonstrate that the Reorganized Debtors will have sufficient resources to fund ongoing business operations. (Exhibit III to the Disclosure Statement.) In addition, International, a publicly traded holding company with revenue of approximately $4.4 billion and net income of approximately $300 million for the fiscal year ended May 31, 2014, is a co-obligor on the SPHC Payment Note and the NMBFiL Payment Note

and will provide funds to the Reorganized Debtors as necessary to permit the Reorganized

Debtors to satisfy their obligations under the Plan. Accordingly, the Plan satisfies the feasibility

standard of section 1129(a)(11) of the Bankruptcy Code.

**12.    Section 1129(a)(12) — The Plan Provides for the Payment of Fees**

Section 1129(a)(12) of the Bankruptcy Code requires that, as a condition

precedent to the confirmation of a plan of reorganization, "[a]ll fees payable under section 1930

of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid

or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C.

§ 1129(a)(12). The Plan complies with section 1129(a)(12) by providing that all fees payable

pursuant to 28 U.S.C. § 1930 will be paid in cash on or before the Effective Date. (See Plan §

III.A.l.b.)

**13.    Section 1129(a)(13) — The Plan Provides for the Continuation
of the Debtors' Obligations To Pay Retiree Benefits**

Section 1129(a)(13) of the Bankruptcy Code is applicable only to debtors that

maintain retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code. In

these cases, section 1129(a)(13) of the Bankruptcy Code is not applicable because the Debtors do

not maintain any retiree benefits, as defined in section 1114 of the Bankruptcy Code.

**14.    Section 1129(d)—The Plan's Purpose
Is Consistent with the Bankruptcy Code**

Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a

plan if the principal purpose of the plan is to avoid taxes or the application of section 5 of the

Securities Act of 1933. The Plan meets these requirements because the principal purpose of the

Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act

of 1933, and there has been no filing by any governmental agency asserting such avoidance.

V.    **THE ASSUMPTION, ASSUMPTION AND ASSIGNMENT OR
REJECTION OF THE EXECUTORY CONTRACTS AND
UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED**

The Plan also proposes that the Debtors will assume certain executory contracts.

Except as otherwise provided in the Plan or in any contract, instrument, release or other

agreement or document entered into in connection with the Plan, on the Effective Date, pursuant

to section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall

assume each of its respective Executory Contracts and Unexpired Leases other than those listed

on Exhibit V.C to the Plan.  The Debtors reserve the right, however, at any time prior to the

Effective Date, to amend Exhibit V.C to:  (a) delete any Executory Contract or Unexpired Lease

listed therein, thus providing for its assumption pursuant to Section V.A.1 of the Plan, or (b) add

any Executory Contract or Unexpired Lease to Exhibit V.C, thus providing for its rejection under

Section V.A.I of the Plan.

Section 365(a) provides that a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).  Courts

routinely approve motions to assume, assume and assign or reject executory contracts or

unexpired leases upon a showing that the debtor's decision to take such action will benefit the

debtor's estate and is an exercise of sound business judgment.  See, e.g., NLRB v. Bildisco &

Bildisco, 465 U.S. 513, 523 (1984); Group of Inst'l Investors v. Chi., M., St. P., & P.R.R. Co.,

318 U.S. 523, 550 (1943); City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d. 1221,

1226 (6th Cir. 1995); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (the

"resolution of th[e] issue of assumption or rejection will be a matter of business judgment by the

bankruptcy court").

The "business judgment" test is not a strict standard; it merely requires a showing

that either assumption or rejection of the executory contract or unexpired lease will benefit the

-41-

debtor's estate.  See Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc., 25 B.R. 484, 495 (Bankr.

S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's estate, Court

approval of a debtor in possession's decision to assume the lease should only be withheld if the

debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the

Bankruptcy Code . . . ."); see also Borman's, Inc. v. Allied Supermarkets, Inc.

706 F.2d 187 (6th Cir. 1983); NLRB v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d

Cir. 1982), aff'd, 465 U.S. 513 (1984).  Because the Debtors have reviewed their Executory

Contract and Unexpired Leases and made the determination, in their sound business judgment, to

assume the contracts and leases other than those listed on Exhibit V.C to the Plan, the

assumption, assumption and assignment and rejection of executory contracts proposed by the

Plan should be approved.

## VI.    THE TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS PERSONAL INJURY TRUST DOES NOT DESTROY OR WAIVE ANY PRIVILEGES OR PROTECTIONS

Section IV.I.l of the Plan provides that the Reorganized Debtors will transfer and

assign, or cause to be transferred and assigned, to the Asbestos Personal Injury Trust copies of

those books and records agreed upon by the parties that pertain directly to Asbestos Personal

Injury Claims that have been asserted against any Debtor.  The transfer of these materials is

essential to the implementation of the Asbestos Personal Injury Trust and the preservation of its

assets.  Section IV.I.l of the Plan provides that the Debtors will ask the Bankruptcy Court in the

Confirmation Order to rule that the transfer of books and records from the Reorganized Debtors

to the Asbestos Personal Injury Trust will not waive or destroy any applicable privilege

pertaining to such books and records.  Under the Plan, the Asbestos Personal Injury Trust is a

successor in interest to the Debtors with respect to the Asbestos Personal Injury Claims.  As

such, there is no waiver or destruction of applicable privileges upon the transfer of the relevant

books and records to the Asbestos Personal Injury Trust.  Further, because the Asbestos Personal

Injury Trust will be the successor in interest with respect to the Debtors' asbestos personal injury

liabilities, the Debtors and the Asbestos Personal Injury Trust share common, virtually identical

legal interests, and the surrender of any privileged documents does not terminate any privileges

related to those interests.  In addition, the Bankruptcy Court has the power under sections 105(a)

and 1123(b)(6) of the Bankruptcy Code to order that the books and records will remain subject to

privilege after they are turned over to the Asbestos Personal Injury Trust.

  The Asbestos Personal Injury Trust is a successor in interest to the Debtors with

respect to the asbestos personal injury liabilities, and the law is clear that a successor in interest

retains and may assert any applicable privileges.[9]  The Delaware Uniform Rules of Evidence

provide that the attorney-client privilege, in general, may be asserted by a client's successor.[10]

See D.R.E. 502(c) (stating that "[t]he privilege under this rule may be claimed by the client . . .

or the successor, trustee or similar representative of a corporation, association or other

organization, whether or not in existence").  Thus, in analogous situations, courts have held that

liquidating trusts established by confirmed plans of liquidation can assert the attorney-client

privilege of their predecessor debtor corporations.  See Official Comm. of Unsecured Creditors

of Hechinger Inv. Co. v. Fleet Retail Fin. Grp., 285 B.R. 601, 613 (D. Del. 2002) (holding that

the liquidating trust could assert and waive the attorney-client privilege of the debtor

corporation); Whyte v. Williams (In re Williams), 152 B.R. 123, 129 (Bankr. N.D. Tex. 1992)

---

[9]  See Owens-Illinois Inc. v. Rapid Am. Corp (In re The Celotex Corp.), 124 F.3d 619, 624 (4th Cir. 1997) ("Under the Confirmed Plan, the Asbestos Claims Trust is deemed the successor for all purposes to the liabilities of Celotex with respect to allowed amounts of asbestos related claims.").

[10]  The Asbestos Personal Injury Trust is a statutory trust under Delaware law.

(holding that the liquidating trustee had the power to invoke or waive evidentiary privileges in connection with the causes of action transferred to the trust under the confirmed plan).

The Reorganized Debtors and the Asbestos Personal Injury Trust will have a common interest in the privilege attaching to the books and records, copies of which will be transferred to the Asbestos Personal Injury Trust.  Rule 502(b) of the Delaware Uniform Rules of Evidence assures that the attorney-client privilege will protect confidential communications involving separate clients so long as the clients share a common interest sufficient to justify invocation of such privilege.  See D.R.E. 502(b)(3) (stating that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest"). See, e.g., United States v. Doe, 429 F.3d 450, 453 (3d Cir. 2005) (stating that the common interest privilege allows for two clients to discuss their affairs "so long as they have an 'identical (or nearly identical) legal interest as opposed to a merely similar interest'"); U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C., C.A. No. 112-N, 2005 WL 2037353, at *1 (Del. Ct. Ch. June 9, 2005) (stating that the common-interest privilege extends to the protection of confidential communications involving separate clients "so long as the clients share a 'common interest' sufficient to justify invocation of the privilege"); see also In re Grand Jury Subpoenas 89-3 & 89-4, John Doe 89-129 (Under Seal), 902 F.2d 244, 249 (4th Cir. 1990) (holding that "persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their

claims"). Thus, the transfer of privileged information between two parties that share a common interest does not waive or destroy the attorney-client privilege.

Further, the work-product doctrine protects the transfer of any privileged material from the Reorganized Debtors to the Asbestos Personal Injury Trust. The work-product doctrine protects the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information. See In re Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1428 (3d Cir. 1991). Here, the Asbestos Personal Injury Trust and the Reorganized Debtors are non-adverse with respect to the Claims that are subject to transfer of the books and records and share a common interest. Thus, providing the books and records to the Asbestos Personal Injury Trust will not destroy, impair, or waive the work-product privilege or any other privileges that may exist with respect to the books and records.

Moreover, the Bankruptcy Court has authority under sections 105(a) and 1123(b)(6) of the Bankruptcy Code to order that the books and records will remain protected by any applicable privilege after they are turned over to the Asbestos Personal Injury Trust. Section 105 of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." In addition, section 1123(b)(6) of the Bankruptcy Code permits a plan to "include any other applicable provision not inconsistent with the applicable provisions of the [Bankruptcy Code]." Because the transfer of the Debtors' relevant books and records to the Asbestos Personal Injury Trust is necessary to the administration of the Plan, the Bankruptcy Court has the authority, under

sections 105(a) and 1123(b)(6) of the Bankruptcy Code, to preserve the evidentiary privileges associated with the transfer of these interests, assets and liabilities.

As noted above, it is essential to the implementation of the Plan that the Asbestos Personal Injury Trust have the ability to evaluate the merits of the Asbestos Personal Injury Claims to preserve assets for all such Claim holders.  The Asbestos Personal Injury Trust will be the successor in interest to the Debtors' asbestos personal injury liabilities.  As a result, the Debtors and the Asbestos Personal Injury Trust share common legal interests, and the surrender of any privileged documents does not terminate any privileges related to those interests. Accordingly, the Debtors hereby request that the Bankruptcy Court rule, in connection with confirmation of the Plan, that the transfer of the Debtors' books and records does not result in the destruction or waiver of any privileges or protections applicable thereto.

**VII.    THE PLAN SATISFIES THE REQUIREMENTS FOR ENTRY OF THE ASBESTOS PERSONAL INJURY CHANNELING INJUNCTIONS UNDER SECTION 524(G) OF THE BANKRUPTCY CODE**

**A.    The Asbestos Personal Injury Trust Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code**

Section 524(g)(l)(A) authorizes a court to enter, in connection with confirmation of a plan of reorganization, an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or demands if the plan of reorganization establishes a trust to resolve and pay such claims.  11 U.S.C. § 524(g)(l).  To receive such an injunction, the trust to which such claims and demands are channeled must meet the structure and funding requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code.  For the reasons set forth below, the Asbestos Personal Injury Trust comports with those requirements.

Section 524(g)(2)(B)(i)(I) requires that an asbestos trust assume the liabilities of a debtor that, as of the petition date, has been named as a defendant in actions to recover damages for asbestos-related claims. 11 U.S.C. § 524(g)(2)(B)(i)(I). The Asbestos Personal Injury Trust meets this requirement because, on the Effective Date, the trust will assume all liabilities and responsibility for all Asbestos Personal Injury Claims. (See Plan § III.B.4, 5.)

Section 524(g)(2)(B)(i)(II) requires that an asbestos trust "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." 11 U.S.C. § 524(g)(2)(B)(i)(II). In accordance with this subsection, the Plan provides that the Asbestos Personal Injury Trust will be funded in part by the securities issued by the Reorganized Debtors in the form of the SPHC Payment Note and the NMBFiL Payment Note. (See Plan § IV.I.2.) The Asbestos Personal Injury Trust will have the right to receive future payments from the Reorganized Debtors under the SPHC Payment Note and the NMBFiL Payment Note. (See Plan §§ I.A.72, 108.)

Some courts have suggested that this subsection requires that at least one of the debtors involved in the plan is a going concern with the ability to make future payments to the trust. See In re Combustion Eng'g, Inc., 391 F.3d 190, 248 (3rd Cir. 2004) ("The implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants."); see also In re Am. Capital Equip., LLC, 688 F.3d 145, 159 (3rd Cir. 2012) (noting that a section 524(g) plan typically provides that "[t]he bankrupt company continues 'to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants,'" but also noting that some commentators argue that "future payments are not always

necessary and that in some cases, a present contribution of securities may be sufficient under § 524(g)").  Here, as of the Effective Date, each of the Reorganized Debtors will have the financial wherewithal to make future payments to the Asbestos Personal Injury Trust.  SPHC  is an intermediate holding company whose assets consist primarily of its direct ownership of eight domestic operating companies (collectively, the "Operating Subsidiaries") and its indirect ownership interests in certain other domestic and foreign non-debtor subsidiaries.  During fiscal year 2014, SPHC and its Operating Subsidiaries generated consolidated revenues of approximately $410.74 million and operating income of approximately $53.2 million.  Further, Republic, a leader in building restoration, generated revenue of approximately $25 million during fiscal year 2013.  Finally, on or after the Confirmation Date, Bondex and NMBFiL will each lease certain storage facilities located in Medina, Ohio from International and sublease those facilities to affiliates.  These leasing arrangements will generate $120,000 in yearly revenue for each of the New Debtors.

Section 524(g)(2)(B)(i)(III) of the Bankruptcy Code requires that an asbestos trust have the ability to own, if specified contingencies occur, "a majority of the voting shares of— (aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor." 11 U.S.C. § 524(g)(2)(B)(i)(III).  As set forth in Sections I.A.72 and I.A.108 of the Plan, (a) the SPHC Payment Note is secured by a pledge of 100% of the equity of SPHC, Bondex and Republic and (b) the NMBFiL Payment Note is secured by a pledge of 100% of the equity of NMBFiL.  The issuance of the SPHC Payment Note and the NMBFiL Payment Note satisfies the statute because the Asbestos Personal Injury Trust will have the ability to own a majority of the Reorganized Debtors upon the occurrence of an event of default.

Finally, section 524(g)(2)(B)(i)(IV) requires an asbestos trust "to use its assets or income to pay claims and demands." 11 U.S.C. § 524(g)(2)(B)(i). Here, the Asbestos Personal Injury Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims (see Plan § IV.I.3.) and will use its assets to pay and satisfy Asbestos Personal Injury Claims in accordance with the Plan, the SPHC Asbestos Personal Injury Trust Distribution Procedures, the NMBFiL Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order (see Plan § IV.F.), thus satisfying the requirements of section 524(g)(2)(B)(i)(IV).

Accordingly, based on the foregoing provisions of the Plan and other applicable documents, the Asbestos Personal Injury Trust satisfies the structure and funding requirements for an asbestos trust set forth in section 524(g)(2)(B)(i) of the Bankruptcy Code.

**B.      The Debtors' History, the Nature of Asbestos-Related Litigation and the Facts of These Chapter 11 Cases Support the Findings <u>Required for Issuance of the Asbestos Permanent Channeling Injunctions</u>**

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires the Court to make certain factual findings to support the issuance of a channeling injunction under section 524(g)(1)(A). As set forth below, the Debtors' history, the nature of asbestos-related litigation and the facts of these Reorganization Cases all support the findings required for the issuance of the Asbestos Permanent Channeling Injunctions under section 524(g)(l)(A) of the Bankruptcy Code.

To support entry of a channeling injunction under section 524(g)(l)(A), a court must find that "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction." 11 U.S.C. § 524(g)(2)(B)(ii)(I). The Debtors' history and the nature of asbestos-related litigation support this finding in connection with Confirmation of the Plan. As of the Petition Date, Bondex and/or SPHC were defendants in approximately 15,000 pending

asbestos-related lawsuits, approximately 2,700 of which were pending mesothelioma-related bodily injury lawsuits.  Since 2000, Bondex and/or SPHC have resolved approximately 27,000 asbestos-related personal injury claims at a total asbestos-related indemnity cost of approximately $380 million.

The first asbestos-related lawsuit was served on Republic in 1990.  Since that time, Republic has been named in more than 5,000 asbestos-related claims.  Although, since 2005, Republic has not settled any claims and many claims have been dismissed without payment, Republic has continued to incur significant professional fees defending the lawsuits and has no insurance coverage for asbestos claims.  Moreover, Republic expects to face a continuing stream of asbestos lawsuits in the future.

The first asbestos-related lawsuit against NMBFiL was served in 1998.  Since that time, more than 1,100 asbestos personal injury lawsuits have been filed against NMBFiL.  NMBFiL has only minimal insurance and lawsuits, which were escalating in number at the time of NMBFiL's bankruptcy filing, are expected to continue well into the future.

Based on the long latency period of asbestos-related disease and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved on the Petition Date, the Debtors would likely be subject to substantial future Demands for payment arising from the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims, which supports the finding required in section 524(g)(2)(B)(ii)(I).

Section 524(g)(2)(B)(ii)(II) of the Bankruptcy Code requires a court to find that "the actual amounts, numbers, and timing of such future demands cannot be determined." 11 U.S.C. §  524(g)(2)(B)(ii)(II).  The Debtors are unable to predict the amounts, numbers and

timing of future Demands in respect of alleged asbestos-related personal injuries.  Accordingly, there is support for the finding required by section 524(g)(2)(B)(ii)(II).

Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code requires a finding that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands." 11 U.S.C. § 524(g)(2)(B)(ii)(III).  Here, if the holders of asbestos-related Demands are able to pursue such Demands outside of the Asbestos Personal Injury Distribution Procedures, the holders of such Demands would be required to liquidate their claims through settlements or judgments in the tort system on a claim by claim basis.  Because of the vagaries and uncertainties inherent in litigation and the limited resources of the Debtors, holders of asbestos-related Demands are virtually certain to obtain inconsistent awards and disparate recoveries.  In addition to obtaining inconsistent results in the tort system, holders of earlier asserted Demands might be paid in full as the Demands are settled or liquidated in the tort system while holders of later Demands may be paid less or go unsatisfied altogether.  Accordingly, the pursuit of asbestos-related Demands outside the SPHC Asbestos Personal Injury Trust Distribution Procedures and the NMBFiL Asbestos Personal Injury Trust Distribution Procedures contemplated by the Plan would likely threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims, including future asbestos-related Demands, which supports the finding required in section 524(g)(2)(B)(ii)(III).

Section 524(g)(2)(B)(ii)(IV) of the Bankruptcy Code requires a court to find that, as part of the confirmation process, the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the disclosure statement in support of the plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).  A

court must also find that "a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan." 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  As part of the confirmation process in these cases, the Debtors included the terms of the SPHC Asbestos Permanent Channeling Injunction and the NMBFiL Asbestos Permanent Channeling Injunction, including provisions therein barring actions against any SPHC Protected Party and NMBFiL Protected Party, in both the Plan and the Disclosure Statement.  (See Plan § IV.B.2, Disclosure Statement § VII.T.2.)  The Debtors also designated two separate classes, Class 4a and Class 4b under the Plan, for all Asbestos Personal Injury Claims. (See Plan §§ III.B.4, III.B.5.)  The claim holders in Classes 4a and 4b overwhelmingly support the Plan.

Finally, section 524(g)(2)(B)(ii)(V) of the Bankruptcy Code requires a court to find that

> the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

11 U.S.C. § 524(g)(2)(B)(ii)(V).  Here, the Asbestos Personal Injury Trust will pay Asbestos Personal Injury Claims in accordance with the SPHC Asbestos Personal Injury Trust Distribution Procedures and the NMBFiL Asbestos Personal Injury Trust Distribution Procedures (see Plan § III.B.4, 5), and those procedures contain mechanisms that provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future asbestos-related Demands that involve similar claims in substantially the same manner.

For example, the SPHC Asbestos Personal Injury Trust Distribution Procedures establish a schedule of eight asbestos-related diseases, along with specific liquidated values, anticipated average values and caps on liquidated values, to further the Asbestos Personal Injury Trust's goal of "paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system." (See Plan Ex. IA.102.)  The NMBFiL Asbestos Personal Injury Trust Distribution Procedures contain similar provisions related to mesothelioma claims.  (See Plan Ex. I.A.66.)   Payments to holders of Asbestos Personal Injury Claims for most of covered asbestos-related diseases will be based on the liquidated value of such claim times the Payment Percentage then in effect. (See Plan Ex. I.A.66 § 4.3, Plan Ex. I.A.102 § 4.3.) The payment percentage for the SPHC Trust Account (the "SPHC Payment Percentage") shall be set soon after the Effective Date and periodically will be reevaluated based on current estimates of the number, types and values of SPHC Asbestos Personal Injury Claims, the value of the assets then-available to the Asbestos Personal Injury Trust for payment of SPHC Asbestos Personal Injury Claims, all anticipated administrative and legal expenses and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of SPHC Asbestos Personal Injury Claims. (See Plan Ex. I.A.66 § 4.2, Plan Ex. I.A.102 § 4.2.)  If the SPHC Payment Percentage is adjusted upward, the Asbestos Personal Injury Trust shall make supplemental payments to claimants who previously liquidated their claims against the Asbestos Personal Injury Trust and received payments based on a lower Payment Percentage.  (See Plan Ex. I.A.66 § 4.3, Plan Ex. I.A.102 § 4.3.)

In order to gather data sufficient to evaluate whether to establish a payment percentage for the NMBFiL Trust Account ("NMBFiL Payment Percentage"), the Asbestos

Personal Injury Trust will not resolve any NMBFiL Asbestos Personal Injury Claim for payment until after the expiration of a three year Assessment Period. Based on the number of claims asserted against the NMBFiL Trust Account by the end of the Assessment Period, a NMBFiL Payment Percentage will then be determined, but only for mesothelioma claims. During the following two years, only mesothelioma claims will be resolved. After this two year period, the NMBFiL Asbestos Personal Injury Trust Distribution Procedures may be amended in accordance with the provisions therein to include additional Disease Levels, should the Trustees determine that sufficient funds remain in the NMBFiL Trust Account to continue to resolve and pay all future Demands on the Asbestos Personal Injury Trust arising from the Disease Level of mesothelioma in full, then the NMBFiL Asbestos Personal Injury Trust Distribution Procedures will be reevaluated and may be amended by the Trustees to include additional Disease Levels, their presumptive Medical/Exposure Criteria, and respective values.

Accordingly, the SPHC Asbestos Personal Injury Trust Distribution Procedures and NMBFiL Asbestos Personal Injury Trust Distribution Procedures to be used by the Asbestos Personal Injury Trust, which include mechanisms such as supplemental payments, pro rata distributions, matrices and periodic review of estimates of the numbers and values of present Asbestos Personal Injury Claims and future asbestos-related Demands, provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future asbestos-related Demands in substantially the same manner. As a result, the Plan, the SPHC Asbestos Personal Injury Trust Distribution Procedures and the NMBFiL Asbestos Personal Injury Trust Distribution Procedures contemplated therein support the findings required in section 524(g)(2)(B)(ii)(V).

C.    **The Court May Extend the Asbestos**
      **Permanent Channeling Injunction to Third Parties**

Sections 524(g)(3)(A) and 524(g)(4)(A)(ii) of the Bankruptcy Code designate

certain entities that are protected by a channeling injunction entered pursuant to

section 524(g)(1)(A).  Specifically, section 524(g)(3)(A) provides that

> (ii) no entity that pursuant to such plan or thereafter becomes a
> direct or indirect transferee of, or successor to any assets of, a
> debtor or trust that is the subject of the injunction shall be liable
> with respect to any claim or demand made against such entity by
> reason of its becoming such a transferee or successor; and

> (iii) no entity that pursuant to such plan or thereafter makes a loan
> to such a debtor or trust or to such a successor or transferee shall,
> by reason of making the loan, be liable with respect to any claim or
> demand made against such entity, nor shall any pledge of assets
> made in connection with such a loan be upset or impaired for that
> reason.

11 U.S.C. § 524(g)(3)(A)(ii)-(iii).  Consistent with that section, the Plan contemplates that the

SPHC Asbestos Permanent Channeling Injunction will be extended to protect the following:

> Entities that, pursuant to the Plan or on or after the Effective Date,
> become a direct or indirect transferee of, or successor to, any assets
> of any SPHC Parties or Reorganized SPHC Parties, or the
> Asbestos Personal Injury Trust, but only to the extent that liability
> is asserted to exist by reason of such Entity becoming such a
> transferee or successor (see Plan § I.A.111.h.); and

> Entities that, pursuant to the Plan or on or after the Effective Date,
> make a loan to any SPHC Parties or Reorganized SPHC Parties, or
> the Asbestos Personal Injury Trust or to a successor to, or
> transferee of, any assets of any SPHC Parties or Reorganized
> SPHC Parties, or the Asbestos Personal Injury Trust, but only to
> the extent that liability is asserted to exist by reason of it becoming
> such a lender (see Plan § I.A.111.i.).

Further, the NMBFiL Asbestos Permanent Channeling Injunction will be extended to protect the

following:

> Entities that, pursuant to the Plan or on or after the Effective Date,
> become a direct or indirect transferee of, or successor to, any assets

of NMBFiL or Reorganized NMBFiL, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor (see Plan § I.A.75.j.); and

Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to NMBFiL or Reorganized NMBFiL, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of NMBFiL or Reorganized NMBFiL, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender (see Plan § I.A.75.k.).

In addition to the entities protected by virtue of section 524(g)(3)(A),

section 524(g)(4)(A)(ii) provides that a channeling injunction entered pursuant to

section 524(g)(1)(A):

may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

(I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to —

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii).  As required by section 524(g)(4)(A)(ii), each Protected Party

under the Plan is either identifiable from the terms of the injunction or is a member of an

identifiable group. (See Plan §§ I.A.75, I.A.111.)  In addition, the Plan defines Protected Party to

include those parties that fit within the categories listed in section 524(g)(4)(A) of the

Bankruptcy Code. (See Plan §§ I.A.75, I.A.111.)  Each Protected Party under the Plan therefore

falls within the groups designated in sections 524(g)(3)(A) and 524(g)(4)(A)(ii) as third parties

to whom a channeling injunction may be extended.  Accordingly, the Court may extend (a) the

SPHC Asbestos Permanent Channeling Injunction to protect all SPHC Protected Parties from

liability for any SPHC Asbestos Personal Injury Claims and (b) the NMBFiL Asbestos

Permanent Channeling Injunction to protect all NMBFiL Protected Parties from liability for any

NMBFiL Asbestos Personal Injury Claims.

>    **D.    The Court Has Appointed a Legal Representative To Protect
>            the Rights of Persons Who Might Subsequently Assert Demands**

Section 524(g)(4)(B)(i) provides that a channeling injunction will be valid and

enforceable with respect to future demands only if "as part of the proceedings leading to issuance

of such injunction, the court appoints a legal representative for the purpose of protecting the

rights of persons that might subsequently assert demands of such kind."  11 U.S.C.

§ 524(g)(4)(B)(i).  As noted above, during the proceedings leading to the issuance of the

Asbestos Permanent Channeling Injunctions, the Court appointed Professor Eric D. Green as the

Future Claimants' Representative in the Initial Debtors' cases [D.I. 374] and in the New Debtors'

cases [D.I. 5017] for the purpose of protecting the rights of persons that might subsequently

assert Demands against such Debtors.  Accordingly, the requirements of section 524(g)(4)(B)(i)

of the Bankruptcy Code are met here.

### E. Entry of the Asbestos Permanent Channeling Injunctions Is Fair and Equitable With Respect to Future Asbestos Claimants

Section 524(g)(4)(B)(ii) requires a court to determine that entry of the channeling injunction, and the protection from liability that is afforded to the parties named therein, "is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party." 11 U.S.C. § 524(g)(4)(B)(ii). In accordance with that section, the SPHC Parties, on behalf of all SPHC Protected Parties, and NMBFiL and International, on behalf of all NMBFiL Protected Parties, are contributing certain assets to the Asbestos Personal Injury Trust. (See Plan § IV.I.2.) On the Effective Date: (i) the SPHC Parties and/or International on behalf of and as a contribution to such SPHC Parties will pay an aggregate of $447.5 million in cash to the Asbestos Personal Injury Trust; (ii) the SPHC Parties and International, as co-obligors, shall issue the SPHC Payment Note; (iii) NMBFiL and/or International on behalf of and as a contribution to NMBFiL shall pay an aggregate of $2.45 million in cash to the Asbestos Personal Injury Trust; and (iv) NMBFiL and International, as co-obligors, shall issue the NMBFiL Payment Note. Thus, in light of the substantial contributions made to the Asbestos Personal Injury Trust on behalf of all Protected Parties, entry of the Asbestos Permanent Channeling Injunctions, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands.

### VIII. REQUEST FOR AUTHORITY TO CONSUMMATE AND IMPLEMENT THE PLAN IMMEDIATELY UPON THE ENTRY OF THE CONFIRMATION ORDER NOTWITHSTANDING 14-DAY STAY OF THE CONFIRMATION ORDER IMPOSED BY OPERATION OF BANKRUPTCY RULE 3020(E)

The Debtors respectfully request that this Court direct that the Confirmation Order shall be effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e). Bankruptcy Rule 3020(e) provides that: "An order

confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e).  As such, and as the Advisory Committee notes to Rule 3020(e) states, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately." Id. (emphasis added).

Under the circumstances of the Reorganization Cases, there being no objections to the Plan, it is appropriate for the Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order.  The Debtors submit that this relief is in the best interests of the Debtors' estates and creditors and will not prejudice any parties in interest.

According to the Advisory Committee notes to the 1999 amendments to the Bankruptcy Rules, the purpose of Bankruptcy Rule 3020(e) is to permit a party in interest to request a stay of the confirmation order pending appeal before the plan is implemented and an appeal becomes moot.  FRBP 3020(e), Adv. Comm. Notes, 1999 Amend.  No objections to the Plan were filed and the Debtors have resolved all informal objections to Confirmation.  As a result, no party will be appealing the Confirmation Order.  Therefore, no party in interest will be prejudiced by the consummation of the Plan immediately upon the entry of the Confirmation Order.[11]

---

[11]    If for some reason a party in interest decides to appeal the Confirmation Order notwithstanding that it has not objected to the Plan, in addition to the fact that it likely has waived its appeal rights, such party is on notice that the Debtors are asking the Court for a waiver of the stay imposed by Bankruptcy Rule 3020(e). Therefore, such party is on notice that it must request a stay pending appeal immediately after the entry of the Confirmation Order.  See, e.g., Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 187 (3d Cir. 2001)  (noting that all parties were on notice that the plan called for "Immediate Effectiveness," allowing appellants the opportunity to seek a stay immediately upon confirmation of the plan).  In any case, as the

The Debtors, therefore, respectfully request that the Court direct that the Confirmation Order be effective immediately upon its entry notwithstanding the stay otherwise imposed pursuant to Rule 3020(e).

## IX.    <u>CONCLUSION</u>

For the reasons set forth in this Memorandum of Law, the Debtors submit that (i) the Plan, as modified by the Modifications, fully satisfies all applicable requirements of the Bankruptcy Code and should be confirmed by the Court, (ii) the Debtors should be authorized to make the Modifications to the Plan, which should be deemed accepted by all creditors and equity security holders of the Debtors and (iii) the 14-day stay of the Confirmation Order should be waived.

---

(continued…)

Court is aware, the likelihood of such party being able to obtain a stay pending appeal, regardless of the period of time to do so, is extremely low.

Dated:  December 8, 2014
        Wilmington, Delaware

Respectfully submitted,

_/s/ Zachary I. Shapiro_
Daniel J. DeFranceschi (DE 2732)
Paul N. Heath (DE 3704)
Zachary I. Shapiro (DE 5103)
RICHARDS, LAYTON & FINGER
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

        -and-

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Paul M. Green (TX 24059854)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR DEBTORS