

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | : |
|  | : |
| SPECIALTY PRODUCTS HOLDING CORP., | : |
| *et al.*,[1] | : |
|  | : |
| Debtors. | : |

Chapter 11

Case No. 10-11780 (PJW)

(Jointly Administered)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
## CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION
## OF SPECIALTY PRODUCTS HOLDING CORP., BONDEX INTERNATIONAL,
## INC., REPUBLIC POWDERED METALS, INC. AND NMBFiL, INC. , AS MODIFIED

---

[1]   The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Specialty Products Holding Corp. (0857); Bondex International, Inc. (4125); Republic Powdered Metals, Inc. (4388); and NMBFiL, Inc. (2441).  The address of Specialty Products Holding Corp. and Bondex International, Inc. is 4515 St. Clair Avenue, Cleveland, Ohio 44103. The address of Republic Powdered Metals, Inc. and NMBFiL, Inc. is 2628 Pearl Road, Medina, Ohio 44256.

# TABLE OF CONTENTS

Page

I. FINDINGS OF FACT.................................................................................................. 4

    A. History of the Debtors' asbestos personal injury LIABILITIES, the decision to file the reorganization cases and the term sheets................................. 4

        1. Background .................................................................................................. 4

        2. Business Operations.................................................................................... 7

        3. General Overview of the Debtors' Manufacture and Sale of Products Alleged to Contain Asbestos....................................................... 8

        4. History of the Debtors' Asbestos Personal Injury Litigation .................... 9

        5. Determination to File Reorganization Cases ........................................... 10

        6. Appointment of the Asbestos Personal Injury Committee and Future Claimants' Representative ............................................................ 11

        7. Resolution of the Reorganization Cases ................................................. 12

    B. MODIFICATIONS TO THE PLAN ................................................................. 14

    C. COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.............................................................................. 15

        1. Section 1129(a)(1) — Compliance of the Plan with Applicable Provisions of the Bankruptcy Code ........................................................ 15

        2. Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code................................................................................ 20

        3. Section 1129(a)(3) — Proposal of the Plan in Good Faith...................... 21

        4. Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable ............................................................................................... 22

        5. Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy ........................................................................................................ 22

        6. Section 1129(a)(6) — Approval of Rate Changes.................................... 23

        7. Section 1129(a)(7) — Best Interests of Holders of Claims and Interests .................................................................................................... 23

        8. Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class......................................................................................................... 23

        9. Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code................................ 24

        10. Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class..................................................................................... 25

**TABLE OF CONTENTS**
(continued)

Page

11.    Section 1129(a)(11) — Feasibility of the Plan ........................................ 26

12.    Section 1129(a)(12) — Payment of Bankruptcy Fees ............................ 26

13.    Section 1129(d) — Purpose of Plan........................................................ 26

D.    THE ASBESTOS personal injury TRUST AND THE ASBESTOS permanent CHANNELING INJUNCTIONs COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE............................................................ 27

1.    The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code..................................... 27

2.    The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.................................... 29

3.    The Extension of the NMBFiL Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate ............................................... 32

4.    The Extension of the SPHC Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate ............................................... 35

5.    The Rights of Persons That Might Subsequently Assert an Asbestos Personal Injury Claim That Is a Demand Addressed by the Asbestos Permanent Channeling Injunctions and Transferred to the Asbestos Personal Injury Trust Were Represented by the Future Claimants' Representative ............................................................ 38

6.    Entry of the Asbestos Permanent Channeling Injunctions Is Fair and Equitable with Respect to Persons That Might Subsequently Assert an Asbestos Personal Injury Claim that is a Demand Addressed by the Asbestos Permanent Channeling Injunctions and Transferred to the Asbestos Personal Injury Trust .................................. 38

E.    Comprehensive Settlement of Claims and Controversies...................................... 39

F.    SATISFACTION OF CONDITIONS TO CONFIRMATION ........................... 39

II.   CONCLUSIONS OF LAW ...................................................................................... 46

A.    JURISDICTION AND VENUE ................................................................... 46

B.    MODIFICATIONS TO THE PLAN ............................................................. 47

C.    EXEMPTIONS FROM TAXATION ............................................................ 47

D.    COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE ...... 48

E.    COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE........................................................................................................ 48

F.    Propriety of the term sheets ...................................................................... 48

G.    Transfer of books and records to the asbestos personal injury trust .................... 49

**TABLE OF CONTENTS**
(continued)

Page

H.    APPROVAL OF THE Settlements and RELEASES PROVIDED UNDER
      THE PLAN ........................................................................................................... 49

## INTRODUCTION

WHEREAS, Specialty Products Holding Corp., Bondex International, Inc., Republic Powdered Metals, Inc. and NMBFiL, Inc. (collectively, the "Debtors" and, as reorganized entities after emergence, the "Reorganized Debtors") proposed the Joint Plan of Reorganization of Specialty Products Holding Corp, Bondex International, Inc., Republic Powdered Metals, Inc. and NMBFiL, Inc., dated October 20, 2014, as modified by the modification set forth in the blackline of the Plan in Exhibit B attached hereto and incorporated herein by reference (as it may be amended, the "Plan");[2]

WHEREAS, the Bankruptcy Court, on October 20, 2014, signed its Order (I) Approving the Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization and (III) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures [D.I. 5112] (the "Disclosure Statement Order"), by which the Bankruptcy Court, among other things, approved the Debtors' proposed disclosure statement (the "Disclosure Statement"), established procedures for the solicitation and tabulation of votes to accept or reject the Plan and scheduled a hearing to consider Confirmation of the Plan for December 10, 2014, at 3:30 p.m. (prevailing Eastern Time) (the "Confirmation Hearing");

WHEREAS, affidavits of service were executed by Kathleen M. Logan with respect to the mailing of notice of the Confirmation Hearing and solicitation materials in respect

---

[2] Capitalized terms and phrases used herein have the meanings given to them in the Plan. The rules of interpretation set forth in Section I.B.1 of the Plan apply to the Findings of Fact and Conclusions of Law (the "Findings and Conclusions"), which are being entered concurrently herewith, and to this Order (this "Confirmation Order"). In addition, in accordance with Section I.A of the Plan, any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

A copy of the Plan (without the exhibits thereto) is attached hereto as Exhibit A and incorporated herein by reference.

of the Plan in accordance with the Disclosure Statement Order (collectively, the "<u>Affidavits of Service</u>") and were filed with the Bankruptcy Court on November 6, 2014 [D.I.s 5157, 5158, 5159, 5160 and 5161] and December 4, 2014 [D.I. 5228].

WHEREAS, the Declaration of Lael Dowd [D.I. 5249] (the "<u>Publication Declaration</u>"), which was filed with the Bankruptcy Court on December 9, 2014, addresses the publication of the Notice of (A) Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Proposed Joint Plan of Reorganization and (C) Related Matters and/or the other forms of publication notice approved by the Bankruptcy Court as set forth in the Disclosure Statement Order.

WHEREAS, Logan & Company, Inc., the Bankruptcy Court-appointed solicitation and tabulation agent in respect of the Plan, filed Declaration of Kathleen M. Logan Certifying Voting on, and Tabulation of, Ballots Accepting and Rejecting Joint Plan of Reorganization of Specialty Products Holding Corp., Bondex International, Inc., Republic Powdered Metals, Inc. and NMBFiL, Inc. [D.I. 5236] (the "<u>Voting Agent Declaration</u>") on December 8, 2014, attesting to the results of the tabulation of the properly executed and timely received Ballots for the Plan as follows:

**<u>Class 4a Claimants</u>.** The Debtors received 71,995 acceptances out of 72,006 votes from holders of Claims under Class 4a (SPHC Asbestos Personal Injury Claims), with Class 4a claimants who voted in favor of the Plan holding Claims in the amount of $1,356,209,300 for voting purposes only, such acceptances being 99.98 percent in number and 99.99 percent in amount of all ballots received from holders of Class 4a Claims (Voting Agent Decl. ¶¶ 16,17.);

**Class 4b Claimants.** The Debtors received 49,799 acceptances out of 49,810 votes from holders of Claims under Class 4b (NMBFiL Asbestos Personal Injury Claims), with Class 4b claimants who voted in favor of the Plan holding Claims in the amount of $306,072,446 for voting purposes only, such acceptances being 99.99 percent in number and 99.99 percent in amount of all ballots received from holders of Class 4b Claims (Voting Agent Decl. ¶¶ 16,17.);

WHEREAS, no objections to Confirmation of the Plan were filed by any party. Informal objections were raised by: 3M Company; the United States Department of Justice; and California Franchise Tax Board.

WHEREAS, the Debtors filed modifications to the Plan [D.I. 5252], which are set forth in Exhibit B attached hereto (collectively, the "Modifications");

WHEREAS, the Debtors filed a memorandum of law in support of Confirmation of the Plan [D.I. 5234] (the "Memorandum of Law");

WHEREAS, the declarations of Stephen J. Knoop [D.I. 5247], Tracy D. Crandall [D.I.5248], Edward W. Moore [D.I.5250], Eric D. Green [D.I. 5238], John James O'Connell III [D.I. 5246] and Peter A.. Kraus [D.I. 5245] were submitted in support of the Plan (collectively, the "Declarations");

WHEREAS, the Bankruptcy Court has reviewed the Plan, the Disclosure Statement, the Disclosure Statement Order, the Voting Agent Declaration, the Affidavits of Service, the Publication Affidavit, the Memorandum of Law, the Declarations and the other papers before the Bankruptcy Court in connection with the Confirmation of the Plan;

WHEREAS, the Bankruptcy Court heard the statements of counsel in support of Confirmation at the Confirmation Hearing, as reflected in the record made at the Confirmation Hearing;

WHEREAS, the Bankruptcy Court has considered all evidence presented at the Confirmation Hearing;

WHEREAS, the Bankruptcy Court has taken judicial notice of the papers and pleadings on file in these chapter 11 cases;

WHEREAS, the Bankruptcy Court, after due deliberation and for sufficient cause, finds that the evidence admitted in support of the Plan at the Confirmation Hearing is persuasive and credible;

NOW, THEREFORE, the Bankruptcy Court hereby enters the following Findings of Fact and Conclusions of Law with respect to Confirmation of the Plan.[3]

## I.    FINDINGS OF FACT.

### A.    HISTORY OF THE DEBTORS' ASBESTOS PERSONAL INJURY LIABILITIES, THE DECISION TO FILE THE REORGANIZATION CASES AND THE TERM SHEETS

#### 1.    Background

SPHC was incorporated under the name Republic Powdered Metals, Inc. on May 26, 1947 in Ohio.  (Knoop Decl. ¶ 7.)  On October 26, 1963, Debtor Republic was incorporated in Ohio under the name R.P.M., Inc. as a wholly owned subsidiary of SPHC. (Crandall Decl. ¶ 8.)  At that time, Republic had no assets.  (Id.)  In March 1966, SPHC, pursuant to an asset purchase agreement dated February 11, 1966 (the "Reardon Asset Purchase Agreement"), acquired substantially all the assets and contractually assumed certain liabilities of The Reardon Company ("Reardon"), a Missouri corporation, including liability for products manufactured or sold by Reardon pre-transfer which caused bodily injury subsequent to the date

---

[3]    These Findings and Conclusions constitute the Bankruptcy Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable herein by Bankruptcy Rules 7052 and 9014. Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact.

of the Reardon Asset Purchase Agreement. (Knoop Decl. ¶ 7.) Reardon manufactured a line of consumer home improvement products under the brand name "Bondex," including an asbestos-containing joint compound. (Id.) Reardon also produced a number of other asbestos-containing products that did not use the Bondex name. (Id.)

Following the Reardon acquisition, SPHC internally operated a "Republic Powdered Metals Division" and a "Reardon Company Division." SPHC's original manufacturing, marketing and sales efforts continued under the Republic Powdered Metals Division. The Reardon Company Division continued to manufacture, market and sell a number of asbestos-containing products, including Bondex joint compound. (Knoop Decl. ¶ 8.)

On November 9, 1971, SPHC changed its name from Republic Powdered Metals, Inc. to RPM, Inc. Also on that date, Debtor Republic changed its name from R.P.M., Inc. to Republic Powdered Metals, Inc. Between November 1971 and May 1972, SPHC continued to manufacture and sell products, including asbestos-containing products, through both (1) the Republic Powdered Metals Division and (2) the Reardon Company Division. (Knoop Decl. ¶ 9.)

In May 1972, SPHC incorporated Bondex in Ohio as an independently operated and wholly-owned subsidiary. On May 31, 1972, Bondex acquired or assumed from SPHC the assets, property and liabilities of the Reardon Company Division of SPHC. After Bondex's incorporation, Bondex took over the production of Reardon's basic product lines, including the production of its joint compound. On May 31, 1972, Republic acquired or assumed from SPHC the assets and liabilities of the Republic Powdered Metals Division of SPHC. As a result of the 1972 transactions, SPHC became a holding company with no operating assets. Bondex manufactured joint compound products that contained asbestos until 1977, when it began to manufacture a newly reformulated product without asbestos. Republic continued to manufacture

a line of roofing and exterior maintenance products, some of which contained asbestos until the mid- to late-1980s. (Knoop Decl. ¶ 10.)

Bondex ceased operations in 1999 and sold its assets to sister companies DAP Products, Inc. ("DAP") and Zinsser Co., Inc., with the majority of the assets going to DAP. From and after that time, Bondex's sole activity was the litigation and settlement of asbestos-related claims. As of July 2000, Bondex had terminated all of its employees except for John A. Fleming. (Knoop Decl. ¶ 11.)

Until October 15, 2002, SPHC was the parent company for the RPM businesses that then existed. On that date, SPHC engaged in a corporate reorganization (the "2002 Reorganization") pursuant to which International, which had been formed in July 2002, became the parent holding company in place of SPHC, and SPHC became an intermediate holding company. (Knoop Decl. ¶ 12.)

Bondex was reincorporated in Delaware on January 1, 2010. As of May 31, 2010, SPHC was the parent company of Bondex, as well as the direct parent of eight domestic operating companies (the "Operating Subsidiaries") and the indirect parent of certain other domestic and foreign non-debtor subsidiaries. The Operating Subsidiaries are manufacturers, distributors and sellers of various specialty chemical product lines, including exterior insulating finishing systems, powder coatings, fluorescent colorants and pigments, cleaning and protection products, fuel additives, wood treatments and coatings and sealants, in both the industrial and consumer markets. Their family of products includes those marketed under brand names such as CCI, Chemspec, Day-Glo, Dryvit, Guardian, Mohawk, Kop-Coat, TCI and Valvtect. (Knoop Decl. ¶ 13.)

The entities that ultimately became NMBFiL, Dynatron Corporation ("Dynatron") and the H. Talbot Co. ("Talbot"), were incorporated in 1957 and 1955, respectively. On June 30, 1983, SPHC acquired the successor to Talbot, and on June 8, 1993, SPHC acquired the successor to Dynatron. On December 22, 1995, the successor to Talbot changed its name to Mar-Hyde Corporation. On January 1, 1997, Mar-Hyde Corporation and the successor to Dynatron merged, and on December 16, 1999, NMBFiL, the merged entity, changed its name to Bondo Corporation. (Crandall Decl. ¶ 11.)

Until October 15, 2002, SPHC was the ultimate parent corporation of Republic and NMBFiL. At that time, RPM Industrial Holding Co. became the direct parent of Republic, RPM Consumer Holding Company ("Consumer") became the direct parent of NMBFiL, and International became the ultimate parent of Republic and NMBFiL. On May 6, 2005, DAP Products Inc., a wholly owned subsidiary of Consumer, became the direct parent of NMBFiL such that Consumer and International are now NMBFiL's indirect parents. In 2007, NMBFiL sold substantially all its assets to 3M Company, including the Bondo name, and changed its name to NMBFiL. In connection with the sale, NMBFiL and International, jointly and severally, agreed to indemnify 3M Company and other parties from certain losses, as set forth in the asset purchase agreement dated November 2, 2007 among Bondo Corporation, International, 3M Company and 3M Innovative Properties Company. (Crandall Decl. ¶ 12.)

## 2.    Business Operations

During fiscal year 2014, SPHC and its Operating Subsidiaries generated consolidated revenues of approximately $410.74 million and operating income of approximately $53.2 million. (Knoop Decl. ¶ 14.) Republic is a leader in building restoration, and continues to provide an extensive line of roof coatings. (Crandall Decl. ¶ 13.) During fiscal year 2013, Republic generated revenue of approximately $25 million. (Id.) On or after the Confirmation

Date, Bondex and NMBFiL will each lease certain storage facilities located in Medina, Ohio from International and sublease those facilities to affiliates. (Crandall Decl. ¶ 14; Knoop Decl. ¶ 14.) These leasing arrangements will generate $120,000 in yearly revenue for each of Bondex and NMBFiL. (Crandall Decl. ¶ 14; Knoop Decl. ¶ 14.)

### 3.   General Overview of the Debtors' Manufacture and Sale of Products Alleged to Contain Asbestos

#### a.   SPHC and Bondex

The manufacture and sale of Bondex brand joint compound generated the overwhelming majority of asbestos claims filed against the Initial Debtors. The main manufacturing facility for the Bondex line of products was located in St. Louis, Missouri. There was also a smaller manufacturing facility in Toms River, New Jersey and a small warehouse in California. All of the asbestos fiber used in Bondex brand joint compound was of the chrysotile variety. (Knoop Decl. ¶ 15.)

Bondex brand joint compound was consumer oriented and sold primarily in small quantity containers in hardware stores for the do-it-yourself market. (Knoop Decl. ¶ 16.) The majority was sold in five pound bags. (Id.) A list of the asbestos-containing products sold by either SPHC, Bondex or Republic or their predecessor The Reardon Company and, based upon the Debtors' information and belief, the years during which each product was sold is attached to the Disclosure Statement as Exhibit V.

#### b.   Republic

On May 31, 1972, Republic purchased the assets and assumed the liabilities associated with the product line of the Republic Powdered Metals Division of what is now SPHC. From that time forward, Republic continued to manufacture a line of roofing and exterior

maintenance products. Some of those products contained asbestos until the mid- to late-1980s. (Crandall Decl. ¶ 15.)

### c.    NMBFiL

NMBFiL's asbestos-related liabilities derive principally from its manufacture of automobile body filler or other automobile repair products that contained talc that plaintiffs have alleged was contaminated with asbestos. NMBFiL did not use asbestos in the manufacture of any of its products. (Crandall Decl. ¶ 16.)

### 4.    History of the Debtors' Asbestos Personal Injury Litigation

#### a.    SPHC and Bondex

17.    The first mesothelioma case against Bondex was filed in 1980. SPHC received its first asbestos-related lawsuit in 1992. Since 2000, the Initial Debtors have resolved approximately 27,000 asbestos-related personal injury claims at a total asbestos-related indemnity cost of approximately $380 million. As of the Petition Date, the Initial Debtors were defendants in approximately 15,000 pending asbestos-related lawsuits, approximately 2,700 of which were pending mesothelioma-related bodily injury lawsuits. The substantial majority of historical indemnity payments made by the Initial Debtors were made in respect of mesothelioma claims. (Knoop Decl. ¶ 17.)

#### b.    Republic

The first asbestos-related lawsuit was served on Republic in 1990. Since that time, Republic has been named in more than 5,000 asbestos-related claims, many of which were dismissed without payment. The filings against Republic have been somewhat erratic over this period; high volumes of claims were filed in 1997 (1,551) and 2000 (2,057), but relatively few claims were filed in the years before or after. During the period between 2000 and 2010, Republic averaged approximately 140 claims per year. Since 2005, Republic has not settled any

claims and many claims have been dismissed without payment. Nonetheless, Republic has continued to incur significant professional fees defending the lawsuits and has no insurance coverage for asbestos claims. Moreover, Republic expects to face a continuing stream of asbestos lawsuits in the future. (Crandall Decl. ¶ 17.)

Many claims against Republic appear to have been the result of name confusion with SPHC. This may be the result of the fact that, historically, SPHC has been known by three names: (a) from its inception through 1971, it was known as Republic Powdered Metals, Inc.; (b) from 1971 through April 2010, it was known as RPM, Inc.; and (c) from April 2010 it has been known as SPHC. The remaining claims appear to have been based on Republic's historical manufacture of certain roofing and exterior maintenance products that contained asbestos. (Crandall Decl. ¶ 18.)

### c.    NMBFiL

The first asbestos-related lawsuit against NMBFiL was served in 1998. Since that time, more than 1,100 asbestos personal injury lawsuits have been filed against NMBFiL. From 2002 to 2005, the number of claims filed per year rose from 22 to 584. From 2006 to 2010, the rate of filings dropped precipitously, averaging fewer than 5 claims per year. In 2011, the rate of new claims began to rise again, from 14 in 2011 to 127 in 2013. NMBFiL has never been found liable in any of these lawsuits tried to verdict, and it has never paid to settle a claim arising from alleged asbestos exposure. Notwithstanding NMBFiL's success to date in the asbestos litigation, NMBFiL has minimal insurance coverage and has incurred substantial professional fees in defending the claims. Moreover, despite its favorable track record at this juncture, NMBFiL expects that numerous asbestos claims will continue to be filed against it. (Crandall Decl. ¶ 19.)

### 5.    Determination to File Reorganization Cases

During fiscal years 2005 through 2009, the Initial Debtors incurred asbestos costs in the range of approximately $60 million to $82 million per year.  Although they believed they had strong defenses to the asbestos claims, the increasing cost of managing and resolving the asbestos-related litigation led the Initial Debtors to conclude that the filing of their Reorganization Cases was necessary.  (Knoop Decl. ¶ 18.)

In view of the cost and extent of the asbestos-related litigation and the likelihood that the litigation would continue well into the future, NMBFiL and Republic (together, the "New Debtors") determined that a resolution of their current and future asbestos-related personal injury liability under section 524(g) of the Bankruptcy Code was necessary.  On July 26, 2014, the Initial Debtors, the New Debtors, and International entered into the Term Sheets (as defined below) setting forth the parties' agreements in principle on a consensual plan of reorganization that included all of the Debtors.  The New Debtors filed their chapter 11 cases to effectuate the agreements outlined in the Term Sheets and pursue confirmation and consummation of the Plan.  (Crandall Decl. ¶ 20.)

### 6.    Appointment of the Asbestos Personal Injury Committee and Future Claimants' Representative

On June 10, 2010, the U.S. Trustee appointed the Asbestos Personal Injury Committee pursuant to section 1102 of the Bankruptcy Code.  [See D.I. 75].  The Asbestos Personal Injury Committee was reconstituted by the U.S. Trustee on October 18, 2010 [D.I. 457], December 14, 2010 [D.I. 666] and again on October 22, 2014 [D.I. 5115].  With the assistance of counsel and other advisers, the Committee has been very active in the all aspects of the Debtors' cases, including numerous investigations, extensive contested litigation, and ultimately the negotiation of the Term Sheets leading to the Plan.  (Kraus Decl. at 3-5.)

By order dated October 18, 2010 [D.I. 374], the Bankruptcy Court approved the appointment of Professor Eric D. Green as the Future Claimants' Representative in the Initial Debtors' cases and by order dated September 25, 2014 [D.I. 5017] in the New Debtors' cases. Professor Green has extensive experience with the resolution of asbestos-related personal injury claims and asbestos bankruptcy cases. (Green Decl. ¶¶ 6-9.) With the assistance of counsel and other advisors, Professor Green has been extensively involved in all aspects of the Debtors' chapter 11 cases, including discovery, litigation, and negotiation of the Term Sheets. (Green Decl. ¶¶ 14, 18.)

### 7.    Resolution of the Reorganization Cases

In November 2011, the Initial Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative and International agreed to mediate the Reorganization Cases of the Initial Debtors before retired Judge Daniel Weinstein of JAMS. The parties attended mediation sessions with Judge Weinstein on February 12, 2012 in New York, New York and on November 6, 2012 in San Francisco, California. The mediation sessions did not result in an agreement among the parties. (Knoop Decl. ¶ 19.)

In late July 2014, following extensive settlement discussions among the parties, the Debtors and International reached an agreement with the Asbestos Personal Injury Committee and the Future Claimants' Representative and others to resolve all Asbestos Personal Injury Claims, settle all disputes in connection with the Court's estimation decision, resolve litigation which the Asbestos Personal Injury Committee and the Future Claimants' Representative had been authorized to pursue against International and others related to the 2002 Reorganization and to cooperate in the confirmation of the Plan. In particular, on July 26, 2014, the Initial Debtors, Republic and International entered into a settlement term sheet (the "SPHC Term Sheet") with (i) the Asbestos Personal Injury Committee, both in its capacity as the official

asbestos claimants' committee in the Initial Debtors' bankruptcy cases and in its capacity as the ad hoc asbestos claimants' committee selected for the purpose of negotiating a pre-packaged or pre-negotiated plan of reorganization for Republic, (ii) counsel for each member of the Asbestos Personal Injury Committee, both in their capacity as counsel for members of the Asbestos Personal Injury Committee and as counsel for the members of the ad hoc asbestos claimants' committee for Republic, and (iii) the Future Claimants' Representative, both in his capacity as the Future Claimants' Representative in the Initial Debtors' bankruptcy cases and in his capacity as the future claimants' representative selected by Republic and the ad hoc asbestos claimants' committee. The SPHC Term Sheet set forth the parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future asbestos personal injury claims related to the Initial Debtors and Republic. (Knoop Decl. ¶ 20.)

On the same date, International and NMBFiL entered into a settlement term sheet (the "NMBFiL Term Sheet" and together with the SPHC Term Sheet, the "Term Sheets") with (i) an ad hoc committee of law firms representing asbestos claimants that have pursued and presently are pursuing claims against NMBFiL and (ii) the Future Claimants' Representative, in his capacity as the future claimants' representative selected by NMBFiL and the ad hoc committee. The NMBFiL Term Sheet set forth the parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future asbestos personal injury claims related to NMBFiL. (Knoop Decl. ¶ 21; Crandall Decl. ¶ 22.)

The Term Sheets provide that they will be implemented through the Plan, which incorporates their terms. (Knoop Decl. ¶ 22; Crandall Decl. ¶ 22.) The Plan proposes to implement the agreements in principle by, among other things, providing for the creation and funding of a trust to resolve Asbestos Personal Injury Claims. (Id.) The Asbestos Personal

Injury Trust to be created under the Plan will contain two separate series: one of which will hold the SPHC Trust Account and all assets and income thereof, and the other of which shall hold the NMBFiL Trust Account and all assets and income thereof. (Id.) The SPHC Trust Account will be used to resolve SPHC Asbestos Personal Injury Claims pursuant to the SPHC Asbestos Personal Injury Trust Distribution Procedures and the NMBFiL Trust Account will be used to resolve NMBFiL Asbestos Personal Injury Claims pursuant to the NMBFiL Asbestos Personal Injury Trust Distribution Procedures. (See id.)

The trust account for holders of SPHC Asbestos Personal Injury Claims will be funded by (i) an aggregate of $447.5 million in cash paid by one or more of the SPHC Parties and International on the Effective Date and (ii) the SPHC Payment Note issued by the SPHC Parties and International as co-obligors. The SPHC Payment Note, in substantially the form of Exhibit I.A.108 to the Plan, will (a) bear no interest, (b) mature on the fourth anniversary of the Effective Date, (c) be secured by the SPHC Pledge, and (d) provide for the following scheduled principal payments to the Asbestos Personal Injury Trust, in each case, payable in the form of cash, shares of common stock of International or a combination thereof: (1) on or before the second anniversary of the Effective Date of the Plan, $102.5 million; (2) on or before the third anniversary of the Effective Date of the Plan, $120 million; and (3) on or before the fourth anniversary of the Effective Date of the Plan, $125 million. (Knoop Decl. ¶ 23.)

The trust account for holders of NMBFiL Asbestos Personal Injury Claims will be funded by (i) an aggregate of $2.45 million in cash paid by one or both of NMBFiL and International on the Effective Date and (ii) the NMBFiL Payment Note issued to the Asbestos Personal Injury Trust by NMBFiL and International as co-obligors. The NMBFiL Payment Note, in substantially the form of Exhibit I.A.72 to the Plan, will be (a) in the principal amount

of $50,000, (b) secured by the pledge of 100% of the equity of reorganized NMBFiL plus cash or

a letter of credit and (c) due on the first anniversary of the Effective Date.  (Crandall Decl. ¶ 23.)

### B.    MODIFICATIONS TO THE PLAN.

The Debtors filed the Modifications.[4]  The Modifications do not materially or

adversely affect or change the treatment of any Claim against or Interest in any Debtor and do

not require the resolicitation of the Plan.

### C.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

#### 1.    Section 1129(a)(1) — Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

The Plan complies with all applicable provisions of the Bankruptcy Code, as

required by section 1129(a)(l) of the Bankruptcy Code, including sections 1122 and 1123 of the

Bankruptcy Code.  The Plan fully complies with each requirement of section 1123(a) of the

Bankruptcy Code.  Article II of the Plan designates seven classes of Claims and Interests.  (Plan

art. II.)  Section III.B of the Plan specifies that Classes 1-3 and 5-6 are not impaired under the

Plan.  (Plan § III.B.)  Sections III.B.4 and III.B.5 of the Plan specify that Claims in Classes 4a

and 4b are impaired and describe the treatment of each such Class.  (Plan §§ III.B.4, III.B.5.)

Further, the treatment of each Claim or Interest within a Class is the same as the treatment of

each other Claim or Interest in such Class, unless the holder of a Claim or Interest agrees to less

favorable treatment on account of its Claim or Interest.  (Plan § III.B.)

##### a.    Sections 1122 and 1123(a)(1)-(4) — Classification and Treatment of Claims and Interests.

i.    The Plan constitutes a separate plan of reorganization for

each of the Debtors.  The Plan meets the classification requirements of section 1122(a) of the

---

[4]    The Modifications are attached to the Confirmation Order as Exhibit B.

Bankruptcy Code. Article II of the Plan classifies Claims and Interests into seven separate categories. (Plan art. II.) In particular, in accordance with section 1123(a)(1) of the Bankruptcy Code, Article II of the Plan segregates into separate Classes Priority Claims (Class 1), Secured Claims (Class 2), General Unsecured Claims (Class 3), SPHC Asbestos Personal Injury Claims (Class 4a), NMBFiL Asbestos Personal Injury Claims (Class 4b), Intercompany Claims (Class 5) and Stock Interests (Class 6). (Id.) The groupings reflect the diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class.

ii.     In accordance with section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan identifies and describes each Class of Claims or Interests that is not impaired under the Plan. In particular, Article III of the Plan indicates that Classes 1-3 and 5-6 are unimpaired. (Plan art. III.)

iii.     In accordance with section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan identifies and describes any Class of Claims or Interests that is impaired under the Plan. In particular, Sections III.B.4 and III.B.5 of the Plan indicate that Class 4a (SPHC Asbestos Personal Injury Claims) and Class 4b (NMBFiL Asbestos Personal Injury Claims) are impaired. (Plan §§ III.B.4, III.B.5.)

iv.     In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Interest of a particular Class unless the holder of such a Claim or Interest agrees to less favorable treatment. (Plan art. III.)

v.     Due to their entitlement to priority status under section 507 of the Bankruptcy Code, Priority Claims have been separately classified in Class 1. (Plan art. II.)

Based on their secured status, Secured Claims have been separately classified in Class 2. (Id.) General Unsecured Claims have been separately classified in Class 3 due to the distinctive basis for such claims. (Id.)

                vi.      The two Classes of Asbestos Personal Injury Claims are comprised of (a) SPHC Asbestos Personal Injury Claims (Class 4a) and (b) NMBFiL Asbestos Personal Injury Claims (Class 4b). (Plan art. II.) The SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims have been segregated into these two Classes due to the distinctive bases for such Claims and the fact that, unlike all other Classes of Claims, SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims are impaired and will be channeled to the Asbestos Personal Injury Trust. (Plan § III.B.)

                vii.     Moreover, due to their unique nature, Class 5 Intercompany Claims have been classified separately from the Class 3 General Unsecured Claims. (Plan art. II.) Finally, Stock Interests (Class 6) are separately classified due to their distinctive nature. (Id.)

         **b.**      **Section 1123(a)(5) — Adequate Means for Implementation of the Plan.**

In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan, including Article IV of the Plan, provides adequate means for its implementation, including: (i) except as otherwise provided in the Plan and subject to the Restructuring Transactions, the continued corporate existence of the Debtors and the vesting of assets in the Reorganized Debtors under Section IV.A of the Plan; (ii) the consummation of the Restructuring Transactions in connection with Section IV.B of the Plan; (iii) the disposition and lease transactions under Section IV.C of the Plan; (iv) the adoption of the corporate constituent documents that will govern the Reorganized Debtors and the identification of the initial officers and boards of

Case 10-11780-LSS    Doc 5262    Filed 12/11/14    Page 22 of 54

directors of the Reorganized Debtors as provided in Section IV.D of the Plan; (v) the obtaining

of cash for making all payments under the Plan, as detailed in section IV.E of the Plan; (vi) the

creation of, and the transfer of certain property to, the Asbestos Personal Injury Trust and the

NMBFiL Trust Account and SPHC Trust Account and the appointment of the Asbestos Personal

Injury Trustees, as detailed in Sections IV.F, IV.G, IV.H and IV.I of the Plan; (vii) preservation

of rights of action by, and release of certain rights of action against, the Reorganized Debtors, as

described in Section IV.J of the Plan; and (viii) the assumption or rejection of Executory

Contracts and Unexpired Leases to which any Debtor is a party, as stated in Article V of the Plan.

<div style="margin-left: 2em;">

**c.   Section 1123(a)(6) — Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

</div>

Section IV.D.1 of the Plan provides that the initial Certificates of

Incorporation and By-Laws of each Reorganized Debtor will, among other things, prohibit the

issuance of nonvoting equity securities to the extent required under section 1123(a) of the

Bankruptcy Code.  (Plan § IV.D.1.)

<div style="margin-left: 2em;">

**d.   Section 1123(a)(7) — Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

</div>

The Plan ensures that the selection of the officers and directors of each

Reorganized Debtor is consistent with the interests of creditors and equity security holders and

with public policy.  (Knoop Decl. ¶ 29.)  Section IV.D.2 of the Plan provides that the initial

directors and officers of each Reorganized Debtor will consist of the directors and officers of

such Debtor immediately prior to the Effective Date.  (Plan § IV.D.2.)  Such directors and

officers were elected, appointed and serve in accordance with the terms of the certificate of

incorporation and by-laws (or comparable constituent documents) of the respective Debtor and

state law.  In light of the foregoing, the manner of selection of the initial directors and officers of

RLF1 11250202v.1

-18-

the Reorganized Debtors, as set forth in the Certificates of Incorporation and By-laws or similar

constituent documents of the applicable Reorganized Debtor and applicable state law, is

consistent with the interests of the holders of Claims and Interests and public policy.

(Plan § IV.D.2; Knoop Decl. ¶ 29.)

> **e.** **Section 1123(b)(l)-(2) — Impairment of Claims and Assumption or Rejection of Executory Contracts and Unexpired Leases.**

In accordance with section 1123(b)(1) of the Bankruptcy Code, Article III

of the Plan provides for the impairment of certain classes of Claims, while leaving other Classes

unimpaired. (Plan art. III.) The Plan thus modifies the rights of the holders of certain Claims

and leaves the rights of others unaffected. (<u>Id</u>.) In accordance with section 1123(b)(2) of the

Bankruptcy Code, Article V of the Plan provides for the assumption or rejection of certain

Executory Contracts and Unexpired Leases to which the Reorganized Debtors are parties;

provided, however, that the Debtors or Reorganized Debtors reserve the right, at any time prior

to the Effective Date, to add or delete any Executory Contract or Unexpired Lease to be assumed

or rejected to or from Exhibit V.C of the Plan. (Plan art. V.)

> **f.** **Section 1123(b)(3) — Retention, Enforcement and Settlement of Claims Held by the Debtors.**

In accordance with section 1123(b)(3) of the Bankruptcy Code,

Section IV.J of the Plan provides for the retention and enforcement by the Reorganized Debtors

of claims, demands, rights and causes of action that any Debtor or Estate may hold against any

Entity. (Plan § IV.J.)

> **g.** **Section 1123(b)(5) — Modification of the Rights of Holders of Claims.**

Article III of the Plan modifies or leaves unaffected, as the case may be,

the rights of holders of each class of Claims and Interests. (Plan art. III.)  All Claims and

Interests, other than SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal

Injury Claims, are unaffected.  The Plan modifies the rights of SPHC Asbestos Personal Injury

Claims and NMBFiL Asbestos Personal Injury Claims by channeling such Claims to the

Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust

Agreement and related Asbestos Personal Injury Trust Distribution Procedures.  (Plan §§ III.B.4,

III.B.5.)

> **h.      Section 1123(b)(6) — Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code.**

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan

includes additional appropriate provisions that are not inconsistent with the applicable provisions

of the Bankruptcy Code, including:  (i) the provisions of Article VI of the Plan governing

distributions on account of Allowed Claims; (ii) the provisions of Article VII of the Plan

establishing procedures for resolving Disputed Claims and making distributions on account of

such Disputed Claims once resolved; (iii) the provisions of Article IX of the Plan regarding the

release of Claims and injunctions against certain actions, including the Asbestos Permanent

Channeling Injunctions; and (iv) the provisions of Article X of the Plan regarding retention of

jurisdiction by the Bankruptcy Court over certain matters after the Effective Date.  (Plan art. VI,

VII, IX and X.)

> **i.      Section 1123(d) — Cure of Defaults.**

Article V of the Plan provides for the satisfaction of Cure Amount Claims

associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the

Plan in accordance with section 365(b)(1) of the Bankruptcy Code.  (Plan art. V.)  Additionally,

in accordance with Article III of the Plan, certain Claims will be Reinstated.  (Plan art. III.)  All

Cure Amount Claims and Reinstated Claims will be determined in accordance with the

underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established herein or, to the extent applicable, any separate orders of the Bankruptcy Court. (Plan §§ III.B, V.B.)

    2.    **Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code.**

The Debtors have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018. The Disclosure Statement and the procedures by which the ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order. Votes with respect to the Plan were solicited in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, including the inclusion of letters in the solicitation packages from (i) the Debtors and (ii) the Asbestos Personal Injury Committee and the Future Claimants' Representative each recommending those entitled to vote on the Plan vote to accept the Plan. The Debtors, the Reorganized Debtors, International, the Asbestos Personal Injury Committee and the Future Claimants' Representative, their respective members and each of their respective directors, officers, employees, agents and professionals, acting in such capacity, have acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.

    3.    **Section 1129(a)(3) — Proposal of the Plan in Good Faith.**

The Debtors proposed the Plan in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the formulation of the Plan. (See Knoop

Decl. ¶ 30.) Based on the evidence presented at the Confirmation Hearing, the Bankruptcy Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of reorganizing the affairs of each of the Debtors and maximizing the returns available to creditors and other parties in interest. (Knoop Decl. ¶ 30.) Consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, the Plan is designed to allow the Debtors to reorganize by resolving certain pending disputes and proceedings. (Id.) In particular, the Plan achieves a global resolution of Asbestos Personal Injury Claims. (Id.) Moreover, the Plan itself and the arms'-length negotiations among the Debtors, International, the Asbestos Personal Injury Committee and the Future Claimants' Representative leading to the Plan's formulation, as well as the overwhelming support of creditors for the Plan, provide independent evidence of the Debtors' good faith in proposing the Plan. (Id.)

### 4.    Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable.

a.    In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Reorganization Cases, including Professionals' Fee Claims, are subject to the approval of the Bankruptcy Court. (Knoop Decl. ¶ 31.) Section III.A.1 of the Plan provides for the payment of various Administrative Claims, including Professionals' Fee Claims, and makes all such payments subject to Bankruptcy Court approval and the standards of the Bankruptcy Code. (Plan § III.A.1.) Pursuant to the Fee Order, the Bankruptcy Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Reorganization Cases. All such fees and expenses remain subject to final review for reasonableness by the Bankruptcy Court.

b.    In connection with the foregoing, Article X of the Plan provides that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and determine

all applications for allowance of compensation or reimbursement of expenses authorized

pursuant to the Bankruptcy Code or the Plan.  (Plan art. X.)

**5.   Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

In the Disclosure Statement and the Plan, the Debtors have disclosed all necessary

information regarding the Debtors' and Reorganized Debtors' officers and directors.  (Knoop

Decl. ¶ 32.)  The continuance of the proposed directors and officers is consistent with the

interests of the holders of Claims and Interests and with public policy.  (Id.)

**6.   Section 1129(a)(6) — Approval of Rate Changes.**

The Debtors' current businesses do not involve the establishment of rates over

which any regulatory commission has or will have jurisdiction after Confirmation.  (Knoop

Decl. ¶ 33.)

**7.   Section 1129(a)(7) — Best Interests of Holders of Claims and Interests.**

With respect to each impaired Class of Claims for each Debtor, each holder of a

Claim in such impaired Class has accepted or is deemed to have accepted the Plan or, as

demonstrated by the liquidation analyses included as Exhibit IV to the Disclosure Statement, will

receive or retain under the Plan on account of such Claim property of an amount, as of the

Effective Date, that is not less than the value such holder would receive or retain if the Debtors

were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  (O'Connell

Decl. ¶¶ 8-16.)

**8.   Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class.**

Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes of Claims and

Interests have either accepted the Plan or are unimpaired.  (Voting Agent Decl. ¶¶ 8, 16-17.)

Specifically, Classes 4a and 4b, the only classes entitled to vote on the Plan, each

overwhelmingly voted to accept the Plan.  (Id. ¶ 16-17.)  Classes 1-3 and 5-6 are unimpaired

under the Plan and, therefore, are deemed to have accepted the Plan.  (Plan § III.B; Disclosure

Statement Order ¶ H.)  Accordingly, section 1129(a)(8) of the Bankruptcy Code has been

satisfied with respect to all Classes of Claims and Interests.

> **9.      Section 1129(a)(9) — Treatment of Claims Entitled to Priority
> Pursuant to Section 507(a) of the Bankruptcy Code.**

   a.  The Plan also meets the requirements regarding the payment of

Administrative Claims, Priority Claims and Priority Tax Claims, as set forth in

section 1129(a)(9) of the Bankruptcy Code.

   b.  Section III.A.1.a of the Plan provides that, subject to certain bar

date provisions in the Plan and unless otherwise agreed by the holder of an Administrative Claim

and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative

Claim will receive, in full satisfaction of its Administrative Claim, cash equal to the allowed

amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or

(ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on

which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of

Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of

the Administrative Claim.  (Plan § III.A.1.a.)  Pursuant to Section III.A.1.c of the Plan,

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its

business — including Administrative Trade Claims, any Intercompany Claims that are

Administrative Claims, Administrative Claims of governmental units for Taxes, including Tax

audit Claims related to Tax years or portions thereof commencing after the Petition Date, and

Administrative Claims arising from those contracts and leases of the kind described in

Section V.E of the Plan—will be satisfied by the applicable Reorganized Debtor pursuant to the

terms and conditions of the particular transaction giving rise to such Administrative Claims,

without any further action by the holders of such Administrative Claims or further approval of

the Bankruptcy Court.  (Plan § III.A.1.c.)  Section III.A.1.d of the Plan provides that, unless

otherwise agreed by the DIP Lender, on or before the effective date, (i) Allowed DIP Facility

Claims shall be paid in full in cash by the applicable Debtor, (ii) the DIP Lender shall

(A) receive cancellation without draw of all outstanding letters of credit issued under the DIP

Credit Agreement or (B) have such letters of credit extended, refinanced or replaced in the

ordinary course of business on or after the Effective Date, and (iii) the DIP Lender shall have no

further obligation to pay or otherwise fund any Professional fees or disbursements or Carve-Out

Expenses (as such term is defined in the Final Order (A) Authorizing Debtors to Obtain Post-

Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status

(B) Modifying the Automatic Stay and (C) Authorizing Debtors to Enter into Agreements with

Wachovia Capital Finance Corporation (New England) [D.I. 156]).  The Debtors shall be

authorized to take any action necessary or appropriate to cancel, extend, refinance or replace the

DIP Credit Agreement.  (Plan § III.A.1.d.)

        c.      Section III.A.2.a of the Plan provides that, unless otherwise agreed

by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each

holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax

Claim, payment in full of the allowed amount of the Priority Tax Claim plus Postpetition

Interest, if any, on the later of the Effective Date or as soon as practicable after the date when

such Claim becomes an Allowed Claim.  (Plan § III.A.2.a.)

10.     **Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class.**

As indicated in the Voting Declaration and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan.  (Voting Agent Decl. ¶ 5, 17.)  Specifically, Class 4a Claims (SPHC Asbestos Personal Injury Claims) and Class 4b Claims (NMBFiL Asbestos Personal Injury Claims), neither of which are insider Classes and are the only impaired Classes under the Plan, have voted to accept the Plan.  (Id.)

11.     **Section 1129(a)(11) — Feasibility of the Plan.**

As demonstrated by the Debtors' financial projections contained in the Disclosure Statement and the evidence in the record, Confirmation of the Plan is not likely to be followed by the liquidation of, or the need for further financial reorganization of the Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan.  (Disclosure Statement at 9, Ex. III; O'Connell Decl. ¶¶ 17-25.)  Upon the Effective Date, the Reorganized Debtors will have sufficient operating cash and liquidity, including through any contributions to or on behalf of the Reorganized Debtors by International, to meet their financial obligations under the Plan and to fund any ongoing business operations.  (O'Connell Decl. ¶¶ 24-25.)

12.     **Section 1129(a)(12) — Payment of Bankruptcy Fees.**

Section III.A.1.b of the Plan provides for the payment in full in Cash on or before the Effective Date of the fees due to the U.S. Trustee, in accordance with section 1129(a)(12) of the Bankruptcy Code.  (Plan § III.A.1.b.)  All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.  (Id.)

13.   **Section 1129(d) — Purpose of Plan.**

The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933, and there has been no request filed by any governmental unit asserting such avoidance.

D.   **THE ASBESTOS PERSONAL INJURY TRUST AND THE ASBESTOS PERMANENT CHANNELING INJUNCTIONS COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE.**

The Plan comports with the Bankruptcy Code's requirements for issuance of an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or demands against the Reorganized Debtors.

1.   **The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code.**

a.   The SPHC Asbestos Permanent Channeling Injunction and NMBFiL Asbestos Permanent Channeling Injunction are to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.   Pursuant to Section IV.I.3 of the Plan, on the Effective Date, the Asbestos Personal Injury Trust will assume all liability and responsibility, financial and otherwise, for all SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims, and the SPHC Protected Parties shall have no liability or responsibility, financial or otherwise, for any SPHC Asbestos Personal Injury Claims and the NMBFiL Protected Parties shall have no liability or responsibility, financial or otherwise, for any NMBFiL Asbestos Personal Injury Claims.  (Plan § IV.I.3.)

c.   The Asbestos Personal Injury Trust is to be funded in whole or in part by securities of the Reorganized Debtors and by the obligations of the Reorganized Debtors to make future payments.  Section IV.I.2 of the Plan provides that the Asbestos Personal Injury

Trust will be funded by securities issued by the Reorganized Debtors in the form of the SPHC

Payment Note and the NMBFiL Payment Note. (Plan § IV.I.2.) As of the Effective Date, each

Reorganized Debtor will be a going concern with the ability to make future payments to the

Asbestos Personal Injury Trust. (O'Connell Decl. ¶¶ 24-25; Crandall Decl. ¶¶ 13-14; Knoop

Decl. ¶ 14.)

        d.     The Asbestos Personal Injury Trust, by the exercise of rights

granted under the Plan would be entitled to own, if specified contingencies occur, a majority of

the voting shares of each of the Reorganized Debtors. As set forth in Sections I.A.72 and

I.A.108 of the Plan and Exhibits I.A.72 and I.A.108 of the Plan, the Asbestos Personal Injury

Trust shall have the right to own 100 percent of the equity of NMBFiL and 100 percent of the

equity of each of the SPHC Parties, under the NMBFiL Payment Note and SPHC Payment Note,

respectively, exercisable upon the occurrence of a NMBFiL Payment Default or SPHC Payment

Event of Default, as applicable, and certain other specified contingencies. (Plan §§ I.A.71,

I.A.72, I.A.73, I.A.106, I.A.107, I.A.108, and I.A.109; Plan Ex. I.A.72 and I.A.108.)

        e.     The Asbestos Personal Injury Trust shall use its assets and income

to pay SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims, as

applicable, including Demands. In particular, Section IV.F of the Plan provides that the purpose

of the Asbestos Personal Injury Trust is to, among other things: (i) resolve all asserted Asbestos

Personal Injury Claims in accordance with the Plan, Asbestos Personal Injury Trust Agreement,

the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order;

(ii) preserve, hold, manage, maximize and liquidate the assets of the Asbestos Personal Injury

Trust for use in resolving Asbestos Personal Injury Claims; and (iii) qualify at all times as one or

more qualified settlement funds. (Plan § IV.F.) Sections III.B.4 and III.B.5 of the Plan also

provide, respectively, that all SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims shall be determined and paid pursuant to the terms of the Asbestos Personal Injury Trust Agreement and the applicable Asbestos Personal Injury Trust Distribution Procedures. (Plan §§ III B.4 and III.B.5.)

       f.    The Asbestos Personal Injury Trust establishes two separate series pursuant to 12 Del. C. § 3806, being the "SPHC Series" and the "NMBFiL Series" (each, a "Series"). (Kraus Decl. at 9.) Only assets associated with the SPHC Series shall be available for application against SPHC Asbestos Personal Injury Claims, SPHC Asbestos Personal Injury Indirect Claims, and SPHC Protected Parties Indemnification Claims. (Id.) Only assets associated with the NMBFiL Series shall be available for application against NMBFiL Asbestos Personal Injury Claims, NMBFiL Asbestos Personal Injury Indirect Claims, and NMBFiL Protected Parties Indemnification Claims. (Id.) For avoidance of doubt, the debts, liabilities, obligations, and expenses incurred by, contracted for, or otherwise existing with respect to either Series shall be enforceable against the assets of such individual Series only, and not against the assets of the Asbestos Personal Injury Trust generally or any other Series, and none of the debts, liabilities, obligations, and expenses incurred by, contracted for, or otherwise existing with respect to the Asbestos Personal Injury Trust generally or any other Series shall be enforceable against the assets of such Series.

       g.    The Asbestos Personal Injury Trust, as administered through the respective Asbestos Personal Injury Trust Distribution Procedures, is fair and equitable to the holders of Asbestos Personal Injury Claims. (See Kraus Decl. at 10-11.)

2.    **The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.**

a.    As set forth in the Disclosure Statement and reflected in the record of the Confirmation Hearing, the vast majority of asbestos personal injury lawsuits at issue in these Reorganization Cases are lawsuits against Bondex and/or SPHC. (Disclosure Statement at 22-23; see Knoop Decl. ¶ 17; Crandall Decl. ¶¶17-19.) Since 2000, Bondex and/or SPHC have resolved approximately 27,000 asbestos-related personal injury claims. (Knoop Decl. ¶ 17; Disclosure Statement at 23.) As of the Petition Date, Bondex and/or SPHC were defendants in approximately 15,000 pending asbestos-related lawsuits, approximately 2,700 of which were pending mesothelioma-related bodily injury lawsuits. (Knoop Decl. ¶ 17; Disclosure Statement at 23.) Republic has been named in more than 5,000 asbestos-related claims since 1990. (Crandall Decl. ¶ 17; Disclosure Statement at 23.) NMBFiL has been named in more than 1,100 asbestos personal injury lawsuits. (Crandall Decl. ¶ 19; Disclosure Statement at 23.) Based on the long latency period of asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved on the Petition Date, the Debtors will likely be subject to substantial future Demands for payment arising from the same conduct or events that gave rise to the Asbestos Personal Injury Claims. (Knoop Decl. ¶ 34; Crandall Decl. ¶ 26.)

b.    Moreover, due to the long latency period for asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved on the Petition Date, the Debtors are unable to determine the actual amounts, numbers and timing of future Demands against the Debtors in respect of alleged asbestos-related personal injuries. (Knoop Decl. ¶ 34; Crandall Decl. ¶ 26.)

c.      If the holders of Demands are able to pursue such Demands outside of the Asbestos Personal Injury Trust Distribution Procedures, the holders of such Demands would have to liquidate their claims through settlements or the tort system on an individual basis, which, because of the vagaries inherent in litigation, could produce inconsistent awards. (Knoop Decl. ¶ 35; Crandall Decl. ¶ 27.) Moreover, with ever-diminishing funds available to pay Demands, there is a risk that such Demands would initially all be paid in full as they are settled or liquidated in the tort system but that, at some point in the future, Demands would go unsatisfied. (Knoop Decl. ¶ 35; Crandall Decl. ¶ 27.) Accordingly, the pursuit of Demands against the Debtors outside the Asbestos Personal Injury Trust Distribution Procedures contemplated by the Plan would likely threaten the Plan's purpose to deal equitably with SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims, including Demands. (Knoop Decl. ¶ 35; Crandall Decl. ¶ 27.)

d.      Further, as part of the confirmation process in these cases, the Debtors included the terms of the SPHC Asbestos Permanent Channeling Injunction and the NMBFiL Asbestos Permanent Channeling Injunction, including provisions therein barring actions against any SPHC Protected Party and any NMBFiL Protected Party, as applicable, in the Plan and Disclosure Statement. (Plan § IX.B.2; Disclosure Statement at 47-48.) The Debtors also designated two separate Classes, Classes 4a and 4b under the Plan, for all SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims, respectively. (Plan art. II.) Of the holders of SPHC Asbestos Personal Injury Claims in Class 4a that voted, 99.98 percent in number and 99.99 percent in amount voted in favor of the Plan. (Voting Agent Decl. ¶ 17.) Of the holders of NMBFiL Asbestos Personal Injury Claims in Class 4b that voted,

99.99 percent in number and 99.99 percent in amount voted in favor of the Plan.  (Voting Agent Decl. ¶ 17.)

        e.      Also, as set forth in Sections III.B.4 and III.B.5 of the Plan, Exhibit I.A.11 of the Plan (the Asbestos Personal Injury Trust Agreement) and Exhibits I.A.66 (NMBFiL Asbestos Personal Injury Trust Distribution Procedures) and I.A.102 (SPHC Asbestos Personal Injury Trust Distribution Procedures) of the Plan, the Asbestos Personal Injury Trust will pay SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims in accordance with the SPHC Asbestos Personal Injury Trust Distribution Procedures and the NMBFiL Asbestos Personal Injury Trust Distribution Procedures, as applicable, which contain mechanisms that provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, present SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims and future Demands that involve similar claims in substantially the same manner.  (Plan §§ III.B.4 and III.B.5; Plan Exs. I.A.66 and I.A.102; Green Decl. ¶ 38.)

        **3.**      **The Extension of the NMBFiL Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate.**

        a.      Sections I.A.64 , I.A.75 and IX.B.2 of the Plan contemplate that the NMBFiL Asbestos Permanent Channeling Injunction will be extended to protect the following:

        i.      NMBFiL Protected Affiliates (Plan § I.A.75.c.);

        ii.      International (Plan § I.A.75.d.);

        iii.      current and former directors, officers, and employees of NMBFiL, Reorganized NMBFiL and the NMBFiL Protected Affiliates, including without limitation International, solely in their capacity as such (Plan § I.A.75.e.);

iv.    as of July 26, 2014, current and former shareholders of NMBFiL, Reorganized NMBFiL and the NMBFiL Protected Affiliates, including without limitation International, solely in their capacity as such (Plan § I.A.75.f.);

v.    current and former in-house and outside legal, accounting, financial and tax professionals and advisors of NMBFiL, Reorganized NMBFiL and the NMBFiL Protected Affiliates, including without limitation International, solely in their capacity as such (Plan § I.A.75.g.);

vi.    3M Company, and its directors, officers, employees, affiliates, stockholders, agents, attorneys, representatives, successors, and assigns solely to the extent of liability and other costs in any way related to products manufactured or sold by NMBFiL prior to November 9, 2007 (Plan § I.A.75.h.);

vii.    Insurers of NMBFiL, solely in their capacity as such, a non-exclusive schedule of which is attached as Exhibit I.A.75.i of the Plan (Plan § I.A.75.i.);

viii.    Entities that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of NMBFiL or Reorganized NMBFiL, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor (Plan § I.A.75.j.); and

ix.    Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to NMBFiL or Reorganized NMBFiL, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of NMBFiL or

Reorganized NMBFiL, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender (Plan § I.A.75.k.).

b.      Each NMBFiL Protected Party is identifiable from the terms of the NMBFiL Asbestos Permanent Channeling Injunction by name or as part of an identifiable group. Each NMBFiL Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on NMBFiL to the extent that such alleged liability arises by reason of one or more of the following:

i.      such Entity's ownership of a financial interest in NMBFiL or Reorganized NMBFiL, or any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL;

ii.      such Entity's involvement in the management of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL;

iii.      such Entity's service as an officer, director or employee of NMBFiL or Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL, or any Entity that owns or at any time has owned a financial interest in NMBFiL or Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL;

iv.      such Entity's provision of insurance to NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL, or any

Entity that owns or at any time has owned a financial interest in NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL; and

v. such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, any predecessor in interest of NMBFiL or Reorganized NMBFiL, or any Entity that owns or at any time has owned a financial interest in NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling financial interest in any Entity as part of such transaction.

(Plan § I.A.75.l.)

c. The extension of the NMBFiL Asbestos Permanent Channeling Injunction to third parties is consistent with the Bankruptcy Code. Consistent with section 524(g)(4)(A)(ii) of the Bankruptcy Code, the NMBFiL Asbestos Permanent Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on, NMBFiL.

**4. The Extension of the SPHC Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate.**

a. Sections I.A.99 , I.A.111 and IX.B.2 of the Plan contemplate that the SPHC Asbestos Permanent Channeling Injunction will be extended to protect the following:

i. SPHC Protected Affiliates (Plan § I.A.111.c.);

ii.    International (Plan § I.A.111.d.);

iii.    current and former directors, officers, and employees of the SPHC Parties, the Reorganized SPHC Parties and the SPHC Protected Affiliates, including without limitation International, solely in their capacity as such (Plan § I.A.111.e.);

iv.    as of July 26, 2014, current and former shareholders of the SPHC Parties, the Reorganized SPHC Parties and the SPHC Protected Affiliates, including without limitation International, solely in their capacity as such (Plan § I.A.111.f.);

v.    current and former in-house and outside legal, accounting, financial and tax professionals and advisors of the SPHC Parties, the Reorganized SPHC Parties and the SPHC Protected Affiliates, including without limitation International, solely in their capacity as such (Plan § I.A.111.g.);

vi.    Entities that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of any SPHC Parties or Reorganized SPHC Parties, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor (Plan § I.A.111.h.);

vii.    Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to any SPHC Parties or any Reorganized SPHC Parties, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of any SPHC Parties or any Reorganized SPHC Parties, or the Asbestos Personal Injury Trust,

but only to the extent that liability is asserted to exist by reason of it becoming such a lender (Plan § I.A.111.i.).

b.    Each SPHC Protected Party is identifiable from the terms of the SPHC Asbestos Permanent Channeling Injunction by name or as part of an identifiable group. Each SPHC Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on the SPHC Parties to the extent that such alleged liability arises by reason of one or more of the following:

i.    such Entity's ownership of a financial interest in any SPHC Parties or Reorganized SPHC Parties, or any past or present affiliate of any them, or any predecessor in interest of any of them;

ii.    such Entity's involvement in the management of any SPHC Parties or Reorganized SPHC Parties, or any predecessor in interest of any of them;

iii.    such Entity's service as an officer, director or employee of any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them, or any Entity that owns or at any time has owned a financial interest in any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them;

iv.    such Entity's provision of insurance to any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them, or any Entity that owns or at any time has owned a financial interest in any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them; and

v.    such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, any predecessor in interest of any of them, or any Entity that owns or at any time has owned a financial interest in any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling financial interest in any Entity as part of such transaction.

(Plan § I.A.111.j.)

c.    The extension of the SPHC Asbestos Permanent Channeling Injunction to third parties is consistent with the Bankruptcy Code. Consistent with section 524(g)(4)(A)(ii) of the Bankruptcy Code, the SPHC Asbestos Permanent Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on, the SPHC Parties.

5.    **The Rights of Persons That Might Subsequently Assert an Asbestos Personal Injury Claim That Is a Demand Addressed by the Asbestos Permanent Channeling Injunctions and Transferred to the Asbestos Personal Injury Trust Were Represented by the Future Claimants' Representative.**

In accordance with section 524(g)(4)(B)(i) of the Bankruptcy Code, the Future Claimants' Representative was appointed as part of proceedings leading to issuance of the Asbestos Permanent Channeling Injunctions for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the

Asbestos Permanent Channeling Injunctions and transferred to the Asbestos Personal Injury Trust. (Green Decl. ¶¶ 13-14.)

6.  **Entry of the Asbestos Permanent Channeling Injunctions Is Fair and Equitable with Respect to Persons That Might Subsequently Assert an Asbestos Personal Injury Claim That Is a Demand Addressed by the Asbestos Permanent Channeling Injunctions and Transferred to the Asbestos Personal Injury Trust.**

One or more of the SPHC Parties and/or International, on behalf of and as a contribution to such SPHC Parties, are transferring $447.5 million in cash, to be deposited into the SPHC Trust Account, and the SPHC Payment Note, issued by the SPHC Parties and International as co-obligors, to the Asbestos Personal Injury Trust. (Plan § IV.I.2.) NMBFiL and/or International, on behalf of and as a contribution to NMBFiL, are contributing $2.45 million in cash, to be deposited into the NMBFiL Trust Account, and the NMBFiL Payment Note, issued by NMBFiL and International as co-obligors, to the Asbestos Personal Injury Trust. (Id.) In light of the substantial contributions to be made to the Asbestos Personal Injury Trust by or on behalf of the Protected Parties, entry of the Asbestos Permanent Channeling Injunctions, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert an Asbestos Personal Injury Claim that is a Demand addressed by the Asbestos Permanent Channeling Injunctions and transferred to the Asbestos Personal Injury Trust. (Green Decl. ¶¶ 41-43.)

E.  **COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES.**

Based upon the representations and arguments of counsel for the Debtors and all other testimony either actually given or proffered at the Confirmation Hearing and the full record of these Reorganization Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, the Bankruptcy Court finds that, pursuant to section 1123(b)

of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions in the Plan, including the settlement of certain estate claims set forth in Section IV.J.2 and the releases set forth in Section IV.J.3, constitute a good-faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Claim, Asbestos Personal Injury Claim or Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim, Asbestos Personal Injury Claim or Interest.

### F.    SATISFACTION OF CONDITIONS TO CONFIRMATION.

1.    Section VIII.A of the Plan contains conditions precedent to Confirmation that must be satisfied or duly waived pursuant to Section VIII.C of the Plan.  The conditions precedent set forth in Sections VIII.A.1 through VIII.A.5 of the Plan have been satisfied.

2.    Concerning the establishment of the Asbestos Personal Injury Trust and issuance of the SPHC Asbestos Permanent Channeling Injunction and NMBFiL Asbestos Permanent Channeling Injunction, the Bankruptcy Court specifically finds:

a.    The SPHC Asbestos Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.    The NMBFiL Asbestos Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

c.    The Asbestos Personal Injury Trust, as of the Effective Date, shall assume the liabilities of each of the SPHC Protected Parties with respect to all SPHC Asbestos Personal Injury Claims, and, upon such assumption, no SPHC Protected Party shall have any liability for any SPHC Asbestos Personal Injury Claim.

d.    The Asbestos Personal Injury Trust, as of the Effective Date, shall assume the liabilities of each of the NMBFiL Protected Parties with respect to all NMBFiL

Asbestos Personal Injury Claims, and, upon such assumption, no NMBFiL Protected Party shall have any liability for any NMBFiL Asbestos Personal Injury Claim.

     e.    As of the Petition Date, each Debtor had been named as a defendant in a personal injury or wrongful death action seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

     f.    The Asbestos Personal Injury Trust will be funded in whole or in part by securities of the Reorganized Debtors and by the obligation of such Reorganized Debtors or Debtors to make future payments, which payments may be funded by contributions to or on behalf of the Reorganized Debtors by International.

     g.    The Asbestos Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of each of the Reorganized Debtors.

     h.    The Asbestos Personal Injury Trust shall use its assets or income to pay SPHC Asbestos Personal Injury Claims and NMBFiL Asbestos Personal Injury Claims, as applicable, in each case including Demands.

     i.    Each of the Debtors is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the SPHC Asbestos Permanent Channeling Injunction and the NMBFiL Asbestos Permanent Channeling Injunction.

     j.    The actual amounts, numbers and timing of such future Demands cannot be determined.

     k.    Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

l.      The terms of the SPHC Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan.

m.      The terms of the NMBFiL Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan.

n.      For each Debtor, the Plan establishes, in Class 4a (SPHC Asbestos Personal Injury Claims) and Class 4b (NMBFiL Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal Injury Trust.

o.      Class 4a (SPHC Asbestos Personal Injury Claims) has voted, by at least 75 percent of those voting, in favor of the Plan (none of which is attributed to an insider of the Debtors).

p.      Class 4b (NMBFiL Asbestos Personal Injury Claims) has voted, by at least 75 percent of those voting, in favor of the Plan (none of which is attributed to an insider of the Debtors).

q.      Pursuant to court orders or otherwise, the Asbestos Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims that provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, Asbestos Personal Injury Claims, including Demands, in substantially the same manner.

r.      Each SPHC Protected Party is identifiable from the terms of the SPHC Asbestos Permanent Channeling Injunction by name or as part of an identifiable group.

Each SPHC Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on the SPHC Parties to the extent that such alleged liability arises by reason of one or more of the following:

        i.        such Entity's ownership of a financial interest in any SPHC Parties or Reorganized SPHC Parties, or any past or present affiliate of any them, or any predecessor in interest of any of them;

        ii.        such Entity's involvement in the management of any SPHC Parties or Reorganized SPHC Parties, or any predecessor in interest of any of them;

        iii.        such Entity's service as an officer, director or employee of any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them, or any Entity that owns or at any time has owned a financial interest in any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them;

        iv.        such Entity's provision of insurance to any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them, or any Entity that owns or at any time has owned a financial interest in any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them; and

        v.        such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any SPHC Parties or Reorganized SPHC Parties, any past or present affiliate of any of them, any predecessor in interest of any of them, or any Entity that owns or at any time has owned a financial interest in any SPHC Parties or Reorganized

SPHC Parties, any past or present affiliate of any of them, or any predecessor in interest of any of them, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling financial interest in any Entity as part of such transaction.

s.       Each NMBFiL Protected Party is identifiable from the terms of the NMBFiL Asbestos Permanent Channeling Injunction by name or as part of an identifiable group. Each NMBFiL Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on NMBFiL to the extent that such alleged liability arises by reason of one or more of the following:

i.       such Entity's ownership of a financial interest in NMBFiL or Reorganized NMBFiL, or any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL;

ii.       such Entity's involvement in the management of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL;

iii.       such Entity's service as an officer, director or employee of NMBFiL or Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL, or any Entity that owns or at any time has owned a financial interest in NMBFiL or Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL;

iv.     such Entity's provision of insurance to NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL, or any Entity that owns or at any time has owned a financial interest in NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL; and

v.     such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, any predecessor in interest of NMBFiL or Reorganized NMBFiL, or any Entity that owns or at any time has owned a financial interest in NMBFiL, Reorganized NMBFiL, any past or present affiliate of NMBFiL or Reorganized NMBFiL, or any predecessor in interest of NMBFiL or Reorganized NMBFiL, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling financial interest in any Entity as part of such transaction.

t.     The Future Claimants' Representative was appointed as part of proceedings leading to issuance of the Asbestos Permanent Channeling Injunctions for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the Asbestos Permanent Channeling Injunctions and transferred to the Asbestos Personal Injury Trust.

u.      Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Asbestos Permanent Channeling Injunctions is fair and equitable with respect to individuals that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of any such Protected Party.

v.      The Plan and the Asbestos Personal Injury Trust Documents comply with section 524(g) of the Bankruptcy Code in all respects.

w.      The Plan and Exhibits are a fair, equitable and reasonable resolution of the liability of the Debtors for the Asbestos Personal Injury Claims.

x.      The Future Claimants' Representative has adequately and completely fulfilled his duties, responsibilities and obligations as the representative for the individuals referred to in finding Section I.D.5 above in accordance with section 524(g) of the Bankruptcy Code.

y.      Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to (i) all known creditors and holders of Interests, (ii) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Asbestos Personal Injury Committee and the Future Claimants' Representative), (iii) all parties to Unexpired Leases and Executory Contracts with the Debtors, (iv) all taxing authorities listed on the Debtors' Schedules or in the Debtors' Claims database, in each case, (v) the Department of the Treasury by service upon the District Director of the IRS, (vi) state attorney generals and state departments of revenue for states in which any of the Debtors have conducted business, and (vii) the Securities and Exchange Commission, (A) in accordance with the solicitation procedures governing such service and (B) in substantial

compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b). Such transmittal and service were adequate and sufficient to bind, among other parties, any holder of an Asbestos Personal Injury Claim, and no other or further notice is or shall be required.

## II. CONCLUSIONS OF LAW.

### A. JURISDICTION AND VENUE.

The Bankruptcy Court and the District Court have jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C.§ 157(b)(2), and the Bankruptcy Court has jurisdiction to enter a final order with respect thereto, except to the extent of the requirements of section 524(g) of the Bankruptcy Code for issuance or affirmance of the Confirmation Order by the District Court. The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue of the Reorganization Cases in the United States Court for the District of Delaware was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.

### B. MODIFICATIONS TO THE PLAN.

The Modifications (1) do not adversely change, in any material respect, the treatment under the Plan of any Claims or Interests and (2) comply in all respects with Bankruptcy Rule 3019. Pursuant to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Plan under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against or Interests in the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the Plan as Filed with the Bankruptcy Court. Disclosure of the Modifications on the record at the Confirmation Hearing constitutes due and sufficient notice thereof under the circumstances of the Reorganization Cases. Accordingly, the Plan (as modified) is properly before the

Bankruptcy Court and the District Court and all votes cast with respect to the Plan prior to the Modifications shall be binding and shall be deemed to be cast with respect to the Plan as modified.

C.   **EXEMPTIONS FROM TAXATION.**

Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp Tax or similar Tax: (i) the creation of any Encumbrances; (ii) the making or assignment of any lease or sublease; (iii) the execution and implementation of the Asbestos Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust and any transfers to or by the Asbestos Personal Injury Trust; (iv) any Restructuring Transaction; or (v) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

D.   **COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.**

As set forth in Section I.C above, which is incorporated fully herein, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

E.   **COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE.**

As set forth in Section I.A.6 and I.D above, which are incorporated fully herein, the Plan complies in all respects with the applicable requirements of section 524(g) of the Bankruptcy Code.

## F.     PROPRIETY OF THE TERM SHEETS

In light of the extensive litigation related to the Asbestos Personal Injury claims and the consideration to be provided by the Reorganized Debtors and/or by International to or on behalf of the Reorganized Debtors to the Asbestos Personal Injury Trust under the Plan and based on the evidentiary record presented at the Confirmation Hearing, the Term Sheets, as incorporated in the Plan, are fair, reasonable and adequate, in accordance with applicable United States Supreme Court and Third Circuit law.  See Protective Comm. for Indep. Stockholder of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); Knoop Decl. ¶ 25-26; Crandall Decl. ¶¶ 24-25; Green Decl. ¶ 20; Kraus Decl. at 5-7, 11.

## G.     TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS PERSONAL INJURY TRUST.

Section IV.I.1 of the Plan provides that the Reorganized Debtors will transfer and assign, or cause to be transferred and assigned, to the Asbestos Personal Injury Trust copies of those books and records agreed upon by the parties that pertain directly to the Asbestos Personal Injury Claims that have been asserted against any Debtor.  The transfer of these materials is essential to implementation of the Asbestos Personal Injury Trust and the preservation of its assets.  (Knoop Decl. ¶ 36.)  The transfer of books and records from the Reorganized Debtors to the Asbestos Personal Injury Trust shall not waive or destroy any applicable privileges pertaining to such books and records, and each of the Reorganized Debtors and the Asbestos Personal Injury Trust shall retain the right to assert any applicable privilege with respect to such books and records.

**H.    APPROVAL OF THE SETTLEMENTS AND RELEASES PROVIDED UNDER THE PLAN.**

The settlement of certain estate claims set forth in Section IV.J.2 of the Plan and the releases set forth in Section IV.J.3 of the Plan, including the releases of nondebtor parties pursuant to the general releases in Section IV.J.3.c, are (i) integral to the terms, conditions and settlements contained in the Plan, (ii) appropriate in connection with the Reorganization of the Debtors and (iii) supported by reasonable consideration.  In light of all of the circumstances, settlement of certain estate claims in Section IV.J.2 of the Plan and the releases in Section IV.J.3 of the Plan are fair.

Dated: December _10_, 2014
       Wilmington, Delaware

_____
THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY COURT JUDGE